United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| JANE ROE, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>SFBSC MANAGEMENT, LLC,<br><br>    Defendant. | Case No. 14-cv-03616-LB<br><br>**ORDER DENYING ARBITRATION**<br>[ECF Nos. 25, 36] |

## INTRODUCTION

This is a labor dispute under federal and California law. The plaintiffs are or were exotic dancers who are suing their former employer. The court previously granted their motion to proceed anonymously. (ECF Nos. 17, 32.)[1] Defendant SFBSC Management, LLC ("BSC"), moves under the plaintiffs' employment contracts to compel Jane Roe #1 and Jane Roe #2 to arbitrate their claims. (ECF No. 25.) The court held a hearing on this motion. (*See* ECF No. 48.) The plaintiffs move the court to judicially notice certain material in connection with the arbitration analysis. (ECF No. 36.) The court grants the plaintiffs' request for judicial notice. The court holds that several parts of the arbitration agreement are unconscionable and declines to sever these from

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the tops of the documents.

the rest of the contract. The court therefore denies BSC's motion to compel arbitration.[2]

**STATEMENT**

**I. THE EMPLOYMENT CONTRACTS**

The plaintiffs allege that BSC "operated, controlled, and . . . dictated employment policies" at several California nightclubs where the plaintiffs formerly worked. (Am. Compl. – ECF No. 11 at 1-2, ¶1.) BSC responds that it owned none of the clubs, but rather "provided consulting and administrative services" to the clubs; this included "marketing and advertising, human resources support, payroll coordination, and contract review and administration." (Marlin Decl. – ECF No. 25-4 at 2, ¶ 3.) When the plaintiffs worked at the clubs, they signed "Performer Contracts" that declared them independent contractors, rather than employees, and that generally set the rules under which they would work.

These contracts went through different iterations. All contained arbitration agreements. The short version of the arbitration clause, which appeared in some of the plaintiffs' contracts, read as follows:

> All disputes between the parties, whether statutory, contractual or tort, shall be decided by binding arbitration, shall be pursuant to the Federal Arbitration Act, and shall be before a neutral arbitrator agreed upon by the parties. Either party may demand an expert in the adult industry. The arbitrator shall be permitted to award any relief available in a Court. Owner [the given club] shall pay any cost required by law. Any award may be entered as a judgment in any court having jurisdiction. An arbitrator may not consolidate more than one person's claims, and may not preside over any form of representative or class proceeding.

(*E.g.,* ECF No. 25-6 at 6.) A longer version added cost-shifting and cost-sharing terms (emphasized here):

> All disputes between the parties, whether statutory, contractual or tort, shall be decided by binding arbitration, shall be pursuant to the Federal Arbitration Act, and shall be before a neutral arbitrator agreed upon by the parties. Either party may demand an expert in the adult industry. The arbitrator shall be permitted to award any relief available in a Court, ***including fees and costs for enforcing***

---

[2] The parties have made several sealing motions in connection with the arbitration issue. (ECF Nos. 28, 35, 43.) The court has separately granted the parties' various motions. (ECF No. 46.)

> *this term. The costs of arbitration shall be borne equally by performer and owner unless the arbitrator concludes that a different allocation is required by law.* Any award may be entered as a judgment in any court having jurisdiction. An arbitrator may not consolidate more than one person's claims, and may not preside over any form of representative or class proceeding. NOTE: some agency claims may not be subject to arbitration.

(*E.g.,* ECF No. 25-6 at 4) (emphasis added). All the contracts contained this additional clause:

> Waiver of Class Action. Performer agrees that any claim she may make against Owner shall be in her individual capacity, and not as a class or representative action; she agrees not to consolidate any claim she may have against Owner with the claims of others. This clause shall survive termination of the contract, but is severable if the law is deemed to prohibit such waiver.

(*E.g., id.*) The arbitration provisions, and the class-action waiver, in all the contracts (that the court has seen) were printed wholly in boldface. (*E.g.,* ECF No. 25-5 at 4.) Some versions of the contracts added lines beneath both the arbitration clause, and the class-action waiver, that provided a space for the performer to "Accept" or "Reject" the respective terms by writing her initials. (*E.g.*, ECF No. 35-1 at 7.)

After briefing on its motion closed, BSC found and filed two "extensions" to the plaintiffs' contracts. (ECF No. 43.) One of these extensions is signed by Jane Roe #1; it is dated January 26, 2014, and purports to extend Roe #1's contract with the Gold Club that was set to expire on January 31, 2014. (ECF No. 43-2 at 2.) The other extension is signed by Jane Roe #2; it, too, is for the Gold Club, is dated January 26, 2014, and purports to extend her contract that was set to expire on January 31, 2014. (ECF No. 43-2 at 3.) Both documents extend the relevant original contracts by 90 days. They thus appear to be stopgap agreements covering periods after one full contract expired but before the parties signed a new full contract for the next year. More important for present purposes, both extensions refer to an "Addendum A" to the respective original contracts. (*Id.* at 2, 3.) No original contract that has appeared in this case refers to, or includes, an Addendum A. (*See* ECF No. 25-5 at 4, 7, 9; ECF No. 25-6 at 4, 6; ECF No. 25-7 at 2, 4, 6.)

The defendant later indicated that the Addendum A issue may in fact be a non-issue. On February 9, 2015, BSC filed the Third Supplemental Declaration of Gary Marlin. (ECF No. 49.) Mr. Marlin was BSC's president from 2004 to June 2013. (ECF No. 25-4 at 2, ¶ 1.) His new declaration makes two assertions concerning Addendum A. First, Mr. Marlin states that, by his

"understanding," the BSC-run clubs "stopped using addenda to the Performer Contracts" after the 2011-2012 contract year. (ECF No. 49 at 2, ¶¶ 3-4.) After that year, the information that Addendum A had contained was moved into the main body of the contracts. (*Id.*, ¶ 4.) The extensions to Jane Roe #1's and Jane Roe #2's Gold Club contracts were both signed in January 2014, and purport to continue into 2014 contracts that had covered (roughly speaking) 2013. (ECF No. 43-2 at 2-3.) Mr. Marlin thus believes that the extensions' reference to Addendum A is "erroneous." (ECF No. 49 at 2, ¶¶ 4-5.)

The second thing that Mr. Marlin's latest declaration does is to proffer a document labeled "Addendum A." (*Id.* at 2 (¶ 6), 5 (addendum).) The top of the document carries the name and address of the Gold Club. (*Id.* at 5.) "To the best of [Mr. Marlin's] knowledge," this is the "only" addendum that BSC's client clubs used in conjunction with Performer Contracts. (*Id.* at 2, ¶ 6.) The document in question is unsigned and refers to no particular performer. (*Id.* at 5.) It does not mention arbitration.

## II. THE PLAINTIFFS' SPECIFIC CONTRACTS

Jane Roe #1 entered into three Performer Contracts with BSC-managed nightclubs. She entered into one with the Gold Club dated March 6, 2013 (ECF No. 25-5 at 9); another with the Gold Club dated April 9, 2014 (ECF 25-5 at 7); and one with the Condor club dated June 21, 2014 (ECF No. 25-5 at 4). She also signed the extension at ECF No. 43-2 at 2.

Jane Roe #2 entered into five Performer Contracts with BSC-run nightclubs. She entered into three with the Gold Club, respectively dated: February 11, 2013 (ECF No. 25-7 at 2); November 5, 2013 (ECF No. 25-6 at 6); and April 11, 2014 (ECF No. 25-6 at 4). She also entered a contract with the Gold Club dated July 8, 2012 (ECF No. 25-7 at 4), and one with the Centerfolds club dated July 14, 2012 (ECF No. 25-7 at 6). In these last two contracts Jane Roe #2 rejected both the arbitration clause and the class-action waiver. She also signed the extension at ECF No. 43-2 at 3.

## III. SURROUNDING CIRCUMSTANCES

According to the plaintiffs, management at the relevant clubs told them that all performers had to sign the contracts — and had to agree to the arbitration clause — in order to work. (ECF No. 33 at 12.) They further allege that management presented them with the contracts when they were

ORDER – 14-3616 LB 4

"mostly naked." (*Id.* at 13-14.) They were "rushed" to sign the agreements, or at least felt so; were told they could not take the contracts home to review; and believed that they could not review the contracts before signing them. (*Id.*) The plaintiffs further claim that management sometimes presented the contracts for signing when performers were intoxicated. (*Id.* at 14.) They do not allege, however, that they themselves were ever intoxicated when presented with a contract. Last in this area, the plaintiffs contend that the "accept or reject" choice on some contracts was effectively a sham. If a performer checked the "Reject" box, they claim, the club would purposely "lose" the agreement, and later present them with a new one, with a direction to fill it out "correctly" by accepting the arbitration and class-waiver terms. (ECF No. 33 at 12.) Or, say the plaintiffs, management would find a reason not to hire the performer, or to fire her if she had already started working. (*Id.*)

BSC denies all this. (ECF No. 38 at 14-15; Marlin Decl. – ECF No. 38-2 at 3-5, ¶¶ 8, 12-13; Calcagni Decl. – ECF No. 38-3 at 2- 4, ¶¶ 6-11; Bordeau Decl. – ECF No. 38-4 at 3-4, ¶¶ 10, 13-17.) It denies that employment was conditioned on performers' accepting the arbitration agreement. (Marlin Supp. Decl. – ECF No. 38-2 at 3-5, ¶ 8, 12-13; Calcagni Decl. – ECF No. 38-3 at 2-3, ¶¶ 6-7.) It rejects entirely the plaintiffs' depiction of the circumstances under which they were asked to sign the contracts; it denies that performers are "rushed," approached while intoxicated, purposely approached while "mostly naked," and are prevented from reviewing the agreements before signing them.

## JUDICIAL NOTICE

Before analyzing the arbitration issue, the court first addresses the plaintiffs' related request for judicial notice. (ECF No. 36.) The plaintiffs ask the court to judicially notice the following eight items:

**A.** Letter from defendant's lawyer to plaintiffs' lawyer (dated 12/9/14) demanding arbitration of Jane Roe No. 1's claims in this case, "relating to her performances at Gold Club SF, LLC."

**B.** Letter from defendant's lawyer to plaintiffs' lawyer (dated 12/9/14) demanding arbitration of Jane Roe No. 1's claims in this case, "relating to her performances at the Condor

1               Gentleman's Club."
2       **C.** Letter from defendant's lawyer to plaintiffs' lawyer (dated 12/9/14) demanding arbitration
3           of Jane Roe No. 2's claims in this case, "relating to her performances at Gold Club SF,
4           LLC."
5       **D.** Second Amended Counterclaim, filed in *Jane Does Nos. 1-4 v. Cin-Lan, Inc.,* No. 08-cv-
6           12719 (E.D. Mich.).
7       **E.** The court's docket in *Jane Does Nos. 1-4 v. Cin-Lan, Inc.,* No. 08-cv-12719 (E.D. Mich.).
8       **F.** "Release and Settlement Agreement" filed in *Jane Does Nos. 1-4 v. Cin-Lan, Inc.,* No. 08-
9           cv-12719 (E.D. Mich.).
10      **G.** Letter from defendant's lawyer to the California Department of Labor Standards
11          Enforcement (dated 9/2/11) in *Corbin v. Gold Club SF, LLC*, No. 11-39859 CT.
12      **H.** *Jackson v. S.A.W. Entertainment, Ltd.*, 629 F. Supp. 2d 1018 (N.D. Cal. 2008).
13  (ECF No. 36 at 1-2.) BSC has not opposed this motion.

The plaintiffs have removed personally identifying information from the exhibits to their judicial-notice request. To the extent that it is necessary, the court holds that this material is properly sealed in the judicial-notice request. (*See* ECF No. 32 (order granting anonymity).)

Judicial notice is governed by Rule 201 of the Federal Rules of Evidence. That rule, in relevant part, allows courts to judicially notice facts that are "not subject to reasonable dispute" because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). If material meets this description, "the court must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2).

It is not clear that the three letters constituting Exhibits A-C need to be judicially noticed. Presumably, the plaintiffs' attorney could have submitted a declaration stating that he had received these letters from defense counsel: the letters are not submitted to establish the truth of any assertions that they contain, so that would have been enough. In any case, these letters, as well as the letter constituting Exhibit G, are all proper objects of judicial notice. *See In re Forster,* 162 B.R. 478 (Bankr. N.D. Ohio 1993) (judicially noticing letter from debtor's attorney); *Nw. Bypass*

*Group v. U.S. Army Corps of Eng'rs*, 488 F. Supp. 2d 22 (D.N.H. 2007) (letter from city counsel noticed in absence of objection); *Von Koenig v. Snapple Beverage Corp.*, 713 F. Supp. 2d 1066 (E.D. Cal. 2010) (letter from Food and Drug Administration); *Jimenez v, Domino's Pizza, Inc.*, 238 F.R.D. 241 (C.D. Cal. 2006) ((opinion letter from California Department of Labor Standards Enforcement).

All the court records — Exhibits D, E, and F — may be judicially noticed. *See, e.g., Delagarza v. Tesoro Ref. and Mktg. Co.*, 2011 WL 4017967, *18 (N.D. Cal. Sept. 8, 2011) (judicially noticing filings from actions in various courts).The court can take judicial notice of matters of public record, such as pleadings in another action and records and reports of administrative bodies. *See Emrich v. Touche Ross Co.*, 846 F.2d 1190, 1198 (9th Cir. 1988). Such records are "not subject to reasonable dispute" because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Indeed, Rule 201 was "drafted on the theory" that certain "particular matters" — including court records and "other governmental facts" — "are included within the general categories" that Rule 201(b) describes and so "need no specific mention" in the rule. Fed. R. Evid. 201(b) advisory comm. notes.

The court appreciates being pointed toward Exhibit H — *Jackson v. S.A.W. Entertainment, Ltd.*, 629 F. Supp. 2d 1018 (N.D. Cal. 2008) — and has considered that case in analyzing BSC's motion to compel arbitration.

**ANALYSIS**

The Federal Arbitration Act ("FAA") embodies a strong federal policy in favor of arbitration. *E.g., Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). "In determining whether to issue an order compelling arbitration, the court may not review the merits of the dispute but must limit its inquiry to (1) whether the contract containing the arbitration agreement evidences a transaction involving interstate commerce, (2) whether there exists a valid agreement to arbitrate, and (3) whether the dispute(s) fall within the scope of the agreement to arbitrate." *Soto v. Am. Honda Motor Co.*, 946 F. Supp. 2d 949, 953 (N.D. Cal. 2012) (citing *Republic of Nicaragua v. Standard Fruit Co.,* 937 F.2d 469, 477-78 (9th Cir.1991)). If the answer

ORDER – 14-3616 LB 7

to each of these queries is affirmative, then the court must order the parties to arbitration in accordance with the terms of their agreement. 9 U.S.C. § 4.

The FAA "does not confer a right to compel arbitration of any dispute at any time." *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.,* 489 U.S. 468, 474 (1989). "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582 (1960). The FAA thus provides that arbitration agreements are unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "[G]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening" federal law. *Doctor's Assoc., Inc. v. Casarotto,* 517 U.S. 681, 687 (1996). The court determines whether the putative arbitration agreement is enforceable under the laws of the state where the contract was formed. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Ingle v. Circuit City Stores*, 328 F.3d 1165, 1170 (9th Cir. 2003). The party seeking to compel arbitration bears the burden of proving the existence of a valid arbitration agreement by a preponderance of the evidence. *See Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.,* 622 F.3d 996, 1005 (9th Cir. 2010).

## I. SEVERAL TERMS IN THE ARBITRATION AGREEMENT ARE UNCONSCIONABLE

The plaintiffs argue that several parts of the arbitration agreement are unconscionable. (ECF No. 33 at 19-27.) They further argue that the court should decline to sever these from the rest of the contract, and instead hold the entire arbitration clause unenforceable. (*Id.* at 27-28.) Because the court agrees that Ninth Circuit and California law require that result, it does not reach most of the parties' other arguments.

Contractual unconscionability has both a procedural and a substantive component. *E.g., Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000). The "prevailing view" is that both components must be present before a contract can be deemed unconscionable. *Id.* As the plaintiffs correctly say, a "sliding scale" applies: "[T]he more substantively oppressive

the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Id.* The party opposing arbitration bears the burden of proving that the arbitration provision is unconscionable. *Correa v. Firestone Complete Auto Care*, 2013 WL 6173651, *2 (N.D. Cal. Nov. 25, 2013) (citing *Arguelles–Romero v. Superior Court,* 184 Cal. App. 4th 825, 836 (2010)).

**A. Procedural Unconscionability**

Procedural unconscionability focuses on the circumstances surrounding the negotiation of the contract. *Gatton v. T–Mobile USA, Inc.,* 152 Cal. App. 4th 571, 581 (2007). Specifically, procedural unconscionability can arise from oppression or surprise. *Armendariz,* 24 Cal.4th at 114. "Oppression arises from an inequality of bargaining power which results in no real negotiation and an absence of meaningful choice." *Bruni v. Didion,* 160 Cal. App. 4th 1272, 1288 (2008) (internal quotations omitted). "Surprise involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms." *Id.*; *Correa*, 2013 WL 6173651, at *2.

Surprise in this sense is not present here. The "Performer Contracts" are relatively short. The arbitration clause, and the class-action waiver, are both set out in distinct paragraphs composed entirely in boldface. (*See, e.g.,* ECF No. 25-5 at 7; (ECF No. 25-6 at 4.)

The claimed procedural deficiencies of these contracts are better treated under the "oppression" rubric. The plaintiffs contend that, in the circumstances in which they signed the agreements, there was "inequality in bargaining power" that resulted in "no real negotiation" and no "meaningful choice." (*See* ECF No. 33 at 21.) They complain most broadly that they had no choice but to accept the contracts with their arbitration terms. According to the plaintiffs, management at the relevant clubs told them that all performers had to sign the contracts in order to work. (*Id.*) They further allege that management presented them with the contracts when they were "mostly naked." (*Id.* at 14, 21.) They were "rushed" to sign the agreements, or at least felt so, and believed that they could not review the contracts before signing them. (*Id.* at 21.) The plaintiffs further claim that management sometimes presented the contracts for signing when performers were intoxicated. (*Id.*) They do not allege, however, that they themselves were ever intoxicated

when presented with a contract. Last in this area, the plaintiffs contend that the "accept or reject" choice on some contracts was effectively a sham. If a performer checked the "Reject" box, they claim, the club would purposely "lose" the agreement, and later present them with a new one, with a direction to fill it out "correctly" by accepting the arbitration and class-waiver terms. (*Id.* at 12, 21.) Or, say the plaintiffs, management would find a reason to fire the performer. (*Id.* at 12.) For the plaintiffs' direct statements on the foregoing, see their declarations at ECF Nos. 35-1 and 35-3.

BSC denies all this. It denies that it "rushed" the performers into signing, that it made a practice out of presenting contracts to them while they were "mostly naked," much less intoxicated, and that it denied them the chance to review the contracts before signing. (ECF No. 38 at 14-15.) Most fundamentally, it denies that accepting the arbitration agreement was a requisite of working for the clubs. BSC notes in this regard that Jane Roe 2 rejected the arbitration term and the class-action waiver on more than one occasion — and continued to work at BSC-run clubs "without consequence." (*E.g., id.* at 8.) The plaintiffs do not counter this last point. The relevant contracts indeed show that, in her 2012 contracts with Centerfolds and the Gold Club, Jane Roe #2 rejected the pertinent terms. (ECF No. 25-7 at 4, 6.) For the defendant's full evidence on all this, see the declarations at ECF Nos. 38-2, 38-3, 38-4.

The parties addressed this point at oral argument. In their helpful and high-quality discussion, the parties' attorneys focused on the personal knowledge underlying certain evidence and the question of evidentiary specificity.

BSC raised the issue. It cautioned that one should not buy into simple "clichés" about the goings-on at clubs like the ones in question — and, more to the point, that the plaintiffs cannot show procedural unconscionability, and thus avoid their arbitration commitments, on the strength of general depictions of a "sex, drugs, and rock n' roll" atmosphere at such clubs, including broadly sketched pictures of "rampant drug use" and drunken performers. Were this the state of affairs, BSC observed, the clubs could not run in an orderly fashion. And they are, after all, functioning businesses. Turning to the analytical point, general accusations of this nature do not show that the conditions under which *the plaintiffs' specific contracts* were signed amounted to the procedurally unconscionable.

These are sound points, fair caveats, and admonitions well taken. On the current record, though, a due insistence on evidentiary specificity undermines BSC's case, more than the plaintiffs', on the issue of procedural unconscionability. Former Gold Club manager Darius Rodrigues has submitted two declarations on the plaintiffs' behalf. (ECF Nos. 34, 47-1.) Among other things, Mr. Rodrigues claims that, whatever the written policy, in practice drug use at the clubs was "rampant," and that "management encouraged exotic dancers" to drink, partly to attain "the right 'attitude' . . . while performing" — which of course suggests some intoxication. (ECF No. 47-1 at 1-2, ¶¶ 3, 5.) He further claims:

> Management would give exotic dancers the [contract] paperwork to sign or initial at times when they were mostly naked, and management rushed exotic dancers to initial and sign it. Management would not allow exotic dancers to take the paperwork home and read it before signing it.

(*Id.* at 2, ¶ 4.) BSC's counsel correctly points out that Mr. Rodrigues's charges are general. He says nothing specifically about the contracts with Jane Roe #1 and #2 — the only agreements in question. Yet both these plaintiffs have submitted declarations in which they allege that, when *they* signed *their* contracts, they were "mostly naked," were told that the contracts were "time-sensitive," were "rushed" into signing them, and were told that they could not bring the contracts home to review. (ECF No. 35-1 at 1-3, ¶¶ 2, 5-6; ECF No. 35-3 at 1-5, ¶¶ 2-7, 9.) BSC has not submitted specific evidence countering these specific allegations. The declarations that BSC has submitted — from Condor manager Mark Calcagni and Gold Club manager Craig Bordeau — both deny such charges in only general terms. These gentlemen state, for example, that there was no "policy" of rushing the performers to sign, for instance, or approaching them while they were not fully clothed, and that they are "not aware" of an occasion on which a dancer was inebriated while reviewing or signing a contract. (ECF No. 38-3 at 3-4, ¶¶ 13, 15-17; ECF No. 38-4 at 2-4, ¶¶ 6-7, 9-11.) It is BSC, in other words, who counters specific proof with general rebuttal.

(This may of course reflect an unavoidable reality: The plaintiffs will be very much aware of the specific conditions under which they signed their own contracts, while management oversees many workers over time. Still, that is the evidence on which the court must base its decision.)

The decision in *Jackson v. S.A.W. Entertainment, Ltd.*, 629 F. Supp. 2d 1018 (N.D. Cal. 2009)

is instructive on procedural unconscionability. That case, too, involved an exotic dancer claiming that a nightclub where she used to work had violated labor laws by misclassifying her as an independent contractor. *Id.* at 1021. The *Jackson* court denied the defendant's motion to compel arbitration. *Id.* Discussing procedural unconscionability, the *Jackson* court noted that "the critical question" was whether the plaintiff "could have worked for [the defendant] in some capacity — whether as an employee or as an independent contractor — without being subject to an arbitration provision." *Id.* at 1024. Like BSC in this case (ECF No. 38-2 at 3-5, ¶¶ 8-11), the *Jackson* defendant noted that the plaintiff had had the option to become an employee. *Jackson*, 629 F. Supp. 2d at 1024. It had not, however, "offer[ed] any evidence that employees are not subject to arbitration." *Id.* The same is true here. "[A]n employer-employee contract with" the BSC-run clubs "might well have contained an arbitration provision, too." *Id.* The fact that the plaintiffs were offered employee status, in other words, does not by itself suggest that they were practically free to decline contracts in which arbitration was on the face of the agreement mandatory.

The plaintiffs make two other arguments for finding the contracts procedurally unconscionable. They complain that club management neither provided them the rules that arbitration would proceed under nor explained that arbitration meant ceding their right to a jury trial. (ECF No. 33 at 21-22.) Largely for the reasons that BSC identifies (*see* ECF No. 38 at 15-16), the court finds these arguments unpersuasive. Furthermore, the plaintiffs' contracts did not refer to any specific set of arbitration rules; consequently, it cannot be said here that the plaintiffs were agreeing to a set of rules that were not before them. This is an operative part of what has driven other decisions that find procedural unconscionability in an employer's failing to provide arbitration rules along with their employment contracts. *See Poublon v. Robinson Co.*, 2015 WL 588515, *1, *4-*5 (C.D. Cal. Jan. 12, 2015) (discussing cases).

\* \* \*

The closeness of this issue, and the precise analysis it evokes, testify to the fine work of both sides' lawyers. The court appreciates their quality discourse and has weighed their arguments carefully. In the end, the plaintiffs have spoken more specifically; they have shown that they signed their contracts under conditions in which ordinary people similarly situated would detect

ORDER – 14-3616 LB 12

"unequal bargaining power," and would feel that they had no "real" chance to negotiate, no "meaningful choice" but to sign. The court concludes that under all the conditions that the plaintiffs describe there is at least mild procedural unconscionability.

**B. Substantive Unconscionability**

No matter how great the procedural unconscionability, a contract is enforceable under California law unless it is also substantively unconscionable. *Correa*, 2013 WL 6173651, at *3 (citing *Armendariz,* 24 Cal.4th at 114). Substantive unconscionability focuses on the harshness and one-sidedness of a contract's substantive terms. *Correa*, 2013 WL 6173651, at *3 (*A & M Produce Co. v. FMC Corp.,* 135 Cal. App. 3d 473, 486-87 (1982)). The plaintiffs contend that several aspects of the arbitration clause are substantively unconscionable.

*1. The clubs did not specifically accept the challenged terms*

The plaintiffs correctly observe that, in contracts that featured an "accept or reject" choice, there was no specific place for the club to indicate its acceptance of the arbitration clause or the class-action waiver. (*See* ECF No. 33 at 23-24.) Only the performer was given a place to initial her agreement to (or rejection of) these terms. The club's signature appeared only at the end of the whole contract. "[T]he employer did not agree to be bound by these terms," the plaintiffs write, which in their view makes the agreement "one-sided, substantively unconscionable, and unenforceable." (*Id.* at 24.)

The court disagrees. That the respective clubs did not initial their acceptance of the arbitration and class-waiver terms does not mean that they "did not agree to be bound by these terms." The clubs proffered these terms and signed the contract containing them; this suggests that they assented to the whole contract, including those provisions. The plaintiffs here cite *Higgins v. Superior Court*, 140 Cal. App. 4th 1238 (2006). (ECF No. 33 at 24.) That case offers the helpful rule that, "an agreement may lack 'a modicum of bilaterality' and therefore be unconscionable if the agreement requires arbitration only for the claims of the weaker party but a choice of forums for the claims of the stronger party." *Id.* at 1253 (partial quotation omitted). The circumstances in *Higgins*, however, show a unilateral obligation to arbitrate that is not present here. First, the agreements in *Higgins* "repeatedly" said "I agree" — meaning that the *Higgins* plaintiffs agreed

— to arbitrate. *Id.* at 1243-44, 1253. No similar, personally specific language bound the *Higgins* defendant. *See id.* (If that seems excessively technical, the fact nonetheless played an operative role in the *Higgins* analysis. *See id.* at 1253.) The *Higgins* defendant moreover did not sign the contract until after it had moved to compel arbitration. *Id.* at 1254 n. 11. Finally, the arbitration clause in *Higgins* was deeply lopsided. The clause gave the defendant, but only the defendant, the right to decline arbitration and choose a judicial forum, after all. *Id.* at 1254. None of these facts is present here. Nothing in *Higgins* suggests that the arbitration clause in this case is substantively unconscionable because the clubs did not assent to it as specifically as the plaintiffs were asked to.

### *2. One-way ban on collective actions*

The plaintiffs also call substantively unconscionable the contracts' "one-way ban" on collective actions. (ECF No. 33 at 23-25.) The court agrees. The basic arbitration term is bilateral. The ban on the plaintiffs' consolidating claims, however, lacks even a "modicum of bilaterality." *See Armendariz*, 24 Cal. 4th at 115-18. Neither the contracts, nor BSC's submissions here, "justif[y]" this one-way ban in the "business realities" behind the contract. *See id.* "Without reasonable justification for this lack of mutuality, arbitration appears less as a forum for neutral dispute resolution and more as a means of maximizing employer advantage. Arbitration was not intended for this purpose." *Id.* at 118.

The agreement makes a point of driving home by repetition the ban on consolidating plaintiff claims. This underscores the imparity of this term. The arbitration clause itself states: "An arbitrator may not consolidate more than one person's claims, and may not preside over any form of representative or class proceeding." (*E.g.*, ECF No. 25-5 at 4.) The class-action waiver confirms that consolidation is forbidden only to *plaintiffs'* claims. That waiver provides:

> *Performer agrees* that any claim *she may make* against Owner shall be in her individual capacity, and not as a class or representative action; *she agrees* not to consolidate any claim *she may have* against Owner with the claims of others. Owner shall be entitled to fees and costs for enforcing this term.

(*Id.*) (emphasis added).

BSC suggests that the court should not consider the class-action waiver in judging the arbitration clause. (ECF No. 38 at 16.) The law is to the contrary. In *Newton v. Am. Debt Servs.,*

ORDER – 14-3616 LB 14

*Inc.*, 549 Fed. App'x 692 (9th Cir. 2013), in "determining unconscionability of the arbitration agreement," the Ninth Circuit looked to fee-shifting provisions and a damages limitations "located outside the specific arbitration clause." *Id.* at 694 (citing *Rent–A–Center, West Inc. v. Jackson*, 561 U.S. 63, 73 (2010)). The court in *Jackson, supra*, also looked to class-action and limitations-defense waivers that were strictly extrinsic to the arbitration clause that was being assessed. *Jackson*, 629 F. Supp. 2d at 1025-27. *Jackson* held that the waivers were "substantively unconscionable." *Id.* (citing *Gentry v. Superior Court*, 42 Cal.4th 443 (2007) and *Murphy v. Check 'N Go of Cal., Inc.*, 156 Cal. App. 4th 138 (2007)).

BSC implicitly acknowledges that it views the class-action waiver as unilateral, as, in other words, barring only the plaintiffs from combining claims. BSC argues that "a bilateral class-action waiver would make no practical sense." (ECF No. 38 at 16.) BSC continues:

> [A] class action is a procedural device that permits one or more plaintiffs to file and prosecute a lawsuit on behalf of a larger group, or "class." . . . It is difficult to envision any circumstance in which BSC would join with a "class" of other similarly situated businesses to pursue class claims against an entertainer.

(*Id.*) But Rule 23 contemplates both plaintiff and *defendant* classes. *See, e.g.,* Fed. R. Civ. P. 23(a) ("One or more members of a class may sue *or be sued* as representative parties . . . .") (emphasis added); *In re Gap Stores Secs. Litig.*, 79 F.R.D. 283 (N.D. Cal. 1978) (certifying defendant class of underwriters). The bilateral possibility is not so much that BSC would join with other similarly situated employers to sue a single performer (the scenario that BSC, probably correctly, finds "difficult to envision"). The bilateral possibility is that BSC — alone or with other employers — could sue a *defendant* class of performers to establish some right or liability. Indeed, BSC-managed nightclubs appear to have done just that. In *Doe v. Cin-Lan, Inc.*, 2:08-12719 (E.D. Mich.), BSC-affiliated clubs filed counterclaims against exotic dancers as a counterclaim-defendant class; the Gold Club later invoked the *Cin-Lan* settlement to bar an administrative claim by a performer who was an absent member of the counterclaim-defendant class. (*See* ECF No. 36; ECF No. 36-4 at 5-15, 67-115; ECF No. 36-5 at 1-7, 37-38.)

The instant contracts hold open the opportunity for consolidated action to the clubs alone; the plaintiffs are foreclosed from it. The class-action ban speaks only of performers' claims. (*E.g.*,

ORDER – 14-3616 LB                                                                                                   15

ECF No. 25-5 at4.) And, although it may rest on a misapprehension of Rule 23, BSC's own understanding is that the clause is indeed unilateral.

### *3. Cost-shifting and cost-sharing*

The plaintiffs also challenge the cost-shifting and cost-sharing aspects of the arbitration provisions. Once again, those terms provide: "The arbitrator shall be permitted to award any relief available in a Court, including fees and costs for enforcing this term. The costs of arbitration shall be borne equally by performer and owner unless the arbitrator concludes that a different allocation is required by law." (*E.g.,* ECF No. 25-5 at 4.)

The Ninth Circuit has repeatedly found such provisions to be substantively unconscionable and thus unenforceable under California law. *Newton v. Am. Debt Servs., Inc.*, 549 Fed. App'x 692, 694 (9th Cir. 2013); *Martin v. TeleTech Holdings, Inc.*, 213 Fed. App'x 581, 583 (9th Cir. 2006); *Ingle v. Circuit City Stores*, *Inc.*, 328 F.3d 1165, 1178 (9th Cir. 2003); *Ting v. AT&T*, 319 F.3d 1126, 1151 (9th Cir. 2003); *Ferguson v. Countrywide Credit Indus.*, 298 F.3d 778, 785 (9th Cir. 2002); *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 894 (9th Cir. 2002) (reasoning that term requiring employee to split arbitrator's fees with employer "alone would render an arbitration agreement unenforceable"); *see Armendariz*, 99 Cal. Rptr. 2d at 110 ("[T]he arbitration agreement . . . cannot generally require the employee to bear any type of expense that the employee would not be required to bear if he or she were free to bring the action in court.") (emphasis removed). The court sees no significant difference between the cost-allocation terms of the BSC arbitration contracts in this case and those rejected in Ninth Circuit precedent.

## II. THE COURT WILL NOT SEVER THE UNCONSCIONABLE TERMS

The question thus becomes whether to sever these three problematic elements from the contract and enforce the remaining arbitration clause, or to decline severance and deem the entire arbitration agreement unenforceable. The decision to sever, under both California and Ninth Circuit law, ultimately rests in the trial court's discretion. *Armendariz*, 99 Cal. Rptr. 2d at 114, 121-25; *Newton*, 549 Fed. App'x at 695. The "overarching inquiry is whether the interests of justice . . . would be furthered by severance." *Armendariz*, 99 Cal. Rptr. 2d at 124 (quotation omitted). The *Armendariz* court found that a central feature, also present here, "weigh[ed] against

ORDER – 14-3616 LB 16

severance" — namely, that the arbitration agreement contained "more than one" unconscionable term. *Id.* (There were two such terms in *Armendariz*. *Id.*) "[M]ultiple defects," the court wrote, "indicate a systematic effort to impose arbitration on an employee not simply as an alternative to litigation, but as an inferior forum that works to the employer's advantage." *Id.* The California high court concluded: "[G]iven the multiple unlawful provisions, the trial court did not abuse its discretion" in deciding not to sever but to deem the whole arbitration clause unenforceable. *Id.*

The Ninth Circuit's decision in *Newton* is similar and effectively controls this analysis. *Newton* upheld the district court's decision not to sever and enforce the remainder of an arbitration agreement. *Newton*, 549 Fed. App'x at 695. The Ninth Circuit's language in *Newton* is relevant here:

> The district court did not implausibly or illogically decline to sever the unconscionable parts of this arbitration agreement, despite Congress's preference for arbitration. The arbitration agreement included four unconscionable provisions. To have severed all of them would have left a mere agreement to arbitrate, therefore requiring extensive reformation of the arbitration agreement.

*Id.* (citations omitted). Here, too, the arbitration agreement is riddled with multiple provisions that the court has found substantively unconscionable under governing law. It would constitute "extensive reformation" to redact all those terms, leaving little more than the "mere agreement to arbitrate." *See Jackson*, 629 F. Supp. 2d at 1029-31 (declining to sever where arbitration clause had "more than one" unconscionable term).

Keeping in mind the "overarching" concern to do justice, and the fact that arbitration, however valuable and strongly preferred, is meant only to provide an alternative forum to litigation, not to overstuff one party's quiver, the court declines to sever the problematic parts of the plaintiffs' contracts. The court instead holds the entire arbitration agreement unenforceable.

## III. THE THIRD MARLIN DECLARATION — ADDENDUM A

Before BSC filed the Third Supplemental Declaration of Gary Marlin — the document that claims that the 2014 extensions to the plaintiffs' Gold Club contracts "erroneously" refer to an Addendum A; and which filed an unsigned Addendum A (ECF No. 49) — the court had drafted an order in which it found that the missing Addendum A suggested that the plaintiffs' whole

ORDER – 14-3616 LB 17

contracts were not before the court. This would have been an independent reason that the court could not compel arbitration. *See Branch Law Firm L.L.P. v. Osborn*, 447 S.W.3d 390, 397-98 (Tex. App. 2014). Mr. Marlin's new declaration changes the court's analysis in this regard. The plaintiffs have briefed the issue (ECF No. 52) and so the court wishes to briefly explain its conclusions with respect to the newly found Addendum A.

First, on the record before it, the court is not willing to accept that the Addendum A that is attached to Mr. Marlin's latest declaration is in fact the Addendum A to which the plaintiffs' contract extensions refer. The document is unsigned. It refers to no particular performer. The court cannot accept that this largely untethered piece of paper formed a part of anyone's contract. This comment is potentially relevant to other performers and other contract extensions — those who worked under contracts in years up to and including 2011-2012; but, given the court's next conclusion, it seemed worth stating this point clearly.

That next conclusion is this: the court accepts Mr. Marlin's assertion that BSC's client clubs stopped using addenda altogether after the 2011-2012 contract year. Mr. Marlin was BSC's president from 2004 until June 2013. (ECF 25-4 at 2, ¶ 1.) He avers personal knowledge of the matters that he discusses. (*Id.*; ECF No. 49 at 2, ¶ 1.) The court therefore accepts Mr. Marlin's follow-on conclusion that the references to Addendum A in the extensions to Jane Roe #1's and Jane Roe #2's 2014 Gold Club contracts are "erroneous."

The extensions' mistaken reference to Addendum A thus no longer gives an additional reason for refusing to compel arbitration. This does not affect the court's unconscionability analysis. The plaintiffs argue that the whole Addendum A — BSC's finding contract extensions only after the hearing; the extensions' reference to a then-missing addendum; and Mr. Marlin's subsequent third declaration dismissing that reference as erroneous — the plaintiffs contend that all this is "further evidence of procedural unconscionability" in the signing of the plaintiffs' contracts. (ECF No. 52 at 3-4.) The court disagrees. The authorities that the plaintiffs cite on this point (ECF No. 52 at 4) do not suggest a different conclusion.

///

///

## CONCLUSION

The court takes judicial notice of Exhibits A-G to ECF No. 36. The court denies BSC's motion to compel arbitration (ECF No. 25).

This disposes of ECF Nos. 25 and 36.

**IT IS SO ORDERED**.

Dated: March 2, 2015

_____
LAUREL BEELER
United States Magistrate Judge