1  SHANNON LISS-RIORDAN (State Bar No. 310719)
2  sliss@llrlaw.com
   LICHTEN & LISS-RIORDAN, P.C.
3  729 Boylston Street, Suite 2000
   Boston, MA 02116
4  Telephone:     (617) 994-5800

5  MICHAEL L. FREEDMAN (State Bar No. 262850)
   mfreedman@llrlaw.com
6  MATTHEW D. CARLSON (State Bar No. 273242)
   mcarlson@llrlaw.com
7  LICHTEN & LISS-RIORDAN, P.C.
8  466 Geary St., Suite 201
   San Francisco, CA 94102
9  Telephone:     (415) 630-2651

10  ATTORNEYS FOR OBJECTORS NICOLE HUGHES, PENNY
    NUNEZ, ANGELYNN HERMES, ELANA PERA, SARAH
11  MURPHY, AND DEVON LOCKE

12

13                    UNITED STATES DISTRICT COURT

14               NORTHERN DISTRICT OF CALIFORNIA

15  JANE ROES 1-2, on behalf of          Case No.: 14-cv-03616-LB
    themselves and all others similarly
16  situated,
                                         **DECLARATION OF SHANNON LISS-**
17                    Plaintiffs,        **RIORDAN IN SUPPORT OF OBJECTION TO**
                                         **PROPOSED CLASS ACTION SETTLEMENT**
18  v.

19  SFBSC MANAGEMENT, LLC; and
    DOES 1-200,
20
21                    Defendants

22

23

24

25

26

27

28

1

2

I, Shannon Liss-Riordan, declare as follows:

1.  I represent Nicole Hughes, Penny Nunez, Angelynn Hermes, Elana Pera, Sarah Murphy, and Devon Locke, exotic dancers who have worked at Hustler Club, Gold Club, Condor Club, Lil Darlings, and Garden of Eden in San Francisco.  These dancers are objecting to the proposed settlement in this case, Roe v. SFBSC Management, LLC, 3:14-cv-03616-LB (N.D. Cal.)  I submit this declaration in support of their Objection.  I have personal knowledge of the information set forth herein.

2.  Several of these dancers are named plaintiffs in the cases of Hughes v. S.A.W. Entertainment, Ltd., 3:16-cv-03371-LB (N.D. Cal.), and Pera v. S.A.W. Entertainment, Ltd., 3:17-cv-00138-LB (N.D. Cal.), which challenge dancers' misclassification as independent contractors and resulting wage violations at the Hustler Club, Gold Club, and Condor Club.  I am lead plaintiffs' counsel in these cases.

3.  I am a partner in the law firm of Lichten & Liss-Riordan, P.C.  I have practiced exclusively in the field of employment law on the side of employees for my entire legal career.  I co-founded this firm in June 2009.  Prior to starting Lichten & Liss-Riordan, P.C., I was a partner at Pyle, Rome, Lichten, Ehrenberg & Liss-Riordan, P.C., which I joined in 1998 and became a partner in 2002.

4.  My specialty, and nearly exclusive area of practice, for the last 15 years has been wage and hour class actions, with a particular focus on class actions regarding independent contractor misclassification, tips, and arbitration issues.

5.  I am an honors graduate of Harvard College (A.B., 1990) and Harvard Law School (J.D., 1996).  Following law school and prior to practicing at Pyle Rome, I served as a law clerk for two years for U.S. District Court Judge Nancy F. Atlas in the Southern District of Texas.

6.  I am a member of the bars of Massachusetts, California, New York, the United States Supreme Court, and the United States Court of Appeals for the First Circuit, Second Circuit, Third Circuit, Seventh Circuit, Ninth Circuit, and D.C. Circuit.

7. I am a frequent invited speaker at seminars sponsored by local and national organizations, such as the National Employment Lawyers Association, the American Bar Association, Massachusetts Continuing Legal Education, and other organizations on various topics regarding employment law, class actions, and wage and hour litigation.

8. Each year since 2008, I have been selected for inclusion in <u>Best Lawyers in America</u> (Chambers). Our firm, and my law partner and I have consistently been ranked in recent years in the top tier for our practice area. The 2013 edition referred to me as *"the reigning plaintiffs' champion"*, and the 2015 edition said I am *"probably the best known wage class action lawyer on the plaintiff side in this area, if not the entire country".*[1]

9. I have been featured by many major publications for my accomplishments representing low wage workers in a variety of industries. These publications include <u>San Francisco Magazine</u>, the <u>Los Angeles Times</u>, the <u>Wall Street Journal</u>, <u>American Lawyer</u>, <u>Mother Jones</u>, and the <u>Boston Globe</u>. <u>See</u>, <u>e.g.</u>, Exhibits 1 - 4; http://www.llrlaw.com/shannon-liss-riordan/. <u>San Francisco Magazine</u> wrote in a profile of me last year: "Liss-Riordan has achieved a kind of celebrity unseen in the legal world since Ralph Nader sued General Motors." <u>Politico</u> named me to its guide to the "Top 50 thinkers, doers and visionaries transforming American politics in 2016." <u>See</u> http://www.politico.com/magazine/politico50/2016.

10. Each year since 2008 I have been listed by the <u>Boston Globe Magazine</u> as one of "Boston's Best Lawyers". I have been named a "Super Lawyer" by <u>Boston Magazine</u> each year since 2005. I was named one of ten "Lawyers of the Year" by <u>Massachusetts Lawyers Weekly</u> in 2002 (in my fourth year of practice). In 2009, I was included on "The Power List", <u>Massachusetts Lawyers Weekly</u>'s "roster of the state's most influential attorneys" (which described me as a "[t]enacious class-action plaintiffs' lawyer [who] strikes fear in big-firm employment attorneys throughout

---

[1]     The 2013 edition of Chambers <u>Best Lawyers in America</u> said this about me:

**KEY INDIVIDUALS  Shannon Liss-Riordan** is considered a leader of the wage and hour litigation Bar, where she is described by peers as *"the reigning plaintiff's champion."* She has a nationwide practice, and is highly experienced in cases involving tipped employees.

Boston with her multi-million-dollar victories on behalf of strippers, waiters, skycaps and other non-exempt employees.").

11. Cases that I have won at trial include[2]: <u>Travers v. Flight Services & Systems</u>, C.A. No. 11-10175 (D. Mass. 2014) (skycap terminated in retaliation for leading class action); <u>DiFiore et al. v. American Airlines, Inc.</u>, C.A. No. 07-10070 (D. Mass. 2008) (verdict for plaintiff skycaps challenging $2 per bag charge for curbside check-in); <u>Benoit, et al. v. The Federalist, Inc.</u>, C.A. No. 04-3516 (Mass. Super. 2007) (verdict for plaintiff class for violation of Massachusetts Tips Law); <u>Calcagno, et al. v. High Country Investor, Inc., d/b/a Hilltop Steak House</u>, C.A. No. 03-0707 (Mass. Super. 2006) (verdict for plaintiff class for violation of Massachusetts Tips Law); <u>Bradley et al. v. City of Lynn et al.</u>, 443 F.Supp.2d 145 (D. Mass. 2006) (verdict for plaintiff class where federal court held following bench trial that Commonwealth's entry level firefighter hiring examination has disparate impact on minorities and violated Title VII); <u>Collins v. Commonwealth</u>, (Mass. Super. Court 2007) (jury verdict in favor of state police trooper who had been disqualified from employment because of his kidney transplant); <u>Bingham v. Lynn Sand & Stone</u>, 93-BEM-1491 (MCAD 2003) (finding of discrimination by MCAD after public hearing that company failed to hire African American truck driver applicant because of his race); <u>Hernandez v. Winthrop Printing Co.</u> (Suffolk Superior Court 2002) (jury verdict in favor of Native American/Mexican plaintiff who was terminated in retaliation for complaining of race discrimination); <u>Sprague v. United Airlines, Inc.</u>, 2002 WL 1803733 (D. Mass 2002) (judgment of $1.1 million in a discrimination case brought by deaf airline mechanic who had been denied employment based on disability); <u>Dahill v. Boston Police Department</u>, 434 Mass. 233 (2001) (Supreme Judicial Court decided that Massachusetts law would diverge from federal law in prohibiting discrimination against individuals with correctable disabilities, resulting in hiring of hearing-impaired police officer candidate and jury verdict of $850,000).

---

[2]   Twice in 2016, I tried a three-week FLSA collective action trial on behalf of assistant store managers challenging their classification as exempt from overtime, *Morrison v. Ocean State Jobbers, Inc.*, C.A. No. 09-1285 (D. Conn.).  Both trials resulted in hung juries, and the case subsequently settled.

12. Examples of cases that I have won on appeal include: <u>Khanal v. San Francisco Hilton, Inc.</u>, No. 15-15493 (9th Cir. 2017) (reversing order holding wage claims brought by union employees preempted by LMRA); <u>Williams v. Jani–King of Philadelphia Inc.</u>, 837 F.3d 314 (3d Cir. 2016) (affirming class certification in case challenging cleaning workers' classification as independent contractor "franchisees" under Pennsylvania law); <u>Marzuq v. Cadete Enterprises, Inc.</u>, 2015 U.S. App. LEXIS 21301 (1st Cir. 2015) (Dunkin Donuts general managers could be eligible for overtime pay by proving management was not their primary duty, distinguishing 1982 First Circuit <u>Burger King</u> precedent, which had held fast food managers to be overtime-exempt); <u>Travers v. Flight Systems & Services</u>, 2015 U.S. App. LEXIS 21671 (1st Cir. 2015) (affirming jury verdict in favor of skycap who was terminated in retaliation for leading class action wage complaint challenging policy affecting skycaps' tips and reinstating claim for front pay); <u>Villon v. Marriott.</u>, Hawaii Supreme Court No. 11-747 (July 15, 2013) (holding that waitstaff employees could recover under Hawaii wage law for service charges not remitted to them); <u>Depianti v. Jan-Pro Franchising International, Inc.</u>, 465 Mass. 607 (2013) (Massachusetts Supreme Judicial Court held that national company could not evade liability for independent contractor misclassification by virtue of it not having direct contracts with the workers); <u>Taylor v. Eastern Connection Operating, Inc.</u>, 465 Mass. 191 (2013) (SJC held Massachusetts independent contractor law applicable to work performed in New York for Massachusetts company); <u>Matamoros v. Starbucks Corp.</u>, 699 F.3d 129 (1st Cir. 2012) (holding that Starbucks violated Massachusetts Tips Law by allowing shift supervisors to share in tip pool); <u>Awuah v. Coverall North America, Inc.</u>, 460 Mass. 484 (2011) (SJC established the damages awardable for independent contractor misclassification under Massachusetts law, finding it to violate Massachusetts wage law and public policy to charge employees for a job); <u>DiFiore v. American Airlines, Inc.</u>, 454 Mass. 486 (2009) (SJC held airline liable for Tips Law violation despite fact that skycap employees were directly employed by an intermediary company), rev'd on federal preemption grounds, 646 F.3d 81 (1st Cir. 2011), cert. denied, 132 S. Ct. 761 (2011); <u>Skirchak v. Dynamics Research Corporation</u>, 508 F.3d 49 (1st Cir. 2007) (First Circuit struck down class arbitration waiver in employer's arbitration policy); <u>Gasior v. Massachusetts General Hospital</u>, 446 Mass. 645 (2006)

(SJC determined that discrimination claims, including claims for punitive damages, survive the plaintiff's death); Smith v. Winter Place LLC d/b/a Locke-Ober Co., Inc., 447 Mass. 363 (2006) (SJC held employees engaged in protected activity by making internal complaints of wage violations); Dahill v. Boston Police Department, 434 Mass. 233 (2001) (SJC decided that Massachusetts law would diverge from federal law in prohibiting discrimination against individuals with correctable disabilities, resulting in hiring of hearing-impaired police officer candidate and jury verdict of $850,000); Cooney v. Compass Group Foodservice, et al., 69 Mass. App. Ct. 632 (2007) (Appeals Court held that servers were entitled as a matter of law to receive proceeds of service charges added to function bills); King v. City of Boston, 71 Mass. App. Ct. 460 (2008) (Appeals Court reversed grant of summary judgment in sex discrimination suit, finding that plaintiffs could show that Boston Police Department discriminated against female superior officers by not providing them with separate locker rooms).

13. In addition to the cases described above, I have also litigated and obtained favorable court rulings in many dozens of cases on summary judgment, class certification, and numerous other issues related to wage and hour law, class actions, and arbitration clauses.

14. I have also settled many dozens of class action wage and hour cases.

**Experience Representing Exotic Dancers and Recoveries in other Exotic Dancer Misclassification Cases**

15. Over the last 10 years (since 2007), I have gained unique expertise in litigation on behalf of exotic dancers asserting wage claims arising from misclassification as independent contractors.

16. Beginning with Chaves v. King Arthur's Lounge, 2009 WL 3188948 (Mass. Super. July 30, 2009), I successfully represented plaintiffs in the first Massachusetts case challenging exotic dancers' misclassification as independent contractors.  In that case, the court held that the dancers were misclassified and certified the case as a class action.  See Exhibit 5.  The case received a great deal of attention and led to more suits against adult entertainment establishments.  See, e.g. Boston Globe Editorial ("Stripped by the Boss") (Exhibit 6).

17. Following that case, I successfully led misclassification cases against adult entertainment clubs throughout Massachusetts, obtaining summary judgment in a number of cases, including Cruz v.

Manlo Enterprises, Inc. d/b/a/ Mario's Showplace, Worcester Civ. A. 10-1931 (Mass. Super. June 9, 2011) (Exhibit 7); Monteiro v. PJD Entertainment of Worcester, Inc., d/b/a/ Centerfolds ("Centerfolds"), 29 Mass.L.Rptr. 203 (Worcester Super. Ct. Nov. 23, 2011) (Exhibit 8); Cruz v. Dartmouth Clubs, Inc. d/b/a King's Inn ("King's Inn"), Bristol Civ. A. No. 10-1042 (Mass. Super. Aug. 16, 2012) (Exhibit 9); Cusick v. The 15 Lagrange Street Corp. d/b/a The Glass Slipper, Suffolk Civ. A. No. 10-4127 (Mass. Super. Aug. 8, 2013) (Exhibit 10).  I have also obtained class certification in virtually all of these cases, as well as Raposo v. Mardi Gras, Hampden Cty. C.A. No. 10-0034 (Dec. 11, 2013), and Marino v. Oznemoc, Inc., et al. ("Centerfolds"), Suffolk Civ. A. No. 15-2326 (Jan. 6, 2017).

18. My firm has since represented exotic dancers asserting claims that they have been misclassified under the FLSA and state wage laws in other states as well, including Connecticut, South Carolina, Pennsylvania, Nevada, Rhode Island, New Hampshire, Kentucky, and Illinois.

19. In a case I brought in Connecticut in which two exotic dancers were compelled to arbitrate their claims under the FLSA and state wage law, I represented the dancers in arbitration, won their claims at arbitration, and obtained awards for them of $58,756 and $69,738 (plus attorneys' fees). See D'Antuono v. C & G Groton, et al., AAA No. 11-160-02069-11, (Jun. 17, 2013) (Exhibit 11).

20. My firm has successfully resolved all of the cases listed above that are no longer pending, as well as others.  Examples of settlements my firm has reached in these Massachusetts cases include a $1.1 million settlement with the club Centerfolds (which is a single club in Boston), a $950,000 settlement with the club The Glass Slipper (also a single club in Boston), and a $1.8 million settlement with the club Mardi Gras (and several small affiliated clubs) in Western Massachusetts.  In many of the cases my firm has brought against smaller clubs, the defendant's ability to pay has influenced the amount of the settlement.

21. My experience in administering these and other class action settlements is that participation rates of dancers in the settlements is lower than in many other types of employment cases.  This lower claim rate appears to be largely because of the transient nature of the workforce, the lack of complete employment information in the possession of the employers, and the use of aliases by the dancers.

22. As an example of the FLSA cases my law firm has litigated on behalf of exotic dancers, in Dittus v. KEG, Inc., my law firm obtained a settlement of $750,000 on behalf of sixty-one opt-in plaintiffs in a FLSA collective action brought by exotic dancers from four clubs, with settlement shares ranging from $2,000 for dancers who worked less than four months at the defendant clubs, and more than $14,000 for dancers who worked for the entire class period (approximately four years). See Dittus v. K.E.G., Inc., No. 14-300 (D.S.C.) (motion for final approval attached hereto as Exhibit 12).  In Alvarez v. KWLT, Inc., my law firm obtained a settlement in an FLSA collective action on behalf of thirty dancers, with an average settlement share of $5,916 after attorney's fees and incentive payments.  Alvarez v. KWLT, Inc., No. 14-7075 (E.D. Pa.) (approval motion attached hereto as Exhibit 13.).  Typically, class members in our exotic dancer case settlements receive in the thousands of dollars, with the longest-working class members often receiving more than $10,000.

23. All of the more than dozen class settlements that my firm has negotiated in cases brought on behalf of exotic dancers were for a cash settlement fund and did not include coupons or credits for class members to use in future employment with the defendants.  All of the settlement funds were non-reversionary, meaning that no amount of the settlement fund would revert to defendants in the event of an unexpectedly low claims rate, and unclaimed funds are instead redistributed to participating class members.

24. Along with the favorable settlements, judgments, and decisions that my law firm has obtained, I am aware of numerous cases in which courts across the country have held that exotic dancers are "employees" under the FLSA and various state wage laws.  See, e.g., McFeeley v. Jackson St. Entm't, LLC, 825 F.3d 235 (4th Cir. 2016); Shaw v. The Set Enterprises, Inc., No. 15-62152 (S.D.Fla. Mar. 17, 2017) (Exhibit 14); Hart v. Rick's Cabaret Int'l, Inc., 2013 WL 4822199 (S.D.N.Y. Sept. 10, 2013); Butler v. PP & G, Inc., 2013 WL 5964476 (D. Md. Nov. 7, 2013); Thornton v. Crazy Horse, Inc., 2012 WL 2175753 (D. Alaska June 14, 2012); Clincy v. Galardi S. Enters., Inc., 808 F.Supp.2d 1326, 1343 (N.D.Ga.2011); Thompson v. Linda and A. Inc., 779 F.Supp.2d 139, 151 (D.D.C. 2011); Morse v. Mer Corp., 2010 WL 2346334 (S.D.Ind.2010); Harrell v. Diamond A Entm't, Inc., 992 F.Supp. 1343 (M.D.Fla.1997); Reich v. Priba Corp., 890

F.Supp. 586 (N.D.Tex.1995); <u>Martin v. Priba Corp.</u>, 1992 WL 486911 (N.D.Tex.1992); <u>Lewis v. L.B. Dynasty</u>, 411 S.C. 637, 639, 770 S.E.2d 393, 394 (2015), <u>reh'g denied</u> (Apr. 22, 2015) (dancer was an "employee" of club and covered by state workers' compensation statute); <u>Terry v. Sapphire Gentlemen's Club</u>, 130 Nev. Adv. Op. 87, 336 P.3d 951 (2014), <u>reh'g denied</u> (Jan. 22, 2015) (dancers were employees under Nevada wage laws that utilized "economic realities" test for employee status); <u>Jeffcoat v. Alaska Dep't of Labor</u>, 732 P.2d 1073 (Alaska 1987) (finding dancers to be employees under state labor laws modeled on FLSA).

25. Along with the substantial arbitration award I achieved in the <u>D'Antuono</u> case, I am aware that many other exotic dancers have succeeded on their misclassification claims at trial and obtained significant recoveries, including the following:

- <u>Alex, et al. v. KHG of San Antonio, LLC d/b/a Tiffany's Cabaret</u>, No. 13-728 (W.D.Tex.) (Ex. 15) - after jury trial, judgment of $121,923 and $130,016 for two dancers in FLSA case

- <u>Thompson v. Linda and A. Inc</u>., No. 09-1942 (D.D.C.) (Ex. 16) - after summary judgment decision finding dancers were employees, special master awarded five dancers $345,632, for an average award of $69,126.40

- <u>McFeeley v. Jackson Street Entertainment, LLC</u>, No. 12-1019 (D. Md.) (Ex. 17) - after jury trial, six dancers received a total of $265,276.50, with an average award of $44,212.75

- <u>Thornton v. Crazy Horse, Inc.</u>, No. 06-cv-00251 (D. Alaska) (Ex. 18) - after bench trial, award of $148,388.54 to four dancers, with an average award of $37,097.14

26. In light of the numerous favorable outcomes for dancers in these cases at summary judgment and at trial across the country, there have been a number of substantial settlements in which class shares for participating dancers numbered in the thousands of dollars, including:

- <u>Hart v. RCI Hosp. Holdings, Inc.</u>, 2015 WL 5577713, at *5, *11 (S.D.N.Y. Sept. 22, 2015) - $15,000,000 cash settlement fund for one nightclub, which represented 66% of the performers' maximum recovery at trial on their wage claims, with an average payment of

$4,255 per class member (assuming full participation of the 2,208 person class) and with

288 dancers receiving more than $10,000;

- Clincy v. Galardi, No. 09-2082 (N.D. Ga.) (Ex. 19) - $1,550,000 cash settlement of FLSA

  action on behalf of 80 dancers equivalent to 50% of possible recovery, and with 34 class

  members receiving more than $10,000;

- Eley v. Stadium Grp., LLC, 2017 WL 663525, at *2 (D.D.C. Feb. 17, 2017) – settlement

  providing for payments of between $1,700 and $17,200 to class members;

- In re Penthouse Executive Club Compensation Litigation, No. 10 Civ. 1145 (S.D.N.Y.)

  (Ex. 20) - settlement with payments of $3,727 for first year worked by any dancer, $988

  for any additional years after that, with average settlement shares of $4,667;

- Jones v. JGC Dallas LLC, 2014 WL 7332551, at *9 (N.D. Tex. Nov. 12, 2014), report and

  recommendation adopted in part, 2014 WL 7336889 (N.D. Tex. Dec. 24, 2014) -

  $2,300,000 FLSA settlement on behalf of 194 dancer plaintiffs, with an average payment

  of $7,900.

**Damages Analysis for Dancers at Hustler Club, Gold Club, and Condor Club**

27.  Although counsel for the Roe Plaintiffs has stated that it is "difficult" to determine a "potential

recovery" in a wage and hour case on behalf of dancers, Dkt. 127 at 24, my experience is that

such a calculation is essential to negotiating any wage and hour settlement.

28. In cases brought on behalf of exotic dancers seeking minimum wage damages, the clubs often

have records showing dancers' schedules, from which counsel can calculate or estimate the hours

worked by the class and, accordingly, the classwide minimum wage damages.  Where such

records do not exist, it is still possible to make estimates based upon the number of dancers who

typically work per shift and the length of the shifts.  In addition to the minimum wage damages,

dancers in these cases typically seek to recover fees they must pay to the club to work, as well as

tips they must share with other club employees.  Based upon clubs' records, or estimates

regarding the number of dancers, and the amount of fees that were required to be paid, it is

possible to estimate potential damages.

29. When clubs do not have records, we typically will make estimates based on information from our clients and other dancers.

30. For example, one of the named Plaintiffs in the <u>Hughes</u> action, Angelynn Hermes, worked at Hustler Club (one of the clubs subject to the <u>Roe</u> settlement) for nearly two years.  She estimates that in an average week, the class of dancers worked approximately 250 shifts total at the club, and that shifts were approximately eight hours long. (Hermes Decl., attached hereto as Exhibit 21.)

31. Using an average state minimum wage of $9.00 per hour, the single minimum wage damages for an average week at Hustler Club were $18,000 ($9.00 x 8 hours per shift x 250 shifts).  Over the approximately seven-year class period that is subject of the <u>Roe</u> settlement, single minimum wage damages at Hustler Club alone would exceed $6,552,000 ($18,000 x 52 weeks x 7 years).

32. Similarly, the plaintiffs in <u>Roe</u> and <u>Hughes</u> seek to recover the portion of "dance fees" retained by the clubs, the fees paid to the club for each shift (often referred to as "House Fees"), and the mandatory tip-outs to other club employees.  Plaintiff Hermes has estimated that given all of the fees and tip-outs, the clubs retained on average more than $200 of the dancers' earnings during each shift.  Even with a more conservative estimate of $150 per shift, given 250 shifts per week, and approximately seven years in the class period, these single damages at Hustler Club alone could be approximately $13,650,000 ($150 x. 250 shifts x 52 weeks x 7 years).

33. Plaintiff Nicole Hughes worked at Hustler Club and Gold Club, and she has explained that the policies and shifts were similar at both clubs, with the major difference being that the Gold Club was larger than Hustler Club and employed more dancers on any given shift.  (Hughes Decl., attached hereto as Exhibit 22.)  Even assuming conservatively that Gold Club was the same size as Hustler Club and employed the same number of dancers, the minimum wage damages at Gold Club would also be $6,552,000 during the <u>Roe</u> class period, with an additional $13,650,000 in dance fees, tip-outs, and other fees.

34. Based on this straightforward analysis, the single damages between Hustler Club and Gold Club alone during the <u>Roe</u> class period could exceed $40 million if the plaintiffs were successful at trial (as many dancers have been in other cases).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**My Representation of Dancers in the Hughes and Pera cases**

35. I am lead plaintiffs' counsel in Hughes v. S.A.W. Entertainment, Ltd., 3:16-cv-03371-LB (N.D. Cal.), and Pera v. S.A.W. Entertainment, Ltd., 3:17-cv-00138-LB (N.D. Cal.), in which exotic dancers seek damages for wage violations arising from their misclassification as independent contractors at three clubs in San Francisco: Larry Flynt's Hustler Club, Gold Club San Francisco, and Condor Club.

36. At the time I filed the Hughes lawsuit (which was originally filed on behalf of only dancers at the Hustler Club), I was not aware that the putative class in Roe included individuals who performed at Hustler Club.

37. After filing Hughes, I moved to relate the case to a previous case filed against Hustler Club over which Judge Chen had previously presided.  See Jackson v. S.A.W. Entertainment Ltd., 3:09-cv-00448-EMC (N.D. Cal.), Dkt. 41.  In its response to the motion to relate, the defendant indicated that dancers who performed at Hustler Club were part of the putative class in Roe; this was when I first became aware of the potential overlap between the classes in Hughes and Roe.

38. After conferring with Plaintiffs' counsel in Roe, I learned that Roe involved only "joint employment" claims against SFBSC, and thereafter I amended the complaint for Hughes (who had also worked at Gold Club) to add claims (and additional named plaintiffs) directly against the Gold Club, which is owned and operated by Gold Club – SF, LLC.

39. In the fall of 2016, Plaintiffs' counsel in Roe invited me to participate in a mediation with the Roe defendant that was scheduled for October 25, 2016.

40. On or about September 15, 2016, counsel for SFBSC informed me that SFBSC would not permit me to participate in the mediation session.

41. I did not participate in the mediation session, nor was I aware of the status of any ongoing settlement discussions, or even whether such discussions were continuing.

42. I first became aware that a proposed settlement had been reached in Roe on December 23, 2016, when the parties in Roe filed their notice of settlement.  Roe, Dkt. 103. This was just after I had

DECLARATION OF SHANNON LISS-RIORDAN IN SUPPORT OF OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT

agreed to postpone the hearing that was to be held shortly before that date on our pending motion for conditional certification in the <u>Hughes</u> case, which Defendants' counsel urged me to agree to for scheduling reasons.

43. I have reviewed the terms of the <u>Roe</u> settlement.  As set forth in the accompanying Objection, based on my extensive experience litigating this type of case, I believe that the proposed Roe settlement is not fair, adequate, nor reasonable for class members.

44. My firm's clients in the <u>Hughes</u> and <u>Pera</u> cases have serious concerns about the settlement and a number have conveyed these concerns to the Court through their signed Declarations.  (See Murphy Decl. at ¶ 5 (attached hereto as Ex. 23); Hughes Decl. at ¶ 5 (attached hereto as Ex. 22); Hermes Decl. at ¶ 5 (attached hereto as Ex. 21).)  These dancers are aware of the types of recoveries that dancers have received in other class action misclassification cases, and they have explained that they believe the amount of money offered through the proposed <u>Roe</u> settlement ($800 maximum) is "insulting," "ridiculously low," and "incredibly small", given the hard work and long hours that they put in while performing at Hustler Club, Gold Club, and Condor.  (<u>See</u> Murphy Decl. at ¶ 5; Hughes Decl. at ¶ 5; Hermes Decl. at ¶ 5.)  These dancers were also concerned that the "coupon," or "Dance Fee Credit", was meaningless to the many dancers who no longer perform at the defendant clubs and questioned whether any current dancers would even choose this option for a variety of reasons.  (<u>See</u> Murphy Decl. at ¶ 6; Hughes Decl. at ¶ 10; Hermes Decl. at ¶ 8.)

Executed on March 23, 2017, in Boston, Massachusetts.

By: ___/s/ Shannon Liss-Riordan_____
Shannon Liss-Riordan

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibsn, Dunn &
Crutcher LLP