THE TIDRICK LAW FIRM
STEVEN G. TIDRICK, SBN 224760
JOEL B. YOUNG, SBN 236662
2039 Shattuck Avenue, Suite 308
Berkeley, California 94704
Telephone: (510) 788-5100
Facsimile: (510) 291-3226
E-mail: sgt@tidricklaw.com
E-mail: jby@tidricklaw.com

Attorneys for Plaintiffs Jane Roes 1-2 *et al.*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE ROES 1-2 *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>SFBSC MANAGEMENT, LLC *et al.*,<br><br>Defendants. | Civil Case No. 14-cv-03616-LB<br><br>**DECLARATION OF STEVEN G. TIDRICK, ESQ. IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT**<br><br>The Honorable Laurel Beeler<br><br>Date: September 14, 2017<br>Time: 9:30 A.M.<br>Courtroom: Courtroom C, 15th Floor<br>450 Golden Gate Avenue<br>San Francisco, California<br>Judge: The Honorable Laurel Beeler |

I, Steven G. Tidrick, do declare and state as follows:

1. I am managing partner of The Tidrick Law Firm, attorneys of record for Plaintiffs in this action. I am licensed to practice before all of the courts of the State of California and the Commonwealth of Massachusetts, various federal courts including all of the U.S. District Courts in the State of California, and the U.S. Court of Appeals for the First and Ninth Circuits. I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would competently testify thereto.

2. During three in-person mediation sessions and multiple telephone conferences with Ninth Circuit Mediator Peter Sherwood, both sides exchanged significant facts, documents, and information regarding Class Members' working conditions, performance hours, compensation, and the relative control exercised respectively by the Class Members and Defendants over the manner and means under which Class Members performed at the Nightclubs.

3. Discussions between counsel as well as the respective investigation and evaluation of the claim and defenses have permitted both sides to assess the relative merits of the claims and the defenses to those claims. The above-described investigation and evaluation are sufficient to assess the merits of both sides' positions and to reach a compromise on a fair and equitable basis.

4. All of the terms of this settlement are contained within the Settlement Agreement. At all times, the settlement negotiations have been non-collusive, adversarial, and at arm's length.

5. Based on our own independent investigations and evaluations, our law firm is of the opinion that the Settlement with Defendants for the consideration and terms set forth herein, considering the representative and class claims, and the risk of loss, is fair, reasonable, and adequate in light of all known facts and circumstances, and is in the best interests of the Class. We are also of the opinion that the total consideration set forth in the Settlement Agreement is adequate in light of the uncertainties surrounding the risk of further litigation, and the defenses that have been asserted or could be asserted as the substantive merit of the

claims.

6. Our law firm has weighed the monetary benefit under the Settlement to the Settlement Class against the expenses and length of continued proceedings that would be necessary to prosecute the Action against Defendant through trial and possible appeals. We have also taken into account the uncertain outcome and risk of any litigation, especially in complex actions such as class actions, as well as the difficulties and delay inherent in such litigation. As a result, we have determined that the settlement set forth in the Settlement Agreement is in the best interests of the Settlement Class.

7. If the case were to proceed to trial and Defendants convinced the finder of fact that Plaintiffs were not misclassified, the total damages for the class members could be zero. If Plaintiffs were to prevail on liability at trial, then the amount of damages awarded could fall within a wide range, based on the number of workdays in which a class member's pay fell below the minimum wage, the statute of limitations, and the potential punitive damages, among other factors. For example, if Defendants established that any violation was not willful, the third year of the statute of limitations would be eliminated for the FLSA claims. If, on the other hand, Plaintiffs convinced the finder of fact that class members were entitled to many hours per week of overtime pay, and succeeded in obtaining a three year statute of limitations under the FLSA, the total classwide damages would be higher.

8. Because the variables in a wage-and-hour damage analysis cause the numbers to vary so widely, as shown above, it is often difficult to pinpoint a realistic "potential recovery" in a wage-and-hour case such as this one. During settlement negotiations, our law firm reviewed payroll data for the nightclubs at issue in this case. We aggressively estimated potential minimum wage damages of $75.8 million. Our assessment was and is that there was a substantial risk of no recovery, or nominal recovery, on the other claims.

9. An accounting analysis by Maria Montie, who is a Certified Public Accountant, a Certified Valuation Analyst, a Master Analyst in Financial Forensics, and has a Master of Science degree in Taxation, indicates that class members would have had to have earned $4,775,274.70 in additional dance fees during the class period to be compensated at a

rate at least equal to the applicable San Francisco Minimum Wage for all performance hours logged. Our law firm reviewed the data that Ms. Montie relied upon. We believe that there is a substantial risk that, if the case proceeded through trial and plaintiffs prevailed, the trier-of-fact could determine that classwide minimum wage damages are less than $5 million.

10. The proposed settlement in this case is clearly substantial. This is not a settlement where the aggregate value of the settlement is large simply because the size of the class is in the tens or hundreds of thousands. Instead, class members are eligible to recover significant financial benefit. These considerations indicate that the settlement is adequate and reasonable. This conclusion is reinforced by considering such factors as the risk that a class might not be certified or might be significantly smaller than proposed, and the time, expense, and complexity of the litigation, including risk associated with the pending appellate proceeding and the possibility of further appellate proceedings. In light of our analysis of the estimated value of the claims, the gross settlement value is adequate and reasonable.

11. While our law firm believes that Plaintiffs' claims are meritorious, we are experienced class action litigators, and we understand that the outcome of the pending appeal, Plaintiffs' anticipated motion to certify the class, Defendants' anticipated motion to decertify the class, trial, and any further appeals were inherently uncertain, as well as likely to consume many more months, even years. Having extensively investigated the facts and researched the pivotal legal and factual issues, we arrived at a reasonable resolution through a protracted and arm's-length mediation and negotiation process, which continued into all details of the settlement agreement and the class notice.

12. A comparison of this settlement to settlements in other wage-and-hour cases alleging misclassification of exotic dancers provides an additional basis for finding that settlement is a fair, reasonable, and adequate resolution of the claims. Relevant documents concerning these other settlements were attached to, and described, in my declaration filed on March 9, 2017 (ECF No. 128), at ¶¶ 10-17.

13. The information set forth in Plaintiffs' motion regarding the claims received and the estimated amounts that class members will receive is based on the latest data received

from the Court-appointed administrator, Rust Consulting, Inc. Rust is scheduled to file a due diligence declaration 21 days before the September 14, 2017 fairness hearing, *i.e.*, on August 24, 2017, in accordance with the Court-ordered schedule. *See* ECF No. 151 at 21:19-20.

14. As stated in the notice that was mailed to class members, a full copy of the Settlement Agreement and the operative complaint are online at http://www.tidrick.com/SFBSC-Settlement, and has been since May 4, 2017 (*i.e.*, for the entire time since the class notice was mailed to the class members). Plaintiffs filed their Motion for Award of Attorneys' Fees and Costs and Service Awards on June 12, 2017 (ECF No. 159), in compliance with the schedule that the Court specified in its order granting preliminary approval (*i.e.*, 39 days from mailing of notice), *see* ECF No. 151 at 21:17-18, and within a few hours of that filing, that motion and the supporting declarations were posted online at that same URL.

15. Attached hereto as **Exhibit A** is a true and correct copy of an order issued in a case alleging exotic dancer misclassification, *Tijerino v. Stetson Desert Project LLC*, No. CV-15-2563-PHX-SMM (D. Ariz. June 21, 2017), in which the court found that "on balance, the factors weigh in favor of independent contractor status". The plaintiff in that case filed a motion for reconsideration on July 14, 2017.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 4, 2017

/s/ Steven G. Tidrick

STEVEN G. TIDRICK, SBN 224760

# Exhibit A

Case 2:15-cv-02563-SMM Document 52 Filed 06/21/17 Page 1 of 15

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Josephine Tijerino,

Plaintiff,

v.

Stetson Desert Project LLC, et al.,

Defendants.

No. CV-15-2563-PHX-SMM (Lead)

Nos. CV-15-2564-PHX-SMM, CV-16-0408-PHX-SMM (Consolidated)

**ORDER**

Before the Court is Plaintiff Jane Roe Dancer's ("Plaintiff") Brief RE: Dancers' Employee Status Under the FLSA's Economic Realities Test. (Doc. 41.) Defendants Stetson Desert Project LLC, Cory Anderson, and Cary Anderson ("Defendants") filed a Response to Plaintiff's Brief. (Doc. 46.) The Court now issues the following ruling.

## I. BACKGROUND

Defendants own and operate Le Girls Gentlemen's Club located in Phoenix, Arizona. (Doc. 8 at 1.) Plaintiff is a former dancer at Le Girls (Doc. 16 at 1; Doc. 19 at 3), and brings this lawsuit as an individual, as a collective action on behalf of all those similarly situated individuals under § 216(b) of the Fair Labor Standards Act ("FLSA"), and as a class action on behalf of all those similarly situated individuals under Fed. R. Civ. P. 23 to remedy violations of the Arizona Minimum Wage Act and Arizona common law (Doc. 1 at 2).

Plaintiff filed a motion requesting that the Court enter an order conditionally certifying a FLSA opt-in class in connection with Count I (Failure to Pay Minimum

Wage - FLSA) of Plaintiff's Complaint, and authorizing notice to putative class members regarding their opt-in rights. (Doc. 16.)

On December 6, 2016, the Court denied Plaintiff's motion, finding it premature. (Doc. 21.) The Court explained that "[b]efore the Court will rule on a motion for conditional class certification, Plaintiff must satisfy her initial burden of alleging specific facts that permit an inference that she is an "employee" (and the Defendants her "employer") within the meaning of the FLSA." (Id. at 3-4.) The Court then ordered Plaintiff to brief the issue of whether Plaintiff and her putative class are employees within the meaning of FLSA under the economic realities test set forth in Real v. Driscoll Strawberries Assocs., Inc., 603 F.2d 748, 754 (9th Cir. 1979). (Id. at 4-5.)

In response to the Court's Order, Plaintiff filed the instant brief,[1] to which Defendants filed a Response (Doc. 46).

## II. THE FAIR LABOR STANDARDS ACT (FLSA)

The FLSA mandates that employers pay employees certain minimum and overtime wages, and employ employees for no more than a certain amount of hours each week. 29 U.S.C. § 206-207 (2016). The FLSA penalizes employers for violations of its provisions. Id. § 216.

The FLSA defines "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). An "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee[.]" Id. § 203(d). Courts have adopted "an expansive interpretation of 'employer' and 'employee' under the FLSA, in order to effectuate the broad remedial purposes of the Act." Real, 603 F.2d at 754. Consequently, employees are those "who as a matter of economic reality are dependent upon the business to which they render service." Id. (quoting Bartels v. Birmigham, 332 U.S. 126, 130 (1947)). Whether an individual is an employee or an independent contractor for purposes of the FLSA is a question of law. See Bonnette v. Ca. Health &

[1] On the same day Plaintiff filed the instant brief, she also filed a Renewed Motion for Conditional Certification and to Authorize Notice to Putative Class Members. (Doc. 40.)

Welfare Agency, 704 F.2d 1465, 1469 (9th Cir. 1983).

Courts consider a number of factors to assess the economic reality between the putative employee and putative employer for purposes of the FLSA. Real, 603 F.2d at 754. The factors include:

(1) the degree of the alleged employer's right to control the manner in which the work is to be performed;
(2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
(3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers;
(4) whether the service rendered requires a special skill;
(5) the degree of permanence of the working relationship; and
(6) whether the service rendered is an integral part of the alleged employer's business.

Id. The presence of any one of the above factors is not dispositive of whether an employee/employer relationship exists; rather, whether such a relationship exists depends "upon the circumstances of the whole activity." Id. (quoting Rutherford, 331 U.S. at 730). Importantly, a contractual label does not determine employment status, nor does the subjective intent of the parties to a labor contract override the economic realities reflected in the factors described above. Id. at 755 (internal citations omitted).

Although this District and the Ninth Circuit appear not to have examined the relationship between exotic dancers and the clubs where they perform under the factors set forth in Real, numerous courts outside of this District and Circuit have examined the relationship under factors similar to those set forth in Real. See e.g. Shaw v. Set Enterprises, Inc., No. CV-15-65152, 2017 WL 1380774, at *3 (S.D. Fla. Mar. 17, 2017) (analyzing relationship between exotic dancers and clubs under Scantland v. Jeffry Knight, Inc., 721 F.3d 1308 (11th Cir. 2013)); Lester v. Agment LLC, No. CV 1:15-886, 2016 WL 1588654, at *4 (N.D. Ohio April 20, 2016) (analyzing relationship between exotic dancers and clubs under Donovan v. Brandel, 736 F.2d 1114 (6th Cir. 1984)); Hanson v. Trop, Inc., 167 F. Supp. 3d 1324 (N.D. Ga. 2016) (analyzing relationship between exotic dancers and clubs under Scantland); Foster v. Gold & Silver Private Club, Inc., No. CV 7:14-00698, 2015 WL 8489998, at *3 (W.D. Va. Dec. 9, 2015) (analyzing relationship between exotic dancers and clubs under Schultz v. Capital Int'l Sec., Inc.,

466 F.3d 298, 304 (4th Cir. 2006)); Mason v. Fantasy, LLC, No. CV-13-02020-RM, 2015 WL 4512327, at *8 (D. Colo. July 27, 2015) (analyzing relationship between exotic dancers and clubs under Baker v. Flint Eng'g & Constr. Co., 137 F.3d 1346 (10th Cir. 1998)); Verma v. 3001 Castor, Inc., No. CV-13-3034, 2014 WL 2957453, at *5 (E.D. Pa. June 30, 2014) (analyzing relationship between exotic dancers and clubs under Donovan v. DialAmerica Mktg., Inc., 757 F.2d 1376 (3d Cir. 1985)); McFeeley v. Jackson Street Entertainment, LLC, 47 F. Supp. 3d 260 (D.Md. 2014) (analyzing relationship between exotic dancers and clubs under Schultz); Hart v. Rick's Cabaret Intern., Inc., 967 F. Supp. 2d 901 (S.D.N.Y. 2013) (analyzing relationship between exotic dancers and clubs under Brock v. Superior Care, 840 F.2d 1054 (2d Cir. 1988)); Doe v. Cin-Lan, Inc., No. CV-08-12719, 2008 WL 4960170, at *6 (E.D. Mich. Nov. 20, 2008) (analyzing relationship between exotic dancers and clubs under Donovan)).

In each of the foregoing cases, the courts found an employee-employer relationship to exist. Notably, in all but one of these cases,[2] the clubs were found to exert "substantial," "significant," "high," or a "tight" amount of control over their dancers.[3]

These cases are persuasive but non-binding upon this Court. Nevertheless, an important question will be what difference, if any, exists between the economic realities in the foregoing cases and the economic reality in this case.

## III. DISCUSSION

Before resolving the issue before it, the Court will first address an argument raised by Plaintiff prior to his arguing the status of Plaintiff as an employee under the FLSA.

Plaintiff argues that it is improper for the Court to determine whether Plaintiff is

---

[2] In Doe, the District Court found that the evidence on the control factor was "mixed." The District Court ultimately concluded that, on balance, the control factor weighed in favor of the dancer's likelihood of proving that she was an employee, because "[h]er autonomy in performing her work [was] undermined too much by [the Club's] entirely discretionary control over what she [could] charge third-party customers." Doe, 2008 WL 4960170, at *17.

[3] Cf. Home Insur. Co. v. Industrial Commission, 599 P.2d 801, 803 (Ariz. 1979) (explaining that the distinction between an employee and an independent contractor turns on the employer's right to control the employee).

Case 2:15-cv-02563-SMM Document 52 Filed 06/21/17 Page 5 of 15

an employee at the conditional certification stage because "it goes to the heart of the merits of this case and is not properly considered as part of the initial 'notice stage' determination of whether Plaintiffs are 'similarly situated' for purposes of conditionally certifying an FLSA collective action." (Doc. 41 at 2 (citing Colson v. Avnet, Inc., 687 F. Supp. 2d 914, 925-26 (D. Ariz. 2010).) The Court disagrees.

First, whether Plaintiff is an employee does not go "to the heart of the merits of this case"; rather, it is an antecedent issue. See Rutherford Food Corp. v. McComb, 331 U.S. 722, 727 (1947) (explaining that whether the acts charged in a complaint violate the FLSA depends on whether Plaintiff is an employee and Defendant her employer); accord Dellinger v. Science Applications Intern. Corp., 649 F.3d 226, 228 (4th Cir. 2011) ("Consistent with the FLSA's purpose to regulate the employer-employee relationship and the relevant text of the Act...only employees can sue their current or former employers[.]"). If Plaintiff is not an employee under the FLSA, then there can be no alleged violation of the FLSA, and therefore no conditional certification of a FLSA collective action.

Second, the rule set forth in Colson – that it is not the court's role to resolve factual disputes or decide substantive issues going to the ultimate merits of the case at the conditional certification stage – applies to the court's "similarly situated" determination, not to the court's employee determination. See Colson, 687 F. Supp. 2d at 924-26. Plaintiff fails to recognize that the question of whether Plaintiff and her putative class are "similarly situated" for purposes of conditionally certifying an FLSA collective action is not the same question as whether Plaintiff is an employee within the meaning of the FLSA. Indeed, they are separate inquiries analyzed under different legal standards. Compare Colson, 687 F.Supp.2d at 924-26 (explaining that Plaintiff and her proposed class members are "similarly situated" within the meaning of § 216(b) if the evidence shows "some factual nexus which brings the named plaintiffs and the potential class members together as victims of a particular alleged policy or practice") with Real, 603 F.2d at 754 (explaining that Plaintiff is an employee if she "as a matter of economic

reality [is] dependent upon the business to which [she] renders service") (quoting Bartels v. Birmigham, 332 U.S. 126, 130 (1947).) The rule set forth in Colson therefore does not apply to the Court's employee determination.

Third, as stated by the Court in a prior Order (Doc. 21), it is apparent from Plaintiff's Motion for Conditional Certification and to Authorize Notice to Putative Class Members (Doc. 16), Defendant's Response (Doc. 19), and Plaintiff's Reply (Doc. 31), that Plaintiff's status as an employee or independent contractor of the Club is unsettled. Accordingly, it was incumbent upon the Court to order briefing on the issue prior to considering Plaintiff's motion for conditional class certification.

The Court now turns to the issue of whether Plaintiff and her putative class are employees within the meaning of FLSA under the economic realities test set forth in Real.

*Factor 1: The degree of the alleged employer's right to control the manner in which the work is to be performed*

The first factor of the economic realities test is the "degree of the alleged employer's right to control the manner in which the work is to be performed." Real, 603 F.2d at 754. An example of a club exerting significant control over dancers includes a Club requiring dancers: to follow "Entertainer Rules" regulating appearance and behavior, and terminating dancers for violations thereof; to pay escalating house fees based on time of arrival; to sign in for shifts; to follow procedures for stage rotations; and to charge minimum fees as set by the club. Shaw, 2017 WL 1380774, at *4. Another example includes a club requiring dancers: to consent to random drug testing; to check-in upon arrival; to pay a house fee based on arrival time; to work at least three shifts per week; to attend annual parties and other mandatory meetings; to not leave the Club once they have arrived; to pay tip-outs and to submit to breathalyzer tests prior to leaving; and to perform stage dances when called upon to do so by the DJ, pursuant to a rotation system controlled by the DJ. Hanson, 167 F.Supp. 3d at 1329-1330. A third example includes a club requiring dancers to complete shifts and pay fines for leaving early, and

subjecting dancers to behavioral rules, including rules prohibiting drugs and alcohol and restricting attendance of significant others. Foster, 2015 WL 8489998, at *4. A final example includes a club where dancers choose when they will work based upon availability set by the club; where dancers are required to work a certain amount of days each month; where dancers are required to notify the club in advance of their preferred work schedules; where dancers are required to check-in upon arriving for their shifts; where dancers are required to enter the club through a certain entrance; where dancers are assessed fines for late appearances and early departures; and where dancers' physical appearance and conduct is regulated by instructions set by the club. Verma, 2014 WL 2957453, at *5-*6.

Plaintiff argues that Defendants exert control over the dancers by setting up and controlling the physical space where the dancers perform, which includes specifying certain areas for different dances (stage dances, private "lap" or "couch" dances, VIP dances, and VIP booth dances); controlling and monitoring access to the VIP area and keeping track of the duration of VIP performances; and setting up a rotation for all dancers who appear on the stages. (Doc. 41 at 5-6, citing Doc. 41-1 Exhibit A.)

Defendants argue that they exert minimal control over the dancers. In support, they state that: the Club maintains no schedule for dancers, rather, dancers are free to appear or not appear at the Club whenever and for however long they desire; the Club does not impose rules on dancers as to how to dance or interact with patrons, rather, the only rules imposed are those imposed by the City of Phoenix; the Club has no internal set of rules or standards for dancers, and there is no evidence in the record that any dancer was ever disciplined or fined for non-compliance with any Club internal rules; the Club does not control or monitor what dancers receive in gratuities or report this information to taxing authorities; and the Club does not dictate how much a dancer may charge a patron for a dance except in the VIP area. (Doc. 46 at 4-8, citing Doc. 47 Exhibits.)

In addition, Defendants state that dancers are free to leave the premises and take a break at any time without having to provide an excuse or reason for doing so; dancers are

Case 2:15-cv-02563-SMM Document 52 Filed 06/21/17 Page 8 of 15

free to dance at other establishments, which many do or did; dancers are free to take long hiatuses from appearing at the Club, and Plaintiff testified that she went weeks and sometimes months in between appearances at Le Girls; dancers choose which side of the Club they will appear (topless side or fully nude), and Plaintiff testified that she appeared on both sides of the Club; and dancers receive no wages from Defendants and never have in the decades the establishment has been in operation. (Id.) Defendants also state that dancers are free to use, or refrain from using, any of the Club's areas for whatever purpose she chooses – whether it be to dance or to interact with patrons without performing. (Id.) Defendants further argue that dancers are free to decide where in the Club they will perform, and cites Plaintiff Toliver's testimony, wherein she stated that she preferred not to use the VIP areas because she could then collect directly from patrons, as opposed to having to go through the Club for collection of a VIP fee, even though she could earn more per dance in the VIP areas. (Id.) Finally, Defendants state that dancers are not obligated to participate in the main stage rotation, and that the purpose of the rotation is to allow equal time for all performers who wish to appear on the mainstage. (Id.)

On this record, the Court finds that the dancers at Le Girls have overwhelming autonomy, and that the Club exerts minimal control over them. Accordingly, the Court finds that this factor weighs heavily in favor of a finding that Plaintiff is an independent contractor rather than an employee. The Court adds that this factor is entitled to significant weight in the overall analysis and causes subsequent factors to have an inconsequential impact on the overall analysis, or to carry only minimal weight.

*Factor 2: The alleged employee's opportunity for profit or loss depending upon his managerial skill*

The second factor of the economic realities test is "the alleged employee's opportunity for profit or loss depending upon his managerial skill." Real, 603 F.2d at 754. Most courts have ruled in favor of dancers on this factor, finding that the clubs' investments, and returns on those investments, outweighed the relatively minor

Case 2:15-cv-02563-SMM Document 52 Filed 06/21/17 Page 9 of 15

investments and returns of their dancers. See Hart, 967 F.Supp.2d at 919-20 (finding that dancers had little opportunity for profit or loss despite setting their own schedules and cultivating relationships with clients as to encourage them to visit more often and tip more, compared to the club's opportunity for profit or loss based upon its ability to set business hours, choose the club's location, determining its aesthetics and decor, paying wages to other staffers, and purchasing the bar and kitchen supplies); see also Verma, 2014 WL 2957453, at *7; Foster, 2015 WL 8489998, at *4; McFeely, 47 F.Supp.3d at 270; Lester, 2016 WL 1588654, at *6.

Plaintiff argues that the dancers have "no opportunity for profit depending on managerial skill, and no opportunity for loss whatsoever (other than the fees paid to the Club)." (Doc. 41 at 6.) In support, Plaintiffs state that dancers have no control over determining the physical location of the club and are not responsible for paying any facility expenses relating to the operation of the Club; Defendants maintain exclusive control over major determinants of customer volume, such as marketing, advertising, business hours, facility maintenance, aesthetics, beverage inventory, and setting of cover charge; Defendants hired, supervised, and paid all managers, hosts, bartenders, waitresses, and other employees necessary to operate the Club; dancers do not control the prices that the Club "recommends" to customers for private or VIP dancers; patrons cannot pay dancers by credit card for private "lap" dances; patrons cannot use credit cards to pay dancers additional amounts for VIP dances; and any credit card "tip" for VIP dances goes to VIP host or manager. (Id. at 6-7, citing Doc. 41-1 Exhibits.)

Defendants counter that the dancers have a significant opportunity for profit or loss. In support, Defendants argue that dancers are free to determine how much they will accept from patrons for performing, and free to determine when, how, and where they will perform. (Doc. 46 at 8-10.) Defendants also dispute Plaintiff's statement that patrons cannot use credit cards to pay dancers in the VIP areas, arguing that customers are free to obtain a cash advance on their credit cards to pay a cash tip to the dancer. (Id. at 9.) Defendants also argue that the dancers "are free to reach any arrangement they may want

with patrons both in the VIP areas of the Club and elsewhere on the premises." (Id.) Defendants also emphasize that dancers are free to appear at other venues, and that dancers can maintain a list of regular customers in order to maximize her profit. In other words, how dancers choose to manage their time and cultivate regular clients will determine their opportunity for profit and loss at Le Girls. (Id. at 10.)

The evidence is clear that Defendants bore the greater opportunity for profits and losses since they have a greater role than the dancers do in drawing customers to Le Girls: Defendants chose the location of the Club, set its business hours, maintain the facility, oversee its aesthetics, manage the Club's marketing and advertising, and control the Club's food and beverage inventory. (Doc. 41-1 at 5-8.) Given the autonomy of the dancers (as described under the "control" factor analysis), however, it is unsurprising that this is the case. Therefore, the Court finds that this factor is inconsequential to the overall analysis.

*Factor 3: The alleged employee's investment in equipment or materials required for his task, or his employment of helpers*

The third factor of the economic realities test is "the alleged employee's investment in equipment or materials required for his task, or his employment of helpers." Real, 603 F.2d at 754. In analyzing this factor, courts look to the capital investments made in the club by the respective dancers and club owners. McFeeley, 47 F.Supp.3d at 217. In cases such as the one at bar, courts have concluded that a dancer's investment is minor compared to the club's investment. See Reich v. Circle C Investments, Inc., 998 F.2d 324, 324-28 (5th Cir. 1993); McFeeley, 47 F.Supp.3d at 271; Clincy v. Galardi South Enterprises, Inc., 808 F. Supp. 2d 1326, 1347 (N.D. Ga. 2011).

In support of her argument that dancers' investment is "miniscule" compared to Defendants' capital investment in the club, Plaintiff cites the fact that dancers are only required to cover the cost of their makeup and clothing. (Doc. 41 at 7; citing Doc. 41-1 at 15.) Plaintiff then states that courts in similar cases have found that this factor favors a finding that exotic dancers are employees. (Doc. 41 at 7, citing Reich, 998 F.2d at 324-

28; McFeeley, 47 F.Supp.3d at 271.)

In response, Defendants state that the club generates approximately $1.5 million annually, but Plaintiffs have not provided any record as to the amount of their investment in their performance activities at Le Girls. (Doc. 46 at 10.) Defendants also argue that given the flexible arrangement between dancers and Le Girls, "framing a comparison of relative investments between the Club and dancers is irrelevant and inapposite." (Id.) The Court agrees. If Defendants have no meaningful control over their dancers, it is not surprising that the dancers would not invest heavily in the establishment. Therefore, the Court finds that this factor is inconsequential to the overall analysis.

*Factor 4: Whether the service rendered requires a special skill*

The fourth factor of the economic realities test is whether the service rendered requires a special skill. Real, 603 F.2d at 754. "Other courts have held that there is no special skill required to become an exotic dancer, pointing to the lack of instruction, certification, and prior experience required to become an exotic dancer." McFeeley, 47 F.Supp.3d at 272 (further citations omitted).

In support of her argument that exotic dancing requires no special skill, Plaintiff cites two cases where courts have made such a finding: Butler v. PP&G, Inc., No. CV-13-430, 2013 WL 5964476, at *5 (D. Md. Nov. 7, 2013), and Stevenson v. Great American Dream, Inc., No. CV 1:12-3359, 2013 WL 6880921, at *5 (N.D. Ga. Dec. 31, 2013). (Doc. 41 at 7.) Plaintiff also cites the fact that Le Girls does not require its dancers to have any formal dance training or certification. (Id. at 7, citing Doc. 41-1 at 12-14.)

Defendants counter that it is an "undeniable skill set" for a dancer to excel at performing and interacting well with patrons. (Doc. 46 at 11.) Defendant urges this Court to depart from other courts which have dismissed exotic dancing as requiring little to no specialized skill. (Id.) Defendant also offers the creative argument that plumbers, handymen, and standup comedians may not have special training but could be deemed to possess "special skills." (Id.)

The Court is inclined to follow the reasoning of other courts on this matter. Other

than Defendants' own opinion, there is no evidence to show that exotic dancing requires a special skill. Defendant also fails to cite to any controlling or persuasive authority in support of his argument that exotic dancing is an "undeniable skill set." The Court also rejects the notion that performing and interacting well with patrons is a special skill. (See Lester, 2016 WL 1588654, at *5 (noting that every court to consider a "hustling" argument by a strip-club proprietor has rejected it).)

On the other hand, there is evidence showing that exotic dancing does not require a special skill. Defendants do not require that their dancers have any formal training or dance certifications, or provide references. (Doc. 41-1 at 14.) Defendants admit that dancers are free to dance how they choose, so long as they comply with the City of Phoenix's rules and regulations. (Doc. 46 at 11.) Joshua Thornton also testified that all that is required of a woman with no prior experience to try out to be an exotic dancer is that she do a "trial run." (Doc. 41-1 at 13.)

For these reasons, the Court finds that there is a minimal degree of skill required to be an exotic dancer at Le Girls. Thus, this factor weighs in favor of employee status.

*Factor 5: The degree of permanence of the working relationship*

The fifth factor of the economic realities test is the degree of permanence of the working relationship. Real, 603 F.2d at 754. "Generally, a long, exclusive relationship weighs in favor of finding that the individual is an employee." Lester, 2016 WL 1588654, at *5 (further citation omitted). However, since exotic dancers tend to be itinerant, many courts that have addressed whether dancers are employees have accorded this factor only modest weight. Id.

Plaintiff argues that even if Le Girls and its dancers could terminate their relationship at any time, and even if it is unknown how long dancers tended to remain at Le Girls, that this factor is entitled to only modest weight. (Doc. 41 at 8, citing cases.)

Defendant argues when dancers perform at multiple clubs, this factor weighs in favor of independent contractor status. (Doc. 46 at 12, citing Clincy v. Galardi South Enterprises, Inc., 808 F. Supp. 2d 1236 (N.D. Ga. 2011).) Defendant points to Plaintiff

Tijerno's testimony, in which she stated that she appeared at over a dozen clubs across multiple states during her performing career. (Id., citing Doc. 47-1 at 39-56.)

The Court finds that these facts weigh in favor of independent contractor status. Per the License Agreement, dancers are "free to perform at any other adult entertainment venue" while performing at Le Girls. (Doc. 47-1 at 5.) Plaintiff Tijerno testified that she performed at Le Girls and other clubs over the same period of time (Id. at 19-27), and Plaintiff Toliver likewise testified that she appeared at more than one club at a time (Id. at 60). The License Agreement also permits a dancer to go up to twelve months without appearing at Le Girls, and states that the relationship between a dancer and Le Girls can be terminated at any time. (Id. at 2.) For these reasons, the Court finds that this factor weighs in favor of independent contractor status.

*Factor 6: Whether the service rendered is an integral part of the alleged employer's business*

The sixth factor of the economic realities test is whether the service rendered is an integral part of the alleged employer's business. Real, 603 F.2d at 754.

Plaintiff argues that exotic dancing is an integral part of Le Girls, as the name of the Club reflects this reality, and Defendants' website markets itself as a venue where patrons can enjoy "sexy" topless and nude female dancers. (Doc. 41 at 8-9, citing Le Girls' website.) Plaintiff also cites a number of cases in support of the proposition that courts have "emphatically rejected the notion that exotic dancers are anything less than integral to a strip club." (Id., citing cases.)

Defendants admit that dancers are relevant to its operations, but also argue that musical performances are also relevant to its operations. (Doc. 46 at 12.)

The Court finds that exotic dancing is, undoubtedly, an integral part of Le Girls. This factor thus weighs in favor of employee status.

*Consideration of all factors*

To summarize, weighing in favor of independent contractor status is the fact that Defendants exercise virtually no control over the manner in which the dancers' work is

performed, and the fact that there is a lack of permanence of the working relationship between Defendants and the dancers. The absence of meaningful control carries substantial weight under the Real test, and decreases the weight accorded to all other factors. (See supra, page 8.)

Weighing in favor of employee status is the fact that the service rendered by the dancers does not require a special skill, and the fact that the service rendered is an integral part of Defendants' business.

The facts having no impact on the overall analysis include the dancers' opportunity for profit or loss depending upon their managerial skill and the dancers' investment in equipment or materials required for their task, or their employment of helpers.

Accordingly, the Court finds that, on balance, the factors weigh in favor of independent contractor status.

## IV. CONCLUSION

Although Plaintiff urges this Court to find an employee/employer relationship on the basis that so many other courts have found so in cases involving exotic dancers and the clubs where they perform, Plaintiff's reliance on these cases is misplaced; the facts of the instant case are materially distinguishable from the facts of these other cases. Most significant is the fact that in this case, Defendants exert virtually no control over their dancers, as discussed under the first Real factor.

The Court thus finds that the service rendered by Plaintiff at Le Girls is that of an independent contractor. Having concluded that Plaintiff is not an employee of Le Girls for purposes of the FLSA, the Court need not consider her Renewed Motion for Conditional Certification and to Authorize Notice to Putative Class Members. (Doc. 40.)

Accordingly,

**IT IS HEREBY ORDERED** denying Plaintiff's Renewed Motion for Conditional Certification and to Authorize Notice to Putative Class Members. (Doc. 40.)

**IT IS FURTHER ORDERED** requiring that Plaintiff show cause by **Friday,**

Case 2:15-cv-02563-SMM Document 52 Filed 06/21/17 Page 15 of 15

**July 14, 2017**, why this case should not be dismissed with prejudice for lack of subject matter jurisdiction. Defendant shall respond to Plaintiff's show cause brief by **Friday, July 28, 2017**. There shall be no reply.

Dated this 21st day of June, 2017.

Honorable Stephen M. McNamee
Senior United States District Judge