Douglas J. Melton, Bar No. 161353
Shane M. Cahill, Bar. No. 227972
LONG & LEVIT LLP
465 California Street, 5th Floor
San Francisco, California 94104
Telephone: (415) 397-2222
E-mail: dmelton@longlevit.com
scahill@longlevit.com

Attorneys for Defendant
SFBSC Management, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE ROES 1-2, on behalf of themselves and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SFBSC MANAGEMENT, LLC; and DOES 1-200,<br><br>Defendants. | Case No. 3:14-cv-03616-LB<br><br>**DECLARATION OF DOUGLAS J. MELTON IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT**<br><br>Date: September 14, 2017<br>Time: 9:30 a.m.<br>Courtroom: Courtroom C, 15th Floor<br>Judge: The Honorable Laurel Beeler |

I, Douglas J. Melton, declare:

1. I am a partner with the law firm Long & Levit LLP, defense counsel of record in this action. I am licensed to practice before all the Courts of the state of California as well as the U.S. District Courts located in California. I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would competently testify thereto.

**BACKGROUND**

2. For the last approximately 13 years my practice has included counseling and defending San Francisco adult entertainment clubs featuring nude and semi-nude exotic dance ("adult nightclubs").

3. During the last approximately 13 years, my firm has provided legal services to almost every adult nightclub operating in San Francisco. On information and belief, during that timeframe, all but one of the adult nightclubs operating in San Francisco had independent contractor relationships with the majority of entertainers who performed at the clubs. On information and belief based on my work on behalf of adult nightclubs, it is my understanding that classifying exotic dancers as independent contractors is the industry standard throughout California and the nation.

4. On information and belief, the one San Francisco adult nightclub that did not offer exotic dancers the option of performing as independent contractors during that timeframe went out of business in 2013.

5. Our work on behalf of San Francisco adult nightclubs has included litigating the question of whether exotic dancers were properly classified as independent contractors. We have also counseled adult nightclub clients as to the legal and logistical issues associated with possibly converting exotic dancers to employee status.

6. In my experience, the ubiquity of the independent contractor exotic dancer model within the adult nightclub industry has functioned as an impediment to adult nightclubs' willingness to attempt to implement an employment relationship with exotic dancers as well as a factor in many exotic dancers' desire to be characterized as independent contractors. In my experience, adult nightclub owners and managers fear that if their club were to withdraw the

option for entertainers to perform as independent contractors, and require them to become club employees, the exotic dancers would abandon the club *en masse* and simply go work at competitor clubs that retained the independent contractor model.

## CHANGED BUSINESS PRACTICES

7. On information and belief, the changed business practices at the adult nightclubs involved in the Settlement Agreement in this case (see ECF No. 126, ¶¶ 136-144 [Settlement Agreement]) would, if the settlement is approved by the Court, represent the most sweeping change in the relationship between San Francisco adult nightclubs, on the one hand, and the exotic dancers who perform there, on the other hand, at any time during the period that our firm has represented adult nightclubs.

8. On information and belief, at present there are a total of 12 adult nightclubs operating in San Francisco that feature female nude and semi-nude entertainment. The changed business practices outlined in the Settlement Agreement would be implemented at 10 of these adult nightclubs.

9. The fact that 10 of the 12 adult nightclubs operating in San Francisco would simultaneously adopt these changed business practices, which are expected to facilitate the conversion of a significant percentage of the exotic dancers from independent contractor status to employee status, provides for a unique opportunity to implement change on a scale that has the potential to present an alternative business model for the larger industry.

10. Moreover, by including all 10 adult nightclubs in a settlement that requires them to implement the same changed business practices, the clubs will be allowed to fully explore this alternative business model without any single gentlemen's club being put at a competitive disadvantage.

11. As the court is aware, Class Members who elect the employee option would be paid an hourly rate of $15.00. (ECF No. 126, ¶ 139.) They will also be entitled to a commission of 20% on their sales of private dances for all sales that exceed $150.00 per performance date. (*Id.*) Class Members who elect to become employees would also receive, or be eligible to receive, paid sick leave, unemployment insurance, workers' compensation insurance and group

health insurance (assuming they work sufficient hours to qualify under the plan documents). The settling adult nightclubs would also pay applicable state and federal social security tax, Medicare tax, and California Employee Training Tax. The settling adult nightclubs would also pay the cost of supplying employee entertainers with costumes and the cost of additional training an entertainer may receive as an employee.

12. Moreover, to address some of the concerns raised in this litigation about alleged misconduct by club personnel (which Defendants deny but nevertheless agreed for the purposes of settlement to address), the Settlement Agreement requires the settling adult nightclubs to provide a document summarizing the terms of the employment offer and the differences between performing at the gentlemen's club as an employee versus an independent contractor, the contents of which must be approved by Class Counsel. (ECF No. 126, ¶ 140.) Also, personnel of the settling adult nightclubs will not be allowed to present a Class Member with the choice regarding employee versus independent contractor status while the Class Member is in a state of nudity or semi-nudity or otherwise impaired. (*Id.* at ¶ 141-142.) Finally, any Class Member performing as an independent contractor will be entitled, at any time, to notify club management of her desire to terminate her contract and be hired as an employee. (*Id.* at ¶ 143.)

13. Finally, to ensure uniform implementation of the changed business practices at all the adult nightclubs participating in the Settlement Agreement, Long & Levit will create a training video that explains the employment option for exotic dancers set forth above (the "Training Video") prior to the Fairness Hearing. (ECF No. 126, ¶ 146.) Prior to use in the clubs, the Training Video will be reviewed and must be approved by Class Counsel and will also be submitted to the Court for review prior to the Fairness Hearing. (*Id.*) Each Nightclub manager, and all club personnel tasked to engage in exotic dancer onboarding, will be required to fully review the Training Video. (*Id.*)

14. In objectors' Objection to Proposed Class Action Settlement at the preliminary approval phase, objectors' counsel characterizes the changed business practices summarized above as "… relatively meaningless changes in working conditions …" (ECF No. 133, p. 9:23) that are "… really of little to no value ..." (*Id.*, p. 12:18) that "… would simply affect how the

dancers are paid." (*Id.*, p. 13:7-8.) Objectors' counsel also argued that the settling parties have failed to provide "... any real explanation as to how the dancers' ability to choose to be paid differently would create future value for them ..." and that, accordingly, "... the Court should not place monetary value on this portion of the settlement." (*Id.*, 13:10-13). Now, at final approval, Objectors' counsel makes substantially similar arguments in Objectors' Objection to Proposed Class Action Settlement. (ECF No. 162, p. 13:20-16:12.)

15. As they were during preliminary approval, these arguments are curious coming from a lawyer who seeks to assert damages claims on behalf of a putative class of exotic dancers arising from their alleged improper classification as independent contractors with the damages consisting of allegedly unpaid wages, unreimbursed business expenses and the absence of the benefits and protections available to employees but not to independent contractors. Objectors' counsel's complaints in *Hughes v. S.A.W. Entertainment Ltd.*, 3:16-cv-03371-LB (N.D. Cal.) and *Pera v. S.A.W. Entertainment*, Ltd., 3:17-cv-00138-LB (N.D. Cal.), and all the claims therein, are premised entirely on the alleged monetary value to exotic dancers associated with being characterized as employees and not as independent contractors.

16. In any event, as the Court found at preliminary approval, "there is an economic value that attaches to [the changed business practices] portion of the settlement." (ECF No. 151, p. 18:1-9) As summarized in the declaration of Maria Montie (ECF No. 129; see also Montie Declaration submitted in support of Plaintiff's Final Approval Motion), based on an evaluation of Class Member 2015 hours and earnings data, if just Class Members who would earn more money under the employee model summarized above than they did in 2015 elected to become employees, the total cost to the settling adult nightclubs of paying the associated wages, commissions, benefits and taxes would exceed $2 million over the course of two years. These funds would be paid directly to, or for the direct benefit of, Class Members. Similar benefits would also be conferred upon non-Class Member exotic dancers who commenced to perform after final approval. Obviously, if even more Class Members elected to become employees, these costs and corresponding benefits would increase.

///

17. In sum, the changed business practices are an essential part of the proposed settlement. They were the subject of intensive negotiations during the mediation sessions with Ninth Circuit Mediator, Peter Sherwood, and are the product of subsequent Herculean efforts to get the ownership and management of 10 different adult nightclubs to agree on an exotic dancer employee model that could be uniformly implemented at all the settling adult nightclubs.

18. The changed business practices provide Class Members who elect employee status all of the employment benefits and protections class counsel argued in the Complaint were improperly denied to Class Members. As such, the Court should continue to regard the changed business practices as conferring a substantial financial benefit on Class Members.

**DANCE FEE PAYMENTS**

19. In addition to the changed business practices outlined above, Class Members were given an opportunity under the Settlement Agreement to elect to receive either a Cash Payment (ECF No. 126 [Settlement Agreement] ¶ 116) or a Dance Fee Payment. (ECF No. 126, ¶¶ 112(c), 124-135.)

20. In Objectors' Objection to Proposed Class Action Settlement, Objectors' counsel characterizes the Dance-Fee Payment component of the Settlement as a "coupon" with "no value." (ECF No. 162, p. 18:8.) Objector's counsel contends the Nightclubs' retention of a portion of customers' Dance Fees constitutes a charge to Class Members "for the mere 'privilege' of working." (*Id.* at p. 18:9-18.) Objectors' counsel also argues that the Dance-Fee Payments under the Settlement Agreement are improper because "the class members must first 'hand over more of their own money before they can take advantage of the coupon… because dancers must pay the stage fee or house fee out of their own pocket for the 'opportunity' to work." (*Id.* at 19:11-17; *see also, id.* at 11:25—12:1 ["Each time that a dancer works a shift to 'cash in' the Dance Fee coupon, she first pays a house fee to the club, she pays any charges or fines assessed by the club…."].)

21. Having worked with the Nightclubs for many years, I have developed a familiarity with their business practices vis-à-vis independent contractor exotic dancers. Based on that familiarity, and contrary to Objectors' counsel's arguments, I can state that entertainers at the

Nightclubs are not, and have never been charged, a "fee" to perform. Accordingly, entertainers do not have to "pay" to redeem Dance Fees. Rather, under their contractual agreements with the Nightclubs, entertainers agree to share a percentage of Dance Fees paid by customers with the Nightclub. (*See e.g.*, ECF No. 25-5, p. 2 at ¶ II.C. [Performer Contract defining "Dance Fees" as: "[T]he non-gratuitous cost or price for Private Dances. These fees are MANDATORY CHARGES to the patrons as the price for a personal or private dance. They are NOT tips or gratuities."].) Dance Fees and other sales attributable to the entertainer constitute "Gross Revenue. (*Id.* at ¶ II.D.) And the Gross Revenue is split between the Nightclub and the entertainer pursuant to the terms of the Performer Contract. (*Id.* at ¶ II.A. ["ALLOCATION OF GROSS REVENUE"].) For example, entertainers may retain 100% of Gross Revenue from main floor dances and 80% of Gross Revenues from VIP performances. (*Id.*) Entertainers, of course, retain all of their tips. (*Id.* at ¶ II.E. ["'Tips/Gratuities' are the amounts over and above the Dance Fee, voluntarily given by a patron and handed directly to Performer, and are the exclusive property of Performer."].)

**ARBITRATION**

22. Objectors' counsel attempts to minimize the risk that Plaintiffs in this lawsuit might still be compelled to individually arbitrate their claims if final approval is denied. Specifically, Objectors' counsel argues that "this Court and the Ninth Circuit have already held that Defendant could not invoke the arbitration provision and there is no longer any serious risk presented by the issue." (ECF No. 162, at p. 29:16-18.)

23. As the Court will recall, at the outset of this case Defendant SFBSC Management, LLC ("SFBSC") filed a motion to compel the named Plaintiffs (Jane Roe 1 and Jane Roe 2) to individual arbitration based on the arbitration provisions class-action waivers contained in the arbitration provisions in the Performer Contracts they executed. (ECF No. 25.) The Court denied the motion on the basis that the agreements were unconscionable. (ECF No. 53.) SFBSC appealed and the Court stayed the action pending resolution of the appeal on the basis that SFBSC's appeal "raised 'serious legal questions' regarding the correctness of the court's order denying arbitration." (ECF No. 80, p. 4:3-4.) While the Ninth Circuit affirmed the Court's order

denying SFBSC's motion to compel arbitration, it did so only because SFBSC failed to present sufficient evidence that it had standing to enforce the arbitration agreements. (See, ECF No. 90.)

24. If final approval of the settlement is denied, however, SFBSC has the right to have its appeal reinstated so it can file a petition for reconsideration and/or *en banc* review of the Ninth Circuit's decision. (ECF No. 104.) We believe there are valid grounds to petition for reconsideration and/or to seek *en banc* review.

25. Even if SFBSC did not further pursue its appeal rights in the event final approval were denied, we are informed and believe that additional evidence would come to light through discovery regarding the circumstances under which the contracts containing the arbitration provisions were presented as signed, as regarding SFBSC's standing to enforce the arbitration agreements, such that SFBSC would have grounds for a renewed motion to compel arbitration. In addition, before the parties entered into the Settlement Agreement, Plaintiffs' counsel advised that it was his intention to add the Nightclubs as named Defendants. As they are signatories to the Performer Contracts that contain the arbitration provisions and class-action waivers, the Nightclubs would unquestionably have standing to seek to enforce the agreements. In short, contrary to Objectors' counsel's arguments, there remains a risk that Plaintiffs and/or other putative class members who opt-in to the FLSA claim will be forced to individually arbitrate their claims if final approval of the parties' settlement is denied.

26. Likewise, Objectors' counsel suggests there is no risk that Plaintiffs in the related lawsuits of *Hughes v. S.A.W. Entertainment, LTD* (Case No. 16-cv-03371-LC) ("*Hughes*") and *Pera v. Saw Entertainment Ltd.* (Case No. 17-cv-00138-DMR) ("*Pera*") will be compelled to individual arbitration. (ECF No. 162, at p. 29:18-21.) This, too, is incorrect and Objectors' counsel's contention that "the defendant in Hughes has agreed that it will not seek to invoke the arbitration clause in that case," (*id.*) is an oversimplification of the agreement that transpired.

27. When the *Hughes* lawsuit was filed, the only named parties were Plaintiff, Nicole Hughes, and Defendant, S.A.W. Entertainment, LTD. d/b/a Larry Flynt's Hustler Club ("SAW"). (*Hughes* ECF No. 2.) In response to Hughes' complaint, SAW filed a motion to compel arbitration. (*Hughes* ECF No. 27.) Thereafter, the complaint in *Hughes* was amended to add

Angelynn Hermes and Penny Nunez as Plaintiffs and Gold Club-SF, LLC as a Defendant. (ECF No. 32.) The Plaintiffs also added a cause of action under California's Private Attorney General Act ("PAGA") (ECF No. 32) (Hughes original complaint did not contain a PAGA claim.) (ECF No. 2.) Ultimately, the amended complaint rendered SAW's motion to compel arbitration moot. (ECF No. 35.) Accordingly, SAW withdrew the motion. (*Id.*)

28. Around the same time, Hughes filed a charge with the National Labor Relations Board ("NLRB") alleging SAW's effort to enforce its arbitration agreement and class-action waiver violated the National Labor Relations Act ("NLRA"). The NLRB immediately began investigating Hughes' charge and demanded SAW respond to the allegations, forcing SAW to defend on two fronts.

29. As the Court is no doubt aware, the law regarding the enforceability of class-action waivers has evolved, sometimes quickly and drastically, over the last few years. In *Iskanian v. CLS Transp. Los Angeles, LLC* (2014) 59 Cal.4th 348, 359, the California Supreme Court, taking guidance from the U.S. Supreme Court, upheld the enforceability of class-action waivers in employment agreements. In its decision, the Court held that the enforcement of class-action waivers did not violate the NLRA (*id.* at 367-374); however, it also held that class-action waivers cannot preclude an employee from brining a representative PAGA action. (*Id.* at 379-391.) In *Sakaab v. Luxottica Retail North America, Inc.*, 803 F.3d 425 (9th Cir. 2015), the Ninth Circuit reached a similar conclusion regarding PAGA waivers.

30. Before and after *Iskanian*, numerous federal district courts in the Ninth Circuit ruled an employer's enforcement of a valid class-action waiver was not a violation of the NLRA. (*See e.g.*, *Fardig v. Hobby Lobby Stores*, 2014 WL 2810025 (C.D. Cal. 2014) [holding that following the NLRB's reasoning on this issue would conflict with the FAA and the Supreme Court's decision in *Concepcion*...and noting that "every district court in this circuit to consider [this argument] has declined to follow it."] *see also Morvant v. P.F. Chang's China Bistro, Inc.*, 870 F.Supp.2d 831 (N.D. Cal. 2012).)

31. Despite the fact that numerous courts had found enforcement of class-action waivers in the employment (or alleged employment) context did not violate the NLRA, it was our

experience that the NLRB would nevertheless vigorously pursue any such charges, up through trial and appeal. It was the NLRB's position that it was only bound to follow U.S. Supreme Court precedent. Because the Supreme Court, according to the NLRB, had rendered no decision on this issue, the NLRB was free to interpret the NLRA as it deemed appropriate and reject the weight of authority against it. This meant SAW faced a long and expensive battle with the NLRB as long as it sought to enforce its arbitration agreement and class-action waiver in *Hughes*. Indeed, it was our experience that the NLRB and its Administrative Law Judges were entirely unpersuaded and uninfluenced by the numerous Court decisions on the issue, assuring an almost guaranteed loss. It was also our experience that the NLRB would pursue any charge of alleged violation of the NLRA even if the lawsuit between the parties had settled.

32. Not long before SAW filed its motion to compel in *Hughes*, a divided Ninth Circuit panel joined the minority of courts that had concluded class-action waivers in mandatory employment arbitration agreements violate the NLRA. (*Morris v. Ernst & Young*, 834 F.3d 975 (9th Cir. Aug. 22, 2016).)[1] This deepened an already existing circuit split on the issue. (*See, Lewis v. Epic Systems Corp.*, 823 F.3d 1147 (7th Cir. 2016); *Cellular Sales of Missouri, LLC v. NLRB,* 824 F.3d 772 (8th Cir. 2016)*; D.R. Horton v. NLRB,* 737 F.3d 344, 362 (5th Cir. 2013); *Sutherland v. Ernst & Young LLP,* 726 F.3d 290, 297 n.8 (2nd Cir. 2013).) On January 13, 2017, the Supreme Court granted *certiorari* in *National Labor Relations Board v. Murphy Oil USA* (No. 16-307), *Epic Systems Corp. v. Lewis* (No. 16-285), and *Ernst & Young LLP v. Morris* (No. 16-300)) to resolve the split.

33. Against this uncertain legal backdrop, facing the prospect of an expensive and lengthy battle with the NLRB, and given that the Plaintiffs in *Hughes* had amended their complaint to add a PAGA cause of action, SAW made the decision that it would not pursue enforcement its arbitration agreement against Hughes; and Defendants' counsel advised *Hughes'* counsel accordingly. This resulted in Hughes agreeing to withdraw her NLRB charge, but without prejudice in the event SAW again moved for enforcement.

---

[1] Because Hughes' was not an employee and was not forced to agree to arbitration, it was SAW's position that *Morris* did not apply.

34. SAW never agreed it would not, under any circumstance, reconsider enforcement of the arbitration agreement and class-action waiver Hughes executed. Hughes and her counsel must have contemplated this possibility, as Hughes withdrew her NLRB charge without prejudice. If the U.S. Supreme Court determines class-action waivers do not violate the NLRA, SAW will, of course, reconsider filing a motion compelling Hughes to individual arbitration.

35. With respect to Plaintiffs Hermes and Hughes, no agreements were made regarding the enforcement of the arbitration provision and class-cation waivers they executed. Likewise, Gold Club did not make any representations about whether it would move to enforce its arbitration agreements and class action waivers in *Hughes*. Finally, the Defendant in *Pera* (SAW d/b/a Condor Gentlemen's Club) never made any representations or agreements with respect to enforcement of its arbitration agreements and class action waivers.

**CAFA COMPLIANCE**

36. As required by the Class Action Fairness Act ("CAFA") 28 U.S.C. § 1715, Defendants' counsel caused to be served notices to the United States Attorney General and on the Attorneys General of each state in which a Class Member was known or believed to reside.

37. The CAFA notices were timely served on March 15, 2017, within 10 days after submission of the Settlement Agreement to the Court.

38. Attached hereto as Exhibit "A" is a true and correct copy of the CAFA Notice served on the United States Attorney General. A substantially similar version of this CAFA Notice was sent to all other Attorneys General who Defendants served. Along with the CAFA Notice, I caused to be served a disc containing all the information referenced in the CAFA Notice.

39. A copy of Defendants' Proof of Service of the CAFA Notice is attached hereto as Exhibit "B."

40. As of the filing of this declaration, Defendants' counsel has received only one response to Defendants' CAFA Notice. This was an acknowledgement from the Washington State Attorney General's Office that it had received Defendants' CAFA Notice. A true and correct copy of this e-mail is attached hereto as Exhibit "C."

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on August 4, 2017 at San Francisco, California.

DOUGLAS J. MELTON

# EXHIBIT A

LONG & LEVIT LLP

ATTORNEYS AND COUNSELORS AT LAW

Shane M. Cahill
*Senior Counsel*

scahill@longlevit.com
Direct Dial: 415-438-4594

March 15, 2017

S0301.204

**VIA U.S. MAIL**

Jeff Sessions
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

**Re: Notice of Proposed Class-Action Settlement in *Roe v. SFBSC Management, LLC* U.S.D.C., N.D. Cal., No. 3:14-cv-03616-LB**

Dear Attorney General Sessions:

Pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1715, Defendant SFBSC Management, LLC ("Defendant") provides notice of the proposed settlement reached between Plaintiffs and Defendant in the above-entitled class action.

**Compliance with 28 U.S.C. § 1715**

Subsection 1715(b) lists eight items that must be provided in connection with any proposed class action settlement covered under CAFA. Each of these items is addressed below. Documents referenced below are included on a CD enclosed with this letter.

1. **28 U.S.C. § 1715(b)(1) – Complaint and Related Materials**

Copies of the complaints filed in the Action, including the proposed Second Amended Complaint, are enclosed. The proposed Second Amended Complaint is attached as Exhibit B to the Settlement Agreement.

2. **28 U.S.C. § 1715(b)(2) – Notice of Any Scheduled Judicial Hearing**

The hearing on Plaintiffs' Motion for Preliminary Approval is set for April 13, 2017, at 9:30 a.m. in Courtroom C of the Northern District of California, San Francisco Division, located at 450 Golden Gate Avenue, San Francisco on the 15th Floor. A copy of Plaintiffs' Motion for Preliminary Approval is enclosed.

3. **28 U.S.C. § 1715(b)(3) – Notification to Class Members**

The proposed class notice is enclosed.

4. **28 U.S.C. § 1715(b)(4) – Class Action Settlement Agreement**

A copy of the Settlement Agreement, with exhibits, is enclosed.

5. **28 U.S.C. § 1715(b)(5) – Any Settlement of Other Contemporaneous Agreements**

There are no other settlements or contemporaneous agreements between class counsel and counsel for Defendant.

6. **28 U.S.C. § 1715(b)(6) – Final Judgment or Notice of Dismissal**

There has been no final judgment or notice of dismissal.

7. **28 U.S.C. § 1715(b)(7)(B) – Estimate of Class Members**

Defendant estimates based on information derived from its records that there are approximately 4,691 class members. On January 1, 2015, the Court issued an order granting Plaintiffs' Motion to Proceed using Pseudonyms to protect their identities due to the nature of the work in which they engaged. A copy of the Court's order is enclosed. As a result of the Court's order, it is not feasible for Defendant to provide the names of settlement class members. Enclosed, however, is a breakdown of the estimated number of class members who reside in each state.

The settlement award to each class member shall be determined based on the nature of each class members' claim as set forth in the Plans of Allocation in Sections V and VI of the enclosed Settlement Agreement. Section VII of the Settlement Agreement also calls for injunctive relief in the form of changed business practices.

8. **28 U.S.C. § 1715(b)(8) -- Judicial Opinions Related to the Settlement**

There have been no judicial opinions regarding class notification, the settlement agreement, judgment, or dismissal.

**<u>Timeliness of Notice</u>**

Section 1715(b) provides that defendants in class actions must serve notice of the settlement, "[n]ot later than 10 days after a proposed settlement of a class action is filed in court...." Defendant has complied with this deadline because the Settlement Agreement, together with the Motion for Preliminary Approval, was filed on March 9, 2017 and this notice is being served within ten days from the date of those court filings.

Please contact our office at the number listed above if you require any additional materials or need any further information about the above matter.

Very truly yours,

Shane M. Cahill

Enclosures on CD-ROM

cc: Steven G. Tidrick, Esq.

# EXHIBIT B

Douglas J. Melton, Bar No. 161353
Shane M. Cahill, Bar. No. 227972
LONG & LEVIT LLP
465 California Street, 5th Floor
San Francisco, California 94104
Telephone: (415) 397-2222
E-mail: dmelton@longlevit.com
scahill@longlevit.com

Attorneys for Defendant
SFBSC Management, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE ROES 1-2, on behalf of themselves and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SFBSC MANAGEMENT, LLC; and DOES 1-200,<br><br>Defendants. | Case No. 3:14-cv-03616-LB<br><br>**PROOF OF SERVICE** |

## PROOF OF SERVICE

I, the undersigned, declare:

I am a citizen of the United States and employed in San Francisco County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 465 California Street, 5th Floor, San Francisco, California 94104.

On March 15, 2017, I served the document(s) named below on the interested parties in the case of *Jane Roes v. SFBSC Management, LLC,* United States Court of Appeals (Ninth Circuit) Case No.: 15-15437.

**MARCH 15, 2017 LETTER FROM SHANE CAHILL OF LONG & LEVIT LLP TO ATTORNEYS GENERAL ENCLOSING NOTICE OF PROPOSED SETTLEMENT**

SERVED UPON:

Steven T. Marshall
Office of the Attorney General
P.O. Box 300152
Montgomery, AL 36130-0152

Mark Brnovich
Office of the Attorney General
1275 West Washington Street
Phoenix, AZ 85007-2926

CAFA Coordinator
Office of the Attorney General
Consumer Law Section
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102

Cynthia H. Coffman
Office of the Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Building
1300 Broadway, 10th Floor
Denver, CO 80203

George Jepsen
Office of the Attorney General
55 Elm Street
Hartford, CT 06106

Pam Bondi
Office of Attorney General
The Capitol PL-01
Tallahassee, FL 32399-1050

Chris Carr
Office of the Attorney General
40 Capitol Square, SW
Atlanta, GA 30334

Doug Chin
Office of the Attorney General
425 Queen Street
Honolulu, HI 96813

Tom Miller
Office of the Attorney General
Hoover State Office Building
1305 E. Walnut Street
Des Moines, IA 50319

Lawrence Wasden
Office of the Attorney General
700 W. Jefferson Street, Suite 210
Boise, ID 83720-0010

Lisa Madigan
Office of the Attorney General
100 West Randolph Street
Chicago, IL 60601

Curtis T. Hill, Jr.
Office of the Attorney General
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN 46204

Derek Schmidt
Office of the Attorney General
120 SW 10th Ave., 2nd Floor
Topeka, KS 66612

Jeff Landry
Office of the Attorney General
P.O Box 94005
Baton Rouge, LA 70804

Maura Healey
Office of the Attorney General
ATTN: CAFA Coordinator/General Counsel's Office
One Ashburton Place
Boston, MA 02108

Brian E. Frosh
Office of the Attorney General
200 St. Paul Place
Baltimore, MD 21202

Bill Schuette
Office of the Attorney General
Consumer Protection Division
P.O. Box 30213
Lansing, MI 48909-7713

Lori Swanson
Office of the Attorney General
445 Minnesota Street, Suite 1400
St. Paul, MN 55101-2131

Josh Hawley
Office of the Attorney General
Supreme Court Building
207 W. High St.
Jefferson City, MO 65102

Josh Stein
Office of the Attorney General
9001 Mail Service Center
Raleigh, NC 27699-9001

Christopher S. Porrino
Office of the Attorney General
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

Hector Balderas
Office of the Attorney General
P.O. Drawer 1508
Santa Fe, NM 87504-1508

Adam Paul Laxalt
Office of the Attorney General
Old Supreme Ct. Bldg.
100 N. Carson St.
Carson City, NV 89701

Eric Schneiderman
Office of the Attorney General
Department of Law
The Capitol, 2nd floor
Albany, NY 12224

Mike DeWine
Office of the Attorney General
State Office Tower
30 E. Broad St.
Columbus, OH 43266-0410

Mike Hunter
Office of the Attorney General
313 NE 21st Street
Oklahoma City, OK 73105

Ellen F. Rosenblum
Office of the Attorney General
Justice Building.
1162 Court St.
NE, Salem, OR 97301

Josh Shapiro
Office of the Attorney General
Strawberry Square, 16th Floor,
Harrisburg, PA 17120

Peter Kilmartin
Office of the Attorney General
150 S. Main St.
Providence, RI 02903

Alan Wilson
Office of the Attorney General
P.O. Box 11549
Columbia, SC 29211

Marty J. Jackley
Office of the Attorney General
1302 East Highway 14, Suite 1
Pierre, SD 57501-8501

Herbert H. Slatery, III
Office of the Attorney General
425 5th Avenue North
Nashville, TN 37243

Ken Paxton
Office of the Attorney General
P.O. Box 12548
Austin, TX 78711-2548

Sean Reyes
Office of the Attorney General
P.O. Box 142320
Salt Lake City, UT 84114-2320

Mark Herring
Office of the Attorney General
202 North Ninth Street
Richmond, VA 23219

Bob Ferguson
Office of the Attorney General
1125 Washington St. SE
PO Box 40100
Olympia, WA 98504-0100

Brad Schimel
Office of the Attorney General
Wisconsin Department of Justice
P. O. Box 7857
Madison, WI 53707-7857

Jeff Sessions
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Steven G. Tidrick, Esq.
Joel B. Young, Esq.
The Tidrick Law Firm
2039 Shattuck Avenue, No. 308
Berkeley, CA 94704

☒ (BY MAIL) I am readily familiar with Long & Levit LLP's practice for collection and processing of documents for mailing with the United States Postal Service. I caused such document(s) to be placed in a sealed envelope, addressed to the person(s) on whom it is to be delivered pursuant to the attached service list, with postage thereon fully prepaid, to be deposited with the United States mail at San Francisco, California, that same day in the ordinary course of business.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on March 15, 2017, at San Francisco, California.

Jessica Urbina

# EXHIBIT C

**From:** ATG MI WA CAFA-PrivateCP Lawsuits <privatecpa@ATG.WA.GOV>
**Sent:** Thursday, April 13, 2017 4:09 PM
**To:** Cahill, Shane M.
**Subject:** RE: Matter # 10754789, Roe v. SFBSC Management, LLC

**Sent on behalf of Assistant Attorney General Amy Teng:**

Dear Shane Cahill:

This message acknowledges that we have received notice from you regarding the above mentioned case pursuant to the Class Action Fairness Act of 2005, 28 U.S.C § 1715 (CAFA).

Thank you for bringing this matter to the attention of the Washington State Attorney General's Office, Consumer Protection Division.

Sincerely,

*Donnelle Brooke*
Paralegal
Office of the Attorney General
Consumer Protection Division
Phone-206-464-6562