1

2

3

4

5

6

7

8

9 UNITED STATES DISTRICT COURT

10 NORTHERN DISTRICT OF CALIFORNIA

11 San Francisco Division

12 JANE ROE, et al.,                              Case No. 14-cv-03616-LB

13              Plaintiffs,

14       v.                                       **ORDER APPROVING CLASS-ACTION SETTLEMENT**

15 SFBSC MANAGEMENT, LLC, et al.,
                                                   Re: ECF No. 159 and 163
16              Defendants.

17

18                            **INTRODUCTION**

19       This is a dispute under federal and California labor law. It is a putative collective action under

20 the Fair Labor Standards Act (29 U.S.C. §§ 201-19) and a putative class action under Rule 23.[1]

21 The plaintiffs are or were exotic dancers suing the company — defendant SFBSC, LLC — that

22 (broadly speaking) managed the nightclubs where they worked. The court previously granted their

23 motion to proceed anonymously.[2] It denied SFBSC's motion to compel arbitration on the ground

24 of unconscionability,[3] and SFBSC appealed. The Ninth Circuit affirmed, holding that SFBSC

25

26 [1] Am. Compl. – ECF No. 11 at 1–2 (¶ 1); Record citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

27 [2] Mot. – ECF No. 17; Order – ECF No. 32.

28 [3] Order – ECF No. 53.

ORDER — No. 14-cv-03616-LB

lacked standing because it was not a party to the performer contracts and had not established that it was the nightclubs' principal or alter ego. *Roes v. SFBSC Mgmt., LLC*, No. 15-15437, mem. op., ECF No. 90 (9th Cir. Jul. 18, 2016). The parties then settled their case, and the plaintiffs moved for preliminary approval of the proposed class-action settlement, which includes the nightclubs (added as defendants by a proposed amended complaint).[4] The court granted the motion.[5] The plaintiffs moved for final approval of the settlement.[6] The court held a fairness hearing on September 14, 2017.[7] The court finds the settlement fair, adequate, and reasonable and approves the final settlement, including fees, costs, and enhancement payments.

## STATEMENT

### 1. Other Information About the Lawsuit to Date

During their appeal, the parties had three in-person mediations and multiple telephone conferences with Ninth Circuit Mediator Peter Sherwood, exchanging information about working conditions, hours worked, compensation, and the parties' relative control over their work, among other matters; ultimately the parties executed a settlement agreement.[8] The Ninth Circuit — based on the parties' stipulation — dismissed the appeal without prejudice to its reinstatement if this court did not approve the parties' settlement. *Roes v. SFBSC Mgmt.*, No. 15-15437, order, ECF No. 52 (9th Cir. Dec. 21, 2016). As part of the settlement, and for settlement purposes only, the plaintiffs submitted a proposed second amended complaint that added the following nightclubs as named defendants: SFBSC Management, LLC; Chowder House, Inc.; Déjà Vu San Francisco, LLC; Roaring 20's, LLC; SF Garden of Eden, LLC; SAW Entertainment, Ltd.; Déjà Vu Showgirls of San Francisco, LLC; Gold Club–SF, LLC; Bijou–Century, LLC; and BT California, LLC.

---

[4] Settlement Agreement – ECF No. 126; Mot. – ECF No. 127.

[5] Order – ECF No. 151.

[6] Mot. – ECF No. 163.

[7] 9/14/2017 Minute Order – ECF No. 177.

[8] Settlement Agreement – ECF No. 126; Mot. – ECF No. 127 at 5; Tidrick Decl. – ECF No. 128, (¶¶ 2–3).

During this process, two new lawsuits were filed: (1) *Hughes v. S.A.W. Entm't, Ltd.*, No. 16-cv-03371-LB (filed 6/16/2016), a lawsuit by exotic dancers against S.A.W. doing business as Larry Flynt's Hustler Club sand the Gold Club; and (2) *Pera v. Entm't, Ltd.*, No. 17-cv-00138-LB (filed 1/1/2017), a lawsuit by exotic dancers against S.A.W. doing business as Condor's Gentlemen's Club. The plaintiffs in the new lawsuits are represented by Lichten & Liss-Riordan; Long & Leavitt represents all defendants in all lawsuits. The cases involve the same substantive claims for wage-and-hours violations, but the new lawsuits named the nightclubs themselves as defendants.

On March 24, 2017, plaintiffs' counsel in *Hughes* and *Pera* — on behalf of dancers at several of the clubs — filed objections to the settlement.[9] Three dancers submitted declarations in support of the objections: two named plaintiffs in *Hughes* and a named plaintiff in *Pera*.[10]

On April 14, 2017, the court approved the settlement preliminarily.[11] The court also granted leave to file the second amended complaint (filed at ECF No. 126 at 73–123) and found preliminarily (and now finds generally) that it relates back to the filing date of the original complaint.[12]

The plaintiffs moved for final approval of the settlement and for their attorney's fees and costs.[13] Three objectors — represented by plaintiffs' counsel in *Hughes* and *Pera* — objected, and the plaintiffs responded. [14] The court held a fairness hearing on September 14, 2017.[15]

**2. Proposed Settlement**

The parties agreed to the following class definitions for settlement purposes only:

---

[9] Obj. to Proposed Settlement – ECF No. 133.

[10] Decls. – ECF Nos. 131-21 to -23.

[11] Order – ECF No. 151.

[12] *Id.*

[13] Mots. – ECF Nos. 159, 163.

[14] Obj. to Proposed Settlement – ECF No. 162; Response – ECF No. 164.

[15] 9/14/2017 Minute Order – ECF No. 176.

"Settlement Class Member" means any Class Member who has not timely and properly excluded herself from the Settlement as provided in Section XIII of this Agreement.

"Class" means the group of Entertainers who, during the class period, performed at one or more of the Nightclubs, but does not include those individuals who provide or have provided services as "headliner" or "feature" performers unless such individual was otherwise party to a Dancer Contract with a Nightclub during the Class Period.

"Class Member" means any individual who, during the Class Period, has performed as an Entertainer at one or more of the Nightclubs, but does not include those individuals who provide or have provided services as "headliner" or "feature" performs unless such individual was otherwise party to a Dancer Contract with a Nightclub during the Class Period.

"Entertainer(s)" means persons who dance, Perform, and/or entertain, or who have danced, Performed, or entertained, as exotic dance entertainers on the premises of a Nightclub and who sell personal entertainment performances or services to customers.

"Perform(s)," "Performed," "Performing," and "Performances" mean(s) all acts of entertaining, dancing, and /or engaging in entertainment services, and all activities related thereto, at the Nightclubs or at any of them.

"Dancer Contract" means a contract entered into between a Settlement Class Member and a Nightclub, which permits the Settlement Class Member to engage in personal dance sales for remuneration at the Nightclub's premises.

"Class Period" means the period from August 8, 2010, through the Preliminary Approval Date.[16]

The Nightclubs[17] are defined in paragraph 70 of the Settlement Agreement, listed in Exhibit A, and named as the defendants in the proposed amended complaint (and listed *supra*).[18] There are nine Nightclubs reflecting ten Nightclub Entities, which are the commercial names for the clubs themselves (sometimes the same name, but sometimes a different name, such as "the Hungry I" for the owner/defendant "Chowder House").[19]

In summary form, the settlement agreement is as follows.

---

[16] Settlement Agreement – ECF No. 126 at 10, 12–13, 17, 21 (¶¶ 37, 39, 41, 49, 54, 76, 98).

[17] Capitalized terms throughout this order have the definitions given them in the Settlement Agreement.

[18] *Id.* at 16 (¶ 70), 71 (Ex. A), 73 (Ex. B).

[19] *Id.* at 71 (Ex. A).

The settlement consideration includes Cash Payments, Dance Fee Payments, Residual Dance Fee Payments, and changes to the defendants' business practices that will confer a direct financial benefit on class members.[20] The Gross Settlement Value is $5 million, broken into tiers: (1) First Tier Cash Pool: $2 million; (2) Second Tier Cash Pool: up to $1 million; (3) Dance Fee Payments and Residual Dance Fee Payments: $1 million; and (4) changes to the defendants' business practices (estimated to confer benefits to class members in excess of $1 million).[21]

### 2.1 First-Tier and Second-Tier Cash Pools: Cash Payments, Fees, Costs, and Awards

The First Tier Cash Pool of $2 million will be used first for (1) cash compensation to Settlement Class Members who elect to receive a cash payment, then for (2) attorney's fees and expenses and the enhancement payments, then for (3) the PAGA[22] payment, and finally for (4) administrative costs.[23] After subtracting enhancement payments, the PAGA payment, and administrative costs, the fund will be distributed to class members who submitted timely requests for cash payments.[24] If the sum of the claims, enhancement payments, PAGA payment, and administrative costs exceeds $2 million, the defendants will fund the Second Tier Cash Pool of up to $1 million to cover the sum of the valid claims for cash payment, the attorney's fees and expenses, the Enhancement Payments, the PAGA payment, and administrative costs.[25]

The following is a summary of how settlement funds are distributed for Cash Payments.

To receive a Cash Payment, a Settlement Class Member must submit an FLSA claim form with her Performance Months (identified to the best of her knowledge). Cash Payments are calculated as follows, reduced *pro rata* if the First Tier Cash Pool and the Second Tier Cash Pool are depleted:

---

[20] *Id.* at 29 (¶ 111).

[21] *Id.* at 29–35 (¶¶ 111–12).

[22] PAGA is California's Private Attorneys General Act (Cal. Labor Code §§ 2698–99.5).

[23] Settlement Agreement – ECF No. 126 at 29–30 ( ¶ 112(a)).

[24] *Id.*

[25] *Id.* at 30–31 (¶ 112(b)).

a. $800 for Cash Payment Claimants who accrued 24 or more Performance
　　　　　 Months during the Class Period;

　　　　b. $700 for Cash Payment Claimants who accrued between 12 and 23
　　　　　 Performance Months during the Class Period;

　　　　c. $500 for Cash Payment Claimants who accrued between 6 and 11 Performance
　　　　　 Months during the Class Period; and

　　　　d. $350 for Cash Payment Claimants who accrued fewer than 6 Performance
　　　　　 Months during the Class Period.[26]

　　　Performance Month means any month during the class period when the Settlement Class Member had at least one Date of Performance at the Nightclub.[27] If funds remain after payment of valid claims for cash payments, attorney's fees and costs, enhancement payments, and administrative costs, then the remaining funds will be paid to Cash Payment Claimants in proportion to the amount they received.[28]

　　　The enhancement payments, payable from the First Tier Cash Pool, are: (1) $5,000 each to Jane Roes 1 and 2; (2) $3,500 each to Jane Roes 3, 10 through 13, and 22; (3) for a total sum of no more than $31,000, considered non-wage income and reflected on an IRS Form 1099.[29] There are General Release Enhancement Payments, payable from the First Tier Cash Pool to Jane Roe 1 or 2 or both, contingent on their execution of the general release, of an amount not to exceed $20,000 for a total sum of $40,000.[30]

　　　The PAGA payment is $100,000, payable from the First Tier Cash Pool, with 75% ($75,000) paid to the California Labor and Workforce Development Agency ("LWDA") and 25% ($25,000) distributed equally to Cash Payment Claimants and Dance Fee Payment Claimants.[31]

　　　The defendants will not object to an attorney's fees-and-expense award not to exceed 25% of the Gross Settlement Value.[32] The defendants will pay the amount (not to exceed $1 million) to

---

[26] Id. at 36 (¶ 116).

[27] Id. at 17 (¶ 77).

[28] Id. at 36 (¶ 117).

[29] Id. at 33 (¶ 112(e)).

[30] Id. at 33 (¶ 112(f)).

[31] Id. at 34 (¶ 112(h)).

[32] Id. at 15–16 (¶ 66).

Class Counsel from the First Tier Cash Pool and, as appropriate, from the Second Tier Cash Pool, to pay fees and costs that the court awards in its final approval order.[33] (The final fee request is $950,000.)

The Administrative Costs allocated in the settlement agreement are $50,000, payable from the First Tier Cash Pool, for a third-party administrator to manage the class notice, website, distribution of funds, and other administration of the settlement.[34] The parties initially identified four potential administrators: Simpluris, Rust Consulting, Settlement Services, or CPT Group.[35] Ultimately, they chose Rust Consulting as the administrator with the most cost-effective bid. The court thus appointed Rust Consulting. The final administrative costs are $35,000.[36]

### 2.2 Dance Fee and Residual Dance Fee Payments

As an alternative to a Cash Payment Claim, settlement class members may elect to receive a "Dance Fee Payment," which is the mandatory and published cost of personal entertainment performances owned by the Nightclubs under the "Dancer Contracts."[37] The "Dance Fee Payment Pool" is $1 million.[38] The ten nightclubs in Exhibit A each fund $100,000 to fund "Dance Fee Payments" to claimants who elect that payment and who designate that Nightclub on their claim form as their Primary or Secondary Nightclub.[39] The Nightclubs divide the $1-million pool *pro rata* to claimants; the payment cannot exceed $5,000 per claimant for that claimant's Primary Nightclub and $3,000 per claimant for the Nightclub she designates as her Secondary Nightclub.[40] The dancer must schedule a Date of Performance during the Dance Fee Redemption Period at her

---

[33] *Id.* at 33–34 (¶ 112(g)).

[34] *Id.* at 34–35 (¶ 112(i)).

[35] *Id.* at 20 (¶ 96).

[36] Myette Decl. – ECF No. 166 at 5 (¶ 17).

[37] Settlement Agreement – ECF No. 126 at 31–32, 38–39 (¶¶ 112(c), 125).

[38] *Id.* at 31–32 (¶ 112(c)).

[39] *Id.*

[40] *Id.*

Primary or Secondary Nightclub at least three business days before the performance and then can retain 100% of the Dance Fees capped at these amounts.[41]

If the claims for Dance Fee Payments are less than $100,000 for any Nightclub, the Nightclub will create a Residual Dance Fee Payment Pool for the residual amounts, which are available to Settlement Class Members who do not submit an FLSA claim form but who submit a Residual Dance Fee Claim Form, available from management at the clubs, and that contains an acknowledgment that the claimant did not submit an FLSA claim.[42]

### 2.3 Changed Business Practices

The Nightclubs have changed their business practices, as set forth in paragraphs 136 to 144 of the Settlement Agreement. Dancers now can be employees of a Nightclub or Independent Professional Entertainers ("IPEs"); this does not waive any rights under any labor laws except as those laws specifically permit.[43] Managers will not influence dancers' choices. The Nightclubs will provide Entertainers and Entertainer Applicants enhanced employment offers that provide for an hourly rate of $15 plus 20% commissions for sales of private dances greater than $150.[44] The settlement agreement has other changed business practices about review of choices, context for making choices (*e.g.*, not while intoxicated or in a nude or semi-nude state), provisions for changing status to an employee, clothing choices, a prohibition against tip-sharing, training videos, and guaranteed average earnings for IPEs.[45]

The defendants' counsel's declaration describes how the changed business practices represent a sweeping change in the relationship between nightclubs and exotic dancers.[46]

---

[41] *Id.* at 39 (¶ 126).

[42] *Id.* at 32 (¶ 112(d)).

[43] *Id.* at 41 (¶ 137).

[44] *Id.* at 42 (¶ 139).

[45] *Id.* at 41–43 (¶¶ 137–47).

[46] Melton Decl. – ECF No 163-2.

## 2.4 Release

In return for the settlement relief, the settlement agreement has release provisions.

If a class member does not submit an FLSA claim form and does not exclude herself from the settlement, the release generally is for all claims that are or could have been asserted in this action (as described in the Second Amended Collective and Class Action Complaint) except claims under the FLSA, and specifically including wage-and-hours claims.[47] The plaintiffs are not releasing any personal-injury claims.[48]

If a class member submits an FLSA claim form (or has consented to be an FLSA party plaintiff and does not exclude herself from the settlement), she releases claims as described in the previous section and also any claims that are or could have been asserted in the action under the FLSA.[49]

The temporal scope of the release for the "FLSA Claimants' Released Claims" and the "Settlement Class Members' Released Claims" is the "Class Period" (*see supra*, Statement), which is "August 8, 2010, through the Preliminary Approval Date."[50]

For "General Releasors" (defined as Jane Roe 1 and 2 — on certain conditions),[51] the release is of known and unknown claims under California Code § 1542 (except claims that cannot be released as a matter of law).[52] The temporal scope of the release is the "Effective Date" of the settlement, defined as seven days after which both of the following events occur: (1) the final approval order is entered, and (2) the final approval order and judgment become final.[53]

---

[47] Settlement Agreement – ECF No. 126 at 14, 19, 49 (¶¶ 62, 85, 164).

[48] *Id.* at 19 (¶ 85).

[49] *Id.* at 14, 49, 56–57 (¶¶ 62, 165, 186).

[50] *Id.* at 9, 13–14 (¶¶ 41, 62, 99); *see* Defendants' Reply – ECF No. 168 at 2–4) (addressing this point); *cf.* Objectors' Sur-Reply – ECF Nos. 172-1, 176.

[51] *Id.* at 14, 49 (¶¶ 63, 164).

[52] *Id.* at 14, 51 (¶¶ 63, 168–69).

[53] *Id.* at 12, 14 (¶¶ 52, 63).

**2.5 Administration and Distribution Amounts**

The notice procedures required the administrator to send class notice to class members at their last known address on their most recent contract (after first running a National Change of Address database search on all addresses and then using any current address).[54] Other administration procedures — including notice, administration, procedures for exclusion, and procedures for objections — are set forth in the settlement agreement.[55] Settlement Class Members who elect a cash payment must "opt in" under 29 U.S.C. § 216(b) by submitting a timely FLSA claim form (Exhibit C to the Settlement Agreement). Settlement Class Members who do not opt in are eligible to participate in the Residual Dance Fee Payment Pool and to receive Residual Dance Fee Payments.[56] A Settlement Class Member may not elect more than one of the following forms of monetary compensation: a Cash Payment; a Dance Fee Payment; or a Residual Dance Fee Payment.[57]

The administrator (Rust Consulting, Inc.) complied with these procedures.[58] It mailed the court-approved notice to the 4,681 class members on May 4, 2017.[59] The Postal Service returned 1,546 as undeliverable, and Rust performed address traces on all.[60] It obtained 1,167 current addresses, obtained four more addresses from the 800 hotline, and did not obtain addresses for 375 undeliverable Class Notices.[61] From the new addresses, 185 notices were returned as undeliverable, resulting in a total of 560 undeliverable class notices.[62]

---

[54] *Id.* at 35 ( ¶ 113).

[55] *Id.* at 52–51, 56–59 (¶¶ 172–81, 186–201).

[56] *Id.*

[57] *Id.*

[58] Myette Decl. for Rust Consulting – ECF No. 166.

[59] *Id.* at 3 (¶ 10).

[60] *Id.*at 3 (¶ 11).

[61] *Id.*

[62] *Id.*

The notice informs class members that the settlement agreement and the operative complaint are posted online at http://www.tidrick.com/SFBSC-Settlement); they have been posted there since May 4.[63] The motion for fees was posted there too within a few hours of filing.[64]

As of August 22, 2017, 865 class members (or 18.5%) responded (790 for a Cash Payment and 75 for a Dance Fee Payment); 14 requested exclusion from the settlement.[65] Three putative class members filed objections through attorney Shannon Liss-Riordan.[66] The projected average payment to class members who made claims is $1,062.17 (and the more specific payments are summarized below).[67] (The First Tier Cash Pool will be fully distributed.) The Second Tier Cash Pool of $1 million was made available and was not claimed.

This results in the following distribution: (1) a fees award of $950,000 (allowed below), (2) expenses of $4,884.21, (3) service awards to eight individuals totaling $71,000, (4) PAGA payments of $100,000, (5) administrative fees to Rust Consulting of $35,000, and (6) distribution of First Tier funds as follows:

    a. $1,500.77 for Cash Payment Claimants who accrued 24 or more Performance Months during the Class Period;

    b. $1,313.17 for Cash Payment Claimants who accrued between 12 and 23 Performance Months during the Class Period;

    c. $937.98 for Cash Payment Claimants who accrued between 6 and 11 Performance Months during the Class Period; and

    d. $650.59 for Cash Payment Claimants who accrued fewer than 6 Performance Months during the Class Period.[68]

As of August 22, 2017, 75 class members claimed $370,0000 of the $1 million Dance Fee Payment Pool, resulting in a projected average dance fee of $4,933.22.[69] The remainder of

---

[63] Tidrick Decl. – ECF No. 163-1 at 5 (¶ 14).

[64] *Id.*

[65] Myette Decl. – ECF No. 166 at 4–5 (¶¶ 13–15) (summarizing data as of August 2 and August 22, 2017).

[66] ECF No. 162.

[67] Myette Decl. – ECF No. 166 at 3–4 (¶ 14).

[68] Tidrick Decl. – ECF No. 163-1 at 4–5 (¶ 13); Myette Decl. – ECF No. 166 at 3–4 (¶ 14).

[69] Myette Decl. – ECF No. 166 at 3–4 (¶ 14).

United States District Court
Northern District of California

$630,000 is available for class members to claim for at least two years after the judgment is final.[70]

The $25,000 PAGA additional amount is an extra $28.90 for each claimant.[71]

The plaintiffs propose, and the court allows, late claims (postmarked after the July 3, 2017 deadline).[72]

## ANALYSIS

### 1. Jurisdiction

The court has federal-question jurisdiction under 28 U.S.C. § 1331 for the FLSA claim and supplemental jurisdiction over the California state-law claims.

### 2. Certification of Settlement Class

The court determines whether the Settlement Class meets the requirements for class certification first under Rule 23 and then under the FLSA.

#### 2.1 Rule 23 Requirements

The court reviews the propriety of class certification under Federal Rule of Civil Procedure 23(a) and (b). When parties enter into a settlement before the court certifies a class, the court "must pay 'undiluted, even heightened, attention' to class certification requirements" because the court will not have the opportunity to adjust the class based on information revealed at trial. *Staton v. Boeing*, 327 F.3d 938, 952–53 (9th Cir. 2003) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

Class certification requires the following: (1) the class must be so numerous that joinder of all members individually is "impracticable"; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the class representatives must be typical of the claims or

---

[70] Settlement Agreement – ECF No. 126 at 11–12 (¶ 48).

[71] Myette Decl. – ECF No. 166 at 5 (¶ 15).

[72] Motion – ECF No. 163 at 5.

defenses of the class; and (4) the person representing the class must be able to fairly and adequately protect the interests of all class members. Fed. R. Civ. P. 23(a); *Staton*, 327 F.3d at 953.

Here, the factors — numerosity, commonality, typicality, and adequacy — support the certification of the class for settlement purposes only.

First, there are approximately 4,681 class members. The class is so numerous that joinder of all members is impracticable.

Second, there are questions of law and fact common to the class. All class members worked for one of the defendant nightclubs as dancers. Common questions include whether they were classified properly as independent contractors and whether the defendants' practice of not paying minimum wage and not paying overtime violated federal state or local law. The claims depend on common contentions that — true or false — will resolve an issue central to the validity of the claims. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct 2541, 2551 (2011); *Betorina v. Ranstad US, L.P.*, No. 15-cv-03546-EMC, 2017 WL 1278758, at *4 (N.D. Cal. Apr. 6, 2017).

Third, the claims of the representative parties are typical of the claims of the class. All have worked as dancers for the defendants during the class period, and all class members allege wage-and-hours violations based on similar facts. All representatives possess the same interest and suffer from the same injury. *Betorina*, 2017 WL 1278758, at *4.

Fourth, the representative parties fairly and adequately protect the interests of the class. The factors relevant to a determination of adequacy are (1) the absence of potential conflict between the named plaintiff and the class members, and (2) counsel chosen by the representative party who is qualified, experienced, and able to vigorously conduct the litigation. *Id*. The court is satisfied that the factors exist here: the named plaintiffs have shared claims and interests with the class (and no conflicts of interest), and they retained qualified and competent counsel who have prosecuted the case vigorously. *See Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001); *Hanlon*, 150 F.3d at 1020; *Brown v. Ticor Title Ins. Co.*, 982 F.2d 386, 390 (9th Cir. 1992).

Thus, the court finds (for settlement purposes only) that the proposed settlement class meets the Rule 23(a) prerequisites of numerosity, commonality, typicality, and adequacy: (1) the class is

so numerous that joinder of all members is impracticable; (2) there are common questions of law and fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative party will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). The court also finds (for settlement purposes only) that questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3); *Brown v. Hain Celestial Group, Inc.*, No. 11-CV-03082-LB, 2014 WL 6483216, at *15–20 (N.D. Cal. Nov. 18, 2014). The court certifies the class under Federal Rule of Civil Procedure 23(b)(3) for settlement purposes only.

**2.2 FLSA Class**

The FLSA authorizes "opt-in" representative actions where the complaining parties are "similarly situated" to other employees. 29 U.S.C. § 216(b); *see generally Hoffman-LaRoche v. Sperling*, 493 U.S. 16 (1989). Here, all class members have worked as dancers for one or more defendants during the class period, and their wage-and-hours claims — and related issues such as independent-contractor status — present common fact and law questions under federal and California law. The court certifies the FLSA class for settlement purposes only.

**3. Appointment of Class Representative, Class Counsel, and Claims Administrator**

The court confirms its previous appointment of the plaintiffs Jane Roe 1 and Jane Roe 3 as the settlement class representatives.[73] They have claims that are typical of members of the class generally and that they are adequate representatives of the other members of the proposed classes.

The court confirms its previous appointment of Steven G. Tidrick and Joel Young of The Tidrick Law Firm as Settlement Class Counsel.[74] The court finds that they have sufficient qualifications, experience, and expertise in prosecuting class actions.

---

[73] Order – ECF No. 151 at 19.

The court confirms its previous appointment of Rust Consulting as the claims administrator.[75]

### 4. Class Notice

As described above, the claims administrator provided notice to the members of the class in the form that the court had approved. The notice met all legal requisites: it was the best notice practicable, satisfied the notice requirements of Rule 23, adequately advised class members of their rights under the settlement agreement, met the requirements of due process, and complied with the court's order regarding notice.

The court previously addressed the objectors' challenges to the notice.[76] That analysis holds still. The court disagrees with the objectors' assertion that the notice process was halfhearted and designed to maintain a low claims rate.[77] As discussed in the Statement, Rust Consulting conducted address traces on all returned mail and reduced the number of undeliverable notices significantly. In addition to mailing, there was the website. Also, the nightclubs displayed posters in the dancers' dressing rooms to ensure that they were seen, were confident that they were seen by all entertainers at the clubs, and responded to questions by encouraging entertainers to review the settlement notice, website, and poster.[78] The poster is Exhibit A to the declarations of the nightclub managers.[79] It informs dancers of the settlement terms, tells them availability of cash payments or dance-fee payments, and tells them where to get the claim form and how to submit it.[80] It includes the class notice.[81] And it tells the entertainers that the clubs support the settlement,

---

[74] *Id.*

[75] *Id.*

[76] Order – ECF No. 151 at 20–21.

[77] Opp. to Mot. For Approval – ECF No. 165 at 18.

[78] Melton Decl. – ECF No. 168-1 at 2 (¶ 3); Bourdeau Decl. – ECF No. 168-2; Cooper Decl. – ECF No. 168-3; Morataya Decl. – ECF No. 168-4; Calcagni Decl. – ECF No. 168-5; Britton Decl. – ECF No. 168-6; Johnson Decl .– ECF No. 168-7; Garrett Decl. – ECF No. 168-8; Reid Decl. – ECF No. 168-10.

[79] Ex. A – ECF No. 169.

[80] *Id.*

[81] *Id.*

hopes that eligible entertainers will get the benefit of the settlement, and will not retaliate against the dancers.[82]

### 5. Compliance with Class Action Fairness Act

On March 15, 2017, the plaintiffs provided notice of the settlement and other information showing compliance with the Class Action Fairness Act of 2005, 28 U.S.C. § 1715, to the appropriate federal and state officials.[83] The notice met the requirements of 28 U.S.C. § 1715, and the final settlement approval is more than 90 days after service as required by § 1715.

### 6. Approval of Settlement

Settlement is a strongly favored method for resolving disputes, particularly "where complex class action litigation is concerned." *Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1276 (9th Cir. 1992); *see, e.g., In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995). A court may approve a proposed class-action settlement only "after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The court need not ask whether the proposed settlement is ideal or the best possible; it determines only whether the settlement is fair, free of collusion, and consistent with the named plaintiffs' fiduciary obligations to the class. *See Hanlon*, 150 F.3d at 1026–27 (9th Cir. 1998). In *Hanlon*, the Ninth Circuit identified factors relevant to assessing a settlement proposal: (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class-action status throughout trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceeding; (6) the experience and views of counsel; (7) the presence of a government participant; and (8) the reaction of class members to the proposed settlement. *Id.* at 1026 (citation omitted).

---

[82] *Id.*

[83] Melton Decl. – ECF No. 163-2 at 11 (¶¶ 36–40).

"Where a settlement is the product of arms-length negotiations conducted by capable and experienced counsel, the court begins its analysis with a presumption that the settlement is fair and reasonable." *Garner v. State Farm Mut. Auto Ins. Co.*, 2010 WL 1687832, *13 (N.D. Cal. Apr. 22, 2010); *see, e.g., Rodriguez v. West Publ'g Corp.,* 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution . . . ."); *Nat'l Rural Telecomm. Coop. v. DirecTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004).

The court has evaluated the proposed settlement agreement for overall fairness under the *Hanlon* factors and finds that the settlement is fair, reasonable, and adequate.

First, the settlement is fair because the cash payments correlate with the months that a dancer worked with one or more defendants, and the dance-fee payments — as an alternative to cash payments — are a fair alternative.

Second, a related point is that the plaintiffs are recovering a substantial amount. As the plaintiffs point out in their final approval papers, it is difficult to pinpoint a realistic potential recovery in a case such as this.[84] At the preliminary approval stage, the court engaged in a close review of other settlements in other districts.[85] The plaintiffs cite more in their motion for final approval.[86] The court also considered whether the settlement (1) is the product of serious, informed, non-collusive negotiations, (2) has no obvious deficiencies; (3) does not grant preferential treatment to class representatives or segments of the class; and (4) falls within the range of possible approval. The court continues to see the settlement as reasonable and fair, especially given that the response rate is relatively high, and the objections and opt-outs are low. A "relatively small number" of objections is "an indication of a settlement's fairness." *Brotherton v. Cleveland*, 141 F. Supp. 2d 894, 906 (S.D. Ohio 2001); *cf. Staton*, 327 F.3d at 959 (court should consider "reaction of the class members to the proposed settlement"); *Ching v. Siemens Indus.*, 2014 U.S. Dist. LEXIS 89002, at *18–19 (N.D. Cal. June 27, 2014).

---

[84] Mot. – ECF No. 163 at 11.

[85] Order – ECF No. 151 at 12–13.

[86] Mot. – ECF No. 163 at 16–17.

United States District Court
Northern District of California

Third, a class action allows class members — who otherwise would not pursue their claims individually because costs would exceed recoveries — to obtain relief.

Fourth, litigation poses risk. If the defendants convinced a trier of fact that the plaintiffs were not misclassified, then their recovery would be zero. In *Tijerino v. Stetson Desert*, No. CV-15-2563-PHY-SMM (D. Az. June 21, 2017), the district court — while recognizing other cases where courts found that exotic dancers were misclassified — held that exotic dancers failed to establish that they were employees and denied conditional certification of their FLSA claim.[87] And in *Buel v. Chowder House*, the issue of whether exotic dancers were misclassified was decided in favor of one of the defendant nightclubs (Chowder House, Inc., doing business as Hungry I). *Buel v. Chowder House, Inc.*, 2006 WL 1545860 (Cal. App. June 7, 2006) (affirming jury verdict). As the plaintiffs observe, it is difficult to pinpoint a realistic potential recovery in a case such as this.[88] The plaintiffs point to risk associated with the certification process and on the merits.[89] There are risks that attend the arbitration clauses. (The objectors disagree,[90] but the court's decision was a close one.[91]) In sum, the settlement is a reasonable resolution given the risks for wage-and-hours cases.

Fifth, the PAGA provisions are reasonable. *See Thurman v. Bayshore Transit Mgmt., Inc.*, 203 Cal. App. 4th 1112, 1145 (2012) (general rule regarding 75/25 split to LWDA and claimants).[92]

Sixth, the settlement is the product of serious, non-collusive, arm's-length negotiations and was reached after mediation with an experienced mediator at the Ninth Circuit.

There are three objectors to the settlement who have not opted out of the settlement.[93] The court considered objections at the preliminary approval stage too.

[87] Ex. A to Tidrick Decl. – ECF No. 163-1.

[88] Mot. – ECF No. 163 at 11.

[89] *Id.* at 11–15; Response to Objection – ECF No. 163 at 9 (collecting cases).

[90] Opp. to Mot. For Approval – ECF No. 165 at 19.

[91] Order – ECF No. 53 at 12.

[92] Mot. – ECF No. 163 at 18–19 (collecting cases).

[93] Obj. to Proposed Class Action Settlement – ECF No. 162 at 9 n.2.

The objectors' main argument remains that the settlement is not fair because the recovery is inadequate.[94] They point to other settlements with average recoveries that they say exceed the recoveries here.[95] Some of these are excerpted in the court's preliminary approval order (and the court incorporates its previous analysis by this reference).[96] They argue too that the settlement value is not fair compared with the plaintiffs' own damages assessment of the class-wide minimum-wage claims.[97] Essentially, they say, it is a $2 million settlement, with close to half going to fees, $100,000 to the PAGA penalty, some to costs and incentive amounts, and the balance to dancers with a low claim rate.[98]

The plaintiffs respond that the gross settlement value is larger than, or similar to, other exotic-dancer class settlements.[99] They note that the objectors' own damages assessment supports this conclusion, based in part on the following: the objectors looked at two of ten nightclubs and estimated damages for possible claims; 34.5% of the settlement class worked at the two nightclubs; extrapolating to all ten clubs yields estimated class damages (which the plaintiffs calculate is approximately $116 million); the Gross Settlement Value here is 4.3% of that amount —within the range that the objectors identify as reasonable settlement ranges.[100] (The preliminary approval order has a more detailed analysis of the settlements and the parties' competing views about them.[101])

The recoveries here are adequate to justify approval. Given other comparable settlements, and the litigation risks identified above, the settlement amount is fair. The exotic dancers are transient workers; that affects the hit rate for claimants. And the Tier One funds are not reversionary. And the hit rate was relatively substantial and did not push claims into Tier Two.

---

[94] *Id.* at 16–24.

[95] *Id.* at 26–27; Opposition to Motion For Approval – ECF No. 165 at 10–11.

[96] Order – ECF No. 151 at 14.

[97] Opp. to Mot. For Approval – ECF No. 165 at 7.

[98] *Id.* at 9–10.

[99] Response to Obj. – ECF No. 164 at 3–4 (collecting examples).

[100] *Id.* at 9 (collecting settlements).

[101] Order – ECF No. 151 at 14–15.

The objectors quarrel with the dance fee payments.[102] Other courts have approved settlements that combine cash fees and dance payments.[103] It is a tangible benefit, dancers have claimed it, and it remains available for two years. Dance fee claimants will receive on average $4,933.22.[104] It is not the ordinary illusory coupon payment with a more arguable lack of value.

The objectors also challenge the changed business practices as illusory.[105] The court disagrees. The Statement sets forth the changes, which are substantial. The Enhanced Offer of Employee Status and the Minimum Pay Guarantee for independent contractors are real benefits, as are the mandates regarding treatment and the procedures for new exotic dancers. The court also finds persuasive the reasons advanced in defendants' counsel's declaration at ECF Nos. 139 and 163-2. On this record, the changed business practices — which locally are almost industry-wide (this settlement covers 10 out of the 12 such nightclubs in San Francisco) — will allow an alternative business model for the industry, providing employees with a guaranteed hourly rate, commissions, and benefits, among other changed practices. There is an economic value that attaches to this portion of the settlement. The cases that the plaintiffs cite do not change this conclusion.[106]

The court's earlier order addresses the objectors' challenges to the release and remains the court's view.[107] The lawsuit was always about SFBSC as a joint employer. Moreover, as the defendants point out, releases often extend through final approval or the "Effective Date" of the settlement.[108] The plaintiffs cite to cases that deal with prospective waiver of FLSA claims before disputes arise.[109] This settlement and its accompanying release resolve existing disputes.

---

[102] Obj. – ECF No. 162 at 18.

[103] Response to Obj. – ECF No. 164 at 7–8 (collecting cases).

[104] Aff. – ECF No. 166 at 5 (¶ 14).

[105] Obj. – ECF No. 151 at 21–22.

[106] Opp. to Mot. For Approval  – ECF No. 165 at 13.

[107] Order –ECF No. 151 at 17.

[108] Defendants' Reply – ECF No 168 at 2 (collecting cases).

[109] *Id.* (analyzing cases).

The objectors also quarrel with settlement based on only "minimal discovery."[110] As the court said in its previous orders and at hearings, the lawyers on both sides have done fine work.[111] Exceptional work, really. And as summarized in the Statement, the parties represented that they worked hard at settlement, exchanging relevant information, including payroll data. The court does not doubt that they worked collaboratively — as they must under the civil rules of procedure — to exchange relevant information. And again, they engaged in serious, non-collusive, arm's-length negotiations and reached settlement through mediation with an experienced mediator at the Ninth Circuit.

In sum, the court finds that viewed as a whole, the proposed settlement is sufficiently "fair, adequate, and reasonable" such that approval of the settlement is warranted. *See Officers for Justice v. Civil Serv. Comm'n of the City and Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982).

### 7. Cy Pres Award

Any remaining amount of the net settlement fund will be split equally between the two *cy pres* beneficiaries identified in the settlement agreement: The St. James Infirmary and the Impact Fund. This distribution accounts for and has a substantial nexus to the nature of the lawsuit, the objectives of the statutes, and the interests of the silent class members. *See Lane v. Facebook, Inc.*, 696 F.3d 811, 819-22 (9th Cir. 2012); *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038-41 (9th Cir. 2011).

### 8. Attorney's Fees and Costs

Class counsel asks for $950,000 in attorney's fees and $4,884.21 in costs.[112]

Rule 23(h) of the Federal Rules of Civil Procedure provides: "In a certified class action, the

---

[110] Opp. to Mot. For Approval – ECF No. 165 at 21.

[111] *See* Order – ECF No. 53 at 12.

[112] Mot. for Fees and Costs – ECF No. 159.

court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fee provisions included in proposed class-action settlements must be reasonable. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011). The court is not bound by the parties' settlement agreement as to the amount of attorney's fees. *See id.* at 942–43. The Ninth Circuit has instructed district courts to review class fee awards with special rigor:

> Because in common fund cases the relationship between plaintiffs and their attorneys turns adversarial at the fee-setting stage, courts have stressed that when awarding attorneys' fees from a common fund, the district court must assume the role of fiduciary for the class plaintiffs. Accordingly, fee applications must be closely scrutinized. Rubber-stamp approval, even in the absence of objections, is improper.

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052 (9th Cir. 2002) (quotation omitted).

When counsel recovers a common fund that confers a "substantial benefit" on a class of beneficiaries, counsel is "entitled to recover their attorney's fees from the fund." *Fischel v. Equitable Life Assurance Soc'y of the U.S.*, 307 F.3d 997, 1006 (9th Cir. 2002). California fee-shifting statutes also authorize the award of fees. When a fee-shifting statute applies, courts may award fees on the lodestar method. *See California Practice Guide: Federal Civil Procedure Before Trial* § 10:870 (Rutter Group 2015) (collecting cases); *see PLCM Grp. v. Drexler*, 997 P.2d 511, 518 (Cal. 2000) (fee-setting inquiry under California law ordinarily begins with the lodestar); *Serrano v. Priest*, 569 P.2d 1303, 1316 n.23 (Cal. 1977). In common-fund cases, courts may calculate a fee award under either the "lodestar" or "percentage of the fund" method. *Id.*; *Hanlon*, 150 F.3d at 1029.

Where the settlement involves a common fund, courts typically award attorney's fees based on a percentage of the total settlement. The Ninth Circuit has established a "benchmark" that fees should equal 25% of the settlement, although courts diverge from the benchmark based on a variety of factors, including "the results obtained, risk undertaken by counsel, complexity of the issues, length of the professional relationship, the market rate, and awards in similar cases." *Morales v. Stevco, Inc.*, 2013 WL 1222058, *2 (E.D. Cal. Mar. 25, 2013); *see also Morris v. Lifescan, Inc.*, 54 F. App'x 663, 664 (9th Cir. 2003) (affirming 33% fee award); *Pacific*

*Enterprises*, 47 F.3d at 379 (same); *State of Fla. v. Dunne*, 915 F.2d 542, 545 (9th Cir. 1990); *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990).

When determining the value of a settlement, courts consider the monetary and non-monetary benefits that the settlement confers. *See, e.g.*, *Staton*, 327 F.3d at 972–74; *Pokorny v. Quixtar, Inc.*, 2013 WL 3790896, *1 (N.D. Cal. July 18, 2013) ("The court may properly consider the value of injunctive relief obtained as a result of settlement in determining the appropriate fee."); *In re Netflix Privacy Litig.*, 2013 WL 1120801, *7 (N.D. Cal. Mar. 18, 2013) (settlement value "includes the size of the cash distribution, the *cy pres* method of distribution, and the injunctive relief").

Finally, Ninth Circuit precedent requires courts to award class counsel fees based on the total benefits being made available to class members rather than the actual amount that is ultimately claimed. *Young v. Polo Retail, LLC*, 2007 U.S. Dist. LEXIS 27269, *23 (N.D. Cal. Mar. 28, 2007) (citing *Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026 (9th Cir. 1997) ("district court abused its discretion in basing attorney fee award on actual distribution to class" instead of amount being made available) (quoted language from *Young*)).

If the court applies the percentage method, it then typically roughly calculates the lodestar as a "cross-check to assess the reasonableness of the percentage award." *See, e.g.*, *Weeks v. Kellogg Co.*, 2013 WL 6531177, *25 (C.D. Cal. Nov. 23, 2013); *see also Serrano v. Priest*, 20 Cal. 3d 25, 48–49 (1977); *Fed-Mart Corp. v. Pell Enters.*, 111 Cal. App. 3d 215, 226–27 (1980); *Melnyk v. Robledo*, 64 Cal. App. 3d 618, 624 (1976); *Clejan v. Reisman*, 5 Cal. App. 3d 224, 241 (1970). "The lodestar . . . is produced by multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate." *Lealao v. Beneficial Cal., Inc.*, 82 Cal. App. 4th 19, 26 (2000). Once the court has fixed the lodestar, it may increase or decrease that amount by applying a positive or negative "multiplier to take into account a variety of other factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented." *Id.*

Class counsel also are entitled to reimbursement of reasonable out-of-pocket expenses. Fed. R. Civ. P. 23(h); *see Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (attorneys may recover

reasonable expenses that would typically be billed to paying clients in non-contingency matters.; *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995) (approving reasonable costs in class action settlement). Costs compensable under Rule 23(h) include "nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h).

Based on the declarations submitted by the plaintiff's counsel establishing a lodestar amount $1,078,324,[113] the court finds that fee award is supported by a lodestar cross-check. The billing rates are within normal and customary ranges for timekeepers with similar qualifications and experience in the San Francisco market. The rates counsel used are appropriate given the deferred and contingent nature of counsel's compensation. *See LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2nd Cir. 1998) ("[C]urrent rates, rather than historical rates, should be applied in order to compensate for the delay in payment . . . .") (citing *Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989)); *In re Wash. Pub. Power Supply Sys. Secs. Litig.,* 19 F.3d 1291, 1305 (9th Cir. 1994) ("The district court has discretion to compensate delay in payment in one of two ways: (1) by applying the attorneys' current rates to all hours billed during the course of litigation; or (2) by using the attorneys' historical rates and adding a prime rate enhancement."). Counsel also submitted a sufficient breakdown of the attorneys' billing efforts for the court to reach its conclusion about the lodestar.

The court concludes that a fee award at the requested amount is justified. *See Hanlon*, 150 F.3d at 1029. It is appropriate based on counsel's efforts and the substantial benefits to the class. It is similar to awards in other cases. It is supported by the lodestar cross-check, the efficiency of the litigation, the quality of the representation, and the contingent risk. There are different ways of looking at the fees award as a percentage of the recovery, depending on how one values the settlement. The court previously calculated the gross settlement amount as $5 million. $950,000 is 19%. Subtracting the Second Tier Cash Pool results in a settlement value of $4 million, which is 23.75% allocated to fees.

The court awards costs of $4,884.81 and $35,000 for the claims administration.

---

[113] ECF No. 159 at 13.

### 9. Service Awards

District courts must evaluate proposed incentive awards individually, using relevant factors that include "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . [and] the amount of time and effort the plaintiff expended in pursuing the litigation." *Staton*, 327 F.3d at 977. "Such awards are discretionary . . . and are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958–59 (citation omitted). The Ninth Circuit has "noted that in some cases incentive awards may be proper but [has] cautioned that awarding them should not become routine practice." *Radcliffe v. Experian Info. Solutions*, 715 F.3d 1157, 1163 (9th Cir. 2013) (discussing *Staton*, 327 F.3d at 975–78). The Ninth Circuit also has emphasized that district courts "must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives." *Id.* at 1164.

Counsel described sufficiently the efforts of the named plaintiff, including consulting with counsel, assisting in discovery, participating in the settlement process, and otherwise participating in the litigation.[114] The court approves the awards of to Jane Roe 1 and Jane Roe 2 of $25,000 each ($5,000 each for their service and $20,000 each for their broader general releases) and $3,500 each to Jane Role 3, Jane Roes 10 through 13 and Jane Roe 22.

### CONCLUSION

The court certifies the class set forth in the Statement for settlement purposes only and approves the class-action settlement, which is allocated as follows from the First Tier Cash Pool: (1) $950,000 for attorney's fees; (2) $4,884.21 for costs; (3) $35,000 to Rust Consulting for administration fees; (4) $25,000 in service awards each to Jane Roe 1 and Jane Roe 2 ($5,000 each for their service and $20,000 each for their broader general releases) and $3,500 each to Jane Role

---

[114] Mot. – ECF No. 51 at 14; Nguyen Decl. – ECF No. 51-6 ; Grover Decl. – ECF No. 51-1, ¶¶ 35–39.

3, Jane Roes 10 through 13 and Jane Roe 22; (5) a PAGA payment of $100,000 ($75,000 to LWDA and $25,000 distributed to the Cash Payment Claimants and Dance Fee Payment Claimants, as specified in Settlement Agreement ¶ 112(g); and (6) the remainder of $839,115.79 to be paid on a *pro rata* basis to the Cash Payment Claimants. The court approves the request to accept late but otherwise valid claims that are postmarked on or before the date of this final approval order. The Dance Fee Payment Pool must remain available to be claimed for at least two years after the judgment becomes final, as specified in Settlement Agreement ¶ 48.

The court approves the disbursement of unused funds equally to the two *cy pres* beneficiaries: The St. James Infirmary and the Impact Fund. The claims administrator must make all payments required by this order in accordance with the terms of the settlement agreement.

Without further approval from the court, the parties are authorized to agree to and adopt such amendments, modifications, and expansions of the Settlement Agreement, including all Exhibits thereto, as (i) is consistent in all material respects with this order and final Judgment and (ii) do not limit the rights of Settlement Class Members. By way of example only, the Parties are authorized to agree to treat late-submitted claims for Cash Payments as valid.

Except as otherwise provided by this order, the parties and objectors will bear their own costs and attorney's fees.

The court dismisses the case with prejudice. Based on this final approval of the settlement, all settlement class members who did not opt out have released the defendants from the released claims as set forth in the Settlement Agreement (and as summarized in the Statement). They are enjoined from pursuing the released claims as set forth in the Settlement Agreement. Pursuant to Federal Rule of Civil Procedure 23(c)(3), all class members who satisfy the class definition except for those class members who properly requested exclusion are class members bound by this judgment and by the terms of the settlement agreement.

Without affecting the finality of this final order and judgment in any way, the court retains jurisdiction over: (a) effectuating and implementing the Settlement Agreement and its terms; (b) supervising all aspects of the administration of the Settlement Agreement; (c) determining whether, in the event that an appeal is taken from any aspect of this final order and judgment,

whether to require the appellant to post a bond or provide other security, and such other matters as the court may order; (d) enforcing and administering the Settlement Agreement, including any releases executed in connection therewith, and the provisions of this final order and judgment; (e) adjudicating any disputes that arise under the Settlement Agreement; and (f) any other matters related or ancillary to the foregoing.

The court hereby enters judgment, which is a final judgment under Rule 54(b) of the Federal Rules of Civil Procedure. The court finds that no reason exists for delay in ordering final judgment pursuant to Federal Rule of Civil Procedure 54(b) and thus directs the Clerk of Court to enter the judgment forthwith. The court also directs the Clerk to close the file.

This disposes of ECF Nos. 159 and 163.

**IT IS SO ORDERED.**

Dated: September 14, 2017

LAUREL BEELER
United States Magistrate Judge