Trenton R. Kashima, Esq. (SBN 291405)
tkashima@sommerspc.com
SOMMERS SCHWARTZ, P.C.
402 West Broadway, Suite 1760
San Diego, CA 92101
Telephone: (619) 762-2125
Facsimile: (619) 762-2127

Jason J. Thompson, Esq. (*Pro Hac Vice*)
jthompson@sommerspc.com
SOMMERS SCHWARTZ, PC
One Town Square, Suite 1700
Southfield, MI 48076
Telephone: 248-355-0300
Facsimile: 248-746-4001

*Attorneys for Plaintiffs*
*and the Putative Class*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **JANE ROE, et al.** individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**DÉJÀ VU SERVICES, INC., et al.,** jointly and severally,<br><br>Defendants. | Case No: 14-cv-03616-LB<br><br>Related Cases:<br>16-cv-03371-LB<br>17-cv-00138-LB<br>17-cv-05288-LB<br>17-cv-06971-LB<br>19-cv-03960-LB<br><br>**DECLARATION OF JASON J. THOMPSON IN SUPPORT OF MOTION TO PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Honorable Laurel Beeler<br><br>Date: March 17, 2022<br>Time: 9:30 a.m. |

## DECLARATION OF JASON J. THOMPSON

Jason J. Thompson, hereby declare as follows:

1. I am a Senior Shareholder and Managing Partner of the Complex Litigation Group at the law firm of Sommers Schwartz P.C., attorneys for Plaintiffs in the above captioned case. I have personal knowledge of the matters set forth herein, based on my active participation in all material aspects of this litigation, including personal involvement in the negotiation of the Settlement. If called upon, I could and would testify competently to the facts herein based upon my personal involvement in this case. This declaration is being submitted in support of Plaintiffs' motion for leave to file the first amended complaint, conditional certification, preliminary approval of class action settlement, approval of class notice, and setting final approval hearing date.

## EXPERIENCE AND BACKGROUND

1. I have been employed by the law firm of Sommers Schwartz, P.C. since 2008. I am currently a senior partner with the firm and chair of its Complex Litigation Department. Sommers Schwartz, P.C. is a firm that primarily represents plaintiffs in complex employment, business, and personal injury litigation. Since 1992, I have represented numerous companies and individuals in matters involving federal litigation. My primary practice is in class action and MDL litigation.

2. I am licensed to practice in the State of Michigan and have been so since 1992. I have been admitted *pro hac vice* or became a member of a particular federal district court in multiple federal courts around the country. My bio and our firm's Complex Litigation Department bio are attached hereto as **Exhibit A**.

3. I am experienced in the obligations of serving as class counsel and the legal requirements of Rule 23. My experience includes first and foremost serving as lead class counsel and other various leadership positions as outlined in my bio. In addition, I have taught class actions at Michigan State University Law School as an adjunct professor. (*Id.*)

4. I have also been recognized as a leader in my field, including: serving as chairperson on professional committees; speaking at or moderating professional CLE courses; selected as a top lawyer by professional groups on multiple occasions; and awarded professional recognition by legal publications over my career. (*Id.*)

## THE LITIGATION

### A. The San Diego Action

5. The history of case is storied. Plaintiffs Jane Roe Nos. 2 and 4 ("San Diego Plaintiffs") originally filed this lawsuit in the California Superior Court for the County of San Diego on May 31, 2018. *See* Notice of Removal, Ex. 1 [ECF No. 1-1]. The San Diego Plaintiffs sue under fictitious names because (1) there is a significant social stigma associated with the nude and semi-nude "dancing" that exotic dancers, also known as "strippers," perform; (2) there are risks inherent in working as an exotic dancer, including risk of injury by current or former customers of Defendants if an exotic dancer's name or address is disclosed; (3) Plaintiffs would be hesitant to maintain this action enforcing fundamental employee rights if their names were to be forever associated with Defendants' Nightclubs, which could affect their prospects for future employment by others; and (4) Plaintiffs wish to protect their rights to privacy. *Id.*, at ECF p. 6.

6. The lawsuit sought to remedy Defendants' misclassification of dancers as independent contractors. *See generally id.* The San Diego Plaintiffs contend that Defendants failed to pay Plaintiffs and all other members of the Class the minimum and overtime wages and other benefits to which they were entitled under applicable federal and California state laws. *See generally id.* Additionally, Defendants engaged in unlawful tip-sharing by requiring dancers in the Class to share gratuities given to them by patrons with Defendants and their employees, such as doormen and DJs. *See generally id.* The San Diego Plaintiffs, therefore, brought this class action seeking damages, back pay, restitution, liquidated damages, injunctive and declaratory relief, civil penalties, prejudgment interest, and reasonable attorneys' fees and costs. *See generally id.* The San Diego Plaintiffs brought this action as a class action under the California Labor law and as a collectively action under the Fair Labor Standards Act ("FLSA"). Additionally, the San Diego Plaintiffs sought civil penalties pursuant to the Labor Code Private Attorneys General Act of 2004 ("PAGA") Lab Code §2699 and other provisions of the California Labor Code. *Id.*

7. Subsequent to the filing of the Action, the Named Plaintiffs submitted notice to the California Labor and Workforce Development Agency (the "LWDA") pursuant to the PAGA, noting their intention to file an amended complaint to add a claim under the PAGA if the LWDA did not act

within the specified statutory period of time.

8. The lawsuit was spurred by a recent change in the law. The California Supreme Court issued a landmark opinion in *Dynamex Operations W. v. Superior Court*, 4 Cal.5th 903 (2018), *reh'g denied* (June 20, 2018), adopting the "ABC test" for determining employment status. In so doing, the Court narrowed the definition of independent contractor, embracing a standard presuming that all workers are employees and placing the burden on any entity classifying an individual as an independent contractor of establishing that this classification is proper under the three factor "ABC test." *Id*. at 957. To meet this burden, the hiring entity must establish <u>*each*</u> of the following: (a) that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; (b) at the worker performs work that is outside the usual course of the hiring entity's business; and (c) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed. *Id*. The San Diego Plaintiffs asserts that this change in the law prevents any argument, at least to the state law claims, that the dancers were independent contractors.

9. At the time the parties started their litigation (and prior to the execution of the settlement agreement), there was a significant question of whether the "ABC" test was retroactive. However, after the settlement had been negotiated, the California Supreme Court resolved this dispute, in *Vasquez v. Jan-Pro Franchising, Inc*., 2021 WL 127201 (Cal. Jan 14, 2021), noting that *Dynamex* is retroactively applied. Accordingly, Plaintiff position is that California law is clear, the dancers are (and have been) employees.

10. The San Diego Plaintiffs federal claims are less clear. Federal law adopts the multi-prong "economic realities" test (similar to the pre-*Dynamex* California jurisprudence—*see Borello & Sons, Inc. v. Department of Industrial Relations*, 769 P.2d 399 (Cal. 1989)), which looks at the extent of the worker's economic dependence from the potential employer. *Real v. Driscoll Strawberry Assocs., Inc*., 603 F.2d 748, 755 (9th Cir. 1979) ("Economic realities, not contractual labels, determine employment status for the remedial purposes of the FLSA."). Some courts have refused to find that dancers are actually employees under this test. *See Tijerino v. Stetson Desert Project LLC*, No. CV-15-2563-PHX-SMM, 2017 WL 9511247, at *6 (D. Ariz. June 21, 2017), *rev'd and remanded*, 934

F.3d 968 (9th Cir. 2019). Other courts have held the opposite. *Shaw v. Set Enterprises, Inc.*, 241 F.Supp.3d 1318, 1327 (S.D. Fla. 2017); *Clincy v. Galardi S. Enterprises, Inc.*, 808 F.Supp.2d 1326, 1350 (N.D. Ga. 2011).

11. This disparity in decisions is based on the underlying nature of the industry. It is not uncommon for dancers to set their own schedule, work similar jobs at other clubs or independently, to provide their own makeup and clothing, and have significant say in other aspects of their work (including what consumers they would work with and the costs of certain services). *See Tijerino, supra.* Yet, it is also undeniable that the clubs, by their control over the venue of the services, did exercise some control over the dancers. *Id.*

**B. Prior Deja Vu Litigations in Michigan**

12. Attorneys form the Firm had previously served as Class Counsel pursuant to court order in the prior two related cases against Defendants, Case No 2:08-cv-12719 and Case No. 1:16-cv-10877, both in the United States District Court for the Eastern District of Michigan, Southern Division. Of particular significant here is the *Doe v. Deja Vu Consulting, Inc.*, Case No. 2:08-cv-12719 (the "Cin-Lan Action"). In the Cin-Lan Action, Plaintiff alleged that she and other dancers that at eight (8) other identified adult entertainment establishments in Michigan, were misclassified as non-employees or as "independent contractors" by their alleged employer, Cin-Lan amd that Deja Vu Consulting, Inc. Mohney was later added as a defendant to the Cin-Lan Action wherein the Cin-Lan Plaintiff alleged that he was her joint employer as well.

13. In the Cin-Lan Action, counsel conduced comprehensive discovery and extensive motion practice, which resulted in, among other things, the court refusing to dismiss the Cin-Lan Defendants' counterclaims against the Cin-Lan Plaintiff and the putative class. Counsel engaged in lengthy settlement negotiations that extended over a more than six (6) month period, in an effort to reach a resolution. Such negotiations resulted in a settlement which extended to and included Entertainer Claims against all exotic dance establishments that were at the time affiliated with Deja Vu Consulting, Inc., including numerous Clubs located in the State of California. The settlement obtained final approval from the federal district court in 2011. But the Cin-Lan Settlement did not provide for conversation of the dancers to employees. Accordingly, the underlying legal dispute

remained.

14. On March 10, 2016, five years after the approval of the Cin-Lan Settlement, Sommers Schwartz, P.C. represented another dancer (Jane Doe 1) filed a complaint against Déjà Vu Consulting, its affiliate dance clubs, and its owner Harry Mohney in the Eastern District of Michigan (the "Michigan Action"). Doe 1 filed the complaint as both a class action under Federal Rule of Civil Procedure 23 and a collective action under 29 U.S.C. § 216(b) of the FLSA, seeking to bring the action on behalf of herself and "[a]ll exotic dancers who worked for Defendants and were misclassified by Defendants as independent contractors at any time in the past three years." Again, Plaintiff alleged that Déjà Vu's clubs violated the FLSA and state wage-and-hour laws by misclassifying class members as independent contractors, refusing to pay minimum wage, unlawfully requiring employees to split gratuities, and unlawfully deducting employee wages through rents, fines, and penalties."

15. Ultimately, the parties settled their claims (the "Michigan Settlement"). In February of 2017, the parties to the Action executed a Release and Settlement Agreement. Settlement included the expansion of the Michigan Action to include all then-existing nightclubs throughout the United States that were then affiliated, in any way, with Déjà Vu Consulting, with the exception of any nightclubs located in San Francisco, California. Those nightclubs already being under suit in another litigation and potentially subject to a separate settlement. *See, infra*.

16. Under the Michigan Settlement, every club provide its current dancers with an "Entertainer Assessment Form." This assessment determines whether the dancer should be classified as an employee or independent contractor. Under the Settlement, employees must be paid minimum wage (or, where available, at the tip-credited wage) and are entitled to commissions of at least 20% of their dance fees that exceed the cost of employment. Employees will be reimbursed by the club for all license and permit fees required to perform at the club, and the club will provide them with two logo costumes per month to wear while working. In contrast, the Settlement prevents Déjà Vu from imposing any work schedule upon independent contractors or requiring independent contractors to tip-out or tip-pool with any employee. Independent contractors also cannot be required to wear any costume. Finally, independent contractors will have the right to vote in each club's annual meeting to change or modify any club policy that affects independent contractor, which ensures that they have

sufficient control over the clubs' operations to prevent Déjà Vu from exerting employer-employee control.

17. The Michigan Settlement provided $6.55 million in monetary relief, divided into three primary categories: $1 million toward the Net Cash Payment Settlement Fund ("the cash pool"), $4.5 million toward Secondary Pool Remuneration ("the secondary pool"), and $900,000 in attorneys' fees. Dancers could select between a one-time payment from the cash pool or payment from the secondary pool in the form of credits that can be used at Déjà Vu clubs. This was the default form of relief for dancers who do not opt into the cash pool: each time a class member performs at one of Déjà Vu's clubs, credits from the secondary pool will either cover 60% of her daily rent at the club or allow her to collect up to $ 100 in dance fees. Depending on how many months the dancer has performed at the Déjà Vu club where she collects the credits, the total amount of money she can recuperate from the secondary pool is capped at $200, $1,000, or $2,000.

18. On June 19, 2017, the district court approved the Settlement Agreement in the Michigan Action. *Doe 1-2 v. Deja Vu Servs., Inc.*, No. 2:16-CV-10877, 2017 WL 2629101 (E.D. Mich. June 19, 2017). Objectors, represented by Lichten & Liss-Riordan, P.C., appealed the district court's order, which was affirmed by the United States Court of Appeals for Sixth Circuit on June 3, 2019. *Does 1-2 v. Deja Vu Servs., Inc.*, 925 F.3d 886 (6th Cir. 2019).

19. Accordingly, Sommers Schwartz P.C. was well verse with Defendant's business and had a prior relationship with Defendants' counsel. This knowledge allowed Sommers Schwartz to quickly evaluate the case and engaged Defendants in settlement discussions.

**C. The San Francisco Action**

20. The San Diego and Michigan Actions were not the only pending against Defendant. August 8, 2014, Jane Does 1-2 filed suit against SFBSC Management, LLC ("SFBSC"), in this Court, Case No. 3:14-cv-03616-LB, asserting that they, and all dancers who performed at eleven nightclubs in San Francisco, California, were misclassified as independent contractors while they were really employees of those nightclubs (the "San Francisco Action").

21. In March of 2017, following extensive motion practice, an appeal to the Ninth Circuit United States Court of Appeals, three mediations under the auspices of the Ninth Circuit mediation

program, and lengthy negotiations, the parties to the San Francisco Action executed a Class Action Settlement Agreement and Release. Like the Michigan Action, the San Francisco Action Settlement allowed dancers to elect to be employees or independent contractors with similar benefits for each option. Additionally, the San Francisco Action Settlement provided for monetary benefits, including a cash payment based on the number of months worked or a "Dance Fee Payment," under which claimants can retain 100% of the Dance Fees capped at up to $8,000.

22. On September 14, 2017, the Court approved the Settlement Agreement in the San Francisco Action. *Roe v. SFBSC Mgmt., LLC*, No. 14-CV-03616-LB, 2017 WL 4073809, at *4 (N.D. Cal. Sept. 14, 2017). Objectors, represented by Lichten & Liss-Riordan, P.C., appealed the district Court's order, which was overturned by the United States Court of Appeals for Ninth Circuit on December 11, 2019. *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035 (9th Cir. 2019).

**THE INITIAL SETTLEMENT DISCUSSIONS**

23. The scope of the San Diego Action's settlement discussions were always in the context of the two existing settlements; a fact necessarily raised many complicated issues. At the time, Michigan Action was on appeal to the Sixth Circuit Court and San Francisco Action was on appeal to the Ninth Circuit Court. These settlements would resolve a portion of the San Diego Action's claims, if approved.

24. To ensure for a productive mediation, a face-to-face meeting was scheduled and held in my Michigan Office between plaintiffs and defense counsel, where we identified several general issues and challenges, and identified the areas of agreement and disagreement that existed.

25. The settlement discussions became more intense after the Michigan meeting, including (1) review and discussions of other pending lawsuit claims; (2) resolution of the PAGA claims; (3) exploring the actual costs to the Clubs of converting dancers to employees under existing business models; (4) extensive client interviews on all aspects of the possible settlement terms and related issues.

26. The parties also agreed to informal discovery at this point. It included a review of Performer Reports for a mutually agreed upon sample of 10 dancers from 3 clubs identified (one from each a high income, middle income and low income club. The reports predate this litigation and were

business records regularly kept on Defendants operations; and thus deemed reliable.

27. In addition, we demanded certification of important club data form defense counsel, statistical array of data that would directly affect damage computations. We received data from California 321 dancers that revealed the following picture as to performance dates worked by the dancers:

- 87 dancers worked less than 5 performance dates (27%);
- 88 dancers worked more than 5 performance dates but less than 30 (27%);
- 71 dancers worked more than 30 performance dates but less than 90 (22%);
- 74 dancers worked more than 90 performance dates but less than 360 (23%); and
- 1 dancer worked more than 360 performance dates but less than 532 (.003%).

Accordingly, the average tenure of a class member at Defendant's clubs was relatively short-lived.

28. We also learned the following on average:

- the dancers worked 56.25 performance dates average;
- the average total hours performed during employment tenure was 302.78;
- the average hours performed was 5.3 hours per day; and
- the average hourly rate was approximately 40 dollars per hour, without tips.

It should be noted that these numbers were based on Southern California Clubs. Defendant's analysis has found that a sampling of their 2017 computer data established that the "average" dancer in the Class only worked 37.73 shifts *per year* at the Clubs (or 3.14 shifts per month), and 5.21 hours per shift.

29. Based on the above research, client interviews, and law, a detailed damage model was prepared for use at the mediation based on assumptions made from the sample data, plaintiffs understanding of the clubs operations and extensive interviews with many dancers.

30. The model found that the average damages per dancer (lost wages, wage premiums, and waiting time penalties) was estimated at $5,454.16, including:

- Approximately $395.05 in unpaid overtime per dancer;
- Approximately $1,434.00 in unlawful tip deductions per dancer;
- Approximately $38.44 in minimum wage violations per dancer; and
- Approximately $3,586.67 in rest and meal period related pay per dancer (includes both premium pay and compensation for rest periods separate from any dance fee related compensation).

Accordingly, damages for the entire class would be approximately $32,029,352.45 for the entire class (estimated at approximately 5,800 dancers.) These number jumped exponentially when PAGA and other related penalties were added. However, this model was also based on a number of assumptions.

31. First, the damages modeling assumed that each dancer worked 39 minutes "off the clock" at the beginning and end of each shift (this time was ascribed to changing clothing, post-shift accounting with management, and other related tasks). Such unpaid time would rarely result in overtime premium pay. Additionally, the damages modeling assumed a $20 dollar tip deduction each shift worked, one missed rest/meal period for any shift that lasted longer than five (5) hours.

32. Additionally, the model as based on the assumption that *Dynamex Operations W. v. Superior Court* (2018) 4 Cal.5th 903, applied retroactively; a position that although Defendants denied during the mediations, has been proven correct. The model also found that, on average, the dancers made significantly more than the respective minimum wages of the cities and counties in which the clubs were located (the average dancer made approximately $40 per hour) and worked relatively few overtime hours (dancers generally worked an average of approximately six hours a shift). Accordingly, the vast major of the damages was the result of waiting time penalties and premium wage for meal and rest breaks.

33. To put this numbers in context, given that dancers worked 56.25 performance dates average and 40 dollars per hour average hourly rate, this damages model results in Class Members receive receiving $96.96 dollars less ($5,454.16 divided by 56.25 shifts) than they should have been paid per shift worked (2.42 hours of paid at their average 40 dollar per hour rate). Plaintiffs believe this to be a reasonable estimate of damages considering the vast major of the damages was the result of waiting time penalties and premium wage for meal and rest breaks.

34. However, this estimate likely represents the "best case" scenario at trial. Realistically, the amount of damages could be less. During the course of the negotiations, and since this Action was filed, Defendants have asserted, and continue to assert, both formally and in discussions with Class Counsel, that they have substantial defenses – predicated in part on the matters set forth above – to the claims brought by the Plaintiffs. The Plaintiffs, for their part, dispute the validity of these defenses. Nevertheless, these defenses warrant consideration and include, but are not limited, to the following:

- The Plaintiffs and each and every one of them, have executed Dancer Contracts that contain legally valid and binding arbitration clauses, which include comprehensive waivers of class and collective action proceedings and that therefore preclude Plaintiffs from proceeding: a) in any forum other than in individualized arbitration; or b) as a Federal Rule of Civil Procedure Rule 23 (or similar state law) class or as a collective under § 216(b) of the FLSA;
- Dancers are properly classified as independent contractors because, among other things, they perform if, when, where and for whom they choose; they are not paid by the hour; they are not terminable at will; they control their profits and losses; they must exercise independent initiative in order to successfully engage in their professional occupation; they perform at other businesses; they intended to be independent contractors and/or non-employees; and they specifically rejected the ability to become Club employees when that option was offered to them;
- Dancers specifically fall within the statutory exemptions for professionals;
- Defendants' policies and practices with respect to permitting the Dancers at the Clubs to classify themselves as independent contractors and/or as non-employees are fully lawful and legally enforceable. Moreover, the applicable agreements signed by the Dancers are clear and unambiguous, and are not unlawful, unfair, deceptive, fraudulent, misleading, wrongful or unenforceable in any way;
- Any application of *Dynamex* to these Clubs would be unlawful since the Michigan Settlement and the San Francisco Settlement, both of which have been approved by federal district courts (with the Michigan Settlement also having been approved by the Court of Appeals), specifically permit the Dancers to perform as independent contractors at the Clubs so long as the standards for doing so, as set forth in those settlements, are met, and would thereby violate the orders of those courts;
- The Dancers fully satisfied the legal standards under *Dynamex* of being independent contractors as written or as modified to apply to the work circumstances of dancers;
- *Dynamex* cannot be applied retroactively consistent with due process;
- Dancers earned more income as independent contractors than they would have as employees,

and after offset of non-tip service charge monies paid to the Dancers, the Dancers would not be entitled to any compensation, damages or restitution of any kind;

- Joint employer liability cannot be imposed upon the Defendants in the circumstances here;
- A variety of formal rulings from the Internal Revenue Service ("IRS") and the United State Department of Labor ("DOL") support the position of the Defendants that the mandatory entertainment charges collected from customers are, in fact, "service charges" and not tip income, which could be used, under applicable law, to satisfy any minimum wage obligations found to be due if the Dancers are ultimately found to have been the employees of the respective establishments when they Performed as IPE's during the times of the applicable Class Periods. Those rulings included FLSA 2005-31, 2005 WL 3308602 (DOL Wage-Hour); WH-305, 1975 WL 40930 (DOL Wage-Hour); WH-386, 1976 WL 41739 (DOL Wage-Hour); Rev. Ruling 77-290; Rev. Ruling 65-282; Rev. Ruling 59-252; Rev. Ruling 58-220; and Rev. Ruling 58-515. None of these formal rulings have been abrogated or superseded by the IRS or the DOL. Moreover, The IRS has also issued Rev. Ruling 2012-18 which, the Defendants contend, further supports the conclusion that the mandatory entertainment charges paid by customers to the Clubs are services charges and not the tip income of the Dancers. And, California follows federal law on the distinctions between service charges and tip income. As such, it is likely that this defense would establish that Class Members earned far more than minimum wage, exclusive of tips, while Performing at the Clubs; thereby negating any claims for monetary remuneration, damages or other penalties;
- The Clubs paid the Dancers during the applicable Class Periods through IRS Form 1099-MISC payments, and such payments would fully satisfy any minimum wage obligations found to be due;
- Because the mandatory charges to customers cannot under the law be considered to be tips, the Class Members have no valid claims for tip confiscation;
- Because of the numerous contractual provisions in the Dancer Contracts, signage in the Clubs, and enforced Club polices, the Class Members cannot prevail on any Claims of mandatory and improper tip pooling;

- The Class Members normally worked far less than forty (40) hours per week and far less than eight (8) hours per day, thereby negating any Claims for overtime compensation;
- The Class Members lack standing to bring any Claims for minimum wage or overtime payments since they did not, during the applicable Class Periods, report their tip income to the Clubs and the Clubs did not then make deductions from their "wages." In the unlikely event that the Class Members were found to have been employees of the Clubs, any remaining wages theoretically found to be due and owning would be required to be remitted, under the provisions of the Internal Revenue Code and California tax laws, to the Internal Revenue Service and state taxing authorities as withholdings due on the tip income earned by the Class Members;
- The Dancers were offered and afforded, during the applicable Class Periods, all breaks required under California law for employees;
- The daily receipts provided by the Clubs to the Dancers, during the applicable Class Periods, fully complied with, and satisfied, the requirements under the California Labor Code for the remittance of wage statements;
- Neither a finding of "willfulness," and therefore entitlement to liquidated damages or other penalties, nor an extended statute of limitations, can be sustained because, among other things: a) the Clubs had obtained rulings which held that classifying Dancers as independent contractors or as non-employees was both appropriate and "reasonable" under the law; b) the Clubs had obtained rulings which held that Dancers were not in fact "employees" under the methods of operation discussed above; and c) the Michigan Settlement and the San Francisco Settlement -- both of which have been approved by federal district courts and which govern, through injunctive relief afforded by the courts, the operations of the Clubs vis-à-vis the Dancers who Perform therein -- specifically permit the Dancers to perform as independent contractors so long as the standards for doing so as set forth in those settlements are met; and
- Under the circumstances set forth above, no PAGA penalties could be assessed because to do so would be unjust, arbitrary and oppressive, or confiscatory in accordance with Cal. Labor Code § 2699(e)(2).

35. Indeed, Defendant asserted that it provided its dancers opportunities to take meal and

rest periods, had an aggressively enforced policy against tip sharing, and its dancers rarely had any overtime or made less the minimum wage. Additionally, Defendant notes that each club was independently managed and it would be difficult to establish any commonality between the clubs.

36. Defendants have also aggressively litigated that the class's claims is subject to arbitration agreements that would prevent any recovery on a class or representative basis. Defendants' argument has been bolstered by *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612 (2018), whereby the Court held that employer-mandated arbitration agreements that contain class and collective action waivers were legal, enforceable, and did not violate either the National Labor Relations Act or the Norris-Laguardia Act. Defendants assert that the holding in *Epic* also requires claims under California's Labor Code Private Attorneys General Act of 2004, Cal. Lab. Code § 2698, *et seq*. ("PAGA"), be litigated in individualized arbitration. *See also ZB, N.A. v. Superior Ct.*, 8 Cal. 5th 175, 198 (2019) (requiring any claim for individual wages to be arbitrated).

37. Additionally, Defendant would likely argue that any civil penalties would likely be reduced given that fundamental change in the law represented by *Dynamex Operations W. v. Superior Court*, 4 Cal.5th 903 (2018). Plaintiffs do understand that PAGA penalties are discretionary and there is some inequity in holding Defendants to a legal standard that was not yet articulated. These factors informed Plaintiffs' settlement negotiations.

38. The parties decided to hold an initial mediation to explore settlement terms with the assistance of the Hon. Victor E. Bianchini on July 24, 2018. While they were unable to reach a resolution at the mediation, they outlined the basic terms of a potential settlement and continued to negotiate. That mediation eventually lead to a term sheet, which included a 14-day unconditional recession period for either party to cancel the settlement without condition or penalty. On or about August 1, 2018, those parties reached an understanding as to the general terms the settlement and executed a Letter of Understanding that provided a period for them to attempt to negotiate a full and complete settlement.

39. To promote the likelihood that a full and complete settlement could be reached, I flew to Boston to meet with Harold Lichtenberg of the Lichten & Liss firm, who also had dancer cases that arguably involved the same class members and overlapping class periods, but which may have been

stayed and largely ordered to arbitration. (*Hughes, et al. v. S.A.W. Entertainment, LTD.*, et al., No. 16-3371 (N.D. Cal.) and *Pera v. S.A.W. Entertainment, LTD*, 17-138 (N.D. Cal.).) They were apprised of the tentative settlement and invite to participate in a continued mediation if they wished to. They accepted the invitation.

40. A second mediation was held with Mark Rudy in San Francisco in August, and lawyers form Lichten & Liss attended and participated. The San Diego Plaintiffs shared their damage analysis with Ms. Liss-Riordan. At the mediation, all parties contemplated their respective positions to see if a more comprehensive settlement could be reached, and perhaps settlement of the appeal, in which Ms. Liss-Riordan was the counsel for the primary objecting parties. It was unsuccessful. The original term sheet became fixed and final by expiration of the recession period.

41. The parties set out to work to convert the term sheet into the settlement agreement, including consulting with notice providers and tax experts as to W2 and 1099 issues.

42. Pursuant to the proposed San Diego Action Settlement, Defendant would have paid a total of one and a half million dollars ($1,500,000.00) to satisfy the legal claims of the Settlement Class (the "Settlement Fund"). This amount will satisfy the payments to the Settlement Class, PAGA penalties, administrative costs, any incentive award to Plaintiffs, litigation costs, and Plaintiffs' attorneys' fees.

43. The Settlement Fund would have been distributed to first satisfy the PAGA penalties due to the State, the settlement administration costs, any incentive award to Plaintiffs, litigation costs, and any Plaintiffs' attorneys' fees awarded. $20,000 be allocated from the Settlement Fund for settlement of claims for civil penalties under PAGA and various other provisions of the California Labor Code ("PAGA Settlement"). Consistent with California Labor Code, section 2699(i), seventy-five percent (75%), or $15,000, of the PAGA Settlement would have been paid to the California LWDA and the remaining twenty-five (25%), or $5,000, will be allocated back into the Settlement Fund for distribution to the Settlement Class. The San Diego Plaintiffs intended to request an incentive award of $1,500 and payment for general release of $8,500 for each of the named Plaintiffs ($20,000 total). Attorney fees and costs will not exceed $500,000.00. No portion of the Settlement Fund could have reverted to the Class.

44. Defendants also agreed to convert the dancers who performed at Defendants' clubs to employees by the preliminary approval date on monetary terms that are at least as favorable as specified for employee in the Michigan Action Settlement or the San Francisco Action Settlement. The Defendants fully complied with the Entertainer conversion requirements of the Agreement, and converted all dancers then performing at the clubs by November 16, 2018.

45. On October 11, 2018, the San Diego Plaintiffs filed their motion for preliminary approval of the proposed Settlement before the San Diego Superior Court (Judge Timothy Taylor presiding). [ECF no. 1-7]. The hearing for which had originally been scheduled to occur on November 2, 2018. Additionally, clients of Ms. Liss-Riordan filed Motion to Intervene, to oppose and object to the Settlement (the "Plaintiff-Intervenors"). Nearly all of the Plaintiff-Intervenors have been actively pursuing wage and hour claims against Defendants for more than two years in the Northern District of California in *Hughes, et al. v. S.A.W. Entertainment, LTD., et al.*, No. 16-3371 (N.D. Cal.), and *Pera v. S.A.W. Entertainment, LTD*, 17-138 (N.D. Cal.). All but one had been ordered to arbitration. Given the new filings Judge Taylor continued the hearing.

46. The Court ultimately heard these matters (including seeking supplemental briefing), and on November 30, 2018, the Court denied the San Diego Plaintiffs' Motion for Preliminary Approval, without prejudice, in order to allow the San Diego Plaintiffs' to provide additional information regarding the non-monetary aspects of the Settlement. *See* Minute Order [ECF. 1-43]. On December 27, 2018, the Court granted Plaintiff-Intervenors' motion to intervene. *See* Minute Order [ECF. 1-47]. And on January 18, 2019, the Court denied Defendant's Motion to Compel Arbitration. *See* Minute Order [ECF. 1-52]. This would begin the case's journey to this Court's docket.

**REMOVAL TO THE SOUTHERN DISTRICT OF CALIFORNIA**

47. On January 24, 2019, the Plaintiff-Intervenors filed their Complaint in Intervention. [ECF No. 1-53]. Given that the Complaint in Intervention named a new defendants, including SFBSC Management, LLC, Defendants were able to remove this case from the San Diego Superior Court to the United States District Court for the Southern District of California. *See* Notice of Removal [ECF No. 1].

48. It is likely that this removal was strategic; Defendants perceived the federal court as a friendlier forum to hear their Motion to Compel Arbitration. In February 2019, Defendants filed a Motion for Reconsideration of Judge Taylor's order denying its Motion to Compel Arbitration and a Motion to Compel Arbitration for the Plaintiff-Intervenors. [ECF Nos. 7 & 8]. These Motions were set to be heard on March 29, 2019 and April 12, 2019, respectively. [ECF No. 9].

49. On February 20, 2019, the Plaintiff-Intervenors moved, *ex parte*, to stay Defendants' Motions until they could filed their Motion for Remand. [ECF No. 10]. Plaintiff-Intervenors' Motion to Remand was filed on February 27, 2019. [ECF No. 11]. On March 1, 2019, Plaintiff-Intervenors' request to stay was granted. [ECF No. 12]. The San Diego Plaintiffs did not oppose the Plaintiff-Intervenors' Motion for Remand. [ECF No. 15].

50. On April 29, 2019, Judge Dana M. Sabraw denied Plaintiff-Intervenors' Motion for Remand. [ECF No. 19]. In the same Order, Judge Sabraw also noted that Plaintiff-Intervenors' pending cases in the United States District Court for the Northern District of California and ordered the parties to show cause why the case should not be transferred. *Id.*,

51. Both the Defendants and the Plaintiff-Intervenors, who were already before this Court, consented to the transfer. [ECF No. 22-23]. The San Diego Plaintiffs, on the other hand, objected to the transfer, as none of the San Diego Plaintiffs, nor their claims, had any connection to the District. [ECF No. 22]. Nevertheless, the Case was transferred to this Court.

**LITIGATION IN THE NORTHERN DISTRICT OF CALIFORNIA AND COVID-19**

52. Once in this Court, the parties were ordered to appear at an initial case management conference on October 10, 2019, which was reset for December 14, 2019. [ECF No. 28 & 51]. The parties all appeared, and the San Diego Plaintiffs and Defendant affirmed their intention to settle their claims.

53. The Plaintiff-Intervenors attempted to stay the San Diego Plaintiffs' action under the "first filed" rule. [ECF No. 64]. This was opposed by the San Diego Plaintiffs and Defendants. [ECF Nos. 66, 68]. The Plaintiff-Intervenors were also Plaintiffs in the *Hughes, et al. v. S.A.W. Entertainment, LTD.*, et al., No. 16-3371 (N.D. Cal.) and *Pera v. S.A.W. Entertainment, LTD*, 17-138 (N.D. Cal.) actions.

54. Also pending before this Court was the Settlement in the San Francisco Action. In 2014, Plaintiffs Jane Roes Nos. 1–2 (the "San Francisco Plaintiffs") filed a putative class and collective action alleging violations of the FLSA and various provisions of the California Labor Code and San Francisco municipal ordinances. I understand that the proposed class included approximately 4,700 who worked at worked as exotic dancers at eleven adult entertainment clubs in San Francisco.

55. Shortly after the case was filed, SFBSC brought a motion to compel arbitration of the San Francisco Plaintiffs' claims. The Court denied that motion on March 2, 2015, holding that the relevant arbitration provision was unconscionable and therefore unenforceable. SFBSC appealed the district court's decision, but the Ninth Circuit affirmed. *See Roes v. SFBSC Mgmt., LLC,* 656 F. App'x 828, 829 (9th Cir. 2016).

56. During this appeal, the San Francisco Plaintiffs and Defendants meet to discuss settlement, through the Ninth Circuit Mediator. Ultimately, the parties executed a settlement agreement and, per the parties' stipulation, Defendants then dismissed their appeal (without prejudice to its reinstatement if the district court did not approve the parties' settlement).

57. The Court ultimately approved the San Francisco Plaintiffs' Settlement on September 2017. *See Roe v. SFBSC Mgmt., LLC,* No. 14-CV-03616-LB, 2017 WL 4073809, at *1 (N.D. Cal. Sept. 14, 2017). However, this settlement was reversed on appeal on December 11, 2019. *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035 (9th Cir. 2019). Ms. Liss-Riordan represented the objectors in the appeal.

58. Given the appellate decision, the Court ordered the parties, including the San Francisco Plaintiffs, San Diego Plaintiffs, and Plaintiff-Intervenors, to appear at a joint case management conference on January 16. 2020. [ECF No. 72]. Both the San Francisco Plaintiffs and San Diego Plaintiffs expressed their intention to renew their respective settlement efforts. [ECF No. 73]. The San Francisco and San Diego Plaintiffs agreed to stay their cases during settlement discussions. The case was refer to mediation and a further case management conference was set for February 20, 2020. [ECF No. 75].

59. In connection with this joint case management conference, counsel for San Francisco and San Diego Plaintiffs increasingly discussed the possibility of a global settlement of all the parties'

claims. Both San Francisco and San Diego Plaintiffs believed it to be in the best interest of their respective classes to present a united front, to prevent a reverse settlement auction.

60. The parties ultimately agreed to engage in private mediation with Tripper Ortman on March 11, 2020. Counsel benefited from the extensive settlement discussion and discovery that had been conducted in the prior efforts to settle the San Francisco and San Diego Actions. The parties also had the benefit of various legal decisions which provided guidance to the parties, including the appeals in the San Francisco and Michigan Actions.

61. The March 11, 2020 mediation focused on creating a workable settlement structure, which provided both monetary and injunctive relief. As discussed, a material component of this Settlement is the agreement convert the Class Members to, and/or treat them as, employees. At this mediation, the parties were unable to resolve their disputes with Lichten & Liss-Riordan, but following further negotiations among the parties, were able to reach agreement on a basic structure of a resolution of the San Francisco and San Diego Action. Nonetheless, the parties still had to reduce their agreement to a final form.

62. However, on March 16, 2020, the Public health officers of Alameda, Contra Costa, Marin, San Francisco, San Mateo, and Santa Clara counties announced, with the City of Berkeley, a order directing their respective residents to shelter at home beginning March 17, 2020. On March 19, 2020, Governor Gavin Newsom issued a stay at home order to protect the health and well-being of all Californians and to establish consistency across the state in order to slow the spread of COVID-19.

63. Of course, this closed Defendants' clubs throughout the state. Because of the material change in circumstance, the Settlement negotiations were paused. These settlement discussions only continued on April 2021, when Defendant's clubs reopened

64. Over the next few months, the parties would discuss renewing the Settlement. The main obstacle to settlement was uncertainty due to the continuing pandemic. Not only did the pandemic close Defendants' operations, but it also made future income difficult to predict. Accordingly, the negotiations focused on ensuring that the previous settlement benefits were provided to the class, while ensuring the risk represented by the pandemic were property addressed.

65. The parties were finally able to agree to terms in June 2021 and the Settlement

Agreement was finally executed on September 12, 2021. Attached hereto as **Exhibit B** is a true and correct copy of the Release and Settlement Agreement.

**THE SETTLEMENT AGREEMENT**

66. Under the terms of the Settlement Agreement, the parties will settle the claims of both the San Francisco and San Diego Plaintiffs on a class wide basis. *See generally* Ex. B. The Settlement Agreement also provides for release of the FLSA collective and payment of PAGA related civil penalties. *Id.*

67. The Settlement Class is defined as "all Entertainers who Performed at one or more of the Clubs at any time during the applicable Class Periods, but does not include those individuals who provide or who have provided services as 'headliner' or 'feature' performers unless such individual was otherwise a party to a Dancer Contract with one or more of the Clubs during the Class Periods." *Id.*, at ¶ 2.9. In turn, the Class Period is defined as:

a) the time period from August 8, 2010 to November 16, 2018 for Entertainers who Performed as Independent Professional Entertainers (independent contractors) at one or more of the San Francisco Clubs (the "San Francisco Class Period"); and

b) the time period from February 8, 2017 to November 16, 2018 for Entertainers who Performed as Independent Professional Entertainers (independent contractors) at one or more of the Greater California Clubs (the "Greater California Class Period").

*Id.*, at ¶ 2.14. The reason for the two different class periods is that the San Francisco Plaintiffs' claims were pending well before the San Diego Plaintiffs filed their respective case. Additionally, the San Francisco Plaintiffs' claims were only brought against a number of Bay Area clubs, as opposed to the San Diego Plaintiffs' claims, which were statewide.

68. Counsel understands that the individuals referenced as "headliner" or "feature" performers are well-known dancers who perform at the Clubs for a limited period of time based on an individually negotiated contract. Their performances are generally advertised as a special event, being hosted by the Clubs.

69. Plaintiffs estimate the Settlement Class to include 6,800 individuals. This estimate likely includes some duplication. Class members often worked at multiple clubs, under different stage

names, and may have worked for several distinct separate short time period. Defendants are currently working to dedupicate the Class List. Accordingly, Plaintiffs believe that the Settlement Class will likely include less than **8,408 individuals**.

70. The Settlement also provides for amendment of the Plaintiffs' respective complaints and to effectuate the purposes and intent, of the Settlement Agreement. *Id.*, at ¶ 3.4. Additionally, the parties will consolidate their actions to settle their claims. *Id.*, at ¶ 3.2.

**D. Settlement Benefit**

71. For release of the claims, the Settlement Class will receive a total Settlement Consideration of five million five hundred thousand dollars ($5,500,000), which will fund any Cash Payments, Dance Fee Payments, Enhancement Payments, the PAGA Payments, the Attorneys' Fees and Expenses Award, Administrative Costs, and changes to the Clubs' business practices. *Id.*, at ¶ 5.1. There will be no revision of any portion of the Settlement Consideration. *Id.*

72. The Settlement Consideration will be allocated as follows:

- Cash Pool: $4,000,000;
- Dance Fee Pool: $500,000 (any Unclaimed Dance Fee Pool will revert to the Cash Pool);
- Total PAGA Payments: $125,000 (75% of which will be allocated as the LWDA PAGA Payment and the remaining 25% of which will be allocated as the Settlement Class Members' PAGA Payment);
- Administrative Costs: $90,000;
- Total Enhanced Payments of $35,000;
- Attorneys' Fees and Expenses Award as ordered by the Court; and
- Changes to Defendants' Business Practices: valued at a minimum of $1,000,000.

*Id.*, at ¶ 5.2.

1. <u>Cash Benefit</u>

73. For the Cash portion of the Settlement, it will be distributed as follows:

- <u>PAGA Payment</u>: thirty-one thousand two hundred fifty dollars ($31,250) will be paid to Settlement Class Members on a pro rata basis, based on the ratio determined dividing

the Form 1099s Payments by the Form 1099s Payments received by all Settlement Class Members (*Id.*, at ¶¶ 6.2, 6.3.2);

- Class Payment: the Net Cash Fund will be paid to Settlement Class Members on a pro rata basis, based on the ratio determined dividing the Form 1099s Payments by the Form 1099s Payments received by all Settlement Class Members (*Id.*, at ¶ 6.3.1);

74. For Settlement Class Members who do not timely submit a Properly Completed Opt-Out Form, they will be presumed to have selected to obtain their Settlement Payment in the form of Cash Payments. *Id.*, at ¶ 4.11. The Cash portion of the Settlement will be funded in four installments: Defendants shall pay the Notice and Administrative Fund within five (5) business days of the Preliminary Approval Date; an initial payment of two million dollars ($2,000,000) by March 1, 2022; a second payment of one million dollars ($1,000,000) by March 1, 2023; and a third payment of the balance of the funds (including the Unclaimed Dance Fee Pool, if any) by March 1, 2023. *Id.*, at ¶ 5.3.

75. The reason for this payment schedule is largely due to Defendant's financial condition, particularly after the interruption of Defendant's businesses during the Pandemic and resulting Public Health Orders. Both state and local Public Health Orders halted Defendant's business operations, interrupting normal revenue streams for Defendant. Additionally, even when clubs are open, COVID 19 has required the clubs to adopt more strict health and safety guidelines, which presents an unexpected cost for Defendants. Finally, the ongoing Pandemic is likely to have a continuing effect on demand for Defendants' services even after the lockdown ends. Accordingly, Defendant has significant concerns regarding cash flow in the post lockdown period.

76. Payments to the Class Members will be made in three installments, on a pro rata basis after the initial, second, and third payments detailed above. *Id.*, at ¶ 5.5.2. LWDA's PAGA Payment, any Enhancement Payments, and fifty percent (50%) of the Attorneys' Fees and Expenses Award will be paid out of the initial payment. *Id.* And twenty five percent (25%) of the Attorneys' Fees and Expenses Award will be paid out each subsequent payment. *Id.* This structure ensures that Class Counsel only gets paid as the Settlement Class gets paid.

77. Settlement Class Members shall have 180 days from the date their Settlement Checks

are dated to cash the same. *Id.*, at ¶ 6.6. If any Settlement Check remains uncashed after 180 days or is undeliverable, the Settlement Administrator will deliver the monies represented by the check to the California State Controller's Unclaimed Property Fund to be held in the Settlement Class Member's name. *Id.*, at ¶ 6.3.1.

78. Additionally, the payment of the above cash payments is conditions on at least seventy five percent (75%) of the Clubs being permitted, under COVID-19 pandemic Executive Orders or other legal processes, to both operate to at least seventy five percent (75%) of normal capacity and to present exotic dance entertainment, by January 1, 2022. *Id.*, at ¶ 5.4. However, this condition has been met.

2. Dancer Fee Benefit

79. The $500,000 Dance Fee Pool is made available to Settlement Class Members who select to obtain their Settlement Payment in the form of Dance Fee Payments. *Id.*, at ¶¶ 2.27, 7.1. Dance Fee Payments entitled the Class Member to receive 100% of the "Dance Fee" collected by Defendant for the Settlement Class Member's services—the mandatory charge that customers are required to pay in order to purchase such Performances or sessions at a club. *Id.*, at ¶¶ 2.19, 7.1.

80. The Dance Fee Pool will be distributed based on the same formula used in the cash payments. *Id.*, at ¶¶ 7.1, 6.3.1. However, if the Dance Fee Pool claims exceed $500,000, the distribution will be subject to a pro rata reduction (dividing the Claimant's Form 1099 Payments into the amount of Form 1099s Payments received by all Dance Fee Claimants; and (2) then multiplying that number by five hundred thousand dollars ($500,000)). *Id.*, at ¶ 7.1. Any Unclaimed Dance Fee Pool (the portion of the $500,000 not claimed through the Dance Fee Payment Election Form) will be paid to the Class, in cash, during the third payment. *Id.*, at ¶¶ 2.91, 5.3, 7.1. Additionally, if a Settlement Class Member she elects to receive her Settlement Payment in the form of Dance Fee Payments, but does not use the Dance Fee Payment within the Dance Fee Payment Collection Period (one (1) year from the Effective Date), the unused amount will be returned to the Dance Fee Claimant as a check. *Id.*, at ¶¶ 2.23, 2.93, 5.3, 7.6. This amount will be paid to the Settlement Administrator within 30 days of expiration of the Dance Fee Payment Collection Period and a check will be issued within ten (10) days of the funds receipt. *Id.*, at ¶ 7.6.

81. There are some limitations for the Dance Fee Payments. A Dance Fee Claimant must elect one club to receive her Dance Fee Payment, for accounting purposes. *Id.*, at ¶ 7.2. A Properly Completed Dance Fee Payment Request Form must be submitted at least seven (7) business days before the Claimant desires to Perform. *Id.* And the clubs can limit the number of Dance Fee Claimants receiving Dance Fee Payments on any one Date of Performance to seven (7) such Dancers on a first come/first served basis. *Id.*, at ¶ 7.3.

82. To the extent that a Dance Fee Claimant is also entitled to Dance Fee Payments under the any other settlement, her collection of Dance Fee Payments shall first be ascribed to the Dance Fee Payments to which she is entitled under the other settlement and then, after she has obtained all such Dance Fee Payments, to the Dance Fee Payments she is entitled to under this Settlement. *Id.*, at ¶ 7.4.

83. The purpose of Dance Fee Payments is to allow Claimant to accelerate the payment of the benefits under the Settlement for any current employees, should they opt to do so. Because these payments are linked to a specific and predetermined revenue stream, the concerns regarding cash flow, as described above, are not as significant.

84. Defendants shall provide to Class Counsel on a monthly basis, no later than the 10th day of each month during the Dance Fee Payment Collection Period, electronic copies of the Dance Fee Payment Request Forms submitted during the prior calendar month. *Id.*, at ¶ 7.2.

**E. Conversion of Class Members and Entertainers to Employees**

85. Additionally, as part of the Settlement, Defendants agreed to convert all Class Members as employees in accordance with applicable law. *Id.*, at ¶ 9.1. Pursuant to this Settlement and a prior iteration of it in the San Diego Action memorialized as the San Diego Settlement, such conversion has already taken place, with the conversion process having been completed by November 16, 2018. *Id.*, at ¶ 9.1. The reason that the conversion predates the effective date of the Settlement is to ensure an end to the dispute and the corresponding Settlement Class Period.

86. Defendant has agreed to provide certain "Enhanced Terms of Employment" through at least the one (1) year anniversary after the Final Approval Date. These Enhanced Terms of Employment ensure that dancers receive at least 40% of any dance fees collected as a commission.

87. To value the benefits associated with the Enhanced Terms of Employment, the parties

retained David Shindel, a Certified Valuation Analyst and Master Analyst in Financial Forensics, with the accounting firm Shindel, Rock & Associates. The parties agreed that Defendants would bear the cost of this expert valuation. A copy of Mr. Shindel's report is concurrently filed herewith.

88. However, to summarize Mr. Shindel's findings, the Enhanced Terms of Employment (increased commission on dance fees and drinks and other allowances) would result in a net benefit of $12,474,093 to future employees over a one year period. *See* Declaration of David Shindel ("Shindel Decl.") at ¶ 34. Additionally, the Settlement provided additional value to dancers by way of conversion to employees. For example, dancers will now be eligible for overtime wages, meal and rest periods (including the premium pay associated with missed meal breaks), matching social security, state unemployment coverage, worker's compensation coverage, paid sick leave, and expense reimbursement. These benefits should not be underestimated. Nonetheless, Plaintiffs agreed to limit any value attributed to the injunctive relief to $1 million dollars for purposes of the Court's evaluation.

**F. Release**

89. In change for the benefits provided, Settlement Class Members will Release the following claims:

> means any and all Claims pursuant to any theory of recovery whatsoever (whether at law, in equity or otherwise, including but not limited to Claims based in contract, tort, common law, federal, state or local law, statute, ordinance, or regulation, and whether for compensatory, consequential, liquidated, punitive or exemplary damages, statutory damages, penalties, fines, interest, attorneys' fees, costs, or other disbursements, including those that may have been incurred or billed by Class Counsel or any other counsel representing the Class Representatives or any Settlement Class Members), that a Settlement Class Member has or may have against the Release Defendants, or against any one or group of them, from the beginning of her applicable Class Period(s) up to and including November 16, 2018, that are asserted in the Actions or that are to be asserted in the Actions by way of the Amended Complaints for Settlement contemplated in this Agreement, as well as any and all Claims of any conceivable kind or nature whatsoever that are or could be based on the factual allegations contained in such pleadings or that are reasonably related thereto (excepting only for FLSA Claims), and specifically including:
>
> > a) Any and all Claims for unpaid wages including, without limitation, Claims for minimum wage, regular wages, overtime, waiting time, final wages, calculation of the correct overtime or regular rate, and meal period and rest period payments/premiums;
> >
> > b) Any and all Claims to recover any allegedly retained or confiscated tip, gratuity or other payment, or portion thereof;
> >
> > c) Any and all Claims for expense reimbursement;

d) Any and all Claims for uniform/costume costs and associated cleaning expenses;

e) Any and all Claims pursuant to the California Labor Code, including but not limited to Claims under or pursuant to California Labor Code sections 98.6, 132A, 200-204, 206.5, 207, 208, 210-214, 216, 218, 218.5, 218.6, 221, 222.5, 223, 225.5, 226, 226.3, 226.7, 226.8, 227, 227.3, 245-249, 351, 353, 432.5, 450, 510, 512, 551-552, 558, 1174, 1174.5, 1182.12, 1194, 1194.2, 1194.3, 1197, 1197.1, 1198, 2698 et seq. (PAGA), 2753, 2802, and 2804;

f) Any and all Claims under or pursuant to California Code of Civil Procedure section 1021.5;

g) Any and all Claims under or pursuant to California Code of Regulations, Title 8, sections 11010 and 11040;

h) Any and all Claims under or pursuant to any California Industrial Welfare Commission Wage Orders;

i) Any and all Claims under or pursuant to California Business and Professions Code sections 17200, et seq. and 17500;

j) Any and all Claims asserting unfair business practices or violations of similar laws; k) Any and all Claims under the National Labor Relations Act, 29 U.S.C. § 151 et seq.;

l) Any and all Claims asserting any form of retaliation predicated upon a Settlement Class Member's assertion that any of the Release Defendants wrongfully terminated her Dancer Contract, right to Perform, or employment, or otherwise retaliated against her, after she or any other Person acting on her behalf, in her interest, or for here benefit, asserted a Claim that she was misclassified as an independent contractor and/or as a non-employee, or that other Entertainers were misclassified as independent contractors and/or as non-employees, and were therefore entitled to any form of compensation or remuneration thereby;

m) Any and all other employment, wage, or labor-related Claims that could be brought under any statute, ordinance, regulation, rule, order, or otherwise against the Released Defendants, or against any one or group of them, that arise out of, relate to, are associated with, are based upon, or concern, in any way, manner, regard or fashion whatsoever, any act or omission as pled in the Amended Complaints for Settlement that occurred during the Class Periods, including but not limited to any Claims under any legal or equitable theory as a result of the alleged violation of any federal, state, or local law or regulation, Claims brought pursuant to breach of contract, Claims brought pursuant to common law, Claims of unjust enrichment and/or quantum meruit, and any and all Claims pursuant to, or derived from, ERISA that arise, or may arise, from any alleged failure to pay wages, including any Claims for benefits under any benefit plans subject to ERISA;

n) Any and all Claims, including common law Claims, arising out of or related to the statutory causes of action described in this Section 2.85; and

o) Any and all Claims asserting breach of contract, violation of injunctive relief, contempt, rescission, or otherwise, with regard to the terms of previously executed Dancer Contracts or of the Limited National Settlement,

> arising out of the required conversion of the Entertainers Performing at the Clubs to employees as mandated by § 8.1 of the San Diego Settlement and as incorporated and modified by Article IX of this Agreement.

*Id.*, at ¶ 2.85.

90. For FLSA Claims, Class Member who execute a Dance Fee Payment Election Form or negotiate their Settlement Class Member will be deemed to have consented to join as the FLSA lawsuit and released their FLSA Claims. *Id.*, at ¶¶ 4.12, 6.5.

**G. Notice Process**

91. Within thirty (30) days of the Preliminary Approval Date, Defendants will provide the Settlement Administrator with records identifying each Class Member. *Id.*, at ¶ 4.1. Twenty (20) days after its receipt, Class Members will be mailed and emailed (were available) Notice of the settlement and a Dance Fee Payment Election Form. *Id.*, at ¶¶ 2.56, 4.4. These notices will be designed to ensure the confidentiality of the nature of the Class Members employment. *Id.*, at ¶ 4.4. At the same time, the Settlement Administrator shall create a website dedicated to the Settlement with the Notice and other important information. *Id.*, at ¶ 4.7.

92. If the Class Notice mailed to a Class Member is returned within twenty-one (21) days of the initial mailing with a forwarding address provided by the Postal Service, the Class Notice will be re-sent by the Settlement Administrator to the forwarding address within seven (7) days of return. *Id.*, at ¶ 4.5. If no forwarding address is provided by the Postal Service, the Settlement Administrator shall perform a skip trace on the Class Member using the National Change of Address ("NCOA") database, and, if an alternative address is found, the Class Notice will be re-sent by the Settlement Administrator to the alternative address within seven (7) days of discovery of the additional address. *Id.*

93. Additionally, Notice will be provided through publication designed to reach the Class. Notice in each of relevant Club's Entertainer dressing room. *Id.*, at ¶ 4.6. This posted Notice will remain up for ninety (90) days after the date of filing the motion for Final Approval. *Id.* Notice will also be provided to the International Entertainment Adult Union for posting on their internet message board and to be emailed to their subscriber list. *Id.*, at ¶ 4.8. Notice will also be posted to the StripperWeb.com "Stripping (was Stripping General)" discussion thread, weekly, for eight (8) weeks.

*Id.* This electronic notice will provide hyperlink to the Settlement Website. *Id.*

94. Finally, notice of the Settlement will be provided by online advertising campaign directed at social media websites. *Id.*, at ¶ 4.9. A Social Media Notice Fund of $10,000 will be established to effectuate posting of the Social Media Notice. *Id.* Again, this electronic notice will provide hyperlink to the Settlement Website. *Id.*

95. No later than thirty (30) days prior to the expiration of the Opt Out Period, the Settlement Administrator shall effectuate Reminder Notices to the Class by mail and Email and the International Entertainment Adult Union. *Id.*, at ¶ 4.10.

96. The Settlement Administrator will verify it has completed Noticed within thirty (30) days of the initial mailing. *Id.*, at ¶ 4.14.

97. Class Counsel further project that the cost of settlement administration will be approximately $59,500 to be paid to Simpluris, Inc. Class Counsel has experience with Simpluris, Inc and have found it to be a competent and competitive priced settlement administrator. Class Counsel also found that $59,500 to be a reasonable estimated of settlement administration costs for the Settlement Class. Attached hereto as Exhibit C is a true and correct copy of the Estimate from Simpluris, Inc.

**<u>ATTORNEY FEES AND COSTS</u>**

98. Under the Settlement Agreement, Class Counsel can apply to the Court for an award of: (1) attorneys' fees in an amount that does not exceed thirty-five percent (35%) of the Settlement Consideration ($5,500,000); and (2) up to eighty thousand dollars ($80,000) in Litigation Expenses. Settlement Agreement, at ¶ 10.1. Any disapproval or modification by the Court of such applications shall not affect the enforceability of the Settlement Agreement or provide any of the Parties with the right to terminate the Settlement Agreement. *Id.*, at ¶ 10.1.

99. As class counsel, I have reviewed all of the time and expenses and can attest that they are reasonable as to both the hourly rate, time spent, work allocation and totals, as well as being absolutely necessary to reach the settlement in this case. However, the amount of attorneys' fees that will ultimately be requested in this case will be less than the actual lodestar form Class Counsel. As detailed above, this case has been subject to years of litigation and negotiations, involving a number

of cases.

100. All Plaintiff's counsel diligently worked to avoid duplication of efforts and expenses, while at the same time not sacrificing work quality on behalf of the class. The settlement obtained in this litigation were directly affected by the efforts and expenses advanced by Plaintiff's counsel, and only those counsel, in this lawsuit.

101. Plaintiff's counsel will separately submit a motion for approval of their fees and costs, with detailed explanation of the time and expenses expended on this case.

**SERVICE AWARDS FOR THE REPRESENTATIVES**

102. Plaintiffs are requesting that the Court approve a modest service award of between $3,000 and $5,000 for each Named Plaintiff ($35,000 total). Based on my personal experience representing these Plaintiffs during the course of the litigation, I believe that each one is deserving of the requested award.

103. Indeed, each Plaintiff has spent substantial amounts of time and energy assisting Class Counsel in the prosecution of this action. Plaintiffs provided Class Counsel with vital assistance in gathering facts relevant to their and other Class Members' potential claims. Indeed, as much of the employment recorders are unavailable, Plaintiffs provided invaluable assistance in valuing damages. Additionally, Plaintiffs reviewed the complaints, made themselves available for consultation during settlement negotiations, and generally kept themselves apprised on the status of the case. This included phone conversations and electronic correspondence with Class Counsel.

104. It is my belief that the Settlement Class would not have obtained the outstanding results discussed above without the consistent, efforts provided by Plaintiffs in this action. At no small risk to themselves, Plaintiffs engaged themselves at the forefront of a class litigation not merely to obtain a lost wages, but —more importantly—to right a wrong and obtain a far greater remedy than the one to which they themselves were entitled. The substantial remedy obtained by Plaintiffs accrues to the benefit of, at least, hundreds of their prior co-workers. Their admirable efforts are worthy of recognition.

105. The requested amounts for incentive awards are commensurate with other incentive or enhancement awards I have had approved as fair and reasonable in similar wage and hour matters. Furthermore, the proposed allocation of the incentive awards is also fair and reasonable.

**REASONABLENESS OF THE SETTLEMENT**

106. I can attest to the numerous complications that arose in determining how to structure and value this Settlement during the parties' settlement discussions. I can further attest to the level of effort, expertise, dedication and creativeness of both Plaintiffs' and Defendants' counsel in making sure that the current settlement was fair, reasonable and adequate to both sides. The extent of the Defendants' liability was the subject of extensive deliberation and negotiation.

107. Class Counsel only negotiated this Settlement after sufficient informal discovery was taken, and having fully explored the value of the putative Class's claims. The proposed release by the Settlement Class was extensively scrutinized and negotiated by the attorneys involved in this litigation.

108. The class representatives have all consented to the release, as well as the Settlement Agreement and have been afforded full access to Plaintiffs' counsel, and have signed the Settlement Agreement.

109. Class Counsel remains confident in Plaintiffs' claims. Nevertheless, class action trials are exceedingly rare and notably complex. The outcome of any class action trial, regardless of the perceived merits of the claims, is far from certain. This is particularly true of this case, where key legal and factual issues remain unsettled. Additionally, a class has not yet be certified in this case. And Class Counsel are fully aware of the difficulty in maintaining an employment case as a class action, given the number of individualized damage calculations, which generally require extensive expert testimony. *Compare Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) (finding that individual issue predominate in an employment case); *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) (same) *with Levya v. Medline Indus. Inc.*, 716 F.3d 510 (9th Cir. 2013) (In a California wage and hour case, Court held that certification still appropriate where "the amount of pay owed" is the only individualized issue.). Additionally, even if Plaintiffs did proceed on a classwide basis, Defendants assert that their sale staff is exempt from overtime regulations pursuant to 29 C.F.R. § 779.412 & Wage Order No. 4, § 3(D). But, even if Plaintiffs were successful, based on Class Counsel'

experiences, it would take *at least* two years to shepherd this case trough trial.

110. Sommers Schwartz P.C. also has an appellate practice and understands that the post-trial appellate process poses its own risk and can significantly delay any relief recovered. But even a successfully litigated appeal, to an appellate court of first instance, required two years and was froth with numerous perils. Accordingly, Class Counsel is acutely aware that securing a favorable judgment is not the end of the litigation process. Plaintiffs fully expect that any judgment for the Class would be appealed by Defendants. Indeed, appeals already have occurred in both the Michigan and San Francisco Actions.

111. Finally, even if Plaintiffs were successful at trial, business realities created uncertainty in Plaintiffs' ability to recover their hard-fought judgment. Potential exposure for the Settlement Class's claims could exceed $45.8 million ($5,454.16 damages per dancer x 8,408 Class Members). Plaintiffs were concerned that Defendants would not be able to absorb a large judgment in this case. This is particular true given Defendants financial difficulties follow the closure of their business due to COVID-19. During the March mediation, and subsequent negotiations, Defendants provided Plaintiffs' counsel with an overview of Defendants' financials that confirmed their current financial state. Indeed, the reason for the installment payments under the Settlement Agreement is due to Defendants' lack of liquidity. Accordingly, any judgment in this case may only result in Defendants' bankruptcy. Indeed, we understand that at least five of Defendant's Clubs had been shutdown during the pandemic: Chowder House Inc.; Deja Vu Showgirls of San Francisco, LLC; San Francisco – Roaring 20's, LLC; Cathay Entertainment, LLC; and EF5 Acquisitions Group, LLC (having also filed for bankruptcy).

112. Under the Settlement, Defendants will be required to pay $4,500,000 of non-reversionary monetary benefits. After deduction of the LWDA's portion of the PAGA Payment ($93,750), Settlement Administration Costs ($59,500), Enhancement Awards from the Named-Plaintiffs (up to $35,000), litigation costs (up to $80,000), and Attorneys' Fees (up to $1,925,000.00), the net monetary settlement benefit to the Class will be **<u>$2,306,750</u>**. This is on top of the over **$1,000,000** provided in injunctive relief.

113. Given that there is 8,408 Class Members (likely less), that average monetary benefit

that each Class Member receives will be approximately **<u>$274.35</u>** ($2,306,750 net monetary settlement benefit/8,408 Class Members). This represents approximately 5.0% of the average individual damages ($274.35 recovery/$5,454.16 individual damages). The net recovery also represents approximately 5.0% of the total damages ($2,306,750 net monetary settlement benefit/$45,858,577.28 total damages). If the total Settlement Consideration of $5,500,000 is considered, then the Settlement represents approximately 12.0% recovery of the total damages owed ($5,500,000 monetary settlement benefit/$45,858,577.28 total damages). This is a reasonable outcome.

114. The amount that each Class Member will receive must be placed in the context of the short nature of their employment. Indeed, as noted above, Class Members likely worked less than 56.25 performance dates and only for 302.78 hours worked. Additionally, there are significant risks moving forward.

115. First, *Dynamex*'s ABC test only applies to Plaintiff Wage Order claims. *Karl v. Zimmer Biomet Holdings*, No. C 18-04176, 2018 WL 5809428, at *3 (N.D. Cal. Nov. 6, 2018) ("ABC test applies only to claims arising under Industrial Welfare Commission Wage Orders"). Accordingly, the *Borello* test remains the proper test for claims not arising from the Wage Orders. *See Henry v. Central Freight Lines, Inc*., 2021 WL 3187257, at *3 (E.D. Cal. July 28, 2021) (denying motion to reconsider and holding that claims "based on the labor code" must "be analyzed using the *Borello* test."); *Haitayan v. 7-Eleven*, Inc., 2021 WL 757024, at *5 (C.D. Cal. Feb. 8, 2021) ("Because *Dynamex* applies retroactively, but only to wage orders, and AB 5 is not retroactive, the ABC test applies to Plaintiffs' Wage Order claim and the *Borello* test applies to Plaintiffs' Labor Code claim.").

116. This is a concern because Class Members were permitted to determine if, when, where and for whom they would perform dances, they are not paid by the hour; they are not terminable at will; they control their profits and losses; they must exercise independent initiative in order to successfully engage in their professional occupation; they perform at other businesses; they intended to be independent contractors and/or non-employees; and they specifically rejected the ability to become Club employees when that option was offered to them. There are courts that have found that dancers are independent contractors under similar legal standards under similar facts. This places much of Plaintiff's non-Wage Order based claims at risk. Defendant also would likely claim that

Dancers specifically fall within the statutory exemptions for professionals and are not subject to overtime and other provision of the Wage Orders.

117. Additionally, it will be difficult to prove liability on a classwide basis. First, there are arbitration agreements and class waivers to overcome. But even if Plaintiff's were to clear this hurdle, it would be difficult to provide Plaintiff's class claims as to dancers who worked at a number of different clubs, with different management. Plaintiff would have to establish that common policies and procedures predominated over any individual questions as to all of the clubs at issue.

118. Finally, damages would be difficult to prove on a class wide basis. By way of example:

- Plaintiffs' Overtime claims would be difficult to establish as the dancers worked (on average) less than 6 hours per day and were not paid on an hourly basis but based on "commissions" received during their shift; and
- Meal and Rest Periods violations would be difficult to prove as many shifts were less than 5 hours in length and dancers had a large amount of control of when they worked during the shift.

These are significant risks would have to be overcome at trial.

119. Additionally, Plaintiff counsel considered whether individual Class Members would be likely to bring their own claims when valuing the Settlement. First, given the nature of the work, many Class Members would be reluctant to file an individual action. Second, the Class has executed arbitration clauses and over three years has lapsed since the end of the Class Period. These barriers make individual action unlikely. Accordingly, the benefits provided under the Settlement like represent the only opportunity for the Settlement Class to receive any monetary benefit for their claims. For those Class Members who believe that their claims are worth more, they can engage in individual arbitration.

120. Based on Sommers Schwartz P.C.'s experience, this firm advocates for the Court's approval of this settlement. Sommers Schwartz P.C. evaluated the Settlement, on behalf of the Class, and concluded that it was a fair and reasonable compromise of the Class's claims given the inherent risk of if this case was go to trial (as well as any possible subsequent appeals).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 11th day of February, 2022 in Southfield, Michigan.

Jason J. Thompson

# EXHIBIT A

SOMMERS SCHWARTZ
LAW OFFICES

Medical Malpractice | Personal Injury | Birth Injury | Class Action | Employment | Commercial Law & Intellectual Property

# ***Expert** litigators.*
# ***Extraordinary** results.*

**All too often, people and businesses are seriously harmed.** In an instant, a life can be destroyed, a job lost, a livelihood ruined, at the hands of another's careless or deliberate acts. As experienced and aggressive trial attorneys, we fix serious problems. We earn our clients' trust every day, case after complex case, and we're very good at what we do. We give individuals, families, and companies the ability to move forward.

## We make the law work **for you.**

*Sommers Schwartz is a contingency-based litigation firm recognized for who we are, what we do, and how we win - a reputation we've built over the past forty years.*

Our lawyers have been recognized nationally in personal injury and medical malpractice, commercial and business law, intellectual property, employment and wage and hour laws, antitrust, and consumer protection. We try serious cases on behalf of people and families, businesses, and municipal entities seeking to enforce their rights.

Selecting a law firm to fight for your cause can be one of the most important decisions you make. Law firms are more than just collections of lawyers who work together. When choosing your law firm, it's important to know who those people are and how well they collaborate with one another. Sommers Schwartz is a collection of the brightest and the best attorneys in their respective fields. And we work amazingly well together.

Because of our vast experience, our unmatched accomplishments, our synergy, size, and resources, we're known as one of the top law firms in the country. We are the law firm that people and businesses turn to when so much hangs in the balance. Make no mistake, we fight hard and we win.

You've got a critical choice to make, so choose wisely. Choose Sommers Schwartz





One Towne Square | 17th Floor | Southfield, MI 48076 | Toll-free: (800) 783-0989 | Phone: (248) 355-0300
**www.sommerspc.com | www.sommerspc.com\blog**

SOMMERS SCHWARTZ
LAW OFFICES

Medical Malpractice

## *The more you need to win,* ***the more you need Sommers Schwartz.***

The effects of medical malpractice can be devastating, leaving both patients and families overwhelmed and confused. When that happens, you need an experienced legal team to simplify complex medical and legal matters while aggressively pursuing the compensation you deserve. *You need Sommers Schwartz.*

Birth Injury

## ***Choosing a law firm*** *to pursue a birth injury lawsuit can be the most important decision you make for your family's future.*

When you're faced with having to find an attorney to pursue a lawsuit involving a birth injury, finding the right lawyer and law firm is as important as selecting your obstetrician or hospital.

Sommers Schwartz attorneys investigate, evaluate, and personally handle each of the matters they take on. For each birth injury case that comes to us, our team of lawyers, nurses, and paralegals thoroughly reviews the facts and consults with leading experts in all areas of obstetrics and perinatal medicine, from pregnancy and prenatal care, to labor and delivery, to neonatology.

Personal Injury

## ***You win. We win.*** *It's that simple.*

An injury may leave you feeling confused, not knowing which way to turn. You need compensation and you know that someone should be made to pay, but you aren't sure who is responsible. Maybe you've suffered the death of a loved one because of a catastrophic accident and, along with your family, you want justice.

Class Action

## *When everything is on the line, you need a* ***deep level of expertise****.*

A Class Action, simply by its nature, is a big case. When the claims and rights of tens of thousands of people are at stake, everything is on the line – for both sides. Class actions take many years of work and require teams of lawyers and professionals to prosecute. Our Class Action practice group has the resources and experience to take on the biggest of defendants and beat them.

Employment

## ***Employment law*** *is complicated and the stakes can be high.*

When your livelihood, your business, and your future are on the line, you need experienced attorneys who've been in the trenches. You need lawyers who've devoted their careers to successfully representing and responding to clients involved in serious employment disputes.

Sommers Schwartz is committed to representing both employees and employers in employment-related disputes. There aren't many law firms that do that.

Commercial Law & Intellectual Property

## ***When your business is on the line****, you can't afford to take unnecessary risks.*

Business litigation is a complex undertaking that can be difficult to fully understand and manage without guidance from a seasoned attorney. When a lawsuit arises and propels you into the courtroom, you want - *you need* - the best legal representation on your side. *You need Sommers Schwartz.*

One Towne Square | 17th Floor | Southfield, MI 48076 | Toll-free: (800) 783-0989 | Phone: (248) 355-0300
**www.sommerspc.com | www.sommerspc.com\blog**

**JASON J. THOMPSON**
**Senior Shareholder**

Direct Phone: 248-415-3206
Direct Fax: 248-436-8453
jthompson@sommerspc.com

CLASS ACTION & COMMERCIAL LITIGATION / PERSONAL INJURY / UNPAID WAGES & OVERTIME



**Jason Thompson** represents clients in class action and multi-district litigation (MDL) involving consumer protection, employee rights, and mass tort cases in both federal and state courts throughout the United States. His clients include individuals as well as municipalities, healthcare plans, and unions.

Over the past 26 years, Jason has been repeatedly recognized for his excellence as a trial lawyer, including selection by his peers as a SuperLawyerTM, board certification by the National Board of Trial Advocacy, and an AV Preeminent Lawyer rating from Martindale-Hubbell. Jason has been appointed as class counsel and in MDL leadership positions in cases involving antitrust, overtime pay, insurance coverage, environmental pollution, and consumer protection. He has been asked to testify before the Michigan Legislature regarding the state's pharmaceutical immunity law and amendments to qui tam provisions under Michigan's Medicaid fraud law.

In addition to practicing law, Jason writes and speaks on topics related to his practice and sits on the firm's Board of Directors. He also teaches a course on class action and multi-district litigation as an Adjunct Professor at Michigan State University College of Law. In 2017, Jason became an Arbitrator with the American Arbitration Association.

## EDUCATION

**Michigan State University College of Law**, Juris Doctor Cum Laude, 1992

**University of Southern California**, Bachelor of Arts in Economics, 1989

## MEMBERSHIPS

**State Bar of Michigan**

**The National Trial Lawyers**

**Million Dollar Advocates Forum**

**American Association for Justice**

- Wage & Hour Litigation Group (Former Co-Chair)
- Class Action Litigation Group
- Section on Toxic Environmental and Pharmaceutical Torts
- Employment Rights Section

**Michigan Association for Justice**

- Former Executive Committee Member

**American Arbitration Association**

- Arbitrator, Class Action and Employment Panels

SOMMERS SCHWARTZ

## BAR ADMISSIONS

**Michigan**
**U.S. Supreme Court**
**U.S. Sixth Circuit Court of Appeals**
**U.S. Ninth Circuit Court of Appeals**
**U.S. District Court for the Eastern District of Michigan**
**U.S. District Court for the Western District of Michigan**
**U.S. District Court for the District of Alabama**
**U.S. District Court for the Northern District of California**
**U.S. District Court for the Northern Central District of California**
**U.S. District Court for the Southern District of California**
**U.S. District Court for the District of Colorado**
**U.S. District Court for the Northern District of Georgia**
**U.S. District Court for the Northern District of Illinois**
**U.S. District Court for the Southern District of Illinois**
**U.S. District Court for the Western District of Kentucky**
**U.S. District Court for the Western District of Louisiana**
**U.S. District Court for the District of Maryland**
**U.S. District Court for the District of Massachusetts**
**U.S. District Court for the District of Minnesota**
**U.S. District Court for the Southern District of Mississippi**
**U.S. District Court for the Northern District of Missouri**
**U.S. District Court for the Western District of Missouri**
**U.S. District Court for the District of Nevada**
**U.S. District Court for the Southern District of New York**
**U.S. District Court for the Western District of North Carolina**
**U.S. District Court for the Northern District of Ohio**
**U.S.District Court for the Eastern District of Tennessee-Knoxville**
**U.S. District Court for the Southern District of West Virginia**
**U.S. District Court for the Western District of Washington**

## SEMINARS & LECTURES

"Wage and Hour Law," 2018 Michigan Association for Justice Annual Convention

"Mediating FLSA Actions," 2016 American Association for Justice Annual Convention, Employment Rights Section and Wage & Hour Litigation Group

"The Current State of the De Minimis Doctrine and Recent Supreme Court Fair Labor Standards Act Decisions," 2015 American Association for Justice Annual Convention, Employment Rights Section and Wage & Hour Litigation Group

"Rule 68 Offers of Judgment-Genesis and Beyond," 2014 American Association for Justice Annual Convention, Employment Rights Section and Wage & Hour Litigation Group

SOMMERS SCHWARTZ

Moderator for the Employment Rights Section and Wage & Hour Litigation Group CLE Program, 2013 American Association for Justice Annual Convention

“The Latest Developments Affecting your Class Action Strategy Teleseminar,” 2013 American Association for Justice, Continuing Legal Education Program

Sponsor, 2013 First Annual Great Lakes Mass Tort Seminar

Moderator for the Employment Rights Section and Wage & Hour Litigation Group CLE Program Moderator, 2012 American Association for Justice Annual Convention

Moderator for the Employment Rights Section and Wage & Hour Litigation Group CLE Program, 2011 American Association for Justice Annual Convention

“H2B Visa Workers and FLSA Violations,” 2011 Ohio Association for Justice Wage & Hour Seminar

Moderator for the 2011 American Association for Justice Annual Convention, New York, New York

“Discovery Workshop,” 2010 Michigan Association for Justice New Lawyers

Moderator for the 2010 American Association for Justice Annual Convention, Wage & Hour Litigation Group Educational Seminar

“Wage & Hour Litigation: Employee Status,” 2009 American Association for Justice Annual Convention

Panel Member, 2007 Michigan Trial Lawyers Association Deposition Workshop

“Obtaining Recovery for Identity Theft Victims,” 2005 American Association for Justice, Annual Convention

“Bringing Your Closing Argument to Life,” 2005 Florida Justice Association

“New Ways to Succeed,” 2005 Michigan Trial Lawyers Association Rapid Fire Seminar

“Class Action and Multidistrict Litigation Settlements,” 2003 Product Liability and Personal Injury Law Conference, Kitzbühel, Austria

Judge for the 3rd Annual National Trial Advocacy Competition, Michigan State University/Detroit College of Law, 2002

“Mass Torts and Environmental Class Actions,” 2002 Michigan Trial Lawyers Association Seminar

Moderator for the 2002 Michigan Trial Lawyers Association Rapid Fire Symposium – “Environmental Torts”

“EMS Cases,” 1998 Michigan Trial Lawyers Association Rapid Fire Symposium

SOMMERS SCHWARTZ

## HONORS AND AWARDS

**Super Lawyers (Michigan)** – 2006-2012 and 2014 to present

**Best Lawyers**, Plaintiff's Mass Tort Litigation/Class Actions, 2021

**Michigan Lawyers Weekly** – Top Settlement 2012 ($22.5 Million)

**Michigan Lawyers Weekly "Up & Coming Lawyers"**, 2001

**Top 100 Trial Lawyers in Michigan, National Trial Lawyers Association**

**Board Certified Civil Trial Lawyer, National Board of Trial Advocacy**

**Leading Lawyers** – Class Action & Mass Tort Law

**AV Preeminent Lawyer (Martindale Hubbell)**–Peer Review Rating of 5.0 out of 5.0

## ACCOMPLISHMENTS

$6.55 million collective action settlement on behalf of exotic dancers working at a Deja Vu gentleman's club that misclassified them as independent contractors, forced them to "rent," and failed to pay minimum wage

$6.25 million class settlement on behalf of Permanente "advice nurses" who were not paid wages and overtime for off-the-clock work in violation of the Fair Labor Standards Act

Over $16 million in client settlements for women injured by defective transvaginal mesh products

$680,000 class action settlement involving restaurant employees who alleged they were forced to tip-out to ineligible employees and also cheated out of minimum wage

$3.0 million class action settlement involving restaurant employees who alleged they were cheated out of minimum wage and overtime pay

$3 million class action settlement on behalf of hourly employees at Bloomin' Brands, Inc. for violation of the Fair Labor Standards Act in failing to pay their employees all earned wages.

$3.5 million class action settlement on behalf of home-based customer service agents who claimed their employer unlawfully withheld compensation in violation of the Fair Labor Standards Act's wage and hour provisions

$22.5 million recovered for class of insurance policyholders in 38 states whose covered property damage claims were previously underpaid

$7.5 million settlement in nationwide wage and hour collective action involving more than 12,000 call center employees who were not paid for their pre-shift computer login and boot-up time.

$4.5 million settlement in nationwide wage and hour class action involving more than 20,000 at-home call center employees who were not paid for their pre-shift computer login and boot-up time and for time spent working "off-the-clock" while experiencing system downtime.

$1.1 million settlement in nationwide wage and hour class action involving more than 1,000 at-home call center employees who were not paid for their pre-shift computer login and boot-up time and for time spent working "off-the-clock" while experiencing system downtime.

$940,000 settlement wage and hour collective action settlement in a nationwide lawsuit against Sykes Enterprises, Inc. by approximately 4,000 call center employees who were not paid for their pre-shift computer login and boot-up time

SOMMERS SCHWARTZ

Wage and hour collective action settlement for $1.4 million involving call center employees. Alleged violations included logging into and out of software programs which resulted in unpaid overtime compensation.

$11.3 million collective action settlement on behalf of exotic dancers working at a Déjà Vu gentleman's club who were not paid a minimum wage as required under the Fair Labor Standards Act (FLSA). Instead, the dancers were misclassified as independent contractors and were forced to pay the clubs rent out of the dance fees paid by customers.

Smith et al. v. Kaiser Foundation Hospitals (Class Counsel)

Clark et al v. Intelenet America LLC (Class Counsel)

Moreno v. Dash Lube et al. (Class Counsel)

Clay et al. v. CytoSport, Inc. (Class Counsel)

Lambert et al. v. Dollar General Corp. (Class Counsel)

Parrot et al. v. Family Dollar, Inc. (Class Counsel)

Lambert et al. v. General Nutrition Corp. (Class Counsel)

Price et al. v. L'Oreal USA, Inc. et al. (Class Counsel)

Holmes v. Kelly Services, LLC (Class Counsel)

Owens et al. v. GLH Capital Enterprise, Inc.

Gullage et al. v. Cognosanto, LLC (Class Counsel)

Jane Doe et al. v. Deja Vu et al. (Class Counsel)

Wengerd et. al. v. Self-Reliance, Inc. (Class Counsel)

Compressor Engineering Corp. vs. Thomas (Class Counsel)

Lee v. Asurion Insurance Services et al. (Class Counsel)

Gaffers v. Kelly Services, Inc. (Class Counsel)

In Re: Blue Cross Blue Shield Antitrust Litigation MDL No. 2406 (Damages PSC Committee Member)

Bourne v. Ansara Restaurant Group et al. (Class Counsel)

APB Associates v. Bronco's Saloon, Inc. et al. (Class Counsel)

Compressor Engineering Corporation v. Manufacturers Financial Corporation, et al. (Class Counsel) Machesney v. Lar-Bev of Howell, Inc., et al. (Class Counsel)

Alderoty v. Maxim Healthcare Services (Class Counsel)

Atkinson v. TeleTech, LLC (Class Counsel)

Avio, Inc. v. Alfoccino, Inc. et al. (Class Counsel)

Wright v. Jacob Transportation Services, LLC et al. (Class Counsel)

Klein v. Secura Insurance Co. (Class Counsel)

Wilson v. Maxim Healthcare Services (Class Counsel)

Cardoza v. Bloomin' Brands Inc. et al. (Class Counsel)

Matthews v. Convergys Corp. et al. (Class Counsel)

Ingram v. Passmore Towing & Recovery (Class Counsel)

Terry v. TMX Finance LLC et al. (Class Counsel)

Ross v Jack Rabbit Services, LLC, et al. (Class Counsel)

Lawrence v. Maxim Healthcare Services (Class Counsel)

SOMMERS SCHWARTZ

Stelmachers v. Maxim Healthcare Services (Class Counsel)

Williams vs. Sykes Enterprises, Inc. (Class Counsel)

Flores vs. Velocity Express, Inc. (Class Counsel)

Jimenez et al vs. Allstate Insurance Company et al (Class Counsel)

Automotive Wire Harness Systems Antitrust Litigation MDL No 2311 (Direct Purchaser PSC)

Jackson's Five Star Catering, Inc. v John R. Beason d/b/a Tax Connection World & Tax Connection Worldwide LLC (Class Counsel)

Exclusively Veterinary Cats Hospital, P.C. v Anesthetic Vaporizer Services, Inc. (Class Counsel)

Northstar Education Finance, Inc. Contract Litigation MDL No. 1990 (Executive Committee)

Stanley vs. United States Steel Corporation (Class Counsel)

Amgen Off Label Marketing Litigation MDL No 1934 (Executive Committee)

In Re: Neurontin Sales and Marketing MDL No. 1629 (Purchase Claims Committee)

In Re: Vioxx Sales and Marketing MDL No. 1657 (Purchase Claims Committee)

In Re: Bextra/Celebrex Sales and Marketing MDL No. 1699 (Purchase Claims Committee)

In Re: Tricor (TPP Allocation Counsel)

In Re: Zyprexa MDL No. 1596 (Purchase Claims Committee)

Haase vs. Frank J. Bluestein, et al. (PSLRA Counsel)

Regina vs. Comcast of Detroit, Inc. (Class Counsel)

Snow v Atofina Chemical Inc. (Class Counsel)

Million Dollar Advocates Forum

American Arbitration Association®

Listed in Best Lawyers® The World's Premier Guide

National Board of Legal Specialty Certification

Public Justice™ 2020 Patron Member

AV® Preeminent™ Peer Review Rated For Ethical Standards & Legal Ability™ Martindale-Hubbell® from LexisNexis®

**TRENTON R. KASHIMA**
**Shareholder**

Direct Phone: 619-762-2126
Direct Fax: 619-762-2127
tkashima@sommerspc.com

SOMMERS SCHWARTZ

CLASS ACTION & COMMERCIAL LITIGATION
UNPAID WAGES & OVERTIME



Trenton represents clients in employment and class actions matters. Prior to attending law school, Trenton was a student at the Maastricht University, in the Netherlands, where he earned an LL.M. in Globalization and Law. During his time at Maastricht University, Trenton was a Dutch National Semi-Finalist in the International Client Counseling Competition. He also earned his Juris Doctorate from the University of San Diego School of Law, where he was the Senior Editor of the San Diego Journal of Climate and Energy Law, an Honor Court Justice, and President of the VICAM (Vis International Commercial Arbitration Moot) team.

Trenton was recently brought on to the Sommers Schwartz team, where he will continue to represent consumers who have been subjected to unfair business practices. Among the aspects of his class action practice that he most appreciates is working with diverse, interesting, and complex legal issues while helping workers and consumers. Prior to joining Sommers Schwartz, Trenton worked for a boutique law firm in San Diego, California.

In addition to practicing law, Trenton teaches at the University of San Diego's School of Law. In his spare time, Trenton enjoys cooking, traveling, hiking and backpacking.

## EDUCATION

**University of San Diego School of Law**, San Diego, California, Juris Doctor

Senior Editor, San Diego Journal of Climate and Energy Law

Honor Court Justice, Student Bar Association Mentor

President Vis Moot Team

CALI Award (highest marks) in Agency, Partnership & the LLC,Climate Change Law & Policy, and Anti-trust

Law Student Leader Scholarship

2013 USD Enhancement Award

Thesis: "Unilateral International Regulation of Aviation Emissions: EU ETS

**University of Maastricht**, Maastricht, the Netherlands, LL.M

Globalization and Law

Concentration in Comparative Law, International Dispute Settlement, WTO Law

International Client Counseling Competition - Dutch National Semi-Finalist

**San Diego State University**, San Diego, California - Dean's List

B.S., Criminal Justice Administration, cum laude, 2009

Minor in International Security and Conflict Resolution

Thesis: "Policy Analysis of San Diego's Prohibition of Alcohol on City Beaches: One Year Later.

SOMMERS SCHWARTZ

## MEMBERSHIPS

**State Bar of California**

**American Association for Justice** - Wage & Hour Litigation Group, Class Action Litigation Group

**Public Justice**

## BAR ADMISSIONS

**California**

**U.S. Ninth Circuit Court of Appeals**

**U.S. District Court for the North District of California**

**U.S. District Court for the Central District of California**

**U.S. District Court for the South District of California**

## ACCOMPLISHMENTS

*Hansen, et al. v. Newegg.com Americas, Inc.*, Case No. B271477 (Cal. App. 2018), which addressed UCL and FAL standing in a case involving false advertising of a product's former price (or the amount by which the product price had been reduced or discounted)before the California Court of Appeal. The resulting decision ensures that consumers who were deceived by false discounts can sue under California's consumer protection laws.

Named Class Counsel large consumer class actions, including *Krinsk, et al. v. Monster Beverage Corp.*, No. 37-2014-00020192 (Cal. Sup.) and *Clay v. Cytosport Inc.*, No. 3:15-cv-00165-L-AGS (S.D. Cal.).

Achieved a number of settlements on behalf California employees, including *Glass, et al. v. FMMEnterprises, Inc., et al*, Case No. 37-2017-00031250 (Cal. Sup.) and *Terradoet al. v. Accredited Debt Relief LLC et al.*, Case No. 37-2018-00014181 (Cal. Sup.).

Secured a RICO judgement to stop unfair and predatory loans against veterans and service members, *Underwood v. Future Income Payments, LLC*, Case No 8:17-cv-01570-DOC-DFM(C.D. Cal)

**Adjunct Professor, University of San Diego School of Law, San Diego, California.** I coach the USD Vis Moot Competition Team and am responsible for training students in oral advocacy and brief writing, and organizing the USD Pre-moots and MCLEs. I also instruct students in the application of arbitral law/rules, such as the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, UNCITRAL Arbitration Rules, and UNCITRAL Model Law on International Commercial Arbitration.

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

JANE ROE, et al.,

Plaintiffs,

v.

SFBSC MANAGEMENT, LLC, et al.,

Defendants.

---

JANE ROE 1 and 2, et al.,

Plaintiffs,

v.

DEJA VU SERVICES, et al.,

Defendants.

Civil Case No. 14-cv-03616-LB

Related to: 19-cv-03960-LB

**RELEASE AND SETTLEMENT AGREEMENT**

The Honorable Laurel Beeler

---

# TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. DEFINITIONS ..... 3

III. SUBMISSION OF THIS AGREEMENT TO THE COURT FOR REVIEW AND APPROVAL; CONDITIONAL CONSOLIDATION AND CERTIFICATION OF THE PROPOSED CLASS FOR SETTLEMENT PURPOSES ONLY; AND STIPULATION REGARDING AMENDMENT OF THE COMPLAINTS ..... 22

IV. CLASS NOTICE AND DANCE FEE PAYMENT ELECTION ..... 26

V. SETTLEMENT CONSIDERATION AND TERMS OF PAYMENTS ..... 31

VI. PLAN OF ALLOCATION AND DISBURSEMENTS OF PAYMENTS AND PAGA PAYMENTS ..... 36

VII. DANCE FEE PAYMENTS ..... 39

VIII. TAX CONSIDERATIONS OF THE SETTLEMENT ..... 42

IX. DEFENDANTS' CHANGES OF BUSINESS PRACTICES, WHICH HAS AND WILL CONFER A DIRECT AND SUBSTANTIAL FINANCIAL BENEFIT TO THE SETTLEMENT CLASS ..... 44

X. ATTORNEYS' FEES AND EXPENSES AWARD, CLASS REPRESENTATIVE ENHANCEMENT PAYMENTS, AND ADMINISTRATIVE COSTS ..... 49

XI. OBJECTIONS AND OPT-OUTS ..... 51

XII. RELEASES AND COVENANTS ..... 52

XIII. TERMINATION OF SETTLEMENT ..... 57

XIV. LIMITATIONS UPON THE TERMS OF SETTLEMENT ..... 61

XV. PROTECTIVE ORDER ..... 62

XVI. NOTIFICATIONS ..... 63

XVII. FORCE MAJEURE ..... 64

XVIII. MISCELLANEOUS PROVISIONS ..... 65

# RELEASE AND SETTLEMENT AGREEMENT

## ARTICLE I

## INTRODUCTION

1.1 This Release and Settlement Agreement (which, together with all attached exhibits, is referred to collectively herein as the "Agreement"):

a) Is made and entered into to resolve Claims[1] that have been brought, or could have been brought, in two class and collective action lawsuits: *Jane Roes 1-2 v. SFBSC Management, LLC*, Civil Case No. 3:14-cv-03616-LB (the "San Francisco Action"), and *Jane Roe 1 and 2 v. Deja Vu Services, Inc., et al.*, Civil Case No. 19-cv-03960-LB (the "San Diego Action," together with the San Francisco Action being the "Actions");

b) Is by and between Plaintiffs Jane Roes 1 and 3 of the San Francisco Action and Jane Roes 1 and 2 of the San Diego Action (sometimes the "Named Plaintiffs" or the "Class Representatives") on behalf of themselves and all others similarly situated (the Named Plaintiffs and all Class Members are collectively referred to hereinafter simply as the "Plaintiffs"), and Defendants SFBSC Management, LLC ("SFBSC"), Deja Vu Services, Inc. ("Services"), and Harry Mohney ("Mohney"), along with all of the Defendant Entities identified in ***Exhibit A*** attached hereto and incorporated by reference (SFBSC, Services, Mohney, and the Defendant Entities are

---

[1] Capitalized terms and phrases contained in this Introduction are specifically defined in Article II herein or elsewhere in this Agreement. Terms and phrases are underlined when they are first defined in this Agreement.

collectively referred to in the balance of this Agreement as the "Defendants," and shall be designated as such in the Amended Complaints for Settlement); and

c) Settles – except for those matters specifically excluded from this Agreement – collective Claims against the Released Defendants brought pursuant to the provisions of the Fair Labor Standards Act (29 U.S.C. § 201, *et seq*. -- the "FLSA") and class action Claims against the Released Defendants under various California labor, and labor-related, laws pursuant to Federal Rule of Civil Procedure Rule 23 ("Rule 23"), as well as Claims brought on behalf of the California Labor and Workforce Development Agency ("LWDA") under the California Private Attorney General Act, Labor Code § 2698 *et. seq*. ("PAGA"). Upon execution of this Agreement, Final Approval by the Court, and the Judgment becoming Final, it is the express intent of the Parties to resolve all Released Claims during the Class Periods which were brought (both initially and by way of the amendments permitted under this Agreement), or which could have been brought based upon the facts pled, by the Class Representatives, by all "Opt-in" Class Members who submit a Consent to Join these Actions, and by all Class Members who fail to Opt-Out of the Settlement and who therefore constitute part of the Rule 23 Settlement Class. The Settlement shall become fully operative upon the Effective Date.

**NOW THEREFORE,** in consideration of the foregoing and of the promises and mutual covenants contained herein, and other good and valuable consideration, the adequacy of which is acknowledged, it is hereby agreed by and among the Parties as follows:

## ARTICLE II

## DEFINITIONS

As used in this Agreement, the following words and phrases shall have the meanings specified in this Article II. Capitalized words and phrases contained in such definitions that have not been previously explained are defined elsewhere later in this Agreement.

2.1 "Administrative Costs" means the administrative costs and expenses of the Settlement incurred and charged by the Settlement Administrator. In order to provide for the prompt and equitable distribution of all Settlement Payments, the full amount of the Administrative Costs shall be predetermined and specifically set forth in the contract entered into with the Settlement Administrator. The Notice and Administration Fund as defined herein is part of the Administrative Costs.

2.2 "Amended Complaints for Settlement" means amended complaints in the San Francisco Action and the San Diego Action, in all material respects identical to ***Exhibits B*** and ***C***, that are submitted in furtherance, and to effectuate the purposes and intent, of this Agreement.

2.3 "Attorneys' Fees and Expenses Award" means the attorneys' fees and expenses/costs that may be awarded by the Court to Class Counsel to compensate them for their attorneys' fees and expenses/costs related to the Actions and obtaining this Settlement.

2.4 "CAFA Notice" means notice sent by Defendants that complies with the requirements of the Class Action Fairness Act of 2005, 28 U.S.C. § 1711, *et seq*.

2.5 "Cash Payment" means the amount of money to be paid pursuant to the terms of this Agreement to a Cash Pool Recipient. Although the term "cash" is used, Cash Payments will be paid via check, and may be paid and distributed in installments pursuant to the terms of this Agreement.

2.6 "Cash Pool" means the amount of four million dollars ($4,000,000) and the amount of the Unclaimed Dance Fee Pool, if any, that is to be made available by the Defendants to pay: a) Settlement Class Members' Cash Payments; b) the Enhancement Payments; c) the PAGA Payments; d) the Attorneys' Fees and Expenses Award; and e) the Administrative Costs.

2.7 "Cash Pool Recipient" means a Settlement Class Member who has not selected to receive her Settlement Payment in the form of Dance Fee Payments through execution and Timely Submission of a Properly Completed Dance Fee Payment Election Form.

2.8 "Claim(s)" means, when used alone herein and not as a part of another specifically defined phrase, any and all past and present actions, demands, causes of action, suits, debts, obligations, damages, and rights or other assertions of liability or wrongdoing, of any conceivable kind, nature and description whatsoever, whether existing or potential, whether fixed or contingent, whether currently asserted or not, recognized now or hereafter, and whether expected or unexpected.

2.9 "Class" means the group of all Entertainers who Performed at one or more of the Clubs at any time during the applicable Class Periods, but does not include those individuals who provide or who have provided services as "headliner" or "feature" performers unless such individual was otherwise a party to a Dancer Contract with one or more of the Clubs during the Class Periods.

2.10 "<u>Class Counsel</u>" means the law firms of The Tidrick Law Firm, LLP, and specifically Joel Young and Steven Tidrick; Sommers Schwartz, P.C., and specifically attorneys Trenton Kashima and Jason Thompson thereof; and Pitt McGehee Palmer & Rivers, P.C., and specifically Megan Bonanni thereof.

2.11 "<u>Class Member</u>" means any individual who Performed as an Independent Professional Entertainer (independent contractor) at one or more of the Clubs at any time during the applicable Class Periods, but does not include those individuals who provide or who have provided services as "headliner" or "feature" performers unless such individual was otherwise a party to a Dancer Contract with a Club during the Class Periods.

2.12 "<u>Class Notice</u>" means a notice of settlement of class and collective action to be submitted for review and approval by the Court as part of the motion for preliminary approval set forth herein, which shall conform in all material respects to the document attached as ***Exhibit D***.

2.13 "<u>Class Notices</u>" means the Class Notice, the Posted Notice, the Website Notice, the Electronically Posted Notice, and the Social Media Notice, as well as any other notices to the Class ordered or approved by the Court.

2.14 "<u>Class Period(s)</u>" means, for purposes of the Settlement and this Agreement: a) the time period from August 8, 2010 to November 16, 2018 for Entertainers who Performed as Independent Professional Entertainers (independent contractors) at one or more of the San Francisco Clubs (the "<u>San Francisco Class Period</u>"); and b) the time period from February 8, 2017 to November 16, 2018 for Entertainers who Performed as Independent Professional Entertainers (independent contractors) at one or more of the Greater California Clubs (the "<u>Greater California Class Period</u>"). An Entertainer may be subject to both Class Periods if she Performed at one or

more of the San Francisco Clubs during the San Francisco Class Period and at one or more of the Greater California Club during the Greater California Class Period.

2.15 "Class Representatives" includes, in addition to those individuals identified above, any other individual(s) duly appointed as additional or successor representatives of the Settlement Class.

2.16 "Clubs" means collectively the San Francisco Clubs and the Greater California Clubs defined herein, which are all identified on ***Exhibit A*** attached hereto, with each one being a "Club."

2.17 "Consent to Join" means a Class Member's agreement to join these Actions as a party plaintiff to the FLSA Claims asserted therein through either the issuance to her of a Settlement Check or the Timely Submission of a Properly Completed Dance Fee Payment Election Form.

2.18 "Court" means the United States District Court for the Northern District of California.

2.19 "Dance Fee(s)" mean the established and published cost of personal entertainment Performances or sessions engaged in by Entertainers at the Clubs negotiated between the Clubs and Entertainers and set as mandatory charges that customers are required to pay in order to purchase such Performances or sessions.

2.20 "Dance Fee Claim" mean the submission made by a Class Member using the Dance Fee Payment Election Form on which she elects to receive her Settlement Payment in the form of Dance Fee Payments.

2.21 "Dance Fee Claimant" means a Settlement Class Member who Timely Submits a Properly Completed Dance Fee Payment Election Form, whereby she elects to receive her Settlement Payment in the form of Dance Fee Payments.

2.22 "Dance Fee Payments" means the amount of money to be paid to a Dance Fee Claimant in the form of certain Dance Fees that would, but not for the terms of this Agreement, be collected and retained by a Club as part of its gross income. Dance Fee Payments shall be paid to Dance Fee Claimants as additional commissions.

2.23 "Dance Fee Payment Collection Period" means a period of one (1) year from the Effective Date.

2.24 "Dance Fee Payment Election Form" means a form that is approved by the Court in all material respects consistent with ***Exhibit E***, through which Settlement Class Members may elect to receive their Settlement Payment in the form of Dance Fee Payments.

2.25 "Dance Fee Payment Election Period" means a period of sixty (60) days from the Notice Date.

2.26 "Dance Fee Payment Request Form" means a form in all material respects in accordance with ***Exhibit F***, that permits a Class Member to commence receiving her Dance Fee Payments.

2.27 "Dance Fee Pool" means the total sum of Five Hundred Thousand Dollars ($500,000), that is to be made available during the Dance Fee Payment Collection Period to Settlement Class Members who select to obtain their Settlement Payment in the form of Dance Fee Payments. Unpaid Dance Fee Pool Payments (defined in Section 2.93) will be distributed to Dance Fee Claimants pursuant to Section 7.6.

2.28 "Dancer Contract" means a contract entered into between an Entertainer and a Club which permitted or permits the Entertainer to Perform and to engage in the sale of personal entertainment Performances or sessions for remuneration upon the Club's premises.

2.29 "Date(s) of Performance" means a date during which an Entertainer Performs or intends to Perform at a Club.

2.30 "Defendant Entities" means those business entities that are identified on the attached ***Exhibit A***, with each one being a "Defendant Entity." Those entities are businesses that currently are, or that at any time during the Class Periods were, or are or were alleged to be, as may be applicable, either: a) Parties to an agreement or contract with Services or SFBSC whereby they receive(d), or are alleged to have received, either consulting, management, or business support services, or licensing rights, from either Services or SFBSC; b) Parties to an agreement or contract with Global Licensing, Inc. ("Global"), whereby they receive(d), or are alleged to have received, licensing rights from Global; c) owned, either wholly or in any part, directly or indirectly, and in any manner, interest, or fashion whatsoever, by either Mohney or Jason Cash Mohney or by any company or entity which they own or in which they have any interest or association whatsoever; or d) tenants of Mohney or Jason Cash Mohney, either directly or indirectly, or of any company or entity which Mohney or Jason Cash Mohney own or in which they have any interest or association whatsoever.

2.31 "Defense Counsel" means the law firms of Long & Levit LLP, and specifically Douglas Melton and Shane Cahill; Bowman and Brooke LLP, and specifically Tammara Bokmuller; and Shafer & Associates, P.C., and specifically Bradley Shafer.

2.32 "Due Diligence Declaration" means a declaration from the Settlement Administrator verifying that the Class Notices required by this Agreement have been effectuated.

2.33 "Effective Date" means the day when Final Approval Order and Judgment have both become Final.

2.34 "Electronically Posted Notice" means notice of the Settlement which shall conform in all material respects to the document attached as ***Exhibit G*** attached hereto, which shall be submitted to the Court for approval and which shall be used to communicate notice of the Settlement through various online message boards and relevant organizations.

2.35 "Enhancement Payments" means the payments that are approved by the Court to be paid to the Class Representatives and certain Settlement Class Members, and which shall be in addition to their respective Settlement Payment.

2.36 "Entertainer(s)" means an individual who dances, Performs, and/or entertains, or who has danced, Performed or entertained, on the premises of an exotic dance nightclub or "gentlemen's club" or other adult entertainment facility (including but not limited to one of the Clubs).

2.37 "ERISA" means the Employee Retirement Income Securities Act of 1974, 29 U.S.C. § 1001 *et seq.*

2.38 "Exclusion/Objection Deadline" means the final date, established and set forth in the Preliminary Approval Order, by which a Class Member may either: a) object to any aspect of the Settlement; or b) request to be excluded from (to Opt-Out of) the Settlement.

2.39 "Fairness Hearing" means the hearing that is to take place after the entry of the Preliminary Approval Order and after the Notice Date for purposes of determining whether the

Agreement should be approved. The Fairness Hearing shall be set for a date that is in compliance with the provisions of 28 U.S.C. § 1715(d).

2.40 "Final," when referring to the Judgment, the Final Approval Order, or to the Settlement, means that: a) the Judgment is a Final, appealable Judgment; and b) either i) no appeal has been taken from the Judgment as of the date on which all times to appeal therefrom have expired, or ii) an appeal or other review proceeding of the Judgment having been commenced, such appeal or other review has been concluded and is no longer subject to review by any Court, whether by way of appeal, petitions for rehearing or re-argument, petitions for rehearing en banc, petitions for writ of certiorari, or otherwise, and such appeal or other review has been completed in such manner that affirms the Judgment and the Final Approval Order in their entireties.

2.41 "Final Approval" means entry by the Court of both the Final Approval Order and the Judgment.

2.42 "Final Approval Order" means the order of the Court memorializing its definitive, complete, and non-contingent, approval of the Settlement in a form that is approved by and acceptable to all Parties.

2.43 "FLSA Claims" means any and all Claims that a Settlement Class Member may have against the Released Defendants, or against any one or group of them, under, or pursuant to, the FLSA, including but not limited to Claims seeking wages (regular and/or overtime), tip returns, damages, liquidated damages, attorneys' fees, and/or costs.

2.44 "Form 1099 Payments" means the total compensation paid to a Settlement Class Member by all Clubs in the aggregate during the respective Class Periods (as applicable to each Club), as reflected in the Internal Revenue Service ("IRS") Forms 1099-MISC issued to her and

the Internal Revenue Service by the Clubs. For purposes of these calculations: a) all income reflected in an IRS Form 1099-MISC for a calendar year shall be included irrespective of the fact that part of the year may fall outside of the Class Periods; and b) Class Members who were not issued any IRS Forms 1099-MISC during the Class Periods shall be assigned a Form 1099 Payment number of $599.

2.45 "Greater California Clubs" means those Clubs identified as such on ***Exhibit A***; those being Grapevine Entertainment, Inc., d/b/a Deja Vu Showgirls; Cathay Entertainment, Inc., d/b/a Deja Vu Showgirls; Nite Life East, LLC, d/b/a Little Darlings; Coldwater, LLC, d/b/a Deja Vu Showgirls; 3610 Barnett Ave., LLC, d/b/a Adult Superstore; Jolar Cinema of San Diego, LTD, d/b/a Jolar Cinema Showgirls; Showgirls of San Diego, Inc., d/b/a Deja Vu Showgirls; Stockton Enterprises, LLC, d/b/a Deja Vu Showgirls; Hollywood & Vine Club, LLC, d/b/a Deja Vu Showgirls; Deja Vu Showgirls-Sacramento, LLC, d/b/a Deja Vu Showgirls; DV of LA, LLC, d/b/a Deja Vu of LA – Main St.; and EF5 Acquisitions Group, LLC, d/b/a Deja Vu Showgirls Torrance.

2.46 "IEAU" means the International Entertainment Adult Union.

2.47 "IPE" means Independent Professional Entertainer; that being an Entertainer who Performed as an independent contractor or other form of non-employee, as opposed to working as an employee.

2.48 "Judgment" means the final judgment to be entered in these Actions following entry of the Final Approval Order in a form that is approved by and acceptable to all Parties.

2.49 "Legally Authorized Representative" means an administrator/administratrix, personal representative, or executor/executrix of a deceased Class Member; a guardian, conservator, or next friend of an incapacitated Class Member; and/or any other legally appointed

Person responsible for handling the business affairs of a Class Member. All rights, duties and obligations of Class Members, Settlement Class Members, Participating Class Members, and Class Representatives as set forth in this Agreement extend to their Legally Authorized Representatives as well.

2.50 "Limited National Settlement" means the settlement in the case of *Jane Does 1-2 v. Déjà Vu Services*, Civil Case No. 1:16-cv-10877, Eastern District of Michigan. A copy of the Limited National Settlement will be available for review on the Settlement Website.

2.51 "Litigation Expenses" means any costs or expenses incurred by Class Counsel in connection with the preparation, prosecution and resolution/settlement of these Actions, and includes all Court-approved litigation costs and expenses.

2.52 "LWDA PAGA Payment" means that portion of the PAGA Payment that is to be paid to the LWDA.

2.53 "Net Cash Fund" means the Cash Pool less the Enhancement Payments, the PAGA Payments, the Attorneys' Fees and Expenses Award, and the Administrative Costs.

2.54 "Notice and Administration Fund" means a non-refundable fund consisting of $90,000 advanced by Defendants (which will constitute part of the Settlement Consideration if the Settlement becomes Final) to be used by the Settlement Administrator to pay for the costs of administering the Agreement. The monies paid by the Defendants into the Notice and Administration Fund shall constitute part of the Administrative Costs and shall be deducted from Defendants' funding obligations of the Cash Pool. That amount spent up to the Fairness Hearing will not be refunded to Defendants if Final Approval is not granted for any reason.

2.55 "<u>Notice Date</u>" means the date of the initial mailing of the Notice Packet to Class Members.

2.56 "<u>Notice Packet</u>" means the Class Notice and the Dance Fee Payment Election Form.

2.57 "<u>Opt-Out</u>" or "<u>Opted-Out</u>" means the mechanism for a Class Member to be excluded from, or to opt-out of, the Settlement.

2.58 "<u>Opt-Out Form</u>" means a document in any fashion where a Class Member Timely-Submits a writing expressing a clear intention to be excluded from the Settlement.

2.59 "<u>Opt-Out List</u>" means the list of all Class Members who Timely-Submitted an Opt-Out Form.

2.60 "<u>Opt-Out Period</u>" means a period of at least sixty (60) days from the Notice Date and as ordered by the Court in the Preliminary Approval Order.

2.61 "<u>PAGA Claims</u>" mean all civil penalties sought against the Defendants pursuant to California's Labor Code Private Attorneys General Act of 2004, Cal. Lab. Code § 2698, *et seq*.

2.62 "<u>PAGA Payments</u>" means all payments made in accordance with the terms of this Agreement to resolve all PAGA Claims.

2.63 "<u>Participating Class Member(s)</u>" means those Class Members who are issued a Settlement Check or who Timely Submit a Properly Completed Dance Fee Payment Election Form. All Class Representatives are automatically considered to be a Participating Class Member.

2.64 "<u>Participating Class Members' Released Claims</u>" means, for a Participating Class Member, her Settlement Class Members' Released Claims together with any and all FLSA Claims she may have from the beginning of her applicable Class Period(s) up to and including November

16, 2018, as well as any and all related attorneys' fees and costs except as otherwise provided for in this Agreement.

2.65 "Parties" mean, collectively, the Settlement Class Members and the Defendants, and "Party" means any one of them.

2.66 "Perform(s)," "Performed," "Performing," and "Performances" means all acts of entertaining, dancing, and/or engaging in entertainment services, and all activities related thereto, at an exotic dance nightclub or "gentlemen's club," or other adult entertainment facility (including but not limited to at the Clubs or at any one or group of them).

2.67 "Person" means any individual, corporation, partnership, association, affiliate, joint stock company, estate, trust, unincorporated association, entity, government and any political subdivision thereof, or any other type of business or legal entity.

2.68 "Plan of Allocation" means the plan for allocating the Cash Payments, Dance Fee Payments, and the Settlement Class Members' PAGA Payments, between and among Settlement Class Members as set forth in Articles VI and VII.

2.69 "Posted Notice" means a notification in a form attached as ***Exhibit H*** that is to be submitted to the Court for approval, and that is to be posted in the Entertainer dressing room of each Club announcing the existence of the Settlement and the ability of Class Members to obtain remuneration in the form of Cash Payments or Dance Fee Payments.

2.70 "Preliminary Approval Date" means the date on which the Court enters the Preliminary Approval Order.

2.71 "Preliminary Approval Order" means the order that the Class Representatives will seek from the Court that preliminarily approves the Agreement and sets the Fairness Hearing.

2.72 "Properly Completed" means, in terms of a Dance Fee Payment Election Form and a Dance Fee Payment Request Form, that the document is dated and personally signed by the Class Member (which can be done electronically for an electronic submission), and provides accurate – to the best of the Settlement Class Member's knowledge – answers/responses to all of the information requested in the document. For a Dance Fee Payment Election Form, whether it is Properly Completed shall be determined by the Settlement Administrator, and for a Dance Fee Payment Request Form that decision shall be made by the Clubs.

2.73 "Released Claims" means the Settlement Class Members' Released Claims and the Participating Class Members' Released Claims. Notwithstanding any other provision of this Agreement, "Released Claims" do not include Claims for personal injuries, which Plaintiffs are not releasing by way of the Settlement.

2.74 "Released Defendants" means the Defendants, together with each and every one of their respective current, former, and future: Owners (either direct or indirect, including but not limited to partners, shareholders, members, parent companies, holding companies, trusts and/or trustees), officers, directors, managers, employees, agents, representatives, non-Entertainer contractors, landlords, tenants, subtenants, insurers, reinsurers, attorneys (including but not limited to Defense Counsel), auditors, accountants, bookkeepers, experts, subsidiaries, affiliates, divisions, licensees, licensors, consultants, heirs, executors, personal representatives, predecessors and successors in interest, and assigns, as well as any benefit plans sponsored or administered by any of the proceeding individuals and entities.

2.75 "Reminder Notices" means a secondary mailing of Notice Packet to Class Members and reposting of the Electronically Posted Notice.

2.76 "San Diego Settlement" means a settlement previously agreed upon in the San Diego Action that was presented to the San Diego Superior Court for approval, which was denied without prejudice (prior to the San Diego Action being removed to federal court and then transferred to this Court) in order to permit the parties thereto the opportunity to provide certain specified supporting information requested by that court.

2.77 "San Francisco Clubs" means those Clubs identified as such on ***Exhibit A***; those being Chowder House, Inc., d/b/a Hungry I; Deja Vu – San Francisco, LLC, d/b/a Centerfolds; San Francisco - Roaring 20's, LLC, d/b/a Roaring 20's; San Francisco - Garden of Eden, LLC, d/b/a Garden of Eden; S.A.W. Entertainment, Ltd., d/b/a Larry Flynt's Hustler Club; S.A.W. Entertainment, Ltd., d/b/a the Condor Club; Deja Vu Showgirls of San Francisco, LLC, d/b/a Little Darlings of San Francisco; Gold Club - SF, LLC, d/b/a Gold Club; Bijou-Century LLC, d/b/a New Century Theatre; and BT California, LLC, d/b/a The Penthouse Club & Steakhouse (f/k/a Showgirls).

2.78 "San Francisco Settlement" means the settlement approved by the decision of *Roes v. SFBSC Management, LLC*, Case No. 14-cv-03616-LB (N.D. Cal. Sept. 14, 2017), 2017 WL 4073809, but reversed at 944 F.3d 1035 (9th Cir. 2019). A copy of the San Francisco Settlement is available at ECF No. 126 in the San Francisco Action and will be available for review on the Settlement Website.

2.79 "Settlement" means the compromise and settlement of the Actions embodied in this Agreement.

2.80 "Settlement Administrator" means an independent settlement administrator mutually agreed upon by the Parties and appointed by the Court.

2.81 "Settlement Check" means any check issued by the Settlement Administrator to a Settlement Class Member for her Cash Payment, Settlement Class Member's PAGA Payment, Unpaid Dance Fee Pool Payment, or Enhancement Payment.

2.82 "Settlement Class" means all Settlement Class Members, including the Class Representatives.

2.83 "Settlement Class Member" means any Class Member who has not timely and properly excluded herself from the Settlement (by having Timely Submitted an Opt-Out Form) as provided for in this Agreement. "Settlement Class Members" refers to, collectively, all such Class Members. All Class Representatives are automatically considered to be Settlement Class Members.

2.84 "Settlement Class Members' PAGA Payment" means that aggregate portion of the PAGA Payments that is to be distributed by the Settlement Administrator, pursuant to and as part of the Plan of Allocation, among Settlement Class Members. "Settlement Class Member's PAGA Payment" means that portion of the Settlement Class Members' PAGA Payment that is to be conveyed to a specific Settlement Class Member through the Plan of Allocation as provided for herein.

2.85 "Settlement Class Members' Released Claims" means any and all Claims pursuant to any theory of recovery whatsoever (whether at law, in equity or otherwise, including but not limited to Claims based in contract, tort, common law, federal, state or local law, statute, ordinance, or regulation, and whether for compensatory, consequential, liquidated, punitive or exemplary damages, statutory damages, penalties, fines, interest, attorneys' fees, costs, or other disbursements, including those that may have been incurred or billed by Class Counsel or any

other counsel representing the Class Representatives or any Settlement Class Members), that a Settlement Class Member has or may have against the Release Defendants, or against any one or group of them, from the beginning of her applicable Class Period(s) up to and including November 16, 2018, that are asserted in the Actions or that are to be asserted in the Actions by way of the Amended Complaints for Settlement contemplated in this Agreement, as well as any and all Claims of any conceivable kind or nature whatsoever that are or could be based on the factual allegations contained in such pleadings or that are reasonably related thereto (excepting only for FLSA Claims), and specifically including:

a) Any and all Claims for unpaid wages including, without limitation, Claims for minimum wage, regular wages, overtime, waiting time, final wages, calculation of the correct overtime or regular rate, and meal period and rest period payments/premiums;

b) Any and all Claims to recover any allegedly retained or confiscated tip, gratuity or other payment, or portion thereof;

c) Any and all Claims for expense reimbursement;

d) Any and all Claims for uniform/costume costs and associated cleaning expenses;

e) Any and all Claims pursuant to the California Labor Code, including but not limited to Claims under or pursuant to California Labor Code sections 98.6, 132A, 200-204, 206.5, 207, 208, 210-214, 216, 218, 218.5, 218.6, 221, 222.5, 223, 225.5, 226, 226.3, 226.7, 226.8, 227, 227.3, 245-249, 351, 353,

432.5, 450, 510, 512, 551-552, 558, 1174, 1174.5, 1182.12, 1194, 1194.2, 1194.3, 1197, 1197.1, 1198, 2698 *et seq.* (PAGA), 2753, 2802, and 2804;

f) Any and all Claims under or pursuant to California Code of Civil Procedure section 1021.5;

g) Any and all Claims under or pursuant to California Code of Regulations, Title 8, sections 11010 and 11040;

h) Any and all Claims under or pursuant to any California Industrial Welfare Commission Wage Orders;

i) Any and all Claims under or pursuant to California Business and Professions Code sections 17200, *et seq.* and 17500;

j) Any and all Claims asserting unfair business practices or violations of similar laws;

k) Any and all Claims under the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*;

l) Any and all Claims asserting any form of retaliation predicated upon a Settlement Class Member's assertion that any of the Release Defendants wrongfully terminated her Dancer Contract, right to Perform, or employment, or otherwise retaliated against her, after she or any other Person acting on her behalf, in her interest, or for here benefit, asserted a Claim that she was misclassified as an independent contractor and/or as a non-employee, or that other Entertainers were misclassified as independent

contractors and/or as non-employees, and were therefore entitled to any form of compensation or remuneration thereby;

m) Any and all other employment, wage, or labor-related Claims that could be brought under any statute, ordinance, regulation, rule, order, or otherwise against the Released Defendants, or against any one or group of them, that arise out of, relate to, are associated with, are based upon, or concern, in any way, manner, regard or fashion whatsoever, any act or omission as pled in the Amended Complaints for Settlement that occurred during the Class Periods, including but not limited to any Claims under any legal or equitable theory as a result of the alleged violation of any federal, state, or local law or regulation, Claims brought pursuant to breach of contract, Claims brought pursuant to common law, Claims of unjust enrichment and/or *quantum meruit*, and any and all Claims pursuant to, or derived from, ERISA that arise, or may arise, from any alleged failure to pay wages, including any Claims for benefits under any benefit plans subject to ERISA;

n) Any and all Claims, including common law Claims, arising out of or related to the statutory causes of action described in this Section 2.85; and

o) Any and all Claims asserting breach of contract, violation of injunctive relief, contempt, rescission, or otherwise, with regard to the terms of previously executed Dancer Contracts or of the Limited National Settlement, arising out of the required conversion of the Entertainers Performing at the Clubs to employees as mandated by § 8.1 of the San Diego

Settlement and as incorporated and modified by Article IX of this Agreement.

2.86 "Settlement Consideration" means the total and aggregate financial benefit of the Settlement through the Cash Payments, Enhancement Payments, Settlement Class Members' PAGA Payment, and the Dance Fee Payments, all which confer a direct financial benefit on the Settlement Class Members; changes to the Defendants' business practices which conferred and will confer a direct financial benefit to both Settlement Class Members and other Entertainers who Performed or Perform in the Clubs subsequent to the close of the Class Periods; the LWDA PAGA Payment that will confer a direct financial benefit on the LWDA; the Attorneys' Fees and Expenses Award; and the Administrative Costs.

2.87 "Settlement Payment" means the amount of direct monetary consideration that a Settlement Class Member will receive under this Agreement, by way of either a Cash Payment or Dance Fee Payments.

2.88 "Settlement Website" means a website created and maintained by the Settlement Administrator to administer the Settlement.

2.89 "Social Media Notice" means a notice of the Settlement which shall be used in the online advertising campaigns.

2.90 "Timely Submit(ted)" or "Timely Submission" means: a) when used in the context of a Dance Fee Payment Election Form, either the mailing of the form by a Class Member to the Settlement Administrator and post-marking, or the electronic submission to the Settlement Administrator through the Settlement Website, within the Dance Fee Payment Election Period; b) in the context of a Dance Fee Payment Request Form, submission of the form as prescribed by the

Club within the Dance Fee Payment Collection Period; and c) in the context of an Opt-Out Form, the mailing by a Class Member to the Settlement Administrator of the form, and post-marking, within the Opt-Out Period, or the electronic submission of an Opt-Out Form to the Settlement Administrator through the Settlement Website or via email within the Opt-Out Period.

2.91 "Unclaimed Dance Fee Pool" means the funds from the Dance Fee Pool that are not claimed during the Dance Fee Payment Election Period.

2.92 "Unpaid Dance Fee Pool" means Dance Fee Payments that Dance Fee Claimants do not obtain from the Dance Fee Pool during the Dance Fee Payment Collection Period.

2.93 "Unpaid Dance Fee Pool Payment" means the payment to a Dance Fee Claimant by the Settlement Administrator from the Unpaid Dance Fee Pool for any Dance Fee Payments which the Dance Fee Claimant is entitled to, but does not, obtain during the Dance Fee Payment Collection Period.

2.94 "Website Notice" means a notice of the Settlement which shall conform in all material respects to the Class Notice attached as ***Exhibit D*** which shall be posted on the Settlement Website.

## ARTICLE III

## SUBMISSION OF THIS AGREEMENT TO THE COURT FOR REVIEW AND APPROVAL; CONDITIONAL CONSOLIDATION AND CERTIFICATION OF THE PROPOSED CLASS FOR SETTLEMENT PURPOSES ONLY; AND STIPULATION REGARDING AMENDMENT OF THE COMPLAINTS

3.1 Submission of the Settlement for Court Approval. Promptly following execution of this Agreement by Class Counsel and Defense Counsel, Plaintiffs shall submit to the Court a motion for preliminary approval of the Settlement and to both consolidate the Actions and provisionally certify the Class for purposes of settlement only. Contemporaneously thereof,

Plaintiffs shall also, in accordance with Cal. Labor Code § 2699(l)(2), submit this Agreement to the LWDA.

3.2 Provisional Consolidation of these Actions and Certification of the Settlement Class. The Parties agree that Plaintiffs' request for provisional consolidation of the Actions and provisional certification of the Class as a collective action pursuant to 29 U.S.C. § 216(b) and as a Rule 23 Class are for settlement purposes only. Each Party agrees that this stipulation shall not be used by any Person for any purpose whatsoever in any other legal, administrative, or arbitral proceeding. Such matters may only be submitted in a proceeding to enforce the terms of this Agreement. The Parties do not consent to consolidation of the Actions or certification of the Settlement Class other than to effectuate the Settlement contemplated here.

3.3 Limitations of Provisional Consolidation and Certification. The Parties acknowledge and agree that Defendants' consent to provisional consolidation of the Actions and certification of the Class for purposes of this Settlement only does not constitute an admission of wrongdoing, fault, liability, or damage of any kind to the Named Plaintiffs or to any of the other Class Members, or an acknowledgement or concession of the propriety of such consolidation or class/collective certification.

3.4 Additional Actions to Obtain Approval of the Settlement. Solely for purposes of implementing this Agreement and effectuating the proposed Settlement, the Parties agree that:

a) The Named Plaintiffs shall be permitted to file the Amended Complaints for Settlement pursuant to Fed.R.Civ.P. Rule 15(a)(2). The Amended Complaints for Settlement shall be submitted concurrently with the submission of the motion for preliminary approval of the Settlement so that

such complaints may be filed promptly upon preliminary approval of the Settlement by the Court. Obtaining the Court's approval to file the Amended Complaints for Settlement, and the subsequent prompt filing of the Amended Complaints for Settlement, are material conditions of this Agreement. The Parties agree that the filing of the Amended Complaints for Settlement will streamline the settlement process and ensure that more money can be paid to Settlement Class Members by saving the costs of multiple notice and approval processes. The Parties further agree and stipulate that Defendants may seek an order from the Court establishing that the allegations in the Amended Complaints for Settlement, and by each and every one of them, are deemed fully controverted by Defendants such that no further responsive pleadings from Defendants are required; and

b) Defendants shall timely send, consistent with law, the CAFA Notice (which shall be in a form approved by Class Counsel) to all appropriate federal and state officials pursuant to the requirements of the Class Action Fairness Act, 20 U.S.C. § 1715(b).

3.5 <u>The Provisional Nature of the Orders of Consolidation and Certification, and the Filing of the Amended Complaints for Settlement</u>. If, for any reason, the Settlement and Judgment do not become Final, the Parties agree that the Court shall rescind and strike from the record as if they had never been entered or filed, any order of consolidation, any order certifying the Settlement Class (provisionally or otherwise), and the Amended Complaints for Settlement, and the operative complaints in the Actions shall revert to the first amended complaints previously filed in the San

Francisco Action and in the San Diego Action. In such event, no prejudice shall occur to any motions of the Defendants' against any of the Plaintiffs to the Actions (including "opt-ins"), and/or against any intervenors or attempted intervenors to such Actions, to compel their Claims to individual arbitration, and/or to reconsider rulings on such motions to arbitrate, that have been filed by the Defendants or that may be filed by them in the future; meaning specifically that the Court shall not find that Defendants have waived, as a result of this Settlement, any of their rights to file and/or, as applicable, have adjudicated, all such motions on their merits.

3.6 Court Submissions. Any of the Parties, Class Counsel, Defense Counsel, and any Person objecting to this Agreement, may file with the Court, as directed by the Court in its Preliminary Approval Order, a written brief setting forth their respective positions regarding the fairness of the Settlement. All submissions to the Court shall comply with the provisions set forth in the applicable rules of the Court, as well as the dates established by the Court in its Preliminary Approval Order.

3.7 Execution by Class Representatives of this Agreement. Prior to the Fairness Hearing, all Class Representatives shall fully execute this Agreement. Pursuant to the Court's January 1, 2015 order in the San Francisco Action (ECF No. 32), Plaintiffs may execute the Agreement filed with the Court using their pseudonyms. Plaintiffs will also provide Defense Counsel an executed Agreement under their given names and Defense Counsel and Defendants will maintain such Agreement as confidential unless disclosure is required to enforce this Agreement.

3.8 The Fairness Hearing. At the Fairness Hearing, Class Counsel and the Class Representatives shall request entry of the Final Approval Order and the Judgment.

3.10 Statutory Compliance with Notification. Within ten (10) days of entry of the Judgment and the Final Approval Order, Class Counsel shall, in accordance with Cal. Labor Code § 2699(l)(3), submit such documents to the LWDA.

3.11 Cooperation of the Parties. The Parties shall act in good faith to effectuate each and every term of this Agreement in order to obtain both preliminary and Final Approval of this Agreement (including the providing of Class Notices), to take all acts so that the Judgment becomes Final, and to secure a prompt, complete, and Final resolution of the Settlement of these Actions.

**ARTICLE IV**

**CLASS NOTICE AND DANCE FEE PAYMENT ELECTION**

4.1 Information to be Supplied by each Club as Identified in ***Exhibit A***. Within thirty (30) days of the Preliminary Approval Date, Defendants will provide the Settlement Administrator, to the extent available in Defendants' records, the following information:

4.1.1 Each Class Member's legal name;

4.1.2 Each Class Member's last known address;

4.1.3 Each Class Member's last known email address;

4.1.4 Each Class Member's last known phone number; and

4.1.5 The amount of Form 1099 Payments paid to each Class Member.

4.2 Confidentiality of Information. The Parties agree that the information to be disclosed pursuant to Section 4.1 shall be deemed CONFIDENTIAL INFORMATION in accordance with Section 15.1. The Settlement Administrator shall be required to enter into an agreement to keep such information confidential.

4.3 Information to be Supplied by Class Counsel. Within thirty (30) days of the Preliminary Approval Date, Class Counsel will provide the Settlement Administrator with a suggested World Wide Web address of the settlement website that will be established by the Settlement Administrator.

4.4 Effectuation of Class Notice. Within twenty (20) days of the Settlement Administrator's receipt of the information identified in Section 4.1, the Settlement Administrator shall mail, and email where available, the Notice Packet to each Class Member. The envelope containing the Notice Packet will identify the Settlement Administrator's return address only and shall not contain *any* Club-related information from which a reader of the envelope could glean that it relates to the adult nightclub industry.

4.5 Return of Class Notice. If the Class Notice mailed to a Class Member is returned within twenty-one (21) days of the initial mailing with a forwarding address provided by the Postal Service, the Class Notice will be re-sent by the Settlement Administrator to the forwarding address within seven (7) days of return. If no forwarding address is provided by the Postal Service, the Settlement Administrator shall perform a skip trace on the Class Member using the National Change of Address ("NCOA") database, and, if an alternative address is found, the Class Notice will be re-sent by the Settlement Administrator to the alternative address within seven (7) days of discovery of the additional address. Irrespective of these matters, a Timely Submitted Opt-Out Form (in accordance with Sections 2.90 and 11.3) must have been received by the Settlement Administrator in order for a Class Member to have properly Opted-Out.

4.6 Posted Notice. Within twenty (20) days of the Settlement Administrator's receipt of the information identified in Section 4.1, Defendants shall prominently display four copies of

no less than 8x11 size printed paper of the Posted Notice in each Club's Entertainer dressing room. The Posted Notice shall remain displayed until ninety (90) days after the date of filing the motion for Final Approval.

4.7 The Website Notice. Within twenty (20) days of the Settlement Administrator's receipt of the information identified in Section 4.1, the Settlement Administrator shall post the Website Notice on the Settlement Website.

4.8 The Electronically Posted Notice. Within twenty (20) days of the Settlement Administrator's receipt of the information identified in Section 4.1, the Settlement Administrator shall effectuate the posting of the Electronically Posted Notice on StripperWeb.com in the "Stripping (was Stripping General)" discussion thread,[2] which shall continue to be posted for a period of eight (8) weeks thereafter. Each weekly posting shall be titled "California 'Deja Vu' Class Action Settlement Information." The following text shall be included in the posting: "For more information please click on the following link." The referenced link shall be a click-through hyperlink to the Settlement Website. Within the same period as provided for in this Section, the Settlement Administrator shall also contact the IEAU and request the IEAU to post the Electronically Posted Notice (with hyperlink) on its message board and e-mail the same to their subscriber list.[3]

---

[2] Site last visited on Mar. 12, 2021. If this thread is unavailable at the time of posting, posting shall be made in another thread on StripperWeb.com of a general discussion nature.

[3] The IEAU's website address is https://www.entertainmentadultunion.com/index.cfm?zone=/unionactive/contact.cfm. *Last visited* Mar. 12, 2021.

4.9 The Social Media Notice. Within twenty (20) days of the Settlement Administrator's receipt of the information identified in Section 4.1, the Settlement Administrator shall effectuate the posting of the Social Media Notice through an online advertising campaign funded in the total amount of $10,000 (the "Social Media Notice Fund"), which shall run until the Social Media Notice Fund is exhausted. The following text shall be included in the advertisements: "You may be eligible for a class action settlement. For more information please click on the following link." The referenced link shall be a click-through hyperlink to the Settlement Website. The advertising campaign for the Social Media Notice shall be directed by the Settlement Administrator in a manner best suited to promote the Agreement.

4.10 Reminder Notices. No later than thirty (30) days prior to the expiration of the Opt-Out Period, the Settlement Administrator shall effectuate Reminder Notices in the following manner:

a) Mail, and e-mail where available, the Notice Packet to each Class Member whose address: i) the Settlement Administrator was provided pursuant to Section 4.1; or ii) ascertained under Section 4.5, whichever is most accurate. The envelope containing the Class Notice will identify the Settlement Administrator's return address only and shall not contain *any* Club-related information from which a reader of the envelope could glean that it relates to the adult nightclub industry;

b) Re-post the Electronically Posted Notice on StripperWeb.com in the "Stripping (was Stripping General)" discussion thread in the form set forth in Section 4.8; and

c) Contact the IEAU and request the IEAU re-post the Electronically Posted Notice on their message board and e-mail the Electronically Posted Notice to their subscriber list a final time.

4.11 Submission of the Dance Fee Payment Election Form. If a Settlement Class Member decides to obtain her Settlement Payment in the form of Dance Fee Payments as provided for herein, she must Timely Submit to the Settlement Administrator a Fully Completed Dance Fee Payment Election Form. For Settlement Class Members who do not Timely Submit a Properly Completed Opt-Out Form and do not Timely Submit a Properly Completed Dance Fee Payment Election Form, they will be presumed to have selected to obtain their Settlement Payment in the form of Cash Payments. Class Representatives shall be considered to have selected to receive Cash Payments.

4.12 Effect of Execution of the Dance Fee Payment Election Form. The Dance Fee Payment Election Form, if Properly Completed and Timely Submitted to the Settlement Administrator, shall serve as that Class Member's Consent to Join as a party plaintiff to the FLSA Claims asserted in the Actions pursuant to 29 U.S.C. § 216(b) and shall effect a full and complete release of any and all FLSA Claims that the Class Member may have during the Class Periods against the Released Defendants.

4.13 Distribution of Dance Fee Payment Election Forms. In order to document those Settlement Class Members who have selected to receive their Settlement Payment in the form of Dance Fee Payments, and in order to assist in the administration of such payments, within thirty (30) days of the end of the Dance Fee Payment Election Period the Settlement Administrator shall

send to Class Counsel and Defense Counsel all Properly Completed and Timely Submitted Dance Fee Payment Election Forms.

4.14 Class Notice Verification. No later than thirty (30) days after the Settlement Administrator has completed the effectuation of the Class Notices as set forth in Sections 4.4 through 4.10, and before the Fairness Hearing, the Settlement Administrator shall file with the Court, through Class Counsel, the Due Diligence Declaration verifying that the Class Notices set forth in those Sections have been effectuated.

**ARTICLE V**

**SETTLEMENT CONSIDERATION AND TERMS OF PAYMENTS**

5.1 The Value of the Settlement Consideration. The value of the Settlement Consideration is five million five hundred thousand dollars ($5,500,000), consisting of Cash Payments, Dance Fee Payments, Enhancement Payments, the PAGA Payments, the Attorneys' Fees and Expenses Award, Administrative Costs, and changes to the Clubs' business practices. Under no circumstances (with the exception of the change in business practices set forth in Article IX) shall Defendants be responsible for making payments or conveying other remunerations or benefits of any kind that confer an aggregate financial benefit in excess of the amount of the Settlement Consideration. The payment of the Settlement Consideration shall be inclusive of all payments, costs, and fees (including attorney fees) required to be remitted by the Defendants pursuant to the Settlement and this Agreement; all to be paid without reversion to the Defendants.

5.2 Summary of the Components of the Settlement Consideration. The components of the Settlement Consideration are as follows:

a) Cash Pool: $4,000,000, plus the Unclaimed Dance Fee Pool (if any),

consisting of:

i) Total Enhanced Payments of $35,000 as follows:

For the San Francisco Action:

For Roes 1 and 3: $5,000 each.

For Roes 2, 10, 11, 12 13, and 22: $3,000 each.

For the San Diego Action:

$5,000 each to Roes 1 and 2.

ii) Total PAGA Payments: $125,000 (75% of which will be allocated as the LWDA PAGA Payment and the remaining 25% of which will be allocated as the Settlement Class Members' PAGA Payment).

iii) Attorneys' Fees and Expenses Award as ordered by the Court.

iv) Administrative Costs: $90,000 (est.).

v) Cash Payments.

b) Dance Fee Pool: $500,000, minus the Unclaimed Dance Fee Pool (if any).

c) Changes to Defendants' Business Practices: valued at a minimum of $1,000,000.

5.3 Funding of the Cash Pool. Subject to the requirements of Section 5.4 and the Settlement having obtained Final Approval from the Court, the Cash Pool shall be funded by the Defendants as follows:

a) Defendants shall pay the Notice and Administrative Fund within five (5) business days of the Preliminary Approval Date. Once Defendants have, as set forth in this Section, paid the Initial Cash Pool Deposit as defined

immediately below, any further bills from the Settlement Administrator, whether part of the pre-determined Administrative Costs or additional charges as approved by all Parties, shall be paid out of the Cash Pool as funded by the Defendants;

b) The remainder of the Cash Pool shall be paid by the Defendants to the Settlement Administrator as follows: i) an initial payment of two million dollars ($2,000,000), no later than by March 1, 2022 (the "Initial Cash Pool Deposit"); ii) the sum of one million dollars ($1,000,000) no later than by March 1, 2023 (the "Second Cash Pool Deposit"); and iii) the balance of the Cash Pool (including the Unclaimed Dance Fee Pool, if any) no later than by March 1, 2024 (the "Final Cash Pool Deposit"). These payments, subject to Section 5.4, shall be deposited by the Settlement Administrator in an interest-bearing account and the timing requirements of these payments shall apply regardless of the filing and pendency of any appeal(s) arising from Final Approval; and

c) The Unpaid Dance Fee Pool by March 1, 2024, if the Dance Fee Payment Period has ended by then; if not, within thirty (30) days of the expiration of the Dance Fee Payment Collection Period.

5.4 Conditions for Funding of the Cash Pool. The timing of payments of the Cash Pool as set forth in Section 5.3 are conditioned on at least seventy five percent (75%) of the Clubs being permitted, under COVID-19 pandemic Executive Orders or other legal processes, to both operate to at least seventy five percent (75%) of normal capacity and to present exotic dance entertainment,

by January 1, 2022. If these conditions are not met, the Parties shall immediately petition the Court to review this payment-timing issue and to decide whether Defendants are then able to reasonably abide by the payment schedule as set forth in Section 5.3 and, if not, what a reasonable payment schedule would be. The Court shall conduct any hearings or proceedings as it deems necessary and appropriate, including the permitting of reasonable and pertinent discovery requested by Class Counsel, and may require the Defendants to produce for inspection (in camera, but subject to confidential review by Class Counsel) any documents that it determines to be warranted in the circumstances, including but not limited to tax returns and profit and loss statements of the Clubs. In no event shall any order of the Court arising out of such review require payments that are accelerated from those set forth in Section 5.3. Moreover, nothing contained in this Section shall permit the Court to alter or reduce the total Settlement Consideration, or any aspect thereof, as set forth in Section 5.1; these provisions applying solely to the timing of funding payments for the Cash Pool.

5.5 Timing of Distributions from the Cash Pool. The timing of distributions from the Cash Pool shall be as follows:

5.5.1 No distributions from the Cash Pool shall be made by the Settlement Administrator to Settlement Class Members (including to the Class Representatives), the LWDA, or to Class Counsel, until the Effective Date.

5.5.2 In the event that no appeal is taken from the Judgment, distributions shall be made by the Settlement Administrator: a) for the Enhancement Payments, the LWDA PAGA Payment, fifty percent (50%) of the Attorneys' Fees and Expenses Award, and the initial installment payment to Cash Pool Recipients on a pro rata basis (the "First Cash

Payment") within thirty (30) days of the Initial Cash Pool Deposit being received by the Settlement Administrator; b) twenty five percent (25%) of the Attorneys' Fees and Expenses Award and the second installment payment to Cash Pool Recipients on a pro rata basis (the "Second Cash Payment") within thirty (30) days of the Second Cash Pool Deposit being received by the Settlement Administrator; and c) twenty five percent (25%) of the Attorneys' Fees and Expenses Award, the third installment payment to the Cash Pool Recipients on a pro rata basis and the Settlement Class Members' PAGA Payment (the "Third Cash Payment") within thirty (30) days of the Final Cash Pool Deposit being received by the Settlement Administrator.

5.5.3 In the event that an appeal is taken from the Judgment and the Initial Cash Pool Deposit, the Second Cash Pool Deposit, and the Final Cash Pool Deposit have all been received by the Settlement Administrator by the Effective Date, distributions shall be made by the Settlement Administrator for the Enhancement Payments, the PAGA Payments, the Cash Payments, and the Attorneys Fees' and Expenses Award within thirty (30) days of the Effective Date.

5.5.4 In the event that an appeal is taken from the Judgment and only the Initial Cash Pool Deposit has been received by the Settlement Administrator by the Effective Date, distributions shall be made by the Settlement Administrator within 30 days of the Effective Date for: a) the Enhancement Payments, b) the LWDA PAGA Payment, c) 50% of the Attorneys' Fees and Expenses Award, and d) the initial installment payment to the Cash Pool Recipients on a pro rata basis. Distributions from the Second Cash Pool Deposit

and Final Cash Pool Deposit shall be made by the Settlement Administrator in accordance with Section 5.5.2.

5.5.5 In the event that an appeal is taken from the Judgment and the Initial Cash Pool Deposit and Second Cash Pool Deposit have been received by the Settlement Administrator by the Effective Date, distributions shall be made by the Settlement Administrator within 30 days of the Effective Date for: a) the Enhancement Payments, b) the LWDA PAGA Payment, c) seventy five percent (75%) of the Attorneys' Fees and Expenses Award, and the first and second cash installment payments to Cash Pool Recipients on a pro rata basis. Distributions from the Final Cash Pool Deposit shall be made by the Settlement Administrator in accordance with Section 5.5.2.

## ARTICLE VI

## PLAN OF ALLOCATION AND DISBURSEMENTS OF PAYMENTS AND PAGA PAYMENTS

6.1 Information to Calculate Settlement Payments and Settlement Class Members' PAGA Payments. The Settlement Administrator shall use the information provided by the Defendants in accordance with Section 4.1 to determine the amount of each Settlement Class Member's Settlement Payment and Settlement Class Members' PAGA Payment pursuant to the terms of this Agreement.

6.2 The PAGA Payments. Defendants shall pay, as consideration for settlement of alleged civil penalties due pursuant to PAGA, the sum of one hundred twenty-five thousand dollars ($125,000) which shall resolve all PAGA Claims. Seventy-five percent (75%) of this, or ninety-three thousand seven hundred fifty dollars ($93,750), shall be paid out of the Cash Pool to the LWDA (the LWDA PAGA Payment). The remaining twenty-five percent (25%), or thirty-one

thousand two hundred fifty dollars ($31,250), shall be distributed out of the Cash Pool, in accordance with the provisions of Section 6.3, to the Settlement Class Members as each Settlement Class Member's PAGA Payment.

6.3 Computation and Determination of Settlement Payments and Settlement Class Members' PAGA Payments. The Settlement Administrator shall determine each Settlement Class Member's Settlement Payment and Settlement Class Member's PAGA Payment as follows:

6.3.1 The amount of a Settlement Class Member's Settlement Payment shall be determined on a pro rata basis by first dividing her Form 1099 Payments into the amount of Form 1099s Payments received by all Settlement Class Members, and then multiplying that number by the combined sum of the Net Cash Fund and the Dance Fee Pool. That amount shall then constitute the Settlement Payment that the Settlement Class Member is entitled to receive irrespective of whether she obtains a Cash Payment or decides to receive Dance Fee Payments.

6.3.2 The amount of a Settlement Class Member's PAGA Payment shall be determined on a pro rata basis by first dividing her Form 1099 Payments into the amount of Form 1099s Payments received by all Settlement Class Members, and then multiplying that number by the Settlement Class Members' PAGA Payment.

6.3.3 The Settlement Administrator shall provide the calculations for each Settlement Class Member's Settlement Payment and Settlement Class Member's PAGA Payment to the Class Counsel and Defense Counsel in writing within ten (10) days of the Exclusion/Objection Deadline. The Parties shall notify the Settlement Administrator and opposing counsel in writing of any objections thereto within five (5) business days of

receipt of such calculations. Thereafter, Class Counsel and the Settlement Administrator shall seek to resolve any objections.

6.4 Distributions of the Net Cash Fund. Distributions to Cash Pool Recipients shall be made in accordance with the provisions of Section 5.5. All checks for Cash Payments, Settlement Class Members' PAGA Payments, Unpaid Dance Fee Pool Payments and Enhancement Payments shall bear the endorsement: "By cashing this check, I acknowledge that I have released any claims under the Fair Labor Standards Act that I may have against the Released Defendants in the consolidated cases of *Roes v. SFBSC, et al*. and *Roe v. Deja Vu Services, Inc., et al*.

6.5 Effect of Negotiating Settlement Checks. The act of a Settlement Class Member in negotiating any Settlement Check, irrespective of any endorsement, shall serve as that Class Member's Consent to Join as a party plaintiff to the FLSA Claims asserted in the Actions pursuant to 29 U.S.C. §216(b).

6.6 Uncashed or Returned Settlement Checks. Settlement Class Members shall have 180 days from the date their Settlement Checks are dated to cash the same. Any checks that are not cashed during that time shall be void. If any Settlement Checks are returned to the Settlement Administrator, the Settlement Administrator shall endeavor to obtain a valid mailing address for the Settlement Class Member and resend such check (or a replacement check if the original check has expired or is close to expiring) to the new address. If the Settlement Administrator is unable to obtain a valid mailing address of the Settlement Class Member to send out a Settlement Check or if any Settlement Check remains uncashed after 180 days following the distribution of the Settlement Check by the Settlement Administrator, the Settlement Administrator will deliver the monies represented by the check to the California State Controller's Unclaimed Property Fund

with a description of the amount of unclaimed funds attributable to each Settlement Class Member in a manner that avoids any reference to the names of the Defendants or exotic dancing.

6.7 Excess Claims. There can be no excess Settlement Payments (including Cash Payments) or Settlement Class Members' PAGA Payments under the Plan of Allocation because Settlement Class Members shall share 100% of the available Net Cash Fund, Dance Fee Pool, and Settlement Class Members' PAGA Payment pursuant to the formulas described in, and provisions of, this Article and Article VII.

**ARTICLE VII**

**DANCE FEE PAYMENTS**

7.1 The Dance Fee Pool and Allocations Therefrom: Defendants shall make five hundred thousand dollars ($500,000) available for use as Dance Fee Payments that can be obtained by Dance Fee Claimants subject to the terms herein. The amount of Dance Fee Payments allocated to each Dance Fee Claimant shall be established by the Plan of Allocation set forth in Article VI, Section 6.3.1. If more than five hundred thousand dollars ($500,000) in Dance Fee Payments are requested, then the Dance Fee Payments shall be calculated by: (1) dividing the Dance Fee Claimant's Form 1099 Payments into the amount of Form 1099s Payments received by all Dance Fee Claimants; and (2) then multiplying that number by five hundred thousand dollars ($500,000). As for the remaining sum of the Settlement Payment to which each Dance Fee Claimant would have been entitled under Section 6.3.1, the Settlement Administrator shall distribute a Settlement Check to each such Dance Fee Claimant for the balance. The Settlement Administrator shall issue all such Settlement Checks within 30 days of the Final Cash Pool Deposit, or within 30 days of the Effective Date, whichever is later.

7.2 Prerequisites for Obtaining Dance Fee Payments: Dance Fee Payments may be obtained by a Dance Fee Claimant at a Club of her choice (subject to the provisions of Section 7.8), but only at that one Club. Dance Fee Claimants may not “split” their Dance Fee Payments among Clubs. Dance Fee Claimants are required to: a) schedule a Date of Performance at the Club of her choice, and b) submit to the Club in a manner prescribed by it a Properly Completed Dance Fee Payment Request Form—both at least seven (7) business days before she desires to Perform and to obtain Dance Fee Payments in order to allow Defendants time to confirm her entitlement to such Dance Fee Payments (including the fact that she has Timely Submitted a Dance Fee Payment Election Form and is therefore barred from receiving a Cash Payment), the amount of Dance Fee Payments to which she is entitled, and the existence of an employment relationship between the Dance Fee Claimant and the Club. Defendants shall provide to Class Counsel on a monthly basis, no later than the 10th day of each month during the Dance Fee Payment Collection Period, electronic copies of the Dance Fee Payment Request Forms submitted during the prior calendar month.

7.3 Acquisition of Dance Fee Payments. A Dance Fee Claimant is entitled to one hundred percent (100%) of the Dance Fees that are generated from her entertainment services for each Date of Performance after she has completed the prerequisites for obtaining Dance Fee Payments as specified in Paragraph 7.2 until the total amount of her Dance Fee Payments is reached. A Club may, however, limit the number of Dance Fee Claimants receiving Dance Fee Payments on any one Date of Performance to seven (7) such Entertainers on a first come/first served basis.

7.4 Collecting Dance Fee Payments from Multiple Settlements. To the extent that a Dance Fee Claimant is also entitled to Dance Fee Payments under the Limited National Settlement, her collection of Dance Fee Payments shall first be ascribed to the Dance Fee Payments to which she is entitled under the Limited National Settlement and then, after she has obtained all such Dance Fee Payments, to the Dance Fee Payments she is entitled to under this Settlement.

7.5 Period for Obtaining Dance Fee Payments: Dance Fee Claimants must obtain all of their Dance Fee Payments (they must have Performed all necessary Dates of Performance in order to be entitled to the full amount of their Dance Fee Payments) no later than by the last day of the Dance Fee Payment Collection Period. Regardless of whether Dance Fee Claimants have fully exhausted the Dance Fee Pool, Dance Fee Claimants' entitlement to obtain Dance Fee Payments shall terminate at the expiration of the Dance Fee Payment Collection Period.

7.6 Unpaid Dance Fee Pool and Payments. If the full amount of the Dance Fee Payments due a Dance Fee Claimant pursuant to the Plan of Allocation has not been completely paid to her within the Dance Fee Payment Collection Period, then the unpaid amount shall be paid by the Defendants to the Settlement Administrator by check within 30 days of expiration of the Dance Fee Payment Collection Period, along with a report showing the Dance Fee Claimant's name and the amount of the Dance Fee Payments she received. The Settlement Administrator will then send the specified Dance Fee Claimant a check for the unpaid amount within ten (10) days.

7.7 Unclaimed Dance Fee Pool: The Unclaimed Dance Fee Pool, if any, will be allocated to the Cash Pool.

7.8 Performing at Defendant Entities: Nothing in this Agreement requires any Club to open for business or remain in business so that a Dance Fee Claimant can obtain a Dance Fee

Payment, or require that any Club permit a Dance Fee Claimant the right to Perform on its premises in order to obtain Dance Fee Payments if she is not then an employee of the Club. If a Dance Fee Claimant desires to Perform at a Club to obtain Dance Fee Payments pursuant to this Agreement and she is not a current employee of that Club and that Club refuses to allow her to Perform for a legitimate business reason, that Dance Fee Claimant may obtain Dance Fee Payments at another Club or, at her option, she may select to obtain a Cash Payment pursuant to the terms of this Agreement.

7.9 Audit and Data Rights: Throughout the existence of the Dance Fee Pool, Class Counsel shall be provided reasonable access to data and records used to determine any Class Member's eligibility, the total amount of Dance Fee Payments that she may obtain, the amount of Dance Fee Payments that she has been paid and that remain for her to obtain, and the total amount of the Dance Fee Pool paid and remaining to be paid. In addition, Class Counsel will be provided monthly statements identifying those Dance Fee Claimants who received Dance Fee Payments, the amounts thereof, and the running balance of the Dance Fee Pool until it is depleted or otherwise unavailable.

**ARTICLE VIII**

**TAX CONSIDERATIONS OF THE SETTLEMENT**

8.1 No Tax Advice Being Given. Class Counsel represent that they are not providing any tax advice whatsoever to the Settlement Class Members in regard to the tax consequences, tax reporting, and remittance obligations they have in regard to the payments conveyed to them pursuant to the terms of this Agreement, beyond what is contained in this Article. The Class Representatives and all Participating Class Members acknowledge the same. Each Settlement

Class Member is obligated to obtain her own independent tax advice concerning the proper income reporting and tax remittance obligations regarding the payments and/or other remuneration she receives or obtains pursuant to this Agreement and shall further assume the responsibility of remitting to the Internal Revenue Service and any other relevant taxing authorities (including the State of California) any and all amounts required by law to be paid out of any monies received, or other remuneration obtained, under this Agreement, without any contribution whatsoever from any of the Released Defendants or Class Counsel except for the payment of Dance Fees which shall be paid as additional employee commissions subject to all legal withholdings.

8.2 Tax Considerations of Settlement Payments and Dance Fee Payments. Each Settlement Class Member acknowledges and agrees that the Cash Payment and Settlement Class Member's PAGA Payment conveyed to her under this Agreement do not constitute "wages" within the meaning of § 3111(a) of the Internal Revenue Code, any other applicable provisions therein, or any applicable state tax or revenue code. A Form (or Forms, as applicable) 1099-MISC shall be issued, as required by law, by the Settlement Administrator to each Settlement Class Member reflecting the Cash Payment and Settlement Class Member's PAGA Payment made to her in accordance with this Agreement, and copies of said forms shall be duly filed with the United States Internal Revenue Service, with the California taxing authorities, and with any other applicable state taxing authorities, and sent to Defendants for recordkeeping purposes.

8.3 Obligation to Report Tip Income. The Class Notices shall inform Settlement Class Members of their obligation to report all tip income that they have earned, or will earn, as either an IPE or employee, to the Clubs, to the IRS, and to state taxing authorities.

# ARTICLE IX

## DEFENDANTS' CHANGES OF BUSINESS PRACTICES, WHICH HAS AND WILL CONFER A DIRECT AND SUBSTANTIAL FINANCIAL BENEFIT TO THE SETTLEMENT CLASS

9.1 Conversion of Class Members and Entertainers to Employees. As a result of the filing of the San Diego Action and settlement negotiations to resolve the same undertaken between and among the plaintiffs thereof and the Defendants, the Clubs agreed to convert all Class Members who were a party to a Dancer Contract with any one of the Clubs (and who desired to continue to Perform at that Club) to, and to treat all Entertainers who would be Performing in their facilities in the future as, employees in accordance with applicable law. Pursuant to this Settlement and a prior iteration of it in the San Diego Action memorialized as the San Diego Settlement, such conversion has already taken place, with the conversion process having been completed by November 16, 2018. For Settlement Class Members and for other Entertainers who commence or commenced Performing at a Club after the end of the Class Periods, their employment has been on monetary terms that are at least as favorable as specified for employee-Entertainers in the Limited National Settlement (§ 8.20 thereof, but with 40% dance fee commissions) for the Greater California Clubs and in the San Francisco Settlement (§139 thereof, but with 40% dance fee commissions) for the San Francisco Clubs (collectively, the "Enhanced Terms of Employment"); with these Enhanced Terms of Employment being available to those qualified individuals through at least the one (1) year anniversary after the Final Approval Date, subject to Section 9.10, which permits for conversion to non-employee status if permitted by changes in the law. In such case, the monetary compensation paid by the Clubs to qualified individuals shall not be less, if conversion occurs during such one (1) year period, than what

would be afforded under the Enhanced Terms of Employment in this Section 9.1. Irrespective of anything contained in this Agreement to the contrary, the Enhanced Terms of Employment provided for in this Agreement and in the Limited National Settlement shall not be binding upon any legitimate third-party successor of any of the Defendants.

9.2 Employing Clubs. The Defendants may permit a Class Member to be an employee of more than one Club or may limit her to employment to only a single Club. Similarly, the Defendants may permit any Entertainer in the future to be an employee of more than one Club or may limit her to employment only at a single Club of the Defendants' choosing. Nothing contained in this Agreement or in the Limited National Settlement shall require the Defendants to permit any Class Member to work at more than one Club following the conversion of the Entertainers who performed at the Clubs to employees in accordance with Section 9.1 above.

9.3 No Contract of Employment / "At Will" Employment Only. Nothing in this Agreement shall constitute or require any contract of employment between any Class Member or Entertainer and any Defendant. The employment terms set forth herein and in the Limited National Settlement shall be "AT WILL," and shall permit the Clubs to terminate the employment of any Class Member or Entertainer for any reason not precluded by law (including for no specific reason). Just by way of example only, the Clubs shall be permitted to terminate the employment of any Class Member or Entertainer in the future if she fails to appear as scheduled, does not abide by directives of management, or does not generate sufficient income for the Defendant-employer to justify retaining her as an employee.

9.4 Rights of Class Members and Entertainers. Following the conversion to employees as set forth in Section 9.1, Class Members and other subsequent Entertainers have

been and will be eligible, as employees and as may be legally applicable, for Social Security, Medicare, Worker's Compensation and unemployment insurance, as well as to protection under all federal, state and local laws applying to or affecting employees, including but not limited to, as may be legally applicable, the National Labor Relations Act, Title VII of Civil Rights Act of 1964, the Age Discrimination in Employment Act (ADEA), the Older Workers Benefits Protection Act, the Americans with Disabilities Act, the Family Medical Leave Act and the Fair Labor Standards Act, for claims arising out of, or related in any way to, their employment or separation of employment save only for the limitations provided for in this Agreement.

9.5 Rights of Defendant-Employers. Nothing contained in this Agreement or in the Limited National Settlement shall be construed in any way to restrict the rights of the Defendants as employers that they can exercise over Class Members and any Entertainers hired as employees. Just by way of example only and in no way restricting the rights of the Defendants, the Clubs may impose training; set performance goals; establish appearance standards; regulate clothing and costuming; determine work schedules and hours of work; establish and modify job responsibilities; select the music to which Entertainers Perform; mandate Performing for certain customers; determine the nature, content, character, manner and means of Performances; require the participation in advertising; require attendance at meetings; set meal and rest breaks; require the execution of arbitration agreements with class and collective action waivers; and the like.

9.6 Prerequisites to Employment. Prior to conversion to employees as set forth in Section 9.1, all Class Members who desired to continue to Perform in one or more of the Club have been and shall be required to remit to the Club or Clubs at which they are to be employed, all information, documents and materials that are legally required as a condition for employment

(including but not limited valid identification, valid Social Security Card or other documentation permitting the Class Member to work in the United States, I-9, and W-4). Nothing contained in this Agreement shall require a Club to hire a Class Member as an employee who does not possess, has not produced, or has not remitted, as applicable, all such required information, documents and materials, and nothing contained in this Agreement permits a Class Member to continue to Perform at a Club as an IPE following the date on which Defendants converted Entertainers Performing in the Clubs to employees as set forth in Section 9.1.

9.7 Financial Viability of the Clubs. Nothing in this Agreement shall require any Club to remain open for business following the conversion of Entertainers and Class Members to employees or to present female performance dance entertainment upon its premises; the Parties acknowledging that some of the Clubs may not be able to operate in a financially profitable manner following the conversion of the Entertainers and Class Members to employee status or may have to remain closed following the Covid-19 global pandemic. If any Club in fact closes and that closure precludes a Dance Fee Claimant from being able to avail herself to Dance Fee Payments, Defendants shall cure that problem by offering reasonable access to other Clubs that are open.

9.8 Verification of Conversion. Until the date of the Final Approval Order, Class Counsel will be permitted, and shall undertake steps, to verify that the conversion to employees of the Class Members (and other Entertainers who may have started, or who may start Performing at the Clubs after conversion) has in fact taken place. Verification will consist of, at a minimum, Defendants providing Class Counsel with a schedule of conversion dates and a representative sample of paychecks and other documents demonstrating conversion; accompanied (by Defense

Counsel or their designees) site visits by Class Counsel to any of the Clubs identified on ***Exhibit A***; and interviews by Class Counsel with any Entertainers of their choosing who are then Performing in one or more of the Clubs. All fees and costs associated with the obligations of Class Counsel pursuant to this Section 9.8 shall be exclusively borne by Class Counsel but may be included as part of their request for the Attorneys' Fees and Expenses Award.

9.9 No Violations of Prior Settlements. The Parties acknowledge and agree that nothing contained in this Agreement, and in particular the terms of Section 9.1 that required conversion of the Entertainers and Class Members still Performing in the Clubs to be employees, shall be considered to constitute a violation or breach of the terms of the Limited National Settlement, and more specifically of the terms set forth in Article VIII thereof.

9.10 Changes of Law. Only in the event that there is a change of law in the State of California in the future concerning the distinction between employees and independent contractors that modifies or invalidates, in whole or in part, the "ABC" test adopted in *Dynamex Operations West, Inc. v. Superior Court of Los Angeles County*, (2018) 4 Cal.5th 903 and subsequently codified by statute, and/or that modifies, clarifies or specifies either those workers who may be subject to the "ABC" test adopted in *Dynamex* or subsequently in statute, or any exemptions therefrom, including changes by legislation, regulation, wage order adoption or the judiciary, shall the Clubs be permitted to alter their relationship with the Entertainers who perform in their facilities back to the way it existed prior to the conversion process, or to any other structure or relationship that they believe complies with the then-existing law.

9.11 Interpretation and Construction of the Limited National Settlement. The Parties agree that the Limited National Settlement shall be interpreted and construed to permit California

Entertainers who are entitled to claim Secondary Pool Remuneration thereunder to obtain Dance Fee Payments from that settlement (the Limited National Settlement) even though they may be employees of a Club under the terms of this Settlement. Accordingly, Class Members who are entitled to obtain Secondary Pool Remuneration from the Limited National Settlement shall be entitled to, at the same time, both the enhanced terms of employment as set forth in Section 9.1 hereof and Section 8.20 of the Limited National Settlement (including but not limited to dance fee commissions) and their Secondary Pool Remuneration available pursuant to the terms of the Limited National Settlement.

9.12 Right to Modify the Terms of this Article. The Clubs maintain the right, during the time periods established for the Enhanced Terms of Employment set forth in Section 9.1, to make further changes to their business practices so long as such changes do not materially and adversely undermine the monetary terms set forth in this Article or run afoul of any valid laws covering the Entertainers as employees.

9.13 Injunctive Relief. In the Final Approval Order, the Court shall grant injunctive relief to compel the Defendants to comply with, and to continue to comply with, all terms of this Article.

## ARTICLE X

## ATTORNEYS' FEES AND EXPENSES AWARD, CLASS REPRESENTATIVE ENHANCEMENT PAYMENTS, AND ADMINISTRATIVE COSTS

10.1 Attorneys' Fees and Expenses Award. As directed by the Court's Preliminary Approval Order, Class Counsel will apply to the Court for an award of: (1) attorneys' fees in an amount that does not exceed thirty-five percent (35%) of the Settlement Consideration; and (2) up to eighty thousand dollars ($80,000) in Litigation Expenses.

10.2 Limitations on and of the Attorneys' Fee and Expense Award. The disposition of Class Counsels' applications for an Attorneys' Fees and Expense Award is within the sound discretion of the Court. Any disapproval or modification by the Court of such applications shall not: a) affect the enforceability of the Settlement or this Agreement, b) provide any of the Parties with the right to terminate the Settlement or this Agreement, or c) impose any obligation on the Defendants to increase the Settlement Consideration extended in connection with the Settlement, including but not limited to the total amount of the Cash Pool as provide for herein.

10.3 Litigation Expenses. With the exception of the payment(s) for the Attorneys' Fees and Expenses Award made pursuant to order of the Court, all other Litigation Expenses incurred by Class Counsel in connection with investigating the bases for, filing and prosecuting these Actions (including for all appeals and settlement processes, including mediations), and administering the Settlement, shall be borne exclusively by Class Counsel.

10.4 Enhancement Payments. Class Counsel may apply to the Court for an incentive award for various Settlement Class Members (to be paid in addition to their allocated portion of the Net Cash Fund and their Settlement Class Member's PAGA Payment). Subject to Court approval, the Enhancement Payments will be in recognition of the time, efforts, and expenses incurred by each individual in coming forward, assisting in the prosecution of these Actions, and securing the Settlement as embodied in this Agreement. Enhancement Payments shall be considered non-wage income for which an IRS Form 1099-MISC will be issued by the Settlement Administrator, as required by law, to each Settlement Class Member receiving such a payment.

10.5 Payment of Administrative Costs. Defendants shall pay, through remittances to the Settlement Administrator and out of and as part of the Cash Pool, the Administrative Costs in accordance with the terms herein.

**ARTICLE XI**

**OBJECTIONS AND OPT-OUTS**

11.1 Objections to Settlement. All objections to the Settlement must be in writing and must be filed with the Court in accordance with the Court's Preliminary Approval Order. All objections not filed electronically with the Court must be mailed to both Class Counsel and Defense Counsel. All Class Representatives waive the right to object to the Settlement.

11.2 Procedures for Objections. The procedures of objection shall be as set forth in the Preliminary Approval Order.

11.3 Opting Out of the Settlement. Any Class Member who wishes to be excluded from the Settlement must Timely Submit to the Settlement Administrator, at the address that is set forth in the Class Notice, a written request for exclusion from the Settlement personally signed by the Class Member or her Legally Authorized Representative (the Opt-Out Form). Any Class Member may also submit a written request for exclusion from the Settlement (the Opt-Out Form) to the Settlement Administrator through the Settlement Website or via email. The Settlement Administrator shall date-stamp the original of any Opt-Out Form and serve copies thereof on both Class Counsel and Defense Counsel via electronic mail within five (5) business days of the receipt of any such form.

11.4 Failure to Properly Opt-Out and Opt-Out Limitations. Any Class Member who does not express her clear and unequivocal intention to be excluded from the Settlement, and

Timely Submit her notice of her intention to Opt-Out of the Settlement, will be deemed to be a Settlement Class Member. All Class Representatives waive any right to Opt-Out of the Settlement.

11.5 Notification to Counsel of Opt-Outs. Within ten (10) days following the conclusion of the Opt-Out Period, the Settlement Administrator shall provide Class Counsel and Defense Counsel with the Opt-Out List. The contents of the Opt-Out List shall be designated as CONFIDENTIAL INFORMATION in accordance with Section 15.1 and shall be submitted by Class Counsel to the Court, before the Fairness Hearing, UNDER SEAL in order to protect the confidentiality of those Class Members who have Opted Out.

## ARTICLE XII

## RELEASES AND COVENANTS

12.1 Scope of Releases. The Released Claims against each and every one of the Released Defendants shall be fully and finally released and dismissed with prejudice and on the merits (without an award of fees or costs to any Party other than as provided for in this Agreement) upon the Effective Date. The Released Claims shall be construed as broadly as possible to effect complete finality over the Actions and the Claims asserted, or that could have been asserted, therein.

12.2 Release of Released Defendants. The Settlement Class Members, individually and on behalf of their heirs, estates, trustees, executors, administrators, representatives, agents, successors, and assigns, and anyone claiming through them, or acting or purporting to act on their behalf, for their benefit, or in their interest, hereby knowingly and voluntarily forever release, relinquish, acquit, discharge, and hold harmless, each and every one of the Released Defendants from, and covenant not to sue each and every one of the Released Defendants regarding, each and

every one of the Settlement Class Members' Released Claims (in the case of the Settlement Class Members) and the Participating Class Members' Released Claims (in the case of the Participating Class Members); and they further agree that they shall not now or hereafter initiate, maintain, or assert any Settlement Class Members' Released Claims (in the case of the Settlement Class Members) or any Participating Class Members' Released Claims (in the case of the Participating Class Members) against the Released Defendants, or against any one or group of them, in any other court action or before any administrative body, tribunal, arbitration panel, or other adjudicating body. Notwithstanding the foregoing, Settlement Class Members retain the right to bring Claims based upon violations of the terms of this Agreement.

12.3 Waiver of Released Claims. For and in return of the complete and full considerations, terms, covenants and conditions as set forth in this Agreement, the Settlement Class Members, and each and every one of them, further specifically agree to waive each and all of their rights to bring any of the Released Claims at any time in the future arising out of, relating to, associated with, based upon, or concerning, in any way, manner, regard, or fashion whatsoever, the Settlement Class Members' Released Claims (for Settlement Class Members) and the Participating Class Members' Released Claims (for Participating Class Members).

12.4 Release of FLSA Claims. With respect to those Claims that could be asserted under the FLSA, a Class Member's Timely Submission of a Properly Completed Dance Fee Payment Election Form or the issuance to her of any Settlement Check shall fully, finally, and forever settle and release any and all FLSA Claims that she may have up to and including November 16, 2018.

12.5 Claims Barred and Enjoined. All Settlement Class Members shall be permanently barred and enjoined from initiating, asserting, or prosecuting against the Released Defendants, or

against any one or group of them, in any federal or state court or before any administrative body, tribunal, arbitration panel, or other adjudicating body, any and all of the Settlement Class Members' Released Claims (in the case of the Settlement Class Members) and any and all of the Participating Class Members' Released Claims (in the case of the Participating Class Members), as all such claims have been fully satisfied through the terms of this Agreement. The Court shall retain jurisdiction to enforce the provisions of this Section.

12.6 Waiver of Additional Compensation. Irrespective of the releases, waivers, and satisfactions set forth herein, if any court, tribunal, firm, third person or persons, business entity, or governmental entity, organization or agency, brings, asserts, or assumes jurisdiction over any form of investigation, proceeding, lawsuit, claim, charge or cause of action by, for or on behalf of any Settlement Class Member, and/or in her interest or for her benefit, either in whole or in part, against the Released Defendants, or against any one or group of them, arising out of, relating to, associated with, based upon, or concerning, in any way, manner, regard, or fashion whatsoever, the Settlement Class Members' Released Claims or the Participating Class Members' Released Claims, such Settlement Class Member or Participating Class Member, as applicable, shall not seek to enforce, recover or collect upon any damages, awards, remunerations, sanctions, penalties, fines, costs and/or attorney fees assessed against the Released Defendants, or against any one or group of them, and shall reasonably cooperate with any request from the Released Defendants, at the Released Defendants' cost, to demand the dismissal, with prejudice, of any such investigation, proceeding, lawsuit, claim, charge, or cause of action, and/or, as may be appropriate, her withdrawal therefrom (by way of example and without limitation, "withdrawal" includes, where applicable, a formal written request for withdrawal of, or non-participation in, an administrative proceeding, formally "opting"-out of an

opt out class action lawsuit, and refraining from formally "opting"-in to an opt-in class or collective action matter). In the event, however, that any court, tribunal, or governmental entity, organization or agency should assess any damages, awards, remunerations, sanctions, penalties, fines, costs, and/or attorney fees of any kind whatsoever against any Released Defendant beyond the relief provide for in this Agreement (in this Section, sometimes generally hereinafter simply referred to as "Award") arising out of, relating to, associated with, based upon, or concerning, in any way, manner, regard, or fashion whatsoever the Settlement Class Members' Released Claims or the Participating Class Members' Released Claims, the Settlement Class Members and the Participating Class Members, as applicable, and each and every one of them, agree to specifically waive entitlement to, and refrain from collecting upon, any such Award.

12.7 Sufficiency of Consideration. The Class Representatives specifically represent that sufficient and adequate consideration is being conveyed to them and to the Settlement Class through this Agreement and the Settlement to support the Settlement Class Members' Released Claims.

12.8 Acknowledgement of Other Claims. The Class Representatives, and each and every one of them, specifically represent that to their own personal knowledge: a) There are no other lawsuits, Claims, charges, actions, proceedings, investigations, cause, and/or causes of actions of any kind whatsoever, other than those that are set forth in Plaintiffs' Complaints on file and in any amendments to be filed as part of this Settlement, or as otherwise previously disclosed in writing to the Defendants, pending or anticipated against the Released Defendants, or against any one or group of them, whether filed or unfiled, and whether civil or criminal, arising from, relating to, associated with, based upon, or concerning, in any way, manner, regard, or fashion whatsoever, the Settlement Class Members' Released Claims as they apply to the Class Representatives; b) that none of them

have filed, been served with, or have any personal knowledge of any such matters; and c) that they have not participated in, or have provided assistance or cooperation to, such matters.

12.9 Release of Settlement Class Members. Subject to any Claims that they may have for libel, slander, business disparagement, damage or destruction of property, assault and/or battery, or the like, each and every Released Defendant hereby, knowingly and voluntarily, releases, acquits, and forever discharges, each and every Settlement Class Member and Class Counsel from any and all Claims of every conceivable kind or nature whatsoever that they have, had, or may have, against the Settlement Class Member, or against any one or group of them, whether fixed or contingent, whether asserted or unasserted, and whether filed or unfiled, at law, in equity, or otherwise, that arise out of, relate to, are associated with, are based upon, or concern, in any way, manner, regard, or fashion whatsoever, the business arrangement that the Clubs had with the Settlement Class Members and which occurred during the Class Periods, including but not limited to any Claim for breach of contract, or any Claim purportedly arising out of a Dancer Contract. Notwithstanding the foregoing, Defendants retain the right to bring Claims upon future violations of the terms of this Agreement.

12.10 Performing in the Future at the Clubs. The Parties acknowledge that some of the Class Members are no longer Performing at any of the Clubs. Nothing in this Agreement shall require any Club to hire any Class Member who is not currently an employee of the Club at the time of execution of this Agreement in order to be able to Perform on its premises.

12.11 Knowing Execution. Each Class Representative acknowledges, agrees, and understands that: a) she has read and understands the terms of this Agreement; b) she has been advised in writing to consult with an attorney before executing this Agreement; c) she has obtained

and considered such legal counsel as she deems necessary; and d) she has been given twenty-one (21) days or more to consider whether or not to enter into this Agreement (although she may elect not to use the full 21 day period at her option).

12.12 Non-Assignment of Claims. Each Class Representative represents and agrees that she has not and will not assign any of her Settlement Class Members' Released Claims to any other person or entity. These representations shall survive the execution of this Agreement and the approval by the Court of the Settlement contemplated herein.

12.13 Dismissals. Subject to Court approval, all Settlement Class Members shall be bound by this Agreement and all of their Settlement Class Members' Released Claims shall be dismissed with prejudice and fully and forever released and discharged, even if such Person(s) never received actual notice of the Actions or this Settlement and never received the Cash Payment, Settlement Class Member's PAGA Payment, Dance Fee Payments, or Unpaid Dance Fee Pool Payment to be made to her in accordance with this Agreement. Similarly, for Participating Class Members, all of their Participating Class Members' Released Claims shall be dismissed with prejudice and fully and forever released and discharged.

## ARTICLE XIII

## TERMINATION OF SETTLEMENT

13.1 Events Permitting Termination. This Agreement and the Settlement shall terminate and be canceled within ten (10) business days of the mailing of notification if one of the Parties provides written notification of an election to terminate this Agreement and the Settlement based upon the occurrence of any of the following circumstances:

a) The Court denies or rescinds preliminary approval of this Agreement, or enters a Preliminary Approval Order that is at variance with the terms of this Agreement;

b) At least seven and one half percent (7.5%) of the Class Members Opt-Out of the Settlement;

c) Any of the signatories hereto have not signed this Agreement at least fifteen (15) days prior to the Fairness Hearing;

d) The Court declines to provide Final Approval of the Settlement, or declines to enter the Judgment or Final Approval Order that fully adopts the terms of this Agreement, or enters a Judgment or Final Approval Order that material modifies, or that is at material variance from, the terms of this Agreement;

e) The Court's Judgment and/or Final Approval Order is (are) vacated, reversed, or modified in any material respect in any appeal or other review, or in any collateral proceeding occurring prior to the Effective Date;

f) The Effective Date does not occur for some other reason; or

g) Any federal or state authorities object to, or request material modifications of, the Settlement and the Court adopts such objections and/or modifications.

13.2 Consequences of Termination. In the event this Agreement does not receive Final Approval by the Court, or in the event the Court's Final Approval is overturned, reversed, vacated, or modified in any material way on appeal or review, or by or through any collateral proceeding,

or in the event the Settlement is terminated or fails to become effective in accordance with the terms of this Agreement, the Parties shall request the Court to restore them to their respective positions in the Actions as they existed as of March 1, 2020. In such event: a) the terms and provisions of this Agreement, except as provided in this Section, in Sections 3.5 and in Article XV, shall have no further force or effect with respect to the Parties; b) neither this Agreement nor any discussions or documents regarding it, or the Settlement prior to the termination/cancellation of this Agreement (except for Sections 3.5 and Article XV), shall be used in the Actions or in any other proceeding for any purpose (including, but not limited to, in support of a motion for class certification, in opposition to any motion to compel arbitration, or as evidence of Defendants' liability, or lack thereof, in regard to the Claims asserted in or encompassed by these Actions); c) any and all orders and any Judgment entered by the Court in accordance with the terms of this Agreement shall be treated as vacated, *nunc pro tunc*, and shall be null and void for all purposes; d) any Consents to Join filed on behalf of any Class Member and the consequent release of FLSA Claims through this Agreement, shall be null and void *ab initio*; and e) no prejudice shall attach to any motion by Defendants, either filed or unfiled, to compel the Plaintiffs, or any one or group of them (including intervenors in the San Diego Action), into individualized arbitration and to dismiss and/or stay the Actions or any other court proceeding, or to the still-pending motion in the San Diego Action to reconsider the ruling on the previous motion to compel the named plaintiffs thereof into individualized arbitration.

13.3 Costs of Termination. If any Party terminates this Agreement pursuant to Section 13.1, both Plaintiffs and Defendants shall bear their own costs incurred.

13.4 Effects of Termination. In the event this Agreement is terminated pursuant to Section 13.1:

a) The Defendants shall have no obligation under this Agreement to make any payments to the Settlement Class, to any attorney (for attorneys' fees, costs, or otherwise), to any governmental entity (including but not limited to the LWDA), to any fund or account (including but not limited to the Cash Pool and the Notice and Administrative Fund), or to the Settlement Administrator (beyond the Notice and Administration Fund if previously paid);

b) The Defendants shall no longer be required to retain the services of Entertainers as employees as negotiated as part of the San Diego Settlement and as memorialized and modified herein;

c) Any Preliminary Approval Order, Final Approval Order and the Judgment, including any orders of class certification or consolidation pursuant to the Agreement (provisional or otherwise), shall be vacated, and the Amended Complaints for Settlement and any answers/counterclaims thereto shall be deemed withdrawn; and

d) Any monies already paid or remitted by Defendants to the Settlement Administrator and not yet used as part of the Administrative Costs shall be immediately returned to Defendants with all accrued interest.

## ARTICLE XIV

## LIMITATIONS UPON THE TERMS OF SETTLEMENT

14.1 No Admission of Wrongdoing. Neither this Agreement nor the Settlement, nor any act performed or document executed pursuant to or in furtherance thereof (including but not limited to the previous conversion of Entertainers Performing at the Clubs to employees pursuant to the San Diego Settlement and as memorialized and modified herein), is, or may be deemed to be, or may be used as: a) an admission or evidence of the truth of any allegations in the Actions, either as presently pending or as to be amended as provided for herein; b) an admission or evidence of the validity of any of the Released Claims, or any alleged wrongdoing or liability of any of the Released Defendants; c) an admission or evidence of any fault or omission of any of the Released Defendants in any civil, criminal, or administrative proceeding in any Court, administrative agency or other tribunal (including any arbitral forum), other than in such proceedings as may be necessary to consummate or enforce the terms of this Agreement, the Settlement memorialized herein, or the Judgment; d) an admission that Services, Mohney, SFBSC, or any other Defendant Entity is, or could be held to be, a "joint employer" of the Plaintiffs or of any one or group of them; e) an admission that each of the Clubs' separate corporate identity is or can be disregarded; or f) an admission as to, or evidence of, the certifiability of any Claims contemplated herein or in the Actions, either as presently pending or as to be amended as provided for in this Agreement. Notwithstanding the preceding, however, this Agreement and/or the Judgment may be filed and used in any action or proceeding in any Court, administrative agency, or other tribunal, to support a defense of *res judicata*, collateral estoppel, payment, release, good faith settlement, accord and satisfaction, claim preclusion, issue preclusion, or any similar defense or counterclaim.

**ARTICLE XV**

**PROTECTIVE ORDER**

15.1 Terms of Protective Order. The Parties shall agree upon, and shall submit to the Court for entry, a stipulated protective order (the "Protective Order") in the Actions in order to protect the confidentiality of certain identities, information, documents, and materials deemed to be confidential pursuant to the terms of this Agreement or as otherwise designated by the Parties to be so (collectively, "CONFIDENTIAL INFORMATION"). Such CONFIDENTIAL INFORMATION shall be held in confidence by the Parties and/or by their attorneys and shall not be submitted in any public filing or other public disclosures except as may be permitted by this Agreement.

15.2 Return of CONFIDENTIAL INFORMATION. All documents and/or things produced or generated through discovery by any Party in the Actions that has been designated CONFIDENTIAL INFORMATION (including by way of informal discovery) shall be destroyed within thirty (30) days of the Effective Date, unless such information is necessary for administration and verification of the Cash Payments or Dance Fee Payments as provided for herein (in that event, such materials will be destroyed when all such payments have been concluded). If this Agreement is terminated or does not become Final, all documents or things produced pursuant to this Settlement that have been designated CONFIDENTIAL INFORMATION shall be destroyed within thirty (30) days of termination of this Agreement. Each Party shall promptly certify to the other that all documents and/or things produced or generated through discovery, formal or otherwise, that have been designated to be CONFIDENTIAL INFORMATION have been destroyed. No Party shall be required, however, to destroy their own

documents and things or any other document that the Protective Order entitles the Party or its Counsel to retain following the conclusion of litigation.

**ARTICLE XVI**

**NOTIFICATIONS**

16.1 Process of Notification. Unless otherwise specifically provided herein, all notices, demand, or other communications given hereunder shall be in writing and shall be deemed to have been duly given as of the third business day after mailing by United States registered or certified mail, return receipt requested, addressed as follows:

To Plaintiffs and the Settlement Class:

Steven G. Tidrick
The Tidrick Law Firm LLP
1300 Clay Street, Suite 600
Oakland, CA 94612

Jason J. Thompson
Sommers Schwartz, P.C.
One Towne Square, Suite 1700
Southfield, MI 48076

Megan Bonanni
Pitt McGehee Palmer & Rivers
117 West 4th Street, Suite 200
Royal Oak, MI 48067

To Defendants:

Douglas J. Melton
Long & Levit, LLP
465 California Street, 5th Floor
San Francisco, CA 94104

Tammara N. Bokmuller
Bowman and Brooke, LLP
750 B. Street, Suite 2200

San Diego, CA 92101

Bradley J. Shafer
Shafer & Associates, P.C.
3800 Capital City Boulevard, Suite 2
Lansing, MI 48906

## ARTICLE XVII

## FORCE MAJEURE

17.1 Excuse from Performance. No Party shall be liable or responsible to any other Party, nor deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement when and to the extent such failure or delay is caused by, or results from, acts beyond the impacted party's control ("Impacted Party"), including, but not limited to, the following circumstance, occurrences, and/or incidents (the "Force Majeure Events"): a) acts of nature; b) natural disasters (fires, explosions, earthquakes, hurricanes, flooding, storms, explosions, infestations), epidemics or pandemics (but specifically excluding the COVID-19 pandemic and its effects, including government shut downs, all of which are already known and explicitly acknowledged by the Parties in negotiating this Agreement, except as set forth in Section 5.4); c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot or other civil unrest; d) government orders or laws; e) actions, embargoes or blockades in effect on or after the date of this Agreement; f) action by any government authority; g) national or regional emergency; h) strikes, labor stoppages or slowdowns or other industrial disturbances; and i) shortages of adequate power or transportation facilities. The Impacted Party shall give notice within ten (10) days of the Force Majeure Event to the other Party/Parties, stating the period of time the occurrence is expected to continue. The time for performance required of the Impacted

Party shall be extended by the period of such delay provided the Party is exercising diligent effort, and is acting in good faith, to overcome the cause of such delay (the Impacted Party being obligated to use diligent efforts, and to act in good faith, to end the failure or delay in performance and to ensure that the effects of such Force Majeure Event are minimized). The Impacted Party shall resume the performance of its obligations as soon as reasonably practicable after the removal of the cause.

17.2 Changes in Court Ordered Deadlines. In the event of a Force Majeure Event, the Parties shall, to the extent necessary, negotiate in good faith for the extension of any deadlines provided for herein, and submit their proposals to the Court for approval. If the Parties are unable to so agree, any Party may file a motion with the Court to permit the Court to set new deadlines itself.

## ARTICLE XVIII

## MISCELLANEOUS PROVISIONS

18.1 This Agreement may be amended or modified only by a written instrument signed by or on behalf of all of the signatories hereto or their successors-in-interest. No oral amendment or modification shall be permitted or effective.

18.2 This Agreement and the Settlement were entered into after substantial good faith, arms-length, negotiations between the Parties, Class Counsel and Defense Counsel. As such, no Party shall be deemed to have relied upon the representations of any other Party or opposing counsel in relation to the negotiation or execution of this Agreement.

18.3 Each counsel or other Person executing this Agreement on behalf of any of the Parties hereto represents that such counsel or Person, as applicable, has the authority to so execute this Agreement.

18.4 This Agreement may be executed in one or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same Agreement. This Agreement may be executed by signature delivered by facsimile or PDF and need not be the original "ink" signature. A complete set of executed counterparts shall be filed with the Court prior to the Fairness Hearing, with the exception of the true identities of the Class Representatives which are to be kept as CONFIDENTIAL INFORMATION. The signature page(s) of this Agreement for the true names of the Class Representatives shall be kept as confidential for attorneys' eyes only among Class Counsel and Defense Counsel and shall not be attached to the public filing of this Agreement for approval by the Court, except as necessary to enforce the terms of this Agreement.

18.5 This Agreement constitutes the entire fully integrated agreement and understanding among the Parties. No representations, warranties, or inducements have been made to any Party concerning the Settlement, this Agreement, or its exhibits, other than the representations, warranties, and covenants contained in such documents.

18.6 This Agreement shall be governed by the laws of the State of California or federal law, as applicable. All actions or proceedings relating to this Agreement may only be brought in the United States District Court for the Northern District of California.

18.7 Upon the occurrence of the Effective Date, the Settlement shall be fully enforceable by the Parties and the Court, and the Court shall retain exclusive and continuous jurisdiction over

the Parties to interpret and enforce the terms and conditions of, and rights under, the Settlement, the Final Approval Order, and the Judgment.

18.8 Each of the signatories acknowledges and represents that he/she/it: Has fully and carefully read this Agreement prior to execution; has been fully apprised by his/her/its counsel of the legal effect and meaning of this Agreement and all terms and conditions hereof; has had the opportunity to make whatever investigation or inquiry he/she/it deemed necessary or appropriate in connection with the subject matter of these Actions; has been afforded the opportunity to negotiate any and all terms of this Agreement; and is executing this Agreement voluntarily and free from any undue influence, coercion, duress, or menace of any kind. This Agreement reflects the conclusion of each of the Class Representatives and the Defendants that this Agreement, the Settlement, the Judgment to be entered hereunder, and the releases, waivers, and covenants provided for herein, are in their best interest, as well as in the best interests of the general public and the Settlement Class.

18.9 In the event, following the Judgment becoming Final, that any one or more of the provisions contained in this Agreement, or its application to any circumstance, shall for any reason be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall in no way affect any other provisions or applications of this Agreement if Defense Counsel and Class Counsel, on behalf of the Parties, mutually elect in writing to proceed as if such invalid, illegal, or unenforceable provision or application had never been included in this Agreement. However, if any funds have been remitted, or other consideration conveyed, to a Class Representative or a Settlement Class Member, then the releases and discharges granted, waivers conferred, and satisfactions conveyed by this Agreement may not be terminated.

18.10 The headings and captions inserted in this Agreement are for convenience only and in no way define, limit, or otherwise describe the scope or intent of this Agreement, or any provision hereof, or in any way affect the interpretation of this Agreement.

18.11 Except as otherwise provided in this Agreement, the Parties shall bear their own respective costs and fees.

18.12 None of the Parties or their respective counsel shall be deemed to be the drafter of this Agreement for purposes of construing its provisions. The language in all parts of this Agreement (including the exhibits thereto) shall be interpreted according to its fair meaning and shall not be interpreted for or against any of the Parties as the drafter of the language.

18.13 All time computations under this Agreement shall be done in accordance with the provisions of the rules of court applicable to the United States District Court for the Northern District of California, which govern the calculation of time.

18.14 The waiver by any of the Parties of any provision in this Agreement shall not be deemed a waiver by that Party of any other provision herein.

18.15 Each and every one of the Parties hereto acknowledges and agrees that he/she/it will and shall, at all times subsequent to the execution of this Agreement and upon reasonable request by any other Party, make, do, and execute, or cause to be made, done, or executed, all such further documents and instruments to effectuate the full intent, purpose, covenants and conditions as set forth herein.

18.16 This Agreement shall be binding upon and inure to the benefit of the Parties, Class Counsel, and Defense Counsel, as well as their assigns, successors-in-interest of any kind whatsoever, purchasers of any of their assets and/or liabilities, heirs, executors, and administrators.

[THIS SPACE INTENTIONALLY LEFT BLANK]

Respectfully submitted,

Dated: August 13, 2021

Bowman and Brooke, LLP
Tammara N. Bokmuller (CA Bar #192200)
Tammy.Bokmuller@bowmanandbrooke.com
750 B. Street, Suite 2200
San Diego, CA 92101
Telephone: (619) 376-2500
Facsimile: (619) (619) 376-2501
Counsel for Non-San Francisco Defendants

Dated: August 26, 2021

Long & Levit, LLP
Douglas J. Melton (CA Bar #161353)
Shane M. Cahill (CA Bar #227972)
dmelton@longlevit.com
scahill@longlevit.com
465 California Street, 5th Floor
San Francisco, CA 94104
Telephone: (415) 438-4493
Facsimile: (415) 397-6392
Counsel for San Francisco Defendants

Dated: September 8, 2021

Shafer & Associates, P.C.
Bradley J. Shafer (P36604)
brad@bradshaferlaw.com
3800 Capital City Blvd, Suite 2
Lansing, MI 48906
Telephone: (517) 886-6560
Facsimile: (517) 886-6565
Counsel for All Defendants

Dated: , 2021

The Tidrick Law Firm
Steven G. Tidrick (CA Bar #224760)
sgt@tidricklaw.com
1300 Clay Street, Suite 600
Oakland, CA 94612

Respectfully submitted,

Dated: August 13, 2021

Bowman and Brooke, LLP
Tammara N. Bokmuller (CA Bar #192200)
Tammy.Bokmuller@bowmanandbrooke.com
750 B. Street, Suite 2200
San Diego, CA 92101
Telephone: (619) 376-2500
Facsimile: (619) (619) 376-2501
Counsel for Non-San Francisco Defendants

Dated: August 26, 2021

Long & Levit, LLP
Douglas J. Melton (CA Bar #161353)
Shane M. Cahill (CA Bar #227972)
dmelton@longlevit.com
scahill@longlevit.com
465 California Street, 5th Floor
San Francisco, CA 94104
Telephone: (415) 438-4493
Facsimile: (415) 397-6392
Counsel for San Francisco Defendants

Dated: August 26, 2021

Shafer & Associates, P.C.
Bradley J. Shafer (P36604)
brad@bradshaferlaw.com
3800 Capital City Blvd, Suite 2
Lansing, MI 48906
Telephone: (517) 886-6560
Facsimile: (517) 886-6565
Counsel for All Defendants

Steven G. Tidrick (Aug 26, 2021 12:37 PDT)

Dated: , 2021

The Tidrick Law Firm
Steven G. Tidrick (CA Bar #224760)
sgt@tidricklaw.com
1300 Clay Street, Suite 600
Oakland, CA 94612

Telephone: (510) 788-5100
Facsimile: (510) 291-3226
Co-Class Counsel for Plaintiffs

Dated: _______________, 2021

______________________________
Sommers Schwartz, P.C.
Jason J. Thompson (P47184)
jthompson@sommerspc.com
Co-Counsel for Plaintiffs
One Towne Square, Suite 1700
Southfield, MI 48076
(248) 355-0300
Co-Class Counsel for Plaintiffs

Dated: _______________, 2021

______________________________
Pitt McGehee Palmer & Rivers, P.C.
Megan A. Bonanni (P52079)
mbonanni@pittlawpc.com
117 West Fourth Street, Suite 200
Royal Oak, MI 48067
248-398-9800
Co-Class Counsel

Dated: June 10, 2021

3610 BARNETT AVE., LLC
d/b/a Adult Superstore

By: Tim Unblesee
~~James Egizi~~ Tim Unblesee

Its: [signature]

Dated: _______________, 2021

BIJOU – CENTURY, LLC
d/b/a New Century Theatre

By: ________________________
Joseph Carouba

Its: ________________________

Telephone: (510) 788-5100
Facsimile: (510) 291-3226
Co-Class Counsel for Plaintiffs

Dated: _________, 2021

Sommers Schwartz, P.C.
Jason J. Thompson (P47184)
jthompson@sommerspc.com
Co-Counsel for Plaintiffs
One Towne Square, Suite 1700
Southfield, MI 48076
(248) 355-0300
Co-Class Counsel for Plaintiffs

Dated: _________, 2021

Pitt McGehee Palmer & Rivers, P.C.
Megan A. Bonanni (P52079)
mbonanni@pittlawpc.com
117 West Fourth Street, Suite 200
Royal Oak, MI 48067
248-398-9800
Co-Class Counsel

Dated: _________, 2021

3610 BARNETT AVE., LLC
d/b/a Adult Superstore

By: ________________
James Egizi

Its: ________________

Dated: 6/28, 2021

BIJOU – CENTURY, LLC
d/b/a New Century Theatre

By: ________________
Joseph Carouba

Its: Managing Member

Telephone: (510) 788-5100
Facsimile: (510) 291-3226
Co-Class Counsel for Plaintiffs

Dated: ____________, 2021

Sommers Schwartz, P.C.
Jason J. Thompson (P47184)
jthompson@sommerspc.com
Co-Counsel for Plaintiffs
One Towne Square, Suite 1700
Southfield, MI 48076
(248) 355-0300
Co-Class Counsel for Plaintiffs

Dated: September 7, 2021

Pitt McGehee Palmer & Rivers, P.C.
Megan A. Bonanni (P52079)
mbonanni@pittlawpc.com
117 West Fourth Street, Suite 200
Royal Oak, MI 48067
248-398-9800
Co-Class Counsel

Dated: June 10, 2021

3610 BARNETT AVE., LLC
d/b/a Adult Superstore

By: Tim Unblesser
~~James Egizi~~ Tim Unclesser

Its: ____________

Dated: ____________, 2021

BIJOU – CENTURY, LLC
d/b/a New Century Theatre

By: ____________
Joseph Carouba

Its: ____________

Telephone: (510) 788-5100
Facsimile: (510) 291-3226
Co-Class Counsel for Plaintiffs

Dated: ______________, 2021

Sommers Schwartz, P.C.
Jason J. Thompson (P47184)
jthompson@sommerspc.com
Co-Counsel for Plaintiffs
One Towne Square, Suite 1700
Southfield, MI 48076
(248) 355-0300
Co-Class Counsel for Plaintiffs

Dated: Sep. 7, 2021

Pitt McGehee Palmer & Rivers, P.C.
Megan A. Bonanni (P52079)
mbonanni@pittlawpc.com
117 West Fourth Street, Suite 200
Royal Oak, MI 48067
248-398-9800
Co-Class Counsel

Dated: ______________, 2021

3610 BARNETT AVE., LLC
d/b/a Adult Superstore

By: ______________________
James Egizi

Its: ______________________

Dated: 6/28, 2021

BIJOU – CENTURY, LLC
d/b/a New Century Theatre

By: ______________________
Joseph Carouba

Its: Managing Member

Dated: ____________________, 2021

BT CALIFORNIA, LLC
d/b/a The Penthouse Club & Steakhouse

By: ________________________________
Joseph Carouba

Its: ________________________________

Dated: 6/9/ ________________, 2021

Cathay Entertainment, Inc.
d/b/a Deja Vu Showgirls

By: [signature]
Donald Krontz

Its: President

Dated: ____________________, 2021

Coldwater, LLC
d/b/a Deja Vu Showgirls

By: ________________________________
~~Donald Krontz~~

Its: ________________________________

Dated: ____________________, 2021

Chowder House, Inc.
d/b/a Hungry I

By: ________________________________
Joseph Carouba

Its: ________________________________

Dated: ____________________, 2021

Deja Vu – San Francisco, LLC
d/b/a Deja Vu Centerfolds

By: ________________________________
Joseph Carouba

Dated: ________________, 2021

BT CALIFORNIA, LLC
d/b/a The Penthouse Club & Steakhouse

By: ________________________________
Joseph Carouba

Its: ________________________________

Dated: ________________, 2021

Cathay Entertainment, Inc.
d/b/a Deja Vu Showgirls

By: ________________________________
Donald Krontz

Its: ________________________________

Dated: July 9, 2021

Coldwater, LLC
d/b/a Deja Vu Showgirls

By: [signature]
~~Donald Krontz~~
DOUGLAS C. MARKS

Its: President

Dated: ________________, 2021

Chowder House, Inc.
d/b/a Hungry I

By: ________________________________
Joseph Carouba

Its: ________________________________

Dated: ________________, 2021

Deja Vu – San Francisco, LLC
d/b/a Deja Vu Centerfolds

By: ________________________________
Joseph Carouba

Dated: 6/28, 2021

BT CALIFORNIA, LLC
d/b/a The Penthouse Club & Steakhouse

By: ______________________
Joseph Carouba

Its: Managing Member

Dated: ______________, 2021

Cathay Entertainment, Inc.
d/b/a Deja Vu Showgirls

By: ______________________
Donald Krontz

Its: ______________________

Dated: ______________, 2021

Coldwater, LLC
d/b/a Deja Vu Showgirls

By: ______________________
Donald Krontz

Its: ______________________

Dated: 6/28, 2021

Chowder House, Inc.
d/b/a Hungry I

By: ______________________
Joseph Carouba

Its: President

Dated: 6/28, 2021

Deja Vu – San Francisco, LLC
d/b/a Deja Vu Centerfolds

By: ______________________
Joseph Carouba

Its: ______________________________

Dated: ______________, 2021

Deja Vu Services, Inc.

By: ______________________________
Jason Mohney

Its: ______________________________

Dated: ______________, 2021

Deja Vu Showgirls – Sacramento, LLC
d/b/a Deja Vu Showgirls

By: ______________________________
Harry Mohney

Its: ______________________________

Dated: ______________, 2021

Deja Vu Showgirls of San Francisco, LLC
d/b/a Little Darlings of San Francisco

By: ______________________________
Joseph Carouba

Its: ______________________________

Dated: 6/9/, 2021

DV of LA, LLC
d/b/a Deja Vu of LA – Main St.

By: Donald Krontz
Donald Krontz

Its: Manager

Dated: ______________, 2021

EF5 Acquisitions Group, LLC
d/b/a Deja Vu Showgirls Torrance

By: ______________________________
Alan Minato

Its: ______________________________

Its: ______________________

Dated: ____________, 2021

Deja Vu Services, Inc.

By: ______________________
Jason Mohney

Its: ______________________

Dated: ____________, 2021

Deja Vu Showgirls – Sacramento, LLC
d/b/a Deja Vu Showgirls

By: ______________________
Harry Mohney

Its: ______________________

Dated: ____________, 2021

Deja Vu Showgirls of San Francisco, LLC
d/b/a Little Darlings of San Francisco

By: ______________________
Joseph Carouba

Its: ______________________

Dated: 6/9/21, 2021

DV of LA, LLC
d/b/a Deja Vu of LA Main St.

By: [signature]
Donald Krontz

Its: Manager

Dated: AUG 12, 2021

EF5 Acquisitions Group, LLC
d/b/a Deja Vu Showgirls Torrance

By: [signature]
Alan Minato

Its: MANAGING MEMBER

Its: ______________________

Dated: ____________, 2021

Deja Vu Services, Inc.

By: ______________________
Jason Mohney

Its: ______________________

Dated: ____________, 2021

Deja Vu Showgirls – Sacramento, LLC
d/b/a Deja Vu Showgirls

By: *Harry Mohney*
Harry Mohney

Its: *Shawn Holden*

Dated: *June 9*, 2021

Deja Vu Showgirls of San Francisco, LLC
d/b/a Little Darlings of San Francisco

By: ______________________
Joseph Carouba

Its: ______________________

Dated: ____________, 2021

DV of LA, LLC
d/b/a Deja Vu of LA – Main St.

By: ______________________
Donald Krontz

Its: ______________________

Dated: ____________, 2021

EF5 Acquisitions Group, LLC
d/b/a Deja Vu Showgirls Torrance

By: ______________________
Alan Minato

Its: ______________________

Its: ______________________________

Dated: 6/15______________, 2021

Deja Vu Services, Inc.

By: Jason Mohney______________________
Jason Mohney

Its: Pres______________________________

Dated: ________________, 2021

Deja Vu Showgirls – Sacramento, LLC
d/b/a Deja Vu Showgirls

By: ______________________________
Harry Mohney

Its: ______________________________

Dated: ________________, 2021

Deja Vu Showgirls of San Francisco, LLC
d/b/a Little Darlings of San Francisco

By: ______________________________
Joseph Carouba

Its: ______________________________

Dated: __________________, 2021

DV of LA, LLC
d/b/a Deja Vu of LA – Main St.

By: ______________________________
Donald Krontz

Its: ______________________________

Dated: __________________, 2021

EF5 Acquisitions Group, LLC
d/b/a Deja Vu Showgirls Torrance

By: ______________________________
Alan Minato

Its: ______________________________

Its: ______________________________

Dated: ________________, 2021

Deja Vu Services, Inc.

By: ______________________________
Jason Mohney

Its: ______________________________

Dated: ________________, 2021

Deja Vu Showgirls – Sacramento, LLC
d/b/a Deja Vu Showgirls

By: [signature]
Harry Mohney

Its: Manager

Dated: June 9, 2021

Deja Vu Showgirls of San Francisco, LLC
d/b/a Little Darlings of San Francisco

By: ______________________________
Joseph Carouba

Its: ______________________________

Dated: ________________, 2021

DV of LA, LLC
d/b/a Deja Vu of LA – Main St.

By: ______________________________
Donald Krontz

Its: ______________________________

Dated: ________________, 2021

EF5 Acquisitions Group, LLC
d/b/a Deja Vu Showgirls Torrance

By: ______________________________
Alan Minato

Its: ______________________________

Its: ______________________

Dated: ______________, 2021

Deja Vu Services, Inc.

By: ______________________
Jason Mohney

Its: ______________________

Dated: ______________, 2021

Deja Vu Showgirls – Sacramento, LLC
d/b/a Deja Vu Showgirls

By: ______________________
Harry Mohney

Its: ______________________

Dated: 6/28, 2021

Deja Vu Showgirls of San Francisco, LLC
d/b/a Little Darlings of San Francisco

By: [signature]
Joseph Carouba

Its: Managing Member

Dated: ______________, 2021

DV of LA, LLC
d/b/a Deja Vu of LA – Main St.

By: ______________________
Donald Krontz

Its: ______________________

Dated: ______________, 2021

EF5 Acquisitions Group, LLC
d/b/a Deja Vu Showgirls Torrance

By: ______________________
Alan Minato

Its: ______________________

Dated: ________________, 2021

Gold Club – SF, LLC
d/b/a Gold Club

By: ______________________________
Joseph Carouba

Its: ______________________________

Dated: ________________, 2021

Grapevine Entertainment, Inc.
d/b/a Deja Vu Showgirls

By: ______________________________
Christopher Krontz

Its: ______________________________

Dated: ________________, 2021

Harry Mohney

______________________________
Harry Mohney

Dated: ________________, 2021

Hollywood & Vine Club, LLC
d/b/a Deja Vu Showgirls

By: ______________________________
Donald Krontz

Its: ______________________________

Dated: June 10, 2021

Jolar Cinema of San Diego, Ltd.
d/b/a Jolar Cinema Showgirls

By: Tim Unglesbee
~~James Egizi~~

Its: ______________________________

Dated: ________________, 2021

LA Club Management, LLC

Dated: ________________, 2021

Gold Club – SF, LLC
d/b/a Gold Club

By: ______________________________
Joseph Carouba

Its: ______________________________

Dated: ________________, 2021

Grapevine Entertainment, Inc.
d/b/a Deja Vu Showgirls

By: ______________________________
Christopher Krontz

Its: ______________________________

Dated: ________________, 2021

Harry Mohney

______________________________
Harry Mohney

Dated: 6/9/, 2021

Hollywood & Vine Club, LLC
d/b/a Deja Vu Showgirls

By: [signature]
Donald Krontz

Its: Manager

Dated: ________________, 2021

Jolar Cinema of San Diego, Ltd.
d/b/a Jolar Cinema Showgirls

By: ______________________________
James Egizi

Its: ______________________________

Dated: 6/9/, 2021

LA Club Management, LLC

Dated: ________________, 2021

Gold Club – SF, LLC
d/b/a Gold Club

By: ______________________________
Joseph Carouba

Its: ______________________________

Dated: July 9________, 2021

Grapevine Entertainment, Inc.
d/b/a Deja Vu Showgirls

By: ______________________________
~~Christopher Krontz~~
DOUGLAS C. MARKS

Its: President

Dated: ________________, 2021

Harry Mohney

______________________________
Harry Mohney

Dated: ________________, 2021

Hollywood & Vine Club, LLC
d/b/a Deja Vu Showgirls

By: ______________________________
Donald Krontz

Its: ______________________________

Dated: ________________, 2021

Jolar Cinema of San Diego, Ltd.
d/b/a Jolar Cinema Showgirls

By: ______________________________
James Egizi

Its: ______________________________

Dated: ________________, 2021

LA Club Management, LLC

Dated: ____________________, 2021

Gold Club – SF, LLC
d/b/a Gold Club

By: ______________________________
Joseph Carouba

Its: ______________________________

Dated: ____________________, 2021

Grapevine Entertainment, Inc.
d/b/a Deja Vu Showgirls

By: ______________________________
Christopher Krontz

Its: ______________________________

Dated: June 9, 2021

Harry Mohney

______________________________
Harry Mohney

Dated: ____________________, 2021

Hollywood & Vine Club, LLC
d/b/a Deja Vu Showgirls

By: ______________________________
Donald Krontz

Its: ______________________________

Dated: ____________________, 2021

Jolar Cinema of San Diego, Ltd.
d/b/a Jolar Cinema Showgirls

By: ______________________________
James Egizi

Its: ______________________________

Dated: ____________________, 2021

LA Club Management, LLC



Jun 09 21, 12:39p HM (702) 489-6661 p.3

Dated: ____________________, 2021

Gold Club – SF, LLC
d/b/a Gold Club

By: ______________________________
Joseph Carouba

Its: ______________________________

Dated: ____________________, 2021

Grapevine Entertainment, Inc.
d/b/a Deja Vu Showgirls

By: ______________________________
Christopher Krontz

Its: ______________________________

Dated: June 9, 2021

Harry Mohney

______________________________
Harry Mohney

Dated: ____________________, 2021

Hollywood & Vine Club, LLC
d/b/a Deja Vu Showgirls

By: ______________________________
Donald Krontz

Its: ______________________________

Dated: ____________________, 2021

Jolar Cinema of San Diego, Ltd.
d/b/a Jolar Cinema Showgirls

By: ______________________________
James Egizi

Its: ______________________________

Dated: ____________________, 2021

LA Club Management, LLC

Dated: 6/28, 2021

Gold Club – SF, LLC
d/b/a Gold Club

By: [signature]
Joseph Carouba

Its: Operating Member

Dated: ____________, 2021

Grapevine Entertainment, Inc.
d/b/a Deja Vu Showgirls

By: ____________
Christopher Krontz

Its: ____________

Dated: ____________, 2021

Harry Mohney

____________
Harry Mohney

Dated: ____________, 2021

Hollywood & Vine Club, LLC
d/b/a Deja Vu Showgirls

By: ____________
Donald Krontz

Its: ____________

Dated: ____________, 2021

Jolar Cinema of San Diego, Ltd.
d/b/a Jolar Cinema Showgirls

By: ____________
James Egizi

Its: ____________

Dated: ____________, 2021

LA Club Management, LLC

By: Donald Krontz [signature]
Donald Krontz

Its: Manager

Dated: _______________, 2021

Nite Life East, LLC
d/b/a Little Darlings

By: ______________________
Jason Mohney

Its: ______________________

Dated: _______________, 2021

Pine Tree Assets, Inc.
F/K/A Deja Vu Consulting, Inc.

By: ______________________
Harry Mohney

Its: ______________________

Dated: _______________, 2021

S.A.W. Entertainment, Ltd.
d/b/a Hustler San Francisco and The Condor Club

By: ______________________
Joseph Carouba

Its: ______________________

Dated: _______________, 2021

San Francisco Garden of Eden, LLC
d/b/a Garden of Eden

By: ______________________
Joseph Carouba

Its: ______________________

By: ______________________________
Donald Krontz

Its: ______________________________

Dated: ______________, 2021

Nite Life East, LLC
d/b/a Little Darlings

By: ______________________________
Jason Mohney

Its: ______________________________

Dated: June 9, 2021

Pine Tree Assets, Inc.
F/K/A Deja Vu Consulting, Inc.

By: ______________________________
Harry Mohney

Its: ______________________________

Dated: ______________, 2021

S.A.W. Entertainment, Ltd.
d/b/a Hustler San Francisco and The Condor Club

By: ______________________________
Joseph Carouba

Its: ______________________________

Dated: ______________, 2021

San Francisco Garden of Eden, LLC
d/b/a Garden of Eden

By: ______________________________
Joseph Carouba

Its: ______________________________

By: ______________________
Donald Krontz

Its: ______________________

Dated: 6/15, 2021

Nite Life East, LLC
d/b/a Little Darlings

By: ______________________
Jason Mohney

Its: Manager

Dated: 6/16, 2021

Pine Tree Assets, Inc.
F/K/A Deja Vu Consulting, Inc.

By: ______________________
Harry Mohney

Its: ______________________

Dated: ________________, 2021

S.A.W. Entertainment, Ltd.
d/b/a Hustler San Francisco and The Condor Club

By: ______________________
Joseph Carouba

Its: ______________________

Dated: ________________, 2021

San Francisco Garden of Eden, LLC
d/b/a Garden of Eden

By: ______________________
Joseph Carouba

Its: ______________________

By: ______________________________
Donald Krontz

Its: ______________________________

Dated: ________________, 2021

Nite Life East, LLC
d/b/a Little Darlings

By: ______________________________
Jason Mohney

Its: ______________________________

Dated: June 9, 2021

Pine Tree Assets, Inc.
F/K/A Deja Vu Consulting, Inc.

By: ______________________________
Harry Mohney

Its: ______________________________

Dated: ________________, 2021

S.A.W. Entertainment, Ltd.
d/b/a Hustler San Francisco and The Condor Club

By: ______________________________
Joseph Carouba

Its: ______________________________

Dated: ________________, 2021

San Francisco Garden of Eden, LLC
d/b/a Garden of Eden

By: ______________________________
Joseph Carouba

Its: ______________________________



Jun 09 21, 12:39p HM (702) 489-6661 p.5

By: ______________________
Donald Krontz

Its: ______________________

Dated: ______________, 2021

Nite Life East, LLC
d/b/a Little Darlings

By: ______________________
Jason Mohney

Its: ______________________

Dated: ______________, 2021

Pine Tree Assets, Inc.
F/K/A Deja Vu Consulting, Inc.

By: ______________________
Harry Mohney

Its: ______________________

Dated: 6/28, 2021

S.A.W. Entertainment, Ltd.
d/b/a Hustler San Francisco and The Condor Club

By: [signature]
Joseph Carouba

Its: PRESIDENT

Dated: 6/28, 2021

San Francisco Garden of Eden, LLC
d/b/a Garden of Eden

By: [signature]
Joseph Carouba

Its: OPERATING MEMBER

Dated: ____________________, 2021

San Francisco Roaring 20's, LLC
d/b/a Roaring 20's

By: ______________________________
Joseph Carouba

Its: ______________________________

Dated: ____________________, 2021

SFBSC Management, LLC

By: ______________________________
Joseph Carouba

Its: ______________________________

Dated: 6/9/, 2021

Showgirls of San Diego, Inc.
d/b/a Deja Vu Showgirls

By: ______________________________
Donald Krontz

Its: President

Dated: 6/9/, 2021

Stockton Enterprises, LLC
d/b/a Deja Vu Showgirls

By: ______________________________
Donald Krontz

Its: Manager

Dated: ____________________, 2021

Torrance Food & Beverage, LLC

By: ______________________________
Alan Minato

Its: ______________________________

Dated: 6/28, 2021

San Francisco Roaring 20's, LLC
d/b/a Roaring 20's

By: [signature]
Joseph Carouba

Its: Managing Member

Dated: 6/28, 2021

SFBSC Management, LLC

By: [signature]
Joseph Carouba

Its: Managing Member

Dated: ______________, 2021

Showgirls of San Diego, Inc.
d/b/a Deja Vu Showgirls

By: ______________________
Donald Krontz

Its: ______________________

Dated: ______________, 2021

Stockton Enterprises, LLC
d/b/a Deja Vu Showgirls

By: ______________________
Donald Krontz

Its: ______________________

Dated: ______________, 2021

Torrance Food & Beverage, LLC

By: ______________________
Alan Minato

Its: ______________________

Dated: 6/28, 2021

San Francisco Roaring 20's, LLC
d/b/a Roaring 20's

By: [signature]
Joseph Carouba

Its: managing member

Dated: 6/28/, 2021

SFBSC Management, LLC

By: [signature]
Joseph Carouba

Its: managing member

Dated: ______, 2021

Showgirls of San Diego, Inc.
d/b/a Deja Vu Showgirls

By: ______
Donald Krontz

Its: ______

Dated: ______, 2021

Stockton Enterprises, LLC
d/b/a Deja Vu Showgirls

By: ______
Donald Krontz

Its: ______

Dated: AUG 12, 2021

Torrance Food & Beverage, LLC

By: [signature]
Alan Minato

Its: MANAGING MEMBER

Dated: _______________, 2021

_______________________________
SFBSC Jane Roe 1

Dated: _______________, 2021

Jane Roe 3 (Jun 7, 2021 11:54 PDT)
_______________________________
SFBSC Jane Roe 3

Dated: _______________, 2021

_______________________________
San Diego Jane Roe 1

Dated: _______________, 2021

_______________________________
San Diego Jane Roe 2

Dated: ________________, 2021

Jane Roe 1 (Jun 7, 2021 11:37 PDT)

SFBSC Jane Roe 1

Dated: ________________, 2021

SFBSC Jane Roe 3

Dated: ________________, 2021

San Diego Jane Roe 1

Dated: ________________, 2021

San Diego Jane Roe 2

DocuSign Envelope ID: 1EF0220E-D7A3-4A01-BCF1-96916651C2E0

Dated: _______________, 2021

SFBSC Jane Roe 1

Dated: _______________, 2021

SFBSC Jane Roe 3

Dated: 6/17/2021, 2021

DocuSigned by:

1A4EE201A7CF442...

San Diego Jane Roe 2

Dated: _______________, 2021

San Diego Jane Roe 1

DocuSign Envelope ID: 3BC04D34-773C-4C3E-A522-E8AC81B7A0E2

Dated:________________, 2021

______________________________
SFBSC Jane Roe 1

Dated:________________, 2021

______________________________
SFBSC Jane Roe 3

Dated:____________________, 2021

DocuSigned by:
Jane Roe 1
A75B700878A244A...
San Diego Jane Roe 1

Dated:________________, 2021

______________________________
San Diego Jane Roe 2

# Exhibit A

# LIST OF DEFENDANT ENTITIES INVOLVED IN THIS SETTLEMENT

**AFFILIATED COMPANIES**

| | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| DEJA VU SERVICES, INC. | 8252 E. LANSING ROAD | DURAND | MICHIGAN | 48429 |
| LA CLUB MANAGEMENT, LLC | 8252 E. LANSING ROAD | DURAND | MICHIGAN | 48429 |
| PINE TREE ASSETS, INC., F/K/A DEJA VU CONSULTING, INC. | 8252 E. LANSING ROAD | DURAND | MICHIGAN | 48429 |
| SFBSC MANAGEMENT, LLC | 250 COLUMBUS AVE, SUITE 207 | SAN FRANCISCO | CALIFORNIA | 94133 |
| TORRANCE FOOD & BEVERAGE, LLC | 8252 E. LANSING ROAD | DURAND | MICHIGAN | 48429 |
| WORLDWIDE PROMOTIONS, LLC | 8252 E. LANSING ROAD | DURAND | MICHIGAN | 48429 |

**THE "SAN FRANCISCO CLUBS"**

| "CLASS PERIOD": 08-08-2010 TO 11-16-2018 | DOING BUSINESS AS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|
| B.T. CALIFORNIA, LLC | THE PENTHOUSE CLUB & STEAKHOUSE | 412 BROADWAY | SAN FRANCISCO | CALIFORNIA | 94133 |
| BIJOU - CENTURY, LLC | NEW CENTURY THEATRE | 816 LARKING ST | SAN FRANCISCO | CALIFORNIA | 94109 |
| CHOWDER HOUSE, INC. | HUNGRY I | 546 BROADWAY | SAN FRANCISCO | CALIFORNIA | 94133 |
| DEJA VU - SAN FRANCISCO, LLC | DEJA VU CENTERFOLDS | 391 BROADWAY | SAN FRANCISCO | CALIFORNIA | 94133 |
| DEJA VU SHOWGIRLS OF SAN FRANCISCO, LLC | LITTLE DARLINGS OF SAN FRANCISCO | 312 COLUMBUS AVE | SAN FRANCISCO | CALIFORNIA | 94133 |
| GOLD CLUB - SF, LLC | GOLD CLUB | 650 HOWARD ST | SAN FRANCISCO | CALIFORNIA | 94105 |
| S.A.W. ENTERTAINMENT, LTD. | LARRY FLYNT'S HUSTLER CLUB | 1031 KEARNY ST | SAN FRANCISCO | CALIFORNIA | 94133 |
| S.A.W. ENTERTAINMENT, LTD. -- CONDOR CLUB | CONDOR CLUB | 300 COLUMBUS AVE. | SAN FRANCISCO | CALIFORNIA | 94133 |
| SAN FRANCISCO - GARDEN OF EDEN, LLC | GARDEN OF EDEN | 529 BROADWAY | SAN FRANCISCO | CALIFORNIA | 94133 |
| SAN FRANCISCO - ROARING 20'S, LLC | ROARING 20'S | 552 BROADWAY | SAN FRANCISCO | CALIFORNIA | 94133 |

**THE "GREATER CALIFORNIA CLUBS"**

| "CLASS PERIOD": 02-08-2017 TO 11-16-2018 | DOING BUSINESS AS | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|
| 3610 BARNETT AVE., LLC | ADULT SUPERSTORE | 3610 BARNETT AVE. | SAN DIEGO | CALIFORNIA | 92110 |
| CATHAY ENTERTAINMENT, INC. | DÉJÀ VU SHOWGIRLS | 16025 GALE AVE, STE A11-A12 | CITY OF INDUSTRY | CALIFORNIA | 91745 |
| COLDWATER, LLC | DÉJÀ VU SHOWGIRLS | 7350 COLDWATER CANYON | N. HOLLYWOOD | CALIFORNIA | 91605 |
| DEJA VU SHOWGIRLS - SACRAMENTO, LLC | DEJA VU SHOWGIRLS | 11252 TRADE CENTER DR | RANCHO CORDOVA | CALIFORNIA | 95742 |
| DV of LA, LLC | DEJA VU OF LA - MAIN ST. | 1800 S. MAIN ST | LOS ANGELES | CALIFORNIA | 90015 |
| EF5 ACQUISITIONS GROUP, LLC | DEJA VU SHOWGIRLS | 20320 HAMILTON AVE | TORRENCE | CALIFORNIA | 90502 |
| GRAPEVINE ENTERTAINMENT, INC. | DÉJÀ VU SHOWGIRLS | 1524 GOLDEN STATE HWY | BAKERSFIELD | CALIFORNIA | 93301 |
| HOLLYWOOD & VINE CLUB, LLC | DEJA VU SHOWGIRLS | 6315 HOLLYWOOD BLVD | LOS ANGELES | CALIFORNIA | 90028 |
| JOLAR CINEMA OF SAN DIEGO, LTD | JOLAR CINEMA | 6321 UNIVERSITY AVE | SAN DIEGO | CALIFORNIA | 92115 |
| NITE LIFE EAST, LLC | LITTLE DARLINGS | 8290 BROADWAY | LEMON GROVE | CALIFORNIA | 91945 |
| SHOWGIRLS OF SAN DIEGO INC | DÉJÀ VU SHOWGIRLS | 2720 MIDWAY DR | SAN DIEGO | CALIFORNIA | 92110 |
| STOCKTON ENTERPRISES, LLC | DÉJÀ VU SHOWGIRLS | 4206 WEST LANE | STOCKTON | CALIFORNIA | 95204 |

# Exhibit B

THE TIDRICK LAW FIRM
STEVEN G. TIDRICK, SBN 224760
JOEL B. YOUNG, SBN 236662
2039 Shattuck Avenue, Suite 308
Berkeley, California 94704
Telephone: (510) 788-5100
Facsimile: (510) 291-3226
E-mail: sgt@tidricklaw.com
E-mail: jby@tidricklaw.com

Attorneys for Plaintiffs JANE ROES 1-3 *et al.*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE ROES 1-3 *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>SFBSC MANAGEMENT, LLC; CHOWDER HOUSE, INC.; DEJA VU - SAN FRANCISCO, LLC; ROARING 20'S, LLC; GARDEN OF EDEN, LLC; S.A.W. ENTERTAINMENT LIMITED; DEJA VU SHOWGIRLS OF SAN FRANCISCO, LLC; GOLD CLUB - S.F., LLC; MARKET ST. CINEMA, LLC; BIJOU - CENTURY, LLC; BT CALIFORNIA, LLC; and DOES 1-200,<br><br>Defendants. | Civil Case No. 14-cv-03616-LB<br><br>**SECOND AMENDED COLLECTIVE AND CLASS ACTION COMPLAINT FOR SETTLEMENT FOR VIOLATIONS AND/OR RECOVERY OF:**<br>**(1) FAIR LABOR STANDARDS ACT;**<br>**(2) CALIFORNIA LABOR CODE;**<br>**(3) SAN FRANCISCO ADMINISTRATIVE CODE;**<br>**(4) CALIFORNIA INDUSTRIAL WELFARE COMMISSION WAGE ORDERS;**<br>**(5) CALIFORNIA'S UNFAIR COMPETITION ACT, BUS. & PROF. CODE §§ 17200 *et seq.*; and**<br>**(6) PENALTIES UNDER THE LABOR CODE PRIVATE ATTORNEYS GENERAL ACT OF 2004, CALIFORNIA LABOR CODE § 2699(a),(f) ("PAGA" CLAIMS)**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiffs Jane Roes 1 and 3 (collectively "Plaintiffs") allege as follows:

## I. NATURE OF THE CASE

1. Plaintiffs each formerly worked for SFBSC Management, LLC ("Defendant") as an "exotic dancer." As described in more detail below, Plaintiffs specified herein seek to represent classes consisting of all individuals who, during the relevant class periods, have worked as exotic dancers at nightclubs in California that Defendant has operated and controlled, and where Defendant has dictated employment policies. All class members have

been denied fundamental rights under federal, state, and local wage and hour laws in a similar and uniform way. Defendant has misclassified Plaintiffs and class members as independent contractors, as opposed to employees, at all times when they have worked as exotic dancers. Defendant has failed to pay Plaintiffs and class members the minimum wages and other benefits to which they were entitled under the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, the California Labor Code, California Industrial Welfare Commission Wage Orders, and the San Francisco Minimum Wage Ordinance ("SFMWO"). Additionally, Defendant has engaged in unlawful tip-splitting by requiring Plaintiffs and class members, who receive gratuities from customers, to split and share those gratuities with Defendant, its Nightclubs, and its other workers, such as managers, doormen, and disc jockeys (DJs). This collective and class action seeks damages, back pay, restitution, liquidated damages, applicable civil penalties, prejudgment interest, reasonable attorneys' fees and costs, civil penalties, declaratory and injunctive relief, and all other relief that the Court deems just, reasonable, and equitable. This action is also prosecuted under the Labor Code Private Attorneys General Act of 2004, California Labor Code § 2698 *et seq*. ("PAGA"), individually and on behalf of others who currently and formerly have worked for Defendant as exotic dancers, to recover civil penalties for Defendant's violations of law, pursuant to the procedures in Labor Code § 2699.3.

## II. JURISDICTION AND VENUE

2. The FLSA authorizes private rights of action to recover damages for violations of the FLSA's wage and hour provisions. 29 U.S.C. § 216(b). This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the California state law claims because they are so related to this action that they form part of the same case or controversy under Article III of the United States Constitution.

3. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391 because all of the actions alleged herein occurred within the Northern District of California.

4. Intradistrict Assignment. The events set forth in this Complaint occurred within

the City and County of San Francisco, and it is therefore properly assigned to the San Francisco or Oakland division of this Court pursuant to Civil Local Rule 3-2(c) and (d).

## III. PARTIES

5. Plaintiff Jane Roe No. 1 ("Roe No. 1") worked as an exotic dancer for Defendant in San Francisco, California during the class period and is a member of the proposed class. Like other class members, when Roe No. 1 worked in that capacity, she was: (1) misclassified as an independent contractor, and as a result was not paid any wages (or provided other benefits and rights) to which she was entitled as an employee; and (2) required to split tip income as described more fully below. Roe No. 1 sues on her own behalf, as a proposed class representative on behalf of similarly situated individuals, and as a PAGA representative plaintiff on behalf of other current and former employees. She sues under a fictitious name, Jane Roe No. 1, due to the highly sensitive and personal nature of the details about Plaintiffs in this action, and for additional reasons described below.

6. Plaintiff Jane Roe No. 3 ("Roe No. 3") worked as an exotic dancer for Defendant in San Francisco, California during the class period and is a member of the proposed class. Like other class members, when Roe No. 3 worked in that capacity, she was: (1) misclassified as an independent contractor, and as a result was not paid any wages (or provided other benefits and rights) to which she was entitled as an employee; and (2) required to split tip income as described more fully below. Roe No. 3 sues on her own behalf, as a proposed class representative on behalf of similarly situated individuals, and as a PAGA representative plaintiff on behalf of other current and former employees. She sues under a fictitious name, Jane Roe No. 3, due to the highly sensitive and personal nature of the details about Plaintiffs in this action, and for additional reasons described below.

7. Plaintiffs sue under fictitious names due to the highly sensitive and personal nature of the details about Plaintiffs in this action and because (1) there is a significant social stigma associated with the nude and semi-nude "dancing" that exotic dancers, also known as "strippers," perform; (2) there are risks inherent in working as an exotic dancer, including risk of injury by current or former customers of Defendant if an exotic dancer's name or address is

disclosed; (3) Plaintiffs would be hesistant to maintain this action enforcing fundamental employee rights if their names were to be forever associated with Defendant's Nightclubs, which could affect their prospects for future employment by others; and (4) Plaintiffs wish to protect their rights to privacy. Plaintiffs' concerns are reasonable and justified. At the Nightclubs, it is customary for the exotic dancers to use pseudonyms or stage names for privacy and personal safety reasons. *See generally Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067-1068 (9th Cir. 2000) ("In this circuit, we allow parties to use pseudonyms in the 'unusual case' when nondisclosure of the party's identity 'is necessary . . . to protect a person from harassment, injury, ridicule or personal embarrassment.' . . . We join our sister circuits and hold that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity.").

8. Plaintiffs have filed Consents to Become Party Plaintiff executed by similarly situated individuals, and intend to file additional consents as they are secured. Many similarly situated individuals, however, will be afraid to join the lawsuit as party plaintiffs because of reasonable fears relating to privacy, personal safety, and/or the potential for retaliation. In order to allow them to pursue their rights under the FLSA without jeopardizing their privacy, personal safety, or income, Plaintiffs pray that the Court permit party plaintiffs to keep their names and addresses concealed. *See generally Does I thru XXIII*, 214 F.3d at 1071 ("complaining employees are more effectively protected from retaliation by concealing their identities than by relying on the deterrent effect of *post hoc* remedies under FLSA's anti-retaliation provision").

9. Defendant SFBSC Management, LLC maintains ownership, recruitment, and/or operational interests in various nightclubs featuring nude or semi-nude dancing in California, including but not limited to nightclubs doing business as Hungry I, Centerfolds (also known as DejaVu Centerfolds San Francisco), Roaring 20's, Garden of Eden, Larry Flynt's Hustler Club (also known as Larry Flynt's World Famous Hustler Club San Francisco), Little Darlings, Gold Club, Market Street Cinema (which was also known as

MSC), New Century, The Penthouse Club (formerly known as Showgirls or Broadway Showgirls Cabaret), and Condor Gentlemen's Club (also known as The Condor Club) (collectively, the "Nightclubs").

10. Defendant Chowder House, Inc. ("Hungry I") operates a nightclub featuring nude or semi-nude dancing in San Francisco, California, doing business as, including without limitation, Hungry I.

11. Defendant Deja Vu – San Francisco, LLC ("Centerfolds") operates a nightclub featuring nude or semi-nude dancing in San Francisco, California, doing business as, including without limitation: (a) Centerfolds; (b) DejaVu Centerfolds San Francisco; and (c) DejaVu Centerfolds San Francisco.

12. Defendant Roaring 20's, LLC ("Roaring 20's") operates a nightclub featuring nude or semi-nude dancing in San Francisco, California, doing business as, including without limitation: (a) Roaring 20's; (b) Roaring 20s; (c) Roaring 20's San Francisco; (d) Roaring 20s SF; and (e) San Francisco Roaring 20's.

13. Defendant Garden of Eden, LLC ("Garden of Eden") operates a nightclub featuring nude or semi-nude dancing in San Francisco, California, doing business as, including without limitation: (a) Garden of Eden; (b) Garden of Eden San Francisco; (c) San Francisco Garden of Eden; and (d) Garden of Eden SF.

14. Defendant S.A.W. Entertainment Limited ("S.A.W. Entertainment") operates a nightclub featuring nude or semi-nude dancing in San Francisco, California, doing business as, including without limitation: (a) Larry Flynt's Hustler Club; (b) Larry Flynt's World Famous Hustler Club; and (c) Larry Flynt's World Famous Hustler Club San Francisco.

15. Defendant Deja Vu Showgirls of San Francisco, LLC ("Little Darlings") operates a nightclub featuring nude or semi-nude dancing in San Francisco, California, doing business as, including without limitation: (a) Little Darlings; (b) Little Darlings San Francisco; (c) Temptations/Little Darlings; (d) Temptations; and (d) Deja Vu Showgirls of San Francisco.

16. Defendant Gold Club - S.F., LLC ("Gold Club") operates a nightclub featuring

nude or semi-nude dancing in San Francisco, California, doing business as, including without limitation: (a) The Gold Club San Francisco; (b) Gold Club SF; (c) GoldClub [sic] SF; (d) Gold Club SF, LLC; (e) Gold Club-SF, LLC; (f) GOLD CLUB; and (g) Gold Club San Francisco.

17. Defendant Market St. Cinema, LLC ("Market Street Cinema") operates a nightclub featuring nude or semi-nude dancing in San Francisco, California, doing business as, including without limitation: (a) Market Street Cinema; (b) Market St. Cinema; and (c) MSC.

18. Defendant Bijou - Century, LLC ("New Century") operates a nightclub featuring nude or semi-nude dancing in San Francisco, California, doing business as, including without limitation: (a) Century Theatre; and (b) New Century.

19. Defendant BT California, LLC ("The Penthouse Club") operates a nightclub featuring nude or semi-nude dancing in San Francisco, California, doing business as, including without limitation: (a) The Penthouse Club; (b) Showgirls; (c) Broadway Showgirls Cabaret; and (d) Broadway Showgirls.

20. Defendant S.A.W. Entertainment Limited ("S.A.W. Entertainment") operates a nightclub featuring nude or semi-nude dancing in San Francisco, California, doing business as, including without limitation: (a) Condor; (b) Condor Gentlemen's Club; (c) The Condor Club; and (d) Condor Club San Francisco; (e) The Condor Night Club; (f) The Condor; and (g) Condor SF.

21. The following Defendants are referred to herein as the "Nightclub Defendants": Defendant Chowder House, Inc., Defendant Deja Vu – San Francisco, LLC, Defendant Roaring 20's, LLC, Defendant Garden of Eden, LLC, Defendant S.A.W. Entertainment Limited, Defendant Deja Vu Showgirls of San Francisco, LLC, Defendant Gold Club - S.F., LLC, Defendant Market St. Cinema, LLC, Defendant Bijou - Century, LLC, and Defendant BT California, LLC.

22. The true names and capacities, whether individual, corporate, associate or otherwise, of each of the Defendants designated herein as DOES are unknown to Plaintiffs at

this time and therefore said Defendants are sued by such fictitious names. Plaintiffs will amend this Complaint to show their true names and capacities when ascertained. Plaintiffs are informed and believe and thereon allege that each Defendant designated herein as a DOE defendant is legally responsible in some manner for the events and happenings herein alleged and in such manner proximately caused damages to Plaintiffs as hereinafter further alleged.

23. Plaintiffs are informed and believe and thereon allege that each of the Defendants was acting as the agent, employee, partner, or servant of each of the remaining Defendants and was acting within the course and scope of that relationship, and gave consent to, ratified, and authorized the acts alleged herein to each of the remaining Defendants.

24. On information and belief, Plaintiffs anticipate naming, and possibly substituting, additional business entities or individuals because Defendant owns, operates, and/or controls local nightclubs while maintaining shell corporations and/or sham agreements to create the appearance that it does not have ownership and/or control of the nightclubs.

## IV. <u>GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS</u>

25. Each of the Nightclubs is controlled by senior management of Defendant, whose management controls the employment status, classification, and treatment of exotic dancers. Each Nightclub has a distinct business location where Defendant operates and conducts business with the public. Employees, executives, and officers of Defendant make corporate decisions and execute contractual agreements and legal documents on behalf of the Nightclubs, and otherwise control operations of the Nightclubs. Moreover, the Nightclubs share with Defendant certain officers, directors, managers, and employees, who control material matters pertinent to the exotic dancers' work at the Nightclubs.

26. At all relevant times Defendant employed and/or jointly employed all exotic dancers working in the Nightclubs, and managed, directed and controlled the exotic dancers in each Nightclub, including but not limited to the following policies, practices, and decisions: (1) to misclassify exotic dancers as independent contractors, as opposed to employees; (2) to require that exotic dancers split their table dance tips with Nightclubs; (3) to require that exotic dancers further split their table dance tips with Nightclubs' managers, doormen, floor

walkers, DJs and other workers who do not usually receive tips, by paying "tip-outs;" (4) to not pay exotic dancers any wages; (5) to demand improper and unlawful payments from exotic dancers; (6) to adopt and implement employment policies which violate the FLSA, California Labor Code, California Business & Professions Code §§ 17200 *et seq.* (the "UCL"), and SFMWO; and/or (7) to threaten retaliation against any exotic dancer attempting to assert her statutory rights to be classified as an employee. Defendant and its principals created the uniform business model employed at each Nightclub regarding exotic dancer classification and tip splitting and require that it continue to be employed.

27. Defendant has agreed and conspired with others unlawfully: (1) to misclassify exotic dancers as independent contractors, as opposed to employees at each Nightclub; (2) to require that exotic dancers split their table dance tips with Nightclubs; (3) to require that exotic dancers split their table dance tips with Defendant's managers, doormen, floor walkers, DJs and other workers who do not usually receive tips, by paying "tip-outs;" (4) not pay exotic dancers any wages; (5) demand improper and unlawful payments from exotic dancers; (6) adopt and implement employment policies and practices that violate the FLSA, the California Labor Code, the UCL, the SFMWO, and/or other laws; and/or (7) threaten retaliation against any exotic dancer attempting to assert her statutory rights to be treated as an employee. The unlawful agreements in the enterprise were entered into in California as part of a strategy to maximize the revenues and profits Defendant and its co-conspirators by disregarding applicable wage and hour laws and engaging in the other unlawful conduct described. The agreements were made when the Nightclubs were formed, began operations, and/or when Defendant undertook to manage, direct, and operate the Nightclubs.

28. At all relevant times, Defendant has owned and operated nightclub businesses (the Nightclubs) engaged in interstate commerce and utilizing goods that have moved in interstate commerce. For example, goods sold at the Nightclubs are moved in interstate commerce. Defendant owns, manages and/or controls the business operations at numerous Nightclubs. During the relevant time period, the annual gross revenues of Defendant have exceeded $500,000 per year.

29. The foregoing facts demonstrate that Defendant, along with its Nightclubs and the persons who directly and indirectly hold ownership interest in and/or control those entities, were at all relevant times an "enterprise engaged in commerce" as defined in 29 U.S.C. §203(r) and §203(s). Defendant, its Nightclubs, and the owners and operators constitute an "enterprise" within the meaning of 29 U.S.C. §203(r)(1), because they perform "related activities" through a "unified operation" exercising "common control" for a "common business purpose." At relevant times, Plaintiffs and class members were jointly employed by Defendant's enterprise engaged in commerce within the meaning of 29 U.S.C. §206(a) and §207(a).

30. Defendant controls the adult entertainment industry in the San Francisco area, inasmuch as it operates approximately 11 of the 17 adult nightclubs in the City, and operates all but one of the large nightclubs. Further, because Defendant has increasing control of this industry in San Francisco, and because of the concomitantly diminishing alternatives that exotic dancers have for such work, Defendant has the economic power to prohibit exotic dancers from engaging in collective bargaining – or from bargaining at all – and requires exotic dancers to work under illegal and unconscionable terms.

31. The FLSA, the California Labor Code, and the SFMWO applied to the class members when they worked at the Nightclubs. No exceptions to the application of the FLSA, the California Labor Code, and/or the SFMWO apply to Plaintiffs and the class. The exotic dancing performed by class members while working at the Nightclubs does not require invention, imagination, or talent in a recognized field of artistic endeavor, and class members have never been compensated by Defendant on a set salary, wage, or fee basis. Rather, class members' sole source of income while working at the Nightclubs has been a portion of tips given to them by customers (*e.g.*, table dance tips and stage dance tips).

32. At relevant times, Plaintiffs and class members are or were employees of Defendant under the FLSA, the California Labor Code, and the SFMWO, but misclassified as independent contractors. During the relevant time period, over 500 women have worked as exotic dancers at Defendant's Nightclubs without being paid any minimum wages, and have

been denied other rights and benefits of employees. Each of Defendant's Nightclubs averages approximately 30 to 40 class members working on any given day.

33. At relevant times, Defendant has been the employer of Plaintiffs and class members under the FLSA, the California Labor Code, and SFMWO. Defendant suffered or permitted class members to work. Defendant has directly or indirectly employed, and exercised significant control over the wages, hours, and working conditions of, Plaintiffs and class members.

34. At all relevant times, Defendant has been a joint employer of Plaintiffs and class members under the FLSA, the California Labor Code, and SFMWO. Plaintiffs' and class members' employment by Defendant is not completely disassociated from employment by others. Defendant does not act entirely independently of others and is not completely dissociated with respect to the employment of Plaintiffs and the class members. Defendant maintains significant control over the work performed at the Nightclubs by Plaintiffs and class members. Defendant plays significant roles in establishing, maintaining, and directing the employment policies that are applied to class members. Defendant benefits financially from the work that class members perform at the Nightclubs. Additionally, the joint employers have acted directly or indirectly in their joint interests in relation to supervision over, and control of, Plaintiffs and class members. As a joint employer of Plaintiffs and class members, Defendant is responsible both individually and jointly for compliance with all applicable provisions of the FLSA, the California Labor Code, and/or the SFMWO.

35. During the relevant time period, the employment terms, conditions, and policies that applied to Plaintiffs were the same as those applied to the other class members who worked as exotic dancers at Defendant's Nightclubs.

36. Throughout the relevant time period, Defendant's policies and procedures regarding the classification of all exotic dancers (including Plaintiffs) at its Nightclubs and treatment of dance tips were the same in all material respects. As a matter of uniform policy, Defendant has systematically misclassified Plaintiffs and all class members as independent contractors, as opposed to employees. Defendant's classification of Plaintiffs and class

members as independent contractors was not due to any unique factor related to the exotic dancers' employment by or relationship with Defendant. Rather, as a matter of its uniform business policy, Defendant has routinely misclassified all exotic dancers as independent contractors as opposed to employees. All of Defendant's Nightclubs have used the same or materially identical purported contract attempting to classify exotic dancers as independent contractors and confirming these uniform employment policies and procedures. As a result of this uniform practice of misclassification, Plaintiffs and the class members have not been paid the minimum wages under the FLSA, the California Labor Code, and/or the SFMWO, and have been deprived of other statutory rights and benefits. Therefore, they have suffered harm, injury, and have incurred financial loss.

37. Plaintiffs and class members have incurred financial loss, injury, and damage as a result of Defendant's common policies and practices of misclassifying them as independent contractors and failing to pay them minimum wages in addition to the tips that they were given by customers. The named Plaintiffs' injuries and financial losses have been caused by Defendant's application of those common policies and practices in the same manner as Defendant has applied them to absent class members.

38. During the relevant time period, no class member has received any wages or other compensation from Defendant. Members of the class have generated income solely through tips received from customers when they have performed exotic table, chair, couch, lap, and/or VIP room "dances" (hereinafter collectively referred to as "table dance tips").

39. All monies that class members such as Plaintiffs have received from customers when they performed "dances" were tips, not wages or service fees. Tips belong to the person to whom they are given. Table dance tips were given by customers directly to the class members and therefore belong to the class members, not Defendant.

40. The full amount that class members are given by customers for exotic "dances" they perform are not taken into Defendant's gross receipts with a portion paid out to the exotic dancers. Defendant does not issue W-2 forms, 1099 forms, or any other documentation to class members indicating any amounts paid from gross receipts to class members as wages.

41. Plaintiffs and class members are tipped employees as they are engaged in an occupation in which they customarily and regularly receive more than $30 a month in tips. No tip credits offsetting any minimum wages due, however, are permitted. *See* California Labor Code § 351. Therefore, as employees of Defendant, class members are entitled (i) to receive the full minimum wages due under the California Labor Code and/or the SFMWO, without any tip credit, and (ii) to retain the full amount of any table dance tips and monies given to them by customers when they perform exotic "dances."

42. Defendant's misclassification of Plaintiffs and class members as independent contractors was designed to deny class members their fundamental rights as employees to receive minimum wages, to demand and retain portions of tips given to class member by customers, and done to enhance Defendant's profits at the expense of the class.

43. Defendant's misclassification of Plaintiffs and class members was willful. Defendant knew or should have known that Plaintiffs and class members performing the "exotic dancing" job functions were improperly misclassified as independent contractors.

44. Employment is defined with "striking breadth" in the wage and hour laws. *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 325-26, 112 S.Ct. 1344, 1349-50 (1992). The determining factors as to whether exotic dancers such as Plaintiffs are employees or independent contractors under the FLSA or the California Labor Code are not the exotic dancer's purported "election," any subjective intent, or any purported contract. *See, e.g., Rutherford Food Corp. v. McComb*, 331 U.S. 722, 726-29 (1947); *Real v. Driscoll Strawberry Associates, Inc.*, 603 F.2d 784, 754-55 (9th Cir. 1979); *S.G. Borello & Sons, Inc. v. Dep't of Industrial Relations*, 48 Cal. 3d 341, 356-57 & n.7 (1989). Rather, the test for determining whether an individual is an "employee" under the FLSA is the economic reality test. Under that test, employee status turns on whether the individual is, as a matter of economic reality, in business for herself and truly independent, or rather is economically dependent upon finding employment by others.

45. Any purported contract that Defendant may impose in an attempt to have workers in the class waive, limit or abridge their statutory rights to be treated as employees

under the FLSA, the California Labor Code, and/or the SFMWO is void, unenforceable, unconscionable, and contrary to public policy. Workers in the class cannot validly "elect" or "choose" between being treated as employees or independent contractors under threat of adverse treatment. Nor can workers in the class agree to be paid less than the minimum wage.

46. Despite this, Defendant unfairly, unlawfully, fraudulently, and unconscionably has attempted to coerce class members to waive their rights under the FLSA, the California Labor Code, and/or the SFMWO and "elect" to be treated as independent contractors. Defendant threatens to penalize and discriminate against exotic dancers and/or potential exotic dancers if they assert their rights under the FLSA, the California Labor Code, and/or the SFMWO, such as through termination, confiscation of all table dance tips, and other adverse decisions, conditions, and retaliations. Any actual or threatened retaliation against an employee for the assertion of wage and hour law claims violates the state's fundamental public policy to protect the payment of wages and employees' rights.

47. Under the applicable test, courts utilize several factors to determine economic dependence and employment status. They include the following: (i) the degree of control exercised by the alleged employer, (ii) the relative investments of the alleged employer and employee, (iii) the degree to which the employee's opportunity for profit and loss is determined by the employer, (iv) the skill and initiative required in performing the job, (v) the permanency of the relationship, and (vi) the degree to which the alleged employee's tasks are integral to the employer's business.

48. The totality of circumstances surrounding the employment relationship between Defendant and the class establishes economic dependence by the class on Defendant and the class members' employee status. The economic reality is that Plaintiffs and class members are not in business for themselves and truly independent, but rather are economically dependent upon finding employment in others, namely Defendant. The class members are not engaged in occupations of businesses distinct from that of Defendant. Rather, their work is the basis for Defendant's business. Defendant obtains the customers who desire exotic dance entertainment and Defendant provides the customers with its

workers, the class members. The class members conduct the exotic dance "services" on behalf of Defendant. Defendant retains pervasive control over the nightclub operations as a whole, and the exotic dancers' duties are an integral part of Defendant's operations.

**A. Degree of Control – Plaintiffs and The Other Exotic Dancers Exercise No Control Over Their "Own" or Their Employers' Business**

49. Plaintiffs and the class members do not exert control over a meaningful part of the Defendant's nightclub business and do not stand as separate economic entities from Defendant. Defendant exercises control over all aspects of the working relationship with Plaintiffs and class members.

50. Class members' economic status is inextricably linked to those conditions over which Defendant has complete control. Plaintiffs and the other exotic dancers are completely dependent on Defendant's Nightclubs for their earnings. Defendant controls all of the advertising and promotion without which the exotic dancers could not survive economically. Moreover, Defendant creates and controls the working conditions, atmosphere, and surroundings at the Nightclubs, the existence of which dictates the flow of customers. The exotic dancers have no control over the customer volume or the working conditions.

51. Defendant has maintained guidelines and rules dictating the way in which exotic dancers such as Plaintiffs must conduct themselves while working at the Nightclubs. Defendant sets the hours of operation; length of shifts the exotic dancers must work; the show times during which an exotic dancer may perform; minimum table dance tips; the sequence in which an exotic dancer may perform on stage during her stage rotation; the format and themes of exotic dancers' performance (including their apparel and appearance); theme nights; conduct while at work (*e.g.*, that they be on the floor as much as possible when not on stage and mingle with customers in a manner that supports Defendant's general business plan); pay tip-splits; pay "tip-outs" to managers, doormen and other employees who do not normally receive tips from customers; require that exotic dancers help sell a minimum number of drinks to customers (or be penalized and have to buy the drinks themselves); and all other terms and conditions of employment.

52. Defendant requires that Plaintiffs and the other class members schedule work shifts. Defendant requires that each shift worked by an exotic dancer be of a minimum number of hours. Further, Defendant requires exotic dancers such as Plaintiffs to clock in and clock out (or otherwise check in or report) at the beginning and end of each shift. If late or absent for a shift, an exotic dancer is subject to fine, penalty, or reprimand by Defendant. Once a shift starts, an exotic dancer is required to complete the shift and cannot leave early without penalty or reprimand.

53. While working at the Nightclubs, Plaintiffs and class members perform exotic table, chair, couch, lap and/or VIP room "dances" for customers offering them tips (referred to herein "table dance tips" or "tips"). Defendant, not the exotic dancers, sets the minimum tip amount that exotic dancers must collect from customers when performing exotic "dances." Defendant announces the minimum tip amounts to customers in the nightclub desiring table "dances."

54. Defendant dictates the manner and procedure in which table dance tips are collected from customers and tracked. Each time a class member has performed an exotic table dance for a customer and received a table dance tip, the class member has been required to immediately account to Defendant for the time and any table dance tip given to her by the customer. Additionally, Defendant employs other workers called "checkers," doormen, and/or "floor walkers" to watch exotic dancers work, count private "dances" they perform, and record the amount of any table dance tips received. At the end of a work shift, exotic dancers are required to clock out and account to Defendant for all "dances" performed for the customers of the nightclub. Then, in addition to any base "rent" payment, the exotic dancer is required to pay over to the Defendant as "rent" a portion of each table dance tip given to them by customers. The "rent" payment typically exceeds 30% of each table dance tip.

55. The entire sum that an exotic dancer receives from the customer for the table dance is not given to Defendant (and/or its Nightclubs) and taken into its gross receipts. Rather, the exotic dancers keep their share of the payment under the tip share policy and only pay over to Defendant and/or the Nightclubs the portion they demand as "rent" (*e.g.*, $7 from

each $20 table dance tip received). As a result, there is no payout by Defendant to the exotic dancer of any wage. Defendant issues no 1099 forms, W-2 forms, or other documentation to exotic dancers showing any sums being paid to exotic dancers as wages.

56. Defendant establishes the split of percentage that each exotic dancer is required to pay it for each type of dance that the exotic dancer receives in table dance tips during the work shift. In addition, per-dance amounts of "tip-outs" must be paid by exotic dancers to the Defendant's nightclub managers, dance checkers, DJs, bouncers, door staff, and/or other workers as part of Defendant's tip-splitting policy. The foregoing facts demonstrate that Defendant controls and sets the terms and conditions of all work by the exotic dancers. This is the hallmark of economic dependence and control.

**B. Skill and Initiative of a Person in Business for Herself**

57. Plaintiffs, like all other class members, do not exercise the skills and initiative of a person in business for themselves.

58. Plaintiffs, like all other class members, are not required to have any specialized or unusual skills to work at Defendant's Nightclubs. Prior dance experience is not required to perform at Defendant's Nightclubs. Exotic dancers are not required to attain a certain level of specialized or unusual skill in order to work at Defendant's Nightclubs.

59. Plaintiffs and class members do not have the opportunity to exercise business skills and initiative necessary to elevate their status to that of independent contractors. Plaintiffs and class members own no enterprise. They exercise no business management skills. They maintain no separate business structures or facilities. They exercise no control over the customer volume, working conditions, or atmosphere at Defendant's Nightclubs. They do not actively participate in any effort to increase the Defendant's customer base, enhance goodwill, or establish contracting possibilities. The scope of an exotic dancer's initiative is restricted to what apparel, if any, to wear (within Defendant's strict guidelines) or how provocatively to dance, a scope of initiative that is consistent with the status of an employee as opposed to the status of an independent contractor.

60. Plaintiffs and Class members are not permitted to hire or subcontract other

qualified individuals to provide additional “dances” to customers and increase their revenues, as an independent contractor in business for themselves would.

**C. Relative Investment**

61. Plaintiffs’ and class members’ relative investment is minor when compared to the investments made by Defendant. Plaintiffs and class members have made no capital investment in the facilities, advertising, maintenance, sound system and lights, food, beverage, and other inventory, or staffing, of Defendant’s Nightclubs. Defendant provides investment and risk capital. Plaintiffs and class members do not. Other than their time and labor, any investment by Plaintiffs and class members has been limited to expenditures on some apparel and make-up. But for Defendant’s provision of the nightclub environment that Defendant has designed to please its customers (an environment that presents the exotic dancers to customers in a manner that Defendant has designed to increase Defendant’s own profits), Plaintiffs and the class members would earn nothing from their relatively minor expenditures.

**D. Opportunity for Profit and Loss**

62. Defendant, not the class members, manages all aspects of the business operation including attracting investors, establishing the hours of operation, setting the working conditions and atmosphere, coordinating advertising, hiring and controlling the staff (managers, waitresses, bartenders, bouncers/doormen, etc.). Defendant, not the class members, takes the true business risks for the Nightclubs. Defendant, not the class members, has responsibility for attracting investors required to provide the capital necessary to open, operate, and expand the nightclub business.

63. Plaintiffs and class members do not control the key determinants of profit and loss of a successful enterprise. Plaintiffs and class members are not responsible for any aspect of the enterprise’s on-going business risk. For example, Defendant, not the class members, has responsibility for financing, the acquisition and/or lease of the physical facilities and equipment, inventory, the payment of wages (for managers, bartenders, doormen, and waitresses), and obtaining appropriate business insurance and licenses. Defendant, not the exotic dancers, establishes the minimum table dance tip amounts to be collected from

customers for "dances." Even with respect to any "rent" payments, the exotic dancers do not truly pay "rent" for exclusive use of space. Rather, the term "rent" is a misnomer or subterfuge for tip-splitting. Defendant demands a set portion (approximately 35%) of each table dance tip given to an exotic dancer.

64. The extent of the immediate financial risk that Plaintiffs and class members bear is the loss of any "base rent" fee that Defendant collects after each exotic dancer's shift. Defendant, not the exotic dancers, bears the risk of loss. For example, the table dance tips the exotic dancers receive are not a return for risk on capital investment. They are a gratitude for services rendered. Thus, it is clear that an exotic dancer's "return on investment" (*i.e.*, tips) is illusory, and no different than that of a waiter who serves food during a customer's meal at a restaurant.

**E. Permanency**

65. Certain class members have worked at Defendant's Nightclubs as exotic dancers for significant periods of time.

**F. Integral Part of Employer's Business**

66. Plaintiffs and the class members are essential to the success of Defendant's Nightclubs. The continued success of Defendant's Nightclubs depends to a significant degree upon the provision of exotic "dances" by class members for Defendant's customers. The primary reason that the Nightclubs exist is to showcase the exotic dancers' physical attributes for customers and for the exotic dancers to perform "lap dances" for customers. The primary "product" or "good" that Defendant is in business to sell to customers that come to its Nightclubs are the class members' bodies and the "lap dances" that the class members perform. Defendant recruits class members to work in its Nightclubs and instructs them to work in specific ways.

67. At least some of Defendant's Nightclubs do not serve alcohol and therefore are not truly in direct competition with others in the nightclub, tavern, or bar business. Absent the performance of exotic "dances" by exotic dancers, a nightclub serving only non-alcoholic beverages would have difficulty remaining in business. Moreover, Defendant is able to

charge admission prices and a much higher price for drinks (*e.g.*, $10 for a single soft drink) than establishments without exotic dancers are able to charge, because the exotic dancers are the main attraction of Defendant's Nightclubs. In other words, the exotic dancers attract customers who are willing to pay more in order to enjoy the exotic dancers. As a result, the exotic dancers are an integral part of Defendant's nightclub business.

68. The foregoing facts demonstrate that exotic dancers such as Plaintiffs and the class members are economically dependent on Defendant and subject to significant control by Defendant. Therefore, Plaintiffs and class members have been misclassified by Defendant as independent contractors and should have been paid minimum wages at all times when they have worked at Defendant's Nightclubs and otherwise should have been afforded all rights and benefits of employees under federal, state, and local wage and hour laws.

**G. Defendant's Intent**

69. All of Defendant's actions and agreements as described herein were willful, intentional, and not the result of mistake or inadvertence.

70. Defendant was aware that the FLSA, the California Labor Code, and the SFMWO applied to its operation of the Nightclubs at all relevant times and that, under the economic realities test applicable to determining employment status under those laws, it misclassified the exotic dancers as independent contractors. Defendant was subject to, or aware of, previous litigation and enforcement actions that successfully challenged the misclassification of exotic dancers as independent contractors. Further Defendant was aware, and on actual or constructive notice, that California Labor Code § 350(e), § 351, and A.B. 2509 rendered all table dance tips the exotic dancer's sole property, and rendered Defendant's tip-share, rent, and tip-out policies unlawful. Despite being on notice of its violations, Defendant intentionally chose to continue to misclassify the exotic dancers, withhold payment of minimum wages, and require the exotic dancers to split their tips with Defendant and its other workers, in order to enhance its profits. Such conduct and agreements were intentional, unlawful, fraudulent, deceptive, unfair, and contrary to public policy.

**H. Injury and Damage**

71. Plaintiffs and all class members have suffered injury, have been harmed, and have incurred damage and financial loss as a result of Defendant's conduct complained of herein. Among other things, Plaintiffs and the class have been entitled to minimum wages and have been entitled to retain all of the table dance tips and other tips they were given by customers, but Defendant has denied them these rights, and thereby has injured Plaintiffs and the class members, and caused them financial loss, harm, injury, and damage.

## COLLECTIVE AND CLASS ACTION ALLEGATIONS

72. Plaintiffs Jane Roes 1 and 3 bring the First Cause of Action (for violations of the FLSA) as an "opt-in" collective action pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b) on behalf of themselves and a proposed collection of similarly situated individuals defined as follows, and hereinafter referred to as the "FLSA Collection":

> All individuals who have worked in California for Defendant(s) as an exotic dancer at any time on or after the date three (3) years before the filing of this action.

73. Plaintiffs Jane Roes 1 and 3 individually and on behalf of all others similarly situated as defined above, seek relief on a collective basis challenging Defendant's policy and practice of failing to pay for all hours worked plus applicable overtime and failing to accurately record all hours worked. Plaintiffs and the FLSA Collection are similarly situated, have performed substantially similar duties for Defendant, and have been uniformly subject to Defendant's uniform, class-wide payroll practices that are ongoing, including Defendant's policy of and practice of not compensating class members for compensable time as described herein. The number and identity of other similarly situated persons yet to opt-in and consent to be party plaintiffs may be determined from the records of Defendant, and potential opt-ins may be easily and quickly notified of the pendency of this action.

74. The names and addresses of the individuals who comprise the FLSA Collection are available from Defendant. Accordingly, Plaintiffs herein pray for an Order requiring Defendant to provide the names and all available locating information for all members of the FLSA Collection, so that notice can be provided regarding the pendency of this action, and of

such individuals' right to opt-in to this action as party plaintiffs.

75. Plaintiffs Jane Roes 1 and 3 bring the Second through Ninth Causes of Action (the California state law claims) as an "opt-out" class action pursuant to Federal Rule of Civil Procedure 23, defined initially as follows, and hereinafter referred to as the "California Class":

> All individuals who have worked in California for Defendant(s) as an exotic dancer at any time on or after the date three (3) years before the filing of this action.

Excluded from the California Class is anyone employed by counsel for Plaintiffs in this action, and any Judge to whom this action is assigned and his or her immediate family members.

76. Plaintiffs Jane Roes 1 and 3 bring the Tenth Cause of Action (the claims under § 17200 *et seq.*) as an "opt-out" class action pursuant to Federal Rule of Civil Procedure 23, defined initially as follows, and hereinafter referred to as the "Section 17200 Class":

> All individuals who have worked in California for Defendant(s) as an exotic dancer at any time on or after the date four (4) years before the filing of this action.

Excluded from the class is anyone employed by counsel for Plaintiffs in this action, and any Judge to whom this action is assigned and his or her immediate family members.

77. Numerosity. Defendant has employed hundreds of individuals as exotic dancers during the relevant time periods.

78. Existence and Predominance of Common Questions. Common questions of law and/or fact exist as to the members of the proposed classes and, in addition, common questions of law and/or fact predominate over questions affecting only individual members of the proposed classes. The common questions include the following:

a. Whether Defendant's policy and practice of not paying exotic dancers the minimum wage and/or at one-and-a-half (1.5) times the regular rate of pay (*i.e.*, time-and-a-half) for all hours worked in excess of forty hours in a week or eight hours in a day violates the FLSA, California labor laws,

and/or the SFMWO;

b. Whether Defendant's payroll policies and practices have violated California law;

c. Whether Defendant's practices have violated the UCL;

d. Whether the class members are entitled to unpaid wages, waiting time penalties, and other relief;

e. Whether Defendant's affirmative defenses, if any, raise common issues of fact or law as to Plaintiffs and the class members; and

f. Whether Plaintiffs and the proposed classes are entitled to damages and equitable relief, including, but not limited to, restitution and a preliminary and/or permanent injunction, and if so, the proper measure and formulation of such relief.

79. Typicality. Plaintiffs' claims are typical of the claims of the proposed classes. Defendant's common course of conduct in violation of law as alleged herein has caused Plaintiffs and the proposed classes to sustain the same or similar injuries and damages. Plaintiffs' claims are therefore representative of and co-extensive with the claims of the proposed classes.

80. Adequacy. Plaintiffs are adequate representatives of the proposed classes because their interests do not conflict with the interests of the members of the classes they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of members of the proposed classes.

81. Superiority. The class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each member of the proposed classes, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Defendant economically feasible. Individualized litigation increases the delay and expense to all parties and the court system

presented by the legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

82. In the alternative, the proposed classes may be certified because the prosecution of separate actions by the individual members of the proposed classes would create a risk of inconsistent or varying adjudication with respect to individual members of the proposed classes that would establish incompatible standards of conduct for Defendant; and Defendant has acted and/or refused to act on grounds generally applicable to the proposed classes, thereby making appropriate final and injunctive relief with respect to members of the proposed classes as a whole.

**PRIVATE ATTORNEY GENERAL ALLEGATIONS**

83. In addition to asserting class action claims in this action, Plaintiffs Jane Roes 1 and 3 assert claims as a private attorney general action on behalf of members of the general public pursuant to the UCL. The purpose of such claims is to require Defendant to disgorge and restore all monies wrongfully obtained by Defendant through its unlawful business acts and practices. A private attorney general action is necessary and appropriate because Defendant has engaged in the wrongful acts described herein as a general business practice. Under the UCL, Plaintiffs pursue said representative claims and seeks relief on behalf of themselves and the proposed classes pursuant to Federal Rule of Civil Procedure 23.

**FIRST CAUSE OF ACTION**

**Violations of the Fair Labor Standards Act**

84. Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

85. This particular claim presents a collective cause of action under the Fair Labor Standards Act by Plaintiffs, as well as any similarly situated individuals who “opt in” to this action under 29 U.S.C. § 216.

86. The Fair Labor Standards Act provides that a private civil action may be brought for the non-payment of federal minimum wages and for an equal amount in liquidated

damages in any court of competent jurisdiction by any employee on behalf of himself or herself and others employees similarly situated pursuant to 29 U.S.C. § 216(b). Moreover, Plaintiffs may recover the attorneys' fees incurred pursuant to 29 U.S.C. § 216(b). Federal district courts further have the authority to fashion injunctive relief pursuant to 29 U.S.C. § 217.

87. As set forth above, Defendant avoids its legal obligation to provide its exotic dancers basic employee rights such as wages and workers compensation by employing them under sham "independent contractor" agreements.

88. Defendant does this by presenting exotic dancers and/or potential exotic dancers with non-negotiable employment "options": an independent contractor "option" and an employee "option." Virtually all, if not all, exotic dancers necessarily choose the independent contractor "option" because it is the only real "option." In other words, the Defendant's purported "choice" for exotic dancers to decide whether to work as "employees" or "independent contractors" is not a choice at all. It is a sham.

89. Notwithstanding the legal principle that independent contractors have greater control over their work than employees, Defendant does not, as a matter of practice, observe any real distinction between "independent contractor" exotic dancers and "employee" exotic dancers, other than to refuse, terminate, retaliate against, and/or not hire any woman who requests "employee" status. Defendant exercises great control over all exotic dancers, regardless of classification.

90. Defendant's control over its exotic dancers is sufficient to render all of them employees. Defendant uses sham "independent contractor" agreements to avoid its duties to pay wages. Further, as described above, Defendant actually has used its sham "independent contractor" agreements to require exotic dancers to pay to work.

91. Defendant's failure to pay the exotic dancers an hourly rate of at least the federal minimum wage violates 29 U.S.C. § 206(a)(1)(c). That failure is willful, intentional, and in bad faith, as alleged in more detail herein.

92. Therefore, Plaintiffs seek, on behalf of themselves, and Jane Roes 1 and 3 on

behalf of all others who "opt in" to this cause of action under 29 U.S.C. § 216, unpaid wages, including minimum wages and overtime wages, reimbursement of stage fees, liquidated damages, interest, attorneys' fees and costs, and all other costs and penalties allowed by law. Plaintiffs further seek injunctive relief to compel Defendant to recognize exotic dancers' employee status, to provide all wages guaranteed by law, and for this Court's continuing jurisdiction to enforce compliance.

93. In addition and/or in the alternative, and as further described below, Plaintiff Jane Roe 1 asserts this cause of action, on behalf of herself and all others similarly situated, against the Nightclub Defendants.

## SECOND CAUSE OF ACTION

### Failure to Pay All Straight Time Worked in Violation of Calif. Labor Code § 1194, 1194.2, 1197, 1197.1, 1198

94. Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

95. California Labor Code §§ 1194, 1194.2, 1194.5, 1197, 1197.1 and 1198 provide for a private right of action for nonpayment of wages, and further provides that a plaintiff may recover the unpaid balance of the full amount of such wages, together with costs of suit, as well as liquidated damages, interest thereon, injunctive relief, and the attorneys' fees and costs incurred.

96. At all relevant times, Defendant has been required to pay the exotic dancers minimum wages under California law, including without limitation pursuant to IWC Wage Order Nos. 4, 5, and/or 10, but has not done so. Defendant has willfully failed to pay Plaintiffs and class members any wages whatsoever. By failing to compensate them for all hours worked, Defendant has violated IWC Wage Order Nos. 4, 5, and/or 10 and/or California Labor Code §§ 1182.12, 1194, 1194.2, 1194.5, 1197, 1197.1, and 1198.

97. Therefore, Plaintiffs seek, on behalf of themselves, and Jane Roes 1 and 3 on behalf of all others similarly situated, unpaid wages at the required legal rate, reimbursement of stage fees, liquidated damages, interest, attorneys' fees and costs, and all other costs and

penalties allowed by law. Plaintiffs further seek injunctive relief to compel Defendant to recognize exotic dancers' employee status, to provide all payment guaranteed by law, and for this Court's continuing jurisdiction to enforce compliance.

**<u>THIRD CAUSE OF ACTION</u>**

**Failure to Pay the Minimum Wage for All Hours Worked in Violation of San Francisco Administrative Code Chapter 12R**

98. Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

99. During the class period, Defendant has employed Plaintiffs and the class members, but has willfully failed to treat them as employees or pay them any wages whatsoever.

100. Pursuant to the San Francisco Administrative Code, Chapter 12R (the SFMWO), Plaintiffs and the proposed California Class are entitled to recover in a civil action the unpaid balance of the full amount of straight time owed to them, including interest thereon, plus liquidated damages, plus reasonable attorneys' fees and costs.

101. In addition and/or in the alternative, and as further described below, Plaintiff Jane Roe 1 asserts this cause of action, on behalf of herself and all others similarly situated, against the Nightclub Defendants.

**<u>FOURTH CAUSE OF ACTION</u>**

**Failure to Pay Overtime as Required by State Law**

102. Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

103. At all times relevant to the Complaint, Wage Order Nos. 4, 5 and 10 have required the payment of an overtime premium for hours worked in excess of 8 hours in a workday, 40 hours in a workweek, or on the seventh day worked in a single workweek.

104. During the relevant time period, Plaintiffs and the class members were employed by Defendant within California but were not paid overtime wages for overtime hours worked.

105. Defendant's failure to pay overtime wages violates, inter alia, California Labor Code §§ 510, 558, 1194, and 1198, and the above-referenced Wage Orders.

106. Plaintiffs request that Defendant be required to pay them, and all those similarly situated, all overtime wages illegally withheld, penalties as provided under the California Labor Code including §§ 201-203, 510 and 1194.1(a) *et seq*., punitive/exemplary damages, and attorneys' fees and costs under California Labor Code § 218.5 and 1194(a).

107. In addition and/or in the alternative, and as further described below, Plaintiff Jane Roe 1 asserts this cause of action, on behalf of herself and all others similarly situated, against the Nightclub Defendants.

**FIFTH CAUSE OF ACTION**

**Failure to Provide Itemized Wage Statements in Violation of California Labor Code § 226 and IWC Wage Orders**

108. Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

109. California Labor Code § 226(a) requires: "Every employer shall, semimonthly or at the time of each payment of wages, furnish each of his or her employees, either as a detachable part of the check, draft, or voucher paying the employee's wages, or separately when wages are paid by personal check or cash, an accurate itemized statement in writing showing (1) gross wages earned, (2) total hours worked by the employee, except for any employee whose compensation is solely based on a salary and who is exempt from payment of overtime under subdivision (a) of Section 515 or any applicable order of the Industrial Welfare Commission, (3) the number of piece-rate units earned and any applicable piece rate if the employee is paid on a piece-rate basis, (4) all deductions, provided that all deductions made on written orders of the employee may be aggregated and shown as one item, (5) net wages earned, (6) the inclusive dates of the period for which the employee is paid, (7) the name of the employee and only the last four digits of his or her social security number or an employee identification number other than a social security number, (8) the name and address of the legal entity that is the employer and, if the employer is a farm labor contractor, as

defined in subdivision (b) of Section 1682, the name and address of the legal entity that secured the services of the employer, and (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee and, beginning July 1, 2013, if the employer is a temporary services employer as defined in Section 201.3, the rate of pay and the total hours worked for each temporary services assignment. The deductions made from payment of wages shall be recorded in ink or other indelible form, properly dated, showing the month, day, and year, and a copy of the statement and the record of the deductions shall be kept on file by the employer for at least three years at the place of employment or at a central location within the State of California."

110. Defendant has failed, and continues to fail, to provide timely, accurate itemized wage statements to Plaintiffs and California Class members in accordance with California Labor Code § 226 and Wage Order Nos. 4, 5, and 10. The wage statements that Defendant has provided to its exotic dancers, including Plaintiffs and the proposed California Class members, do not accurately reflect the actual hours worked and/or wages earned.

111. Defendant's failure to provide timely, accurate, itemized wage statements to Plaintiffs and members of the proposed California Class in accordance with the California Labor Code and the California Wage Orders has been knowing and intentional. Accordingly, Defendant is liable for damages and penalties under California Labor Code § 226.

112. In addition and/or in the alternative, and as further described below, Plaintiff Jane Roe 1 asserts this cause of action, on behalf of herself and all others similarly situated, against the Nightclub Defendants.

## SIXTH CAUSE OF ACTION

### Waiting Time Penalties Under California Labor Code §§ 201, 202, and 203

113. Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

114. California Labor Code § 201(a) requires an employer who discharges an employee to pay compensation due and owing to said employee upon discharge. California Labor Code § 202(a) requires an employer to pay compensation due and owing within

seventy-two (72) hours of an employee's termination of employment by resignation. California Labor Code § 203 provides that if an employer willfully fails to pay compensation promptly upon discharge or resignation, as required under §§ 201 and 202, then the employer is liable for waiting time penalties in the form of continued compensation for up to thirty (30) work days.

115. Certain members of the proposed California Class are no longer employed by Defendant but have not been paid full compensation for all hours worked, as alleged above. They are entitled to unpaid compensation for all hours worked, and overtime, for which to date they have not received compensation, and any applicable overtime.

116. Defendant has failed and refused, and continues to willfully fail and refuse, to timely pay compensation and wages and compensation to Plaintiffs and members of the proposed California Class whose employment with Defendant have terminated, as required by California Labor Code §§ 201 and 202. As a direct and proximate result, Defendant is liable to all such California Class members for up to thirty (30) days of waiting time penalties pursuant to California Labor Code § 203, together with interest thereon.

117. WHEREFORE, pursuant to Labor Code §§ 218, 218.5, and 218.6, Plaintiffs and Class members are entitled to recover the full amount of their unpaid wages, continuation wages under § 203, interest thereon, reasonable attorneys' fees, and costs of suit.

118. In addition and/or in the alternative, and as further described below, Plaintiff Jane Roe 1 asserts this cause of action, on behalf of herself and all others similarly situated, against the Nightclub Defendants.

**SEVENTH CAUSE OF ACTION**

**Failure To Pay all Wages Owed Every Pay Period Under California Labor Code § 204**

119. Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

120. During the relevant time period, Plaintiffs and class members have been employees of Defendant covered by Labor Code § 204 but have been misclassified and not treated as employees.

121. Pursuant to Labor Code § 204, Plaintiffs and class members were entitled to receive on regular paydays all wages earned for the pay period corresponding to the payday.

122. Defendant has failed to pay Plaintiffs and class members all wages earned each pay period. On information and belief, at all times during the proposed class period, Defendant has maintained a policy or practice of not paying Plaintiffs and class members overtime wages for all overtime hours worked.

123. As a result of Defendant's unlawful conduct, Plaintiffs and class members have suffered damages in an amount, subject to proof, to the extent they were not paid all wages and/or compensation and/or penalties each pay period. The precise amounts of unpaid wages, compensation, and/or penalties are not presently known to Plaintiffs but can be determined directly from Defendant's records or indirectly based on information from Defendant's records and/or information known by class members.

124. WHEREFORE, pursuant to Labor Code §§ 218, 218.5 and 218.6, Plaintiffs and class members are entitled to recover the full amount of their unpaid wages, interest thereon, reasonable attorneys' fees and costs of suit.

125. In addition and/or in the alternative, and as further described below, Plaintiff Jane Roe 1 asserts this cause of action, on behalf of herself and all others similarly situated, against the Nightclub Defendants.

## EIGHTH CAUSE OF ACTION

### Common Law Conversion

126. Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

127. Defendant's failure to give class members gratuities from customers that were given and/or left for class members, as alleged above, constitutes common law conversion.

128. Defendant has assumed control and ownership over the above-referenced gratuities, and applied them to its own use.

129. Plaintiffs and class members had a right of ownership and possession over the above-referenced gratuities.

130. Defendant's theft and retention of the above-referenced gratuities, without consent, have caused Plaintiffs and class members significant financial harm.

131. In failing to pay said monies to Plaintiffs and class members and retaining that money for its own use, Defendant has acted with malice, oppression, and/or conscious disregard for the statutory rights of Plaintiffs and class members. Such wrongful and intentional acts, given the number of victims and the number of acts and previous claims and/or lawsuits relative to similar acts, justify awarding Plaintiffs and class members punitive damages pursuant to California Civil Code § 3294 *et seq.* in an amount sufficient to deter future similar conduct by Defendant.

132. In addition and/or in the alternative, and as further described below, Plaintiff Jane Roe 1 asserts this cause of action, on behalf of herself and all others similarly situated, against the Nightclub Defendants.

## NINTH CAUSE OF ACTION

### Failure to Reimburse for Expenses in Violation of Cal. Labor Code §§ 450, 2802

133. Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

134. Defendant's conduct, as alleged above, violates California Labor Code §§ 450, 2802, insofar as Defendant has misclassified Plaintiffs and class members as independent contractors, and has failed to reimburse them for expenses that they paid that should have been paid by their employer.

135. In addition and/or in the alternative, and as further described below, Plaintiff Jane Roe 1 asserts this cause of action, on behalf of herself and all others similarly situated, against the Nightclub Defendants.

## TENTH CAUSE OF ACTION

### Violation of California's Unfair Competition Law, Bus. & Prof. Code §§ 17200 *et seq.*

136. Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

137. Plaintiffs bring this claim on behalf of themselves, and Jane Roes 1 and 3 on

behalf of all others similarly situated in their representative capacities as private attorneys general against Defendant and Does 1 through 200 for their unlawful business acts and/or practices pursuant to the UCL, which prohibits all unlawful business acts/or practices.

138. Plaintiffs Jane Roes 1 and 3 assert these claims as representatives of an aggrieved group and as private attorneys general on behalf of the general public and other persons who have been exposed to Defendant's unlawful acts and/or practices and are owed wages that the Defendant should be required to pay or reimburse under the restitutionary remedy provided by the UCL.

139. As set forth herein, Defendant is engaging in numerous illegal business practices that constitute unlawful and/or unfair and/or fraudulent business acts and/or practices within the meaning of the UCL, including but not limited to imposing sham, non-negotiable "independent contractor" agreements on exotic dancers to avoid its legal obligation to provide basic employee rights, failing to give exotic dancers gratuities from customers that were given and/or left for exotic dancers, as alleged above, in violation of California Labor Code § 351, failing to pay for all hours worked including minimum wage and overtime, failing to pay all wages when they were due and upon termination, failing to provide accurate and itemized wage statements, and failing to reimburse business expenses.

140. Defendant's conduct constitutes one or more unfair business practices as defined in the UCL. Defendant's conduct was and is unfair within the meaning of the UCL because it is unlawful, causes significant harm to Plaintiffs and similarly situated individuals, and is in no way counterbalanced by any legitimate utility to Defendant. In addition, the conduct offends established legislatively declared public policy and has been immoral, unethical, oppressive, and unscrupulous. Plaintiffs and the Class members have been injured by Defendant's illegal activities, which have deprived them of their rights as employees, including wages. They have suffered injury in fact, losing money and property, including without limitation in the form of unpaid wages, in the form of misappropriated gratuities, and in the form of money spent on business expenses that should have been borne by the employer. Plaintiffs and Class members are entitled to restitution of monies due,

disgorgement of the ill-gotten gains of Defendant, declaratory relief, a preliminary and permanent injunction enjoining Defendant from continuing the unlawful and unfair practices described herein, and to such other equitable relief as is appropriate under the UCL, including the fees, costs, and expenses incurred in vindicating their rights and the public interest generally, pursuant to California Business and Professions Code § 17203, California Code of Civil Procedure §1021.1, and any other applicable law.

141. In addition and/or in the alternative, and as further described below, Plaintiff Jane Roe 1 asserts this cause of action, on behalf of herself and all others similarly situated, against the Nightclub Defendants.

**ELEVENTH CAUSE OF ACTION**

**PAGA CLAIMS**

**Cal. Lab. Code § 2699(a), (f)**

142. Plaintiffs incorporate by reference the above listed paragraphs as if fully set forth herein.

143. To enforce California law, Plaintiffs prosecute this cause of action under the Labor Code Private Attorneys General Act of 2004, California Labor Code § 2698 *et seq.* (“PAGA”), on behalf of themselves, and Jane Roes 1 and 3, on behalf of others currently and formerly employed by Defendant as exotic dancers, to recover civil penalties for Defendant’s violations of law, pursuant to the procedures in Labor Code § 2699.3.

144. “The purpose of the PAGA is . . . to create a means of “deputizing” citizens as private attorneys general to enforce the Labor Code.” *Brown v. Ralphs Grocery Co.*, 197 Cal. App. 4th 489, 501 (2011).

145. PAGA provides: “Notwithstanding any other provision of law, any provision of this code that provides for a civil penalty to be assessed and collected by the Labor and Workforce Development Agency or any of its departments, divisions, commissions, boards, agencies, or employees, for a violation of this code, may, as an alternative, be recovered through a civil action brought by an aggrieved employee on behalf of himself or herself and other current or former employees pursuant to the procedures specified in Section 2699.3.”

California Labor Code § 2699(a).

146. PAGA also provides: “For all provisions of this code except those for which a civil penalty is specifically provided, there is established a civil penalty for a violation of these provisions, as follows: (1) If, at the time of the alleged violation, the person does not employ one or more employees, the civil penalty is five hundred dollars ($500). (2) If, at the time of the alleged violation, the person employs one or more employees, the civil penalty is one hundred dollars ($100) for each aggrieved employee per pay period for the initial violation and two hundred dollars ($200) for each aggrieved employee per pay period for each subsequent violation.” California Labor Code § 2699(f)(1)-(2).

147. “Of the civil penalties recovered, 75 percent goes to the Labor and Workforce Development Agency, leaving the remaining 25 percent for the ‘aggrieved employees.’ *Iskanian v. CLS Transp. Los Angeles, LLC*, 59 Cal. 4th 348, 380 (2014) (quoting Cal. Lab. Code § 2699, subd. (i)). “[A]n aggrieved employee acting as the LWDA’s proxy or agent by bringing a PAGA action may likewise recover underpaid wages as a civil penalty under section 558.” *Thurman v. Bayshore Transit Management, Inc.*, 203 Cal. App. 4th 1112, 1148 (2012). “[T]he language of section 558, subdivision (a) . . . provid[es] a civil penalty that consists of both the $50 or $100 penalty amount and any underpaid wages, with the underpaid wages going entirely to the affected employee or employees as an express exception to the general rule that civil penalties recovered in a PAGA action are distributed 75 percent to the Labor and Workforce Development Agency (LWDA) and 25 percent to the aggrieved employees (§ 2699, subd. (i)).” *Id.* at 1145.

148. PAGA also provides: “Any employee who prevails in any action shall be entitled to an award of reasonable attorney’s fees and costs.” California Labor Code § 2699(g)(1).

149. Plaintiffs Jane Roes 1 and 3 bring this action under PAGA against SFBSC Management, LLC and the Nightclub Defendants individually and as a representative suit on behalf of all current and former employees pursuant to the procedures in California Labor Code § 2699.3 or in the alternative as a class action as alleged above.

150. The factual allegations in this complaint against Defendant SFBSC Management, LLC are also alleged, either in addition or in the alternative, against the Nightclub Defendants.

**COMPLIANCE WITH NOTICE AND EXHAUSTION REQUIREMENTS**

151. Plaintiffs incorporate by reference the above listed paragraphs as if fully set forth herein.

152. The LWDA and Defendant SFBSC Management, LLC were notified about violations of law by letter dated August 11, 2014, which was mailed by certified mail on that date to SFBSC MANAGEMENT, LLC, PO BOX 2602, SEATTLE WA 98111 and to the LWDA. The exhaustion requirement was satisfied by waiting until November 28, 2014 to file the amended complaint in this Court alleging PAGA claims. The facts and theories set forth in the letter qualified as sufficient notice.

153. The LWDA and Defendant SFBSC Management, LLC were notified about violations of law by letter dated December 10, 2014, which was mailed by certified mail on that date to SFBSC MANAGEMENT, LLC, PO BOX 2602, SEATTLE WA 98111 and to the LWDA. The letter specifically identified all of the Nightclubs by name. The facts and theories set forth in the letter qualified as sufficient notice

154. The LWDA, Defendant SFBSC Management, LLC, and the Nightclub Defendants were notified about violations of law by letter dated December 7, 2016, which was mailed by certified mail on that date to SFBSC Management, LLC, the Nightclub Defendants, and the LWDA.

**PRIVATE ATTORNEY GENERAL ALLEGATIONS**

155. Plaintiffs incorporate by reference the above listed paragraphs as if fully set forth herein.

156. As alleged herein and above, Defendants SFBSC Management, LLC and/or the Nightclub Defendants have violated several provisions of the California Labor Code for which Plaintiffs are seeking recovery of civil penalties, including but not limited to Labor Code §§ 201, 202, 204, 210, 223, 226, 226.3, 226.8, 245-249, 351, 353, 432.5, 450, 510, 558,

1174, 1194, 1194.2, 1194.5, 1197, 1197.1, 1198, 1199, 2753, 2802, 3700, 3700.5, 3712, 3715, and Wage Order Nos. 4, 5, and/or 10.

## CALIFORNIA LABOR CODE VIOLATIONS

### Willful Misclassification in Violation of Labor Code § 226.8

157. Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

158. California Labor Code 226.8(a) provides: "It is unlawful for any person or employer to engage in any of the following activities: (1) Willful misclassification of an individual as an independent contractor. (2) Charging an individual who has been willfully misclassified as an independent contractor a fee, or making any deductions from compensation, for any purpose, including for goods, materials, space rental, services, government licenses, repairs, equipment maintenance, or fines arising from the individual's employment where any of the acts described in this paragraph would have violated the law if the individual had not been misclassified."

159. California Labor Code 226.8(b) provides that if the "court issues a determination that a person or employer has engaged in any of the enumerated violations of subdivision (a), the person or employer shall be subject to a civil penalty of not less than five thousand dollars ($5,000) and not more than fifteen thousand dollars ($15,000) for each violation, in addition to any other penalties or fines permitted by law."

160. California Labor Code 226.8(c) provides that if the "court issues a determination that a person or employer has engaged in any of the enumerated violations of subdivision (a) and the person or employer has engaged in or is engaging in a pattern or practice of these violations, the person or employer shall be subject to a civil penalty of not less than ten thousand dollars ($10,000) and not more than twenty-five thousand dollars ($25,000) for each violation, in addition to any other penalties or fines permitted by law."

161. The California Court of Appeal has stated: "Nothing in our analysis precludes plaintiffs from pursuing enforcement of section 226.8 through their PAGA claim." *Noe v. Superior Court*, 237 Cal. App. 4th 316, 341 n.15 (2015). *See also Johnson v. Serenity*

*Transp., Inc.*, 2015 U.S. Dist. LEXIS 108227, at *10-11 (N.D. Cal. Aug. 17, 2015) ("at least one California court has suggested that plaintiffs may bring a PAGA claim predicated on a Section 226.8 violation") (citing *Noe*).

162. Defendants are jointly and severally liable, pursuant to Labor Code § 2753, for advising an employer to misclassify an employee, in exchange for valuable consideration.

163. Defendants have violated California Labor Code § 226.8 through their conduct described herein, and therefore Plaintiffs seeks recovery of the penalties specified herein.

**Failure to Pay Minimum Wages as Required by State Law**

164. Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

165. California Labor Code § 1197.1(a) provides: "Any employer or other person acting either individually or as an officer, agent, or employee of another person, who pays or causes to be paid to any employee a wage less than the minimum fixed by an order of the commission shall be subject to a civil penalty, restitution of wages, liquidated damages payable to the employee, and any applicable penalties imposed pursuant to Section 203 as follows: (1) For any initial violation that is intentionally committed, one hundred dollars ($100) for each underpaid employee for each pay period for which the employee is underpaid. This amount shall be in addition to an amount sufficient to recover underpaid wages, liquidated damages pursuant to Section 1194.2, and any applicable penalties imposed pursuant to Section 203. (2) For each subsequent violation for the same specific offense, two hundred fifty dollars ($250) for each underpaid employee for each pay period for which the employee is underpaid regardless of whether the initial violation is intentionally committed. This amount shall be in addition to an amount sufficient to recover underpaid wages, liquidated damages pursuant to Section 1194.2, and any applicable penalties imposed pursuant to Section 203. (3) Wages, liquidated damages, and any applicable penalties imposed pursuant to Section 203, recovered pursuant to this section shall be paid to the affected employee."

166. California Labor Code § 558 provides, in relevant part: "(a) Any employer or other person acting on behalf of an employer who violates, or causes to be violated, a section

of this chapter or any provision regulating hours and days of work in any order of the Industrial Welfare Commission shall be subject to a civil penalty as follows: (1) For any initial violation, fifty dollars ($50) for each underpaid employee for each pay period for which the employee was underpaid in addition to an amount sufficient to recover underpaid wages. (2) For each subsequent violation, one hundred dollars ($100) for each underpaid employee for each pay period for which the employee was underpaid in addition to an amount sufficient to recover underpaid wages. (3) Wages recovered pursuant to this section shall be paid to the affected employee. . . . (c) The civil penalties provided for in this section are in addition to any other civil or criminal penalty provided by law."

167. The California Court of Appeal has held: "We disagree that section 558 provides for a civil penalty of $50 or $100 only, and that it clearly excludes underpaid wages from the civil penalty. In our view, the language of section 558, subdivision (a), is more reasonably construed as providing a civil penalty that consists of both the $50 or $100 penalty amount and any underpaid wages, with the underpaid wages going entirely to the affected employee or employees as an express exception to the general rule that civil penalties recovered in a PAGA action are distributed 75 percent to the Labor and Workforce Development Agency (LWDA) and 25 percent to the aggrieved employees (§ 2699, subd. (i))." *Thurman v. Bayshore Transit Management, Inc.*, 203 Cal. App. 4th 1112, 1145 (2012).

168. At all relevant times, Defendants have willfully failed to pay Plaintiffs and other exotic dancers any wages whatsoever.

169. At all relevant times, Defendants have been required to pay the exotic dancers minimum wages under California law, including without limitation pursuant to IWC Wage Order Nos. 4, 5, and/or 10, but has not done so.

170. "[T]he Legislature . . . authorized the LWDA to recover underpaid wages on behalf employees in the form of a civil penalty under section 558. Accordingly, an aggrieved employee acting as the LWDA's proxy or agent by bringing a PAGA action may likewise recover underpaid wages as a civil penalty under section 558." *Thurman v. Bayshore Transit Management, Inc.*, 203 Cal. App. 4th 1112, 1148 (2012).

171. Based on the violations set forth herein, on behalf of themselves and the other current and former employees, Plaintiffs seek recovery pursuant to Labor Code § 558 of either fifty dollars ($50) or one hundred dollars ($100) for each underpaid employee for each pay period for which the employee was underpaid, to be distributed 75 percent to the Labor and Workforce Development Agency (LWDA) and 25 percent to the aggrieved employees.

172. Based on the violations set forth herein, on behalf of themselves and the other current and former employees, Plaintiffs also seek recovery pursuant to Labor Code § 1197.1(a) of either one hundred dollars ($100) or two hundred fifty dollars ($250) for each underpaid employee for each pay period for which the employee is underpaid, to be distributed 75 percent to the Labor and Workforce Development Agency (LWDA) and 25 percent to the aggrieved employees.

173. In addition, on behalf of themselves and the other current and former employees, Plaintiffs seek recovery of the underpaid wages going entirely to the affected employees, as a civil penalty pursuant to Labor Code § 558.

174. PAGA also allows for recovery with respect to Labor Code § 1194 for "any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee." *See* Labor Code § 2699.5 (listing, *inter alia*, § 1194). Therefore, because of Defendants' failure to pay the legal minimum wage as required by state law, as alleged herein, Defendants are liable for civil penalties under California Labor Code § 2699(f)(1)-(2) for each aggrieved employee per pay period.

175. PAGA also allows for recovery with respect to Labor Code § 1198 which provides, in relevant part: "The employment of any employee . . . under conditions of labor prohibited by the order [of the IWC] is unlawful." *See* Labor Code § 2699.5 (listing, *inter alia*, § 1198). Therefore, because of Defendants' violations of one or more IWC wage orders, as alleged herein, Defendants are liable for civil penalties under California Labor Code § 2699(f)(1)-(2) for each aggrieved employee per pay period.

**Failure to Pay Overtime as Required by State Law**

176. Plaintiffs incorporate by reference all paragraphs in this complaint as if fully

set forth herein.

177. At all relevant times, Defendants have willfully failed to treat the exotic dancers as employees and has not paid them overtime wages for overtime hours worked.

178. At all relevant times, Defendants have been required to pay the exotic dancers an overtime premium for hours worked in excess of eight (8) hours in a workday, forty (40) hours in a workweek, or on the seventh consecutive day of work in a workweek pursuant to IWC Wage Order Nos. 4, 5, and/or 10, but have not done so.

179. Based on the violations set forth herein, on behalf of themselves and the other current and former employees, Plaintiffs seek recovery pursuant to Labor Code § 558 of either fifty dollars ($50) or one hundred dollars ($100) for each underpaid employee for each pay period for which the employee was underpaid, to be distributed 75 percent to the Labor and Workforce Development Agency (LWDA) and 25 percent to the aggrieved employees.

180. Based on the violations set forth herein, on behalf of themselves and the other current and former employees, Plaintiffs also seek recovery pursuant to Labor Code § 1197.1(a) of either one hundred dollars ($100) or two hundred fifty dollars ($250) for each underpaid employee for each pay period for which the employee is underpaid, to be distributed 75 percent to the Labor and Workforce Development Agency (LWDA) and 25 percent to the aggrieved employees.

181. In addition, on behalf of themselves and the other current and former employees, Plaintiffs seek recovery of the underpaid wages going entirely to the affected employees, as a civil penalty pursuant to Labor Code § 558.

182. PAGA also allows for recovery with respect to Labor Code § 1194 for "any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee." *See* Labor Code § 2699.5 (listing, *inter alia*, § 1194). Therefore, because of Defendant's failure to pay overtime as required by state law, as alleged herein, to the extent that § 1194's provision for recovery of "the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon" constitutes "civil penalties" recoverable under Labor Code § 2699(a) or "underpaid wages"

recoverable as a civil penalty (*cf. Thurman v. Bayshore Transit Management, Inc.*, 203 Cal. App. 4th 1112, 1148 (2012)), Defendant is liable for such civil penalties, or in the alternative, Defendant is liable for civil penalties under California Labor Code § 2699(f)(1)-(2) for each aggrieved employee per pay period.

183. PAGA also allows for recovery with respect to Labor Code § 1198 which provides, in relevant part: "The employment of any employee . . . under conditions of labor prohibited by the order [of the IWC] is unlawful." *See* Labor Code § 2699.5 (listing, *inter alia*, § 1198). Therefore, because of Defendants' violations of one or more IWC wage orders, as alleged herein, Defendants are liable for civil penalties under California Labor Code § 2699(f)(1)-(2) for each aggrieved employee per pay period.

**Failure to Provide Itemized Wage Statements in Violation of Labor Code § 226 and IWC Wage Orders**

184. Plaintiffs incorporate by reference all paragraphs in this complaint as if fully set forth herein.

185. The California Court of Appeal has held: "For employers who violate section 226(a), civil penalties are assessed as provided in section 226.3." *Heritage Residential Care, Inc. v. Division of Labor Standards Enforcement*, 192 Cal. App. 4th 75, 81 (2011).

186. California Labor Code § 226.3 provides: "Any employer who violates subdivision (a) of Section 226 shall be subject to a civil penalty in the amount of two hundred fifty dollars ($250) per employee per violation in an initial citation and one thousand dollars ($1,000) per employee for each violation in a subsequent citation, for which the employer fails to provide the employee a wage deduction statement or fails to keep the records required in subdivision (a) of Section 226. . . . In enforcing this section, the Labor Commissioner shall take into consideration whether the violation was inadvertent, and in his or her discretion, may decide not to penalize an employer for a first violation when that violation was due to a clerical error or inadvertent mistake."

187. Defendants' failure to provide timely, accurate, itemized wage statements to Plaintiffs and the other current and former employees in accordance with the California Labor

Code and the Wage Orders has been knowing and intentional.

188. Based on the violations set forth herein, Defendants are liable for civil penalties pursuant to Labor Code § 226.3.

189. PAGA also allows for recovery with respect to Labor Code § 1198 which provides, in relevant part: "The employment of any employee . . . under conditions of labor prohibited by the order [of the IWC] is unlawful." *See* Labor Code § 2699.5 (listing, *inter alia*, § 1198). Therefore, Defendant is liable for civil penalties under California Labor Code § 2699(f)(1)-(2) for each aggrieved employee per pay period

**Violations of Labor Code §§ 201, 202, and 203 ("Waiting Time")**

190. Plaintiffs incorporate by reference all paragraphs in this complaint as if fully set forth herein.

191. California Labor Code 203(a) provides, in relevant part: "If an employer willfully fails to pay, without abatement or reduction, in accordance with Sections 201, 201.3, 201.5, 201.9, 202, and 205.5, any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days."

192. Plaintiffs and certain of the other aggrieved individuals were not paid full compensation, including overtime, for all hours worked, as alleged above, and were not paid that compensation that was due and owing upon discharge and/or within seventy-two (72) hours of the employee's termination of employment by resignation. Thus, Defendants have failed and refused, and continue to willfully fail and refuse, to timely pay compensation and wages and compensation in violation of California Labor Code §§ 201, 202, and 203.

193. Because of Defendants' violations of California Labor Code § 201, Defendants are liable for civil penalties under California Labor Code § 2699(f)(1)-(2) for each aggrieved employee per pay period.

194. Because of Defendants' violations of California Labor Code § 202, Defendants are liable for civil penalties under California Labor Code § 2699(f)(1)-(2) for each aggrieved

employee per pay period.

195. Because of Defendants' violations of California Labor Code § 203, Defendants are liable for civil penalties under California Labor Code § 2699(f)(1)-(2) for each aggrieved employee per pay period.

**Failure To Pay All Wages Owed Every Pay Period In Violation of Labor Code § 204**

196. Plaintiffs incorporate by reference all paragraphs in this complaint as if fully set forth herein.

197. During the relevant time period, Plaintiffs and other current and former aggrieved employees have been employees covered by Labor Code § 204 but have been misclassified and not treated as employees.

198. Pursuant to Labor Code § 204, Plaintiffs and other current and former aggrieved employees were entitled to receive on regular paydays all wages earned for the pay period corresponding to the payday.

199. During the relevant time period, Defendants have failed to pay Plaintiffs and the other current and former employees all wages earned each pay period. That violates Labor Code § 204.

200. During the relevant time period, Defendants have maintained a policy and/or practice of not paying Plaintiffs and other current and former aggrieved employees overtime wages for all overtime hours worked. That violates Labor Code § 204.

201. Because of Defendants' violations of Labor Code § 204, Defendants are liable for civil penalties under California Labor Code § 2699(f)(1)-(2) for each aggrieved employee per pay period, and under Labor Code § 210 for each aggrieved employee per pay period.

**Tip Splitting in Violation of Labor Code § 351**

202. Plaintiffs incorporate by reference all paragraphs in this complaint as if fully set forth herein.

203. Defendants' tip splitting practices violate California Labor Code § 351.

204. Defendants' failure to keep records of all gratuities received violates California Labor Code § 353.

205. Because of Defendants' violations of Labor Code §§ 351 and 353, Defendants are liable for civil penalties under California Labor Code § 2699(f)(1)-(2) for each aggrieved employee per pay period.

**Failure to Reimburse for Expenses in Violation of Labor Code §§ 450 and 2802**

206. Plaintiffs incorporate by reference all paragraphs in this complaint as if fully set forth herein.

207. Defendants' conduct, as alleged above, violates California Labor Code §§ 450 and 2802, insofar as Defendants have misclassified Plaintiffs and class members as independent contractors, and have failed to reimburse them for expenses that they paid that should have been paid by their employer.

208. Because of Defendants' violations of Labor Code §§ 450 and 2802, Defendants are liable for civil penalties under California Labor Code § 2699(f)(1)-(2) for each aggrieved employee per pay period.

**Compelling Illegal Purported Agreements in Violation of Labor Code § 432.5**

209. Plaintiffs incorporate by reference all paragraphs in this complaint as if fully set forth herein.

210. Defendants' conduct, as alleged above, violates California Labor Code § 432.5, insofar as Defendants have required exotic dancers to enter into written purported agreements that contain numerous illegal provisions.

211. Because of Defendants' violations of Labor Code § 432.5, Defendants are liable for civil penalties under California Labor Code § 2699(f)(1)-(2) for each aggrieved employee per pay period.

**Violations of Paid Sick Day Requirements, Labor Code §§ 245-249**

212. Plaintiffs incorporate by reference all paragraphs in this complaint as if fully set forth herein.

213. Defendants violated Labor Code § 246 by not having policies and procedures for exotic dancers to accrue and take paid sick days.

214. Because of Defendants' violations of the paid sick day requirements,

Defendants are liable for civil penalties under California Labor Code § 248.5 in an amount equal to "the dollar amount of paid sick days withheld from the employee multiplied by three; or two hundred fifty dollars ($250), whichever amount is greater . . . ."

215. Because of Defendants' violations of the paid sick day requirements under California law, Defendants are also liable for civil penalties under California Labor Code § 2699(f)(1)-(2) for each aggrieved employee per pay period.

216. Because of Defendants' violations of the paid sick day requirements, Defendants are also liable for civil penalties pursuant to California Labor Code § 558 as follows: "(1) For any initial violation, fifty dollars ($50) for each underpaid employee for each pay period for which the employee was underpaid in addition to an amount sufficient to recover underpaid wages. (2) For each subsequent violation, one hundred dollars ($100) for each underpaid employee for each pay period for which the employee was underpaid in addition to an amount sufficient to recover underpaid wages. (3) Wages recovered pursuant to this section shall be paid to the affected employee. . . . (c) The civil penalties provided for in this section are in addition to any other civil or criminal penalty provided by law."

**Failure to Secure Compensation in Violation of Labor Code § 3700 *et seq*.**

217. Plaintiffs incorporate by reference all paragraphs in this complaint as if fully set forth herein.

218. Defendants did not secure workers' compensation for exotic dancers, in violation of Labor Code §§ 3700, 3700.5, 3712, 3715.

219. Because of Defendants' violations of the above-referenced statutes, Defendants are subject to the penalties and fines per Labor Code § 3700.5 and are liable for civil penalties under California Labor Code § 2699(f)(1)-(2) for each aggrieved employee per pay period.

**Failure to Maintain Payroll Records in Violation of Labor Code § 1174**

220. Plaintiffs incorporate by reference all paragraphs in this complaint as if fully set forth herein.

221. California Labor Code § 1174(d) requires: "Every person employing labor in this state shall: . . . "Keep, at a central location in the state or at the plants or establishments at

which employees are employed, payroll records showing the hours worked daily by and the wages paid to, and the number of piece-rate units earned by and any applicable piece rate paid to, employees employed at the respective plants or establishments. These records shall be kept in accordance with rules established for this purpose by the commission, but in any case shall be kept on file for not less than three years."

222. Defendants' conduct described herein constitutes a willful failure to maintain accurate and complete payroll records in violation of California Labor Code § 1174(d). Accordingly, Defendants are liable for civil penalties under California Labor Code § 1174.5, which provides: "Any person employing labor who willfully fails to maintain . . . accurate and complete records required by subdivision (d) of Section 1174 . . . shall be subject to a civil penalty of five hundred dollars ($500)."

223. WHEREFORE, for all of the violations specified in this cause of action, Plaintiffs seek civil penalties, attorneys' fees, costs of suit, and any further relief that the Court deems appropriate.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs individually, and Plaintiffs Jane Roe 1 and Jane Roe 3 as a representative suit on behalf of all current and former employees pray for relief against Defendant SFBSC MANAGEMENT, LLC as follows:

a) For an order certifying that the First Cause of Action of this Complaint may be maintained as a collective action pursuant to 29 U.S.C. § 216(b) and requiring that Defendant identify all members of the FLSA Collection and provide all locating information for members of the FLSA Collection, and that notice be provided to all members of the FLSA Collection apprising them of the pendency of this action and the opportunity to file Consents to Become Party Plaintiff thereto;

b) For an order certifying that the Second through Tenth Causes of Action of this Complaint may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of the classes as defined herein and that notice of the pendency of this action be provided to members of the proposed classes;

c) For an order designating certain of the named Plaintiffs, as identified herein, as class representatives for both the FLSA and California state law claims and Plaintiffs' attorneys as counsel for the FLSA Collection and the proposed classes;

d) For an order awarding Plaintiffs, the FLSA Collection, and the proposed classes compensatory damages and statutory damages, including unpaid wages, overtime compensation, liquidated damages, and all other sums of money owed, together with interest on these amounts;

e) For preliminary, permanent, and mandatory injunctive relief prohibiting Defendant and its officers and agents from committing the violations of law herein alleged in the future;

f) For a declaratory judgment that Defendant has violated the FLSA, California labor law, SFMWO, PAGA, and public policy as alleged herein;

g) For an order imposing all statutory and/or civil penalties provided by law, including without limitation penalties under the California Labor Code, SFMWO, and PAGA;

h) For exemplary and punitive damages, as appropriate and available under each cause of action, pursuant to California Civil Code § 3294;

i) For all unpaid overtime wages due to Plaintiffs and each class member;

j) For an order enjoining Defendant from further unfair and unlawful business practices in violation of the UCL;

k) Disgorgement of profits;

l) For an order awarding restitution of the unpaid regular, overtime, and premium wages due to Plaintiffs and class members;

m) For pre- and post-judgment interest;

n) For an award of reasonable attorneys' fees as provided by the FLSA, California Labor Code §§ 226(e) and 1194, California Code of Civil Procedure § 1021.5, SFMWO, PAGA, and/or other applicable law;

o) For all straight time owed, including interest thereon, plus liquidated damages and

penalties, pursuant to the SFMWO;

p) For all costs of suit; and

q) For such other and further relief as the Court deems just and proper.

WHEREFORE, under PAGA, Plaintiffs Jane Roe 1 and Jane Roe 3 individually and as a representative suit on behalf of all current and former employees pray for relief against the Nightclub Defendants as follows:

a) Civil penalties as alleged herein;

b) Reasonable attorneys' fees and costs of suit as allowed under PAGA, Labor Code § 2699(g)(1); and

c) Any further relief that the Court deems just and proper.

DATED: April __, 2021

Respectfully submitted,

THE TIDRICK LAW FIRM

By: ______________________________

STEVEN G. TIDRICK, SBN 224760
JOEL B. YOUNG, SBN 236662

Attorneys for Plaintiffs JANE ROES 1-3 *et al.*

**<u>JURY DEMAND</u>**

Plaintiffs in the above-referenced action, on their own behalf and on behalf of all persons they seek to represent, hereby demand a trial by jury on all counts.

DATED: April __, 2021

Respectfully submitted,

THE TIDRICK LAW FIRM

By: ______________________________

STEVEN G. TIDRICK, SBN 224760
JOEL B. YOUNG, SBN 236662

Attorneys for Plaintiffs JANE ROES 1-3 *et al.*

# Exhibit C

SOMMERS SCHWARTZ, P.C.
Trenton R. Kashima, Esq. (SBN 291405)
402 West Broadway, Suite 1760
San Diego, CA 92101
Telephone: 248-355-0300
Facsimile: 248-746-4001
Email: tkashima@sommerspc.com

Attorneys for Plaintiffs
and the Putative Classes

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **JANE ROE NO. 1 and 2**, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>**DÉJÀ VU SERVICES, INC.; HARRY MOHNEY; LA CLUB MANAGEMENT, LLC; PINE TREE ASSETS, INC.; SFBSC MANAGEMENT, LLC; TORRANCE FOOD & BEVERAGE, LLC; 3610 BARNETT AVE., LLC; CATHAY ENTERTAINMENT, INC.; COLDWATER, LLC; DEJA VU SHOWGIRLS - SACRAMENTO, LLC; DV of LA, LLC; EF5 ACQUISITIONS GROUP, LLC; GRAPEVINE ENTERTAINMENT, INC.; HOLLYWOOD & VINE CLUB, LLC; JOLAR CINEMA OF SAN DIEGO, LTD; NITE LIFE EAST, LLC; SHOWGIRLS OF SAN DIEGO INC; STOCKTON ENTERPRISES, LLC; SAN FRANCISCO - ROARING 20'S, LLC; SAN FRANCISCO - GARDEN OF EDEN, LLC; S.A.W. ENTERTAINMENT, LTD. -- CONDOR CLUB; S.A.W. ENTERTAINMENT, LTD.; GOLD CLUB - SF, LLC; DEJA VU SHOWGIRLS OF SAN FRANCISCO, LLC; DEJA VU - SAN FRANCISCO, LLC; CHOWDER HOUSE, INC.; BIJOU - CENTURY, LLC; B.T. CALIFORNIA, LLC**<br><br>Defendants. | Case No: 3:19-cv-03960-LB<br><br>**SECOND AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT FOR VIOLATION OF THE FLSA AND STATE LAW**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1. This is a class action brought by Plaintiffs Jane Roe No. 1 and 2 ("Plaintiffs") against Defendants Déjà Vu Services, Inc., Harry Mohney, and the Déjà Vu Affiliated Nightclubs (hereinafter collectively referred to as "Defendants")

2. The Class which Plaintiffs seek to represent is composed of people who, during the relevant time period, worked as exotic dancers at Déjà Vu Affiliated Nightclubs in California.

3. Plaintiffs contend that all class members were denied their fundamental rights under applicable federal and state wage and hour laws, causing financial loss and injury. Specifically, Plaintiffs complain that Defendants misclassified Plaintiffs and all other members of the Class as independent contractors, as opposed to employees, at all times in which they worked as dancers at Defendants' adult nightclubs located throughout California. Plaintiffs contend that Defendants failed to pay Plaintiffs and all other members of the Class the minimum and overtime wages and other benefits to which they were entitled under applicable federal and California state laws. Additionally, Defendants engaged in unlawful tip-sharing by requiring dancers in the Class to share gratuities given to them by patrons with Defendants and their employees, such as doormen and DJs. Plaintiffs, therefore, bring this class action seeking damages, back pay, restitution, liquidated damages, injunctive and declaratory relief, civil penalties, prejudgment interest, reasonable attorneys' fees and costs, and any and all other relief the Court deems just, reasonable and equitable under the circumstances.

## I. JURISDICTION AND VENUE

4. This action was removed from the California Superior Court for the County of San Diego, on January 28, 2019 and transferred to this Court from the United States District Court for the Southern District of California.

5. This Court has jurisdiction over Plaintiffs' Fair Labor Standards Act ("FLSA") claims pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the California state law claims because they are so related to this action that they form part of the same case or controversy under Article III of the United States Constitution.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants operate their business and employ the class members within this County, and a substantial or significant

portion of the conduct complained of herein occurred and continues to occur within this County.

## II. PARTIES AND STANDING

7. Plaintiff Jane Roe No. 1 is a resident of San Bernardino County, California. Jane Roe No. 1 worked as an exotic dancer for Defendants at Déjà Vu Showgirls in Bakersfield, California during the class period and is a member of the proposed class. Like other class members, when Jane Roe No. 1 worked in that capacity, she was: (1) misclassified as an independent contractor, and as a result was not paid any wages (or provided other benefits and rights) to which she was entitled as an employee; and (2) required to split tip income as described more fully below. Jane Roe No. 1 sues on her own behalf and as a proposed class representative on behalf of similarly situated individuals. She sues under a fictitious name, Jane Roe No. 1, due to the highly sensitive and personal nature of the details about Plaintiffs in this action, and for additional reasons described below.

8. Plaintiff Jane Roe No. 2 is a resident of San Diego County, California. Jane Roe No. 2 worked as an exotic dancer for Defendants at Déjà Vu Showgirls in San Diego, California and Torrance, California during the class period and is a member of the proposed class. Like other class members, when Jane Roe No. 2 worked in that capacity, she was: (1) misclassified as an independent contractor, and as a result was not paid any wages (or provided other benefits and rights) to which she was entitled as an employee; and (2) required to split tip income as described more fully below. Jane Roe No. 2 sues on her own behalf and as a proposed class representative on behalf of similarly situated individuals. She sues under a fictitious name, Jane Roe No. 2, due to the highly sensitive and personal nature of the details about Plaintiffs in this action, and for additional reasons described below.

9. Plaintiffs sue under fictitious names due to the highly sensitive and personal nature of the details about Plaintiffs in this action and because (1) there is a significant social stigma associated with the nude and semi-nude “dancing” that exotic dancers, also known as “strippers,” perform; (2) there are risks inherent in working as an exotic dancer, including risk of injury by current or former customers of Defendants if an exotic dancer’s name or address is disclosed; (3) Plaintiffs would be hesitant to maintain this action enforcing fundamental employee rights if their names were to be forever associated with Defendants’ Nightclubs, which could affect their prospects for future employment by others; and (4) Plaintiffs wish to protect their rights to privacy. Plaintiffs’ concerns

are reasonable and justified. At the Nightclubs, it is customary for the exotic dancers to use pseudonyms or stage names for privacy and personal safety reasons. *See generally Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067-1068 (9th Cir. Cal. 2000) *accord Starbucks Corp. v. Superior Court* (2008) 168 Cal.App.4th 1436, n.7 ("[W]e allow parties to use pseudonyms in the 'unusual case' when nondisclosure of the party's identity 'is necessary . . . to protect a person from harassment, injury, ridicule or personal embarrassment.' . . . We join our sister circuits and hold that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity."). The California Superior Court for the County of San Diego previously ordered that Plaintiffs could maintain this action under fictitious names.

10. Defendants are business entities and/or individuals that jointly employ and control the work of members of the Class that work or have worked at Déjà Vu Affiliated Nightclubs throughout California.

11. Defendants 3610 Barnett Ave., LLC; Cathay Entertainment, Inc.; Coldwater, LLC; Deja Vu Showgirls - Sacramento, LLC; DV of LA, LLC; Ef5 Acquisitions Group, LLC; Grapevine Entertainment, Inc.; Hollywood & Vine Club, LLC; Jolar Cinema Of San Diego, LTD; Nite Life East, LLC; Showgirls Of San Diego Inc.; Stockton Enterprises, LLC; San Francisco - Roaring 20's, LLC; San Francisco - Garden Of Eden, LLC; S.A.W. Entertainment, LTD. -- Condor Club; S.A.W. Entertainment, LTD.; Gold Club - SF, LLC; Deja Vu Showgirls of San Francisco, LLC; Deja Vu - San Francisco, LLC; Chowder House, Inc.; Bijou - Century, LLC; and B.T. California, LLC are collectively known and referred to herein as the "Déjà Vu Affiliated Nightclubs." The Déjà Vu Affiliated Nightclubs are businesses that, within the state of California, currently are, or that at any time during the Class Period were, either: A) parties to an agreement or contract with Déjà Vu Services, Inc. whereby they receive(d) either consulting or management services, or licensing rights, from Déjà Vu Services, Inc.; B) parties to an agreement or contract with Global Licensing, Inc., whereby they receive(d) licensing rights from Global Licensing, Inc.; C) owned, either wholly or in part, and directly or indirectly, by either Harry Mohney or Jason "Cash" Mohney; or D) tenants of Harry Mohney or Jason "Cash" Mohney, either directly or indirectly.

12. The senior management of all Déjà Vu Affiliated Nightclubs throughout California is delegated to Déjà Vu Services, Inc., Harry Mohney and/or their agents. In turn, the employment policies affecting class members at the Déjà Vu Affiliated Nightclubs in California are dictated, determined, controlled and perpetuated in material part by Déjà Vu Services, Inc. and Harry Mohney. As such, Déjà Vu Services, Inc. and Harry Mohney are joint employers of all dancers under applicable federal and state wage and hour laws, including the FLSA.

13. Defendant Déjà Vu Services, Inc. is a Michigan Corporation maintaining offices in North Hollywood, California, San Diego, California and Lansing, Michigan. The registered office for Déjà Vu Services is 8252 E. Lansing Road, Durand, Michigan, 48429. Déjà Vu Services also maintains corporate offices in North Hollywood and San Diego, California. From those offices DVS manages, operates and/or controls the business operations and employment and wage policies at the numerous Déjà Vu Affiliated Nightclubs doing business under "Déjà Vu," "Déjà Vu Showgirls," "Déjà Vu Dream Girls," "Déjà Vu Centerfolds," and/or other trade names nationwide, including the Déjà Vu Affiliated Nightclubs where Plaintiffs and all Class members worked. Defendants LA Club Management, LLC; Pine Tree Assets, Inc.; SFBSC Management, LLC; and Torrance Food & Beverage, LLC are also businesses providing management services to one or more of the Déjà Vu Affiliated Nightclubs. Collectively, Déjà Vu Services, Inc., LA Club Management, LLC; Pine Tree Assets, Inc.; SFBSC Management, LLC; and Torrance Food & Beverage, LLC are referred to herein as the ""Déjà Vu Services" or "DVS."

14. Defendant Harry Mohney ("Mohney") is an individual residing in California, Nevada and/or other foreign addresses. Upon information and belief, Mohney owns, manages and/or controls Déjà Vu Services and each of the Déjà Vu Affiliated Nightclubs, directly or indirectly. Together with DVS, Mohney perpetuates the employment policies affecting Class members that are challenged in this lawsuit. Mohney maintains offices in California where he conducts this work and makes these decisions that affect Class members in California. Mohney manages, operates and/or controls the business operations and employment policies at the numerous nightclubs doing business under "Déjà vu," "Déjà Vu Showgirls," "Déjà Vu DreamGirls," "Déjà Vu Centerfolds," and/or other trade names nationwide, including the Déjà Vu Affiliated Nightclubs where Plaintiffs and all Class members

worked.

15. Déjà Vu Services, Mohney, LA Club Management, LLC; Pine Tree Assets, Inc.; SFBSC Management, LLC; Torrance Food & Beverage, LLC, and the Déjà Vu Affiliated Nightclubs are joint employers of all Class members and as such are jointly and severally liable for any violations of the wage and hour laws set forth below. Plaintiffs seek to certify a class of all exotic dancers who worked at Déjà Vu Affiliated Nightclubs in California that were directly or indirectly owned, operated, controlled and/or managed by Déjà Vu Services and/or Mohney. Déjà Vu Services and Mohney manage, operate and control the significant business operations in each Déjà Vu Affiliated Nightclub, and dictate the common employment policies applicable to each nightclub, including but not limited to the decisions: (1) to classify dancers as independent contractors, as opposed to employees, and; (2) to require that dancers share their tips. Those policies, which affected and harmed Class members in California, were established and implemented, in significant and material part, at Déjà Vu Services' and Mohney's offices and places of business in California.

16. DVS, its officers and consultants, including Mohney, have been involved in the decisions to classify exotic dancers working at the Déjà Vu Affiliated Nightclubs as independent contractors, as opposed to employees, and to perpetuate and maintain that classification system. As part of those discussions, DVS, its officers and consultants, including Mohney, have discussed compliance with the labor codes relating to the dancer classification issue and made the decision to try to have dancers "elect" to be independent contractors and waive their statutory rights under the wage and hour laws.

17. Each Déjà Vu Affiliated Nightclub has a common structure where it is held by a nominal corporation, but substantial senior management, financial, legal and other critical operational functions are delegated to affiliated companies which all come under the common control of DVS, its officers and consultants, including Mohney; all or significant senior management functions of each nightclub corporation are delegated to Déjà Vu Services, a company indirectly owned by Mohney. Other key business functions are delegated to and performed by other affiliated companies controlled by Mohney.

18. DVS currently makes its services available to each of the Déjà Vu Affiliated Nightclubs

and licenses various “Déjà Vu” trademarks to the clubs. DVS establishes policies that confirm that it controls the workplace at all of the Déjà Vu Affiliated Nightclubs, including those pertaining to the work and classification of exotic dancers in the Class. Upon information and belief, Déjà Vu Services performs the same business functions with respect to all Déjà Vu Affiliated Nightclubs, including management and consultation functions regarding the employment classification of dancers and tip sharing practices.

19. Mohney, directly or indirectly, holds a significant ownership share in all or certain Déjà Vu Affiliated Nightclubs. DVS, its officers and consultants, including Mohney, make decisions regarding the Déjà Vu Affiliated Nightclubs (including employment policies) from their offices in California. Specifically, a senior DVS consultant lives in California and, in conjunction with others, implements, directs, and creates DVS policies on behalf of the Déjà Vu Affiliated Nightclubs.

20. DVS employs a number of “consultants” including Mohney. These individuals make decisions regarding DVS and the Déjà Vu Affiliated Nightclubs (including employment policies) from their offices in California.

21. Certain DVS officers and “consultants” also manage the Déjà Vu Affiliated Nightclubs. For instance, one DVS consultant - who resides and works in California - is also the President of a holding company that maintains ownership interests in numerous Déjà Vu Affiliated Nightclubs. Other managers of Déjà Vu Affiliated Nightclubs report to, are controlled by, and answer to, DVS’s officers and consultants. Through this, *inter alia*, DVS and Mohney control the operations of the Déjà Vu Affiliated Nightclubs and the people who work there, including dancers in the class.

22. Upon information and belief, at all relevant times, Mohney has played a significant role in managing, directing and controlling the day-to-day business operations of Déjà Vu Services, all of the Déjà Vu Affiliated Nightclubs, and Modern Bookkeeping.

23. Upon information and belief, at all relevant times Mohney was employed by Déjà Vu Services and conducted his work, supervision, and direction of the Déjà Vu Affiliated Nightclubs’ operations from his offices in California, Nevada, and/or Michigan.

24. Upon information and belief, Mohney, Déjà Vu Services and the Déjà Vu Affiliated Nightclubs employ “consulting” agreements to allow Mohney and Déjà Vu Services to control,

operate, direct, and manage the business affairs of the Déjà Vu Affiliated Nightclubs, including those that affect dancer classification and tip sharing policies.

25. At all relevant times, Mohney has been the *de facto* chief corporate officer of Déjà Vu Services and the Déjà Vu Affiliated Nightclubs; has had a significant ownership interest in Déjà Vu Services and the Déjà Vu Affiliated Nightclubs; and has had operational control over significant aspects of the business functions of Déjà Vu Services and the Déjà Vu Affiliated Nightclubs, including those relating to the employment classification of dancers; the determination of dancers' wages (or more accurately, the lack thereof); and tip-sharing requirements applicable to dancers working at the nightclubs. Mohney played a significant role in creating and maintaining the business model where dancers working at the Déjà Vu Affiliated Nightclubs were to be classified as independent contractors and required to share their tips. As such, Mohney is jointly and severally liable to Plaintiffs and the Class, along with the other Defendants, for damages stemming from Déjà Vu Services and the other Déjà Vu Affiliated Nightclubs' failure to comply with applicable wage and hour laws.

26. At all relevant times, DVS and Mohney jointly employed all exotic dancers working in the Déjà Vu Affiliated Nightclubs, managed, directed and controlled the operations in each Déjà Vu Affiliated Nightclub, and dictated the common employment policies applicable in each nightclub, including but not limited to the decisions: (1) to misclassify dancers as independent contractors, as opposed to employees; (2) to require that dancers share their tips with Defendants; (3) to require that dancers further share their tips with Defendants' managers, doormen, floor walkers, DJs and other employees who do not usually receive tips, by paying "tip-outs;" (4) to not pay any dancers any wages; (5) to demand improper and unlawful payments from class members; (6) to adopt and implement employment policies which violate the FLSA and/or California wage and hour laws, and; (7) to threaten retaliation against any dancer attempting to assert her statutory rights to be recognized as an employee. DVS and Mohney created the common business model employed at each Déjà Vu Affiliated Nightclub regarding dancer classification and tip-sharing and require that the practices continue.

27. All named Defendants agreed and conspired among themselves, along with any third party owners of certain of the Déjà Vu Affiliated Nightclubs throughout California to unlawfully: (1)

misclassify dancers as independent contractors, as opposed to employees; (2) require that dancers share their tips with Defendants; (3) require that dancers further share their tips with Defendants' managers, doormen, floor walkers, DJs and other employees who do not usually receive tips, by paying "tip-outs;" (4) not pay any dancers any wages; (5) demand improper and unlawful payments from Class members; (6) adopt and implement employment policies which violate the FLSA and California wage and hour laws, and; (7) threaten retaliation against any dancer attempting to assert her statutory rights to be recognized as an employee. The unlawful agreements and conspiracies between Defendants and third parties in the enterprise were entered into as part of a strategy to maximize revenues and profits and to violate Class members' statutory rights.

28. Defendants knew or should have known that the business model employed was unlawful as applicable laws confirm that all money given to dancers by patrons was defined as a gratuity and the sole property of the dancer. Despite this, Defendants continued to willfully engage in the acts described below misclassifying dancers and sharing tip income in violation of their legal duties.

29. At all relevant times, Defendants owned and operated a nightclub business engaged in interstate commerce and which utilized goods moving in interstate commerce. For example, goods sold at the Déjà Vu Affiliated Nightclubs moved in interstate commerce. DVS and Mohney own, manage, and control the business operations at numerous nightclubs in California doing business under "Déjà Vu" and other tradenames. On information and belief, during the relevant time period, the annual gross revenues of each Defendant exceeded $500,000 per year.

30. By reason of the foregoing, Defendants, along with the Déjà Vu Affiliated Nightclubs, were at all relevant times enterprises engaged in commerce as defined in 29 U.S.C. §203(r) and §203(s). Defendants and the Déjà Vu Affiliated Nightclubs constitute an "enterprise" within the meaning of 29 U.S.C. §203(r)(1), because they perform related activities through common control for a common business purpose. At all relevant times, Defendants were enterprises engaged in commerce within the meaning of 29 U.S.C. §206(a) and §207(a).

31. The true names and capacities, whether individual, corporate, associate or otherwise, of each of the Defendants designated herein as DOES are unknown to Plaintiffs at this time and

therefore said Defendants are sued by such fictitious names. Plaintiffs will amend this Complaint to show their true names and capacities when ascertained. Plaintiffs are informed and believe and thereon allege that each Defendant designated herein as a DOE defendant is legally responsible in some manner for the events and happenings herein alleged and in such manner proximately caused damages to Plaintiffs as hereinafter further alleged.

32. Plaintiffs are informed and believe and thereon allege that each of the Defendants was acting as the agent, employee, partner, or servant of each of the remaining Defendants and was acting within the course and scope of that relationship, and gave consent to, ratified, and authorized the acts alleged herein to each of the remaining Defendants.

33. On information and belief, Plaintiffs anticipate naming, and possibly substituting, additional business entities or individuals because Defendant owns, operates, and/or controls local nightclubs while maintaining shell corporations and/or sham agreements to create the appearance that it does not have ownership and/or control of the nightclubs.

## III. GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS

34. The FLSA and California Labor Code and Industrial Welfare Commission ("IWC") Wage Orders applied to Plaintiffs and the Class at all times in which they worked at the Déjà Vu Affiliated Nightclubs.

35. No exceptions to the application of the FLSA or California wage and hour laws apply to Plaintiffs and the Class. For example, no Class member has ever been a professional or artist exempt from the provisions of those statutes. The exotic dancing performed by Class members while working at the Déjà Vu Affiliated Nightclubs does not require invention, imagination, or talent in a recognized field of artistic endeavor, and Class members have never been compensated by Defendants on a set salary, wage, or fee basis. Rather, Class members' sole source of income while working at the Déjà Vu Affiliated Nightclubs were tips given to them by patrons.

36. At all relevant times, Plaintiffs and each member of the Class, defined below, were employees of Defendants under the FLSA and applicable California wage and hour laws.

37. At all relevant times, Defendants were the employers of Plaintiffs and each member of the Class, defined below, under the FLSA and other applicable law. Defendants suffered or permitted

Class members to work. Defendants, directly or indirectly, employed and exercised significant control over the Class members' wages, hours, and working conditions.

38. At all relevant times, all Defendants were the joint employers of Plaintiffs and members of the Class. Under the FLSA and/or California laws, Plaintiffs' and Class members' employment for one Defendant is not completely disassociated from their employment by the other Defendant(s). DVS, Mohney, and the Déjà Vu Affiliated Nightclubs do not act entirely independent of each other and are not completely dissociated with respect to the employment of Plaintiffs and the Class. DVS and Mohney maintain significant control over Plaintiffs and other Class members while working at the Déjà Vu Affiliated Nightclubs. DVS and Mohney play significant roles in establishing, maintaining and directing the working and employment policies that are to be applied to Class members while working at the Déjà Vu Affiliated Nightclubs. DVS and Mohney benefit financially from the work Class members perform while working at the Déjà Vu Affiliated Nightclubs. As joint employers of Plaintiffs and members of the Class, DVS and Mohney are responsible both individually and jointly for compliance with all of the applicable provisions of the FLSA and other applicable wage and hour laws. 29 C.F.R. § 791.2(a) and (b).

39. During the relevant time period, the employment terms, conditions, and policies that applied to Plaintiffs were the same as those applied to the other Class members who worked as exotic dancers at all Déjà Vu Affiliated Nightclubs in all material respects.

40. Throughout the relevant time period, Defendants' policies and procedures regarding the classification of all exotic dancers (including Plaintiffs) at the Déjà Vu Affiliated Nightclubs and treatment of dance tips were the same.

41. As a matter of common business policy, Defendants systematically misclassified Plaintiffs and all Class members as independent contractors, as opposed to employees. Defendants' classification of Plaintiffs as independent contractors was not due to any unique factor related to their employment or relationship with Defendants. Rather, as a matter of common business policy, Defendants routinely misclassified all exotic dancers as independent contractors as opposed to employees. As a result of this uniform misclassification, Plaintiffs and the members of the Class were not paid the minimum and overtime wages required, were deprived of other statutory rights and

benefits, and therefore, suffered harm, injury and incurred financial loss.

42. Plaintiffs and members of the Class incurred financial loss, injury, and damage as a result of Defendants' common practices misclassifying them as independent contractors and failing to pay them minimum and overtime wages in addition to the tips that they were given by patrons. Plaintiffs' injuries and financial loss were caused by Defendants' application of those common policies in the same manner as they were applied to absent Class members.

43. During the relevant time period, no Class member received any wages or other compensation from Defendants. Members of the Class generated their income solely through the tips received from patrons when they performed exotic table, chair, couch, lap and/or VIP room dances (collectively referred to herein as "dance tips").

44. All monies Class members like Plaintiffs received from patrons when they performed exotic dances were tips, not wages or service fees. Tips belong to the person they are given to. Dance tips were given by patrons directly to dancers in the Class and therefore, belong to dancers in the Class, not Defendants.

45. The full amount dancers in the Class are given by patrons in relation to exotic dances they perform are not taken into Defendants' gross receipts, with a portion then paid out to the dancers. Neither Defendants nor any of their affiliated companies issue W-2 forms, 1099 forms or any other documents to Class members indicating any amounts being paid from their gross receipts to Class members as wages.

46. Plaintiffs and members of the Class are tipped employees as they are engaged in an occupation in which they customarily and regularly receive more than $30 a month in tips. No tip credits offsetting any minimum wages due, however, are permitted. Therefore, as employees of Defendants, Class members are entitled to: (a) receive the full minimum wages due, without any tip credit, reduction or other offset; and (b) to retain the full amount of any dance tips and monies given to them by patrons when they perform exotic dances.

47. Defendants' misclassification of Plaintiffs and other Class members as independent contractors was designed to deny Class members their fundamental rights as employees to receive minimum wages, to demand and retain portions of tips given to Class members by patrons, and done

to enhance Defendants' profits at the expense of the Class.

48. Defendants' misclassification of exotic dancers like Plaintiffs was willful. Defendants knew or should have known that Plaintiffs and the other dancers performing the same job functions were improperly misclassified as independent contractors.

49. Employment is defined with "striking breadth" in the wage and hour laws. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 325-26, 112 S.Ct. 1344, 1349-50 (1992). The determining factor as to whether dancers like Plaintiffs are employees or independent contractors under the FLSA is not the dancer's election, subjective intent or any contract. *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 727 (1947). Rather, the test for determining whether an individual is an "employee" under the FLSA is the economic reality test. Under the economic reality test, employee status turns on whether the individual is, as a matter of economic reality, in business for herself and truly independent, or rather is economically dependent upon finding employment in others.

50. Any contract which attempts to have workers in the Class waive, limit or abridge their statutory rights to be treated as an employee under the FLSA or other applicable wage and hour laws is void, unenforceable, unconscionable and contrary to public policy. Workers in the Class cannot validly "elect" to be treated as employees or independent contractors under threat of adverse treatment. Nor can workers in the Class agree to be paid less than the minimum wage.

51. Despite this, Defendants unfairly, unlawfully, fraudulently and unconscionably attempt to coerce dancers in the Class to waive their statutory rights and elect to be treated as independent contractors. Defendants threaten to penalize and discriminate against dancers in the Class if they assert their statutory rights such as through termination and the confiscation of all dance tips, among other adverse conditions and retaliations. Any such retaliation based on the assertion of statutory rights under the wage and hour laws is unlawful. 29 U.S.C. § 215(a)(3). Further, it is unlawful for an employer to even threaten to discharge, demote, terminate or discriminate in the terms and conditions of employment because an employee has made a bona fide complaint against an employer for a violation of wage and hour laws. This protection encompasses the exercise of statutory rights on the employees own behalf and on behalf of others. Any actual or threatened retaliation against an employee for the assertion of wage and hour law claims violates the state's fundamental public policy

to protect the payment of wages and employee's rights.

52. Under the applicable FLSA test, courts utilize several factors to determine economic dependence and employment status. They are: (i) the degree of control exercised by the alleged employer; (ii) the relative investments of the alleged employer and employee; (iii) the degree to which the employee's opportunity for profit and loss is determined by the employer; (iv) the skill and initiative required in performing the job; (v) the permanency of the relationship; and (vi) the degree to which the alleged employee's tasks are integral to the employer's business.

53. By contrast, California has opted for the "ABC Test." On April 30, 2018, the California Supreme Court issued its long-awaited opinion in *Dynamex Operations W., Inc. v. Super. Ct.*, 416 P.3d 1, 5 (Cal. 2018), clarifying the standard for determining whether workers in California should be classified as employees or as independent contractors for purposes of the wage orders adopted by California's Industrial Welfare Commission. In so doing, the Court narrowed the definition of independent contractor, holding that there is a presumption that individuals are employees and that an entity classifying an individual as an independent contractor bears the burden of establishing that such a classification is proper.

54. To meet this burden, the **hiring** entity must establish *each* of the following three factors, commonly known as the "ABC test":

a. that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and*

b. that the worker performs work that is outside the usual course of the hiring entity's business; *and*

c. that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed.

55. The totality of circumstances surrounding the employment relationship between Defendants and the dancers in the Class working at the Déjà Vu Affiliated Nightclubs establishes economic dependence by the dancers on Defendants and employee status. Here, as a matter of economic reality, Plaintiffs and all other Class members are not in business for themselves and truly independent, but rather are economically dependent upon finding employment in others, namely Defendants. The dancers are not engaged in occupations or businesses distinct from that of Defendants. Rather, their work is the basis for Defendants' business. Defendants obtain the patrons

who desire exotic dance entertainment and provide the workers who conduct the exotic dance services on behalf of Defendants. Defendants retain pervasive control over the nightclub operation as a whole, and the dancers' duties are an integral part of the operation.

56. Thus, whether analyzed according to the FLSA's economic reality test or California's more rigorous "ABC test," it is clear that Defendants miscast Plaintiffs and the Class as independent contractors.

### ***A. Degree Of Control – Plaintiffs And The Other Dancers Exercise No Control Over Their "Own" Or Their Employers' Business'***

57. Plaintiffs and the other members of the Class do not exert control over a meaningful part of the nightclub business and do not stand as separate economic entities from Defendants. Defendants exercise control over all aspects of the working relationship with Plaintiffs and the other dancers in the nightclubs.

58. Class members' economic status is inextricably linked to those conditions over which Defendants have complete control. Plaintiffs and the other dancers are completely dependent on the Déjà Vu Affiliated Nightclubs for their earnings. The club controls all of the advertising and promotion without which dancers like Plaintiffs could not survive economically. Moreover, Defendants create and control the atmosphere and surroundings at the Déjà Vu Affiliated Nightclubs, the existence of which dictates the flow of patrons into the club. The dancers have no control over the customer volume or the atmosphere at each of the nightclubs.

59. Defendants employ guidelines and rules dictating the way in which dancers like Plaintiffs must conduct themselves while working at the Déjà Vu Affiliated Nightclubs. Defendants dictate: the hours of operation; length of shifts dancers must work; the show times during which a dancer may perform; minimum dance tips; determine the sequence in which a dancer may perform on stage during her stage rotation; the format and themes of dancers' performances (including their costuming and appearances); theme nights; conduct while at work (*i.e.*, that they be on the floor as much as possible when not on stage and mingle with patrons in a manner which supports Defendants' general business plan); tip sharing; paying "tipouts" to employees who do not normally receive tips from patrons; requirements that dancers help sell drinks or "Déjà Vu " branded novelties to patrons;

and all other terms and conditions of employment.

60. Defendants require Plaintiffs and the other dancers in the Class to schedule work shifts. Defendants require that each shift worked by a dancer be of a minimum number of hours. Further, Defendants require dancers like Plaintiffs to clock-in and clock-out (or otherwise check in or report) at the beginning and end of each shift. If late or absent for a shift, a dancer is subject to fine, penalty, or reprimand by Defendants. Once a shift starts, a dancer, like Plaintiffs, are required to complete the shift and cannot leave early without penalty or reprimand.

61. Defendants impose other rules on dancers such as those restricting smoking breaks, the length of breaks, and how many dancers can take such breaks at a time.

62. While working at the Déjà Vu Affiliated Nightclubs, dancers like Plaintiffs perform exotic table, chair, couch, lap and/or VIP room dances for patrons offering them "dance tips." Defendants, not the dancers, set the minimum tip amount that dancers must collect from patrons when performing exotic dances. Defendants announce the minimum tip amounts to patrons in the nightclub wishing to view dances.

63. Defendants dictate the manner and procedure in which dance tips are collected from patrons and tracked. Each time a dancer performs an exotic dance for a patron and receives a dance tip, the dancer is required to immediately account to Defendants for their time and any dance tip given to them by the patron. Additionally, Defendants employ other employees called "checkers," doormen and/or floor walkers to watch dancers work, count private dances they perform, and record the amount of any dance tips received. At the end of a work shift, dancers like Plaintiffs are required to clock out and account to Defendants for all dances performed for the patrons of the nightclub. Then, in addition to any base "rent" payment, the dancer is required to pay a portion of each dance tip given to them by patrons over to Defendants as "rent." The rent payment typically exceeds 30% of each dance tip. Alternatively, in clubs where rent is not collected on a per-dance basis, the base "rent" the dancer must pay the nightclub at the end of a shift is higher and ultimately funded through tip-sharing.

64. The entire sum a dancer receives from a patron in relation to a dance is not given to Defendants (and/or the nightclubs) and taken into their gross receipts. Rather, the dancers keep their share of the payment under the tip-sharing policy and only pay over to Defendants and the nightclub

the portion demanded as "rent" (e.g., $7 from each $20 dance tip received). As a result, there is no pay out by Defendants to the dancer of any wages. Defendants (and/or the nightclubs) issue no 1099 forms, W-2 forms, or other documents to any dancers showing any sums being paid to dancers as wages.

65. Defendants establish the share or percentage which each dancer is required to pay them for each type of dance they receive dance tips for during the work shift. In addition, per-dance amounts or "tip-outs" must be paid by dancers (e.g. approx. $1 for each dance) to the nightclub manager, dance checkers, disk-jockey, bouncers/door staff and/or other employees as part of Defendants' tip-sharing policy. Dancers are also required to help sell goods (such as t-shirts, videos or hats) bearing the Déjà Vu logo to patrons as part of their job duties performing table dances. As part of these "special" dances, goods are sold as a package with a table dance. The foregoing establishes that Defendants control and set the terms and conditions of all dancers' work. This is the hallmark of economic dependence and control.

***B. Skill and Initiative of a Person in Business for Themselves***

66. Plaintiffs, like all other dancers, do not exercise the skill and initiative of a person in business for themselves.

67. Plaintiffs, like all other dancers, are not required to have any specialized or unusual skills to work at the Déjà Vu Affiliated Nightclubs. Prior dance experience is not required to perform at the Déjà Vu Affiliated Nightclubs. Dancers are not required to attain a certain level of skill in order to work at the Déjà vu Affiliated Nightclubs. There are no dance seminars, no specialized training, no instruction booklets, and no choreography provided or required in order to work at any of the Déjà Vu Affiliated Nightclubs. The dance skills utilized are commensurate with those exercised by ordinary people who choose to dance at a disco or at a wedding.

68. Plaintiffs, like all other dancers, do not have the opportunity to exercise the business skills and initiative necessary to elevate their status to that of independent contractors. Dancers, like Plaintiffs, own no enterprise. Dancers, like Plaintiffs, exercise no business management skills. Dancers maintain no separate business structures or facilities. Dancers exercise no control over customer volume or atmosphere at the Déjà Vu Affiliated Nightclubs. Dancers do not actively participate in any effort to increase the nightclub's client base, enhance goodwill, or establish contracting possibilities.

The scope of a dancer's initiative is restricted to decisions involving what clothes to wear (within Defendants' guidelines) or how provocatively to dance which is consistent with the status of an employee opposed to an independent contractor.

69. Plaintiffs, like all other dancers, are not permitted to hire or subcontract other qualified individuals to provide additional dances to patrons, and increase their revenues, as an independent contractor in business for themselves would.

***C. Relative Investment***

70. Plaintiffs' relative investment is minor when compared to the investment made by Defendants.

71. Plaintiffs, like all other dancers, make no capital investment in the facilities, advertising, maintenance, sound system and lights, food, beverage and other inventory, or staffing of the Déjà Vu Affiliated Nightclubs. Defendants provide all investment and risk capital. Dancers' investments are limited to expenditures on costumes and make-up which they may choose to wear while working, and their own labor. But for Defendants' provision of the lavish nightclub work environment the dancers would earn nothing.

***D. Opportunity for Profit and Loss***

72. Defendants, not dancers like Plaintiffs, manage all aspects of the business operation including attracting investors, establishing the hours of operation, setting the atmosphere, coordinating advertising, hiring and controlling the staff (managers, waitresses, bartenders, bouncers/doormen, etc.). Defendants, not the dancers, take the true business risks for the Déjà Vu Affiliated Nightclubs. Defendants, not the dancers, are responsible for providing the capital necessary to open, operate and expand the nightclub business.

73. Dancers like Plaintiffs do not control the key determinants of profit and loss of a successful enterprise. Specifically, Plaintiffs are not responsible for any aspect of the enterprises' on-going business risk. For example, Defendants, not the dancers, are responsible for all financing, the acquisition and/or lease of the physical facilities and equipment, inventory, the payment of wages (for managers, bartenders, doormen, and waitresses), and obtaining all appropriate business' insurance and licenses. Defendants, not the dancers, establish the minimum dance tip amounts that should be

collected from patrons when dancing. Even with respect to any "rent" payments, the dancers do not truly pay the Club's "rent" for the exclusive use of space. Rather, the term "rent" is a misnomer or subterfuge for tip sharing as in reality, Defendants simply demand a set portion (approx. 35%) of each dance tip given to a dancer.

74. The extent of the risk that dancers like Plaintiffs are confronted with is the loss of any "base rent" fee due to Defendants when the employee clocks out after each shift. Defendants, not the dancers, shoulder the risk of loss. The dance tips the dancers receive are not a return for risk on capital investment. They are a gratitude for services rendered. From this perspective, it is clear that a dancer's "return on investment" (i.e. dance tips) is no different from that of a waiter who serves food during a customer's meal at a restaurant.

***E. Permanency***

75. Certain dancers in the Class have worked at the Déjà Vu Affiliated Nightclubs for significant periods of time.

***F. Integral Part of Employer's Business***

76. Dancers like Plaintiffs are essential to the success of the Déjà vu Affiliated Nightclubs. The continued success of the Déjà Vu Affiliated Nightclubs depends to an appreciable degree upon the provision of exotic dances by dancers for patrons. In fact, the primary reason the nightclubs exist is to showcase the dancers' physical attributes for patrons. The primary "product" or "good" Defendants are in business to sell patrons that come to their nightclubs are lap dances performed by the exotic dancers in the Class that Defendants recruit to work in their clubs and instruct to work in a specific way.

77. Many of the Déjà Vu Affiliated Nightclubs do not serve alcohol and therefore, are not truly in direct competition with other enterprises in the nightclub, tavern, or bar business. Absent the provision of exotic dances by dancers for patrons, a nightclub serving only non-alcoholic beverages would have difficulty remaining in business. Moreover, Defendants are able to charge admission prices and a much higher price for their drinks (e.g., $10 for soft drinks) than establishments without exotic dancers because the dancers are the main attraction of the Déjà Vu Affiliated Nightclubs. Moreover, dancers in the Class must help sell Defendants' drink products to patrons. As a result, the

dancers are an integral part of the Déjà vu Affiliated Nightclubs' business.

78. The foregoing demonstrates that dancers in the Class like Plaintiffs are economically dependent on Defendants and subject to significant control by Defendants. Therefore, Plaintiffs were misclassified as independent contractors and should have been paid minimum wages at all times they worked at any Déjà vu Affiliated Nightclub and otherwise been afforded all rights and benefits of an employee under federal and state wage and hour laws.

## IV. DEFENDANTS' INTENT

79. All actions and agreements by Defendants described herein were willful, intentional, and not the result of mistake or inadvertence.

80. Defendants were aware that the FLSA and state wage and hour laws applied to their operation of the Déjà Vu Affiliated Nightclubs at all relevant times and that under the economic realities test applicable to determining employment status under those laws the dancers were misclassified as independent contractors. Defendants and their affiliated companies, were aware of and/or the subject of previous litigation and enforcement actions relating to wage and hour law violations where the misclassification of exotic dancers as independent contractors was challenged. In the vast majority of those prior cases, exotic dancers working under conditions similar to those employed at the Déjà Vu Affiliated Nightclubs were determined to be employees under the wage and hour laws, not independent contractors. *See e.g., Harrell v. Diamond A Entm't, Inc.*, 992 F. Supp. 1343 (M.D. Fla. 1997). Further, Defendants were aware, and on actual or constructive notice, that applicable law rendered all dance tips given to class members by patrons when working in the Déjà Vu Affiliated Nightclubs the dancer/Class member's sole property, rendering Defendants' tip-share, rent, and tip-out polices unlawful. Despite being on notice of their violations, Defendants intentionally chose to continue to misclassify dancers like Plaintiffs, withhold payment of minimum wages, and require dancers to share their tips with Defendants and their employees in an effort to enhance their profits. Such conduct and agreements were intentional, unlawful, fraudulent, deceptive, unfair and contrary to public policy.

## V. INJURY AND DAMAGE

81. Plaintiffs and all Class members suffered injury, were harmed, and incurred damage

and financial loss as a result of Defendants' conduct complained of herein. Among other things, Plaintiffs and the Class were entitled to minimum wages and to retain all of the dance tips and other tips they were given by patrons. By failing to pay Plaintiffs and the Class minimum wages and interfering with their right to retain all of the dance tips and other tips they were given by patrons, Defendants injured Plaintiffs and the members of the Class and caused them financial loss, harm, injury, and damage. Defendants' conduct causing those injuries was committed in California, emanated to, and affected Class members across the state and nationwide.

## VI. COLLECTIVE AND CLASS ACTION ALLEGATIONS

82. Plaintiffs bring the First Cause of Action (for violations of the FLSA) as an "opt-in" collective action pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b) on behalf of themselves and a proposed collection of similarly situated individuals defined as follows, and hereinafter referred to as the "FLSA Collective":

> All individuals who have worked for Defendant(s) as an exotic dancer at any Déjà Vu Affiliated Nightclub identified on **Exhibit A** at any time during The Relevant Class Period.

83. The names and addresses of the individuals who comprise the FLSA Collective are available from Defendants. Accordingly, Plaintiffs herein pray for an Order requiring Defendants to provide the names and all available locating information for all members of the FLSA Collective, so that notice can be provided regarding the pendency of this action, and of such individuals' right to opt-in to this action as party plaintiffs.

84. Plaintiffs bring the Second through Eighth Causes of Action (the California state law claims) as an "opt-out" class action pursuant to Federal Rules of Civil Procedure, Rule 23, defined initially as follows, and hereinafter referred to as the "California Class":

> All individuals who have worked for Defendant(s) as an exotic dancer at any Déjà Vu Affiliated Nightclub at any time during the Relevant Class Period.

Excluded from the California Class is anyone employed by counsel for Plaintiffs in this action, and any Judge to whom this action is assigned and his or her immediate family members.

85. Relevant Class Period is Defined as (a) the time period from April 15, 2017 to the Preliminary Approval Date for Entertainers who Performed at one or more of the San Francisco Clubs;

and b) the time period from February 8, 2017 to the Preliminary Approval Date for Entertainers who performed at one or more of the Greater California Clubs. An Entertainer may be subject to both Class Periods if she Performed at one or more San Francisco Clubs during the San Francisco Class Period and at one or more of the Greater California Clubs during the Greater California Class Period.

86. Numerosity. Defendants have employed hundreds of individuals as exotic dancers during the relevant time periods.

87. Existence and Predominance of Common Questions. Common questions of law and/or fact exist as to the members of the proposed classes and, in addition, common questions of law and/or fact predominate over questions affecting only individual members of the proposed classes. The common questions include the following:

a. Whether Defendants' policy and practice of not paying exotic dancers the minimum wage and/or at one-and-a-half (1.5) times the regular rate of pay (*i.e.*, time-and-a-half) for all hours worked in excess of forty hours in a week or eight hours in a day violates the FLSA and/or California labor laws;

b. Whether Defendants violated the FLSA and/or California wage and hour laws by classifying all exotic dancers at the Déjà Vu Affiliated Nightclubs as "independent contractors," as opposed to employees, and not paying them overtime and minimum wages;

c. Whether the monies given to dancers by patrons when they perform table dances are gratuities;

d. Whether the dancers own the money given to them by patrons when they perform exotic dances;

e. Whether Defendants unlawfully required Class members to share their tips with Defendants and Defendants' employees;

f. Whether Defendants are joint employers of the dancers in the Class;

g. Whether Defendants and certain third parties agreed and conspired to deny Class members their rights under federal and state wage and hour laws;

h. Whether Defendants failed to keep required employment records;

i. Whether Defendants' payroll policies and practices violated the California Labor Code and/or the Unfair Competition Law ("UCL");

j. Whether the Class members are entitled to unpaid wages, waiting time penalties, and other relief;

k. Whether Defendants' affirmative defenses, if any, raise common issues of fact or law as to Plaintiffs and the Class members; and

l. Whether Plaintiffs and the proposed classes are entitled to damages and equitable relief, including, but not limited to, restitution and a preliminary and/or permanent injunction, and if so, the proper measure and formulation of such relief.

88. Typicality. Plaintiffs' claims are typical of the claims of the proposed classes. Defendants' common course of conduct in violation of law as alleged herein has caused Plaintiffs and the proposed classes to sustain the same or similar injuries and damages. Plaintiffs' claims are therefore representative of and co-extensive with the claims of the proposed classes.

89. Adequacy. Plaintiffs are adequate representatives of the proposed classes because their interests do not conflict with the interests of the members of the classes they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of members of the proposed classes.

90. Superiority. The class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each member of the proposed classes, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Defendants economically feasible. Individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

91. In the alternative, the proposed classes may be certified because the prosecution of separate actions by the individual members of the proposed classes would create a risk of inconsistent or varying adjudication with respect to individual members of the proposed classes that would establish incompatible standards of conduct for Defendants; and Defendants have acted and/or refused to act on grounds generally applicable to the proposed classes, thereby making appropriate final and injunctive relief with respect to members of the proposed classes as a whole.

**FIRST CAUSE OF ACTION**
**VIOLATION OF THE FLSA**
**(Failure to Pay Statutory Minimum Wages and Overtime)**
**(By the FLSA Collective)**

92. Plaintiffs hereby incorporate all of the preceding paragraphs by reference as if fully set

forth herein, unless inconsistent.

93. At all relevant times, Defendants jointly employed Plaintiffs and all Class members within the meaning of the FLSA.

94. 29 U.S.C. § 206 requires that Defendants pay all employees minimum wages for all hours worked. 29 U.S.C. § 206(a) provides in pertinent part:

> Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates:
>
> (1) except as otherwise provided in this section, not less than--
>
> (A) $5.85 an hour, beginning on the 60th day after May 25, 2007;
>
> (B) $6.55 an hour, beginning 12 months after that 60th day; and
>
> (C) $7.25 an hour, beginning 24 months after that 60th day;

95. 29 U.S.C. § 207 requires that Defendants pay all employees overtime wages for all overtime hours worked. 29 U.S.C. § 207(a) provides in pertinent part:

> ... no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate of not less than one and one-half times the regular rate at which he is employed.

96. Like other dancers working at the Déjà Vu Affiliated Nightclubs, Defendants failed to pay Plaintiffs the minimum and overtime wages set forth in 29 U.S.C. §§ 206-207, or any wages whatsoever. In fact, Defendants required that dancers like Plaintiffs actually pay them in order to work.

97. Defendants failed to pay dancers like Plaintiffs a minimum or overtime wage throughout the relevant time period because Defendants misclassified them as independent contractors.

98. The amounts paid to exotic dancers, like Plaintiffs, by patrons in relation to dances performed were tips, not wages. Those monies were not the property of Defendants. The entire amount collected from patrons in relation to dances performed by exotic dancers was not made part of any of Defendants' gross receipts at any point.

99. As a result, the amounts paid to dancers like Plaintiffs by patrons in relation to exotic dances were tips, not wages or service fees, and no part of those amounts can be used to offset Defendants' obligation to pay dancers, like Plaintiff, minimum wages due. *See e.g., Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 934 (S.D.N.Y. 2013) (granting summary judgment to exotic dancers on the issue of whether dance fees offset a nightclub's wage obligations under the FLSA).

100. Further, no tip credit applies to reduce or offset any minimum wages due. The FLSA only permits an employer to allocate an employee's tips to satisfy a portion of the statutory minimum wage requirement provided that the following conditions are satisfied: (1) the employer must inform the tipped employees of the provisions of § 3(m) of the FLSA, 29 U.S.C. § 203(m); and (2) tipped employees must retain *all the tips* received except those tips included in a tipping pool among employees who customarily receive tips. 29 U.S.C. § 203(m).

101. Neither of these conditions was satisfied. Defendants did not inform dancers like Plaintiffs of the provisions of § 3(m) of the FLSA, 29 U.S.C. § 203(m); and Plaintiffs did not retain all the tips received except those tips included in a tipping pool among employees who customarily receive tips. 29 U.S.C. § 203(m). Defendants never notified any dancers that their dance tips were being used to reduce the minimum wages otherwise due under FLSA's tip-credit provisions and that they were still due the reduced minimum wage for tipped employees. Rather, Defendants maintained that no dancers were ever due any minimum wages due to their classification as independent contractors and were paid none.

102. Further, Defendants' requirement that dancers like Plaintiffs share their tips and: (i) pay Defendants a portion of all dance tips as "rent"; and (ii) also pay a percentage of their tips as "tip-outs" to other employees who do not customarily receive tips, such as managers, checkers, DJs and bouncers/doormen/floor walkers, was not part of a valid tip-sharing arrangement.

103. Based on the foregoing, Plaintiffs are entitled to the full statutory minimum wages set forth in 29 U.S.C. §§ 206 and 207 for all periods in which they worked at the Déjà Vu Affiliated Nightclubs, along with all applicable penalties, liquidated damages, and other relief.

104. Defendants' conduct in misclassifying dancers like Plaintiffs as independent contractors was intentional, willful, and done to avoid paying minimum and overtime wages and the

other benefits that they were legally entitled to.

105. The FLSA provides that a private civil action may be brought for the payment of federal minimum and overtime wages and for an equal amount in liquidated damages in any court of competent jurisdiction by an employee pursuant to 29 U.S.C. § 216(b) (“Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.”). Moreover, Plaintiffs may recover attorneys’ fees and costs incurred in enforcing their rights pursuant to 29 U.S.C. § 216(b).

106. 12 U.S.C. § 21 l(c) provides in pertinent part:

(c) Records

> Every employer subject to any provision of this chapter or of any order issued under this chapter shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time, and shall make such reports therefrom to the Administrator as he shall prescribe by regulation or order as necessary or appropriate for the enforcement of the provisions of this chapter or the regulations or orders thereunder.

107. 29 C.F.R.§ 516.2 and 29 C.F.R. § 825.500 further require that every employer shall maintain and preserve payroll or other records containing, without limitation, the total hours worked by each employee each workday and total hours worked by each employee each workweek.

108. To the extent Defendants failed to maintain all records required by the aforementioned statutes and regulations, and failed to furnish Plaintiffs comprehensive statements showing the hours that they worked during the relevant time period, it also violated the aforementioned laws causing Plaintiffs damage.

109. When the employer fails to keep accurate records of the hours worked by its employees, the rule in *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687-688 (1946) is controlling. That rule states:

> ...where the employer's records are inaccurate or inadequate ... an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn

from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

110. The Supreme Court set forth this test to avoid placing a premium on an employer's failure to keep proper records in conformity with its statutory duty, thereby allowing the employer to reap the benefits of the employees' labors without proper compensation as required by the FLSA. Where damages are awarded pursuant to this test, "[t]he employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with ... the Act." *Id.*

111. Based on the foregoing, Plaintiffs seek unpaid minimum wages at the required legal rate for all working hours during the relevant time period, back pay, restitution, damages, reimbursement of any base rent and tip-sharing, liquidated damages, prejudgment interest calculated at the highest legal rate, attorneys' fees and costs, and all other costs, penalties, and other relief allowed by law.

**SECOND CAUSE OF ACTION**
**Violation of Calif. Labor Code §§ 1194, 1197, 1198, and 1199**
**Failure to Pay Minimum Wage as Required by State Law**
**(By the California Class)**

112. Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

113. Defendants' conduct, as set forth above, in failing to pay their dancers minimum wage for all hours worked as required by California law, violates Cal. Lab. Code §§ 1197 and 1194.

114. California Labor Code § 1194(a) provides for a private right of action for nonpayment of wages, and further provides that a plaintiff may recover the unpaid balance of the full amount of such wages, together with costs of suit, as well as liquidated damages, interest thereon, and the attorneys' fees and costs incurred. California Labor Code § 1194.5 further grants courts the authority to enjoin violations of this statute.

115. At all relevant times, Defendants have willfully failed to pay Plaintiffs and class members any wages whatsoever. Defendants have required that Plaintiffs and Class members actually pay Defendants in order to be able to work at Déjà Vu Affiliated Nightclubs.

116. Therefore, Plaintiffs seek, on behalf of themselves and all others similarly situated, unpaid wages at the required legal rate, reimbursement of stage fees, liquidated damages, interest,

attorneys' fees and costs, and all other costs and penalties allowed by law. Plaintiffs further seek injunctive relief to compel Defendants to recognize exotic dancers' employee status, to provide all payment guaranteed by law, and for this Court's continuing jurisdiction to enforce compliance.

**THIRD CAUSE OF ACTION**
**Violation of Calif. Labor Code §§ 1194, 1198, 510, and 558**
**Failure to Pay Overtime as Required by State Law**
**(By the California Class)**

117. Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

118. At all times relevant to the Complaint, Wage Order No. 4 has required the payment of an overtime premium for hours worked in excess of 8 hours in a workday, 40 hours in a workweek, or on the seventh day worked in a single workweek.

119. During the relevant time period, Plaintiffs and the class members were employed by Defendants within California but were not paid overtime wages for overtime hours worked.

120. Plaintiffs request that Defendants be required to pay them, and all those similarly situated, all overtime wages illegally withheld, penalties as provided under the California Labor Code including §§ 201-203, 510 and 1194.1(a) *et seq.*, punitive/exemplary damages, and attorneys' fees and costs under California Labor Code § 218.5 and 1194(a).

**FOURTH CAUSE OF ACTION**
**Violation of Calif. Labor Code § 226 and IWC Wage Order 4-2001**
**Failure to Provide Itemized Wage Statements in Violation of Cal. Labor Code**
**(By the California Class)**

121. Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

122. Defendants have failed, and continue to fail, to provide timely, accurate itemized wage statements to Plaintiffs and California Class members in accordance with California Labor Code § 226 and Wage Order No. 4. The wage statements that Defendants have provided to their exotic dancers, including Plaintiffs and the proposed California Class members, do not accurately reflect the actual hours worked and wages earned.

123. Defendants' failure to provide timely, accurate, itemized wage statements to Plaintiffs and members of the proposed California Class in accordance with the California Labor Code and the California Wage Order has been knowing and intentional. Accordingly, Defendants are liable for damages and penalties under California Labor Code § 226.

**FIFTH CAUSE OF ACTION**
**Violation of Calif. Labor Code §§ 201-203**
**Waiting Time Penalties**
**(By the California Class)**

124. Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

125. California Labor Code § 201(a) requires an employer who discharges an employee to pay compensation due and owing to said employee upon discharge. California Labor Code § 202(a) requires an employer to pay compensation due and owing within seventy-two (72) hours of an employee's termination of employment by resignation. California Labor Code § 203 provides that if an employer willfully fails to pay compensation promptly upon discharge or resignation, as required under §§ 201 and 202, then the employer is liable for waiting time penalties in the form of continued compensation for up to thirty (30) work days.

126. Certain members of the proposed California Class are no longer employed by Defendants but have not been paid full compensation for all hours worked, as alleged above. They are entitled to unpaid compensation for all hours worked, and overtime, for which to date they have not received compensation, and any applicable overtime.

127. Defendants have failed and refused, and continue to willfully fail and refuse, to timely pay compensation and wages and compensation to Plaintiffs and members of the proposed California Class whose employment with Defendants have terminated, as required by California Labor Code §§ 201 and 202. As a direct and proximate result, Defendants are liable to all such California Class members for up to thirty (30) days of waiting time penalties pursuant to California Labor Code § 203, together with interest thereon.

128. WHEREFORE, pursuant to Labor Code §§ 218, 218.5, and 218.6, Plaintiffs and Class members are entitled to recover the full amount of their unpaid wages, continuation wages under § 203, interest thereon, reasonable attorneys' fees, and costs of suit.

**SIXTH CAUSE OF ACTION**
**Violation of Calif. Labor Code § 204**
**Failure to Pay all Wages Owed Every Pay Period**
**(By the California Class)**

129. Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

130. During the relevant time period, Plaintiffs and Class members have been employees of Defendants covered by Labor Code § 204 but have been misclassified and not treated as employees.

131. Pursuant to Labor Code § 204, Plaintiffs and Class members were entitled to receive on regular paydays all wages earned for the pay period corresponding to the payday.

132. Defendants have failed to pay Plaintiffs and Class members all wages earned each pay period. On information and belief, at all times during the proposed class period, Defendants have maintained a policy or practice of not paying Plaintiffs and Class members minimum wages for all hours worked and overtime wages for all overtime hours worked.

133. As a result of Defendants' unlawful conduct, Plaintiffs and Class members have suffered damages in an amount, subject to proof, to the extent they were not paid all wages and/or compensation and/or penalties each pay period. The precise amounts of unpaid wages, compensation, and/or penalties are not presently known to Plaintiffs but can be determined directly from Defendants' records or indirectly based on information from Defendants' records and/or information known by class members.

134. WHEREFORE, pursuant to Labor Code §§ 218, 218.5 and 218.6, Plaintiffs and class members are entitled to recover the full amount of their unpaid wages, interest thereon, reasonable attorneys' fees, and costs of suit.

**SEVENTH CAUSE OF ACTION**
**Violation of Calif. Labor Code § 226.7 and IWC Wage Orders**
**Rest Break Violations**
**(By the California Class)**

135. Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

136. Labor Code §§ 226.7 and paragraph 12 of the applicable IWC Wage Orders provide that employers must authorize and permit all employees to take rest periods at the rate of ten minutes net rest time per four work hours.

137. Plaintiffs and Class members consistently worked consecutive four hour periods during their work shifts. Pursuant to the Labor Code and the applicable IWC Wage Orders, Plaintiffs were entitled to paid rest breaks of not less than ten minutes for each consecutive four hour shift, or major fraction thereof.

138. Labor Code §§ 226.7 and paragraph 12 of the applicable IWC Wage Orders provide that if an employer fails to provide an employee rest periods in accordance with this section, the employer shall pay the employee one hour of pay at the employee's regular rate of compensation for each workday that the rest period is not provided.

139. Defendants failed to provide Plaintiffs with timely rest breaks of not less than ten minutes for each consecutive four hour shift. Defendants failed to implement policies and practices which accounted for and authorized and permitted Plaintiffs and the Class members to timely take all required rest periods under California law. Defendants have therefore intentionally and improperly denied rest periods to Plaintiffs and the Class members in violation of Labor Code § 226.7 and paragraph 12 of the applicable IWC Wage Orders. Consequently, Defendants must pay rest period wages and penalty premium wages as required under Labor Code § 226.7.

140. Defendants' practice of not providing rest breaks or requiring employees to perform work during their legally mandated rest periods without premium compensation is a violation of Labor Code § 226.7 and the applicable IWC Wage Orders.

141. Additionally, Defendants failed to authorize and permit Plaintiffs and the Class members to take paid rest periods, as required by the Labor Code, because Defendants failed to pay an additional piece of compensation to account for the rest breaks. Instead, the only compensation the Class received was in the form of tips that they earned. As such, no *paid* rest break was ever provided under Defendants' compensation structure. Defendants also did not compensate the Class with an additional hour of pay at each Class member's effective hourly rate for each day that Defendants failed to provide them with adequate rest breaks, as required under Labor Code § 226.7.

142. Therefore, pursuant to Labor Code § 226.7 and paragraph 12 of the applicable IWC Wage Orders, Plaintiffs and Class members are entitled to damages in an amount equal to one hour of wages at their effective hourly rates of pay for each day worked without the required rest breaks, a sum to be proven at trial, as well as the assessment of any statutory penalties against Defendants, and each of them, in a sum as provided by the Labor Code and/or other statutes.

## EIGHTH CAUSE OF ACTION
**Violation of Calif. Labor Code §§ 226.7 and 512**
**Meal Break Violations**

**(By the California Class)**

143. Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

144. Plaintiffs and the Class regularly worked shifts greater than five hours and greater than ten hours. Pursuant to Labor Code § 512 an employer may not employ an employee for a shift of more than five hours without providing him or her with a meal period of not less than 30 minutes or for a shift of more than ten hours without providing him or her with a second meal period of not less than 30 minutes.

145. Defendants failed to provide Plaintiffs and the Class members with meal periods as required by the Labor Code, including by not providing them with the opportunity to take meal breaks, by providing them late or for less than 30 minutes, or by requiring them to perform work during breaks.

146. Defendants' practice of not providing meal breaks or requiring employees to perform work during their legally mandated meal periods without premium compensation is a violation of Labor Code §§ 226.7 and 512, and the applicable IWC Wage Orders.

147. Labor Code § 226.7 and paragraph 11 of the applicable IWC Wage Orders also provide that, if an employer fails to provide an employee a meal period in accordance with this section, the employer shall pay the employee one hour of pay at the employee's regular rate of compensation for each workday that the meal period is not provided. Defendants failed to compensate Plaintiffs for each meal period not provided or inadequately provided, as required under Labor Code § 226.7.

148. Therefore, pursuant to Labor Code § 226.7 and paragraph 11 of the applicable IWC Wage Orders, Plaintiffs are entitled to damages in an amount equal to one hour of wages at their effective hourly rates of pay for each meal period not provided or deficiently provided, a sum to be proven at trial, as well as the assessment of any statutory penalties against the Defendants, and each of them, in a sum as provided by the Labor Code and other statutes.

**NINTH CAUSE OF ACTION**
**Violation of Calif. Labor Code § 221, 223 and 351**
**Collecting and Receiving Earned Tips from the Class**
**(By the California Class)**

149. Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

150. Labor Code § 221 provides, "It shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee."

151. Labor Code § 351 prohibits employers and their agents from sharing in or keeping any portion of gratuity left for or given to one or more employees by a patron.

152. Defendants unlawfully received and/or collected wages from Plaintiffs by making unlawful deductions from the wages paid to Plaintiffs and the Class by requiring them to "tip out" the house at the end of their shifts.

153. Labor Code § 223 provides that where any statute or contract requires an employer to maintain the designated wage scale, it shall be unlawful to secretly pay a lower wage while purporting to pay the wage designated by statute or by contract. Labor Code § 225 further provides that the violation of any provision of Labor Code §§ 221 and 223 is a misdemeanor.

154. Additionally, Defendants otherwise withheld and/or failed to pay all wages due and owing to Plaintiffs and the Class. This includes requiring Plaintiffs and the Class to "tip out" the house at the end of their shifts, or to otherwise turn their tips over to Defendants.

155. As a direct and proximate cause of the unauthorized deductions from wages, Plaintiffs have been damaged, in an amount to be determined at trial.

**TENTH CAUSE OF ACTION**
**Common Law Conversion**
**(By the California Class)**

156. Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

157. Defendants' failure to give class members gratuities from customers that were given and/or left for class members, as alleged above, constitutes common law conversion.

158. Defendants have assumed control and ownership over the above-referenced gratuities, and applied them to its own use.

159. Plaintiffs and class members had a right of ownership and possession over the above-referenced gratuities.

160. Defendants' theft and retention of the above-referenced gratuities, without consent, have caused Plaintiffs and class members significant financial harm.

161. In failing to pay said monies to Plaintiffs and class members and retaining that money for its own use, Defendants have acted with malice, oppression, and/or conscious disregard for the statutory rights of Plaintiffs and class members. Such wrongful and intentional acts, given the number

of victims and the number of acts and previous claims and/or lawsuits relative to similar acts, justify awarding Plaintiffs and class members punitive damages pursuant to California Civil Code § 3294 *et seq.* in an amount sufficient to deter future similar conduct by Defendants.

**ELEVENTH CAUSE OF ACTION**
**Violation of California's Unfair Competition Law, Bus. & Prof. Code §§ 17200 *et seq.***
**(By the California Class)**

162. Plaintiffs incorporate the allegations of all the foregoing paragraphs by reference, as if fully set forth herein.

163. Plaintiffs bring this action individually, on behalf of the Class, and on behalf of the general public pursuant to § 17200 *et seq.* of the California Business and Professions Code (the "Cal. Bus. & Prof. Code"), and the Unfair Competition Laws ("UCL").

164. California Business and Professions Code § 17204 prohibits unfair competition, defined as "any unlawful, unfair or fraudulent business act or practice." On behalf of the Class, Plaintiffs seek compensation for the loss of their property and the personal financial impacts they have suffered as a result of Defendants' unfair business practices. Defendants' conduct, as described above, has been and continues to be deleterious to the Class, and Plaintiffs are seeking to enforce important rights affecting the public interest within the meaning of California Code of Civil Procedure § 1021.5.

165. The conduct of Defendants, as described above, constitutes unlawful, unfair, unconscionable and/or fraudulent business acts or practices which injured the Class members and caused them loss of money.

166. The unlawful, unfair, unconscionable and/or fraudulent business acts or practices adopted by Defendants, which injured the Class members and caused them loss of money, were conducted by DVS and Mohney in material part in the state of California and emanated to their business operations in California. Class members, therefore, were harmed and injured as a result of DVS's and Mohney's conduct in California. As such, the UCL applies to the entire Class.

167. Defendants adopted unlawful business and employment policies, entered into agreements and conspired amongst themselves (and with certain third parties in the enterprise who own part of other Déjà Vu Affiliated Nightclubs) to engage in the above-described unlawful, unfair, unconscionable and/or fraudulent business acts and practices in California and that conduct harmed

Class members and caused them injury and financial loss. As such, the UCL applies to all such transactions and dealings. All members of the Class have standing to assert UCL claims against DVS and Mohney.

168. By failing to pay its employees minimum and overtime wages in violation of the FLSA and California wage and hour laws, Defendants violated the UCL.

169. Violations of the FLSA are unlawful acts which are independently actionable under the UCL. *Wang v. Chinese Daily News* (9th Cir. 08-56740 9/27 /1 O); *In re Wells Fargo Home Mortgage Litig.*, 527 F.Supp.2d 1053, 1066-69 (N.D. Cal. 2007). Such cases are certifiable as class actions under Fed. R. Civ. P. 23 where the unlawful, unfair, unconscionable and/or fraudulent business acts or practices, which injured the Class, were conducted by DVS and Mohney in material part in the state of California and emanated to their business operations in this state.

170. Unpaid wages constitute restitution of property earned by the employee.

171. By requiring Class members to share their tips (e.g., dance tips) with Defendants and/or their employees (tip-outs) in violation of the FLSA and/or any other state or federal law or regulation, as described above, Defendants engaged in unlawful, unfair, unconscionable and/or fraudulent business acts or practices in violation of the UCL.

172. By attempting to have Class members waive, abridge or limit their rights under the FLSA and/or other applicable wage and hour laws in order to work as exotic dancers at the Déjà Vu Affiliated Nightclubs, Defendants engaged in unlawful, unfair, unconscionable and/or fraudulent business acts or practices in violation of the UCL.

173. By threatening to retaliate against and penalize Class members for asserting their rights under the FLSA and/or other applicable wage and hour laws (such as by terminating them, confiscating their tips, and/or imposing other penalties and discrimination), Defendants engaged in unlawful, unfair, unconscionable and/or fraudulent business acts or practices in violation of the UCL.

174. By failing to maintain employment records under the FLSA and/or other applicable wage and hour laws, Defendants engaged in unlawful, unfair, unconscionable and/or fraudulent business acts or practices in violation of the UCL.

175. The acts complained of herein, and each of them, constitute unfair, unlawful,

unconscionable and/or fraudulent business practices in violation of Cal. Bus. & Prof. Code § 17200 *et seq*. Defendants' acts and practices described herein offend established public policies including, but not limited to, those set forth in the FLSA and/or other applicable wage and hour laws (including Cal. Labor Code § 356), and involve business practices that are immoral, unethical, oppressive, and/or unscrupulous.

176. The unfair business practices set forth above have and continue to injure the Class and the general public and cause injury and the loss of money, as described further within. These violations have unjustly enriched Defendants at the expense of the Class. As a result, Plaintiffs, the Class and the general public are entitled to restitution and an injunction.

177. Defendants' conduct, as set forth above, violates the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*. Defendants' conduct constitutes unlawful business acts or practices, in that Defendants have violated California Labor Codes §§ 210, 226, 1194, 1197, and 2802, among other laws. As a result of Defendants' unlawful conduct, Plaintiffs and class members suffered injury in fact and lost money and property, including, but not limited to unpaid wages, unpaid minimum wages, and business expenses that dancers were required to pay. Pursuant to California Business and Professions Code § 17203, Plaintiffs and class members seek to recover restitution. Pursuant to California Code of Civil Procedure § 1021.5, Plaintiffs and class members who worked for Defendants in California are entitled to recover reasonable attorneys' fees, costs, and expenses incurred in bringing this action.

178. Defendants' conduct, as set forth above, in failing to permit dancers to retain all gratuities, including dance fees paid by customers, constitutes a violation of California Labor Code § 351. This violation is enforceable pursuant to the UCL, Cal. Bus. & Prof. Code § 17200 *et seq*. Defendants' conduct constitutes unlawful, unfair, or fraudulent acts or practices, in that Defendants have violated California Labor Code § 351 in not permitting dancers to retain all gratuities, including dance fees, paid by customers. As a result of Defendants' conduct, Plaintiffs and class members suffered injury in fact and lost money and property, including the loss of gratuities to which they were entitled. Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs and class members seek declaratory and injunctive relief for Defendants' unlawful, unfair, and fraudulent conduct and to recover

restitution.

**TWELVETH CAUSE OF ACTION**
**Private Attorneys General Act ("PAGA")**
**Violation of Calif. Labor Code § 2698, *et seq.***
**(By Plaintiffs as Aggrieved Employees)**

179. Plaintiffs incorporate the allegations of all the foregoing paragraphs by reference, as if fully set forth herein.

180. Under The Labor Code Private Attorneys General Act ("PAGA"), an aggrieved employee, on behalf of himself or herself and other current or former employees as well as the general public, may bring a representative action as a private attorney general to recover penalties for an employer's violations of the California Labor Code and IWC Wage Orders. These civil penalties are in addition to any other relief available under the Cal. Labor Code, and must be allocated 75% to California's Labor and Workforce Development Agency ("LWDA") and 25% to the aggrieved employee, pursuant to Cal. Labor Code § 2699.

181. Pursuant to Cal. Labor Code § 1198, Defendants' failure to pay proper compensation to Plaintiffs and the California Class, and failure to provide the California Class with accurate wage statements, constitute violations of the Cal. Labor Code, each actionable under PAGA.

182. Plaintiffs allege, on behalf of themselves and the California Class, as well as the general public, that Defendants have violated the following provisions of the Cal. Labor Code that are actionable through the Cal. Labor Code and PAGA, as previously alleged herein: Cal. Labor Code §§ 201, 202, 203, 221, 223, 226, 226.7, 510, 512, 1174, 1194, 1197, 1197.1, and 1198. Each of these violations entitles Plaintiffs, as private attorneys general, to recover the applicable statutory civil penalties on their own behalf, on behalf of all aggrieved employees, and on behalf of the general public.

Cal. Labor Code § 2699(a), which is part of PAGA, provides in pertinent part:

> Notwithstanding any other provision of law, any provision of this code that provides for a civil penalty to be assessed and collected by the Labor and Workforce Development Agency or any of its departments, divisions, commissions, boards, agencies, or employees, for a violation of this code, may, as an alternative, be recovered through a civil action brought by an aggrieved employee on behalf of himself or herself and other current or former employees pursuant to the procedures specified in § 2699.3.

Cal. Labor Code § 2699(f), which is part of PAGA, provides in pertinent part:

> For all provisions of this code except those for which a civil penalty is specifically provided, there is established a civil penalty for a violation of these provisions, as follows: … (2) If, at the time of the alleged violation, the person employs one or more employees, the civil penalty is one hundred dollars ($100) for each aggrieved employee per pay period for the initial violation and two hundred dollars ($200) for each aggrieved employee per pay period for each subsequent violation.

183. Plaintiffs are entitled to civil penalties, to be paid by Defendants and allocated as PAGA requires, pursuant to Cal. Labor Code § 2699(a) for Defendants' violations of the Cal. Labor Code and IWC Wage Orders for which violations a civil penalty is already specifically provided by law. Further, Plaintiffs are entitled to civil penalties, to be paid by Defendants and allocated as PAGA requires, pursuant to Cal. Labor Code § 2699(f) for Defendants' violations of the Cal. Labor Code and IWC Wage Orders for which violations a civil penalty is not already specifically provided.

184. Plaintiffs provided notice pursuant to California Labor Code § 2699.3. On June 4, 2018, they informed the LWDA of their intention to file a class action lawsuit for violations of the California Labor Code, including civil penalties recoverable under PAGA.

185. Sixty-five days have passed since the postmark date of Plaintiffs' PAGA Notice, and the LWDA has not provided notice to Plaintiffs regarding its intention to investigate the alleged violations. As such, pursuant to California Labor Code § 2699.3(a)(2)(A), Plaintiffs have exhausted the PAGA notice requirement and seek civil penalties under California Labor Code § 2698, *et seq.*

186. Under PAGA, Plaintiffs and the State of California are entitled to recover the maximum civil penalties permitted by law for the violations of the Cal. Labor Code that are alleged in this Complaint, including but not limited to penalties pursuant to Labor Code §§ 210, 225.5, 226.3, 558, 1174.5, 1197.1, and 2699(f).

187. Plaintiffs, on behalf of themselves and all California Class members, also request further relief set forth herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

a) For an order certifying that the First Cause of Action of this Complaint may be maintained as a collective action pursuant to 29 U.S.C. § 216(b) and requiring that Defendants identify all members of the FLSA Collective and provide all locating information for members of the FLSA Collective, and that notice be provided to all members of the FLSA Collective apprising them of the pendency of this action and the opportunity to file Consents to Become Party Plaintiffs thereto;

b) For an order certifying that the Second through Eleventh Causes of Action of this Complaint may be maintained as a class action pursuant to California Code of Civil Procedure § 382 on behalf of the classes as defined herein and that notice of the pendency of this action be provided to members of the proposed classes;

c) For an order designating Plaintiffs as class representatives for both the FLSA and California state law claims and Plaintiffs' attorneys as counsel for the FLSA Collective and the proposed classes;

d) For an order awarding Plaintiffs, the FLSA Collective, and the proposed classes compensatory damages and statutory damages (including liquidated damages on the FLSA claims), including unpaid wages, overtime compensation, and all other sums of money owed, together with interest on these amounts;

e) For preliminary, permanent, and mandatory injunctive relief prohibiting Defendants and its officers and agents from committing the violations of law herein alleged in the future;

f) For a declaratory judgment that Defendants have violated the FLSA, California labor law, and public policy as alleged herein;

g) For an order imposing all statutory and/or civil penalties provided by law, including without limitation penalties under the California Labor Code and PAGA;

h) For exemplary and punitive damages, as appropriate and available under each cause of action, pursuant to California Civil Code § 3294;

i) For all unpaid minimum and overtime wages due to Plaintiffs and each class member;

j) For an order enjoining Defendants from further unfair and unlawful business practices in violation of the UCL;

k) Disgorgement of profits;

l) For an order awarding restitution of the unpaid minimum, regular, overtime, and premium wages due to Plaintiffs and class members;

m) For pre- and post-judgment interest;

n) For an award of reasonable attorneys' fees, expenses and costs as provided by the FLSA, 29 U.S.C. § 216(b); California Labor Code §§ 218.5, 226(e) and (h), 1194, and 2699; California Code of Civil Procedure § 1021.5; and/or other applicable law;

o) For all costs of suit; and

p) For such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMAND**

Plaintiffs demand a trial by jury for all of the claims asserted in this Complaint so triable.

DATED: [INSERT] Respectfully submitted,

By: /s/ Trenton R. Kashima

Trenton R. Kashima, Esq. (SBN 291405)
tkashima@sommerspc.com
402 West Broadway, Suite 1760
San Diego, California 92101
Telephone: (619) 762-2126
Facsimile: (619) 762-2123

*Attorneys for Plaintiffs*
*and the Putative Classes*

# Exhibit D

# CLASS ACTION/COLLECTIVE ACTION SETTLEMENT NOTICE

*Jane Roes 1-2 et al. v. SFBSC Management, LLC, et al.*
United States District Court for the Northern District of California
Case No. 3:14-cv-03616-LB

*Jane Roe, et al. v. Deja Vu Services, et al.,*
United States District Court for the Northern District of California
Case No. 19-cv-03960-LB

## YOU MAY BE ENTITLED TO RECEIVE MONEY UNDER A PROPOSED SETTLEMENT

## THIS NOTICE MAY AFFECT YOUR RIGHTS

## PLEASE READ THE ENTIRE NOTICE CAREFULLY

*A court authorized this notice. This is not a solicitation.*
*This is not a lawsuit against you and you are not being sued.*
*However, your legal rights are affected whether you act or not.*

<<Class Member Name>>
<<Street Address>>
<<City, State Zip>>

You are receiving this Class Action/Collective Action Settlement Notice (the "Notice") because you are entitled to participate in a class action/collective action Settlement; you are what is referred to as a "Class Member." The purpose of this Notice is to provide a brief description of the claims alleged in the case, inform you about the proposed Settlement, and advise you of your rights and options with respect to the Settlement.

If you take no action and the Court approves the Settlement, you will automatically be mailed a settlement check (or series of checks) for your share of the Settlement. You will be bound by the Settlement unless you take action to exclude yourself in the manner described in this Notice.

***WHY IT IS IMPORTANT TO READ THIS NOTICE:***

The United States District Court for the Northern District of California has approved the sending of this Notice regarding the proposed Settlement of the class action/collective action known as Jane Roes 1-2 *et al*. v. SFBSC Management, LLC, *et al*. United States District Court for the Northern District of California Case No. 3:14-cv-03616-LB, and the related case of Jane Roe, *et al*. v. Deja Vu Services, et al., United States District Court for the Northern District of California Case No. 19-cv-03960-LB (collectively, the "Action").

Because your rights may be affected by this Settlement, it is extremely important that you read this Notice carefully. You are a "Class Member" in this Action.

| SUMMARY OF YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT (SEE PAGE [INSERT] FOR MORE DETAILS) | |
|---|---|
| **DO NOTHING** | If you do nothing, you will automatically be issued a Cash Payment in the form of a mailed check, or a series of checks over time, for your share of the Settlement funds, which will release all of your claims under California state law and under the Fair Labor Standards Act ("FLSA"). |
| **SUBMIT A DANCE FEE PAYMENT ELECTION FORM** | You may choose to receive Dance Fee Payments in lieu of a Cash Payment by performing at one of the Clubs subject to this Settlement. To do so, you must complete, sign, and date the Dance Fee Payment Election Form that is enclosed, as described below. If you select to receive Dance Fee Payments you will release all claims brought in this Action, or that could have been pleaded based upon the factual allegations set forth in this Action, including claims under the FLSA. The amount of compensation that you will receive as part of the Settlement WILL BE THE SAME regardless of whether you do nothing and are then issued a check (or a series of checks) for a Cash Payment, or whether you select to obtain Dance Fee Payments. |
| **EXCLUDE YOURSELF ("OPT OUT")** | You may exclude yourself from the Settlement by submitting a letter as described below. If you request to be excluded, you will not be releasing any claims, except that claims for penalties authorized under the California Private Attorney's General Act ("PAGA") will be released regardless of whether you exclude yourself or not. If you exclude yourself, you may not object to the Settlement. |
| **OBJECT** | You can object to the Settlement as described below and ask the Court to reject the Settlement. You may also appear at the Final Approval Hearing, either in person or through your own attorney. If you submit an objection, you do not need to come to Court to discuss it. So long as it is a timely and valid objection, the Court will consider it. You cannot object to the Settlement if you have excluded yourself from the Settlement. |

[INSERT TABLE OF CONTENTS]

***WHAT THE CASE IS ABOUT:***

The United States District Court for the Northern District of California is presiding over the Action. The Plaintiffs are individuals who have worked, pursuant to a dancer contract, at one or more of the nightclubs listed on Exhibit A to this Notice (referred to in this Notice as the "Clubs") during the time period from August 8, 2010 to November 16, 2018 for entertainers who performed at one or more of the "San Francisco Clubs" and the time period from February 8, 2017 to November 16, 2018 for entertainers who performed at one or more of the "Greater California Clubs" (collectively, the periods of time referred to as the "Class Periods"). The Defendants are SFBSC Management, LLC, Deja Vu Services, Inc., Harry Mohney, and all of the Clubs and other entities listed on Exhibit A(collectively, the "Defendants"). Plaintiffs allege that the Defendants are responsible for

alleged violations of certain labor laws in regard to their operation of the Clubs. Defendants have denied any wrongdoing of any kind with respect to the Action and assert that they have complied with all applicable laws at all times.

Through the Action, Plaintiffs have alleged claims against Defendants for: (1) failure to pay minimum wages and overtime wages in violation of the FLSA; (2) failure to pay straight time for hours worked in violation of California Labor Code §§ 1194, 1194.2, 1197, 1197.1, 1198 and IWC Wage Order Nos. 4, 5, and/or 10; (3) failure to pay minimum wage for all hours worked in violation of the San Francisco Minimum Wage Ordinance; (4) failure to pay overtime as required by California state law in violation of California Labor Code §§ 510, 558, 1194, and 1198 and Wage Order Nos. 4, 5 and/or 10; (5) failure to provide itemized wage statements in violation of California Labor Code § 226 and IWC Wage Orders; (6) waiting time penalties under California Labor Code §§ 201, 202, and 203, and seeking remedies pursuant to Labor Code §§ 203, 218, 218.5, and 218.6; (7) failure to pay all wages owed every pay period under California Labor Code § 204, and seeking remedies pursuant to Labor Code §§ 218, 218.5 and 218.6; (8) common law conversion; (9) failure to reimburse for expenses in violation of Cal. Labor Code §§ 450, 2802; (10) violation of California's Unfair Competition Law, Bus. & Prof. Code §§ 17200 *et seq.*; (11) for violation of several provisions of the California Labor Code for which Plaintiffs are seeking recovery of civil penalties under the Labor Code Private Attorneys General Act of 2004, California Labor Code § 2698 *et seq.* ("PAGA"), including but not limited to Labor Code §§ 201, 202, 204, 210, 223, 226, 226.3, 226.8, 245-249, 351, 353, 432.5, 450, 510, 558, 1174, 1194, 1194.2, 1194.5, 1197, 1197.1, 1198, 1199, 2753, 2802, 3700, 3700.5, 3712, 3715, and Wage Order Nos. 4, 5, and/or 10. Plaintiffs have sought various forms of relief, including but not limited to: wages, overtime pay, minimum wage, premium pay, penalties, interest, liquidated damages, attorneys' fees and costs, and equitable relief. Plaintiffs have claimed that the alleged violations of law occurred during the Class Periods.

If you wish to learn more details regarding the claims at stake in the Action, please review the complaints for the Action, which are available at [insert settlement website]. In addition, certain capitalized words and phrases in this Notice, which are not defined in this document, are defined in the Settlement Agreement, which can also be found on that website.

Plaintiffs have contended that this Action is suitable for class treatment. Defendants have vigorously denied that they violated any laws and have denied that they engaged in any wrongdoing. Defendants contend that they have complied with all applicable laws at all times and also dispute Plaintiffs' ability to maintain the case as a class or collective action, arguing that, among other things, each of Plaintiffs' claims arise from very individualized and unique circumstances which would require numerous individualized inquiries.

In an effort to resolve their disputes, the parties mediated this case with the assistance of an impartial mediator. The mediation resulted in this Settlement. The Court has not ruled on the merits of Plaintiffs' claims or Defendants' defenses. Although Defendants deny all of the Plaintiffs' allegations, deny that they violated the law, and deny that the Action should be maintained as a class action, they have chosen to resolve this matter based

upon the terms and conditions set forth in the Settlement Agreement now before the Court for approval in order to avoid further expenditures of time and money litigating these matters. By entering into this Settlement, Defendants do not admit any liability or wrongdoing of any kind.

***THE PARTIES AND THE ATTORNEYS IN THIS CASE:***

The "Class" for the Settlement is defined as all persons who, during the Class Periods, have performed as exotic dancers at one or more of the Clubs pursuant to a Dancer Contract, but does not include those who provided services as "headliner" or "feature" performers unless such individual was otherwise a party to a Dancer Contract with a Club. "Dancer Contract" means a contract entered into between a Class Member and a Club, which permitted the Class Member to engage in personal dance sales for remuneration at the Club's premises. The Class is comprised of approximately [insert number] people.

The lead attorneys for the Settlement Class (the group of Class Members who do not exclude themselves from the Settlement) are:

Sommers Schwartz, P.C.
Jason Thompson
One Towne Square, 17th Floor
Southfield, MI 48076
Telephone: (248) 415-3176

Pitt, McGehee, Palmer, Bonanni & Rivers, P.C
Megan Bonanni
117 West 4th Street, Suite 200
Royal Oak, MI 48067
Telephone: (248) 939-5081

The Tidrick Law Firm LLP
Steven G. Tidrick, Esq.
Joel B. Young, Esq.
1300 Clay Street, Suite 600
Oakland, CA 94612
Telephone: 510-788-5100

If you do not request exclusion (as explained later in this Notice), the lawyers above will represent you automatically. The Court has decided that the lawyers listed above, also known as "Class Counsel," are qualified to represent you and all Class Members. However, nothing prohibits you from consulting with or retaining your own attorney at your own personal expense.

***THE SETTLEMENT:***

The following is a summary of monetary terms of the proposed Settlement:

**1. Gross Amount of the Settlement**

Defendant has agreed to provide five million five hundred thousand dollars ($5,500,000), consisting of Cash Payments, Dance Fee Payments, Enhancement Payments, PAGA Payments, Administrative Costs, Attorneys' Fees and Expenses, and changes to the Defendants' business practices.

**2. Distribution of the Settlement Funds**

The following is a summary of how settlement funds will be distributed, if approved by the Court:

a. Cash Pool: The sum of $4,000,000 to be paid by Defendants will provide cash compensation to Class Members who neither exclude themselves from the Settlement nor select to receive Dance Fee Payments, and to pay the Attorneys' Fees and Expenses, the Enhancement Awards, the PAGA Payment, and the Administrative Costs of the Settlement. Because of the impact of the global pandemic upon the operation of the Clubs, the Settlement Agreement provides for the Cash Pool to be funded over a period of two years. The earliest that a portion of your Cash Payment could be sent to you, if you do not decide to obtain your Settlement Payment in the form of Dance Fee Payments, would be April 1, 2022. If you want to understand the Cash Pool funding obligations, the conditions that apply to those funding obligations, and provisions for distributions from the Cash Pool, review Sections 5.3 - 5.5 of the Settlement Agreement, which can be found at: [insert settlement website].

b. Dance Fee Pool: Defendants shall make five hundred thousand dollars ($500,000) available for use as Dance Fee Payments. They are to be made available immediately upon the Settlement becoming Final.

c. Enhancement Payment: Class Counsel will ask the court to award various Class Members a service award of up to $35,000 for their service and assistance to the Class in procuring this Settlement.

d. The PAGA Payment: Defendants shall pay, as consideration for settlement of alleged civil penalties due pursuant to PAGA, the sum of one hundred twenty-five thousand dollars ($125,000), which shall resolve all PAGA Claims. Seventy-five percent (75%) of this, or ninety-three thousand seven hundred fifty dollars ($93,750), shall be paid out of the Cash Pool to the California Labor & Workforce Development Agency (the "LWDA"). The remaining twenty-five percent (25%), or thirty-one thousand two hundred fifty dollars ($31,250), shall be distributed out of the Cash Pool.

e. Administrative Costs: Funds estimated at no more than $90,000 shall be paid to the Settlement Administrator for the administrative costs of settlement, including but not limited to the preparation and copying of this Notice, mailing of this Notice, and other administrative tasks.

f. Attorneys' Fees and Expenses: Class Counsel will apply to the Court for an award of: (1) attorneys' fees in an amount that does not exceed thirty-five percent (35%) of the settlement consideration; and (2) up to eighty thousand dollars ($80,000) in litigation expenses.

g. Changes to Defendants' Business Practices: As a result of the Settlement, the Nightclubs agreed to treat all entertainers who would be performing in their facilities in the future as employees in accordance with applicable law and subject to various "Enhanced Terms of Employment" (such as certain Dance Fee commissions) through at least the one-year anniversary after the Final Approval Date of the Settlement. Such changes to Defendants' business practices are being valued at a minimum of $1,000,000.

h. All payments set forth herein, except for the payment to the LWDA in satisfaction of Plaintiffs' PAGA claim and the Dance Fee Payments, are payments for which the Settlement Administrator shall issue IRS Form 1099-MISC statements to you, the IRS, and to the state taxing authorities (as well as to Class Counsel and Defense Counsel). Nothing in the Settlement or this Notice shall be construed as Class Counsel, Defense Counsel, Defendants, or the Released Parties of the Settlement, providing any advice to you regarding your payment of taxes for, or the tax consequences of, participating in this Settlement; simply put, nothing in this Notice or the Settlement is intended to be tax advice of any kind. You should consult your tax advisor for any tax issues pertaining to this Settlement. In addition, notwithstanding any payment that you may receive as part of this Settlement, in the event that you perform at any of the Clubs in the future as an employee under the terms of this Settlement, you are obligated to report to the applicable Club all of the tip income that you earn in accordance with applicable law, as well as to the IRS and state taxing authorities.

The Settlement Administrator shall determine your Settlement Payment and PAGA Payment as follows:

a. The amount of your Settlement Payment shall be determined on a pro rata basis by first dividing your Form 1099 Payments earned during the Class Periods into the amount of Form 1099 Payments earned by all Settlement Class Members during the Class Periods, and then multiplying that number by the combined sum of the Net Cash Fund and the Dance Fee Pool. That amount shall then constitute the Settlement Payment that you are entitled to receive irrespective of whether you obtain a Cash Payment or decide to receive Dance Fee Payments.

b. The amount of your PAGA Payment shall be determined on a pro rata basis by first dividing your Form 1099 Payments earned during the Class Periods into the amount of Form 1099 Payments earned by all Settlement Class Members during the Class Periods, and then multiplying that number by the Settlement Class Members' PAGA Payment.

c. Based on the information provided to the Settlement Administrator, it has determined that your total Form 1099 Payments earned during the Class Periods is: [insert amount].

The description above is a summary. If you wish to review the specific terms of Settlement in detail, please review the entirety of the Settlement Agreement which, again, is available at: [insert settlement website].

***RELEASES OF CLAIMS:***

Because this Action is a class action under Rule 23 of the Federal Rule of Civil Procedure and a collective action under the FLSA, there are two sets of releases, which are summarized below.

(1) Even if you do not sign, deposit, and/or cash any of your Settlement Checks, or if you elect to receive Dance Fee Payments, you will still be a part of the Settlement Class. You will be bound by the Settlement as summarized below in the section entitled "Settlement Class Members' Released Claims," unless you have timely excluded yourself in the manner described in this Notice.

(2) If you are issued a check for a Cash Payment, and/or elect to receive Dance Fee Payments, you will become a party plaintiff pursuant to Section 216(b) of the FLSA and will be subject to the release summarized below in the section entitled "Participating Class Members' Released Claims."

**1. Settlement Class Members' Released Claims**

Even if you do not sign, deposit, and/or cash your settlement check, or if you elect to receive Dance Fee Payments, and if you do not exclude yourself in the manner described below, you will release the following claims: Any and all Claims that are based on or reasonably related to the Claims asserted in the Action, including as are set forth in the Amended Complaints for Settlement, which are available at [insert settlement website], **with the exception of claims under the FLSA**. As detailed in the Settlement Agreement, this release includes all Claims based on or reasonably related to the Claims asserted in the Action, including without limitation Claims under state law for unpaid minimum wage, unpaid overtime, unpaid final wages, unpaid meal and rest period premium pay, and reimbursement of expenses; to recover unpaid tips; for penalties under PAGA; as well as all Claims for interest, penalties, liquidated damages, or attorneys' fees and costs.

**2. Participating Class Members' Released Claims**

If you are issued a check for a Cash Payment and/or elect to receive Dance Fee Payments, you will release all of the Claims described in the above section entitled "Settlement Class Members' Released Claims," and all Claims that have been or could have been brought in this Action under the FLSA.

This is a summary of the releases. If you wish to review the releases in detail, please

review the Settlement Agreement, which is available at: [insert settlement website].

***WHAT TO DO IN RESPONSE TO THIS NOTICE:***

You have the options described below. Each option has its own consequences, which you should understand before making your decision. Your rights regarding each option, and the procedure you must follow to select each option, follow.

1. **Do Nothing**. If you do nothing and the Court approves the Settlement, you will automatically be mailed a check (or series of checks) for a Cash Payment and for your PAGA Payment. You will remain a part of the case and you will release claims that were or could have been brought in the Action, as set forth more fully in the section of this Notice above entitled "Settlement Class Members' Released Claims" and "Participating Class Members' Released Claims."

2. **Submit a Dance Fee Payment Election Form**. You may complete, sign, and date the Dance Fee Payment Election Form that is enclosed with this Notice and submit it to the Settlement Administrator postmarked by [**INSERT DATE sixty (60) calendar days AFTER MAILING OF NOTICE**]. By doing this, you will waive your right for to obtain a Cash Payment and you will, instead, be entitled to receive Dance Fee Payments from one of the Clubs (in addition to your PAGA Payment). The Dance Fee Payment Election Form describes both of these options in more detail. You will release all Claims brought in the Action or that could have been pleaded based upon the factual allegations set forth in the Action, as is discussed more fully in the section of this Notice entitled "Participating Class Members' Released Claims."

3. **Exclude Yourself**. You may exclude yourself from the Settlement by submitting a letter in accordance with the directions in this paragraph. This is the only option that could allow you to bring your own lawsuit or claim under California state law, or to be a part of another lawsuit against the Defendants making such Claims; however, even if you exclude yourself from the Settlement, you and all other Class Members will still be bound by a release of Claims under PAGA. To exclude yourself from the Settlement, you must send your request to be excluded by mail, email, or submission via the Settlement Website, which includes the words "I request to be excluded from the Settlement," to the Settlement Administrator's mailing address or email address, or to the Settlement Website, listed at the end of this Notice. You must sign the letter and include your full name, address, and telephone number on any submission. If you make this request by mailed letter, it must be **postmarked no later than [INSERT DATE sixty (60) calendar days AFTER MAILING OF NOTICE]**. Similarly, a request for exclusion submitted by email or via the Settlement Website must be received **no later than [INSERT DATE sixty (60) calendar days AFTER MAILING OF NOTICE]**. Excluding yourself is telling the Court that you don't want to be part of the Settlement Class. If you exclude yourself, you have no basis to object because the Action no longer affects you.

4. **Object**. You can ask the Court to deny approval by filing an objection. You cannot ask the Court to order a larger settlement; the Court can only approve or deny the Settlement. If the Court denies approval, no Settlement Payments will be sent out, no settlement benefits will be provided by the Defendants, and the Action will continue. If that is what you want to happen, you must object. If you are going to object to the Settlement, you must do so in writing. You may also appear at the Final Approval Hearing, either in person or through your own attorney. If you appear through your own attorney, you are responsible for paying that attorney. All written objections and supporting papers must contain at least the following: (i) your full name, or, if you wish to preserve your right to privacy, the name or names under which you performed at a Club or Clubs, and the location (city) of such Club(s), (ii) you or your legally authorized representative's signature, (iii) the address and telephone number at which you or your legally authorized representative can be contacted; (iv) a clear reference to the Action; (v) the nature of the objection; and (vi) a statement whether you intend to appear at the hearing on Plaintiffs' motion for Final Approval, either in person or through counsel and, if through counsel, a statement identifying that counsel by name, bar number, address, and telephone number. Objections must be mailed to the Settlement Administrator postmarked on or before [**INSERT DATE sixty (60) calendar days AFTER MAILING OF NOTICE**]. If you submit an objection, you do not have to come to Court to talk about it. As long as you submit a timely, valid written objection, the Court will consider it. If you exclude yourself from the Settlement, you may not object.

***FINAL APPROVAL HEARING ON PROPOSED SETTLEMENT***

The Final Approval Hearing on the fairness and adequacy of the proposed Settlement, the plan of distribution, Class Counsel's request for attorneys' fees and costs, and the request for Enhancement Payments, will be held on [DATE], at [TIME a.m./p.m.], at the United States District Court for the Northern District of California, San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, California, 15th Floor, in Courtroom C. The Final Approval Hearing may be rescheduled to a different date, time, or location without further notice. It is not necessary for you to appear at this hearing unless you have timely filed an objection to the Settlement and wish to be heard. The Court will not hear any objections at such hearing unless such objections have been timely submitted in writing as detailed in this Notice.

***CLASS COUNSEL RECOMMEND THE SETTLEMENT:***

The Settlement was reached with the assistance of an impartial mediator. Class Counsel (the attorneys who were appointed by the Court to represent the Settlement Class) strongly recommend that you accept the Settlement. The Defendants dispute all of the Claims and have raised numerous defenses (including that all Claims must be brought by each Entertainer in an individual arbitration proceeding) and have the ability to raise numerous other defenses if the Settlement is not approved. In light of the substantial risk that you might receive less, or nothing at all, if the case proceeds to trial (either in court or in an arbitration proceeding), Class Counsel believe that the Settlement is in your best interests and is a reasonable compromise of disputed claims.

***HOW TO OBTAIN ADDITIONAL INFORMATION:***

This Notice only summarizes the class action lawsuits that comprise the Action, the Settlement, and related matters. For the precise terms and conditions of the Settlement, please see the Settlement Agreement available at [insert settlement website], by accessing the Court docket in this case through the Court's Public Access to Court Electronic Records (PACER) system at https://ecf.cand.uscourts.gov (which may require payment of a nominal fee), or by visiting the office of the Clerk of the Court for the United States District Court for the Northern District of California, 450 Golden Gate Avenue, 16th Floor, San Francisco, CA 94102, between 9:00 a.m. and 4:00 p.m., Monday through Friday, excluding Court holidays. The motion for attorneys' fees, costs, and Enhancement Payments, will also be available on the websites specified above.

**PLEASE DO NOT TELEPHONE THE COURT OR THE COURT CLERK'S OFFICE TO INQUIRE ABOUT THIS SETTLEMENT, PROCEDURES TO EXCLUDE YOURSELF FROM THE SETTLEMENT OR TO OBJECT TO IT, OR THE CLAIMS PROCESS.**

**IF YOU HAVE QUESTIONS ABOUT THIS NOTICE OR THE SETTLEMENT, PLEASE CALL THE SETTLEMENT ADMINISTRATOR AT:**

SFBSC/Deja Vu Services Settlement
c/o Name of Settlement Administrator
Address
City, State Zip
Telephone: [insert phone number]
Email: [insert email address]
Website: [insert settlement website]

You may also call Class Counsel:

The Tidrick Law Firm LLP
Steven G. Tidrick, Esq.
Joel B. Young, Esq.
1300 Clay Street, Suite 600
Oakland, CA 94612
Telephone: 510-788-5100

DATED: [Insert Date of Mailing]

# Exhibit E

# DANCE FEE PAYMENT ELECTION FORM

If you are a Class Member in *Jane Roe v. SFBSC Management, LLC* (the "San Francisco Action") or *Jane Roe 1 and 2 v. Deja Vu Services, Inc.* (the "San Diego Action"), you have the option to obtain your Settlement Payment in the form of increased commissions, or **Dance Fee Payments,** by performing at one of the Clubs listed below. Under this option, you will obtain **100%** of the Dance Fees you generate out of your services, up to the amount of your Settlement Payment.

You will have one (1) year from the Effective Date of the Settlement to obtain Dance Fee Payments. If you do not obtain the full amount of your Settlement Payment during this one-year period, you will receive a check for the balance. When the Effective Date of the Settlement occurs, the Clubs will post the instructions, both in the Club dressing rooms and at the website at www. _______________, of what you must do in order to begin collecting your Dance Fee Payments.

**To be entitled to receive Dance Fee Payments you must complete and submit this Dance Fee Payment Election Form by [insert date]**. You have two options:

1. File Online: File online at www.____________.com; or
2. File by Mail: Complete and sign this form below and mail it to:

Settlement Administrator
XXXXXXXXXXXX

**If you do not elect to receive Dance Fee Payments**, you will be entitled to receive a Cash Payment as your Settlement Payment (which you will receive in installment payments discussed below). The amount you will be eligible to receive as a Cash Payment is the same as what you will be eligible to receive as Dance Fee Payments. Cash Payments will be paid in up to three installments after the Effective Date of the Settlement, beginning no sooner than April 2022. If there is an appeal from the Court's approval of the Settlement, Cash Payments will not start until the appeal is completed and Court approval has been affirmed. Depending on whether an appeal is filed to the Settlement, you may be able to obtain your Settlement Payment quicker by collecting Dance Fee Payments than by receiving a Cash Payment in installment payments.

Please review Articles V, VI, and VII of the Release and Settlement Agreement for details regarding Dance Fee Payments and Cash Fee Payments, a full copy of which is at www.________________.

## COMPLETE FORM BELOW TO SELECT DANCE FEE PAYMENTS

Your Name ______________________________________________________________

Street Address ______________________________________________________________

City ________________________ State __________________ ZIP _________

E-mail Address __________________________________________________

**These are the Potential Clubs at Which Dance Fee Payments May be Collected**:

| | |
|---|---|
| THE PENTHOUSE CLUB & STEAKHOUSE | SAN FRANCISCO |
| NEW CENTURY THEATRE | SAN FRANCISCO |
| DEJA VU CENTERFOLDS | SAN FRANCISCO |
| LITTLE DARLINGS OF SAN FRANCISCO | SAN FRANCISCO |
| GOLD CLUB | SAN FRANCISCO |
| LARRY FLYNT'S HUSTLER CLUB | SAN FRANCISCO |
| CONDOR CLUB | SAN FRANCISCO |
| GARDEN OF EDEN | SAN FRANCISCO |
| ROARING 20'S | SAN FRANCISCO |
| ADULT SUPERSTORE | SAN DIEGO |
| DÉJÀ VU SHOWGIRLS | CITY OF INDUSTRY |
| DÉJÀ VU SHOWGIRLS | N. HOLLYWOOD |
| DEJA VU SHOWGIRLS | RANCHO CORDOVA |
| DEJA VU OF LA - MAIN ST. | LOS ANGELES |
| DEJA VU SHOWGIRLS | TORRENCE |
| DÉJÀ VU SHOWGIRLS | BAKERSFIELD |
| DEJA VU SHOWGIRLS | LOS ANGELES |
| JOLAR CINEMA | SAN DIEGO |
| LITTLE DARLINGS | LEMON GROVE |
| DÉJÀ VU SHOWGIRLS | SAN DIEGO |
| DÉJÀ VU SHOWGIRLS | STOCKTON |

[redacted]

I understand that by submitting this Dance Fee Payment Election Form, I consent to join, as applicable to where and when I performed, the collective action(s) known as *Jane Roe, et al. v. SFBSC Management, LLC*, Civil Case No. 3:14-cv-03616-LB and/or *Jane Roe 1 and 2 v. Deja Vu Services, Inc., et al.*, Civil Case No. 19-cv-03960-LB, as a party plaintiff.

[redacted]

**Your Signature** **Date**

# Exhibit F

# DANCE FEE PAYMENT REQUEST FORM

If you are a Settlement Class Member in *Jane Roe v. SFBSC Management, LLC* (the "San Francisco Action") and/or *Jane Roe 1 and 2 v. Deja Vu Services, Inc.* (the "San Diego Action") (collectively, the "Action"), and you elected to receive your Settlement Payment in the form of Dance Fee Payments, use this form to obtain your Dance Fee Payments.

Dance Fee Payments may only be obtained at one of the Clubs subject to this Settlement, which are listed on page 3, provided the Club is in operation. You cannot "split" your Dance Fee Payments among Clubs. To obtain Dance Fee Payments you are required to do the following:

a) Schedule a day at the Club when you want to work to obtain your Dance Fee Payments; and

b) Fully complete, sign, date, and submit this Dance Fee Payment Request Form online at www. ________________. If you have any questions, you may contact the manager of the Club at which to intend to obtain your Dance Fee Payments.

**You must electronically submit this form at least seven (7) business days before you intend to work in order to obtain your Dance Fee Payments.**

The last day that you can obtain Dance Fee Payments is ____________________________. If you do not take the steps above and have not obtained all of your Dance Fee Payments by this date, you will be entitled to receive a Cash Payment in accordance with the installment payment terms set forth in the Settlement.

# YOUR IDENTIFICATION INFORMATION

Settlement Personal ID # ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___

You can find this number on the top of the settlement notice you received. If you no longer have that notice and need your Personal ID Number, e-mail the Settlement Administrator at: _________ ______________________________________________

Full Name: ________________________________________________________________

Stage Name (or Names) used when you performed at any of the Clubs: ___________________________ ______________________________________________________________________________

Street Address: ______________________________________________________________

City: ______________________ State: ______________________ ZIP: ______________

E-mail Address:________________________________________________________________

Social Security Number: _______________________________________________________

Club Where You Have Chosen to Obtain Your Dance Fee Payments:

Club Name: ______________________________________________________________

City and State where Club is located: ________________________________________

## EXPLANATION OF YOUR DANCE FEE PAYMENTS

You are entitled to obtain **100%** of the Dance Fees (the mandatory charges to customers for the purchase of personal entertainment performances or sessions) that you generate out of your services until the total amount of your Settlement Payment is reached. Clubs may limit the number of Dance Fee Claimants receiving Dance Fee Payments on any one Date of Performance to seven (7) such Entertainers on a first come/first served basis. Dance Fee Payments will be paid to you as additional commissions ________________ and are subject to all legal tax withholding requirements.

Additional details regarding Dance Fee Payments and Cash Payments are in Articles V, VI, and VII of the Release and Settlement Agreement; a copy of which can be reviewed at www.______________________.

## SIGNATURE

By signing this Dance Fee Payment Request Form, you make the following representations and acknowledgements:

- I have not made a claim for or obtained a Cash Payment under the Settlement; and
- I am not receiving any tax advice from Class Counsel, Defense Counsel, or the Defendants, and I understand that I should obtain my own tax advice in regard to the compensation I receive by way of the Settlement.

**Date:** ________________ **Name (Print):** ____________________________

**Signature:** _______________________________

**LIST OF CLUBS**

| | |
|---|---|
| THE PENTHOUSE CLUB & STEAKHOUSE | SAN FRANCISCO |
| NEW CENTURY THEATRE | SAN FRANCISCO |
| DEJA VU CENTERFOLDS | SAN FRANCISCO |
| LITTLE DARLINGS OF SAN FRANCISCO | SAN FRANCISCO |
| GOLD CLUB | SAN FRANCISCO |
| LARRY FLYNT'S HUSTLER CLUB | SAN FRANCISCO |
| CONDOR CLUB | SAN FRANCISCO |
| GARDEN OF EDEN | SAN FRANCISCO |
| ROARING 20'S | SAN FRANCISCO |
| ADULT SUPERSTORE | SAN DIEGO |
| DÉJÀ VU SHOWGIRLS | CITY OF INDUSTRY |
| DÉJÀ VU SHOWGIRLS | N. HOLLYWOOD |
| DEJA VU SHOWGIRLS | RANCHO CORDOVA |
| DEJA VU OF LA - MAIN ST. | LOS ANGELES |
| DEJA VU SHOWGIRLS | TORRENCE |
| DÉJÀ VU SHOWGIRLS | BAKERSFIELD |
| DEJA VU SHOWGIRLS | LOS ANGELES |
| JOLAR CINEMA | SAN DIEGO |
| LITTLE DARLINGS | LEMON GROVE |
| DÉJÀ VU SHOWGIRLS | SAN DIEGO |
| DÉJÀ VU SHOWGIRLS | STOCKTON |

# Exhibit G

**CLASS ACTION/COLLECTIVE ACTION SETTLEMENT NOTICE**

*Jane Roes 1-2 et al. v. SFBSC Management, LLC, et al.*
United States District Court for the Northern District of California
Case No. 3:14-cv-03616-LB

*Jane Roe, et al. v. Deja Vu Services, et al.,*
United States District Court for the Northern District of California
Case No. 19-cv-03960-LB

- You may be entitled to receive compensation under a proposed settlement if: (1) you worked at one of the "San Francisco" Nightclubs listed below between August 8, 2010 and November 16, 2018, or (2) you worked as an exotic dancer at one or more of the "Greater California" nightclubs listed below between February 8, 2017 and November 16, 2018:
- San Francisco Nightclubs
  - The Penthouse Club & Steakhouse
  - New Century Theatre
  - Hungry I
  - Deja Vu Centerfolds
  - Little Darlings
  - Gold Club
  - Larry Flynt's Hustler Club
  - Condor Club
  - Garden of Eden
  - Roaring 20's
- Greater California Nightclubs
  - Adult Superstore (San Diego)
  - Déjà Vu Showgirls (City of Industry)
  - Déjà Vu Showgirls (N. Hollywood)
  - Deja Vu Showgirls (Rancho Cordova)
  - Deja Vu Of La - Main St. (Los Angeles)
  - Deja Vu Showgirls (Torrence)
  - Déjà Vu Showgirls (Bakersfield)
  - Deja Vu Showgirls (Los Angeles)
  - Jolar Cinema (San Diego)
  - Little Darlings (Lemon Grove)
  - Déjà Vu Showgirls (San Diego)
  - Déjà Vu Showgirls (Stockton)
- For more information regarding the settlement please visit [insert website].

# Exhibit H

# YOU MAY BE ENTITLED TO RECEIVE MONEY OR DANCE FEE PAYMENTS UNDER A PROPOSED CLASS ACTION SETTLEMENT

☒ This club is a party to the settlement of two class and collection action lawsuits: *Jane Roes 1-2 et al. v. SFBSC Management, LLC, et al.* (Case No. 3:14-cv-03616-LB) and *Jane Roe 1 and 2 v. Deja Vu Services, Inc., et al.* (Civil Case No. 19-cv-03960-LB). Club management supports the settlement and hopes eligible entertainers will get the benefits of the settlement.

☒ The club and club management will not retaliate against you based on your choice of whether or not to seek the benefits of the settlement or opt-out of the settlement.

☒ If you do nothing and do not opt-out of the settlement, you will receive a cash payment (payable in installments over a period of time). Alternatively, you have the option to receive dance fee payments for 100% of your total dance sales on future performance dates, but you must complete the "Dance Fee Payment Election Form," a copy of which is posted with this poster.

☒ Regardless of whether you receive a cash payment or dance fee payments, the amount you will be entitled to receive under the settlement will be the same.

☒ **Details and information regarding the Settlement, including a copy of the Release and Settlement Agreement, are available at www.____________________.**

# EXHIBIT C

simpluris
3194-C Airport Loop Drive
Costa Mesa, CA 92626
800-779-2104 www.simpluris.com

| | | | |
|---|---|---|---|
| Estimate #: | 14170V2 | Prepared By: | Michel Sutherland |
| Estimate Date: | 11/27/2021 | Direct Dial #: | 321.223.5067 |
| | | Email: | msutherland@simpluris.com |

| Plaintiff Attorney | | Defense Attorney | |
|---|---|---|---|
| Attorney/Client: | **Joel Young/Steve Tidrick** | Attorney/Client: | |
| Firm: | **Tidrik Law Firm** | Firm: | |
| Email: | jby@tidricklaw.com | Email: | |

**Case Name: Jane Roe vs SFBSC: Opt Out Settlement**

| | |
|---|---|
| **Anticipated Total Cost** | **$59,202** |
| **Capped Fee*** | **$59,500** |

**Terms:**
1) Capped Fees assume that Simpluris will receive data in a Single Excel file with no substantial change in class size or response rate.

| | | | |
|---|---|---|---|
| Total Possible Class Size: | 8,900 | Undeliverable Rate: | 10% |
| Response Rate: | 1% | Call Rate: | 5% |
| Mailing Document Language: | English | Re-distribution: | NA |
| Reminder Postcard | Yes | State(s): | CA + |
| Unclaimed Funds | Escheat | Tax Years | Single |

## Case Setup

Data Compilation - Develop Case Specific Response Tracking - Error Reports

| Category | Unit Value | # of Units | Total |
|---|---|---|---|
| Project Manager - Case Setup-StripperWeb.com | $125.00 | 6 | $750.00 |
| Email Set up and manage | $250.00 | 1 | $250.00 |
| Website development and manage | $2,500.00 | 1 | $2,500.00 |
| Database Manager - Initial Data Analysis | $140.00 | 8 | $1,120.00 |
| | | Total | $4,620.00 |

## Notification

Notice Packet: 6 pg Notice - Double Sided - English

Contact the IEAU and request the IEAU re-post the Electronically Posted Notice on their message board and e-mail the Electronically Posted Notice to their subscriber list a final time.

Simpluris shall post the class notice on StripperWeb.com in the "Stripping (was Stripping General)" discussion thread, which shall continue to be posted for a period of eight (8) weeks thereafter. Each weekly posting shall be titled "California 'Deja Vu' Class Action Settlement Information." The following text shall be included in the posting: "For more information please click on the following link." The referenced link shall be a click-through hyperlink to the Settlement Website. Within the same period as provided for in this Section, the Settlement Administrator shall also contact the International Entertainment Adult Union and request the IEAU post the Electronically Posted Notice (with hyperlink) on its message board and e-mail the same to their subscriber list.

Within twenty (20) days of the Settlement Administrator's receipt of the class data, the Settlement Administrator shall effectuate the posting of the Social Media Notice through an online advertising campaign funded in the total amount of $10,000 (the "Social Media Notice Fund"), which shall run until the Social Media Notice Fund is exhausted. The following text shall be included in the advertisements: "You may be eligible for a class action settlement. For more information please click on the following link." The referenced link shall be a click-through hyperlink to the Settlement Website. The advertising campaign for the Social Media Notice shall be directed by the Settlement Administrator in a manner best suited to promote the Agreement.

| Category | Unit Value | # of Units | Total |
|---|---|---|---|
| Social Media Fund | $10,000.00 | 1 | $10,000.00 |
| Simpluris management fee-15% | $1,500.00 | 1 | $1,500.00 |
| Email to all available email | $0.05 | 4,450 | $222.50 |
| Process undeliverable/bounced emails | $0.10 | 1,780 | $178.00 |
| Mail Notice Packet-40% bounced/unopoened | $0.70 | 1,780 | $1,246.00 |
| Postage | $0.53 | 1,780 | $943.40 |
| NCOA/CASS/LACS | $0.05 | 1,780 | $89.00 |
| Undeliverable Processing | $0.25 | 178 | $44.50 |
| Skip Trace RUM | $1.00 | 178 | $178.00 |
| Remail Notice Packet | $1.00 | 160 | $160.20 |
| Remail Postage | $0.53 | 160 | $84.91 |
| Reminder Post Card | $0.35 | 890 | $311.50 |
| Postage | $0.32 | 890 | $284.80 |
| Reminder E-mail | $0.05 | 4,450 | $222.50 |
| Project Manager | $125.00 | 10 | $1,250.00 |
| Process undeliverable/bounced emails | $0.10 | 142 | $14.24 |
| Mail Supervisor | $50.00 | 15 | $750.00 |
| | | Total | $17,479.55 |



Confidential and Proprietary

# Call Center

| Establish Case Specific Toll Free Number | | | |
|---|---|---|---|
| Category | Unit Value | # of Units | Total |
| Customer Service Reps / Call Center Support | $85.00 | 10 | $850.00 |
| Maintain toll free/maintaince/Inbox management | $85.00 | 12 | $1,020.00 |
| 800 # Charges | $0.10 | 600 | $60.00 |
| | | Total | $1,930.00 |



Confidential and Proprietary

simpluris
3194-C Airport Loop Drive
Costa Mesa, CA 92626
800-779-2104 www.simpluris.com

## Claims Administration

Process Mail: Claims, Opt-Outs and/or Objections. . In order to document those Settlement Class Members who have selected to receive their Settlement Payment in the form of Dance Fee Payments, and in order to assist in the administration of such payments, within thirty (30) days of the end of the Dance Fee Payment Election Period the Settlement Administrator shall send to Class Counsel and Defense Counsel all Properly Completed and Timely Submitted Dance Fee Payment Election Forms.

. In order to document those Settlement Class Members who have selected to receive their Settlement Payment in the form of Dance Fee Payments, and in order to assist in the administration of such payments, within thirty (30) days of the end of the Dance Fee Payment Election Period the Settlement Administrator shall send to Class Counsel and Defense Counsel all Properly Completed and Timely Submitted Dance Fee Payment Election Forms.

| Category | Unit Value | # of Units | Total |
|---|---|---|---|
| Database Manager | $140.00 | 21 | $2,940.00 |
| Disputes / Deficiencies - Send One Cure Letter | $1.50 | 5 | $7.48 |
| Opt Out Processing | $1.00 | 12 | $12.46 |
| Dance Fee processing- submitted to Counsel | $125.00 | 20 | $2,500.00 |
| Project Manager-Coorespondence with PCM'S-Counsel | $140.00 | 23 | $3,220.00 |
| Weekly Reporting to Counsel | **WAIVED** | 12 Wks of Reporting | $0.00 |
| | | Total | $8,679.94 |

## Distribution

Setup a Disbursement Account

Print & Mail Checks to Class Members - 1099's - File Reports with Appropriate Federal & State Taxing Authorities

Account Management & Reconciliation

| Category | Unit Value | # of Units | Total |
|---|---|---|---|
| Disbursement Data Preparation | $140.00 | 6 | $840.00 |
| Disbursement Manager - Data Validation | $75.00 | 1 | $75.00 |
| Setup Banking Account / QSF | $300.00 | 1 | $300.00 |
| Print & Mail Checks. 1099 only | $1.00 | 8900 | $8,900.00 |
| Postage | $0.53 | 8900 | $4,717.00 |
| Process Returned Checks | $0.50 | 445 | $222.50 |
| Skip Trace Search Undeliverable Checks | $5.00 | 445 | $2,225.00 |
| Remail Checks | $3.00 | 445 | $1,335.00 |
| QSF Account Reconciliation | $250.00 | 1 | $250.00 |
| Individual Federal / State Tax Reporting | $500.00 | 1 | $500.00 |
| QSF Reporting / Declaration | $750.00 | 1 | $750.00 |
| QSF Annual Tax Preparation Fee | $1,000.00 | 1 | $1,000.00 |
| Reissuing Checks/Mailing | $3.00 | 134 | $400.50 |
| Postage | $0.58 | 134 | $77.43 |
| Responding to IRS, State, Agency Inquiries | $75.00 | 2 | $150.00 |
| Escheat management for uncashed/claimed funds | $2,500.00 | 1 | $2,500.00 |
| Disbursement Manager | $125.00 | 6 | $750.00 |
| | | Total | $24,992.43 |

simpluris
3194-C Airport Loop Drive
Costa Mesa, CA 92626
800-779-2104 www.simpluris.com

## Case Wrap Up

Send Final Reports to Counsel

| Category | Unit Value | # of Units | Total |
|---|---|---|---|
| Data Manager: Final Reporting | $125.00 | 5 | $625.00 |
| Clerical: Clean Up Any Misc | $50.00 | 5 | $250.00 |
| Project Manager: Wrap-up Final Issues | $125.00 | 5 | $625.00 |
| | | Total | $1,500.00 |

Postage $5,745.31 **Total Case Costs** **$59,201.91**



Confidential and Proprietary

simpluris
Class Action Settlement Administration

3194-C Airport Loop Drive
Costa Mesa, CA 92626
800-779-2104 www.simpluris.com

All administration services to be provided by Simpluris to Client, are provided subject to the following terms and conditions:

1. **Services.** Simpluris agrees to provide Client those services set forth in the Bid (the "Services") to which these terms and conditions are attached and which has been provided to Client. As compensation for such Services, Client agrees to pay the fees for Services outlined in the Bid. However, Client such fees for Services are estimated based on the requirements provided by Client and actual fees charged by Simpluris may be greater or less than such estimate and Client will be responsible for the payment of all such fees.

2. **Billing and Payment**. Simpluris will invoice Client on a regular basis unless a specific timeframe is otherwise set forth in the Bid. Client shall pay all invoices within 30 days of receipt. Amounts unpaid after thirty (30) days are subject to a service charge at the rate of 1.5% per month or, if less, the highest rate permitted by law. Services are not provided on a contingency basis and Client shall remain liable to Simpluris for all fees for the Services, regardless of any court decisions, and/or actions by the parties, including disapproval or withdrawal of a settlement.

3. **Retention of Documents**. Unless directed otherwise in writing by the Client, Simpluris will destroy all undeliverable mail (except for undeliverable checks) on the date that it is processed and retained in Simpluris' system. Simpluris will maintain records to establish that the subject mail is undeliverable. Simpluris will retain undeliverable checks until the Qualified Settlement Fund is closed. Simpluris will also retain all other class member and putative class member correspondence (including without limitation, claims forms and opt out forms) for one year after final distribution of funds or benefits, or until the date that the disposition of the case is no longer subject to appeal or review, whichever is later. Lastly, Simpluris will retain bank & tax documents for such period of time as it determines is required to maintain compliance with various federal and state requirements.

4. **Limitation of Liability; Disclaimer of Warranties**. Simpluris warrants that it will perform the Services diligently, with competence and reasonable care. Simpluris' only obligation will be to correct any non-conformance with the foregoing warranty. In no event will Simpluris be liable for any lost profits/opportunities, business interruption or delay or, special, consequential , or incidental damages incurred by Client relating to the performance of the Services, regardless of whether Client's claim is for breach of contract, tort (including negligence and strict liability) or otherwise. Under no circumstances will Simpluris be liable to Client for any claims, losses, costs, penalties, fines, judgment or damages, including court costs and reasonable attorney's fees (collectively, "Losses"), whether direct or indirect, arising out of, related to, or in connection with Services in an amount in excess of the total fees charged or chargeable to Client for the particular portion of the Services affected by Simpluris' omission or error. THE WARRANTIES SET FORTH IN THIS SECTION ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE.

5. **Force Majeure.** To the extent performance by Simpluris of any of its obligations hereunder is substantially prevented by reason of any act of God or because of any other matter beyond Simpluris' reasonable control, then such performance shall be excused and this Agreement, at Simpluris' option, be deemed suspended during the continuation of such condition and for a reasonable time thereafter.

6. **Rights in Data**. Client agrees that it will not obtain, nor does Simpluris convey, any rights of ownership in the programs, system data, or materials provided or used by Simpluris in the performance of the Services.

7. **Electronic Communications**. During the provision of the Services the parties may wish to communicate electronically with each other at a business e-mail address. However, the electronic transmission of information cannot be guaranteed to be secure or error free and such information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete or otherwise be adversely affected or unsafe to use. Accordingly, each party agrees to use commercially reasonable procedures to check for the then most commonly known viruses and to check the integrity of data before sending information to the other electronically, but each party recognizes that such procedures cannot be a guarantee that transmissions will be virus free. It remains the responsibility of the party receiving an electronic communication from the other to carry out a virus check on any attachments before launching any documents whether received on disk or otherwise.

8. **Notice**. Any notice required or permitted hereunder shall be in writing and shall be delivered personally, by, or sent by registered mail, postage prepaid, or overnight courier and shall be deemed given when so delivered personally, or, if mailed, five days after the date of deposit in United States mail, or, if sent by courier, one business day after delivery to such courier service. Notice should be addressed to an officer or principal of Client and Simpluris, as the case may be.

9. **Waiver.** Failure or delay on the part of a party to exercise any right, power or privilege hereunder shall not operate as a waiver thereof or any of other subject, right, power or privilege.

10. **Termination**. Client may terminate the Services at anytime upon 30 days prior written notice to Simpluris. Termination of Services shall in no event relieve Client of its obligation make any payments due and payable to Simpluris in respect of Services rendered up to the effective date of Termination. Simpluris may terminate this Agreement (i) for any reason upon no less than 90 days prior written notice to the Client; or (ii) upon 15 calendar days' prior written notice, if the Client is not current in payment of fees.

11. **Jurisdiction**. The parties hereto irrevocably and unconditionally submit to the jurisdiction of the Court of the applicable case for purposes of any suit, action or proceeding to enforce any provision of, or based on any right arising out of, this Agreement. The parties hereto hereby irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding in such Court.

12. **Survival**. Any remedies for breach of this Agreement, this Section and the following Sections will survive any expiration or termination of this Agreement: Section 4 - Limitation of Liability; Disclaimer of Warranties, Section 6 – Rights in Data, and Section 12- Jurisdiction, 14 -Confidentiality, and Section 15 – Indemnification.

13. **Entire Agreement**. These Terms and Conditions and the proposal embody the entire agreement between the parties with respect to the subject matter hereof, and cancels and supersedes all prior negotiations, representations, and agreements related thereto, either written or oral, except to the extent they are expressly incorporated herein. No changes in, additions to, or waivers of, the terms and conditions set forth herein will be binding upon any party, unless approved in writing by such party's authorized representative.

14. **Confidentiality**. Simpluris maintains reasonable and appropriate safeguards to protect the confidentiality and security of data provided by Client to Simpluris in connection with the Services. If, pursuant to a court order or other proceeding, a third party requests that Simpluris to disclose any confidential data provided by or for Client, Simpluris will promptly notify the Client unless prohibited by applicable law. Client will then have the option to provide Simpluris with qualified legal representation at Client's expense to defend against such request. If, pursuant to a court order, Simpluris is required to disclose data, produce documents, or otherwise act in contravention of the obligation to maintain confidentiality set forth in these terms and conditions, Simpluris will not be liable for breach of said obligation.

15. **Indemnification**. Client will indemnify and hold Simpluris (and the officers, employees, affiliates and agents harmless against any Losses incurred by Simpluris, arising out of, in connection with , or related to (i) any breach of the terms by Client; (ii) the processing and handling of any payment by Simpluris in accordance with Client's instructions, including without limitation, the imposition of any stop payment or void payment on any check or the wrongful dishonor of a check by Simpluris pursuant to Client's instructions.

16. **Severability**. If any term or condition or provisions of this Agreement shall be held to be invalid, illegal, unenforceable or in conflict with the law of any jurisdiction, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

17. **Database Administration.** Simpluris' database administration for Client assumes that Client will provide complete data that includes all information required to send notifications and calculate and mail settlement payments. Data must be provided in a complete, consistent, standardized electronic format. Simpluris' standardized format is Microsoft Excel, however, Simpluris may accept other formats at its discretion. Further developments or enhancements to non-standardized data will be billed to Client by Simpluris on a time and materials basis according to Simpluris' Standard Rates.

simpluris
Class Action Settlement Administration

AICPA SOC

# **Simpluris Security Summary** – White Paper

Simpluris is committed to the security and overall protection of not only our data and information but our client's data and information, as well. As a demonstration of our commitment, we maintain SOC 2 Certification which requires strict adherence to policies and procedures surrounding information security, including processing and storage of confidential customer data. Simpluris supports a comprehensive, written Information Security Program that complies with all applicable laws and regulations (e.g. HIPAA, Gramm-Leach-Bliley Act, MA 201 CMR 17.00) and is designed to (a) ensure the security, privacy and confidentiality of Client and Class Member Information, (b) protect against any reasonably anticipated threats or hazards to the security or integrity of Client or Class Member Information, and (c) protect against unauthorized access to, use, deletion, or modification of Class Member Information. Simpluris has designated specific employees to be responsible for the administration of its Information Security Program. Also, Simpluris regularly and routinely monitors, tests, and updates our Information Security Program.

Simpluris uses Client and Class Member Information only for the purposes for which its' clients provide it, as described in any Agreements or Court Orders governing the provision of Simpluris' services in any particular case. Simpluris maintains a process for identifying, assessing, and mitigating the risks to Class Member Information in each relevant area of Simpluris' operations. At Simpluris, we continuously evaluate the effectiveness of the safeguards for controlling these risks to data and bank accounts. Simpluris restricts access to Class Member Information only to those employees, agents, or subcontractors who need to know the information to perform their jobs. Simpluris performs background checks of all its employees that will have access to Sensitive Personal Information, including a review of their references, employment eligibility, education, and criminal history to ensure they do not pose a risk to the security of Client or Class Member Information.

Simpluris adheres to the following industry best practices to safeguard its systems which process, store or transmit Client and Class Member Information:

- Identity and Access Management;
- Complex passwords are routinely and regularly changed;
- Role-based access control systems to limit individual employee access to network applications and systems based on their particular job role and function;
- Data Loss Prevention and Intrusion Prevention System software at multiple layers to prevent from internal and external threats of data leaks, malicious activity, and policy violations
- Encryption of Class Member Information if transmitted over public or wireless networks (e.g., via email, FTP, the Internet, etc.);
- Implementation of a Secure File Transfer system (using SSL encryption) for transmitting documents back and forth to clients;
- Encryption of servers, portable media, laptops, desktops, smartphones, mobile devices, and new technologies that store Class Member Information;
- Complex password authentication for remote access to Company's networks;
- Upon hire and annually after that, training of all employees with access to Class Member Information, (including any agents, and subcontractors with access to Class Member Information) about their obligations to implement the Information Security Program;
- Strict disciplinary measures for employees who violate the Information Security Program;
- Preventing terminated employees from accessing Class Member Information;
- Appropriately configured and updated firewall, antivirus, and spyware software;
- Prompt application of vendor-recommended security patches and updates to systems and other applications to avoid any adverse impact on Class Member Information;
- Separation of Duties;
- Infrastructure and Physical Security;
- Business Continuity Planning;
- Disaster Recovery Planning