Douglas J. Melton, Bar No. 161353
Shane M. Cahill, Bar No. 227972
LONG & LEVIT LLP
465 California Street, 5th Floor
San Francisco, California 94104
Telephone: (415) 397-2222
Facsimile: (415) 397-6392
Email: dmelton@longlevit.com
scahill@longlevit.com

Attorneys for San Francisco Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE ROE, et al.<br><br>Plaintiffs,<br><br>v.<br><br>SFBSC MANAGEMENT, LLC, et al.,<br><br>Defendants. | Civil Case No. 14-cv-03616-LB<br><br>Related Cases: 16-cv-03371-LB<br>17-cv-00138-LB<br>17-cv-05288-LB<br>17-cv-06971-LB<br>19-cv-03960-LB<br><br>**DECLARATION OF SHANE M. CAHILL RE PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL**<br><br>The Honorable Laurel Beeler<br><br>Date: ******, 2022<br>Time: ****** a.m. |

I, Shane Cahill, declare as follows:

1. I am licensed to practice law in the State of California and am a partner with the law firm of Long & Levit LLP, counsel of record for Defendants in the above-captioned litigation. If called as a witness in this action I could and would testify competently to the following.

2. The Settlement Agreement that is the subject of Plaintiffs' motion for preliminary approval covers settlement of this action and of *Jane Roe No. 1 and 2 et al. v. Deja Vu Services, Inc. et al.,* Case 3:19-cv-03960-LB, which is also pending before this Court (the "San Diego Action"). Prior to removal of the San Diego Action to this Court, the parties in the San Diego Action (which include the same San Francisco-based nightclubs named as Defendants in this action) reached a settlement and the Plaintiffs moved the court for preliminary approval thereof. The hearing on the motion for preliminary approval was held on November 30, 2018 before Judge Timothy Taylor. Ultimately, the Court denied the motion for preliminary approval in part because it wanted more "detail regarding the non-monetary aspects of the settlement," which included conversion of entertainers from independent contractors to employees. Attached hereto as **Exhibit A** is a true and correct copy of Judge Taylor's November 30, 2018 order.

3. Pursuant to Judge Taylor's order, Defendants hereby submit as **Exhibit B** the attached Declaration (along with the accompanying report and exhibits thereto) of CPA David Shindel in response to Judge Taylor's order. *See*, 28 U.S.C. § 1450 ("All… orders… in such action prior to its removal shall remain in full force and effect until dissolved or modified by the district court."); *see also, Logvinov v. Wells Fargo Bank* (N.D. Cal. Dec. 9, 2011, No. C-11-04772 DMR) 2011 U.S.Dist.LEXIS 141985, at *3.

4. At Plaintiffs' counsels' request, Defendants further submit the declarations of Gary Marlin and Ryan Carlson, attached hereto as **Exhibits C and D**, respectively, regarding the Defendant Nightclubs' financial condition as a result of the COVID-19 pandemic (which has also been outlined in the various Case Management Conference Statements filed in this action).

I declare under penalty of perjury under the laws of California and the United States of

America that the foregoing is true and correct. Executed this 25th day of February 2022, at San Francisco, California.

SHANE M. CAHILL

# EXHIBIT A

**SUPERIOR COURT OF CALIFORNIA,
COUNTY OF SAN DIEGO
CENTRAL**

**MINUTE ORDER**

DATE: 11/30/2018 TIME: 01:30:00 PM DEPT: C-72

JUDICIAL OFFICER PRESIDING: Timothy Taylor
CLERK: Kelly Breckenridge
REPORTER/ERM: Not Reported
BAILIFF/COURT ATTENDANT: O. Godoy

CASE NO: **37-2018-00028044-CU-OE-CTL** CASE INIT.DATE: 05/31/2018
CASE TITLE: **ROE vs Deja Vu Services Inc [EFILE]**
CASE CATEGORY: Civil - Unlimited CASE TYPE: Other employment

---

**EVENT TYPE**: Civil Case Management Conference

---

**EVENT TYPE**: Motion Hearing (Civil)
MOVING PARTY: Sarah Murphy, Penny Nunez, Gypsy Vidal, Angelynn Hermes, Elana Pera, Nicole Hughes, Poohrawn Mehraban
CAUSAL DOCUMENT/DATE FILED: Motion for Leave to Intervene, 11/01/2018

---

**EVENT TYPE**: Motion Hearing (Civil)
MOVING PARTY: Jane Roe 2, Jane Roe 1
CAUSAL DOCUMENT/DATE FILED: Motion for Approval of Class Settlement, 10/11/2018

---

**APPEARANCES**
Jason J Thompson, counsel, present for Plaintiff(s).
Tammara N Bokmuller, counsel, present for Defendant(s).
Shannon Liss-Riordan, counsel, is present for Interested Party Elena Pera.

---

The Court hears oral argument and CONFIRMS (Motion for Leave to Intervene is NOT confirmed) the tentative ruling as follows:

**Rulings on Motions for Leave to Intervene and for Preliminary Approval of Class Action Settlement**

*Roes v. Deja Vu*, Case No. 2018-28044

November 30, 2018, 1:30 p.m., Dept. 72

1. **Overview and Procedural Posture.**

This is an employment action brought on behalf of a class of exotic nude dancers at the defendant topless bars throughout California. Plaintiffs assert they were misclassified as independent contractors instead of employees, and that consequently defendants have violated the applicable wage and hour laws. ROA 1, paragraph 3. Plaintiffs also assert that defendants engaged in unlawful tip-sharing arrangements with the class. *Ibid.* The eight count complaint was filed in May of 2018. There are several other lawsuits involving the same parties and similar issues in other jurisdictions; these other cases are in various procedural postures (including two cases on appeal to the 9th Circuit).

The proposed class reps and the defendants now seek preliminary approval of a class action settlement. ROA 26-32. The motion was initially set for hearing on November 2, 2018. No timely opposition to the motion was filed. On October 30, 2018, the court published a tentative ruling proposing to grant preliminary approval of the settlement. ROA 36. On November 1, 2018, seven putative class members involved in the aforementioned related litigation filed a motion for leave to intervene, set for today; they also filed a very tardy opposition to the motion for preliminary approval. ROA 38-42, 48-50.

Proposed intervenors argue that the settlement should not be approved because the settling parties have not provided adequate information about the value of the claims; the settlement is unreasonably small compared to that achieved in other cases; there is the appearance of collusion; and the non-monetary relief afforded the proposed class (reclassification as employees going forward) is not attributable to this settlement. Chiefly because the tardiness of the proposed intervenors' arrival on the scene did not allow the settling parties to address these contentions, the court continued the hearing on preliminary approval. November 2, 2018 minute order, ROA 43. The court also allowed plaintiffs to file an amended complaint. *Ibid*, p. 6. An amended complaint is not reflected in the ROA. The court directs class counsel to bring an ink original of the first amended complaint (FAC) attached to the motion to the November 30, 2018 hearing so that it may handed up and ordered filed. The FAC will be deemed filed and served on all appearing parties as of November 30, 2018.

Reply papers were then filed with respect to the motion for preliminary approval. ROA 79-88. Opposition and reply papers were filed with respect to the motion for leave to intervene. ROA 52-54, 63-71, 93-94. The court has reviewed the papers.

The case is also set for a continued CMC. ROA 45.

**2. Applicable Standards for Intervention.**

Many cases set forth the standards to be applied by courts in ruling on intervention requests. *See e.g., Lindelli v. Town of Anselmo* (2006) 139 Cal.App.4th 1499, 1504 ("A third party may intervene (1) where the proposed intervener has a direct interest, (2) intervention will not enlarge the issues in the litigation, and (3) the reasons for the intervention outweigh any opposition by the present parties. [Citation.] 'The purpose of allowing intervention is to promote fairness by involving all parties potentially affected by a judgment.' ") *See also* Code of Civil Procedure § 387.

A copy of the proposed complaint in intervention or answer in intervention should be attached to the motion for leave to intervene. *See e.g.*, Weil & Brown et al., *Cal. Prac. Guide: Civ. Pro. Before Trial* (The Rutter Group 2018), § 2:441 ("A nonparty may seek leave to intervene by ex parte application to the court ...; or by a regular noticed motion served on the existing parties. In either event, copies of the proposed complaint in intervention or answer in intervention ... should be attached to the application.")

**3. Applicable Standards for Class Certification.**

"Under Code of Civil Procedure section 382, a class action is permitted 'when the question is one of a common or general interest, or many persons, or when the parties are numerous, and it is impracticable to bring them all before the court. . . .' Class certification requires both an ascertainable class and a well-defined community of interest among class members." (*Gattuso v. Harte-Hanks Shoppers, Inc.* (2007) 42 Cal.4th 554, 575.) " 'The "community of interest" requirement embodies three factors: (1) predominant questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class.' " (*Ibid.*)

"Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification. . . . [I]n the absence of other error, a trial court ruling supported by substantial evidence generally will not be disturbed 'unless (1) improper criteria were used [citation]; or (2) erroneous legal assumptions were made [citation].' [Citation.] Under this standard, an order based upon improper criteria or incorrect assumptions calls for reversal ' "even though there may be substantial evidence to support the court's order." ' [Citations.] *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435-436 (*Linder*).

"The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478-479; *Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 80 ["Under the abuse of discretion standard, 'a reviewing court should not disturb the exercise of a trial court's discretion unless it appears there has been a miscarriage of justice.' "].

No better statement of the principles guiding class certification can be found than the one made by a unanimous Supreme Court in May of 2014 in *Duran v. U.S. Bank*:

a. *Predominance of Common Issues*

"A class action may be maintained if there is an ascertainable class and a well-defined community of interest among the class members. (*Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 913 (*Washington Mutual*); see Code Civ. Proc., § 382.) As part of the community of interest requirement, the party seeking certification must show that issues of law or fact common to the class predominate. (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470.)

"We have observed that the ultimate question for predominance is whether the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants. (*Collins v. Rocha* (1972) 7 Cal.3d 232, 238; see *Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1104-1105, 1108.) ―The answer hinges on whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment." (*Sav–On*, [*supra*, 34 Cal.4th] at p. 327.).

"As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.' [Citations.] (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021-1022 (*Brinker*); see also *Employment Development Dept. v. Superior Court* (1981) 30 Cal.3d 256, 266; *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 809, 815.) However, we have cautioned that class treatment is not appropriate if every member of the alleged class would be required to litigate numerous and substantial questions

determining his individual right to recover following the class judgment on common issues. (*City of San Jose v. Superior Court* (1974) 12 Cal.3d 447, 459.)

"The granting of class certification thus requires a determination that group, rather than individual, issues predominate. Such a finding, however, does not preclude the consideration of individual issues at trial when those issues legitimately touch upon relevant aspects of the case being litigated.

b. *Manageability of Individual Issues*

"Although predominance of common issues is often a major factor in a certification analysis, it is not the only consideration. In certifying a class action, the court must also conclude that litigation of individual issues, including those arising from affirmative defenses, can be managed fairly and efficiently. (*Washington Mutual*, *supra*, 24 Cal.4th at pp. 922-923.) [W]hether in a given case affirmative defenses should lead a court to approve or reject certification will hinge on the manageability of any individual issues. [Citation.] (*Brinker*, *supra*, 53 Cal.4th at p. 1054 (conc. opn. of Werdegar, J.).) In wage and hour cases where a party seeks class certification based on allegations that the employer consistently imposed a uniform policy or de facto practice on class members, the party must still demonstrate that the illegal effects of this conduct can be proven efficiently and manageably within a class setting. (*Brinker*, at p. 1033; *Dailey v. Sears, Roebuck & Co.* (2013) 214 Cal.App.4th 974, 989.)

"After a class has been certified, the court's obligation to manage individual issues does not disappear. [O]nce the issues common to the class have been tried, and assuming some individual issues remain, each plaintiff must still by some means prove up his or her claim, allowing the defendant an opportunity to contest each individual claim on any ground not resolved in the trial of common issues. (*Johnson v. Ford Motor Co.* (2005) 35 Cal.4th 1191, 1210.) In *Sav-On*, *supra*, 34 Cal. 4th at page 332, we upheld the certification of an overtime class action even though the defendant complained that calculation of each class member's recovery would likely 'degenerate into a multitude of mini-trials[.]' There, we found substantial evidence of common issues based on class members' allegations that they were all required to work overtime and perform nonexempt tasks pursuant to uniform company policies and practices. (*Id.* at pp. 327-328.) We upheld the trial court's certification order even as we acknowledged that individualized proof of class members' nonexempt status and overtime amounts might ultimately be required. (*Id.* at pp. 332-334.) In so doing, we stressed that ―[i]ndividual issues do not render class certification inappropriate *so long as* such issues may effectively be managed." (*Id.* at p. 334, italics added.)

"Trial courts must pay careful attention to manageability when deciding whether to certify a class action. In considering whether a class action is a superior device for resolving a controversy, the manageability of individual issues is just as important as the existence of common questions uniting the proposed class. If the court makes a reasoned, informed decision about manageability at the certification stage, the litigants can plan accordingly and the court will have less need to intervene later to control the proceedings.

"Trial courts also have the obligation to decertify a class action if individual issues prove unmanageable. (*Sav-On*, *supra*, 34 Cal.4th at p. 335; *Washington Mutual*, *supra*, 24 Cal.4th at p. 927.) In the context of overtime class actions, some courts have decertified when individual issues related to an exemption defense threaten to overwhelm the litigation. For example, in *Walsh v. IKON Office Solutions, Inc.*, *supra*, 148 Cal.App.4th at pages 1445-1448, the court certified an overtime class action involving the outside salesperson exemption. It later decertified the class when discovery revealed that the circumstances of each class member's employment differed significantly. The Court of Appeal affirmed this ruling, noting

that differences in time spent on sales activities and work outside the office meant that adjudication of the exemption would require individual hearings on liability and damages. (*Id.* at p. 1456.) Similarly, *Keller v. Tuesday Morning, Inc.* (2009) 179 Cal.App.4th 1389 upheld the decertification of an overtime class action brought by retail store managers. Although the trial court initially certified a class based on our opinion in *Sav-On*, two years later it determined that individual inquiries concerning how managers spent their time would overwhelm the issues susceptible to classwide proof. (*Keller*, at p. 1399.)"

*Duran v. U.S. Bank* (2014) 59 Cal.4th 1, 28-30.

**4. <u>Standards for Analysis of Class Settlement</u>.**

There are numerous cases suggesting judicial approaches to approval of class action settlements, including *In re Microsoft I-V Cases* (2006) 135 Cal.App.4th 706, 723; *Dunk v. Ford Motor Co.* (1996) 48 Cal.App.4th 1794, 1801; *Wershba v. Apple Computer*, (2001) 91 Cal.App.4th 224, 240; and *Kullar v. Foot Locker Retail, Inc.* (2008) 168 Cal.App.4th 116.

Under these cases, the factors considered by the court include:

- Strength of Plaintiff's case. This is the most important factor.
- Expense associated with taking the case to trial, *i.e.*, the avoided cost of further litigation.
- Amount or value offered in settlement.
- Extent of discovery completed and state of proceedings.
- Experience and views of counsel.
- Presence of a governmental participant.
- Reaction of class members to proposed settlement.

Some appellate courts are automatically suspicious of settlements reached without extensive and expensive formal discovery. *See, e.g. Molski v. Atlantic Richfield* (9th Cir. 2003) 318 F.3d 937. This court does not share that view.

Under Labor Code section 2699(l)(2), the court must "review and approve any settlement of any civil action pursuant to this part." The criteria for review and approval is not well developed in the California case law. There are some federal district court cases that are not particularly helpful.

**5. <u>Discussion of Foregoing Factors Based on Showing Contained in Moving Papers</u>.**

A. <u>Strength of Case</u>: The Supreme Court's recent adoption of the so-called ABC test [*Dynamex Operations W. v. Superior Court* (2018) 4 Cal.5th 903, *reh'g denied* (June 20, 2018)] certainly suggests this is potentially a case of some merit. Note, however, the limitations on *Dynamex* suggested in Justice Dato's thoughtful decision in *Garcia v. Border Transportation Group* (October 22, 2018) 28 Cal.App.5th 558. And, defendants have claimed the ABC test cannot be used retroactively. Plaintiffs projected that the total damages for the Settlement Class was approximately $32,029,352.45 ($5,522.30 per dancer x 5800 Class Members), if plaintiffs were successful at trial. Accordingly, the Settlement Fund represents approximately 4 to 5% of the full verdict value of the claims being released. On the other hand, there is no guarantee the case would ultimately be certified as a class action,* and certainly no guarantee of complete success on all claims at trial. The court is keenly aware of an immutable fact of civil litigation: the essence of a settlement is compromise - the "yielding of absolutes and an abandoning of highest hopes." *Linney v. Cellular Alaska Partnership* (9th Cir. 1998) 151 F.3d 1234, 1242. Yet a settlement in the low single digit range ($1.5 million vs. $32 million) at a minimum serves to focus attention on the

non-monetary aspects of the case. Of this more below.

B. Avoided Expenses and Other Avoided Risks: The court can well imagine at least $100,000.00 being spent by plaintiffs' counsel getting the case teed up for a class certification motion, and potentially much more (particularly now that there is a struggle for the hearts and minds of the class). In addition, defendants have filed a motion to compel arbitration (ROA 89-92), representing another hurdle for plaintiffs.

C. Amount Offered in Settlement/Settlement Fund:

Gross Settlement: The gross settlement amount is $1.5 million, non-reversionary. In addition, defendants agree to convert all class members to regular employee status. Whether this agreement came as the result of this action being filed, or whether something else was the catalyst, is at present insufficiently developed in the moving papers. The Krontz Declaration (ROA 83), offered in reply, does not address the chronology of the decision-making process with respect to conversion. The Marlin Declaration (ROA 85), also offered in reply, devotes exactly one sentence to this subject. In addition, the value of this change in business practice is not sufficiently developed in the moving papers. The Thompson Declaration (ROA 27) is quite explicit in this regard: at paragraph 25, he states that the "cost to convert" was detailed by defendants' CPA "and can be addressed in great detail if necessary." It *is* necessary. Also necessary is further development (by reference to case law and as a matter of economic theory) of whether and to what extent this cost is properly regarded as part of the consideration offered in settlement of this case. The Cohen declaration (ROA 86) does develop some of these areas – but of course this was offed in reply, and thus the opposing parties did not have the chance to meet these factual assertions. As the court held in the summary judgment context in *San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 316, consideration of evidence offered for the first time in a reply violates the non-moving party's right to know "what issues it was to meet in order to oppose the motion." It is noteworthy that the same rule applies in federal court, *see Zamani v. Carnes* (9th Cir. 2007) 491 F.3d 990, 997 ("the district court need not consider arguments raised for the first time in a reply brief"), and in the courts of appeal, *see American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453 ("[p]oints raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument"); *Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 (" '[T]he rule is that points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before.' ").

Net settlement: In the neighborhood of $900,000. The settlement agreement contemplates a detailed allocation methodology. Counsel contend the average payout will be $303.07.

Class size: approx. 5800

Class period: Dancers who worked from April 15, 2017 to present if they worked in a San Francisco club, or from February 8, 2017 to the present if they worked in a club located in a California city other than San Francisco.

Attorneys' fees, litigation costs, costs of administration: To be determined by future motion, not to exceed $500,000.00.

Class rep incentive payment: $20,000.00, consisting of two components for each of the two class representatives.

D. Extent of Discovery: Formal and informal discovery in the prior litigation involving the same parties and similar claims. Extensive document production and depositions, although none in this case.

E. Experience and Views of Counsel: Counsel are quite experienced with dancer/FLSA litigation in particular, and with class action litigation in particular. Counsel recommend the settlement. It appeared to the court when it drafted the initial tentative ruling an objection to the settlement was anticipated, and this has now come to pass.

F. Presence of a governmental participant: Not really a factor here. LWDA did nothing to assist these aggrieved workers. Nevertheless, LWDA would receive a check in the amount of $15,000.00 (75% of the $20,000.00 settlement allocated to the PAGA claims).

G. Reaction of class members to proposed settlement: This, of course, will not be fully known until notice of the proposed settlement has been given to the class. But we know for certain that at least Ms. Liss-Riordan's clients will object.

H. Form of notice. First class US Mail, email, website, and posting at each "club."

**6. Ruling on Intervention.**

The motion for leave to file a complaint in intervention is granted. (This ruling is NOT confirmed.)

The proposed intervenors make a sufficient showing for permissive intervention under Code of Civil Procedure section 387. They have a direct and immediate interest in the outcome given that they contend they are members of the proposed class and the proposed settlement will extinguish their wage and PAGA claims. Also, assuming the proposed intervenors worked outside the settlement class period (in 2015 and 2016) as contended by the opposition, they appear to be members of the putative class pled in the complaint. *See* complaint, paragraph 85 (FLSA Collective: "All individuals who have worked in California for Defendant(s) as an exotic dancer at any time on or after the date three years before the filing of this action"); *see also* complaint, paragraph 87 (California Class: "All individuals who have worked in California for Defendant(s) as an exotic dancer at any time on or after the date four years before the filing of this action.") Further, they contend that they do not plan to assert any new claims in this litigation. In addition, they contend that their interests will not be adequately represented by plaintiffs and their counsel in this case. Moreover, intervention allows the proposed intervenors to have standing to appeal in the event their objections to the court's decisions cause them to be aggrieved.

Moving counsel must bring an ink original of the complaint in intervention attached to the motion to the November 30, 2018 hearing so that it may handed up and ordered filed. It will be deemed filed and served on all appearing parties as of November 30, 2018.

**7. Ruling on Motion for Preliminary Approval of Class Action Settlement.**

The motion for preliminary approval is denied without prejudice. Given the small percentage recovery referenced in part 5A and part 5C above, and the lack of detail regarding the non-monetary aspects of the settlement, the court cannot say today that it is likely that if notice to the class is given the settlement will ultimately be approved. As proposed, the average class member gets $303.07 plus a status change she may be entitled to anyway under the law, while the class reps get up to $20,000.00 and the lawyers get up to $500,000.00. If the court is going to approve a settlement with these basic facts, there will

have to be an enhanced showing. The court is also eager to avoid the confusion which may ensue if class notice is ordered today, only to be superseded later. The court is not without experience in approving class settlements over objection where the showing of benefit to the class is thorough and complete. *See Lockabey v. American Honda*, Case No. 2010-00087755. Nor is the court a rubber stamp for every settlement that is brought into Dept. 72 (even when unopposed). *See Corona v. Permatex*, Case No. 2017-42923. Here, the court discerns the need for additional work before notice to the class is contemplated.

**8. CMC.**

The case is also set for a continued CMC. ROA 45. The court will set a date for a class certification hearing, probably next summer. Counsel must be prepared to assist the court in this regard.

**IT IS SO ORDERED.**

*The Krontz and Marlin declarations (ROA 83 and 85) are suggestive of significant individualized issues.

---

The Court requests further briefing on the Motion for Leave to Intervene. Briefs due by 12/21/18, not to exceed 10 pages.

Civil Case Management Conference is continued pursuant to Court's motion to 10/25/2019 at 01:30PM before Judge Timothy Taylor.

The Motion Hearing to Certify/Decertify Class Action is scheduled for 10/25/2019 at 01:30PM before Judge Timothy Taylor.

Judge Timothy Taylor

# EXHIBIT B

Tammy N. Bokmuller, Esq., SBN 192200
**BOWMAN AND BROOKE, LLP**
750 B. Street, Suite 1740
San Diego, CA 92101
Telephone: (619) 376-2535
Facsimile: (619) 376-2501
tammy.bokmuller@bowmanandbrooke.com

Attorneys for Defendants Déjà Vu Services, Inc., Harry Mohney, Grapevine Entertainment, Inc. d/b/a Déjà Vu Showgirls; Nite Life East, LLC d/b/a Little Darlings; SP Star Enterprise, Inc. d/b/a Déjà Vu; Coldwater, LLC d/b/a Deja Vu Showgirls; 3610 Barnett Ave., LLC d/b/a Adult Superstore; Jolar Cinema of San Diego, Ltd. d/b/a Jolar Cinema Showgirls; Showgirls of San Diego, Inc. d/b/a Deja Vu Showgirls; Bijou – Century, LLC d/b/a New Century Theatre; BT California, LLC d/b/a Vanity, f/k/a The Penthouse Club & Steakhouse; Chowder House, Inc., d/b/a Hungry I; Deja Vu – San Francisco, LLC d/b/a Centerfolds; Deja Vu Showgirls of San Francisco, LLC d/b/a Little Darlings of San Francisco; Gold Club – S.F., LLC d/b/a Gold Club; S.A.W. Entertainment, Ltd., d/b/a Hustler San Francisco and the Condor Club; San Francisco Garden of Eden, LLC d/b/a Garden of Eden; San Francisco Roaring 20's, LLC d/b/a Roaring 20's; and Stockton Enterprises, LLC d/b/a Deja Vu Showgirls

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN DIEGO

| | |
|---|---|
| JANE ROES 1-4, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>DEJA VU SERVICES, INC., ET AL.<br><br>Defendants. | Case No. 37-2018-00028014-CU-OE-CTL<br><br>**DECLARATION OF DAVID SHINDEL, C.P.A. IN SUPPORT OF DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY APPROVAL**<br><br>Date:<br>Time:<br>Courtroom: |

I, David Shindel, hereby declare under penalty of perjury the following:

1. I am an adult resident of the State of Michigan, and I make this declaration ("Declaration") upon my personal knowledge, unless specifically stated to the contrary. I am competent to testify to the matters stated herein and am prepared to do so upon request.

## QUALIFICATIONS AND ASSISTANCE

2. I am licensed as a Certified Public Accountant ("C.P.A.") in the State of Michigan, and I have practiced as a C.P.A. since 1978. I am also qualified as a Certified Valuation Analyst ("C.V.A.") and as a Master Analyst in Financial Forensics ("M.A.F.F."). My curriculum vitae is attached to this Declaration as Ex. 1.

3. I am a senior partner in the accounting firm ShindelRock & Associates, P.C. ("ShindelRock"); a firm of approximately 20 accountants and bookkeepers. In this capacity I am responsible for the yearly preparation of, and ensuring the compliance with applicable tax laws for, hundreds of federal, state and local tax returns for virtually every state in the country, including California. I am the CPA referred to in the Tentative Ruling issued by the San Diego Superior Court on November 29, 2018, page 5, where the Court references Plaintiffs' counsel Jason Thompson's declaration statement that the "cost to convert" Entertainers to employees "was detailed by defendants' CPA…."

4. As a C.P.A., C.V.A., and M.A.F.F., I have provided professional assistance in many federal and state lawsuits, including tax, labor and employment cases in the State of California. I have been qualified, and have testified, as an expert witness in numerous matters, as reflected on Ex. 1.

5. I regularly engage in preparing projections for businesses of their anticipated costs in complying with tax and labor laws regarding to the legal requirements of employment, including payroll compliance matters. I am qualified

to provide expert advice and opinions regarding federal, state and local tax law compliance as it applies to the employment of workers, and projections of the costs of such compliance, including the matters at issue.

6. I was assisted in this project by Amanda Sayn, who is a C.P.A. and Certified Financial Forensics (C.F.F.) at ShindelRock with a Masters' Degree in forensic accounting.

**PHRASEOLOGY USED IN THIS DECLARATION**

7. In furtherance of our work in this matter, we have been provided by defense counsel with an unsigned copy of the Release and Settlement Agreement ("Agreement," or "Settlement"), which I understand is being submitted to this Court for preliminary approval consideration. I attach the same as Ex. 2 to this Declaration and incorporate it by reference. For the sake of simplicity and the ease of reading this Declaration, the capitalized terms and phrases in the Declaration shall have the same meanings as those terms and phrases are defined in the Agreement, unless otherwise noted.

8. In that regard, I use the phrase "Dance Fees" to refer to the price – the mandatory charge – imposed by the Club on a customer to purchase a personal entertainment performance from, or a specified block of time with, an exotic dance entertainer ("Entertainer").

9. It is my understanding that when the Entertainers performed as independent contractors prior to the execution of an earlier version of the Settlement, the Dance Fees prices were set by Club management with input from the Entertainers; they were advertised in the Clubs to customers; and that, by contract between the Clubs and Entertainers, they were to be paid by the customers either directly to a Club Employee who was *not* an Entertainer or into a "bill acceptor" machine or "collection box" owned and maintained by the respective Club. It is also my understanding that following conversion of the Entertainers to employees under

an earlier version of this Settlement presented to the San Diego Superior Court, the Dance Fees prices have been set by Club management without input from the Entertainers.

10. Given the descriptions of the Dance Fees set forth in the previous two numbered paragraphs and in conjunction with their contracts, under the provisions of the Internal Revenue Code ("IRC") the Dance Fees constitute the property, income, and gross receipts of the Club at which they were paid.

11. I contrast the phrase Dance Fees with what I consider to be "Tips," which, from my understanding with discussions of Club management personnel, are not to be co-mingled with the Dance Fees. I use the term "Tips" to refer to discretionary and gratuitous amounts given by customers to Entertainers. The customer has the discretion to leave a Tip or not, to determine who to leave any Tip to, and also has the discretion to determine the amount of any Tip. *See* Rev. Ruling 2012-18. Tips are any amounts paid by a customer to an Entertainer over-and-above the mandatory Dance Fees along with sums that are handed directly by a customer to an Entertainer for stage performances. It is my understanding that Tips for Entertainers are exclusively their property. No portion of them was/is to be paid to non-Entertainer Club employees (there are no mandatory "tip outs"), nor were/are they to be deposited into the bill acceptor machines or collection boxes. In my review of the previous contracts used between the Clubs and the Entertainers (prior to the Entertainers having been converted to employees pursuant to an earlier version of this Settlement) and as is reiterated through Club postings, Entertainers are informed that they have no obligation to share their Tips with any Club employees.

12. I use the phrase "Deja Vu Group" to refer to nightclubs or other entertainment facilities that have contractual relationships with Deja Vu Services, Inc., which include the Clubs that are subject to the Settlement here.

**MY PRIOR WORK REGARDING THE VALUE TO ENTERTAINERS OF BEING RECLASSIFIED AS EMPLOYEES**

13. As part of a prior settlement involving some of the Clubs in the Deja Vu Group dated February 23, 2017 (in what I will refer to here as the "Limited National Settlement" case), I was asked to project the costs to the defendants there of converting a certain number of Entertainers to employees utilizing certain "enhanced" terms of employment (remuneration over-and-above the legally required minimum wage and mandatory employee benefits) that the Entertainers were permitted to select (or that could be imposed upon them if the "Assessment" process that an Entertainer was required to undergo pursuant to that settlement required such an outcome). That settlement covered a large number of states, was not limited to Entertainers performing in California, but did not include Entertainers who were performing or who had performed at the Clubs located in San Francisco. The report that we prepared for that settlement segregates certain information and data by state and was, as I understand it, filed with a federal district court in Michigan; and is attached as Ex. 3 to this Declaration.

14. For that report, we reviewed the Limited National Settlement, which stated that 64 Deja Vu Group businesses across the country were subject to its terms. For our projections there, we assumed, based upon information provided to us by Deja Vu Group club owners and management personnel, that approximately 7.5% of the class of Entertainers who performed in those establishments would convert to employees in accordance with the terms of that settlement. Based upon these figures and assumptions, we calculated that the costs to the clubs in that suit of conversion under the "enhanced" terms of employment provided by that settlement to 7.5% of the class equated to a yearly amount of **$3,415,808**.

15. My projections for the Limited National Settlement were not predicated upon 100% of the Entertainers performing at the respective clubs being converted to

employees, which is a requirement of the current proposed Settlement in this matter. In fact, I am aware that pursuant to the initial version of this Settlement submitted in the San Diego Superior Court (for clarification, I'll refer to that here as the "San Diego Action") that conversion of Entertainers to employees was completed by the Defendant Clubs in November 2018. Nor did my prior projections attempt to specifically estimate the value to California Entertainers by way of conversion to employees in accordance with the enhanced terms of employment as agreed to in this current Settlement, which incorporates certain terms from the Limited National Settlement (the Clubs that are subject to that settlement being referred to as the "Greater California Clubs") and from what I will refer to as the "San Francisco Settlement" (a prior settlement governing the Clubs that are located in San Francisco[1]; referred to in the Agreement and this Declaration as the "San Francisco Clubs"). In fact, my prior projections in the Limited National Settlement did not include any analysis of the Entertainers performing at *any* of the San Francisco Clubs that are subject to this Settlement.

**NEWLY CHARGED RESPONSIBILITIES**

16. In regard to the Settlement currently before this Court, we have been tasked with, among other things: A) estimating the value, on a per shift basis, of the monetary benefits to the Entertainers affected by the Settlement that are required by law for employees, which would be required to be paid to the Entertainers by way of the Settlement (such as minimum wage, employer-paid Social Security, workers' compensation, unemployment compensation, etc.); B) estimating the value, for a one year period, of the monetary benefits to the Entertainers affected by the Settlement of the "enhanced" terms of employment specified in the Settlement and as

[1] It is my understanding that the while that settlement was approved by this Court, the approval was reversed by the appellate court and sent back to this Court for further consideration. This current Settlement, I understand, supersedes that settlement.

incorporating certain terms of the Limited National Settlement and the San Francisco Settlement – those being the benefits that are *over-and-above* the financial matters required by law for employees (such as specified Dance Fee commissions, drink commissions, costumes, and footwear allowances); C) estimating the value, for a one year period, of the amount of money Entertainers would earn under the terms of the Settlement as employees over what they had been earning as independent contractors; D) controlling for, in such analyses, the certain economic value ascribed to the changes of business practices incorporated in the Limited National Settlement; E) providing a discussion as to why, under economic theory, such matters provide value and financial benefit to the Entertainers affected by the Settlement; and F) explaining the financial benefits of employee status under the Settlement that may not be readily apparent.

## MATERIALS REVIEWED AND RESEARCH CONDUCTED

17. In addition to the Tentative Ruling and the Agreement discussed above (the latter of which, again, incorporates by reference parts of the San Francisco Settlement and the Limited National Settlement), we have been provided by defense counsel with a copy of the Amended Collective and Class Action Complaint for Violations and/or Recovery (of various laws) filed in this Court which, I understand, led to the San Francisco Settlement; a copy of the First Amended Class and Collective Action Complaint for Violation of the FLSA and State Law that had been filed in the San Diego Action; the [Proposed] Complaint in Intervention in the San Diego Action; the decisions of *Dynamex Operations West, Inc v. Superior Court* (2018), *Garcia v. Border Transportation Group, LLC* (2018), and *Vazquez v. Jan-Pro Franchising International, Inc.* (2021); certain statutory provisions enacted subsequent to the rulings in *Dynamex* and *Garcia*, and in particular what many refer to simply as AB-5 and AB-2257; the Declaration of Donald Krontz in Support of Defendants' Joinder in Second Motion for Preliminary Approval submitted in the

San Diego Action; and the Declaration of Gary Marlin in Support of Defendants' Joinder in Second Motion for Preliminary Approval submitted in support of the San Francisco Settlement.

18. We have also been provided by the Defendants with a list of Clubs in the Settlement that contain the corresponding number of Entertainers who Performed in each such Club during 2017; computer reports from the year 2017[2] from four of the Clubs at issue (Showgirls of San Diego, Inc. ("Showgirls of San Diego"), Coldwater, LLC ("Deja Vu Showgirls North Hollywood"), Deja Vu – San Francisco, LLC ("Centerfolds"), and BT California, LLC (formerly "The Penthouse Club," and now known as "Vanity")); and computer reports from the same Clubs from the year 2019[3]. Those computer reports include, among other things, the number of Entertainers performing, dates of performances, hours performed, gross Dance Fee revenues generated by Entertainers, and net Dance Fees paid by the Clubs to the Entertainers[4]. The Report I attach as Ex. 4 ("Report") and the opinions expressed in this Declaration are based, in part, on the documents described above.

19. In preparation of our Report attached as Ex. 4 and this Declaration, we have also reviewed the following materials:

a. My previous report submitted in the Limited National Settlement dated June 1, 2017 (Ex. 3), and the source materials used to prepare that report;

---

[2] This is the most recent -- and indeed last -- year that full-year records of Entertainers performing as independent contractors were available.

[3] This is the first full year of data where all of the California Entertainers at issue had been converted to employees under the terms of a prior version of this Agreement in the San Diego Action, and the last full year of data prior to the effects of the Covid-19 global pandemic.

[4] These four Clubs were selected because, according to Club management personnel, they are two Clubs that are representative (in size, number of Entertainers, number of customers, and income) of the Greater California Clubs and two Clubs that are representative of the San Francisco Clubs.

b. Certain minimum wage rates applicable in California in general, and in San Francisco and Los Angeles in particular;

c. Certain Federal and California wage and hour statutes, regulations, and Wage Orders;

d. The rates and applicable wage caps for California unemployment tax ("SUTA"), Federal Unemployment Tax ("FUTA"), Federal Insurance Contributions Act ("FICA," or sometimes referred to below simply as "Social Security") tax, and Medicare;

e. The rates for and wage limitations (if any) upon California State Disability Insurance ("SDI") and the Employment Training Tax ("ETT");

f. The California Paid Sick Leave Statute and the San Diego and San Francisco Paid Sick Leave Ordinances;

g. The Health Care Security Ordinance of San Francisco;

h. The San Francisco Commuter Benefits Ordinance;

i. Various Entertainer contracts and related documents;

j. Workers' compensation information from the bookkeepers of the Greater California Clubs; and

k. San Francisco Examiner article published January 2, 2019, titled "New rules for contractors have unexpected consequences for the city's strip clubs."

**ASSUMPTIONS UNDERLYING MY REPORT**

20. In preparation of the attached Report, certain assumptions were made based upon our experiences in providing payroll, accounting and tax services for a large number of clients in this industry, including many of the Clubs subject to this Settlement; our previous work in preparing the report we submitted in the Limited National Settlement (Ex. 3 hereto); our review of the data supplied to us for this

project; and our discussions with key personnel in the industry (both within and outside the Deja Vu Group). These assumptions are set forth in Table 9 of the attached Report and are detailed immediately below:

a. That the training that Entertainers will undergo as employees will not have the effect of increasing Dance Fee revenues.[5];

b. That the number of Entertainers who will be performing at the Clubs as employees in the future will be the same as the number who performed as employees in 2019 (see Subsection 20(o) and Footnote 13 below), even if some of the Clubs closed, or decided to discontinue the presentation of live female performance dance entertainment, as a result of the inability to operate in a profitable manner as a result of the requirements of the Settlement, because of the lingering effects of the Covid-19 global pandemic, or otherwise;

c. That the average Entertainer performing in the Clubs would work, as an employee, 4.78 hours on a given shift and would not qualify for overtime compensation[6];

d. That the average Entertainer performing in the Clubs would work, as an employee, 45.69 shifts per year, and 3.81 shifts per month;[7]

---

[5] An argument can be made that in light of such training the Entertainers will in fact experience, as employees, an increase in the Dance Fees they generate and, consequently, an increase in the amount of Dance Fees they are paid under the Settlement as commissions. I discuss this in our report for the Limited National Settlement attached as Ex 3. However, in order to ensure that the results of my Report here are as conservative as possible, we assume that per-Employee Entertainer Dance Fee revenue generation will remain constant irrespective of training.

[6] This is based upon the computer data we received from the four Clubs identified above. Moreover, these numbers directly correlate with the averages we determined in my report for the Limited National Settlement (*see* Ex. 3, Table 2), and so I can have high confidence in them.

[7] This is based upon the computer data we received from the four Clubs identified above.

e. That the average Employee Entertainer would generate $382.84 in gross daily, or "per shift," Dance Fees;[8]

f. That the value to the Class for unemployment compensation, workers' compensation, and health insurance coverage, is equal to 100% of the payments made by the employers (the Clubs) under these government-mandated programs;[9]

g. That Entertainers, as employees, would not qualify (due to their limited work hours), or would waive entitlement to, any paid breaks;[10]

h. That the cost of an Employee Entertainer's costume is $50.00;[11]

i. That because the value of license renewal is de minimis (since only 3 of the Clubs here are subject to Entertainer licensing), there is no value for this aspect of the Settlement (thereby rendering our calculations to be slightly conservative);

---

[8] This is based upon the computer data we received from the four Clubs identified above. Moreover, this number directly correlates with the California average I determined in my report for the Limited National Settlement (*see* Ex. 3, Table 2).

[9] Under economic theory, these programs are to operate at a basic subsistence level; meaning they should take in as revenues (premiums or taxes) only amounts that are equivalent to the benefits that are estimated to be paid out to a specific population. Given, therefore, that all premiums or taxes should eventually be paid out as benefits (or overhead necessary for the administration of such benefits), the only reasonable way I believe for determining a fair valuation of such benefits to the population of Entertainers affected by the Settlement is to ascribe 100% of the premiums or taxes paid by the employers for such coverages.

[10] This assumption is based on two factors. First, since the average number of hours performed by Entertainers is only 4.78 per shift, a large percentage of the Entertainers would simply not qualify for a paid break under California law. In fact, based upon data provided by management, we have determined that no Employee Entertainers will work over six hours in a day. Second, management has further advised us that Employee Entertainers working between five and six hours will waive the optional unpaid 30 minute break. In any event, this assumption renders my estimate of the value of employment conversion as being overly conservative (*i.e.*, it *underestimates* the value to the Entertainers affected by the Settlement).

[11] This figure is derived from conversations I had with key personnel associated with the Clubs.

j. That the average number of Conversation Beverages, certain drinks sold by Employee Entertainers during their shifts would be 1.5 drinks per hour at a price of $10.00 per drink;[12]

k. That Employee Entertainers would receive absolutely no Tip income from their customers (something we know to be false from our previous work), which renders the Report to be overly conservative because our calculations do not then include certain financial benefits to the Employee Entertainers arising out of such Tip income, such as matching Social Security payments, matching Medicare payments, and additional workers' compensation insurance premiums paid based on such Tip income;

l. That the applicable minimum wages are those as of February 1, 2020 (thereby rendering our calculations overly conservative as certain minimum wage rates have increased since then);

m. That no Employee Entertainers will exceed the wage caps for Social Security or State Disability Insurance;

n. That income reaches the wage caps for FUTA and SUTA;

o. That 133.5 Entertainers will work at each Club per year; and[13]

---

[12] This figure is derived from conversations I had with key personnel associated with the Clubs, including with individuals who were involved in the industry years ago when the selling of such drinks was undertaken by Entertainers at some facilities.

[13] This is based on the computer data we received from the four Clubs identified above. However, as noted in Table 8 to my Report, this is far below the average number of independent contractor Entertainers who had been performing at each Club during 2017 (that data reflecting the average of the 225 dancers per Club for a two week period of time immediately prior to the Entertainers being informed that they would be converted to employees pursuant to an earlier version of this Settlement). We understand this drop to be the result of the conversion of the Entertainers to employees. Specifically, I am informed, and am aware from discussions that I have had with key members of the industry in California, including with those who have no connection to these Clubs, that a large part of this decline was attributed to the fact that very few other exotic dance establishments in the state had converted Entertainers to employees at the time and that Entertainers who had been performing in the Clubs had migrated to other competing facilities (Continued...)

p. That no Employee Entertainers will work at a Club over 90 days and thus will not be eligible for any state or city Paid Sick Leave laws.

**ANALYSIS OF THE MONETARY LEGAL REQUIREMENTS OF EMPLOYMENT**

21. Our first task was to analyze the value of the monetary benefits that are provided to the Entertainers as a matter of law by the conversion of them to employees as required by the Settlement: Minimum wage, overtime, and governmentally mandated benefits afforded to employees through payments made directly by their employers (*i.e.*, not through wage withholdings), such as retirement benefits through payment of Social Security, workers' compensation, other disability benefits, and unemployment compensation[14]. We did not ascribe any value to benefits provided through payroll deductions. We counted, rather, only those benefits afforded to employees as a result of payments made by *employers* out of *their* revenues. These are generally referred to as "non-contributory" payments, meaning that the employee does not contribute funds to make such payments.

---

where they could continue to perform as independent contractors. I am also aware, however, that as a result of the filing of similar types of lawsuits a number of those competing facilities similarly converted entertainers to employees. As a consequent result, I am aware that immediately prior to the impact of the global pandemic (late 2019; early 2020), entertainer "numbers" were beginning to return to pre-conversion levels. In addition, I also understand that while a few of the Defendant Clubs have closed as a result of the global pandemic or otherwise, or no longer provide live entertainment, because the "Deja Vu" brand is widely known to Entertainers, we assume that those Entertainers affected by a Club closure will migrate to work at one of the other Clubs subject to the Settlement. While I presume, for these reasons, that as the Clubs emerge from the global pandemic the entertainer "numbers" will begin to return to pre-conversion levels, the fact that we utilize Entertainer counts for the year immediately following conversion of the Entertainers to employees renders our projections, in my estimation, to be conservative.

[14] We did not ascribe "value" for any benefits under California's ETT because it is our understanding that although the Clubs pay this tax in regard to their employees, none of their employees would qualify for benefits under this program since the adult nightclub industry is not considered to be one of the "targeted industries" for which that tax is designed. Similarly, we did not ascribe any value for the San Francisco Commuter Benefits Ordinance because while offered by the Clubs, we were not aware of any Employee Entertainers who had taken this benefit.

22. Based upon the sampling information we were provided from four Clubs for the year 2019, we estimated that there were approximately 2,670 Entertainers performing at the Clubs then who would be able to obtain "value" from these aspects of the Settlement (Report; Table 8). However, for the reasons set forth in Footnote 13 of this Declaration, this estimate most likely renders the valuation calculations set forth in the Report (Ex. 4) as extremely conservative.

23. We then determined the applicable minimum wage rates in February 2020 for California ($13.00 per hour), in Los Angeles ($14.25 per hour), and in San Francisco ($15.59 per hour). Due to differing minimum wage rates and other municipal employment benefits, we segregated our calculations and projections by Entertainers performing in San Francisco, in Los Angeles, and in the rest of California.

24. Based upon the projected average of the number of hours performed by Employee Entertainers per shift (4.78), we calculated the economic values of the legally required benefits for employment,[15] which came out to be $47.49 for Entertainers performing in San Francisco; $37.44 for Entertainers performing in Los Angeles; and $37.03 for Entertainers performing in the other areas of California. These calculations appear on, or were derived from the figures found in, Tables 3 and 5 of my Report (Ex. 4).

**CONTROLLING FOR THE VALUE ALREADY ASCRIBED IN THE LIMITED NATIONAL SETTLEMENT**

[15] Minimum wage payments, in addition to all legally required employer-paid (as opposed to wage withholdings) taxes and other payments related to those wages, including FICA, Medicare, FUTA, SDI, state unemployment insurance, and workers' compensation; and for San Francisco Entertainers all payments under the Paid Sick Leave Ordinance and the Health Care Security Ordinance. We disregarded the ETT and the Commuter Benefits Ordinance for the reasons discussed above.

25. In carrying out our other projections, we wanted to ensure that we were not "double counting" for the value to certain Entertainers who were performing in the non-San Francisco Clubs that they would have already been receiving by the Limited National Settlement. Those Entertainers who converted to be employees, or who were, pursuant to the "Assessment" process set forth in that settlement, compelled to work as employees as opposed to being able to continue to perform as independent contractors, were already being afforded, pursuant to that settlement, minimum wage, 20% Dance Fee commissions over the defined cost of their employment, 20% drink commissions, costumes, footwear allowances, and the like.

26. In order to control for the value to Entertainers through the Limited National Settlement,[16] we took the amount that we had determined in our report for that settlement (Ex. 3) represented, based upon the methodology that we utilized there, the net change per shift in additional earnings that an employee Entertainer would realize over what she had been earning as an independent contractor ($173; Ex. 3, p. 3), multiplied that by the number of independent contractor Entertainers who were estimated to convert to employees as a result of that settlement (14; Ex. 3, pp. 2 and 10 note 4), and multiplied that subtotal by the number of Clubs in this Settlement that were also subject to the Limited National Settlement (10 Clubs). These calculations are reflected on Table 2 of the attached Report and amounts to $4,408,040.

[16] We could not simply export the "total" number contained in our report from the Limited National Settlement (Ex. 3) since that report was undertaken, at the request of counsel, using a different method of analysis which projected certain expenses to the 64 clubs involved in that settlement (most of which are not governed by the Settlement here in the Roes 2 case) and not the aggregated increase in earnings to the Entertainers.

27. We reduced our calculations here by the $4,408,040 so that we were not double counting in this Report for value to certain of the Entertainers that was already been provided by way of the Limited National Settlement.

**<u>VALUE TO THE ENTERTAINERS OF THE "ENHANCED" TERMS OF EMPLOYMENT SPECIFIED IN THE SETTLEMENT AGREEMENT</u>**

28. The second thing we were tasked to do was to prepare a projection, for a period of one year, of the approximate value to the Entertainers impacted by the Settlement of the "enhanced" terms of employment specified in the Settlement (Dance Fee commissions, drink commissions, costumes, and footwear allowances).

29. For this aspect of my Report, we were required to review not only the Settlement, but also the Limited National Settlement and the San Francisco Settlement since this Settlement incorporates certain enhanced terms of employment from those two other documents. Notably, as the result of the incorporation of certain terms of those two other settlements, the enhanced terms of employment for this Settlement vary by Clubs; one set of terms being applicable to Clubs located in San Francisco and another set to those outside of San Francisco.

30. As such, we calculated projections for daily, or "per shift," Dance Fee Commissions as follows: For Entertainers performing in the San Francisco Clubs, 40% of gross Dance Fee revenues generated over $150.00; and for Entertainers performing in Clubs located outside of San Francisco, 40% of gross Dance Fee revenues generated over the "Cost of [their] Employment" as defined in Section 3.28 of the Limited National Settlement.

31. We also calculated daily, or "per shift," commissions on certain drinks (referred to as "Conversation Beverages" in the Limited National Settlement and not applicable to Entertainers performing in the San Francisco Clubs) at a rate of 20% of such drinks; as well as the costs of logo costumes (two per month for Clubs outside of San Francisco and one per month for Clubs located within the City of

San Francisco) and allocations for footwear allowances for the non-San Francisco Clubs as is provided for in the Settlement.

32. But for the Settlement, the Entertainers would not be entitled to the payments and benefits set forth in this section of my Declaration.

33. After determining the per Entertainer, per shift, totals for these enhanced terms of employment for the three areas under review (San Francisco, Los Angeles, and the other areas of California), we multiplied these numbers by the average number of Entertainers we felt would be performing in the Clubs in these three areas (1,335 Employee Entertainers in San Francisco, 134 Employee Entertainers in Los Angeles, and 1,202 Employee Entertainers in the other areas of California) and the average number of shifts per year the Employee Entertainers were working in 2019 (45.69).

34. The projections for the value of these enhanced terms of employment provide for in the Settlement are found in the Summary of Analysis contained in my Report, and the underlying data and calculations appear in Table 4 thereof. In accordance with our calculations, we project that THE VALUE TO THE ENTERTAINERS WHO WOULD BENEFIT FROM THESE ENHANCED TERMS OF EMPLOYMENT PROVIDED FOR IN THE SETTLEMENT, FOR A ONE YEAR PERIOD, and accounting for the estimated aggregate value to the "converted" Entertainers pursuant to the Limited National Settlement, would be **$12,474,093**.

## VALUE TO THE AFFECTED ENTERTAINERS OF THEIR CONVERSION TO EMPLOYEES UNDER THE TERMS OF THE SETTLEMENT

35. Our third task was to prepare a projection as to how much more, or less, the Entertainers would earn as a group, and therefore each Entertainer would earn on average, under the employment structure provided for in the Settlement in

comparison to the previous independent contractor relationship. For this, we added the legally required wages and other benefits that Entertainers would be earning under an employment structure, together with the commissions and other "enhanced" employment benefits provided for under the Settlement, and then compared those figures to what the Entertainers had been earning -- prior to conversion to employees -- by way of their Dance Fee "splits" (for sake of clarity here and in the Report, we will also simply refer to those payments as "commissions"). For purposes of these calculations, we ignored the substantial Tip income that we were aware Entertainers had earned, or would be earning, under either business structure.

36. These calculations are found on the Summary of Analysis contained in my Report, and the underlying data and calculations are found in Table 1 thereof. In accordance with our calculations, we project that the value of conversion to an employee under the terms of employment as set forth in the Settlement and the earlier version of it, over what the same Entertainer would have made as an independent contractor prior to conversion, would be $46.45 per shift for each Entertainer performing in a San Francisco Club; $91.56 per shift for each Entertainer performing in a Los Angeles Club; and $88.02 per shift for each Entertainer performing in a Club located in the other areas of California. CONSEQUENTLY, THE AGGREGATE VALUE TO THE GROUP OF ENTERTAINERS WHO WOULD BENEFIT FROM THIS CONVERSION TO EMPLOYMENT UPON THEIR TERMS PROVIDED FOR IN THE SETTLEMENT, AND ACCOUNTING FOR THE ESTIMATED AGGREGATE VALUE TO THE "CONVERTED" ENTERTAINERS PURSUANT TO THE LIMITED NATIONAL SETTLEMENT, WOULD BE, FOR A ONE YEAR PERIOD, **$3,819,807**.

**THE CONVERSION OF ENTERTAINERS TO EMPLOYEES AS REQUIRED UNDER THE TERMS OF THE SETTLEMENT PROVIDES VALUE TO FOR THE AFFECTED ENTERTAINERS**

37. Under the terms of the Settlement, all Entertainers performing at the Clubs are to be converted to employees, which has in fact already occurred pursuant to earlier version of this Settlement. Prior to the conversion, the Entertainers who performed in the Clubs were classified as independent contractors and not as employees. They were not paid an hourly wage; they did not receive overtime pay; and they were not entitled to receive benefits a Club would legally be required to pay for in regard to its employees which are calculated based upon the wages earned and which directly benefit employees (such as matching Social Security, state unemployment compensation coverage, workers' compensation coverage, Medicare, FUTA, SDI, benefits under the Paid Sick Leave statute and ordinances, and, for Entertainers performing in the San Francisco Clubs, the Health Care Security Ordinance). Rather, the Clubs paid the Entertainers a contractual portion of the Dance Fees their services generated, and the Entertainers received Tips as well.

38. All of the employment-related items listed in the paragraph immediately above are obligations an employer is required, under the law, to pay only to its employees (or for their benefit). These are now *required* under the terms of the Settlement for *all* Entertainers performing in the Clubs, and thus these items provide value to the Entertainers affected by this Settlement. These monetary benefits were not afforded to the Entertainers while they performed as independent contractors, nor were they mandated to apply to all Entertainers performing in each and every one of the Clubs under any other settlement (including the Limited National Settlement and the San Francisco Settlement) prior to the earlier version of this Settlement in the San Diego Action.

39. In addition, the Settlement provides the enhanced terms of employment, which are of a pecuniary gain to the Entertainers over-and-above the legally required remuneration and other financial benefits to which they are entitled through the terms of this Settlement. The enhanced terms of employment as mandated by the Settlement include 40% commissions to the Employee Entertainers on the Dance Fees they generate (for Employee Entertainers performing in the San Francisco Clubs, above $150.00 in Dance Fees, and for Employee Entertainers performing in the non-San Francisco Clubs, above the Costs of Employment as defined in the Limited National Settlement); 20% commissions on Conversation Beverages (for Employee Entertainers performing in Clubs outside of San Francisco); free costumes (two per month for Clubs located outside of San Francisco, and one per month for Clubs located within the City of San Francisco); $25.00 per month footwear allowances (for Employee Entertainers performing in Clubs outside of San Francisco); and license renewal fees (for Employee Entertainers performing in certain non-San Francisco Clubs, but again, not calculated here). *None* of these items are required by law to be provided to employees, and employers are not required to pay these to an employee who is already receiving a legally requisite wage. Consequently, all of these items as well provide value to the class of Entertainers affected by the Settlement.

40. Part of the value that is provided to the Entertainers by the Settlement, and particularly by way of certain legally-mandated benefits of employment, may not be readily recognized. For example, non-contributory Social Security that the Clubs are required to pay "out of their own pocket" (*i.e.*, not as part of the withholdings from an employee's wages) on behalf of an employee provides retirement benefits to that employee. This also includes employer-paid, non-contributory, Social Security for the *tip income* earned and reported by the Employee Entertainer, which provides that Employee Entertainer additional retirement

benefits.[17] The same applies, as the calculations on Table 3 of my Report demonstrate, for Medicare (providing health care benefits for the Employee Entertainers when they reach the age of 65), FUTA (providing Employee Entertainers with unemployment benefits), SDI (providing Employee Entertainers with disability benefits), state unemployment insurance (providing Employee Entertainers with unemployment insurance benefits), workers' compensation (providing Employee Entertainers with workers' compensation benefits), and Health Care Security Ordinance (providing San Francisco Employee Entertainers with health care benefits). These all are included in my projections as providing monetary value to the Entertainers as mandated benefits imposed as a direct result of the conversion-to-employees terms of the Settlement, and are, again, *not* payments that are *withheld* from an Employee Entertainer's wages. They are non-contributory financial payments required, as a result of this Settlement, to be made by the Clubs out of their revenues as a result of, and calculated based upon, the wages paid to the Employee Entertainers.[18]

41. Moreover, because of the withholding requirements under the IRC, Entertainers may misperceive what "pay" they actually are receiving from the Clubs. As discussed above, the Dance Fees constitute service charges, and therefore wages under the IRC, and withholdings must be made directly from them. The withholdings are different, however, with regard to Tips.

42. Under the IRC, employees have an obligation to report all of their Tips to their employer. IRC § 6053(a); and 26 C.F.R. § 31.6053-1. Withholdings due on Tips are not, however, to be taken out of the Tips themselves. Rather, withholdings

---

[17] Again, in order to ensure that my projections were overly conservative, we have assumed that none of the Entertainers would earn any Tip income, even though we know that not to be the case.

[18] And once again, these calculations have been made in our Report without consideration of the significant Tip income that I am aware these Entertainers earn; thereby rendering the calculations in this regard as well to be overly conservative.

due in regarding to reported tip income are to be taken out of the employee's *regular wages* (including commissions) and, if that is insufficient to satisfy all of the requisite withholdings, by any monies that an employee may, in his or her discretion, *voluntarily give* to his or her employer for the payment of those taxes due. *See, e.g.*, IRC § 3102(c)(1) (taxes on reported tips are to be made by "deducting the amount of tax *from such wages* of the employee (*excluding tips*, but including funds turned over by the employee to the employer…")), (2) and (3) (same); IRC § 3402(a)(1) and (k) (same); 26 C.F.R. § 31.3102-3(a) (similar); 26 C.F.R. § 31.3402(k)-1(a) (similar); Rev. Rul. 2012-18, p. 6 (similar); IRS Internal Revenue Manual (updated 2014), at § 4.23.7.2(1); IRS Publication 15 (Circular E), Employer's Tax Guide (2018), p. 18; IRS Publication 505, Tax Withholding and Estimated Tax (2017), at pp. 12-13, under heading "Tips" ("…tax is *not withheld directly from tip income*, as it is from your regular pay. Nevertheless, your employer will take into account the tips you report when figuring how much to withhold from your *regular pay*"); IRS Publication 531, Reporting Tip Income (2017), pp.3-5; IRS Publication 1244, Employee's Daily Record of Tips and Report to Employer (Rev. 8-05) (front cover); and FS-2017-08, IRS, Employer Reminder: Reporting Tips versus Service Charges, p. 2.

43. Because of these withholding requirements, for workers who earn substantial income in Tips – such as the Employee Entertainers here – the withholdings due on that Tip income may substantially reduce any wages to be paid to the Employee Entertainer since those wages are used to satisfy the withholding requirements on the worker's *Tips*. In fact, depending upon the amount of Tips earned, an Employee Entertainer may actually receive a "0" paycheck (because the wages that are otherwise to be paid to the Employee Entertainers are, instead, to be remitted to the applicable governmental entities as withholdings due on the tip income) even though the worker may theoretically be "paid" substantially over

minimum wage. As such, some Employee Entertainers may perceive that they are not obtaining substantial income in the form of wages and commissions when the truth is that they *are* receiving such payments, although those payments are being used to satisfy the withholdings that are legally due on their substantial Tip income.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on July 16, 2021.

David Shindel, C.P.A., C.V.A, and M.A.F.F.

## INDEX OF EXHIBITS

| EX.# | DESCRIPTION | PAGES |
|---|---|---|
| Exhibit 1 | Curriculum Vitae | |
| Exhibit 2 | Copy of Release and Settlement Agreement | |
| Exhibit 3 | Limited National Settlement – Report | |
| Exhibit 4 | Report | |

# EXHIBIT 1

**David H. Shindel, CPA, CVA, MAFF**

Shindel, Rock and Associates, P.C.
28100 Cabot Drive, Ste 102
Novi, MI 48377
Tel: 248-855-8833
Fax: 248-855-4192
Email: dshindel@shindelrock.com

---

**POSITION**

Senior Partner with Shindel, Rock & Associates P.C.

**EDUCATION**

B.S. - Eastern Michigan University 1971
Graduate Courses (Walsh College) 1986 – 1995
Master of Taxation Program - various courses

**LICENSES AND CERTIFICATIONS**

Certified Public Accountant (CPA) - State of Michigan
Certified Valuation Analyst (CVA) - National Association of Certified Valuation Analysts
Master Analyst in Financial Forensics (MAFF) - National Association of Certified Valuation Analysts

**PROFESSIONAL ORGANIZATIONS**

Member – Michigan Association of Certified Public Accountants
Member – American Institute of Certified Public Accountants
Member – National Association of Certified Valuation Analysts
Oakland County Business Finance Company (SBA 504 Program):Past Chairman, Past President, and Past Vice-President

**LECTURES AND PUBLICATIONS**

Lecture - Level One Bank Loan Underwriting, Financial Statement and Tax Return Analysis (2015)
Guest Lecture – Walsh College Graduate Taxation Program (2015)
Lecture - SBA 504 Loan Underwriting, Financial Statement and Tax Return Analysis (2014)
Panelist/Industry Expert/Lecturer - National ACE Convention (2000–2012)
"Adult Nightclubs: Company-Specific Risk as the Extreme" Business Valuation Resources (April 2020) and related National webinar
"Valuers and Bankers: Benefits of Cross-Training Between the Professions", Business Valuation Resources (January 2020)
"Some courts prefer back-of-the-envelope calculations, expert says", Business Valuation Resources (October 2019)
"Michigan Policies Penalize Business", Freep.com, detnews.com, The Oakland Press, August/September 2010
"Valuation of Intangible Property Rights: Adult Use Zoning", The Value Examiner, March/April 2010
"Reopen or Not? A Method for Analyzing a COVID-19 Shuttered Firm" Business Valuation Resources (September 2020)
Walsh College, Troy, Michigan - Development of Masters Degree in Forensic (Accounting) – Five Graduate Courses – write outlines, syllabus, books to use for courses

**PROFESSIONAL EDUCATION COURSES**

2010 - 2015 AICPA National Forensic & Valuation Services Conference
Attended NACVA's CVA Training Center
Attended NACVA's CFFA Training, 2 sections
Ongoing courses to maintain certification of CPA, CVA, and MAFF designations

David Shindel, CPA, CVA, MAFF
Shindel, Rock & Associates, P.C.

Summary of Deposition and Witness Testimony During Last 4 Years

| Trial | Deposition | Case Name | Case Jurisdiction |
|---|---|---|---|
| * | | Jane Does 1-2 v Deja Vu Service, Inc. et al. | United States Court of Appeals, Sixth Circuit. |

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

JANE ROE, et al.,

Plaintiffs,

v.

SFBSC MANAGEMENT, LLC, et al.,

Defendants.

JANE ROE 1 and 2, et al.,

Plaintiffs,

v.

DEJA VU SERVICES, et al.,

Defendants.

Civil Case No. 14-cv-03616-LB

Related to: 19-cv-03960-LB

**RELEASE AND SETTLEMENT AGREEMENT**

The Honorable Laurel Beeler

**TABLE OF CONTENTS**

I. INTRODUCTION ....................1

II. DEFINITIONS ....................3

III. SUBMISSION OF THIS AGREEMENT TO THE COURT FOR REVIEW AND APPROVAL; CONDITIONAL CONSOLIDATION AND CERTIFICATION OF THE PROPOSED CLASS FOR SETTLEMENT PURPOSES ONLY; AND STIPULATION REGARDING AMENDMENT OF THE COMPLAINTS ....................22

IV. CLASS NOTICE AND DANCE FEE PAYMENT ELECTION ....................26

V. SETTLEMENT CONSIDERATION AND TERMS OF PAYMENTS ....................31

VI. PLAN OF ALLOCATION AND DISBURSEMENTS OF PAYMENTS AND PAGA PAYMENTS ....................36

VII. DANCE FEE PAYMENTS ....................39

VIII. TAX CONSIDERATIONS OF THE SETTLEMENT ....................42

IX. DEFENDANTS' CHANGES OF BUSINESS PRACTICES, WHICH HAS AND WILL CONFER A DIRECT AND SUBSTANTIAL FINANCIAL BENEFIT TO THE SETTLEMENT CLASS ....................44

X. ATTORNEYS' FEES AND EXPENSES AWARD, CLASS REPRESENTATIVE ENHANCEMENT PAYMENTS, AND ADMINISTRATIVE COSTS ....................49

XI. OBJECTIONS AND OPT-OUTS ....................51

XII. RELEASES AND COVENANTS ....................52

XIII. TERMINATION OF SETTLEMENT ....................57

XIV. LIMITATIONS UPON THE TERMS OF SETTLEMENT ....................61

XV. PROTECTIVE ORDER ....................62

XVI. NOTIFICATIONS ....................63

XVII. FORCE MAJEURE ....................64

XVIII. MISCELLANEOUS PROVISIONS ....................65

# RELEASE AND SETTLEMENT AGREEMENT

## ARTICLE I

## INTRODUCTION

1.1 This Release and Settlement Agreement (which, together with all attached exhibits, is referred to collectively herein as the "Agreement"):

a) Is made and entered into to resolve Claims[1] that have been brought, or could have been brought, in two class and collective action lawsuits: *Jane Roes 1-2 v. SFBSC Management, LLC*, Civil Case No. 3:14-cv-03616-LB (the "San Francisco Action"), and *Jane Roe 1 and 2 v. Deja Vu Services, Inc., et al.*, Civil Case No. 19-cv-03960-LB (the "San Diego Action," together with the San Francisco Action being the "Actions");

b) Is by and between Plaintiffs Jane Roes 1 and 3 of the San Francisco Action and Jane Roes 1 and 2 of the San Diego Action (sometimes the "Named Plaintiffs" or the "Class Representatives") on behalf of themselves and all others similarly situated (the Named Plaintiffs and all Class Members are collectively referred to hereinafter simply as the "Plaintiffs"), and Defendants SFBSC Management, LLC ("SFBSC"), Deja Vu Services, Inc. ("Services"), and Harry Mohney ("Mohney"), along with all of the Defendant Entities identified in ***Exhibit A*** attached hereto and incorporated by reference (SFBSC, Services, Mohney, and the Defendant Entities are

[1] Capitalized terms and phrases contained in this Introduction are specifically defined in Article II herein or elsewhere in this Agreement. Terms and phrases are underlined when they are first defined in this Agreement.

collectively referred to in the balance of this Agreement as the "Defendants," and shall be designated as such in the Amended Complaints for Settlement); and

c) Settles – except for those matters specifically excluded from this Agreement – collective Claims against the Released Defendants brought pursuant to the provisions of the Fair Labor Standards Act (29 U.S.C. § 201, *et seq*. -- the "FLSA") and class action Claims against the Released Defendants under various California labor, and labor-related, laws pursuant to Federal Rule of Civil Procedure Rule 23 ("Rule 23"), as well as Claims brought on behalf of the California Labor and Workforce Development Agency ("LWDA") under the California Private Attorney General Act, Labor Code § 2698 *et. seq*. ("PAGA"). Upon execution of this Agreement, Final Approval by the Court, and the Judgment becoming Final, it is the express intent of the Parties to resolve all Released Claims during the Class Periods which were brought (both initially and by way of the amendments permitted under this Agreement), or which could have been brought based upon the facts pled, by the Class Representatives, by all "Opt-in" Class Members who submit a Consent to Join these Actions, and by all Class Members who fail to Opt-Out of the Settlement and who therefore constitute part of the Rule 23 Settlement Class. The Settlement shall become fully operative upon the Effective Date.

**NOW THEREFORE,** in consideration of the foregoing and of the promises and mutual covenants contained herein, and other good and valuable consideration, the adequacy of which is acknowledged, it is hereby agreed by and among the Parties as follows:

## ARTICLE II

## DEFINITIONS

As used in this Agreement, the following words and phrases shall have the meanings specified in this Article II. Capitalized words and phrases contained in such definitions that have not been previously explained are defined elsewhere later in this Agreement.

2.1 "Administrative Costs" means the administrative costs and expenses of the Settlement incurred and charged by the Settlement Administrator. In order to provide for the prompt and equitable distribution of all Settlement Payments, the full amount of the Administrative Costs shall be predetermined and specifically set forth in the contract entered into with the Settlement Administrator. The Notice and Administration Fund as defined herein is part of the Administrative Costs.

2.2 "Amended Complaints for Settlement" means amended complaints in the San Francisco Action and the San Diego Action, in all material respects identical to ***Exhibits B*** and ***C***, that are submitted in furtherance, and to effectuate the purposes and intent, of this Agreement.

2.3 "Attorneys' Fees and Expenses Award" means the attorneys' fees and expenses/costs that may be awarded by the Court to Class Counsel to compensate them for their attorneys' fees and expenses/costs related to the Actions and obtaining this Settlement.

2.4 "CAFA Notice" means notice sent by Defendants that complies with the requirements of the Class Action Fairness Act of 2005, 28 U.S.C. § 1711, *et seq*.

2.5 "Cash Payment" means the amount of money to be paid pursuant to the terms of this Agreement to a Cash Pool Recipient. Although the term "cash" is used, Cash Payments will be paid via check, and may be paid and distributed in installments pursuant to the terms of this Agreement.

2.6 "Cash Pool" means the amount of four million dollars ($4,000,000) and the amount of the Unclaimed Dance Fee Pool, if any, that is to be made available by the Defendants to pay: a) Settlement Class Members' Cash Payments; b) the Enhancement Payments; c) the PAGA Payments; d) the Attorneys' Fees and Expenses Award; and e) the Administrative Costs.

2.7 "Cash Pool Recipient" means a Settlement Class Member who has not selected to receive her Settlement Payment in the form of Dance Fee Payments through execution and Timely Submission of a Properly Completed Dance Fee Payment Election Form.

2.8 "Claim(s)" means, when used alone herein and not as a part of another specifically defined phrase, any and all past and present actions, demands, causes of action, suits, debts, obligations, damages, and rights or other assertions of liability or wrongdoing, of any conceivable kind, nature and description whatsoever, whether existing or potential, whether fixed or contingent, whether currently asserted or not, recognized now or hereafter, and whether expected or unexpected.

2.9 "Class" means the group of all Entertainers who Performed at one or more of the Clubs at any time during the applicable Class Periods, but does not include those individuals who provide or who have provided services as "headliner" or "feature" performers unless such individual was otherwise a party to a Dancer Contract with one or more of the Clubs during the Class Periods.

2.10 "<u>Class Counsel</u>" means the law firms of The Tidrick Law Firm, LLP, and specifically Joel Young and Steven Tidrick; Sommers Schwartz, P.C., and specifically attorneys Trenton Kashima and Jason Thompson thereof; and Pitt McGehee Palmer & Rivers, P.C., and specifically Megan Bonanni thereof.

2.11 "<u>Class Member</u>" means any individual who Performed as an Independent Professional Entertainer (independent contractor) at one or more of the Clubs at any time during the applicable Class Periods, but does not include those individuals who provide or who have provided services as "headliner" or "feature" performers unless such individual was otherwise a party to a Dancer Contract with a Club during the Class Periods.

2.12 "<u>Class Notice</u>" means a notice of settlement of class and collective action to be submitted for review and approval by the Court as part of the motion for preliminary approval set forth herein, which shall conform in all material respects to the document attached as ***Exhibit D***.

2.13 "<u>Class Notices</u>" means the Class Notice, the Posted Notice, the Website Notice, the Electronically Posted Notice, and the Social Media Notice, as well as any other notices to the Class ordered or approved by the Court.

2.14 "<u>Class Period(s)</u>" means, for purposes of the Settlement and this Agreement: a) the time period from August 8, 2010 to November 16, 2018 for Entertainers who Performed as Independent Professional Entertainers (independent contractors) at one or more of the San Francisco Clubs (the "<u>San Francisco Class Period</u>"); and b) the time period from February 8, 2017 to November 16, 2018 for Entertainers who Performed as Independent Professional Entertainers (independent contractors) at one or more of the Greater California Clubs (the "<u>Greater California Class Period</u>"). An Entertainer may be subject to both Class Periods if she Performed at one or

more of the San Francisco Clubs during the San Francisco Class Period and at one or more of the Greater California Club during the Greater California Class Period.

2.15 "Class Representatives" includes, in addition to those individuals identified above, any other individual(s) duly appointed as additional or successor representatives of the Settlement Class.

2.16 "Clubs" means collectively the San Francisco Clubs and the Greater California Clubs defined herein, which are all identified on ***Exhibit A*** attached hereto, with each one being a "Club."

2.17 "Consent to Join" means a Class Member's agreement to join these Actions as a party plaintiff to the FLSA Claims asserted therein through either the issuance to her of a Settlement Check or the Timely Submission of a Properly Completed Dance Fee Payment Election Form.

2.18 "Court" means the United States District Court for the Northern District of California.

2.19 "Dance Fee(s)" mean the established and published cost of personal entertainment Performances or sessions engaged in by Entertainers at the Clubs negotiated between the Clubs and Entertainers and set as mandatory charges that customers are required to pay in order to purchase such Performances or sessions.

2.20 "Dance Fee Claim" mean the submission made by a Class Member using the Dance Fee Payment Election Form on which she elects to receive her Settlement Payment in the form of Dance Fee Payments.

2.21 "Dance Fee Claimant" means a Settlement Class Member who Timely Submits a Properly Completed Dance Fee Payment Election Form, whereby she elects to receive her Settlement Payment in the form of Dance Fee Payments.

2.22 "Dance Fee Payments" means the amount of money to be paid to a Dance Fee Claimant in the form of certain Dance Fees that would, but not for the terms of this Agreement, be collected and retained by a Club as part of its gross income. Dance Fee Payments shall be paid to Dance Fee Claimants as additional commissions.

2.23 "Dance Fee Payment Collection Period" means a period of one (1) year from the Effective Date.

2.24 "Dance Fee Payment Election Form" means a form that is approved by the Court in all material respects consistent with ***Exhibit E***, through which Settlement Class Members may elect to receive their Settlement Payment in the form of Dance Fee Payments.

2.25 "Dance Fee Payment Election Period" means a period of sixty (60) days from the Notice Date.

2.26 "Dance Fee Payment Request Form" means a form in all material respects in accordance with ***Exhibit F***, that permits a Class Member to commence receiving her Dance Fee Payments.

2.27 "Dance Fee Pool" means the total sum of Five Hundred Thousand Dollars ($500,000), that is to be made available during the Dance Fee Payment Collection Period to Settlement Class Members who select to obtain their Settlement Payment in the form of Dance Fee Payments. Unpaid Dance Fee Pool Payments (defined in Section 2.93) will be distributed to Dance Fee Claimants pursuant to Section 7.6.

2.28 "Dancer Contract" means a contract entered into between an Entertainer and a Club which permitted or permits the Entertainer to Perform and to engage in the sale of personal entertainment Performances or sessions for remuneration upon the Club's premises.

2.29 "Date(s) of Performance" means a date during which an Entertainer Performs or intends to Perform at a Club.

2.30 "Defendant Entities" means those business entities that are identified on the attached ***Exhibit A***, with each one being a "Defendant Entity." Those entities are businesses that currently are, or that at any time during the Class Periods were, or are or were alleged to be, as may be applicable, either: a) Parties to an agreement or contract with Services or SFBSC whereby they receive(d), or are alleged to have received, either consulting, management, or business support services, or licensing rights, from either Services or SFBSC; b) Parties to an agreement or contract with Global Licensing, Inc. ("Global"), whereby they receive(d), or are alleged to have received, licensing rights from Global; c) owned, either wholly or in any part, directly or indirectly, and in any manner, interest, or fashion whatsoever, by either Mohney or Jason Cash Mohney or by any company or entity which they own or in which they have any interest or association whatsoever; or d) tenants of Mohney or Jason Cash Mohney, either directly or indirectly, or of any company or entity which Mohney or Jason Cash Mohney own or in which they have any interest or association whatsoever.

2.31 "Defense Counsel" means the law firms of Long & Levit LLP, and specifically Douglas Melton and Shane Cahill; Bowman and Brooke LLP, and specifically Tammara Bokmuller; and Shafer & Associates, P.C., and specifically Bradley Shafer.

2.32 "Due Diligence Declaration" means a declaration from the Settlement Administrator verifying that the Class Notices required by this Agreement have been effectuated.

2.33 "Effective Date" means the day when Final Approval Order and Judgment have both become Final.

2.34 "Electronically Posted Notice" means notice of the Settlement which shall conform in all material respects to the document attached as ***Exhibit G*** attached hereto, which shall be submitted to the Court for approval and which shall be used to communicate notice of the Settlement through various online message boards and relevant organizations.

2.35 "Enhancement Payments" means the payments that are approved by the Court to be paid to the Class Representatives and certain Settlement Class Members, and which shall be in addition to their respective Settlement Payment.

2.36 "Entertainer(s)" means an individual who dances, Performs, and/or entertains, or who has danced, Performed or entertained, on the premises of an exotic dance nightclub or "gentlemen's club" or other adult entertainment facility (including but not limited to one of the Clubs).

2.37 "ERISA" means the Employee Retirement Income Securities Act of 1974, 29 U.S.C. § 1001 *et seq.*

2.38 "Exclusion/Objection Deadline" means the final date, established and set forth in the Preliminary Approval Order, by which a Class Member may either: a) object to any aspect of the Settlement; or b) request to be excluded from (to Opt-Out of) the Settlement.

2.39 "Fairness Hearing" means the hearing that is to take place after the entry of the Preliminary Approval Order and after the Notice Date for purposes of determining whether the

Agreement should be approved. The Fairness Hearing shall be set for a date that is in compliance with the provisions of 28 U.S.C. § 1715(d).

2.40 "Final," when referring to the Judgment, the Final Approval Order, or to the Settlement, means that: a) the Judgment is a Final, appealable Judgment; and b) either i) no appeal has been taken from the Judgment as of the date on which all times to appeal therefrom have expired, or ii) an appeal or other review proceeding of the Judgment having been commenced, such appeal or other review has been concluded and is no longer subject to review by any Court, whether by way of appeal, petitions for rehearing or re-argument, petitions for rehearing en banc, petitions for writ of certiorari, or otherwise, and such appeal or other review has been completed in such manner that affirms the Judgment and the Final Approval Order in their entireties.

2.41 "Final Approval" means entry by the Court of both the Final Approval Order and the Judgment.

2.42 "Final Approval Order" means the order of the Court memorializing its definitive, complete, and non-contingent, approval of the Settlement in a form that is approved by and acceptable to all Parties.

2.43 "FLSA Claims" means any and all Claims that a Settlement Class Member may have against the Released Defendants, or against any one or group of them, under, or pursuant to, the FLSA, including but not limited to Claims seeking wages (regular and/or overtime), tip returns, damages, liquidated damages, attorneys' fees, and/or costs.

2.44 "Form 1099 Payments" means the total compensation paid to a Settlement Class Member by all Clubs in the aggregate during the respective Class Periods (as applicable to each Club), as reflected in the Internal Revenue Service ("IRS") Forms 1099-MISC issued to her and

the Internal Revenue Service by the Clubs. For purposes of these calculations: a) all income reflected in an IRS Form 1099-MISC for a calendar year shall be included irrespective of the fact that part of the year may fall outside of the Class Periods; and b) Class Members who were not issued any IRS Forms 1099-MISC during the Class Periods shall be assigned a Form 1099 Payment number of $599.

2.45 "Greater California Clubs" means those Clubs identified as such on ***Exhibit A***; those being Grapevine Entertainment, Inc., d/b/a Deja Vu Showgirls; Cathay Entertainment, Inc., d/b/a Deja Vu Showgirls; Nite Life East, LLC, d/b/a Little Darlings; Coldwater, LLC, d/b/a Deja Vu Showgirls; 3610 Barnett Ave., LLC, d/b/a Adult Superstore; Jolar Cinema of San Diego, LTD, d/b/a Jolar Cinema Showgirls; Showgirls of San Diego, Inc., d/b/a Deja Vu Showgirls; Stockton Enterprises, LLC, d/b/a Deja Vu Showgirls; Hollywood & Vine Club, LLC, d/b/a Deja Vu Showgirls; Deja Vu Showgirls-Sacramento, LLC, d/b/a Deja Vu Showgirls; DV of LA, LLC, d/b/a Deja Vu of LA – Main St.; and EF5 Acquisitions Group, LLC, d/b/a Deja Vu Showgirls Torrance.

2.46 "IEAU" means the International Entertainment Adult Union.

2.47 "IPE" means Independent Professional Entertainer; that being an Entertainer who Performed as an independent contractor or other form of non-employee, as opposed to working as an employee.

2.48 "Judgment" means the final judgment to be entered in these Actions following entry of the Final Approval Order in a form that is approved by and acceptable to all Parties.

2.49 "Legally Authorized Representative" means an administrator/administratrix, personal representative, or executor/executrix of a deceased Class Member; a guardian, conservator, or next friend of an incapacitated Class Member; and/or any other legally appointed

Person responsible for handling the business affairs of a Class Member. All rights, duties and obligations of Class Members, Settlement Class Members, Participating Class Members, and Class Representatives as set forth in this Agreement extend to their Legally Authorized Representatives as well.

2.50 "Limited National Settlement" means the settlement in the case of *Jane Does 1-2 v. Déjà Vu Services*, Civil Case No. 1:16-cv-10877, Eastern District of Michigan. A copy of the Limited National Settlement will be available for review on the Settlement Website.

2.51 "Litigation Expenses" means any costs or expenses incurred by Class Counsel in connection with the preparation, prosecution and resolution/settlement of these Actions, and includes all Court-approved litigation costs and expenses.

2.52 "LWDA PAGA Payment" means that portion of the PAGA Payment that is to be paid to the LWDA.

2.53 "Net Cash Fund" means the Cash Pool less the Enhancement Payments, the PAGA Payments, the Attorneys' Fees and Expenses Award, and the Administrative Costs.

2.54 "Notice and Administration Fund" means a non-refundable fund consisting of $90,000 advanced by Defendants (which will constitute part of the Settlement Consideration if the Settlement becomes Final) to be used by the Settlement Administrator to pay for the costs of administering the Agreement. The monies paid by the Defendants into the Notice and Administration Fund shall constitute part of the Administrative Costs and shall be deducted from Defendants' funding obligations of the Cash Pool. That amount spent up to the Fairness Hearing will not be refunded to Defendants if Final Approval is not granted for any reason.

2.55 "Notice Date" means the date of the initial mailing of the Notice Packet to Class Members.

2.56 "Notice Packet" means the Class Notice and the Dance Fee Payment Election Form.

2.57 "Opt-Out" or "Opted-Out" means the mechanism for a Class Member to be excluded from, or to opt-out of, the Settlement.

2.58 "Opt-Out Form" means a document in any fashion where a Class Member Timely-Submits a writing expressing a clear intention to be excluded from the Settlement.

2.59 "Opt-Out List" means the list of all Class Members who Timely-Submitted an Opt-Out Form.

2.60 "Opt-Out Period" means a period of at least sixty (60) days from the Notice Date and as ordered by the Court in the Preliminary Approval Order.

2.61 "PAGA Claims" mean all civil penalties sought against the Defendants pursuant to California's Labor Code Private Attorneys General Act of 2004, Cal. Lab. Code § 2698, *et seq*.

2.62 "PAGA Payments" means all payments made in accordance with the terms of this Agreement to resolve all PAGA Claims.

2.63 "Participating Class Member(s)" means those Class Members who are issued a Settlement Check or who Timely Submit a Properly Completed Dance Fee Payment Election Form. All Class Representatives are automatically considered to be a Participating Class Member.

2.64 "Participating Class Members' Released Claims" means, for a Participating Class Member, her Settlement Class Members' Released Claims together with any and all FLSA Claims she may have from the beginning of her applicable Class Period(s) up to and including November

16, 2018, as well as any and all related attorneys' fees and costs except as otherwise provided for in this Agreement.

2.65 "Parties" mean, collectively, the Settlement Class Members and the Defendants, and "Party" means any one of them.

2.66 "Perform(s)," "Performed," "Performing," and "Performances" means all acts of entertaining, dancing, and/or engaging in entertainment services, and all activities related thereto, at an exotic dance nightclub or "gentlemen's club," or other adult entertainment facility (including but not limited to at the Clubs or at any one or group of them).

2.67 "Person" means any individual, corporation, partnership, association, affiliate, joint stock company, estate, trust, unincorporated association, entity, government and any political subdivision thereof, or any other type of business or legal entity.

2.68 "Plan of Allocation" means the plan for allocating the Cash Payments, Dance Fee Payments, and the Settlement Class Members' PAGA Payments, between and among Settlement Class Members as set forth in Articles VI and VII.

2.69 "Posted Notice" means a notification in a form attached as ***Exhibit H*** that is to be submitted to the Court for approval, and that is to be posted in the Entertainer dressing room of each Club announcing the existence of the Settlement and the ability of Class Members to obtain remuneration in the form of Cash Payments or Dance Fee Payments.

2.70 "Preliminary Approval Date" means the date on which the Court enters the Preliminary Approval Order.

2.71 "Preliminary Approval Order" means the order that the Class Representatives will seek from the Court that preliminarily approves the Agreement and sets the Fairness Hearing.

2.72 "Properly Completed" means, in terms of a Dance Fee Payment Election Form and a Dance Fee Payment Request Form, that the document is dated and personally signed by the Class Member (which can be done electronically for an electronic submission), and provides accurate – to the best of the Settlement Class Member's knowledge – answers/responses to all of the information requested in the document. For a Dance Fee Payment Election Form, whether it is Properly Completed shall be determined by the Settlement Administrator, and for a Dance Fee Payment Request Form that decision shall be made by the Clubs.

2.73 "Released Claims" means the Settlement Class Members' Released Claims and the Participating Class Members' Released Claims. Notwithstanding any other provision of this Agreement, "Released Claims" do not include Claims for personal injuries, which Plaintiffs are not releasing by way of the Settlement.

2.74 "Released Defendants" means the Defendants, together with each and every one of their respective current, former, and future: Owners (either direct or indirect, including but not limited to partners, shareholders, members, parent companies, holding companies, trusts and/or trustees), officers, directors, managers, employees, agents, representatives, non-Entertainer contractors, landlords, tenants, subtenants, insurers, reinsurers, attorneys (including but not limited to Defense Counsel), auditors, accountants, bookkeepers, experts, subsidiaries, affiliates, divisions, licensees, licensors, consultants, heirs, executors, personal representatives, predecessors and successors in interest, and assigns, as well as any benefit plans sponsored or administered by any of the proceeding individuals and entities.

2.75 "Reminder Notices" means a secondary mailing of Notice Packet to Class Members and reposting of the Electronically Posted Notice.

2.76 "San Diego Settlement" means a settlement previously agreed upon in the San Diego Action that was presented to the San Diego Superior Court for approval, which was denied without prejudice (prior to the San Diego Action being removed to federal court and then transferred to this Court) in order to permit the parties thereto the opportunity to provide certain specified supporting information requested by that court.

2.77 "San Francisco Clubs" means those Clubs identified as such on ***Exhibit A***; those being Chowder House, Inc., d/b/a Hungry I; Deja Vu – San Francisco, LLC, d/b/a Centerfolds; San Francisco - Roaring 20's, LLC, d/b/a Roaring 20's; San Francisco - Garden of Eden, LLC, d/b/a Garden of Eden; S.A.W. Entertainment, Ltd., d/b/a Larry Flynt's Hustler Club; S.A.W. Entertainment, Ltd., d/b/a the Condor Club; Deja Vu Showgirls of San Francisco, LLC, d/b/a Little Darlings of San Francisco; Gold Club - SF, LLC, d/b/a Gold Club; Bijou-Century LLC, d/b/a New Century Theatre; and BT California, LLC, d/b/a The Penthouse Club & Steakhouse (f/k/a Showgirls).

2.78 "San Francisco Settlement" means the settlement approved by the decision of *Roes v. SFBSC Management, LLC*, Case No. 14-cv-03616-LB (N.D. Cal. Sept. 14, 2017), 2017 WL 4073809, but reversed at 944 F.3d 1035 (9th Cir. 2019). A copy of the San Francisco Settlement is available at ECF No. 126 in the San Francisco Action and will be available for review on the Settlement Website.

2.79 "Settlement" means the compromise and settlement of the Actions embodied in this Agreement.

2.80 "Settlement Administrator" means an independent settlement administrator mutually agreed upon by the Parties and appointed by the Court.

2.81 "Settlement Check" means any check issued by the Settlement Administrator to a Settlement Class Member for her Cash Payment, Settlement Class Member's PAGA Payment, Unpaid Dance Fee Pool Payment, or Enhancement Payment.

2.82 "Settlement Class" means all Settlement Class Members, including the Class Representatives.

2.83 "Settlement Class Member" means any Class Member who has not timely and properly excluded herself from the Settlement (by having Timely Submitted an Opt-Out Form) as provided for in this Agreement. "Settlement Class Members" refers to, collectively, all such Class Members. All Class Representatives are automatically considered to be Settlement Class Members.

2.84 "Settlement Class Members' PAGA Payment" means that aggregate portion of the PAGA Payments that is to be distributed by the Settlement Administrator, pursuant to and as part of the Plan of Allocation, among Settlement Class Members. "Settlement Class Member's PAGA Payment" means that portion of the Settlement Class Members' PAGA Payment that is to be conveyed to a specific Settlement Class Member through the Plan of Allocation as provided for herein.

2.85 "Settlement Class Members' Released Claims" means any and all Claims pursuant to any theory of recovery whatsoever (whether at law, in equity or otherwise, including but not limited to Claims based in contract, tort, common law, federal, state or local law, statute, ordinance, or regulation, and whether for compensatory, consequential, liquidated, punitive or exemplary damages, statutory damages, penalties, fines, interest, attorneys' fees, costs, or other disbursements, including those that may have been incurred or billed by Class Counsel or any

other counsel representing the Class Representatives or any Settlement Class Members), that a Settlement Class Member has or may have against the Release Defendants, or against any one or group of them, from the beginning of her applicable Class Period(s) up to and including November 16, 2018, that are asserted in the Actions or that are to be asserted in the Actions by way of the Amended Complaints for Settlement contemplated in this Agreement, as well as any and all Claims of any conceivable kind or nature whatsoever that are or could be based on the factual allegations contained in such pleadings or that are reasonably related thereto (excepting only for FLSA Claims), and specifically including:

a) Any and all Claims for unpaid wages including, without limitation, Claims for minimum wage, regular wages, overtime, waiting time, final wages, calculation of the correct overtime or regular rate, and meal period and rest period payments/premiums;

b) Any and all Claims to recover any allegedly retained or confiscated tip, gratuity or other payment, or portion thereof;

c) Any and all Claims for expense reimbursement;

d) Any and all Claims for uniform/costume costs and associated cleaning expenses;

e) Any and all Claims pursuant to the California Labor Code, including but not limited to Claims under or pursuant to California Labor Code sections 98.6, 132A, 200-204, 206.5, 207, 208, 210-214, 216, 218, 218.5, 218.6, 221, 222.5, 223, 225.5, 226, 226.3, 226.7, 226.8, 227, 227.3, 245-249, 351, 353,

432.5, 450, 510, 512, 551-552, 558, 1174, 1174.5, 1182.12, 1194, 1194.2, 1194.3, 1197, 1197.1, 1198, 2698 *et seq.* (PAGA), 2753, 2802, and 2804;

f) Any and all Claims under or pursuant to California Code of Civil Procedure section 1021.5;

g) Any and all Claims under or pursuant to California Code of Regulations, Title 8, sections 11010 and 11040;

h) Any and all Claims under or pursuant to any California Industrial Welfare Commission Wage Orders;

i) Any and all Claims under or pursuant to California Business and Professions Code sections 17200, *et seq.* and 17500;

j) Any and all Claims asserting unfair business practices or violations of similar laws;

k) Any and all Claims under the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*;

l) Any and all Claims asserting any form of retaliation predicated upon a Settlement Class Member's assertion that any of the Release Defendants wrongfully terminated her Dancer Contract, right to Perform, or employment, or otherwise retaliated against her, after she or any other Person acting on her behalf, in her interest, or for here benefit, asserted a Claim that she was misclassified as an independent contractor and/or as a non-employee, or that other Entertainers were misclassified as independent

contractors and/or as non-employees, and were therefore entitled to any form of compensation or remuneration thereby;

m) Any and all other employment, wage, or labor-related Claims that could be brought under any statute, ordinance, regulation, rule, order, or otherwise against the Released Defendants, or against any one or group of them, that arise out of, relate to, are associated with, are based upon, or concern, in any way, manner, regard or fashion whatsoever, any act or omission as pled in the Amended Complaints for Settlement that occurred during the Class Periods, including but not limited to any Claims under any legal or equitable theory as a result of the alleged violation of any federal, state, or local law or regulation, Claims brought pursuant to breach of contract, Claims brought pursuant to common law, Claims of unjust enrichment and/or *quantum meruit*, and any and all Claims pursuant to, or derived from, ERISA that arise, or may arise, from any alleged failure to pay wages, including any Claims for benefits under any benefit plans subject to ERISA;

n) Any and all Claims, including common law Claims, arising out of or related to the statutory causes of action described in this Section 2.85; and

o) Any and all Claims asserting breach of contract, violation of injunctive relief, contempt, rescission, or otherwise, with regard to the terms of previously executed Dancer Contracts or of the Limited National Settlement, arising out of the required conversion of the Entertainers Performing at the Clubs to employees as mandated by § 8.1 of the San Diego

Settlement and as incorporated and modified by Article IX of this Agreement.

2.86 "Settlement Consideration" means the total and aggregate financial benefit of the Settlement through the Cash Payments, Enhancement Payments, Settlement Class Members' PAGA Payment, and the Dance Fee Payments, all which confer a direct financial benefit on the Settlement Class Members; changes to the Defendants' business practices which conferred and will confer a direct financial benefit to both Settlement Class Members and other Entertainers who Performed or Perform in the Clubs subsequent to the close of the Class Periods; the LWDA PAGA Payment that will confer a direct financial benefit on the LWDA; the Attorneys' Fees and Expenses Award; and the Administrative Costs.

2.87 "Settlement Payment" means the amount of direct monetary consideration that a Settlement Class Member will receive under this Agreement, by way of either a Cash Payment or Dance Fee Payments.

2.88 "Settlement Website" means a website created and maintained by the Settlement Administrator to administer the Settlement.

2.89 "Social Media Notice" means a notice of the Settlement which shall be used in the online advertising campaigns.

2.90 "Timely Submit(ted)" or "Timely Submission" means: a) when used in the context of a Dance Fee Payment Election Form, either the mailing of the form by a Class Member to the Settlement Administrator and post-marking, or the electronic submission to the Settlement Administrator through the Settlement Website, within the Dance Fee Payment Election Period; b) in the context of a Dance Fee Payment Request Form, submission of the form as prescribed by the

Club within the Dance Fee Payment Collection Period; and c) in the context of an Opt-Out Form, the mailing by a Class Member to the Settlement Administrator of the form, and post-marking, within the Opt-Out Period, or the electronic submission of an Opt-Out Form to the Settlement Administrator through the Settlement Website or via email within the Opt-Out Period.

2.91 "Unclaimed Dance Fee Pool" means the funds from the Dance Fee Pool that are not claimed during the Dance Fee Payment Election Period.

2.92 "Unpaid Dance Fee Pool" means Dance Fee Payments that Dance Fee Claimants do not obtain from the Dance Fee Pool during the Dance Fee Payment Collection Period.

2.93 "Unpaid Dance Fee Pool Payment" means the payment to a Dance Fee Claimant by the Settlement Administrator from the Unpaid Dance Fee Pool for any Dance Fee Payments which the Dance Fee Claimant is entitled to, but does not, obtain during the Dance Fee Payment Collection Period.

2.94 "Website Notice" means a notice of the Settlement which shall conform in all material respects to the Class Notice attached as ***Exhibit D*** which shall be posted on the Settlement Website.

## ARTICLE III

## SUBMISSION OF THIS AGREEMENT TO THE COURT FOR REVIEW AND APPROVAL; CONDITIONAL CONSOLIDATION AND CERTIFICATION OF THE PROPOSED CLASS FOR SETTLEMENT PURPOSES ONLY; AND STIPULATION REGARDING AMENDMENT OF THE COMPLAINTS

3.1 Submission of the Settlement for Court Approval. Promptly following execution of this Agreement by Class Counsel and Defense Counsel, Plaintiffs shall submit to the Court a motion for preliminary approval of the Settlement and to both consolidate the Actions and provisionally certify the Class for purposes of settlement only. Contemporaneously thereof,

Plaintiffs shall also, in accordance with Cal. Labor Code § 2699(l)(2), submit this Agreement to the LWDA.

3.2 Provisional Consolidation of these Actions and Certification of the Settlement Class. The Parties agree that Plaintiffs' request for provisional consolidation of the Actions and provisional certification of the Class as a collective action pursuant to 29 U.S.C. § 216(b) and as a Rule 23 Class are for settlement purposes only. Each Party agrees that this stipulation shall not be used by any Person for any purpose whatsoever in any other legal, administrative, or arbitral proceeding. Such matters may only be submitted in a proceeding to enforce the terms of this Agreement. The Parties do not consent to consolidation of the Actions or certification of the Settlement Class other than to effectuate the Settlement contemplated here.

3.3 Limitations of Provisional Consolidation and Certification. The Parties acknowledge and agree that Defendants' consent to provisional consolidation of the Actions and certification of the Class for purposes of this Settlement only does not constitute an admission of wrongdoing, fault, liability, or damage of any kind to the Named Plaintiffs or to any of the other Class Members, or an acknowledgement or concession of the propriety of such consolidation or class/collective certification.

3.4 Additional Actions to Obtain Approval of the Settlement. Solely for purposes of implementing this Agreement and effectuating the proposed Settlement, the Parties agree that:

a) The Named Plaintiffs shall be permitted to file the Amended Complaints for Settlement pursuant to Fed.R.Civ.P. Rule 15(a)(2). The Amended Complaints for Settlement shall be submitted concurrently with the submission of the motion for preliminary approval of the Settlement so that

such complaints may be filed promptly upon preliminary approval of the Settlement by the Court. Obtaining the Court's approval to file the Amended Complaints for Settlement, and the subsequent prompt filing of the Amended Complaints for Settlement, are material conditions of this Agreement. The Parties agree that the filing of the Amended Complaints for Settlement will streamline the settlement process and ensure that more money can be paid to Settlement Class Members by saving the costs of multiple notice and approval processes. The Parties further agree and stipulate that Defendants may seek an order from the Court establishing that the allegations in the Amended Complaints for Settlement, and by each and every one of them, are deemed fully controverted by Defendants such that no further responsive pleadings from Defendants are required; and

b) Defendants shall timely send, consistent with law, the CAFA Notice (which shall be in a form approved by Class Counsel) to all appropriate federal and state officials pursuant to the requirements of the Class Action Fairness Act, 20 U.S.C. § 1715(b).

3.5 The Provisional Nature of the Orders of Consolidation and Certification, and the Filing of the Amended Complaints for Settlement. If, for any reason, the Settlement and Judgment do not become Final, the Parties agree that the Court shall rescind and strike from the record as if they had never been entered or filed, any order of consolidation, any order certifying the Settlement Class (provisionally or otherwise), and the Amended Complaints for Settlement, and the operative complaints in the Actions shall revert to the first amended complaints previously filed in the San

Francisco Action and in the San Diego Action. In such event, no prejudice shall occur to any motions of the Defendants' against any of the Plaintiffs to the Actions (including "opt-ins"), and/or against any intervenors or attempted intervenors to such Actions, to compel their Claims to individual arbitration, and/or to reconsider rulings on such motions to arbitrate, that have been filed by the Defendants or that may be filed by them in the future; meaning specifically that the Court shall not find that Defendants have waived, as a result of this Settlement, any of their rights to file and/or, as applicable, have adjudicated, all such motions on their merits.

3.6 Court Submissions. Any of the Parties, Class Counsel, Defense Counsel, and any Person objecting to this Agreement, may file with the Court, as directed by the Court in its Preliminary Approval Order, a written brief setting forth their respective positions regarding the fairness of the Settlement. All submissions to the Court shall comply with the provisions set forth in the applicable rules of the Court, as well as the dates established by the Court in its Preliminary Approval Order.

3.7 Execution by Class Representatives of this Agreement. Prior to the Fairness Hearing, all Class Representatives shall fully execute this Agreement. Pursuant to the Court's January 1, 2015 order in the San Francisco Action (ECF No. 32), Plaintiffs may execute the Agreement filed with the Court using their pseudonyms. Plaintiffs will also provide Defense Counsel an executed Agreement under their given names and Defense Counsel and Defendants will maintain such Agreement as confidential unless disclosure is required to enforce this Agreement.

3.8 The Fairness Hearing. At the Fairness Hearing, Class Counsel and the Class Representatives shall request entry of the Final Approval Order and the Judgment.

3.10 Statutory Compliance with Notification. Within ten (10) days of entry of the Judgment and the Final Approval Order, Class Counsel shall, in accordance with Cal. Labor Code § 2699(l)(3), submit such documents to the LWDA.

3.11 Cooperation of the Parties. The Parties shall act in good faith to effectuate each and every term of this Agreement in order to obtain both preliminary and Final Approval of this Agreement (including the providing of Class Notices), to take all acts so that the Judgment becomes Final, and to secure a prompt, complete, and Final resolution of the Settlement of these Actions.

## ARTICLE IV

## CLASS NOTICE AND DANCE FEE PAYMENT ELECTION

4.1 Information to be Supplied by each Club as Identified in ***Exhibit A***. Within thirty (30) days of the Preliminary Approval Date, Defendants will provide the Settlement Administrator, to the extent available in Defendants' records, the following information:

4.1.1 Each Class Member's legal name;

4.1.2 Each Class Member's last known address;

4.1.3 Each Class Member's last known email address;

4.1.4 Each Class Member's last known phone number; and

4.1.5 The amount of Form 1099 Payments paid to each Class Member.

4.2 Confidentiality of Information. The Parties agree that the information to be disclosed pursuant to Section 4.1 shall be deemed CONFIDENTIAL INFORMATION in accordance with Section 15.1. The Settlement Administrator shall be required to enter into an agreement to keep such information confidential.

4.3 Information to be Supplied by Class Counsel. Within thirty (30) days of the Preliminary Approval Date, Class Counsel will provide the Settlement Administrator with a suggested World Wide Web address of the settlement website that will be established by the Settlement Administrator.

4.4 Effectuation of Class Notice. Within twenty (20) days of the Settlement Administrator's receipt of the information identified in Section 4.1, the Settlement Administrator shall mail, and email where available, the Notice Packet to each Class Member. The envelope containing the Notice Packet will identify the Settlement Administrator's return address only and shall not contain *any* Club-related information from which a reader of the envelope could glean that it relates to the adult nightclub industry.

4.5 Return of Class Notice. If the Class Notice mailed to a Class Member is returned within twenty-one (21) days of the initial mailing with a forwarding address provided by the Postal Service, the Class Notice will be re-sent by the Settlement Administrator to the forwarding address within seven (7) days of return. If no forwarding address is provided by the Postal Service, the Settlement Administrator shall perform a skip trace on the Class Member using the National Change of Address ("NCOA") database, and, if an alternative address is found, the Class Notice will be re-sent by the Settlement Administrator to the alternative address within seven (7) days of discovery of the additional address. Irrespective of these matters, a Timely Submitted Opt-Out Form (in accordance with Sections 2.90 and 11.3) must have been received by the Settlement Administrator in order for a Class Member to have properly Opted-Out.

4.6 Posted Notice. Within twenty (20) days of the Settlement Administrator's receipt of the information identified in Section 4.1, Defendants shall prominently display four copies of

no less than 8x11 size printed paper of the Posted Notice in each Club's Entertainer dressing room. The Posted Notice shall remain displayed until ninety (90) days after the date of filing the motion for Final Approval.

4.7 The Website Notice. Within twenty (20) days of the Settlement Administrator's receipt of the information identified in Section 4.1, the Settlement Administrator shall post the Website Notice on the Settlement Website.

4.8 The Electronically Posted Notice. Within twenty (20) days of the Settlement Administrator's receipt of the information identified in Section 4.1, the Settlement Administrator shall effectuate the posting of the Electronically Posted Notice on StripperWeb.com in the "Stripping (was Stripping General)" discussion thread,[2] which shall continue to be posted for a period of eight (8) weeks thereafter. Each weekly posting shall be titled "California 'Deja Vu' Class Action Settlement Information." The following text shall be included in the posting: "For more information please click on the following link." The referenced link shall be a click-through hyperlink to the Settlement Website. Within the same period as provided for in this Section, the Settlement Administrator shall also contact the IEAU and request the IEAU to post the Electronically Posted Notice (with hyperlink) on its message board and e-mail the same to their subscriber list.[3]

---

[2] Site last visited on Mar. 12, 2021. If this thread is unavailable at the time of posting, posting shall be made in another thread on StripperWeb.com of a general discussion nature.

[3] The IEAU's website address is https://www.entertainmentadultunion.com/index.cfm?zone=/unionactive/contact.cfm. *Last visited* Mar. 12, 2021.

4.9 The Social Media Notice. Within twenty (20) days of the Settlement Administrator's receipt of the information identified in Section 4.1, the Settlement Administrator shall effectuate the posting of the Social Media Notice through an online advertising campaign funded in the total amount of $10,000 (the "Social Media Notice Fund"), which shall run until the Social Media Notice Fund is exhausted. The following text shall be included in the advertisements: "You may be eligible for a class action settlement. For more information please click on the following link." The referenced link shall be a click-through hyperlink to the Settlement Website. The advertising campaign for the Social Media Notice shall be directed by the Settlement Administrator in a manner best suited to promote the Agreement.

4.10 Reminder Notices. No later than thirty (30) days prior to the expiration of the Opt-Out Period, the Settlement Administrator shall effectuate Reminder Notices in the following manner:

a) Mail, and e-mail where available, the Notice Packet to each Class Member whose address: i) the Settlement Administrator was provided pursuant to Section 4.1; or ii) ascertained under Section 4.5, whichever is most accurate. The envelope containing the Class Notice will identify the Settlement Administrator's return address only and shall not contain *any* Club-related information from which a reader of the envelope could glean that it relates to the adult nightclub industry;

b) Re-post the Electronically Posted Notice on StripperWeb.com in the "Stripping (was Stripping General)" discussion thread in the form set forth in Section 4.8; and

c) Contact the IEAU and request the IEAU re-post the Electronically Posted Notice on their message board and e-mail the Electronically Posted Notice to their subscriber list a final time.

4.11 Submission of the Dance Fee Payment Election Form. If a Settlement Class Member decides to obtain her Settlement Payment in the form of Dance Fee Payments as provided for herein, she must Timely Submit to the Settlement Administrator a Fully Completed Dance Fee Payment Election Form. For Settlement Class Members who do not Timely Submit a Properly Completed Opt-Out Form and do not Timely Submit a Properly Completed Dance Fee Payment Election Form, they will be presumed to have selected to obtain their Settlement Payment in the form of Cash Payments. Class Representatives shall be considered to have selected to receive Cash Payments.

4.12 Effect of Execution of the Dance Fee Payment Election Form. The Dance Fee Payment Election Form, if Properly Completed and Timely Submitted to the Settlement Administrator, shall serve as that Class Member's Consent to Join as a party plaintiff to the FLSA Claims asserted in the Actions pursuant to 29 U.S.C. § 216(b) and shall effect a full and complete release of any and all FLSA Claims that the Class Member may have during the Class Periods against the Released Defendants.

4.13 Distribution of Dance Fee Payment Election Forms. In order to document those Settlement Class Members who have selected to receive their Settlement Payment in the form of Dance Fee Payments, and in order to assist in the administration of such payments, within thirty (30) days of the end of the Dance Fee Payment Election Period the Settlement Administrator shall

send to Class Counsel and Defense Counsel all Properly Completed and Timely Submitted Dance Fee Payment Election Forms.

4.14 Class Notice Verification. No later than thirty (30) days after the Settlement Administrator has completed the effectuation of the Class Notices as set forth in Sections 4.4 through 4.10, and before the Fairness Hearing, the Settlement Administrator shall file with the Court, through Class Counsel, the Due Diligence Declaration verifying that the Class Notices set forth in those Sections have been effectuated.

**ARTICLE V**

**SETTLEMENT CONSIDERATION AND TERMS OF PAYMENTS**

5.1 The Value of the Settlement Consideration. The value of the Settlement Consideration is five million five hundred thousand dollars ($5,500,000), consisting of Cash Payments, Dance Fee Payments, Enhancement Payments, the PAGA Payments, the Attorneys' Fees and Expenses Award, Administrative Costs, and changes to the Clubs' business practices. Under no circumstances (with the exception of the change in business practices set forth in Article IX) shall Defendants be responsible for making payments or conveying other remunerations or benefits of any kind that confer an aggregate financial benefit in excess of the amount of the Settlement Consideration. The payment of the Settlement Consideration shall be inclusive of all payments, costs, and fees (including attorney fees) required to be remitted by the Defendants pursuant to the Settlement and this Agreement; all to be paid without reversion to the Defendants.

5.2 Summary of the Components of the Settlement Consideration. The components of the Settlement Consideration are as follows:

a) Cash Pool: $4,000,000, plus the Unclaimed Dance Fee Pool (if any),

consisting of:

i) Total Enhanced Payments of $35,000 as follows:

For the San Francisco Action:

For Roes 1 and 3: $5,000 each.

For Roes 2, 10, 11, 12 13, and 22: $3,000 each.

For the San Diego Action:

$5,000 each to Roes 1 and 2.

ii) Total PAGA Payments: $125,000 (75% of which will be allocated as the LWDA PAGA Payment and the remaining 25% of which will be allocated as the Settlement Class Members' PAGA Payment).

iii) Attorneys' Fees and Expenses Award as ordered by the Court.

iv) Administrative Costs: $90,000 (est.).

v) Cash Payments.

b) Dance Fee Pool: $500,000, minus the Unclaimed Dance Fee Pool (if any).

c) Changes to Defendants' Business Practices: valued at a minimum of $1,000,000.

5.3 Funding of the Cash Pool. Subject to the requirements of Section 5.4 and the Settlement having obtained Final Approval from the Court, the Cash Pool shall be funded by the Defendants as follows:

a) Defendants shall pay the Notice and Administrative Fund within five (5) business days of the Preliminary Approval Date. Once Defendants have, as set forth in this Section, paid the Initial Cash Pool Deposit as defined

immediately below, any further bills from the Settlement Administrator, whether part of the pre-determined Administrative Costs or additional charges as approved by all Parties, shall be paid out of the Cash Pool as funded by the Defendants;

b) The remainder of the Cash Pool shall be paid by the Defendants to the Settlement Administrator as follows: i) an initial payment of two million dollars ($2,000,000), no later than by March 1, 2022 (the "Initial Cash Pool Deposit"); ii) the sum of one million dollars ($1,000,000) no later than by March 1, 2023 (the "Second Cash Pool Deposit"); and iii) the balance of the Cash Pool (including the Unclaimed Dance Fee Pool, if any) no later than by March 1, 2024 (the "Final Cash Pool Deposit"). These payments, subject to Section 5.4, shall be deposited by the Settlement Administrator in an interest-bearing account and the timing requirements of these payments shall apply regardless of the filing and pendency of any appeal(s) arising from Final Approval; and

c) The Unpaid Dance Fee Pool by March 1, 2024, if the Dance Fee Payment Period has ended by then; if not, within thirty (30) days of the expiration of the Dance Fee Payment Collection Period.

5.4 Conditions for Funding of the Cash Pool. The timing of payments of the Cash Pool as set forth in Section 5.3 are conditioned on at least seventy five percent (75%) of the Clubs being permitted, under COVID-19 pandemic Executive Orders or other legal processes, to both operate to at least seventy five percent (75%) of normal capacity and to present exotic dance entertainment,

by January 1, 2022. If these conditions are not met, the Parties shall immediately petition the Court to review this payment-timing issue and to decide whether Defendants are then able to reasonably abide by the payment schedule as set forth in Section 5.3 and, if not, what a reasonable payment schedule would be. The Court shall conduct any hearings or proceedings as it deems necessary and appropriate, including the permitting of reasonable and pertinent discovery requested by Class Counsel, and may require the Defendants to produce for inspection (in camera, but subject to confidential review by Class Counsel) any documents that it determines to be warranted in the circumstances, including but not limited to tax returns and profit and loss statements of the Clubs. In no event shall any order of the Court arising out of such review require payments that are accelerated from those set forth in Section 5.3. Moreover, nothing contained in this Section shall permit the Court to alter or reduce the total Settlement Consideration, or any aspect thereof, as set forth in Section 5.1; these provisions applying solely to the timing of funding payments for the Cash Pool.

5.5 Timing of Distributions from the Cash Pool. The timing of distributions from the Cash Pool shall be as follows:

5.5.1 No distributions from the Cash Pool shall be made by the Settlement Administrator to Settlement Class Members (including to the Class Representatives), the LWDA, or to Class Counsel, until the Effective Date.

5.5.2 In the event that no appeal is taken from the Judgment, distributions shall be made by the Settlement Administrator: a) for the Enhancement Payments, the LWDA PAGA Payment, fifty percent (50%) of the Attorneys' Fees and Expenses Award, and the initial installment payment to Cash Pool Recipients on a pro rata basis (the "First Cash

Payment") within thirty (30) days of the Initial Cash Pool Deposit being received by the Settlement Administrator; b) twenty five percent (25%) of the Attorneys' Fees and Expenses Award and the second installment payment to Cash Pool Recipients on a pro rata basis (the "Second Cash Payment") within thirty (30) days of the Second Cash Pool Deposit being received by the Settlement Administrator; and c) twenty five percent (25%) of the Attorneys' Fees and Expenses Award, the third installment payment to the Cash Pool Recipients on a pro rata basis and the Settlement Class Members' PAGA Payment (the "Third Cash Payment") within thirty (30) days of the Final Cash Pool Deposit being received by the Settlement Administrator.

5.5.3 In the event that an appeal is taken from the Judgment and the Initial Cash Pool Deposit, the Second Cash Pool Deposit, and the Final Cash Pool Deposit have all been received by the Settlement Administrator by the Effective Date, distributions shall be made by the Settlement Administrator for the Enhancement Payments, the PAGA Payments, the Cash Payments, and the Attorneys Fees' and Expenses Award within thirty (30) days of the Effective Date.

5.5.4 In the event that an appeal is taken from the Judgment and only the Initial Cash Pool Deposit has been received by the Settlement Administrator by the Effective Date, distributions shall be made by the Settlement Administrator within 30 days of the Effective Date for: a) the Enhancement Payments, b) the LWDA PAGA Payment, c) 50% of the Attorneys' Fees and Expenses Award, and d) the initial installment payment to the Cash Pool Recipients on a pro rata basis. Distributions from the Second Cash Pool Deposit

and Final Cash Pool Deposit shall be made by the Settlement Administrator in accordance with Section 5.5.2.

5.5.5 In the event that an appeal is taken from the Judgment and the Initial Cash Pool Deposit and Second Cash Pool Deposit have been received by the Settlement Administrator by the Effective Date, distributions shall be made by the Settlement Administrator within 30 days of the Effective Date for: a) the Enhancement Payments, b) the LWDA PAGA Payment, c) seventy five percent (75%) of the Attorneys' Fees and Expenses Award, and the first and second cash installment payments to Cash Pool Recipients on a pro rata basis. Distributions from the Final Cash Pool Deposit shall be made by the Settlement Administrator in accordance with Section 5.5.2.

## ARTICLE VI

## PLAN OF ALLOCATION AND DISBURSEMENTS OF PAYMENTS AND PAGA PAYMENTS

6.1 Information to Calculate Settlement Payments and Settlement Class Members' PAGA Payments. The Settlement Administrator shall use the information provided by the Defendants in accordance with Section 4.1 to determine the amount of each Settlement Class Member's Settlement Payment and Settlement Class Members' PAGA Payment pursuant to the terms of this Agreement.

6.2 The PAGA Payments. Defendants shall pay, as consideration for settlement of alleged civil penalties due pursuant to PAGA, the sum of one hundred twenty-five thousand dollars ($125,000) which shall resolve all PAGA Claims. Seventy-five percent (75%) of this, or ninety-three thousand seven hundred fifty dollars ($93,750), shall be paid out of the Cash Pool to the LWDA (the LWDA PAGA Payment). The remaining twenty-five percent (25%), or thirty-one

thousand two hundred fifty dollars ($31,250), shall be distributed out of the Cash Pool, in accordance with the provisions of Section 6.3, to the Settlement Class Members as each Settlement Class Member's PAGA Payment.

6.3 Computation and Determination of Settlement Payments and Settlement Class Members' PAGA Payments. The Settlement Administrator shall determine each Settlement Class Member's Settlement Payment and Settlement Class Member's PAGA Payment as follows:

6.3.1 The amount of a Settlement Class Member's Settlement Payment shall be determined on a pro rata basis by first dividing her Form 1099 Payments into the amount of Form 1099s Payments received by all Settlement Class Members, and then multiplying that number by the combined sum of the Net Cash Fund and the Dance Fee Pool. That amount shall then constitute the Settlement Payment that the Settlement Class Member is entitled to receive irrespective of whether she obtains a Cash Payment or decides to receive Dance Fee Payments.

6.3.2 The amount of a Settlement Class Member's PAGA Payment shall be determined on a pro rata basis by first dividing her Form 1099 Payments into the amount of Form 1099s Payments received by all Settlement Class Members, and then multiplying that number by the Settlement Class Members' PAGA Payment.

6.3.3 The Settlement Administrator shall provide the calculations for each Settlement Class Member's Settlement Payment and Settlement Class Member's PAGA Payment to the Class Counsel and Defense Counsel in writing within ten (10) days of the Exclusion/Objection Deadline. The Parties shall notify the Settlement Administrator and opposing counsel in writing of any objections thereto within five (5) business days of

receipt of such calculations. Thereafter, Class Counsel and the Settlement Administrator shall seek to resolve any objections.

6.4 Distributions of the Net Cash Fund. Distributions to Cash Pool Recipients shall be made in accordance with the provisions of Section 5.5. All checks for Cash Payments, Settlement Class Members' PAGA Payments, Unpaid Dance Fee Pool Payments and Enhancement Payments shall bear the endorsement: "By cashing this check, I acknowledge that I have released any claims under the Fair Labor Standards Act that I may have against the Released Defendants in the consolidated cases of *Roes v. SFBSC, et al*. and *Roe v. Deja Vu Services, Inc., et al*.

6.5 Effect of Negotiating Settlement Checks. The act of a Settlement Class Member in negotiating any Settlement Check, irrespective of any endorsement, shall serve as that Class Member's Consent to Join as a party plaintiff to the FLSA Claims asserted in the Actions pursuant to 29 U.S.C. §216(b).

6.6 Uncashed or Returned Settlement Checks. Settlement Class Members shall have 180 days from the date their Settlement Checks are dated to cash the same. Any checks that are not cashed during that time shall be void. If any Settlement Checks are returned to the Settlement Administrator, the Settlement Administrator shall endeavor to obtain a valid mailing address for the Settlement Class Member and resend such check (or a replacement check if the original check has expired or is close to expiring) to the new address. If the Settlement Administrator is unable to obtain a valid mailing address of the Settlement Class Member to send out a Settlement Check or if any Settlement Check remains uncashed after 180 days following the distribution of the Settlement Check by the Settlement Administrator, the Settlement Administrator will deliver the monies represented by the check to the California State Controller's Unclaimed Property Fund

with a description of the amount of unclaimed funds attributable to each Settlement Class Member in a manner that avoids any reference to the names of the Defendants or exotic dancing.

6.7 Excess Claims. There can be no excess Settlement Payments (including Cash Payments) or Settlement Class Members' PAGA Payments under the Plan of Allocation because Settlement Class Members shall share 100% of the available Net Cash Fund, Dance Fee Pool, and Settlement Class Members' PAGA Payment pursuant to the formulas described in, and provisions of, this Article and Article VII.

## ARTICLE VII

## DANCE FEE PAYMENTS

7.1 The Dance Fee Pool and Allocations Therefrom: Defendants shall make five hundred thousand dollars ($500,000) available for use as Dance Fee Payments that can be obtained by Dance Fee Claimants subject to the terms herein. The amount of Dance Fee Payments allocated to each Dance Fee Claimant shall be established by the Plan of Allocation set forth in Article VI, Section 6.3.1. If more than five hundred thousand dollars ($500,000) in Dance Fee Payments are requested, then the Dance Fee Payments shall be calculated by: (1) dividing the Dance Fee Claimant's Form 1099 Payments into the amount of Form 1099s Payments received by all Dance Fee Claimants; and (2) then multiplying that number by five hundred thousand dollars ($500,000). As for the remaining sum of the Settlement Payment to which each Dance Fee Claimant would have been entitled under Section 6.3.1, the Settlement Administrator shall distribute a Settlement Check to each such Dance Fee Claimant for the balance. The Settlement Administrator shall issue all such Settlement Checks within 30 days of the Final Cash Pool Deposit, or within 30 days of the Effective Date, whichever is later.

7.2 Prerequisites for Obtaining Dance Fee Payments: Dance Fee Payments may be obtained by a Dance Fee Claimant at a Club of her choice (subject to the provisions of Section 7.8), but only at that one Club. Dance Fee Claimants may not "split" their Dance Fee Payments among Clubs. Dance Fee Claimants are required to: a) schedule a Date of Performance at the Club of her choice, and b) submit to the Club in a manner prescribed by it a Properly Completed Dance Fee Payment Request Form—both at least seven (7) business days before she desires to Perform and to obtain Dance Fee Payments in order to allow Defendants time to confirm her entitlement to such Dance Fee Payments (including the fact that she has Timely Submitted a Dance Fee Payment Election Form and is therefore barred from receiving a Cash Payment), the amount of Dance Fee Payments to which she is entitled, and the existence of an employment relationship between the Dance Fee Claimant and the Club. Defendants shall provide to Class Counsel on a monthly basis, no later than the 10th day of each month during the Dance Fee Payment Collection Period, electronic copies of the Dance Fee Payment Request Forms submitted during the prior calendar month.

7.3 Acquisition of Dance Fee Payments. A Dance Fee Claimant is entitled to one hundred percent (100%) of the Dance Fees that are generated from her entertainment services for each Date of Performance after she has completed the prerequisites for obtaining Dance Fee Payments as specified in Paragraph 7.2 until the total amount of her Dance Fee Payments is reached. A Club may, however, limit the number of Dance Fee Claimants receiving Dance Fee Payments on any one Date of Performance to seven (7) such Entertainers on a first come/first served basis.

7.4 Collecting Dance Fee Payments from Multiple Settlements. To the extent that a Dance Fee Claimant is also entitled to Dance Fee Payments under the Limited National Settlement, her collection of Dance Fee Payments shall first be ascribed to the Dance Fee Payments to which she is entitled under the Limited National Settlement and then, after she has obtained all such Dance Fee Payments, to the Dance Fee Payments she is entitled to under this Settlement.

7.5 Period for Obtaining Dance Fee Payments: Dance Fee Claimants must obtain all of their Dance Fee Payments (they must have Performed all necessary Dates of Performance in order to be entitled to the full amount of their Dance Fee Payments) no later than by the last day of the Dance Fee Payment Collection Period. Regardless of whether Dance Fee Claimants have fully exhausted the Dance Fee Pool, Dance Fee Claimants' entitlement to obtain Dance Fee Payments shall terminate at the expiration of the Dance Fee Payment Collection Period.

7.6 Unpaid Dance Fee Pool and Payments. If the full amount of the Dance Fee Payments due a Dance Fee Claimant pursuant to the Plan of Allocation has not been completely paid to her within the Dance Fee Payment Collection Period, then the unpaid amount shall be paid by the Defendants to the Settlement Administrator by check within 30 days of expiration of the Dance Fee Payment Collection Period, along with a report showing the Dance Fee Claimant's name and the amount of the Dance Fee Payments she received. The Settlement Administrator will then send the specified Dance Fee Claimant a check for the unpaid amount within ten (10) days.

7.7 Unclaimed Dance Fee Pool: The Unclaimed Dance Fee Pool, if any, will be allocated to the Cash Pool.

7.8 Performing at Defendant Entities: Nothing in this Agreement requires any Club to open for business or remain in business so that a Dance Fee Claimant can obtain a Dance Fee

Payment, or require that any Club permit a Dance Fee Claimant the right to Perform on its premises in order to obtain Dance Fee Payments if she is not then an employee of the Club. If a Dance Fee Claimant desires to Perform at a Club to obtain Dance Fee Payments pursuant to this Agreement and she is not a current employee of that Club and that Club refuses to allow her to Perform for a legitimate business reason, that Dance Fee Claimant may obtain Dance Fee Payments at another Club or, at her option, she may select to obtain a Cash Payment pursuant to the terms of this Agreement.

7.9 Audit and Data Rights: Throughout the existence of the Dance Fee Pool, Class Counsel shall be provided reasonable access to data and records used to determine any Class Member's eligibility, the total amount of Dance Fee Payments that she may obtain, the amount of Dance Fee Payments that she has been paid and that remain for her to obtain, and the total amount of the Dance Fee Pool paid and remaining to be paid. In addition, Class Counsel will be provided monthly statements identifying those Dance Fee Claimants who received Dance Fee Payments, the amounts thereof, and the running balance of the Dance Fee Pool until it is depleted or otherwise unavailable.

**ARTICLE VIII**

**TAX CONSIDERATIONS OF THE SETTLEMENT**

8.1 No Tax Advice Being Given. Class Counsel represent that they are not providing any tax advice whatsoever to the Settlement Class Members in regard to the tax consequences, tax reporting, and remittance obligations they have in regard to the payments conveyed to them pursuant to the terms of this Agreement, beyond what is contained in this Article. The Class Representatives and all Participating Class Members acknowledge the same. Each Settlement

Class Member is obligated to obtain her own independent tax advice concerning the proper income reporting and tax remittance obligations regarding the payments and/or other remuneration she receives or obtains pursuant to this Agreement and shall further assume the responsibility of remitting to the Internal Revenue Service and any other relevant taxing authorities (including the State of California) any and all amounts required by law to be paid out of any monies received, or other remuneration obtained, under this Agreement, without any contribution whatsoever from any of the Released Defendants or Class Counsel except for the payment of Dance Fees which shall be paid as additional employee commissions subject to all legal withholdings.

8.2 Tax Considerations of Settlement Payments and Dance Fee Payments. Each Settlement Class Member acknowledges and agrees that the Cash Payment and Settlement Class Member's PAGA Payment conveyed to her under this Agreement do not constitute "wages" within the meaning of § 3111(a) of the Internal Revenue Code, any other applicable provisions therein, or any applicable state tax or revenue code. A Form (or Forms, as applicable) 1099-MISC shall be issued, as required by law, by the Settlement Administrator to each Settlement Class Member reflecting the Cash Payment and Settlement Class Member's PAGA Payment made to her in accordance with this Agreement, and copies of said forms shall be duly filed with the United States Internal Revenue Service, with the California taxing authorities, and with any other applicable state taxing authorities, and sent to Defendants for recordkeeping purposes.

8.3 Obligation to Report Tip Income. The Class Notices shall inform Settlement Class Members of their obligation to report all tip income that they have earned, or will earn, as either an IPE or employee, to the Clubs, to the IRS, and to state taxing authorities.

## ARTICLE IX

## DEFENDANTS' CHANGES OF BUSINESS PRACTICES, WHICH HAS AND WILL CONFER A DIRECT AND SUBSTANTIAL FINANCIAL BENEFIT TO THE SETTLEMENT CLASS

9.1 Conversion of Class Members and Entertainers to Employees. As a result of the filing of the San Diego Action and settlement negotiations to resolve the same undertaken between and among the plaintiffs thereof and the Defendants, the Clubs agreed to convert all Class Members who were a party to a Dancer Contract with any one of the Clubs (and who desired to continue to Perform at that Club) to, and to treat all Entertainers who would be Performing in their facilities in the future as, employees in accordance with applicable law. Pursuant to this Settlement and a prior iteration of it in the San Diego Action memorialized as the San Diego Settlement, such conversion has already taken place, with the conversion process having been completed by November 16, 2018. For Settlement Class Members and for other Entertainers who commence or commenced Performing at a Club after the end of the Class Periods, their employment has been on monetary terms that are at least as favorable as specified for employee-Entertainers in the Limited National Settlement (§ 8.20 thereof, but with 40% dance fee commissions) for the Greater California Clubs and in the San Francisco Settlement (§139 thereof, but with 40% dance fee commissions) for the San Francisco Clubs (collectively, the "Enhanced Terms of Employment"); with these Enhanced Terms of Employment being available to those qualified individuals through at least the one (1) year anniversary after the Final Approval Date, subject to Section 9.10, which permits for conversion to non-employee status if permitted by changes in the law. In such case, the monetary compensation paid by the Clubs to qualified individuals shall not be less, if conversion occurs during such one (1) year period, than what

would be afforded under the Enhanced Terms of Employment in this Section 9.1. Irrespective of anything contained in this Agreement to the contrary, the Enhanced Terms of Employment provided for in this Agreement and in the Limited National Settlement shall not be binding upon any legitimate third-party successor of any of the Defendants.

9.2 Employing Clubs. The Defendants may permit a Class Member to be an employee of more than one Club or may limit her to employment to only a single Club. Similarly, the Defendants may permit any Entertainer in the future to be an employee of more than one Club or may limit her to employment only at a single Club of the Defendants' choosing. Nothing contained in this Agreement or in the Limited National Settlement shall require the Defendants to permit any Class Member to work at more than one Club following the conversion of the Entertainers who performed at the Clubs to employees in accordance with Section 9.1 above.

9.3 No Contract of Employment / "At Will" Employment Only. Nothing in this Agreement shall constitute or require any contract of employment between any Class Member or Entertainer and any Defendant. The employment terms set forth herein and in the Limited National Settlement shall be "AT WILL," and shall permit the Clubs to terminate the employment of any Class Member or Entertainer for any reason not precluded by law (including for no specific reason). Just by way of example only, the Clubs shall be permitted to terminate the employment of any Class Member or Entertainer in the future if she fails to appear as scheduled, does not abide by directives of management, or does not generate sufficient income for the Defendant-employer to justify retaining her as an employee.

9.4 Rights of Class Members and Entertainers. Following the conversion to employees as set forth in Section 9.1, Class Members and other subsequent Entertainers have

been and will be eligible, as employees and as may be legally applicable, for Social Security, Medicare, Worker's Compensation and unemployment insurance, as well as to protection under all federal, state and local laws applying to or affecting employees, including but not limited to, as may be legally applicable, the National Labor Relations Act, Title VII of Civil Rights Act of 1964, the Age Discrimination in Employment Act (ADEA), the Older Workers Benefits Protection Act, the Americans with Disabilities Act, the Family Medical Leave Act and the Fair Labor Standards Act, for claims arising out of, or related in any way to, their employment or separation of employment save only for the limitations provided for in this Agreement.

9.5 Rights of Defendant-Employers. Nothing contained in this Agreement or in the Limited National Settlement shall be construed in any way to restrict the rights of the Defendants as employers that they can exercise over Class Members and any Entertainers hired as employees. Just by way of example only and in no way restricting the rights of the Defendants, the Clubs may impose training; set performance goals; establish appearance standards; regulate clothing and costuming; determine work schedules and hours of work; establish and modify job responsibilities; select the music to which Entertainers Perform; mandate Performing for certain customers; determine the nature, content, character, manner and means of Performances; require the participation in advertising; require attendance at meetings; set meal and rest breaks; require the execution of arbitration agreements with class and collective action waivers; and the like.

9.6 Prerequisites to Employment. Prior to conversion to employees as set forth in Section 9.1, all Class Members who desired to continue to Perform in one or more of the Club have been and shall be required to remit to the Club or Clubs at which they are to be employed, all information, documents and materials that are legally required as a condition for employment

(including but not limited valid identification, valid Social Security Card or other documentation permitting the Class Member to work in the United States, I-9, and W-4). Nothing contained in this Agreement shall require a Club to hire a Class Member as an employee who does not possess, has not produced, or has not remitted, as applicable, all such required information, documents and materials, and nothing contained in this Agreement permits a Class Member to continue to Perform at a Club as an IPE following the date on which Defendants converted Entertainers Performing in the Clubs to employees as set forth in Section 9.1.

9.7 Financial Viability of the Clubs. Nothing in this Agreement shall require any Club to remain open for business following the conversion of Entertainers and Class Members to employees or to present female performance dance entertainment upon its premises; the Parties acknowledging that some of the Clubs may not be able to operate in a financially profitable manner following the conversion of the Entertainers and Class Members to employee status or may have to remain closed following the Covid-19 global pandemic. If any Club in fact closes and that closure precludes a Dance Fee Claimant from being able to avail herself to Dance Fee Payments, Defendants shall cure that problem by offering reasonable access to other Clubs that are open.

9.8 Verification of Conversion. Until the date of the Final Approval Order, Class Counsel will be permitted, and shall undertake steps, to verify that the conversion to employees of the Class Members (and other Entertainers who may have started, or who may start Performing at the Clubs after conversion) has in fact taken place. Verification will consist of, at a minimum, Defendants providing Class Counsel with a schedule of conversion dates and a representative sample of paychecks and other documents demonstrating conversion; accompanied (by Defense

Counsel or their designees) site visits by Class Counsel to any of the Clubs identified on ***Exhibit A***; and interviews by Class Counsel with any Entertainers of their choosing who are then Performing in one or more of the Clubs. All fees and costs associated with the obligations of Class Counsel pursuant to this Section 9.8 shall be exclusively borne by Class Counsel but may be included as part of their request for the Attorneys' Fees and Expenses Award.

9.9 No Violations of Prior Settlements. The Parties acknowledge and agree that nothing contained in this Agreement, and in particular the terms of Section 9.1 that required conversion of the Entertainers and Class Members still Performing in the Clubs to be employees, shall be considered to constitute a violation or breach of the terms of the Limited National Settlement, and more specifically of the terms set forth in Article VIII thereof.

9.10 Changes of Law. Only in the event that there is a change of law in the State of California in the future concerning the distinction between employees and independent contractors that modifies or invalidates, in whole or in part, the "ABC" test adopted in *Dynamex Operations West, Inc. v. Superior Court of Los Angeles County*, (2018) 4 Cal.5th 903 and subsequently codified by statute, and/or that modifies, clarifies or specifies either those workers who may be subject to the "ABC" test adopted in *Dynamex* or subsequently in statute, or any exemptions therefrom, including changes by legislation, regulation, wage order adoption or the judiciary, shall the Clubs be permitted to alter their relationship with the Entertainers who perform in their facilities back to the way it existed prior to the conversion process, or to any other structure or relationship that they believe complies with the then-existing law.

9.11 Interpretation and Construction of the Limited National Settlement. The Parties agree that the Limited National Settlement shall be interpreted and construed to permit California

Entertainers who are entitled to claim Secondary Pool Remuneration thereunder to obtain Dance Fee Payments from that settlement (the Limited National Settlement) even though they may be employees of a Club under the terms of this Settlement. Accordingly, Class Members who are entitled to obtain Secondary Pool Remuneration from the Limited National Settlement shall be entitled to, at the same time, both the enhanced terms of employment as set forth in Section 9.1 hereof and Section 8.20 of the Limited National Settlement (including but not limited to dance fee commissions) and their Secondary Pool Remuneration available pursuant to the terms of the Limited National Settlement.

9.12 Right to Modify the Terms of this Article. The Clubs maintain the right, during the time periods established for the Enhanced Terms of Employment set forth in Section 9.1, to make further changes to their business practices so long as such changes do not materially and adversely undermine the monetary terms set forth in this Article or run afoul of any valid laws covering the Entertainers as employees.

9.13 Injunctive Relief. In the Final Approval Order, the Court shall grant injunctive relief to compel the Defendants to comply with, and to continue to comply with, all terms of this Article.

**ARTICLE X**

**ATTORNEYS' FEES AND EXPENSES AWARD, CLASS REPRESENTATIVE ENHANCEMENT PAYMENTS, AND ADMINISTRATIVE COSTS**

10.1 Attorneys' Fees and Expenses Award. As directed by the Court's Preliminary Approval Order, Class Counsel will apply to the Court for an award of: (1) attorneys' fees in an amount that does not exceed thirty-five percent (35%) of the Settlement Consideration; and (2) up to eighty thousand dollars ($80,000) in Litigation Expenses.

10.2 Limitations on and of the Attorneys' Fee and Expense Award. The disposition of Class Counsels' applications for an Attorneys' Fees and Expense Award is within the sound discretion of the Court. Any disapproval or modification by the Court of such applications shall not: a) affect the enforceability of the Settlement or this Agreement, b) provide any of the Parties with the right to terminate the Settlement or this Agreement, or c) impose any obligation on the Defendants to increase the Settlement Consideration extended in connection with the Settlement, including but not limited to the total amount of the Cash Pool as provide for herein.

10.3 Litigation Expenses. With the exception of the payment(s) for the Attorneys' Fees and Expenses Award made pursuant to order of the Court, all other Litigation Expenses incurred by Class Counsel in connection with investigating the bases for, filing and prosecuting these Actions (including for all appeals and settlement processes, including mediations), and administering the Settlement, shall be borne exclusively by Class Counsel.

10.4 Enhancement Payments. Class Counsel may apply to the Court for an incentive award for various Settlement Class Members (to be paid in addition to their allocated portion of the Net Cash Fund and their Settlement Class Member's PAGA Payment). Subject to Court approval, the Enhancement Payments will be in recognition of the time, efforts, and expenses incurred by each individual in coming forward, assisting in the prosecution of these Actions, and securing the Settlement as embodied in this Agreement. Enhancement Payments shall be considered non-wage income for which an IRS Form 1099-MISC will be issued by the Settlement Administrator, as required by law, to each Settlement Class Member receiving such a payment.

10.5 Payment of Administrative Costs. Defendants shall pay, through remittances to the Settlement Administrator and out of and as part of the Cash Pool, the Administrative Costs in accordance with the terms herein.

**ARTICLE XI**

**OBJECTIONS AND OPT-OUTS**

11.1 Objections to Settlement. All objections to the Settlement must be in writing and must be filed with the Court in accordance with the Court's Preliminary Approval Order. All objections not filed electronically with the Court must be mailed to both Class Counsel and Defense Counsel. All Class Representatives waive the right to object to the Settlement.

11.2 Procedures for Objections. The procedures of objection shall be as set forth in the Preliminary Approval Order.

11.3 Opting Out of the Settlement. Any Class Member who wishes to be excluded from the Settlement must Timely Submit to the Settlement Administrator, at the address that is set forth in the Class Notice, a written request for exclusion from the Settlement personally signed by the Class Member or her Legally Authorized Representative (the Opt-Out Form). Any Class Member may also submit a written request for exclusion from the Settlement (the Opt-Out Form) to the Settlement Administrator through the Settlement Website or via email. The Settlement Administrator shall date-stamp the original of any Opt-Out Form and serve copies thereof on both Class Counsel and Defense Counsel via electronic mail within five (5) business days of the receipt of any such form.

11.4 Failure to Properly Opt-Out and Opt-Out Limitations. Any Class Member who does not express her clear and unequivocal intention to be excluded from the Settlement, and

Timely Submit her notice of her intention to Opt-Out of the Settlement, will be deemed to be a Settlement Class Member. All Class Representatives waive any right to Opt-Out of the Settlement.

11.5 Notification to Counsel of Opt-Outs. Within ten (10) days following the conclusion of the Opt-Out Period, the Settlement Administrator shall provide Class Counsel and Defense Counsel with the Opt-Out List. The contents of the Opt-Out List shall be designated as CONFIDENTIAL INFORMATION in accordance with Section 15.1 and shall be submitted by Class Counsel to the Court, before the Fairness Hearing, UNDER SEAL in order to protect the confidentiality of those Class Members who have Opted Out.

## ARTICLE XII

## RELEASES AND COVENANTS

12.1 Scope of Releases. The Released Claims against each and every one of the Released Defendants shall be fully and finally released and dismissed with prejudice and on the merits (without an award of fees or costs to any Party other than as provided for in this Agreement) upon the Effective Date. The Released Claims shall be construed as broadly as possible to effect complete finality over the Actions and the Claims asserted, or that could have been asserted, therein.

12.2 Release of Released Defendants. The Settlement Class Members, individually and on behalf of their heirs, estates, trustees, executors, administrators, representatives, agents, successors, and assigns, and anyone claiming through them, or acting or purporting to act on their behalf, for their benefit, or in their interest, hereby knowingly and voluntarily forever release, relinquish, acquit, discharge, and hold harmless, each and every one of the Released Defendants from, and covenant not to sue each and every one of the Released Defendants regarding, each and

every one of the Settlement Class Members' Released Claims (in the case of the Settlement Class Members) and the Participating Class Members' Released Claims (in the case of the Participating Class Members); and they further agree that they shall not now or hereafter initiate, maintain, or assert any Settlement Class Members' Released Claims (in the case of the Settlement Class Members) or any Participating Class Members' Released Claims (in the case of the Participating Class Members) against the Released Defendants, or against any one or group of them, in any other court action or before any administrative body, tribunal, arbitration panel, or other adjudicating body. Notwithstanding the foregoing, Settlement Class Members retain the right to bring Claims based upon violations of the terms of this Agreement.

12.3 Waiver of Released Claims. For and in return of the complete and full considerations, terms, covenants and conditions as set forth in this Agreement, the Settlement Class Members, and each and every one of them, further specifically agree to waive each and all of their rights to bring any of the Released Claims at any time in the future arising out of, relating to, associated with, based upon, or concerning, in any way, manner, regard, or fashion whatsoever, the Settlement Class Members' Released Claims (for Settlement Class Members) and the Participating Class Members' Released Claims (for Participating Class Members).

12.4 Release of FLSA Claims. With respect to those Claims that could be asserted under the FLSA, a Class Member's Timely Submission of a Properly Completed Dance Fee Payment Election Form or the issuance to her of any Settlement Check shall fully, finally, and forever settle and release any and all FLSA Claims that she may have up to and including November 16, 2018.

12.5 Claims Barred and Enjoined. All Settlement Class Members shall be permanently barred and enjoined from initiating, asserting, or prosecuting against the Released Defendants, or

against any one or group of them, in any federal or state court or before any administrative body, tribunal, arbitration panel, or other adjudicating body, any and all of the Settlement Class Members' Released Claims (in the case of the Settlement Class Members) and any and all of the Participating Class Members' Released Claims (in the case of the Participating Class Members), as all such claims have been fully satisfied through the terms of this Agreement. The Court shall retain jurisdiction to enforce the provisions of this Section.

12.6 Waiver of Additional Compensation. Irrespective of the releases, waivers, and satisfactions set forth herein, if any court, tribunal, firm, third person or persons, business entity, or governmental entity, organization or agency, brings, asserts, or assumes jurisdiction over any form of investigation, proceeding, lawsuit, claim, charge or cause of action by, for or on behalf of any Settlement Class Member, and/or in her interest or for her benefit, either in whole or in part, against the Released Defendants, or against any one or group of them, arising out of, relating to, associated with, based upon, or concerning, in any way, manner, regard, or fashion whatsoever, the Settlement Class Members' Released Claims or the Participating Class Members' Released Claims, such Settlement Class Member or Participating Class Member, as applicable, shall not seek to enforce, recover or collect upon any damages, awards, remunerations, sanctions, penalties, fines, costs and/or attorney fees assessed against the Released Defendants, or against any one or group of them, and shall reasonably cooperate with any request from the Released Defendants, at the Released Defendants' cost, to demand the dismissal, with prejudice, of any such investigation, proceeding, lawsuit, claim, charge, or cause of action, and/or, as may be appropriate, her withdrawal therefrom (by way of example and without limitation, "withdrawal" includes, where applicable, a formal written request for withdrawal of, or non-participation in, an administrative proceeding, formally "opting"-out of an

opt out class action lawsuit, and refraining from formally "opting"-in to an opt-in class or collective action matter). In the event, however, that any court, tribunal, or governmental entity, organization or agency should assess any damages, awards, remunerations, sanctions, penalties, fines, costs, and/or attorney fees of any kind whatsoever against any Released Defendant beyond the relief provide for in this Agreement (in this Section, sometimes generally hereinafter simply referred to as "Award") arising out of, relating to, associated with, based upon, or concerning, in any way, manner, regard, or fashion whatsoever the Settlement Class Members' Released Claims or the Participating Class Members' Released Claims, the Settlement Class Members and the Participating Class Members, as applicable, and each and every one of them, agree to specifically waive entitlement to, and refrain from collecting upon, any such Award.

12.7 Sufficiency of Consideration. The Class Representatives specifically represent that sufficient and adequate consideration is being conveyed to them and to the Settlement Class through this Agreement and the Settlement to support the Settlement Class Members' Released Claims.

12.8 Acknowledgement of Other Claims. The Class Representatives, and each and every one of them, specifically represent that to their own personal knowledge: a) There are no other lawsuits, Claims, charges, actions, proceedings, investigations, cause, and/or causes of actions of any kind whatsoever, other than those that are set forth in Plaintiffs' Complaints on file and in any amendments to be filed as part of this Settlement, or as otherwise previously disclosed in writing to the Defendants, pending or anticipated against the Released Defendants, or against any one or group of them, whether filed or unfiled, and whether civil or criminal, arising from, relating to, associated with, based upon, or concerning, in any way, manner, regard, or fashion whatsoever, the Settlement Class Members' Released Claims as they apply to the Class Representatives; b) that none of them

have filed, been served with, or have any personal knowledge of any such matters; and c) that they have not participated in, or have provided assistance or cooperation to, such matters.

12.9 Release of Settlement Class Members. Subject to any Claims that they may have for libel, slander, business disparagement, damage or destruction of property, assault and/or battery, or the like, each and every Released Defendant hereby, knowingly and voluntarily, releases, acquits, and forever discharges, each and every Settlement Class Member and Class Counsel from any and all Claims of every conceivable kind or nature whatsoever that they have, had, or may have, against the Settlement Class Member, or against any one or group of them, whether fixed or contingent, whether asserted or unasserted, and whether filed or unfiled, at law, in equity, or otherwise, that arise out of, relate to, are associated with, are based upon, or concern, in any way, manner, regard, or fashion whatsoever, the business arrangement that the Clubs had with the Settlement Class Members and which occurred during the Class Periods, including but not limited to any Claim for breach of contract, or any Claim purportedly arising out of a Dancer Contract. Notwithstanding the foregoing, Defendants retain the right to bring Claims upon future violations of the terms of this Agreement.

12.10 Performing in the Future at the Clubs. The Parties acknowledge that some of the Class Members are no longer Performing at any of the Clubs. Nothing in this Agreement shall require any Club to hire any Class Member who is not currently an employee of the Club at the time of execution of this Agreement in order to be able to Perform on its premises.

12.11 Knowing Execution. Each Class Representative acknowledges, agrees, and understands that: a) she has read and understands the terms of this Agreement; b) she has been advised in writing to consult with an attorney before executing this Agreement; c) she has obtained

and considered such legal counsel as she deems necessary; and d) she has been given twenty-one (21) days or more to consider whether or not to enter into this Agreement (although she may elect not to use the full 21 day period at her option).

12.12 Non-Assignment of Claims. Each Class Representative represents and agrees that she has not and will not assign any of her Settlement Class Members' Released Claims to any other person or entity. These representations shall survive the execution of this Agreement and the approval by the Court of the Settlement contemplated herein.

12.13 Dismissals. Subject to Court approval, all Settlement Class Members shall be bound by this Agreement and all of their Settlement Class Members' Released Claims shall be dismissed with prejudice and fully and forever released and discharged, even if such Person(s) never received actual notice of the Actions or this Settlement and never received the Cash Payment, Settlement Class Member's PAGA Payment, Dance Fee Payments, or Unpaid Dance Fee Pool Payment to be made to her in accordance with this Agreement. Similarly, for Participating Class Members, all of their Participating Class Members' Released Claims shall be dismissed with prejudice and fully and forever released and discharged.

## ARTICLE XIII

## TERMINATION OF SETTLEMENT

13.1 Events Permitting Termination. This Agreement and the Settlement shall terminate and be canceled within ten (10) business days of the mailing of notification if one of the Parties provides written notification of an election to terminate this Agreement and the Settlement based upon the occurrence of any of the following circumstances:

a) The Court denies or rescinds preliminary approval of this Agreement, or enters a Preliminary Approval Order that is at variance with the terms of this Agreement;

b) At least seven and one half percent (7.5%) of the Class Members Opt-Out of the Settlement;

c) Any of the signatories hereto have not signed this Agreement at least fifteen (15) days prior to the Fairness Hearing;

d) The Court declines to provide Final Approval of the Settlement, or declines to enter the Judgment or Final Approval Order that fully adopts the terms of this Agreement, or enters a Judgment or Final Approval Order that material modifies, or that is at material variance from, the terms of this Agreement;

e) The Court's Judgment and/or Final Approval Order is (are) vacated, reversed, or modified in any material respect in any appeal or other review, or in any collateral proceeding occurring prior to the Effective Date;

f) The Effective Date does not occur for some other reason; or

g) Any federal or state authorities object to, or request material modifications of, the Settlement and the Court adopts such objections and/or modifications.

13.2 Consequences of Termination. In the event this Agreement does not receive Final Approval by the Court, or in the event the Court's Final Approval is overturned, reversed, vacated, or modified in any material way on appeal or review, or by or through any collateral proceeding,

or in the event the Settlement is terminated or fails to become effective in accordance with the terms of this Agreement, the Parties shall request the Court to restore them to their respective positions in the Actions as they existed as of March 1, 2020. In such event: a) the terms and provisions of this Agreement, except as provided in this Section, in Sections 3.5 and in Article XV, shall have no further force or effect with respect to the Parties; b) neither this Agreement nor any discussions or documents regarding it, or the Settlement prior to the termination/cancellation of this Agreement (except for Sections 3.5 and Article XV), shall be used in the Actions or in any other proceeding for any purpose (including, but not limited to, in support of a motion for class certification, in opposition to any motion to compel arbitration, or as evidence of Defendants' liability, or lack thereof, in regard to the Claims asserted in or encompassed by these Actions); c) any and all orders and any Judgment entered by the Court in accordance with the terms of this Agreement shall be treated as vacated, *nunc pro tunc*, and shall be null and void for all purposes; d) any Consents to Join filed on behalf of any Class Member and the consequent release of FLSA Claims through this Agreement, shall be null and void *ab initio*; and e) no prejudice shall attach to any motion by Defendants, either filed or unfiled, to compel the Plaintiffs, or any one or group of them (including intervenors in the San Diego Action), into individualized arbitration and to dismiss and/or stay the Actions or any other court proceeding, or to the still-pending motion in the San Diego Action to reconsider the ruling on the previous motion to compel the named plaintiffs thereof into individualized arbitration.

13.3 Costs of Termination. If any Party terminates this Agreement pursuant to Section 13.1, both Plaintiffs and Defendants shall bear their own costs incurred.

13.4 <u>Effects of Termination</u>. In the event this Agreement is terminated pursuant to Section 13.1:

a) The Defendants shall have no obligation under this Agreement to make any payments to the Settlement Class, to any attorney (for attorneys' fees, costs, or otherwise), to any governmental entity (including but not limited to the LWDA), to any fund or account (including but not limited to the Cash Pool and the Notice and Administrative Fund), or to the Settlement Administrator (beyond the Notice and Administration Fund if previously paid);

b) The Defendants shall no longer be required to retain the services of Entertainers as employees as negotiated as part of the San Diego Settlement and as memorialized and modified herein;

c) Any Preliminary Approval Order, Final Approval Order and the Judgment, including any orders of class certification or consolidation pursuant to the Agreement (provisional or otherwise), shall be vacated, and the Amended Complaints for Settlement and any answers/counterclaims thereto shall be deemed withdrawn; and

d) Any monies already paid or remitted by Defendants to the Settlement Administrator and not yet used as part of the Administrative Costs shall be immediately returned to Defendants with all accrued interest.

**ARTICLE XIV**

**LIMITATIONS UPON THE TERMS OF SETTLEMENT**

14.1 No Admission of Wrongdoing. Neither this Agreement nor the Settlement, nor any act performed or document executed pursuant to or in furtherance thereof (including but not limited to the previous conversion of Entertainers Performing at the Clubs to employees pursuant to the San Diego Settlement and as memorialized and modified herein), is, or may be deemed to be, or may be used as: a) an admission or evidence of the truth of any allegations in the Actions, either as presently pending or as to be amended as provided for herein; b) an admission or evidence of the validity of any of the Released Claims, or any alleged wrongdoing or liability of any of the Released Defendants; c) an admission or evidence of any fault or omission of any of the Released Defendants in any civil, criminal, or administrative proceeding in any Court, administrative agency or other tribunal (including any arbitral forum), other than in such proceedings as may be necessary to consummate or enforce the terms of this Agreement, the Settlement memorialized herein, or the Judgment; d) an admission that Services, Mohney, SFBSC, or any other Defendant Entity is, or could be held to be, a "joint employer" of the Plaintiffs or of any one or group of them; e) an admission that each of the Clubs' separate corporate identity is or can be disregarded; or f) an admission as to, or evidence of, the certifiability of any Claims contemplated herein or in the Actions, either as presently pending or as to be amended as provided for in this Agreement. Notwithstanding the preceding, however, this Agreement and/or the Judgment may be filed and used in any action or proceeding in any Court, administrative agency, or other tribunal, to support a defense of *res judicata*, collateral estoppel, payment, release, good faith settlement, accord and satisfaction, claim preclusion, issue preclusion, or any similar defense or counterclaim.

**ARTICLE XV**

**PROTECTIVE ORDER**

15.1 Terms of Protective Order. The Parties shall agree upon, and shall submit to the Court for entry, a stipulated protective order (the "Protective Order") in the Actions in order to protect the confidentiality of certain identities, information, documents, and materials deemed to be confidential pursuant to the terms of this Agreement or as otherwise designated by the Parties to be so (collectively, "CONFIDENTIAL INFORMATION"). Such CONFIDENTIAL INFORMATION shall be held in confidence by the Parties and/or by their attorneys and shall not be submitted in any public filing or other public disclosures except as may be permitted by this Agreement.

15.2 Return of CONFIDENTIAL INFORMATION. All documents and/or things produced or generated through discovery by any Party in the Actions that has been designated CONFIDENTIAL INFORMATION (including by way of informal discovery) shall be destroyed within thirty (30) days of the Effective Date, unless such information is necessary for administration and verification of the Cash Payments or Dance Fee Payments as provided for herein (in that event, such materials will be destroyed when all such payments have been concluded). If this Agreement is terminated or does not become Final, all documents or things produced pursuant to this Settlement that have been designated CONFIDENTIAL INFORMATION shall be destroyed within thirty (30) days of termination of this Agreement. Each Party shall promptly certify to the other that all documents and/or things produced or generated through discovery, formal or otherwise, that have been designated to be CONFIDENTIAL INFORMATION have been destroyed. No Party shall be required, however, to destroy their own

documents and things or any other document that the Protective Order entitles the Party or its Counsel to retain following the conclusion of litigation.

## ARTICLE XVI

## NOTIFICATIONS

16.1 Process of Notification. Unless otherwise specifically provided herein, all notices, demand, or other communications given hereunder shall be in writing and shall be deemed to have been duly given as of the third business day after mailing by United States registered or certified mail, return receipt requested, addressed as follows:

To Plaintiffs and the Settlement Class:

Steven G. Tidrick
The Tidrick Law Firm LLP
1300 Clay Street, Suite 600
Oakland, CA 94612

Jason J. Thompson
Sommers Schwartz, P.C.
One Towne Square, Suite 1700
Southfield, MI 48076

Megan Bonanni
Pitt McGehee Palmer & Rivers
117 West 4th Street, Suite 200
Royal Oak, MI 48067

To Defendants:

Douglas J. Melton
Long & Levit, LLP
465 California Street, 5th Floor
San Francisco, CA 94104

Tammara N. Bokmuller
Bowman and Brooke, LLP
750 B. Street, Suite 2200

San Diego, CA 92101

Bradley J. Shafer
Shafer & Associates, P.C.
3800 Capital City Boulevard, Suite 2
Lansing, MI 48906

## ARTICLE XVII

## FORCE MAJEURE

17.1 Excuse from Performance. No Party shall be liable or responsible to any other Party, nor deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement when and to the extent such failure or delay is caused by, or results from, acts beyond the impacted party's control ("Impacted Party"), including, but not limited to, the following circumstance, occurrences, and/or incidents (the "Force Majeure Events"): a) acts of nature; b) natural disasters (fires, explosions, earthquakes, hurricanes, flooding, storms, explosions, infestations), epidemics or pandemics (but specifically excluding the COVID-19 pandemic and its effects, including government shut downs, all of which are already known and explicitly acknowledged by the Parties in negotiating this Agreement, except as set forth in Section 5.4); c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot or other civil unrest; d) government orders or laws; e) actions, embargoes or blockades in effect on or after the date of this Agreement; f) action by any government authority; g) national or regional emergency; h) strikes, labor stoppages or slowdowns or other industrial disturbances; and i) shortages of adequate power or transportation facilities. The Impacted Party shall give notice within ten (10) days of the Force Majeure Event to the other Party/Parties, stating the period of time the occurrence is expected to continue. The time for performance required of the Impacted

Party shall be extended by the period of such delay provided the Party is exercising diligent effort, and is acting in good faith, to overcome the cause of such delay (the Impacted Party being obligated to use diligent efforts, and to act in good faith, to end the failure or delay in performance and to ensure that the effects of such Force Majeure Event are minimized). The Impacted Party shall resume the performance of its obligations as soon as reasonably practicable after the removal of the cause.

17.2 Changes in Court Ordered Deadlines. In the event of a Force Majeure Event, the Parties shall, to the extent necessary, negotiate in good faith for the extension of any deadlines provided for herein, and submit their proposals to the Court for approval. If the Parties are unable to so agree, any Party may file a motion with the Court to permit the Court to set new deadlines itself.

## ARTICLE XVIII

## MISCELLANEOUS PROVISIONS

18.1 This Agreement may be amended or modified only by a written instrument signed by or on behalf of all of the signatories hereto or their successors-in-interest. No oral amendment or modification shall be permitted or effective.

18.2 This Agreement and the Settlement were entered into after substantial good faith, arms-length, negotiations between the Parties, Class Counsel and Defense Counsel. As such, no Party shall be deemed to have relied upon the representations of any other Party or opposing counsel in relation to the negotiation or execution of this Agreement.

18.3 Each counsel or other Person executing this Agreement on behalf of any of the Parties hereto represents that such counsel or Person, as applicable, has the authority to so execute this Agreement.

18.4 This Agreement may be executed in one or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same Agreement. This Agreement may be executed by signature delivered by facsimile or PDF and need not be the original "ink" signature. A complete set of executed counterparts shall be filed with the Court prior to the Fairness Hearing, with the exception of the true identities of the Class Representatives which are to be kept as CONFIDENTIAL INFORMATION. The signature page(s) of this Agreement for the true names of the Class Representatives shall be kept as confidential for attorneys' eyes only among Class Counsel and Defense Counsel and shall not be attached to the public filing of this Agreement for approval by the Court, except as necessary to enforce the terms of this Agreement.

18.5 This Agreement constitutes the entire fully integrated agreement and understanding among the Parties. No representations, warranties, or inducements have been made to any Party concerning the Settlement, this Agreement, or its exhibits, other than the representations, warranties, and covenants contained in such documents.

18.6 This Agreement shall be governed by the laws of the State of California or federal law, as applicable. All actions or proceedings relating to this Agreement may only be brought in the United States District Court for the Northern District of California.

18.7 Upon the occurrence of the Effective Date, the Settlement shall be fully enforceable by the Parties and the Court, and the Court shall retain exclusive and continuous jurisdiction over

the Parties to interpret and enforce the terms and conditions of, and rights under, the Settlement, the Final Approval Order, and the Judgment.

18.8 Each of the signatories acknowledges and represents that he/she/it: Has fully and carefully read this Agreement prior to execution; has been fully apprised by his/her/its counsel of the legal effect and meaning of this Agreement and all terms and conditions hereof; has had the opportunity to make whatever investigation or inquiry he/she/it deemed necessary or appropriate in connection with the subject matter of these Actions; has been afforded the opportunity to negotiate any and all terms of this Agreement; and is executing this Agreement voluntarily and free from any undue influence, coercion, duress, or menace of any kind. This Agreement reflects the conclusion of each of the Class Representatives and the Defendants that this Agreement, the Settlement, the Judgment to be entered hereunder, and the releases, waivers, and covenants provided for herein, are in their best interest, as well as in the best interests of the general public and the Settlement Class.

18.9 In the event, following the Judgment becoming Final, that any one or more of the provisions contained in this Agreement, or its application to any circumstance, shall for any reason be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall in no way affect any other provisions or applications of this Agreement if Defense Counsel and Class Counsel, on behalf of the Parties, mutually elect in writing to proceed as if such invalid, illegal, or unenforceable provision or application had never been included in this Agreement. However, if any funds have been remitted, or other consideration conveyed, to a Class Representative or a Settlement Class Member, then the releases and discharges granted, waivers conferred, and satisfactions conveyed by this Agreement may not be terminated.

18.10 The headings and captions inserted in this Agreement are for convenience only and in no way define, limit, or otherwise describe the scope or intent of this Agreement, or any provision hereof, or in any way affect the interpretation of this Agreement.

18.11 Except as otherwise provided in this Agreement, the Parties shall bear their own respective costs and fees.

18.12 None of the Parties or their respective counsel shall be deemed to be the drafter of this Agreement for purposes of construing its provisions. The language in all parts of this Agreement (including the exhibits thereto) shall be interpreted according to its fair meaning and shall not be interpreted for or against any of the Parties as the drafter of the language.

18.13 All time computations under this Agreement shall be done in accordance with the provisions of the rules of court applicable to the United States District Court for the Northern District of California, which govern the calculation of time.

18.14 The waiver by any of the Parties of any provision in this Agreement shall not be deemed a waiver by that Party of any other provision herein.

18.15 Each and every one of the Parties hereto acknowledges and agrees that he/she/it will and shall, at all times subsequent to the execution of this Agreement and upon reasonable request by any other Party, make, do, and execute, or cause to be made, done, or executed, all such further documents and instruments to effectuate the full intent, purpose, covenants and conditions as set forth herein.

18.16 This Agreement shall be binding upon and inure to the benefit of the Parties, Class Counsel, and Defense Counsel, as well as their assigns, successors-in-interest of any kind whatsoever, purchasers of any of their assets and/or liabilities, heirs, executors, and administrators.

[THIS SPACE INTENTIONALLY LEFT BLANK]

Respectfully submitted,

Dated: ________________, 2021 ________________________________

Bowman and Brooke, LLP
Tammara N. Bokmuller (CA Bar #192200)
Tammy.Bokmuller@bowmanandbrooke.com
750 B. Street, Suite 2200
San Diego, CA 92101
Telephone: (619) 376-2500
Facsimile: (619) (619) 376-2501
Counsel for Non-San Francisco Defendants

Dated: ________________, 2021 ________________________________

Long & Levit, LLP
Douglas J. Melton (CA Bar #161353)
Shane M. Cahill (CA Bar #227972)
dmelton@longlevit.com
scahill@longlevit.com
465 California Street, 5th Floor
San Francisco, CA 94104
Telephone: (415) 438-4493
Facsimile: (415) 397-6392
Counsel for San Francisco Defendants

Dated: ________________, 2021 ________________________________

Shafer & Associates, P.C.
Bradley J. Shafer (P36604)
brad@bradshaferlaw.com
3800 Capital City Blvd, Suite 2
Lansing, MI 48906
Telephone: (517) 886-6560
Facsimile: (517) 886-6565
Counsel for All Defendants

Dated: ________________, 2021 ________________________________

The Tidrick Law Firm
Steven G. Tidrick (CA Bar #224760)
sgt@tidricklaw.com
1300 Clay Street, Suite 600
Oakland, CA 94612

Telephone: (510) 788-5100
Facsimile: (510) 291-3226
Co-Class Counsel for Plaintiffs

Dated: ____________________, 2021 ____________________________________

Sommers Schwartz, P.C.
Jason J. Thompson (P47184)
jthompson@sommerspc.com
Co-Counsel for Plaintiffs
One Towne Square, Suite 1700
Southfield, MI 48076
(248) 355-0300
Co-Class Counsel for Plaintiffs

Dated: ____________________, 2021 ____________________________________

Pitt McGehee Palmer & Rivers, P.C.
Megan A. Bonanni (P52079)
mbonanni@pittlawpc.com
117 West Fourth Street, Suite 200
Royal Oak, MI 48067
248-398-9800
Co-Class Counsel

Dated: ____________________, 2021

3610 BARNETT AVE., LLC
d/b/a Adult Superstore

By: ____________________________________
James Egizi

Its: ____________________________________

Dated: ____________________, 2021

BIJOU – CENTURY, LLC
d/b/a New Century Theatre

By: ____________________________________
Joseph Carouba

Its: ____________________________________

Dated: _________________, 2021

BT CALIFORNIA, LLC
d/b/a The Penthouse Club & Steakhouse

By: ___________________________________
Joseph Carouba

Its: ___________________________________

Dated: _________________, 2021

Cathay Entertainment, Inc.
d/b/a Deja Vu Showgirls

By: ___________________________________
Donald Krontz

Its: ___________________________________

Dated: __________________, 2021

Coldwater, LLC
d/b/a Deja Vu Showgirls

By: ___________________________________
Donald Krontz

Its: ___________________________________

Dated: _________________, 2021

Chowder House, Inc.
d/b/a Hungry I

By: ___________________________________
Joseph Carouba

Its:____________________________________

Dated: __________________, 2021

Deja Vu – San Francisco, LLC
d/b/a Deja Vu Centerfolds

By: ___________________________________
Joseph Carouba

Its: ______________________________

Dated: _______________, 2021

Deja Vu Services, Inc.

By: ______________________________
Jason Mohney

Its: ______________________________

Dated: ______________, 2021

Deja Vu Showgirls – Sacramento, LLC
d/b/a Deja Vu Showgirls

By: ______________________________
Harry Mohney

Its: ______________________________

Dated: ______________, 2021

Deja Vu Showgirls of San Francisco, LLC
d/b/a Little Darlings of San Francisco

By: ______________________________
Joseph Carouba

Its: ______________________________

Dated: ________________, 2021

DV of LA, LLC
d/b/a Deja Vu of LA – Main St.

By: ______________________________
Donald Krontz

Its: ______________________________

Dated: ________________, 2021

EF5 Acquisitions Group, LLC
d/b/a Deja Vu Showgirls Torrance

By: ______________________________
Alan Minato

Its: ______________________________

Dated: _________________, 2021

Gold Club – SF, LLC
d/b/a Gold Club

By: ________________________________
Joseph Carouba

Its: ________________________________

Dated: ________________, 2021

Grapevine Entertainment, Inc.
d/b/a Deja Vu Showgirls

By: ________________________________
Christopher Krontz

Its: ________________________________

Dated: ________________, 2021

Harry Mohney

________________________________
Harry Mohney

Dated: _________________, 2021

Hollywood & Vine Club, LLC
d/b/a Deja Vu Showgirls

By: ________________________________
Donald Krontz

Its: ________________________________

Dated: ________________, 2021

Jolar Cinema of San Diego, Ltd.
d/b/a Jolar Cinema Showgirls

By: ________________________________
James Egizi

Its: ________________________________

Dated: ________________, 2021

LA Club Management, LLC

By: ______________________________
Donald Krontz

Its: ______________________________

Dated: _______________, 2021

Nite Life East, LLC
d/b/a Little Darlings

By: ______________________________
Jason Mohney

Its: ______________________________

Dated: _______________, 2021

Pine Tree Assets, Inc.
F/K/A Deja Vu Consulting, Inc.

By: ______________________________
Harry Mohney

Its: ______________________________

Dated: ________________, 2021

S.A.W. Entertainment, Ltd.
d/b/a Hustler San Francisco and The Condor Club

By: ______________________________
Joseph Carouba

Its: ______________________________

Dated: ________________, 2021

San Francisco Garden of Eden, LLC
d/b/a Garden of Eden

By: ______________________________
Joseph Carouba

Its: ______________________________

Dated: ________________, 2021

San Francisco Roaring 20's, LLC
d/b/a Roaring 20's

By: ______________________________
Joseph Carouba

Its: ______________________________

Dated: ________________, 2021

SFBSC Management, LLC

By: ______________________________
Joseph Carouba

Its: ______________________________

Dated: ________________, 2021

Showgirls of San Diego, Inc.
d/b/a Deja Vu Showgirls

By: ______________________________
Donald Krontz

Its: ______________________________

Dated: ________________, 2021

Stockton Enterprises, LLC
d/b/a Deja Vu Showgirls

By: ______________________________
Donald Krontz

Its: ______________________________

Dated: ________________, 2021

Torrance Food & Beverage, LLC

By: ______________________________
Alan Minato

Its: ______________________________

Dated: _______________, 2021

________________________________
SFBSC Jane Roe 1

Dated: _______________, 2021

________________________________
SFBSC Jane Roe 3

Dated: _______________, 2021

________________________________
San Diego Jane Roe 1

Dated: _______________, 2021

________________________________
San Diego Jane Roe 2

**CONFIDENTIAL: NOT TO BE FILED IN COURT**

Dated: ______________, 2021

________________________________,
Christina Singleterry (SFBSC Jane Roe 1)

Dated: ______________, 2021

________________________________,
Donshenya Williams (SFBSC Jane Roe 3)

Dated: ______________, 2021

________________________________,
Azaiah Diaz (San Diego Jane Roe 1)

Dated: ______________, 2021

________________________________,
Gwendolyn Raymond (San Diego Jane Roe 1)

4834-8881-7089, v. 1

# EXHIBIT 3

ShindelRock
28100 Cabot Drive
Suite 102 • Novi, MI 48377
t 248.855.8833
f 248.855.4192
shindelrock.com

June 1, 2017

**Memorandum**
From – David Shindel
To – Deja Vu Services, Inc.
Care of: Brad Shafer

RE – Global Settlement Exhibit A dated 2-23-17

<u>Overview:</u>

a) In accordance with the terms of my engagement, I have prepared an analysis identifying and quantifying certain information and data for current entertainers performing at clubs in addition to the various employee benefits for entertainers consistent with the terms of the Global Settlement Exhibit A dated 2-23-2017 the "Global Settlement".
b) The data for this analysis has been provided by internal bookkeeping systems commonly used by Deja Vu Services, Inc. and related clubs, and by interviews with key management and operational employees of the Deja Vu Organization and other industry experts.

<u>Methodology and Data</u>

a) Attached to this memo are the following:
   i) Calculation of Additional Earnings and Benefits of Becoming an Employee Entertainer per the Global Settlement.
   ii) Table 1: Foundational Information
      This table provides a summary of 2016 data of 18 operating clubs, and certain information on an additional 11 clubs.
   iii) Table 2: Employee Entertainer - Projected Earned Compensation Data
      This table provides the four types of compensation that could be earned by each entertainer on a per shift basis.
   iv) Table 3: Employee Entertainer - Indirect Benefits Data
      This table provide an analysis of indirect and non-compensation benefits of entertainers working as an Employee Entertainer.
   v) Table 4: Employee Entertainer - Cost of Employment
      This table provides details on the cost of employment per the settlement agreement.
   vi) Table 5: Wage and Payroll Tax Data
      This table contains wage analysis provided by Modern Bookkeeping, Inc. (The bookkeeping service for the 18 clubs analyzed.)
   vii) Table 6: Information Sources
      This table provides my sources of data, including individuals who were interviewed, to obtain an understanding of the operational aspect of the clubs.
   viii) Table 7: Employer Costs
      This table provides details on the cost to employers for Independent Professional Entertainers (IPE) converting to Employee Entertainer (EE).
   ix) Calculation of Additional Earnings and Benefits of Becoming an Employee Entertainer per The Global Settlement by State.

Summary

| | | |
|---|---|---|
| a) | Current Earnings, per show date, for an Independent Professional Entertainers | $291 |
| | Projected, per shift, Earnings of an Employee Entertainer | 464 |
| | Calculated Increase in Earnings of an EE Versus an IPE | $173 |
| b) | Calculated overall earnings and benefits of entertainers that are projected to convert to employees: | |
| | i) Estimated number of IPEs to convert to EEs per club | 14 |
| | ii) Total calculated increase in earnings for those entertainers that are estimated to convert to EEs, for 64 clubs, per the Global Settlement agreement, per shift, (14 x 64 x $173) | **$155,008** |
| c) | Calculated annual overall employer costs of Employee Entertainers | |
| | Estimated Direct Costs per Club | $50,960 |
| | Estimated Administrative Costs per Club | 2,412 |
| | Total Employer Costs per Club | $53,372 |
| | **Total Annual Employer Costs per the Global Settlement ($53,372 * 64)** | **$3,415,808** |

**Calculation of Additional Earnings and Benefits**
**of Becoming an Employee Entertainer per The Global Settlement**

AS 5/23/17

| Current Earnings, per show date, for an Independent Professional Entertainer | | | Projected Earnings, per shift, of an Employer Entertainer | | | |
|---|---|---|---|---|---|---|
| Dance Revenues Generated | $ 283 | 1 | Dance Revenues Generated | | $ 566 | 6 |
| Direct Compensation: | | | Direct Compensation | | | |
| IPEs Share of Dance Revenues Generated | $ 165 | 2 | Minimum Wage, net tip credits | | $ 47 | 7 |
| Tips | 165 | 3 | Tips | $ 329 | | 7 |
| Tip Outs | (33) | 4 | Less: Tip Pooling | (50) | | 7 |
| Scrip Redemption | (6) | 5 | Net Tips | | 279 | |
| | | | Commissions - Dance | 124 | | 7 |
| | | | Less: Cost of Employment | (80) | | 8 |
| | | | Net Commissions - Dance | | 44 | |
| | | | Commissions - "Conversation" Drinks | | 18 | 7 |
| | | | Scrip Redemption | | - | 7 |
| Direct Compensation per Show Date | **$ 291** | | Direct Compensation per Shift | | **$ 388** | |
| Indirect Benefits | | | Indirect Benefits | | | |
| None - IPEs are self employed | | | No Scrip Redemption Fees | | $ 10 | 9 |
| | | | Logo Costumes and Shoes Provided | | 9 | 9 |
| | | | Employer Paid Licenses | | 1 | 9 |
| | | | Payroll Taxes and Workers' Compensation Insurance | | 56 | 9 |
| | | | Paid and Unpaid Breaks | | - | 9 |
| | | | Affordable Care Act Insurance | | - | 10 |
| Indirect Benefits per Show Date | - | | Indirect Benefits per Shift | | **$ 76** | |
| Total Direct Compensation and Indirect Benefits Per Show Date | **$ 291** | | Total Direct Compensation and Indirect Benefits Per Shift | | **$ 464** | |

| | | |
|---|---|---|
| Net Change, additional earnings of an Employee Entertainer over an Independent Performer per shift | **$ 173** | |
| **Memo:** Benefit of Training, etc. | **$ 411** | 9 |

1 Source: 2016 information provided by Aloha and other internal software systems. See Table 1.
2 IPE's gross dance revenue x IPE's % of gross dance revenue (Table 1).
3 Tips equal IPE's share of dance revenue (Table 1) per interviews with key members of management.
4 Per interviews with key members of management, approximately 20% of tips received are paid out in voluntary tip outs.
5 Per interviews with key members of management and data from a survey of 39 clubs taken in February 2017.
6 Based on interviews with key members of management, Employee Entertainers converting from Independent Professional Entertainers will generate twice the amount of dance revenues.
7 See Table 2.
8 Per the Global Settlement, cost of employment (payroll tax, insurance and minimum wage) will be offset against dance revenue commissions.
9 See Table 3.
10 See Table 1.

**Table 1**
**Foundational Information**

AS 6/1/17

| State | Number of Clubs | Number of IPEs | Estimated Number of IPEs to Convert to Employee | Average Gross Dance Revenue per IPE Per Hour | Average Hours IPEs Work per Show Date | Average Gross Dance Revenue Per IPE Per Show Date | IPEs Share of Dance Revenue per Show Date | Average Show Dates per Week | Estimated Number of EEs Subject to ACA |
|---|---|---|---|---|---|---|---|---|---|
| **CA** | 10 | 2,049 | 154 | $ 56 | 5.30 | $ 297 | 55.56% | 2.82 | 6 |
| **FL** | 1 | 191 | 14 | 36 | 5.86 | 211 | 75.72% | 2.69 | 1 |
| **IL** | 1 | 64 | 5 | 36 | 7.07 | 255 | 51.44% | 4.11 | - |
| **MD** | 1 | 204 | 15 | 62 | 5.96 | 370 | 60.49% | 2.53 | 1 |
| **MI** | 3 | 374 | 28 | 42 | 6.32 | 265 | 58.70% | 2.56 | 1 |
| **OK** | 1 | 236 | 18 | 38 | 4.67 | 177 | 69.10% | 2.88 | 1 |
| **TN** | 1 | 132 | 10 | 48 | 6.10 | 293 | 64.60% | 2.74 | - |
| **Total / Weighted Average** | **18** | **3,250** | **244** | | **5.51** | **$ 283** | **58.68%** | **2.79** | **4** |
| | 1 | 1 | 2 | 3 | 3 | 3 | 3 | 3 | 4 |

**Memo** According to interviews with key members of management, Employee Entertainers will work an average of 3.5 shifts per week and each shift will be 6 hours.

1 Source: 2016 information provided by Aloha and other internal software systems. These 18 clubs selected, provides a statistical sample of the 64 clubs included in the Global Settlement. These 18 clubs use the same software and thus allows me to compare data that is similar across the clubs.

2 Based on interviews with key members of management, 5-10% of IPEs will convert to EEs as a result of the Global Settlement. For purposes of this report I have taken an average of this range as 7.5%.

3 Summary of data provided by Aloha, other internal software systems and confirmed by key members of management.

4 According to 2015 data provided from 11 clubs in Washington, Colorado and Oregon, there are 760 IPEs contracted at these clubs. Of these 760 IPEs, 28 IPEs (or 3.68%) worked over 29 hours per week.

The Affordable Care Act (ACA) requires that any employee working over 30 hours per week is considered a full time employee and will need to be offered health care coverage under the ACA guidelines.

Management has estimated that 7.5% of all IPEs globally (868 IPEs) will convert to Employee Entertainers ((244/18)*64 clubs). Per my analysis of the data provided for the 11 clubs in Washington, Colorado and Oregon, 3.68% or a grand total of 32 employees (868 * 3.68%) globally will meet the ACA coverage requirements. Due to the minimal number of employees that would meet this requirement I have determined that the cost of this coverage would be de minimis.

AS 6/1/17

**Table 2**
**Employee Entertainer**
**Projected Earned Compensation Data**

| State | 2017 Minimum Hourly Wage, Net of Employer Tip Credits | Minimum Wage per Employer Entertainer per Shift | Tips per Shift | Tip Pooling | Dance Commission per Shift | Drink Commission per Shift | Compensation per EE per Shift |
|---|---|---|---|---|---|---|---|
| **CA** | $ 10.50 | $ 63 | $ 330 | $ (50) | $ 135 | $ 18 | $ 496 |
| **FL** | 5.08 | 30 | 320 | (48) | 86 | 18 | 406 |
| **IL** | 4.95 | 30 | 262 | (39) | 87 | 18 | 358 |
| **MD** | 3.63 | 22 | 448 | (67) | 149 | 18 | 570 |
| **MI** | 3.38 | 20 | 311 | (47) | 101 | 18 | 403 |
| **OK** | 2.13 | 13 | 245 | (37) | 91 | 18 | 330 |
| **TN** | 2.13 | 13 | 379 | (57) | 114 | 18 | 467 |
| **Weighted Avg.** | **$ 7.87** | **$ 47** | **$ 329** | **$ (50)** | **$ 124** | **$ 18** | **$ 469** |
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 |

1 State hourly minimum wage, net of employer tip credits. See Table 5.

2 Each EE will work a 6 hour shift. Minimum wage is calculated as 6 hours x minimum wage, net of employee tip credits. See Table 5.

3 Per my data in Table 1 and interviews with key members of management, IPEs generate tips equal to their share of dance revenues. As an employee, it is estimated that dance revenues will double and proportionally tips will also double.
According to conversations with entertainers, tips per shift also includes payments for conversations, which are not reported through the internal software systems.

4 Tip Pooling is 15% of tips per the Global Settlement.

5 Dance commissions earned by an EE per the Global Settlement are 20% of the gross dance revenue over the cost of employment.

6 Drink commissions are based on EEs selling 1 1/2 "conversation" drinks per hour based upon interviews with key members of management. Commissions are calculated to be 20% of each $10 drink. (1.5* 6 hours worked *.2 * $10).

7 The sum of the previous five columns.

**Note** Overtime will be de minimis. Pursuant to interviews with key members of management, employee entertainers will work 3.5 hour shifts per week and each shift will be six hours (21 hours).

AS 6/1/17

**Table 3**
**Employee Entertainer**
**Indirect Benefits Data**

| State | Value of Logo Costume per Shift | Value of Shoes per Shift | Value of Licenses and Permits per Shift | FUTA, SUTA per Shift | WC and FICA per Shift | ACA Insurance and Paid Breaks | Scrip Redemptions per Shift | Total Benefit per Shift | MEMO: Value of Benefit of Training, etc., per Shift |
|---|---|---|---|---|---|---|---|---|---|
| **CA** | $ 7 | $ 2 | $ 1 | $ 35 | $ 23 | $ - | $ - | $ 68 | $ 433 |
| **FL** | 7 | 2 | 1 | 25 | 8 | - | 37 | 80 | 357 |
| **IL** | 7 | 2 | 1 | 35 | 10 | - | - | 55 | 309 |
| **MD** | 7 | 2 | 1 | 64 | 11 | - | 59 | 144 | 517 |
| **MI** | 7 | 2 | 1 | 45 | 8 | - | - | 63 | 350 |
| **OK** | 7 | 2 | 1 | 33 | 9 | - | 30 | 82 | 286 |
| **TN** | 7 | 2 | 1 | 50 | 8 | - | 48 | 116 | 423 |
| **Weighted Avg.** | **$ 7** | **$ 2** | **$ 1** | **$ 38** | **$ 18** | **$ -** | **$ 10** | **$ 76** | **$ 411** |
| | 1 | 2 | 3 | 4 | 4 | 5 | 6 | 7 | 8 |

1 All Employee Entertainers will receive two logo costumes per month per the Global Settlement. Logo costumes will cost approximately $50 each. ((50*2*12)/(3.5*52)). Values are based on interviews with key members of management.

2 All Employee Entertainers will receive a $25 shoe allowance per month per the Global Settlement. ((25*12)/(3.5*52)).

3 All Employee Entertainers will be reimbursed for all licenses renewal fees related to their employment per the Global Settlement. Licenses will cost $200 on average each year. ((200)/(3.5*52)). Values are based on interviews with key members of management.

4 All Employee Entertainers will receive the benefit of unemployment insurance coverage, workers' compensation coverage and all social security contributions as required by law based on per the Global Settlement. Values are based on information provided by Modern Bookkeeping, Inc. See Table 5.

5 This amount is de minimis.

6 Per interviews with key members of management and a questionnaire survey of 39 clubs.

7 The total benefit per shift is the sum of the seven preceding columns.

8 For the purpose of this report, I have assumed that the value of training for each Employee Entertainer would be earnings in excess of minimum wage. The benefit of training is calculated as follows: Gross Compensation from Table 2 less a six hour shift at full minimum wage.

AS 6/1/17

**Table 4**
**Employee Entertainer**
**Cost of Employment**

| Club Location | Cost of Employment | Wages | FUTA and SUTA per Shift | WC and FICA per Shift | Health Insurance per Shift | Total Cost of Employment per shift |
|---|---|---|---|---|---|---|
| **CA** | 13.47% | $ 63 | $ 30 | $ 9 | $ - | $ 102 |
| **FL** | 8.19% | 30 | 23 | 5 | - | 28 |
| **IL** | 12.89% | 30 | 30 | 5 | - | 35 |
| **MD** | 12.77% | 22 | 56 | 5 | - | 61 |
| **MI** | 12.03% | 20 | 39 | 5 | - | 44 |
| **OK** | 12.50% | 13 | 29 | 4 | - | 33 |
| **TN** | 12.12% | 13 | 44 | 4 | - | 48 |
| **Weighted Avg.** | **12.82%** | **$ 47** | **$ 33** | **$ 7** | **$ -** | **$ 80** |
| | 1 | 2 | 3 | 4 | 5 | 6 |

**Note** Cost of Employment is defined by the Global Settlement document, paragraph 3.28. Per paragraph 8.2 of this document, this calculated cost of employment will offset dance commissions paid to the EE. Cost of Employment is therefore readjusted by its impact on the reduced compensation paid to an Employee Entertainer.

1 For purposes of this report, I have calculated this cost as a percentage of various compensation paid. See Table 5.

2 See Table 2

3 Federal and State unemployment tax on total compensation. For purposes of this report, I have calculated the State unemployment tax using the highest imposed rate per state. The results are thus conservative, showing the highest cost of employment for each state.

4 Wages and reported tips in excess of required minimum wages (considered deemed tips) are subject to employer FICA matching.
The Internal Revenue Code allows for an employer to take a tax credit per IRC §45(b), equal to these matching FICA costs on reported tips in excess of deemed tips.

5 Health care, mandated sick pay and vacation pay are de minimis costs.

AS 6/1/17

**Table 5**

**Wage and Payroll Tax Data**

| State | Full Minimum Wage 2017 | Tip Credits Allowed | Minimum Wage Net Credits | Workers Comp | FUTA | SUTA | Cost of Employment |
|---|---|---|---|---|---|---|---|
| CA | 10.50 | - | 10.50 | 6.47% | 0.80% | 6.20% | 13.47% |
| CO | 9.30 | 2.92 | 6.38 | 2.00% | 0.80% | 9.57% | 12.37% |
| FL | 8.10 | 3.02 | 5.08 | 1.99% | 0.80% | 5.40% | 8.19% |
| IL | 8.25 | 3.30 | 4.95 | 3.14% | 0.80% | 8.95% | 12.89% |
| IN | 7.25 | 5.12 | 2.13 | 1.99% | 0.80% | 7.90% | 10.69% |
| KY | 7.25 | 5.12 | 2.13 | 1.65% | 0.80% | 10.00% | 12.45% |
| LA | 7.25 | 5.12 | 2.13 | 1.93% | 0.80% | 6.20% | 8.93% |
| MD | 8.75 | 5.12 | 3.63 | 1.47% | 0.80% | 10.50% | 12.77% |
| MI | 8.90 | 5.52 | 3.38 | 0.93% | 0.80% | 10.30% | 12.03% |
| MN | 9.50 | - | 9.50 | 2.58% | 0.80% | 10.81% | 14.19% |
| NV | 8.25 | - | 8.25 | 1.35% | 0.80% | 5.40% | 7.55% |
| NY | 11.00 | 3.50 | 7.50 | 1.85% | 0.80% | 8.90% | 11.55% |
| OH | 8.15 | 4.07 | 4.08 | 5.30% | 0.80% | 8.40% | 14.50% |
| OK | 7.25 | 5.12 | 2.13 | 2.50% | 0.80% | 9.20% | 12.50% |
| TN | 7.25 | 5.12 | 2.13 | 1.32% | 0.80% | 10.00% | 12.12% |
| TX | 7.25 | 5.12 | 2.13 | 1.54% | 0.80% | 7.35% | 9.69% |
| WA | 11.00 | - | 11.00 | 2.00% | 0.80% | 5.40% | 8.20% |
| | 1 | 2 | 3 | 4 | 4 | 4 | 5 |

1 Compiled from data prepared and provided by Modern Bookkeeping, Inc.
2 Tip Credit allowed.
3 Minimum Wage less Tip Credit
4 Compiled from data prepared and provided by Modern Bookkeeping, Inc.
5 Sum of Worker's Comp, FUTA and SUTA.

**Table 6**

**Information Sources**

| Source | Data Provided | Interview Date |
|---|---|---|
| Deja Vu Services, Inc. | Internal Bookkeeping Records for 2016 for multiple clubs | Various |
| Modern Bookkeeping, Inc. | Internal Bookkeeping Records for 2016 for multiple clubs | Various |
| Jim St. John | Vice President of Spearmint Rhino | Various |
| Don Krontz | Key Management - Deja Vu Organization | 3/30/2017 |
| Eric Forbes | Key Management - Deja Vu Organization | 3/30/2017 |
| Jason Mohney | Key Management - Deja Vu Organization | 3/31/2017 |
| Harry Mohney | Key Management - Deja Vu Organization | 4/3/2017 |
| Gary Marlin | Key Management - Deja Vu Organization | 3/31/2017 |
| Karen Gay | Owner - Deja VU Saginaw, LLC. Former Entertainer | 4/5/2017 |
| Questionnaire Survey of 39 Clubs | Data from Managers at 39 Clubs regarding Scrip Redemption | 5/16/2017 |
| Larry Troesch | Key Management - Deja Vu Organization | 5/30/2017 |
| Anonymous Entertainers | | Various |

Table 7

Employer Costs

| | Per Club | | Total for 64 Clubs included in the Global Settlement | |
|---|---|---|---|---|
| Direct Costs | | | | |
| Average Cost of Logo Costume per shift | $ 7 | 1 | | |
| Average Cost of Shoes per shift | 2 | 1 | | |
| Average Cost of Licenses and Permits per shift | 1 | 1 | | |
| Average Scrip Redemptions fees lost per shift | 10 | 1 | | |
| Average Cost per EE per shift | $ 20 | 2 | $ 20 | |
| Total Shifts per Week | 3.5 | 3 | 3.5 | |
| Average Number of IPEs to convert to EEs | 14 | 4 | 896 | 4 |
| Average Direct Cost | $ 980 | 5 | $ 62,720 | 6 |
| **Total Annual Direct Cost for Employer** | **$ 50,960** | 7 | **$ 3,261,440** | 8 |
| Administrative Costs | | | | |
| Human Resource Staffing Cost | $ 1,676 | 9 | $ 107,264 | 9 |
| Bi-Weekly Payroll Fees per year | 677 | 10 | 43,328 | 10 |
| W-2 Processing Fees | 59 | 11 | 3,776 | 11 |
| **Total Annual Administrative Costs of Employee Entertainers** | **$ 2,412** | | **$ 154,368** | |
| **Total Annual Employer Costs** | **$ 53,372** | 14 | **$ 3,415,808** | 15 |

1 See Table 3
2 Sum of Direct Costs. (7+2+1+10)
3 According to management, Employee Entertainers will work an average of 3.5 shifts per week.
4 Management has estimated that 7.5% of all IPEs globally will convert to Employee Entertainers (244/18) = 14 Employees *64 clubs = 896 EE.
5 Average cost per club is 20*3.5*14.
6 Average cost for the Global Settlement is 20*3.5*14*64.
7 Annual cost per club is 980*52.
8 Annual cost for the Global Settlement is 62,720*52.
9 Per Modern Bookkeeping, Inc., two additional bookkeepers would need to be hired for the additional Employee Entertainers. Each bookkeeper would work full-time, and will be paid $20/hr. Each additional employee will also receive full benefits at approximately $2,000 per month plus payroll taxes and workers comp insurance. ((20*40*26)*2)+((2,000*2)*12)+ 7.65% PR Taxes and 12.03% Cost of Employment = $107,233. Per Club $107,233/64 = $1,676.
10 Per Modern Bookkeeping, Inc., Employee Entertainers would be paid bi-weekly. Each payroll check would cost $0.93. (14*0.93*26*2) = $677 per year. The total annual cost for all 64 clubs is $677*64 = $43,328.
11 Per Modern Bookkeeping, Inc., each W-2 would cost $4.19. 14*4.19 = $59 per year. The total annual cost for all 64 clubs is $59 * 64 = $3,776.
14 Annual Total Direct Cost per Club. $50,960 + $2,412 = $53,372.
15 Annual Total Direct Cost for the Global Settlement. $3,261,440 + $154,337 = $3,415,777.

**Calculation of Additional Earnings and Benefits**
**of Becoming an Employee Entertainer per The Global Settlement**
**By State**

AS 5/23/17

**DIRECT COMPENSATION PER SHIFT/SHOW DATE**

**Current Earnings, per Show Date, for an Independent Professional Entertainer**

| State | **MEMO** Total Dance Revenues | IPE Share of Dance Revenues | Tip Income | Dance and Drink Commission | Tip Sharing | Scrip Redemption | Earnings Per Show Date | # of IPEs |
|---|---|---|---|---|---|---|---|---|
| **CA** | $ 297 | $ 165 | $ 165 | N/A | $ (33) | $ - | $ 297 | 2,049 |
| **FL** | 211 | 160 | 160 | N/A | (32) | (32) | 256 | 191 |
| **IL** | 255 | 131 | 131 | N/A | (26) | - | 236 | 64 |
| **MD** | 370 | 224 | 224 | N/A | (45) | (22) | 381 | 204 |
| **MI** | 265 | 156 | 156 | N/A | (31) | - | 281 | 374 |
| **OK** | 177 | 122 | 122 | N/A | (24) | (24) | 196 | 236 |
| **TN** | 293 | 189 | 189 | N/A | (38) | (19) | 321 | 132 |
| * **Average** | $ 283 | $ 165 | $ 165 | $ - | $ (33) | $ (6) | $ 290 | |
| | | | | | | | **Total** | 3,250 |
| | 1 | 2 | 3 | | 4 | 5 | 6 | 1 |

**Projected earnings, per Shift, of an Employer Entertainer**

| State | **MEMO** Total Dance Revenues | Minimum Wage | Tip Income | Dance and Drink Commission | Tip Pooling | Scrip Redemption | Direct Compensation Per Shift | # of IPEs to Convert to EE |
|---|---|---|---|---|---|---|---|---|
| **CA** | $ 594 | $ 63 | $ 330 | $ 51 | $ (50) | $ - | $ 394 | 154 |
| **FL** | 422 | 30 | 320 | 76 | (48) | - | 378 | 14 |
| **IL** | 510 | 30 | 262 | 70 | (39) | - | 323 | 5 |
| **MD** | 740 | 22 | 448 | 106 | (67) | - | 509 | 15 |
| **MI** | 530 | 20 | 311 | 75 | (47) | - | 359 | 28 |
| **OK** | 354 | 13 | 245 | 76 | (37) | - | 297 | 18 |
| **TN** | 586 | 13 | 379 | 84 | (57) | - | 419 | 10 |
| * **Average** | $ 566 | $ 47 | $ 329 | $ 61 | $ (50) | $ - | $ 388 | |
| | | | | | | | **Total** | 244 |
| | 7 | 8 | 8 | 9 | 10 | 11 | 6 | 12 |

**INDIRECT COMPENSATION PER SHIFT/SHOW DATE**

| State | Benefit of No Scrip Redemption Paid | Benefit of Logo Costumes and Shoes Provided | Benefit of Employer Paid Licenses | Benefit of Payroll Taxes and Workers' Compensation Insurance | Benefit of Unpaid Breaks and ACA | Indirect Benefits per shift |
|---|---|---|---|---|---|---|
| **CA** | $ - | $ 9 | $ 1 | $ 58 | $ - | $ 68 |
| **FL** | 37 | 9 | 1 | 33 | - | 80 |
| **IL** | - | 9 | 1 | 45 | - | 55 |
| **MD** | 59 | 9 | 1 | 75 | - | 144 |
| **MI** | - | 9 | 1 | 53 | - | 63 |
| **OK** | 30 | 9 | 1 | 42 | - | 82 |
| **TN** | 48 | 9 | 1 | 58 | - | 116 |
| * **Average** | $ 10 | $ 9 | $ 1 | $ 56 | $ - | $ 76 |
| | 13 | 13 | 13 | 13 | 13 | 6 |

* Averages are weighted and calculated based on number of entertainers per club from the 18 clubs. See Table 1.
1 Source: 2016 information provided by Aloha and other internal software systems.
2 IPE's gross dance revenue x IPE's % of gross dance revenue (Table 1).
3 Tips equal IPE's share of dance revenue (Table 1) per interviews with key members of management.
4 Per interviews with key members of management, 20% of tips received will be paid out.
5 Per interviews with key members of management and data from a survey of 39 clubs taken in February 2017.
6 This is a sum of the five preceding columns.
7 Based on interviews with key members of management, Employee Entertainers converting to Independent Professional Entertainers will generate twice the amount of dance revenues.
8 See Table 2
9 Dance and Drink Commission (Table 2) less the cost of employment (Table 4).
10 See Table 2
11 See Table 3
12 See Table 1
13 See Table 3

# EXHIBIT 4

ShindelRock
28100 Cabot Drive
Suite 102 • Novi, MI 48377
t 248.855.8833
f 248.855.4192
shindelrock.com

July 15, 2021

**Memorandum**
From – ShindelRock
To – Doug Melton and Shane Cahill
RE – Jane Roes 1-4 vs. Deja Vu Services, Inc. et al.
Jane Roe vs. SFBSC Management, LLC et al.

Overview:

We were asked to undertake an analysis of certain aspects of a settlement reached in two cases: *Jane Roes 1-4 vs. Deja Vu Services, Inc. et al* and *Jane Roe vs. SFBSC Management, LLC, et al.* (collectively Roes 2). This analysis, comprising of this Memorandum and the attached summary and tables, estimates the value to the entertainers of the portion of the settlement agreement that requires all Independent Professional Entertainers (IPE's) then performing at the Clubs subject to the settlement to convert to Employee Entertainers (EE) under the employment terms laid out in the settlement.

As set out in the attached Summary of Analysis, we have estimated the value of commissions and other "enhanced" benefits of employment that EEs will receive as part of the settlement agreement, and enhanced benefits over those that are required by law for employees. We also analyzed the additional income and benefits an EE will receive on an annual basis over what she would have received as an IPE.

For the annual commissions and benefits paid to Employee Entertainers, we estimated the per shift value of the "enhanced" benefits of employment set forth in the settlement. Using an estimated number of shifts per year, we determined an estimated annual value of these commissions and benefits. We then calculated the overall value to the Entertainers based on the anticipated number of IPEs who would be performing as EEs as laid out in the settlement. As a result of the impact of a previous settlement, *Jane Does 1-2 v Deja Vu Services, Inc. et al.* (Limited National Settlement), we adjusted for the value of the benefits assigned in that settlement, so we did not "double count" the value of certain aspects of this settlement.

In order to calculate the additional income and benefits an EE will receive after conversion, we estimated first the legally required benefits of employment. We then estimated the value of the "enhanced" benefits of employment set forth in the settlement. We then combined these two together to come up with the total estimate of the value to the Entertainers of their conversion to employees in accordance with the terms of the settlement. As previously noted, we adjusted for the value of the benefits to EEs assigned in the Limited National Settlement, so here we did not "double count" the value of certain aspects of that settlement. In addition, we have calculated our values for the enhanced terms of employment net of the commissions IPEs were receiving prior to the conversion to EE's. Our calculated values represent the net additional value of the settlement to the EEs.

Our analysis is explained in detail in the Declaration that has been prepared for this litigation.

Data Upon Which the Declaration is Based

The Declaration is based upon the information provided on the attached documents.

a) **Summary of Analysis**

b) **Table 1**: Summary of Increased Earnings and Benefits

c) **Table 2**: Value to Employee Entertainers Associated with Prior Settlement

d) **Table 3**: Value of Legal Benefits of Employment

e) **Table 4**: Value of Enhanced Terms of Employment

f) **Table 5**: Supporting Details and Calculations

g) **Table 6**: Summary of Actual Data: 2017 Actual Data of Independent Professional Entertainers

h) **Table 7**: Summary of Actual Data: 2019 Actual Data of Employee Entertainers

i) **Table 8**: Club Defendants and Number of Entertainers

j) **Table 9**: Assumptions and Considerations

SUMMARY OF ANALYSIS

Commissions and Other Enhanced Benefits of Employment for Employee Entertainers

| | San Francisco | | Los Angeles | | Other California Clubs | |
|---|---|---|---|---|---|---|
| Commissions Paid | $ 93.14 | Table 4 | $ 135.01 | Table 4 | $ 137.86 | Table 4 |
| Other Enhanced Benefits | 13.12 | Table 4 | 32.81 | Table 4 | 32.81 | Table 4 |
| Per Shift Commissions and Other Enhanced Benefits | $ 106.26 | | $ 167.82 | | $ 170.67 | |
| (Shifts per Year) | 45.69 | Table 7 | 45.69 | Table 7 | 45.69 | Table 7 |
| Annual Commissions and Other Enhanced Benefits per Employee | $ 4,855 | | $ 7,668 | | $ 7,798 | |
| Number of Entertainers in Settlement | 1,335 | Table 8 | 134 | Table 8 | 1,202 | Table 8 |
| Annual Commissions and Other Enhanced Benefits for all Entertainers in Settlement | $ 6,481,425 | | $ 1,027,512 | | $ 9,373,196 | |
| **Total Commissions and Other Enhanced Benefits** | | | **$16,882,133** | | | |
| Control for Benefits as part of Limited National Settlement | | | (4,408,040) | Table 2 | | |
| **Net Annual Commissions and Other Enhanced Benefits for Employee Entertainers** | | | **$ 12,474,093** | | | |

Additional Income and Benefits Earned by Employee Entertainers

| | San Francisco | | Los Angeles | | Other California Clubs | |
|---|---|---|---|---|---|---|
| Additional Income and Benefits Received as Employee Entertainer | $ 46.45 | Table 1 | $ 91.56 | Table 1 | $ 88.02 | Table 1 |
| (Shifts per Year) | 45.69 | Table 7 | 45.69 | Table 7 | 45.69 | Table 7 |
| Annual Increase per Employee | $ 2,122 | | $ 4,183 | | $ 4,022 | |
| Number of Entertainers in Settlement | 1,335 | Table 8 | 134 | Table 8 | 1,202 | Table 8 |
| Annual Increase for all Entertainers in Settlement | $ 2,833,271 | | $ 560,572 | | $ 4,834,004 | |
| **Total Additional Income and Benefits as Employee Entertainers** | | | **$ 8,227,847** | | | |
| Control for Benefits as part of Limited National Settlement | | | (4,408,040) | Table 2 | | |
| **Net Additional Annual Earnings for Employee Entertainers** | | | **$ 3,819,807** | | | |

TABLE 1: Summary of Increased Earnings and Benefits

| | San Francisco | | | | |
|---|---|---|---|---|---|
| | As An IPE | | As An Employee | | Variance |
| Minimum Wage | $ - | | $ 74.52 | Table 3 | $ 74.52 |
| Economic Value of Required Benefits | - | | 47.49 | Table 3 | 47.49 |
| Commissions Paid | 181.82 | Table 6 | 93.14 | Table 4 | (88.68) |
| Other Enhanced Benefits | - | | 13.12 | Table 4 | 13.12 |
| Total Per Shift Income and Benefits | $ 181.82 | | $ 228.27 | | **$ 46.45** |
| | | | | | To Summary |

| | Los Angeles | | | | |
|---|---|---|---|---|---|
| | As An IPE | | As An Employee | | Variance |
| Minimum Wage | $ - | | $ 68.12 | Table 3 | $ 68.12 |
| Economic Value of Required Benefits | - | | 37.44 | Table 3 | 37.44 |
| Commissions Paid | 181.82 | Table 6 | 135.01 | Table 4 | (46.81) |
| Other Enhanced Benefits | - | | 32.81 | Table 4 | 32.81 |
| Total Per Shift Income and Benefits | $ 181.82 | | $ 273.38 | | **$ 91.56** |
| | | | | | To Summary |

| | Other California Clubs | | | | |
|---|---|---|---|---|---|
| | As An IPE | | As An Employee | | Variance |
| Minimum Wage | $ - | | $ 62.14 | Table 3 | $ 62.14 |
| Economic Value of Required Benefits | - | | 37.03 | Table 3 | 37.03 |
| Commissions Paid | 181.82 | Table 6 | 137.86 | Table 4 | (43.96) |
| Other Enhanced Benefits | - | | 32.81 | Table 4 | 32.81 |
| Total Per Shift Income and Benefits | $ 181.82 | | $ 269.84 | | **$ 88.02** |
| | | | | | To Summary |

TABLE 2: Value to Employee Entertainers Associated with Prior Settlement

| Limited National Settlement | | | Per D. Shindel Memo dated 6.1.17 |
|---|---|---|---|
| Increase in earnings of an Employee Entertainer vs an Independent Professional Entertainer, per shift | $ | 173 | |
| Independent Professional Entertainers to convert to Employee Entertainers, per club | | 14 | |
| CA Clubs - subject to Limited National Settlement | | 10 | |
| Annual Income increase for employee entertainers per club, per shift | $ | 24,220 | **(173 x 14 x 10)** |
| Employee Entertainer shifts, per year | | 182 | 3.5 shifts per week 52 weeks per year |
| **Total Additional Employee Entertainer Earnings Calculated for ten California Clubs** | **$** | **4,408,040** | **To Summary** |

TABLE 3: Value of Legal Benefits of Employment

| Applicable Data (Avg.) | | | |
|---|---|---|---|
| Gross Dance Fees Generated per Shift | $ | 382.84 | *Table 5* |
| Hours Per Shift | | 4.78 | *Table 5* |
| Shifts Per Year | | 45.69 | *Table 5* |
| Hours Per Year | | 218.40 | *Table 5* |
| Shifts Per Month | | 3.81 | *Table 5* |

| | San Francisco Settlement | Limited National Settlement | | |
|---|---|---|---|---|
| | ***San Francisco*** | ***Los Angeles*** | ***Other California Clubs*** | |
| Basic Employment Guarantees | | | | |
| CA and Local Minimum Wages | *$15.59 per Hour* | *$14.25 per Hour* | *$13.00 per Hour* | |
| *Estimated Wages per Year* | *$ 3,404.83* | *$ 3,112.17* | *$ 2,839.18* | *Min Wage * Hours per year* |
| *Estimated Tips per year* | - | - | - | |
| *Estimated Earnings per year* | *$ 3,404.83* | *$ 3,112.17* | *$ 2,839.18* | |
| | *Per Shift Analysis* | | | |
| **Minimum Wage per Shift** | **$ 74.52** | **$ 68.12** | **$ 62.14** | *Min Wage * Hours per shift to Table 1* |
| Commissions per Shift | 93.14 | 135.01 | 137.86 | *Table 4 - Used for Payroll Benefit Calculation Only* |
| Estimated Tips | - | - | - | *Table 9* |
| Earnings Per Shift (EPS) | $ 167.66 | $ 203.13 | $ 200.00 | |
| Economic Value of Required Benefits Per Shift | | | | |
| Payroll Taxes | | | | |
| FICA | | | | *EPS * 6.2% (Cap at $137,700 Wages)* |
| FICA - Wages | $ 4.62 | $ 4.22 | $ 3.85 | |
| FICA - Commissions | 5.77 | 8.37 | 8.55 | |
| FICA - Tips | - | - | - | |
| Medicare | 2.43 | 2.95 | 2.90 | *EPS * 1.45% (No Wage Cap)* |
| FUTA | 1.23 | 1.23 | 1.23 | *EPS * 0.8% (Cap at $7,000 Wages) (56 / 217.48) * 4.76* |
| State Disability Insurance | 1.68 | 2.03 | 2.00 | *EPS * 6.2% (Cap at $122,909 Wages)* |
| State Unemployment Insurance | 9.50 | 9.50 | 9.50 | *EPS * 6.2% (Cap at $7,000 Wages) (434 / 217.48) * 4.76* |
| Employee Training Tax | - | - | - | *The Clubs are not within the target industry - no benefit to Employee Entertainer (EE)* |
| California Workers Comp | 7.54 | 9.14 | 9.00 | *EPS * 4.5% (No Wage Cap)* |
| Other Benefits | | | | |
| Paid Sick Leave Ordinance all CA Clubs *1 hr. of pay for every 30 hours worked* | - | - | - | *Must work for over 90 days to be eligible for this benefit, see assumption 14.* |
| Health Care Security Ordinance SF *$3.08 per hour worked* | 14.72 | - | - | *Health Insurance must be offered at least $3.08 per hour worked ( 3.08 * 4.76)* |
| SF Commuter Benefits Ordinance *must offer* | - | - | - | *Offered but no employees are currently taking this benefit* |
| **Economic Value of Required Benefits per shift** | **$ 47.49** | **$ 37.44** | **$ 37.03** | *To Table 1* |

TABLE 4: Value of Enhanced Terms of Employment

| Applicable Data (Avg.) | | | |
|---|---|---|---|
| Gross Dance Fees Generated per Shift | $ | 382.84 | *Table 5* |
| Hours Per Shift | | 4.78 | *Table 5* |
| Shifts Per Year | | 45.69 | *Table 5* |
| Hours Per Year | | 218.40 | *Table 5* |
| Shifts Per Month | | 3.81 | *Table 5* |

| | San Francisco Settlement | Limited National Settlement | | |
|---|---|---|---|---|
| | ***San Francisco*** | ***Los Angeles*** | **Other California Clubs** | |
| | *Per Shift Analysis* | | | |
| Enhanced Terms of Employment | | | | |
| Commissions - Dances | | | | |
| 40% of Dance Fees over $150 | $ 93.14 | $ - | $ - | *Table 5* |
| 40% of Dance Fees over Cost of Employment | - | 120.67 | 123.52 | *Table 5* |
| Commissions - Drinks | | | | |
| 20% Ladies Drinks | | | | |
| Assumes 1.5 drinks per hour $10 per drink - non-alcoholic drink | - | 14.34 | 14.34 | *Table 5* |
| **Total Commissions Paid to Employees** | **$ 93.14** | **$ 135.01** | **$ 137.86** | *To Table 1* |
| License Renewal Fees | - | - | - | *Table 5* |
| Logo Costumes | 13.12 | 26.25 | 26.25 | *Table 5* |
| Shoe Allowance | - | 6.56 | 6.56 | *Table 5* |
| **Enhanced Benefits to Employees** | **$ 13.12** | **$ 32.81** | **$ 32.81** | *To Table 1* |

TABLE 5: Supporting Details and Calculations

| California Cost of Employment | | Per Management and CA Labor Laws | |
|---|---|---|---|
| CA UIA (SUTA) | 6.20% | Capped at $7,000 of wages | |
| CA WC | 4.50% | Paid on wages and commissions no cap for the industry | |
| Federal Unemployment (FUTA) | 0.80% | Capped at $7,000 of wages | |
| FICA | 6.20% | Capped on $137,700 of wages | |
| Medicare (MC) | 1.45% | No cap | |
| For this analysis we assumed no wage caps, not calculated on tips per assumptions | | | |

| Minimum Wage | | Per minimum wage laws | *The applicable rate as of 2/1/2020* |
|---|---|---|---|
| California - 2020 | $ 13.00 | Large Employer Minimum Wage 2020 | |
| Los Angeles - 2020 | 14.25 | Used between 7/1/19 - 6/30/20 | |
| San Francisco - 2020 | 15.59 | Used 7/1/19 Effective Rate | |

| Sample Clubs Per Management's Report | | | |
|---|---|---|---|
| Avg. Dance Fee Revenue Per Shift | $ 382.84 | | ***Table 7*** |
| Avg. Hour Per Shift | 4.78 | (116,166.83 hrs. / 24,400 shifts) | ***Table 7*** |
| Avg. Shifts Per Year | 45.69 | (24,400 shifts / 534 Entertainers) | ***Table 7*** |
| Avg. Hours per EE per Year | 218.40 | (4.76 * 45.69) | ***Table 7*** |
| Avg. Shifts Per Month | 3.81 | (45.69 / 12 months) | ***Table 7*** |

| San Francisco Settlement Structure | | | |
|---|---|---|---|
| Commissions | 40% | Commission over $150 | (382.84 - 150) *.40 = $93.14 |
| Logo Costumes - Per Shift | $ 13.12 | One per month Approx. $50 value | (50/3.81) |

TABLE 5: Supporting Details and Calculations

| | | | |
|---|---|---|---|
| Cost of Employment Analysis | | | |
| Tips - Per Shift | $ - | No tips are included in this analysis to be conservative. | |
| Commissions | | | |
| Dance | 40% | Over Cost of Employment | ( 382.84 - COE) *.40 |
| Drinks | 20% | 1.5 conversation drinks per hour $10 Drinks | (1.5*4.78*10) * .2 = 14.34 |
| Logo Costumes - Per Shift | $ 26.25 | Two per month Approx. $50 value | (100/3.81) |
| Shoes - Per Shift | 6.56 | $25 allowance per month | ( $25 /3.81) |
| Licenses - Per Shift | - | $500 annual for San Diego, $80 annual for Lemon Grove and Bakersfield Only 3 clubs out of settlement have licenses, pass on allocating benefit at this time | |
| Cost of Employment - Per Shift | | | |
| California | | | |
| Wages | | | |
| California | $ 62.14 | | (4.78 * 13) |
| Los Angeles | 68.12 | | (4.78* 14.25) |
| FUTA | | | |
| California | 0.50 | | (62.14 * 0.8%) |
| Los Angeles | 0.54 | | (68.12 * 0.8%) |
| SUTA | | | |
| California | 3.85 | | (62.14 * 6.2%) |
| Los Angeles | 4.22 | | (68.12 * 6.2%) |
| WC/FICA/MC | | | |
| California | 7.55 | | (62.14 * (4.5 + 6.2 + 1.45%) |
| Los Angeles | 8.28 | | (68.12 * (4.5 + 6.2 + 1.45%) |
| Total Cost of Employment Per Shift | | | |
| California | $ 74.04 | Total Cost of Employment (COE) CA | (382.84 - 74.04) * .4 = 123.52 |
| Los Angeles | 81.16 | Total Cost of Employment (COE) L.A. | (382.84 - 81.16) * .4 = 120.67 |

TABLE 6: Summary of Actual Data
2017 Actual Data of Independent Professional Entertainers

Showgirls of San Diego (SD)
1/1/17 - 1/1/18

| | |
|---|---|
| Number of Performance Days | 8,214 |
| Number of Hrs. Performed | 42,634.41 |
| Number of Entertainers | 129.00 |
| Gross Dance Revenues | $ 2,054,321 |
| Commissions Paid | $ 1,408,418 |

Deja Vu Showgirls North Hollywood (NH) Coldwater
1/1/17 - 1/1/18

| | |
|---|---|
| Number of Performance Days | 12,575 |
| Number of Hrs. Performed | 66,723.46 |
| Number of Entertainers | 260.00 |
| Gross Dance Revenues | $ 4,702,030 |
| Commissions Paid | $ 2,729,921 |

BT California, LLC (PH)
1/1/17 - 1/1/18

| | |
|---|---|
| Number of Performance Days | 7,711 |
| Number of Hrs. Performed | 37,675.05 |
| Number of Entertainers | 366.00 |
| Gross Dance Revenues | $ 1,663,820 |
| Commissions Paid | $ 1,138,940 |

Deja Vu San Francisco, LLC (CF)
1/1/17 - 1/1/18

| | |
|---|---|
| Number of Performance Days | 7,982 |
| Number of Hrs. Performed | 43,189.96 |
| Number of Entertainers | 212.00 |
| Gross Dance Revenues | $ 2,356,450 |
| Commissions Paid | $ 1,355,929 |

Sum of Four California Clubs Reports
1/1/17 - 1/1/18

| | | |
|---|---|---|
| Number of Performance Days | A | 36,482 |
| Number of Hrs. Performed | B | 190,222.88 |
| Number of Entertainers | C | 967.00 |
| Gross Dance Revenues | D | $ 10,776,621 |
| Commissions Paid | E | $ 6,633,208 |

| | | | |
|---|---|---|---|
| Gross Revenue per Entertainer | =D/C | $ 11,144.39 | |
| Commissions per Entertainer per year | =E/C | $ 6,859.57 | |
| Commission per shift | To Table 1 | 181.81 | (6,859.57 / 37.73) |
| Average Daily Sales per Shift per Entertainer | =D/A | $ 295.40 | |
| Average Hours per Shift per Entertainer | =A/B | 5.21 | |
| Average Annual Shifts per Entertainer | =A/C | 37.73 | |
| Average Annual Hours per Entertainer | | 196.57 | |
| Average Shifts Per Month per Entertainer | | 3.14 | |

TABLE 7: Summary of Actual Data
2019 Actual Data of Employee Entertainers

Showgirls of San Diego (SD)
1/1/19 - 12/31/19

| | |
|---|---|
| Number of Performance Days | 5,978 |
| Number of Hrs. Performed | 26,184.73 |
| Number of Entertainers | 82 |
| Gross Dance Revenues | $ 1,883,010 |

Deja Vu Showgirls North Hollywood (NH) Coldwater
1/1/19 - 12/31/19

| | |
|---|---|
| Number of Performance Days | 8,327 |
| Number of Hrs. Performed | 39,449.67 |
| Number of Entertainers | 189 |
| Gross Dance Revenues | $ 3,421,516 |

BT California, LLC (PH)
1/1/19 - 12/31/19

| | |
|---|---|
| Number of Performance Days | 5,050 |
| Number of Hrs. Performed | 24,821.21 |
| Number of Entertainers | 140 |
| Gross Dance Revenues | $ 1,565,875 |

Deja Vu San Francisco, LLC (CF)
1/1/19 - 12/31/19

| | |
|---|---|
| Number of Performance Days | 5,045 |
| Number of Hrs. Performed | 26,231.07 |
| Number of Entertainers | 123 |
| Gross Dance Revenues | $ 2,470,985 |

Sum of Four California Clubs Reports
1/1/19 - 12/31/19

| | | |
|---|---|---|
| Number of Performance Days | A | 24,400 |
| Number of Hrs. Performed | B | 116,686.68 |
| Number of Entertainers | C | 534 |
| Gross Dance Revenues | D | $ 9,341,386 |

| | | 2019 | |
|---|---|---|---|
| Average Daily Sales per Shift per Entertainer | =D/A | $ 382.84 | **To Table 5** |
| Average Hours per Shift per Entertainer | =B/A | 4.78 | **To Table 5** |
| Average Annual Shifts per Entertainer | =A/C | 45.69 | **To Table 5** |
| Average Annual Hours per Entertainer | | 218.40 | **To Table 5** |
| Average Shifts Per Month per Entertainer | | 3.81 | **To Table 5** |

TABLE 8: Club Defendants and Number of Entertainers

| Club Location | Average EEs in the club during 2019 | Average IPEs in the clubs during 2017 | |
|---|---|---|---|
| SF | 1,335 | 2,250 | *See Summary* |
| LA | 134 | 225 | *See Summary* |
| CA | 1,202 | 2,025 | *See Summary* |
| **Grand Total** | **2,670** | **4,500** | |

| NAME | LEGAL NAME | CITY | Club Location | Average Number of EE's during 2019 | Average Number of IPEs during 2017 |
|---|---|---|---|---|---|
| Centerfolds | Deja Vu - San Francisco, LLC | San Francisco | SF | **133.50** | **225.00** |
| Condor Club | Saw Entertainment, Ltd | San Francisco | SF | **133.50** | **225.00** |
| Garden Of Eden | San Francisco - Garden Of Eden, LLC | San Francisco | SF | **133.50** | **225.00** |
| Gold Club | Gold Club - S.F., LLC | San Francisco | SF | **133.50** | **225.00** |
| Hungry I | Chowder House, Inc | San Francisco | SF | **133.50** | **225.00** |
| Hustler Club | SAW Entertainment, Ltd | San Francisco | SF | **133.50** | **225.00** |
| Little Darlings | Deja Vu Showgirls of San Francisco, LLC | San Francisco | SF | **133.50** | **225.00** |
| New Century Theater | Bijou Century, LLC | San Francisco | SF | **133.50** | **225.00** |
| Penthouse Club | B.T. California, LLC | San Francisco | SF | **133.50** | **225.00** |
| Roaring 20'S | San Francisco - Roaring 20'S, LLC | San Francisco | SF | **133.50** | **225.00** |
| Showgirls - Main St. | DV of LA, LLC | Los Angeles | LA | **133.50** | **225.00** |
| Little Darlings - Lemon Grove | Nite Life East, LLC | Lemon Grove | CA | **133.50** | **225.00** |
| Showgirls - Bakersfield | Grapevine Entertainment, Inc. | Bakersfield | CA | **133.50** | **225.00** |
| Showgirls - City Of Industry | Cathay Entertainment, Inc. | City Of Industry | CA | **133.50** | **225.00** |
| Showgirls - North Hollywood | Coldwater, LLC | North Hollywood | CA | **133.50** | **225.00** |
| Showgirls - Stockton | Stockton Enterprises, LLC | Stockton | CA | **133.50** | **225.00** |
| Showgirls - San Diego (Midway) | Showgirls Of San Diego, Inc. | San Diego | CA | **133.50** | **225.00** |
| Showgirls - Hollywood | Hollywood And Vine Club, LLC | Hollywood | CA | **133.50** | **225.00** |
| Showgirls - Torrance | EF5 Acquisitions Group, LLC | Torrance | CA | **133.50** | **225.00** |
| Showgirls - Sacramento | Deja Vu Showgirls - Sacramento, LLC | Rancho Cordova | CA | **133.50** | **225.00** |

| Club Location | |
|---|---|
| SF | San Francisco - Subject to San Francisco Wage Ordinances |
| LA | Los Angeles - Subject to Limited National Settlement and Los Angeles Wage Ordinances |
| CA | All remaining California Clubs - Subject to Limited National Settlement and California Wage |

Notes:
Per management, IPE numbers were greater than the new EE counts. To account for the decrease in Entertainers, we are using an average of four clubs in California that had EEs during 2019. The average number of EEs for the class is 133.5 EEs (Coldwater (189 EEs), San Diego (82 EEs), Penthouse (140 EEs) and Centerfold (123 EEs))

Per Management the IPEs that received 1099s during 2017 were, Deja Vu - San Francisco, LLC - 184 1099s Issued, B.T.California, LLC - 318 1099s Issued, Showgirls of San Diego, Inc - 133 1099s Issued and Coldwater, LLC - 265 1099s Issued for a total of 900 IPEs that worked during 2017 or an average of 225 1099s per club.

Table 9: Assumptions and Considerations

Our analysis and report are based on the following assumptions and facts.

1. Based upon information provided by management, the assumption is that if a defendant club closes or no longer has live entertainment, the EE's working at that club will migrate to work at one of the other defendant locations, thereby maintaining the level of EE in the defendant group as a whole. This management assumption is based on the fact that the Deja Vu brand is widely known to entertainers and if the club they are working at closes, they tend to migrate to other related clubs instead of seeking to perform or work at competitor establishments.

2. The assumption is that the 'cost of benefits' will be equivalent to the value of the benefits that the EE will receive in the future. As such, we have ascribed the value of non-wage benefits as being equivalent to the costs paid by the Defendants.

3. Based upon information provided by management, no EE's will work over eight hours in a day or over 40 hours in a week, therefore there will be no overtime paid to EE's.

4. For this analysis, management has advised that any EE's working between five and six hours will waive the optional paid 30-minute break.

5. We are assuming that, if any training is provided, it will not materially impact gross revenue.

6. Minimum wage is calculated at 2/1/2020 rates and it has not been adjusted for any subsequent rate changes.

7. For purposes of this analysis, we have assumed that EE's will not receive any tips, in order to ensure that our projections are conservative. If tips were considered for this analysis, there would be additional non-wage benefits to the EE's including, but not limited to, Social Security matching, Medicare matching, worker's compensation insurance, etc.

8. Entertainer licenses and annual renewal fees are covered by the settlement, when applicable. There are three clubs subject to the settlement that are governed by local entertainer licensing ordinances. The value of this benefit is de minimis and therefore not included in our analysis.

9. According to the Roes 2 settlement, the per shift commissions for EEs working in the San Francisco clubs will be calculated at 40% over $150 of dance revenue generated. For all other clubs, per shift commissions will be calculated at 40% of gross dance revenue over the cost of employment. Non-San Francisco clubs also provide drink commissions 20% per $10 conversation drinks. (Cost of employment is outlined on Table 5)

10. Our calculations assume that no EE's will exceed the wage caps for FICA or State Disability Insurance.

11. Calculation of payroll taxes assume income reaching the wage caps for FUTA and SUTA.

Table 9: Assumptions and Considerations

12. Our analysis is based on data from four 'average' clubs subject to the settlement. Two clubs are within San Francisco and two clubs are from the greater California area. This analysis is based on an average of all four clubs using the information regarding performance days, performance hours, number of EE's and gross dance revenue at each of the 'average' clubs from 2019, see Table 7.

13. We have calculated the data within this memo using the 2019 EE data for the four sample clubs, we have determined that an average of 133.5 entertainers worked at each club during the year.

14. EEs will need to work over 90 days in order to qualify for statutory sick days under California and Los Angeles Paid Sick Leave Ordinances. For both the State and City ordinances, an employee would only qualify for the Paid Sick Leave, 1 hour of paid time off for every 30 hours of work, after working with the Company for 90 days. Due to the fact that there is typically high turnover in the industry and the average EE will be working for 45.69 shifts, we have determined that the impact will be immaterial on the average EEs earnings.

# EXHIBIT C

Douglas J. Melton, Bar No. 161353
Shane M. Cahill, Bar No. 227972
LONG & LEVIT LLP
465 California Street, 5th Floor
San Francisco, California 94104
Telephone: (415) 397-2222
Facsimile: (415) 397-6392
Email: dmelton@longlevit.com
scahill@longlevit.com

Attorneys for San Francisco Defendants

[Additional Counsel Listed on Signature Page]

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE ROE, et al.<br><br>Plaintiffs,<br><br>v.<br><br>SFBSC MANAGEMENT, LLC, et al.,<br><br>Defendants. | Civil Case No. 14-cv-03616-LB<br><br>Related Cases: 16-cv-03371-LB<br>17-cv-00138-LB<br>17-cv-05288-LB<br>17-cv-06971-LB<br>19-cv-03960-LB<br><br>**DECLARATION OF GARY MARLIN RE PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL**<br><br>The Honorable Laurel Beeler<br><br>Date: ****, 2021<br>Time: **** a.m. |

I, Gary Marlin, declare:

1. I have personal knowledge of all facts stated in this declaration and, if called to testify as a witness, I could and would competently testify thereto.

2. From approximately 2004 to June 2013 I was the President of SFBSC Management, LLC ("SFBSC"). Since June 2013 I have worked with SFBSC as an outside consultant.

3. SFBSC is a management consulting firm for nightclubs. Since at least 2004, SFBSC has provided consulting and administrative services to Larry Flynt's Hustler Club ("Hustler"), Hungry I (which is no longer in business), Centerfolds, Roaring 20's (which is no longer in business), Garden of Eden, Little Darlings (which is no longer in business), Gold Club, Market Street Cinema (which is no longer in business), New Century Theater, Showgirls, and Condor Gentlemen's Club (collectively, "the San Francisco Nightclubs"). These services include marketing and advertising, human resources support, payroll coordination, and contract review and administration.

4. In my capacities first as SFBSC's President and now as an outside consultant, I became (and I am) generally knowledgeable about the operations, policies, and practices of the San Francisco Nightclubs. I am also familiar with the record keeping practices of the San Francisco Nightclubs and I have access to the San Francisco Nightclubs' records. I also have access to information about the San Francisco Nightclubs' sales and revenue and I have access to, and regularly review, sales and revenue data and information for the San Francisco Nightclubs.

5. Because of the COVID-19 pandemic, the San Francisco Nightclubs were required to close as of March 16, 2020, and generated no operating revenues for over a year. Three of the defendant nightclubs—Hungry I, Little Darlings, and Roaring 20's—permanently closed as a result of the pandemic. While closed, the San Francisco Nightclubs diligently pursued strategies to cut expenses. While the San Francisco Nightclubs were able to secure PPP loans, they must repay substantial portions of those loans. Moreover, the San Francisco Nightclubs were unable to secure relief under the CARES Act due to regulations purporting to bar businesses that derive revenue from entertainment of a "prurient sexual nature" from accessing to such assistance. See,

*Deja Vu-San Francisco LLC v. United States Small Bus. Admin.*, No. 20-CV-03982-LB, 2020 WL 6260010, at *7 (N.D. Cal. Sept. 11, 2020). As such, the San Francisco Nightclubs went into "hibernation" mode to preserve resources to cover essential expenses in the hope of enduring the pandemic and emerging as viable businesses when reopening was permitted.

6. While the San Francisco Nightclubs that survived the pandemic were permitted to partially reopen beginning in the Summer of 2021, business has remained slow. The San Francisco Nightclubs are operating at substantially reduced sales level than they were pre-COVID. Moreover, due to the Delta and Omicron variants the continued operations of the San Francisco Nightclubs is far from assured going forward. The pandemic is in charge. Simply put, while the San Francisco Nightclubs that survived the pandemic thus far have reopened, they are operating on truncated schedules with less-than-full staffing and are generating far less in revenues then pre-COVID. It is unclear when, if ever, business operations will be re-vitalized.

I declare under penalty of perjury of the laws of the State of California and the United States of America that the foregoing is true and correct and that this declaration was signed at San Francisco, California, on 1/12/2022 | 3:44 PM PST.

DocuSigned by:
Gary Marlin
5FC2C492E3F8412...

GARY MARLIN

# EXHIBIT D

Tammara N. Bokmuller (SBN 192200)
Tammy.Bokmuller@bowmanandbrooke.com
BOWMAN AND BROOKE LLP
750 B Street. Suite 2200
San Diego, CA 92101
Telephone: (619) 376-2500
Facsimile: (619) 376-2501

Attorneys for Defendants Déjà Vu Services, Inc., Harry Mohney, Grapevine Entertainment, Inc. d/b/a Déjà Vu Showgirls; Nite Life East, LLC d/b/a Little Darlings; Coldwater, LLC d/b/a Deja Vu Showgirls; 3610 Barnett Ave., LLC d/b/a Adult Superstore; Jolar Cinema of San Diego, Ltd. d/b/a Jolar Cinema Showgirls; Showgirls of San Diego, Inc. d/b/a Deja Vu Showgirls; Stockton Enterprises, LLC d/b/a Deja Vu Showgirls; and Cathay Entertainment, Inc.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JANE ROES 1-4,<br>Plaintiffs, and<br><br>ELANA PERA, PENNY NUNEZ, SARAH MURPHY, POOHRAWN MEHRABAN, NICOLE HUGHES, ANGELYNN HERMES, GYPSY VIDAL, AND RASHELE HAMREN,<br><br>Plaintiff- Intervenors,<br><br>v.<br>DEJA VU SERVICES, INC,<br><br>Defendants. | Case No. 3:19-cv-03960-LB<br><br>(San Diego Superior Court Case No: 37-2018-28044-CU-OE-CTL)<br><br>Related Cases: 14-cv-03616-LB<br>16-cv-03371-LB<br>17-cv-00138-LB<br>17-cv-05288-LB<br>17-cv-06971-LB<br><br>**DECLARATION OF RYAN CARLSON RE PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL**<br><br>Date:<br>Time:<br><br>Assigned to: Hon. Laurel Beeler |

I, Ryan Carlson, declare:

1. I have personal knowledge of all facts stated in this declaration and, if called to testify as a witness, I could and would competently testify thereto.

2. From approximately 2017 to the Present, I have been the Director of Operations ("DOO") or Chief Executive Officer ("CEO") for Deja Vu Services, Inc. ("Deja Vu"). Deja Vu is a management consulting firm for nightclubs. Since at least 2018, Deja Vu has provided consulting and administrative services to, among other entities, 3610 Barnett Ave, LLC; Cathay Entertainment, Inc.; Coldwater, LLC; Deja Vu Showgirls – Sacramento, LLC; DV of LA, LLC; EF5 Acquisitions Group, LLC; Grapevine Entertainment, Inc.; Hollywood & Vine Club, LLC; Jolar Cinema of San Diego, Ltd.; Nite Life East, LLC; Showgirls of San Diego, Inc.; and Stockton Enterprises, LLC (collectively, the "Greater California Clubs"). These services include, among other things, marketing and advertising, human resources support, payroll coordination, and contract review and administration.

3. In my capacity as Deja Vu's DOO or CEO, I became (and am) generally knowledgeable about the operations, policies, and practices of the Greater California Clubs. I am also familiar with the record keeping practices of the Greater California Clubs and I have access to the Greater California Clubs' records. I also have access to information about the Greater California Clubs' sales and revenue and have access to, and regularly review, sales and revenue data and information for the Greater California Clubs.

4. As a result of the Federal, State, and local governments' response to the COVID-19 Pandemic, the Greater California Clubs were required to close for extended periods of time and generated no operating revenues for their Individual Closure Periods (defined below).

5. The Individual Closure Periods for each of the Greater California Clubs was/is as follows:

a. 3610 Barnett Ave, LLC: Closed from 3/20/20 to 5/24/20. This location has not had live entertainment since before 2020.
b. Cathay Entertainment, Inc.: Closed pre-2020.
c. Coldwater, LLC: Closed from 3/16/20 to 4/29/21. This location has suffered dramatically due to various limitations, including a mask mandate, vaccination mandate, distance requirements, etc.
d. Deja Vu Showgirls – Sacramento, LLC: Closed from 3/21/20 to 2/11/21. This location has suffered dramatically due to various limitations, including a mask mandate, vaccination mandate, distance requirements, etc.
e. DV of LA, LLC: Closed from 3/11/20 to 6/14/21. This location has suffered dramatically due to various limitations, including a mask mandate, vaccination mandate, distance requirements, etc.
f. EF5 Acquisitions Group, LLC: Closed pre-2020.
g. Grapevine Entertainment, Inc.: Closed from 3/19/20 to 5/15/20, 5/18/20 to 6/12/20, 6/30/20 to 7/16/20, and 8/4/20 to 9/10/20. This location has suffered dramatically due to various limitations, including a mask mandate and distance requirements, along with having to close repeatedly.
h. Hollywood & Vine Club, LLC: Closed from 3/17/20 to the Present. This location has been unable to reopen as of this time.
i. Jolar Cinema of San Diego, Ltd.: Closed from 3/20/20 to 6/17/20. This location has not had live entertainment since before 2020.
j. Nite Life East, LLC: Closed from 3/16/20 to 6/11/20 and 7/10/20 to 3/12/21. This location has suffered dramatically due to various limitations, including a mask mandate and distance requirements, along with having to close repeatedly.

///

k. Showgirls of San Diego, Inc.: Closed from 3/18/20 to 6/11/20 and 7/14/20 to 6/11/21. This location has suffered dramatically due to various limitations, including a mask mandate and distance requirements, along with having to close repeatedly.

l. Stockton Enterprises, LLC: Closed from 3/20/20 to 5/30/20, 6/30/20 to 9/24/20, and 12/5/20 to 1/28/21. This location has suffered dramatically due to various limitations, including a mask mandate and distance requirements, along with having to close repeatedly.

6. While closed, the Greater California Clubs diligently pursued strategies to cut expenses. None of the Greater California Clubs were able to secure relief under any of the Pandemic-related relief bills passed by Congress due to regulations purporting to bar businesses that derive revenue from entertainment of a "prurient sexual nature" from accessing such assistance. *See* Deja Vu-San Francisco LLC v. United States Small Bus. Admin., No. 20-CV-03982-LB, 2020 WL 6260010, at *7 (N.D. Cal. Sept. 11, 2020). As such, the Greater California Clubs went into "hibernation" mode to preserve resources to cover essential expenses in hope of enduring the Pandemic and emerging as viable businesses when reopening was permitted.

7. While the Greater California Clubs that survived the pandemic were permitted to partially reopen at various times, business has generally remained slow and most of the Greater California Clubs are struggling to operate effectively and profitably. Moreover, due to the Delta variant of the COVID-19 virus, as well as the new Omicron variant, the continued operations of the Greater California Clubs is far from assumed going forward. The Pandemic is in charge. Simply put, while the Greater California Clubs that survived the Pandemic thus far have

///

///

///

reopened, they are operating on truncated schedules with less-than-full staffing and often at losses. It is unclear when, if ever, business operations will be revitalized.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 1/6/2022

RYAN CARLSON